UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| EASTSIDE LINCOLN MERCURY, INC., et al., | : | |
| | : | |
| Plaintiffs, | : | Case No. C-1-01-567 |
| | : | |
| v. | : | Judge Susan J. Dlott |
| | : | |
| FORD MOTOR COMPANY, et al., | : | |
| | : | |
| Defendants. | : | |

**FORD DEFENDANTS' REPLY IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT**

**A.    Plaintiffs Did Not Meet Their Burden In Responding To A Motion For
Summary Judgment.**

In response to a Motion for Summary Judgment, "the nonmoving party has a reciprocal
burden to respond, by affidavit or as otherwise provided in the rule, in an effort to demonstrate
that there is a genuine issue of material fact suitable for trial." *Werman v. Green*, 2001 Ohio
App. LEXIS 1555 at *4-5 (Lake Cty.) (Exh. A).  "Hunches and mere speculation" are
insufficient to satisfy this burden.  *Id.* at *7.  Although plaintiffs filed a sixty-six page novelette,
all plaintiffs have demonstrated is that their paranoia and extrapolated conclusions are still the
sole support for their allegations.  This Court should not "indulge [plaintiffs'] profligate reliance
on fanciful and unreasonable inferences in assessing whether [plaintiffs] ha[ve] generated
evidence sufficient to avoid summary judgment." *Wootton Enters., Inc. v. Subaru of Am., Inc.*,
134 F. Supp. 2d 698, 703 (D. Md. 2001), *aff'd*, 2002 U.S. App. LEXIS 7180 (4th Cir. 2002); *see
also Neely v. St. Paul Fire & Marine Ins.*, 584 F.2d 341, 345-46 (9th Cir. 1978) (guess and
speculation would not support jury verdict, so insufficient to avoid summary judgment).

Moreover, in many instances, plaintiffs make factual allegations for which they have given this Court no citation. Without specific reference to affidavit or deposition testimony, these assertions are insufficient to create a genuine issue of material fact, as this Court has no duty to comb the record in search of triable issues.[1] *See, e.g., Firestone v. Galbreath*, 895 F. Supp. 917, 934 (S.D. Ohio 1995). In other instances, they attempt to rely on clearly inadmissible hearsay (anonymous telephone calls) or simply misstate the record. These references, likewise, do not create genuine issues of material fact.

**B.      Plaintiffs Offer No Evidence Of Damages Caused By The Ford Defendants.**

Plaintiffs responded to the Ford Defendants' initial arguments regarding damages with page after page of irrelevant, misleading, or out-of-context "citations" to the record. Plaintiffs' "kitchen sink" approach, however, has done nothing to create an issue of fact regarding the existence of damages. Plaintiffs have offered insufficient evidence of damages to support any of the alleged causes of action against the Ford Defendants because they have no expert testimony and because their speculative and conclusory fact-witness testimony is far from the quality of evidence required by Ohio law.

**1.      Plaintiffs Lack Any Expert Testimony Regarding Damages.**

**a.      Plaintiffs' Disregard Of Expert Disclosure Requirements Bars Them From Introducing Expert Testimony.**

Plaintiffs' consistent failures to satisfy their expert witness disclosure obligations under both the Federal Rules of Civil Procedure and this Court's Orders are detailed in (1) Ford Defendants' Memorandum in Opposition to Plaintiffs' Motion for Leave to Identify Additional Expert Witness (filed on June 30, 2003); (2) Defendant Ford Motor Company's Motion to Exclude the Testimony of Plaintiffs' Expert Witnesses (filed on August 28, 2002); and (3) Ford

---

[1] Moreover, plaintiffs even failed to make many of the deposition transcripts from which they cite part of the record as required by Rule 56(c).

Defendants' Memorandum in Support of Their Motion for Summary Judgment (filed on July 1, 2003). Rather than repeating those arguments in their entirety here, the Ford Defendants simply incorporate those arguments by reference. In sum, because plaintiffs have utterly failed to satisfy their obligations to disclose information regarding their proposed expert witness, they are barred from presenting any expert evidence whatsoever. *See, e.g.*, Fed. R. Civ. P. 26(a)(2)(B) and 37.

### b.    The Affidavit Of Roger Bean S*till* Fails To Meet The Disclosure Requirements Of Rule 26, Or The Requirements of Rule 56.

Rule 26 mandates that plaintiffs disclose, among other things, both a complete statement of the proposed expert's opinions and *the basis for those opinions*. Fed. R. Civ. P. 26(a)(2)(B). Roger Bean's Affidavit ("Bean Affidavit") contains neither a complete statement of Mr. Bean's opinions, nor the basis for those opinions. Instead, in instance after instance, the Bean Affidavit provides only conclusory and general statements of opinion with *no statement of the basis for the opinion or how the estimates of damages were calculated or how conclusions were reached. See, e.g.,* Bean Aff. at ¶¶ 5, 7(a)-(d), 8, 9, and 10. In some instances, the Bean Affidavit states only that plaintiffs have been damaged and fails to even calculate an amount of alleged damages, let alone set forth the detailed basis for the opinion. *See, e.g.,* Bean Aff. at ¶¶ 10 and 11.[2] Therefore, if the Bean Affidavit was intended to serve as a substitute for a timely expert report, it too fails to meet the most basic requirements of Rule 26, and for that reason alone, should be disregarded.[3]

Even if the Bean Affidavit is considered by this Court, it is not sufficient to meet plaintiffs' burden under Rule 56(e), for the same reasons that it does not meet the requirements of Rule 26. The Bean Affidavit's conclusory statements of alleged damages are insufficient to

---

[2] For example, Mr. Bean opines that ELM has suffered "depressed net worth." Bean Aff. at ¶ 11.
[3] Any use by the Court of this report/affidavit would also unfairly prejudice all of the defendants who had no notice of the opinions in the Bean Affidavit until after discovery was complete and their motions for summary judgment had been filed.

create a genuine issue of material fact with regard to damages under Ohio law, as is set forth in detail below.

> **2.    Plaintiffs Can Offer No Fact-Witness Evidence Of Damages Sufficient To Support Their Claims.**

Plaintiffs cannot recover damages that are not proved with reasonable certainty – damages are simply not recoverable if they are uncertain or speculative in nature.  *Anchor v. O'Toole,* 94 F.3d 1014, 1020 (6th Cir. 1996) (lost profits must be shown with reasonable certainty and may not be remote or speculative); *Silver Cloud, Inc. v. Quikut,* 1994 U.S. App. LEXIS 23860 at *16 (6th Cir. 1994) (damages may not be remote or speculative) (Exh. C); *Doner v. Snapp*, 98 Ohio App. 3d 597, 606 (Miami Cty. 1994) (affirming summary judgment where plaintiff failed to demonstrate damages with reasonable certainty).

Such "reasonable certainty" is *not* established by mere conclusory statements of damages, without a detailed explanation of exactly how the amount was calculated.  *See, e.g., Baumer v. Franklin Cty. Distilling Co.*, 135 F.2d 384, 390 (6th Cir. 1943).  As the Ohio Court of Appeals recognized in *Kinetico v. Independent Ohio Nail Co.*:

> More is required of the plaintiff than merely his assertion (either directly or through an expert witness) that he would have made a particular amount in profits.  Unless the figure is substantiated by calculations based upon facts available or in evidence, the courts will properly reject it as speculative or uncertain.

19 Ohio App. 3d 26, 30 (Cuyahoga Cty. 1984) (citations omitted).  Citing *Kinetico* and other Ohio cases, the Sixth Circuit agreed:

> Substantial certainty requires "more than a conclusory statement as to the amount of lost profits."  [citation omitted]  Rather, the plaintiff must substantiate the claimed amount by placing in evidence facts "with respect to overhead costs or a breakdown of expenses, parts, labor, etc."  [citation omitted].

*Silver Cloud,* 1994 U.S.App. LEXIS at *17.

Because it is plaintiffs' burden to prove damages, if plaintiffs fail to set forth sufficient evidence of damages, it would be error to allow a jury to speculate about the value of alleged damages, *Anchor,* 94 F.3d at 1021; *Massera v. Gulf Oil*, 1988 Ohio App. LEXIS 5426 at *7 (Cuyahoga Cty.) (Exh. D), and such evidence is insufficient to overcome a motion for summary judgment.

While plaintiffs cite sporadic deposition testimony generally asserting harm at the hands of the Ford Defendants, they cite nothing more – no specific calculations, quantifications, calculation methodology, substantiation, nor anything similar, as required by Ohio law. Plaintiffs offer only that "we've been hurt" and expect the Ford Defendants and this Court to simply take their word that their calculations and conclusions are legitimate.

For example, in support of their claim for $300,000-$600,000 for the refusal to allow plaintiffs to relocate and "dual" their facility with Chevrolet, plaintiffs cite the deposition testimony of Mr. Woeste.   Mr. Woeste's testimony, however, is obviously conclusory, speculative and well-short of the requirement of Ohio law: "it's a huge number that *we kind of thought was somewhere between* three and five or $600,000 a year . . . ."  Woeste II at 41 (emphasis added).  Further, plaintiffs' "evidence" of alleged reduced warranty sales provides no basis for the opinion, no calculation methodology, no review of costs or expenses, no evidence of causation, and no indication whatsoever that the alleged damages were due to any wrongdoing by the Ford Defendants.  As a final example, regarding damages allegedly incurred in evaluating the potential purchase of the Florence Lincoln Mercury store, plaintiffs muster testimony only that it was "thousands of dollars."   Again, plaintiffs offer no specifics, no calculations, no methodology, and no evidence of invoice or payment.  As noted repeatedly by Ohio courts, such conclusory and speculative opinions are little more than guesswork and are insufficient support

for any claim of damages under Ohio law.

Further, plaintiffs offer no testimony or other evidence establishing that their damage calculations have fully considered all necessary expenses and/or deductions – *i.e.,* that their calculations are "net" calculations rather than just "gross" estimates.[4]  Damage calculations *must* consider all necessary expenses or they are insufficient to support a claim.  *Digital & Analog Design Corp. v. North Supply Co.,* 44 Ohio St.3d 36, 40 (1989) (damages evidence based upon gross, rather than net, profits must be considered speculative and an insufficient basis for an award of damages); *Kinetico,* 19 Ohio App. 3d at 30; *Thomasville Furniture Indus. v. Elder-Beerman Stores,* 250 B.R. 609, 624 (S.D. Ohio 1998) (under Ohio law, plaintiff must prove not only gross profits, but also expenses and costs associated with obtaining those profits).  No such expenses, deductions, or costs are provided by the plaintiffs here.

Plaintiffs wholly ignore the fact pointed out in the Ford Defendants' Motion for Summary Judgment that their own key witnesses expressly disclaimed specific and first-hand knowledge of damage calculations and quantifications.  Beattie at 163, 183 (he has limited access to information and has not done a damage calculation) (Exh. E); Woodall at 40-41, 104, 123 (he is not capable of completing a damage calculation (Exh. F); Woeste II at 5-7, Woeste I at 53-54 (his dealership is more valuable today).  Plaintiffs' speculative and unsupported conclusions that "we've somehow been hurt" do nothing to overcome these witnesses' express disclaimers of specific, first-hand knowledge of the calculation and quantification of damages.  Simple conclusions, without specific, first-hand evidence of damages quantification are insufficient to support a claim of damages under Ohio law.

---

[4]  Even Mr. Bean's calculation of alleged lost profits because of warranty process manipulation is admittedly an estimate of "lost gross profits," rather than *net* profits.  Bean Affidavit at ¶8(A).

### C.    Consolidation Is Not "The Root of All Evil."

No factual dispute exists that Lincoln-Mercury developed a business strategy to consolidate many markets across the country, including Cincinnati.  No dispute exists that Mr. Woeste was not chosen as the desired consolidator of the Cincinnati market.  No dispute exists that Ford pursued this plan to improve its brand image in the market.  No dispute exists that Ford did not sit down with Mr. Woeste and lay out its approach to seeking to improve Lincoln Mercury's standing in the market and explain to him that it would like for someone to purchase his store.

Formation and implementation of a business strategy that attempts consolidation, however, is not a breach of the contracts between Eastside and Ford, is not a violation of statute, and does not constitute a tort.  Plaintiffs have provided no evidence or law to the contrary.  Moreover, plaintiffs have no evidence that Ford or its employees used illegal means to effectuate consolidation, or that any of the conduct about which plaintiffs now complain was done for the purposes of forcing Eastside to fit within the consolidation efforts.  Absent any proof of such motivation, plaintiffs' claims all fail as a matter of law.  *See, e.g., Wootton,* 134 F. Supp. 2d at 716-17 (citations omitted).

While plaintiffs claim that it is "hotly disputed" whether the consolidation plan was voluntary, they have not produced *any* evidence that Ford or Jerry Carter ever sought to use improper means to force Eastside out of business or to sell at a below market price.  In an effort to create the illusion of evidence,[5] on page 13 of their Opposition, plaintiffs state:

---

[5]  Plaintiffs employ similar misleading and fundamentally unsubstantiated representations to impugn the veracity of Mr. Carter on matters not directly germane to this matter.  Although these references are misleading and false, refutation of these allegations is not necessary to defeat plaintiffs' claims, and would distract from the relevant issues.

> In 1999, an unidentified person at Ford provided Mr. Woeste with both telephone calls and highly sensitive documents, including the 1999 GSP and Jerry Carter's performance evaluation, which indicated that Ford was illegally aiding Reichert/KDG and intended to replace Mr. Woeste as dealer principal so that Ford could award the franchise to Reichert/KDG.

Plaintiffs first point to anonymous calls that they, without any support, now claim came from a person at Ford. The contents of anonymous calls from anyone, however, are not evidence. Next, plaintiffs allude to the fact that Eastside was listed as a "dealer replacement opportunity" on the 1999 Growth Strategy Plan. Nothing in this Plan and none of the testimony about the Plan shows or tends to show that Ford or Mr. Carter intended to or used illegal means to replace Mr. Woeste or to illegally aid Mr. Reichart or his dealerships. Merely having the subjective view that Eastside might be willing to sell[6] does not mean that Mr. Carter engaged in illegal tactics to insure that his assessment of Mr. Woeste's lack of commitment to the brand could be later validated. This sentence also references Mr. Carter's performance evaluation, which they do not attach, because it is not relevant to any of plaintiffs' claims. The alleged existence of performance incentives relating to consolidation does nothing to establish that improper means were used to achieve a company bonus. No where in plaintiffs' sixty-six pages is there any evidence of any plan to change the ownership of Eastside through illegal means.

Moreover, plaintiffs did not provide this Court with any basis to find that Paragraph 9 of the Sales and Service Agreements were breached by any non-disclosure of the consolidation strategy. No merit can be attributed to attempting to expand the reach of Paragraph 9 of the Agreements by ignoring the definitions of terms set forth in the contracts and explained in the

---

[6] This subjective evaluation was not incorrect. Mr. Woeste admits that he negotiated for the Florence Lincoln Mercury store, including entertaining proposals for swapping Eastside for the Florence location. *See, e.g.*, Woeste I at 123-24. He actively negotiated with Mr. Reichert for the sale of Eastside. Woeste I at 52-56. If Eastside did not want to sell under any circumstances, it would not have engaged in any of these discussions.

Motion for Summary Judgment.[7]  Superimposing a definition of "franchise action" given by Mr. Carter in his deposition in response to a question that did not even relate to Paragraph 9 does not mystically increase Ford's contractual disclosure obligations.  As set forth in Ford's Motion for Summary Judgment, the disclosure requirements of Paragraph 9 are very specific.  Plaintiffs have offered no evidence that those requirements were breached or that plaintiffs were damaged by any non-disclosure of the consolidation plan.

### D.    Negotiations for a Lincoln Mercury Store in Florence Are Not Actionable.

Plaintiffs argue that the failed negotiations for the Florence, Kentucky Lincoln Mercury store between Ford and Mr. Woeste also create some cause of action, presumably for fraud, as negotiations for the purchase of a separate business cannot be the basis for a breach of the current contracts between the parties, nor a violation of the franchise statutes that exist to protect franchises that have been consummated.  Plaintiffs, however, have failed to identify any aspect of the Florence negotiations that could satisfy the requirements of a claim for fraud.  Plaintiffs have not identified any specific factual statement that they claim was not true when made.  Plaintiffs have not identified any aspect of the relationship between themselves and Ford that created a duty to speak, nor have they identified any manner in which they relied upon any allegedly false statements.

Rather, what plaintiffs have described is a series of negotiations that failed.  Plaintiffs do not refute that Mr. Woeste voluntarily engaged in these negotiations and sought the advice of an accountant.  *See, e.g.,* Woeste I at 125.  Plaintiffs have not cited to any evidence that Mr. Carter entered into these negotiations simply for the purpose of inducing Mr. Woeste to expend funds

---

[7] As was explained in detail in the Ford Defendants' Motion for Summary Judgment, the disclosure requirements of Paragraph 9(b) extend only to decisions that representation within a dealers' locality is no longer needed, that additional representation (a new dealership) within the locality is needed or that the current location of the dealership within the locality should be moved.  *See* Motion at 13-14.

on this accountant or to use the accountant's assessment of the deal to shop it to other buyers, or that the assessment was in fact shown to other potential buyers.

Prospective business associates engage in negotiations where money is expended and no deal is done on a daily basis – these failed negotiations do not create actions for fraud. *See, e.g., Properties Dev. Co. v. Bingham*, 1990 Ohio App. LEXIS 3512 at *8 (Lake Cty.) (even with existing letter of intent, failure to disclose impending sale to third party is not fraud) (Exh. G). Without any evidence of a false statement or any other illegal conduct, any claim based on the Florence negotiations must fail as a matter of law.

**E.     Ford's Dualing Decisions Do Not Create A Cause of Action.**

Plaintiffs complain at some length about Ford's decisions to deny Eastside's request for a change in location and permanent dual with Chevrolet[8] in 1999 and to grant Mr. Reichart's request to temporarily dual his Lincoln Mercury store to allow for an assessment of the market and the potential construction of a stand alone facility.[9]     Despite the fact that plaintiffs are obviously in disagreement with the exercise of Ford's business judgment about the placement of its franchise locations (a right specifically reserved by Ford under its Agreements at Paragraph 5(c), and not abrogated by the Ohio dealer statutes, *see, e.g.,  Flynn v. General Motors Corp.*, Case No. 02-02-MVDB-263-SS (Exh. H)), plaintiffs never explain how these decisions create a cause of action.

Furthermore, plaintiffs cannot explain how a decision to allow another dealer to engage in a temporary dual is threatening, coercive or intimidating to Eastside or Mr. Woeste, within the

---

[8]   Plaintiffs never had permission from General Motors for this proposed dual, either.  Woeste II at 43.
[9]   Given the disparity of the factual circumstances of the two situations, even under plaintiffs' own description, no claim for discrimination under O.R.C. Section 4517.59(M) can be viable, as discrimination infers two parties that are similarly situated.  In fact, plaintiffs have never stated that their claim with regard to the refusal to relocate falls under subsection (M) of 4517.59.

meaning of either the Dealer Day in Court Act or the Ohio franchise statutes.  *Cf. Normandy Ford, Inc. v. Ford Motor Company*, Case No. 96-5-9105-JS at 27 (Bank. D. Md. August 5, 2002) (failure to allow relocation and grant of same location to another dealer is not coercion as a matter of law) (Exh. I).  Rather, the standard is whether the manufacturers' decision with regard to Eastside's request was "commercially justifiable."  *Jim White Agency Co. v. Nissan Motor Corp.*, 126 F.3d 832, 835 (6th Cir. 1997).  Mr. Carter testified that he denied Eastside's request because he did not believe that the new location was an improvement and he did not want to allow a permanent dual with Ford's largest competitor.  Carter at 187-88 (Exh. J).  Exercise of Ford's contractual right, based upon these commercially justified reasons, cannot be the basis for a claim of coercion, intimidation or threat.  *Bill Call Ford, Inc. v. Ford Motor Company*, 48 F.3d 201, 207 (6th Cir. 1995); *Jaguar Cars v. Blackhorse Motorworks, Ltd*., 1998 U.S. Dist. LEXIS 22858 at *7 (E.D. Ky. 1998) (Exh. K).

**F.    Eastside's Failure To Qualify For Lincoln Premier Experience Is Not Actionable.**

Plaintiffs are also unhappy that Eastside failed initially to qualify for Lincoln Premier Experience ("LPE").[10]  Again, however, plaintiffs cannot explain how this failure is actionable under any of the causes of action set forth in their Complaint.  LPE is not a contractual entitlement.  Disqualification of Eastside does not violate the statutes relied upon by plaintiffs.  There are no false statements alleged to have been made with regard to LPE.

Rather, the undisputed evidence is that Eastside was inspected by an employee of JD Powers who determined that Eastside should fail the image requirement of LPE because of some

---

[10]    LPE is a program that established facility standards, process check standards and customer satisfaction processes, all designed to improve the sales and service experience for Lincoln's consumers.  Dealerships that meet these standards receive bonus monies based on these levels of customer satisfaction.  Csernotta at 38-39.

discoloration on its facade.  Csernotta at 170 (Exh. L).[11]  This decision was appealed to a five member board, which consisted of two dealers, two factory representatives who were chosen by the dealer council, and a person not affiliated with Ford or the dealers (none of which had any connection to the Cincinnati Region), who reviewed all dealer LPE appeals.  *Id.* at 130.  The decision of the board was unanimous to uphold the disqualification.  *Id.* at 169.[12]  Moreover, to the extent that it is even relevant, one Reichert store failed LPE as well.  Reichert at 240 (Exh. M).  A second Reichert store was give a waiver from Lincoln Mercury offices in Irvine (not the Cincinnati Region) as to the image requirement because of impending renovations.  Huser at 63 (Exh. N).  Therefore, these actions by Ford do not create a cause of action upon which plaintiffs may be heard, as a matter of law.

   **G.    Plaintiffs Do Not Have A Claim Based On Inequitable Allocation of Marketing Funds.**

   Significantly, plaintiffs have again failed to point out a single case in which any court has determined that an alleged inequitable distribution of marketing assistance between franchisees is a violation of any law.  Rather, plaintiffs offer the testimony of Ford employees as to what constitutes company policy regarding marketing assistance.  Plaintiffs, however, have no standing to sue over Ford's internal operating procedures.

   Moreover, even if an inequitable distribution of marketing funds could be construed as "discrimination" under O.R.C. Section 4517.59, plaintiffs lack evidence of any such inequity.  Plaintiffs first rely on an anonymous phone call with regard to an alleged payment of $50,000 to Reichert's franchises.  Anonymous telephone calls are not evidence, and any claim based upon

---

[11] Whether this JD Powers inspector did or did not also have some affiliation with Volvo, a completely separate subsidiary of Ford Motor Company, is not evidence that the inspector failed Eastside to further a scheme by Ford or Mr. Carter to force Eastside out of business.

[12] Mr. Csernotta's statement that the picture of the dealership that he was shown at his deposition might not support failure in his mind is not relevant.  The only potential question is whether the reviewer or the appeal board acted in furtherance of a scheme to coerce plaintiffs.  Plaintiffs have not and cannot offer any evidence of this sort.

that "fact" must fail.   Rules 801 and 802, Federal Rules of Evidence; *see, e.g., Phillips v. Holladay Property Servs., Inc.*, 937 F. Supp. 32, 36 (D.D.C. 1996) (citation omitted).  Plaintiffs next complain about $105,000 that was paid out of the co-op advertising budget to pay Mr. Reichert for money owed him on a transaction for another dealership to which plaintiffs were not parties.  This payment, however, cannot be shown to be discriminatory.  Mr. Carter testified that Reichert's organization conducted advertising to match the amount paid.    Carter at 109. Plaintiffs do not refute this.  Neither do they claim that they attempted to apply for co-op advertising funds that were denied to them.  Moreover, as Mr. Reichert testified, this money was owed to him by Ford Motor Company in a transaction unrelated to plaintiffs.  Payment of that debt, from whatever budget, does not discriminate against plaintiffs.

Plaintiffs also allege that Reichert's stores were given $10,000 in marketing monies and told to "make up" a program to justify its receipt.  Memo. In Opp. at 26.  Yet, a review of the testimony cited makes clear that plaintiffs have simply misstated the facts.  Both gentlemen cited by plaintiffs testified that the money was offered to Reichert's stores to address a problem with aged inventory.  J. Mullins at 21 (Exh. O); Huser at 25.  Use of discretionary funds for these purposes is neither discriminatory nor improper.  The only reference made to "making up" a program was with reference to the development of a program by the dealerships to sell the old vehicles.  Plaintiffs' blatant mischaracterization of the evidence does not create an issue of fact.

Lastly, plaintiffs point to the testimony of Mr. Gene Mullins as alleged evidence of the alleged payment of preferential marketing moneys.  The only marketing money that Mr. Mullins claimed was discriminatorily spent was a contest that his dealership won that entitled his salespersons to select clothing from a local store at Ford's expense.  E. Mullins at 49-50 (Exh. P).  How exactly this contest unfairly benefited Reichert's *dealerships*, or otherwise adversely

impacted Eastside, is not explained. Significantly, plaintiffs take advantage of Mr. Mullins' testimony that this contest was allegedly not offered to all dealerships, but fail to inform this Court that it won this very same contest the year before. See Letter from J. Zimmerman to D. Snider (Exh. Q). Plaintiffs have failed to sustain their burden of offering any evidence that marketing monies were distributed discriminatorily. Therefore, this claim, too, must fail as a matter of law.

   **H.    Plaintiffs Have No Claim For The Inequitable Allocation of Vehicles.**

   Plaintiffs' claim with regard to allocation fails for several reasons. First, plaintiffs admit that without an allocation expert, they cannot set forth any claim with regard to liability or damage based on any alleged illegal behavior with regard to allocation. Memo. in Opp. at 38. Plaintiffs never designated an allocation expert and have not even offered any testimony of any purported allocation expert. Moreover, plaintiffs' promise to provide this expert at a yet unspecified date does not sustain their burden under Rule 56. Therefore, plaintiffs' claims relating to allocation should fail as a matter of law.

   In addition, plaintiffs' allocation claims misrepresent the purpose of allocation statutes and the language of the contract dealing with allocation. Vehicle allocation exists because manufacturers have limited production capabilities. It simply is not possible for every dealer to have every vehicle in every color, with every accessory that it would prefer, when it would prefer to receive them. Therefore, manufacturers have developed allocation systems that distribute vehicles to dealers based on a number of factors, including prior sales and numbers of vehicles in a dealers' inventory. With a new model, this allocation must be done with regard to sales of similar types of vehicles.

Significantly, plaintiffs are not arguing that Ford ever withheld earned allocation from them. Such evidence is crucial to a valid allocation claim. *Cabriolet Porsche Audi, Inc. v. American Honda Motor Co.*, 773 F.2d 1193, 1210 (11th Cir. 1985). Rather, with regard to new vehicle roll outs (models, dates, number are never specified),[13] they rely on the anecdotal testimony of Mr. Beattie that Eastside did not receive new vehicles at roll out at the same time as their competitors. Such "evidence" is insufficient to state an allocation based claim. *Wootton*, 134 F.Supp.2d at 705; *Colonial Dodge, Inc. v. Chrysler Corp.*, 11 F.Supp.2d 737, 751-52 (D.Md. 1996) (finding lack of specificity in expert's report fatal to malallocation claim).

Moreover, plaintiffs blame this lack of a model at rollout on the fact that Mr. Carter did not take ten percent of the vehicles that were allocated to the 150 dealers in the Cincinnati region and make sure that Eastside had one. Failure to maintain a discretionary pool of vehicles, however, is not a contractual or statutory violation. *See* Agreements at Paragraph 2(c)(1) and O.R.C. Section 4517.59; *see also Colonial Dodge*, 11 F.Supp.2d at 744 ("A dealer is entitled only to the cars due under the allocation system, not all the automobiles it requests.") Maintenance of a pool would have meant that at least one of the other 150 dealerships in the Region who otherwise earned a vehicle would nonetheless not get one because Mr. Carter had decided to give it to Eastside. Or, a pool would have nevertheless required choices between dealers as to who received a vehicle as no pool could "cover" every dealership in the Region. Mr. Carter's decision to avoid the appearance that he was playing favorites and to allow the allocation system to play itself out is simply not actionable.

---

[13] This lack of specificity is because Lincoln Mercury only rolled out two new vehicles, Lincoln LS and Lincoln Blackwood, during the period in question – the date of the GSP (1999) until the filing of the Complaint (2001). Even if plaintiffs meant to include models that had been refreshed, this would add only another six vehicles. Fisher at 32-35 (Exh. S). Even if plaintiffs could show that Eastside did not get a model of each of these vehicles at roll out, which so far they have not, their allocation case would be about the timing of the shipment of eight vehicles.

Moreover, Aviator is not an issue, by plaintiffs' own admission. Regardless of the truth or falsity of the story related, however, the outcome of the story is that Eastside received the vehicle in question.

In addition, plaintiffs point to the testimony of Mr. Gene Mullins to allege some generalized "manipulation of the allocation process."  Mr. Mullins actually claims that the dealership in which he worked was given an inordinate number of Grand Marquis and Town Cars in the summer of 2000, and that *he was told* that it came from the "inventory" of Eastside, E. Mullins at 83-85, although he earlier admitted, "I really can't answer where the cars came from."  *Id.* at 82.  Significantly, Eastside has not claimed that Ford removed vehicles from its inventory[14] or that it was deprived of its earned allocation of Grand Marquis or Town Cars during any time period, let alone the summer of 2000, or that Grand Marquis or Town Cars were *ever* scarce vehicles, all of which it must show to sustain its burden to make a claim under O.R.C. Section 4517.59.  *See Earl Evans Chevrolet v. General Motors*, 74 Ohio App.3d 266, 276 (Lake Cty. 1991).  Without any evidence of damage, or any allegation that Eastside was deprived of vehicle allocation that it had earned through Ford's uniformly applied allocation system, plaintiffs' claim based upon allocation fails as a matter of law.

## I.    Warranty Audits Are Not Actionable.

In another example of how plaintiffs would like to be treated like everyone else, except when they do not like the outcome, plaintiffs allege that Ford's warranty audit of Eastside is somehow actionable.  Significantly, plaintiffs do not refute the statements in the Ford Defendants' Motion for Summary Judgment that prior to this third audit, plaintiffs had been in the warranty counseling process since 1993, were selected for audit under an objective standard administered by an operating unit of Ford, Global Warranty Operations, that exists and functions separately from the Regions, and were administered a penalty for their warranty results that came from a standardized matrix that is applied to every dealership in the country that has any negative

---

[14] Ford, of course, cannot remove vehicles from Eastside's inventory as it had *sold* all of the vehicles in Eastside's inventory to Eastside.

findings following an audit.  Nor did plaintiffs deny that Ford is contractually entitled to conduct audits of dealerships' warranty operations.  Finally, plaintiffs offer no evidence as to how they were damaged by the audits, other than Mr. Beattie's hearsay statement that Eastside technicians did not record warranty repairs for fear of another audit.  Without evidence of any of these factors, plaintiffs claims fail as a matter of law.  *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 97 (3rd Cir. 2000) (failure to show that audit was not appropriate and that punishment was disproportionate was fatal to claim of intimidation by warranty audit).

Rather, the best that plaintiffs allege is that Mr. Carter knew that there was going to be an audit, that the standardized letter that all audited dealerships receive is "threatening," and that Mr. Carter must have lied about opposing termination of the dealership if Eastside refused to engage an in-dealership consultant as required under the matrix.  These "facts" do not create a violation of the Dealer Day in Court Act or the Ohio Revised Code.  Eastside's failure to conduct proper warranty repairs is grounds to charge a dealership for improperly paid claims and to suggest more aggressive penalties if the dealership does nothing to address the fact that it continues to be consistently "flagged" as a dealer with anomalous warranty performance.  The audit matrix states that termination should be recommended if the dealership refuses to engage an in-dealer consultant.  Exh. R (referenced in Walls Affidavit attached to Motion).  Plaintiffs have provided no evidence that this nationally standardized penalty was not solely an effort by Ford to encourage its dealerships to be proactive about getting out of the warranty counseling process, but rather some individualized attempt to force Eastside out of business.   Moreover, plaintiffs themselves acknowledge that when termination was discussed internally, Mr. Carter stepped into the process and refused to accept any recommendation of termination that may have been discussed by Global Warranty.  Memo. in Opp. at 21.

Any question whether Mr. Carter had knowledge that an audit was going to occur or did or did not have an agreement with FCSD prior to the closing meeting is simply not relevant to anything.  Regardless of whether Mr. Carter did or did not support termination if Eastside refused to hire an in-dealership consultant does not change the fact that this was the penalty that Ford had determined was applicable to *all* audits with any findings.  Enforcement of this uniform policy by Mr. Walls at the close of the audit, with or without a "deal" with Mr. Carter, does not violate either the Agreements nor any statutory provision.

**J.    Plaintiffs' Claim For Civil Conspiracy Also Fails As A Matter Of Law.**

Plaintiffs allege that a conspiracy existed between Ford, Mr. Carter, Mr. Walls and Reichert to force Eastside out of business.  Aside from the reasons set forth in the Ford Defendants' Motion for Summary Judgment, which remain valid, plaintiffs' responsive brief also demonstrates that plaintiffs lack any evidence that any such conspiracy was formed between Ford or its employees and Reichert.[15]

Plaintiffs attempt to create this evidence from the Right of First Refusal that was entered into between Kenwood Dealer Group and Ford because the agreement purports to give Mr. Reichart control over franchise decisions north of the Ohio River.  Despite the fact that this document purports to give Mr. Reichart rights that he cannot have, it contains no evidence that either Ford or Kenwood or the two in combination agreed to do anything to force Eastside out of business.  Again, it simply affirms that a strategy did exist for Mr. Reichart to own all of the Lincoln Mercury stores in the Cincinnati market; in no way does it show that illegal means were

---

[15] Plaintiffs cannot allege that any conspiracy existed between Ford and its employees, as such a claim is not cognizable as a matter of law.  *BSW Dev. Corp. v. City of Dayton*, 1995 U.S. Dist. LEXIS 22173 at *28 (S.D. Ohio) (Exh. T).

to be used to achieve that goal.  For these reasons, plaintiffs claims for civil conspiracy must also fail as a matter of law.

**K.    Plaintiffs' Claims Do Not Become Actionable In Aggregation.**

Plaintiffs have not presented this Court with any evidence that any of the business dealings between Ford and Eastside were conducted for the purpose of forcing Eastside to sell or to force it out of business.  There are no e-mails, memoranda, letters, conversations, meetings, threats or notes setting forth any desire or agenda to force Eastside into an unwanted consolidation.  Plaintiffs can point to nothing, other than their own speculation, that anyone at Ford wanted to force Eastside into a sale or out of business.

Finally, Eastside remains in business selling and servicing Lincoln Mercury products to this day.  Despite this undeniable fact, plaintiffs claim that they can still make a claim for constructive termination, under either the statutes or its Agreements with Ford.  On this point, they cite to *Imperial Motors, Inc. v. Chrysler Corp.*, 559 F. Supp. 1312 (D. Mass. 1983).  In *Imperial Motors*, however, constructive termination was recognized because Imperial Motors went out of business even though it had not been officially terminated by the manufacturer.  As was stated in the Ford Defendants' Motion for Summary Judgment, any cognizable claim for constructive termination requires that the dealership cease to do business.  Absent an actual termination, express or constructive, no cause of action can accrue under the statutes relating to wrongful termination and no breach of the termination provisions of the Agreements can occur.

**L.    Mr. Woeste Lacks Standing To Assert Any Claims.**

Plaintiffs attempt to refute the overwhelming authority that states that Mr. Woeste has no standing as a shareholder to assert claims that properly belong to the dealership corporation by

pointing to some of the penalties associated with the third warranty audit of Eastside.[16]  Aside from whether this is sufficient to confer standing, plaintiffs have a more fundamental problem – none of the penalties associated with the third audit were ever carried forward.  Walls at 102 (Exh. U).  In addition, despite Mr. Woeste's protestations, he is contractually obligated to sign all warranty claims under his current Agreements with Ford regardless of any audit.  Agreements at Paragraph 4(b)(3).  Furthermore, he has no right to any additional franchises under any of the Agreements or statutes at issue in this matter; and he himself admits that he has no evidence that his negotiations with Volvo in Northern Kentucky were in any way impacted by the warranty audit.  Woeste I at 57.  Therefore, even under plaintiffs' analysis, Mr. Woeste's individual claims against the Ford Defendants must be denied.

For all of the forgoing reasons and those set forth in their Motion For Summary Judgment, Ford Motor Company, Jerry Carter and A.W. Walls are entitled to judgment in their favor as a matter of law.

Respectfully submitted,

_____
Elizabeth A. McNellie (0046534)
BAKER & HOSTETLER LLP
65 East State Street, Suite 2100
Columbus, Ohio  43215
(614) 462-2651
(614) 462-2616 (fax)

Trial Attorney for Defendants Ford Motor Company, Jerry Carter, and A.W. Walls

---

[16] Plaintiffs represent to this Court that the Ford Defendants did not refute Mr. Woeste's ability to assert "personal" fraud claims, Memo. In Opp. at 43, but failed to state what those claims are.  All of the fraud claims related to alleged statements or omissions directed to the corporation.  To the extent that Mr. Woeste has "personal" fraud claims, those fail for the same reasons as the fraud claims of the corporation.  *See* Ford Defendants' Motion for Summary Judgment at 23-25.

OF COUNSEL:

George W. Hairston (0030507)
Brian T. Johnson (0065417)
R. Gregory Smith (0071493)
BAKER & HOSTETLER LLP
65 East State Street, Suite 2100
Columbus, Ohio  43215

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Ford Defendants' Reply in Support of

Their Motion for Summary Judgment was served this ____ day of September, 2003, by regular

United States mail, postage prepaid, upon:

| | |
|---|---|
| Alan J. Statman, Esq. | Steven D. Hengehold, Esq. |
| Gregory Berberich, Esq. | James J. Englert, Esq. |
| Statman, Harris, Seigel & Eyrich, LLC | Rendigs, Fry, Kiely & Dennis LLP |
| 2900 Chemed Center | Fourth & Vine Tower |
| 255 E. Fifth Street | Suite 900 |
| Cincinnati, Ohio 45202 | Cincinnati, Ohio 45202 |
| | |
| Attorneys for Plaintiffs | Attorneys for Defendants |
| Eastside Lincoln Mercury, Inc. | Robert C. Reichert and |
| And William Woeste, Jr. | Kenwood Dealer Group, Inc. |

_____

Elizabeth A. McNellie