# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

EASTSIDE LINCOLN MERCURY, INC.,          :
et al.,                                  :
                                         :
                Plaintiffs,          :          Case No. C-1-01-567
                                         :
       v.                       :          Judge Susan J. Dlott
                                         :
FORD MOTOR COMPANY, et al.,              :
                                         :
                Defendants.          :

## EXHIBITS TO FORD DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

| Exhibit | Description |
|---------|-------------|
| A. | *Werman v. Green*, 2001 Ohio App. LEXIS 1555, *4-5 (Lake Cty.) |
| B. | Woeste Deposition taken March 3, 2003 and March 4, 2003 |
| C. | *Silver Cloud, Inc. v. Quikut,* 1994 U.S. App. LEXIS 23860, *16 (6th Cir. 1994) |
| D. | *Massera v. Gulf Oil*, 1988 Ohio App. LEXIS 5426 at *7 (Cuyahoga Cty.) |
| E. | Beattie Deposition taken March 12, 2003 |
| F. | Woodall Deposition taken February 21, 2003 |
| G. | *Properties Development Co. v. Bingham*, 1990 Ohio App. LEXIS 3512 (Lake Cty.) |
| H. | *Flynn v. General Motors Corp.*, Case No. 02-02-MVDB-263-SS |
| I. | *Normandy Ford, Inc. v. Ford Motor Company*, Case No. 96-5-9105-JS (Bank. D. Md. August 5, 2002) at 27 |
| J. | Carter Deposition dated March 6, 2003 |
| K. | *Jaguar Cars v. Blackhorse Motorworks, Ltd.*, 1998 U.S. Dist. LEXIS 22858, *7 (E.D. Ky. 1998) |

| Exhibit | Description |
|---------|-------------|
| L. | Csernotta Deposition taken March 24, 2003 |
| M. | Reichert Deposition taken April 1, 2003 |
| N. | Huser Deposition taken April 2, 3003 |
| O. | Jerry Mullins Deposition taken April 2, 2003 |
| P. | Gene Mullins Deposition taken June 25, 2003 |
| Q. | Letter to Eastside Lincoln-Mercury, Inc. from Lincoln Mercury |
| R. | Fisher Deposition taken March 20, 2003 |
| S. | Warranty Audit Action Matrix |
| T. | *BSW Development Corp., et al. v. City Of Dayton, et al.* 1995 U.S. Dist. LEXIS 22173 (S.D. Ohio) |
| U. | Walls Deposition taken March 13, 2003 |

REBECCA C. WERMAN, et al., Plaintiffs-Appellants, - vs -DOROTHY GREEN, et al., Defendants-Appellees.
ACCELERATED CASE NO. 2000-L-033

COURT OF APPEALS OF OHIO, ELEVENTH APPELLATE DISTRICT, LAKE COUNTY

2001 Ohio App. LEXIS 1555

March 30, 2001, Decided

PRIOR HISTORY: [*1] CHARACTER OF PROCEEDINGS: Civil Appeal from the Court of Common Pleas. Case No. 99 CV 000234.

DISPOSITION: Affirmed.

CASE SUMMARY:

PROCEDURAL POSTURE: Appellants sued appellee and other defendants, alleging that appellee, through fraud, duress, undue influence or other tortious acts, interfered with appellants' expectancy of inheritance. The Lake County Court of Common Pleas (Ohio) granted appellee's summary judgment motion. Appellants challenged the decision.

OVERVIEW: Appellants argued that summary judgment was inappropriate, because they introduced circumstantial evidence supporting every essential element of their claim. Appellants believed that their deposition testimony showed that defendant executrix was overbearing and exercised virtually total control over family matters. Moreover, appellants submitted that the evidence, while not direct, also demonstrated that because they were related to the decedent, in addition to the fact that comments had been made in the past suggesting that certain heirlooms would be kept in the family, they had a reasonable expectancy of inheritance. The appellate court held the record showed that appellants had very little or no contact with decedent for approximately fifteen years prior to her death. Decedent had not given appellants any gifts or money since the early 1980s. The appellate court further held that appellants failed to introduce any evidence with respect to tortious conduct on the executrix's. The mere fact that defendant executrix had the opportunity to exert influence, along with the family dissention, was simply not enough to prove tortious conduct.

OUTCOME: The decision was affirmed.

CORE TERMS: inheritance, summary judgment, expectancy, nonmoving party, matter of law, initial burden, genuine issue, moving party, appellants filed, cause of action, nonmoving, circumstantial evidence, issues of material fact, entitled to judgment, assignment of error, tortious conduct, undue influence, interfered, genuine, duress, died

LexisNexis (TM) HEADNOTES - Core Concepts:

Civil Procedure: Summary Judgment: Summary Judgment Standard
[HN1] Summary judgment is proper when: (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come but to one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence construed most strongly in his favor. Ohio R. Civ. P. 56(C).

Civil Procedure: Summary Judgment: Summary Judgment Standard
[HN2] Material facts for summary judgment are those facts that might affect the outcome of the suit under the governing law of the case. To determine what constitutes a genuine issue, the court must decide whether the evidence presents a sufficient disagreement to require submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law.

Civil Procedure: Summary Judgment: Burdens of Production & Proof

2001 Ohio App. LEXIS 1555, *

[HN3] The party seeking summary judgment on the ground that the nonmoving party cannot prove its case bears the initial burden of informing the trial court of the basis for the motion and of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential elements of the nonmoving party's claims. The moving party must be able to point specifically to some evidence of the type listed in Ohio R. Civ. P. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claim.

Civil Procedure: Summary Judgment: Burdens of Production & Proof
[HN4] If the moving party in summary judgment fails to satisfy the initial burden, summary judgment should be denied. However, if the initial burden is met, the nonmoving party has a reciprocal burden to respond, by affidavit or as otherwise provided in the rule, in an effort to demonstrate that there is a genuine issue of fact suitable for trial. If the nonmoving party fails to do so, the trial court may enter summary judgment against that party if appropriate.

Torts: Intentional Torts
[HN5] The following elements must be proven to maintain a cause of action for intentional interference with an expectancy of inheritance: (1) an existence of an expectancy of inheritance in the plaintiff; (2) an intentional interference by a defendant(s) with that expectancy of inheritance; (3) conduct by the defendant involving the interference which is tortious, such as fraud, duress or undue influence, in nature; (4) a reasonable certainty that the expectancy of inheritance would have been realized, but for the interference by the defendant; and (5) damage resulting from the interference.

COUNSEL: ATTY. GLENN E. FORBES, COOPER & FORBES, Painesville, OH (For Plaintiffs-Appellants).

ATTY. STEPHEN M. DARLINGTON, ATTY. BRIAN J. GREEN, ZIEGLER, METZGER & MILLER, L.L.P., Cleveland, OH (For Defendants-Appellees).

JUDGES: HON. WILLIAM M. O'NEILL, P.J., HON. JUDITH A. CHRISTLEY, J., HON. DIANE V. GRENDELL, J. O'NEILL, P.J., GRENDELL, J., concur.

OPINIONBY: JUDITH A. CHRISTLEY

OPINION:
CHRISTLEY, J.

This is an accelerated calendar appeal submitted to the court on the briefs of the parties. Appellants, Rebecca C. Werman, David M. Green, and Ronald Green, appeal from a final judgment of the Lake County Court of Common Pleas granting appellee, David A. Raymond, summary judgment. For the reasons that follow, we affirm the decision of the trial court.

On February 17, 1999, appellants filed a complaint in the Lake County Court of Common Pleas against Dorothy Green ("Green"), individually and as executrix of the estate of Ann S. Green ("Ann Green"). n1 In their complaint, appellants alleged that Green through "fraud, duress, undue influence or other tortious act *** interfered with[*2] their expectancy of inheritance." On May 11, 1999, Green filed an answer in which she denied the allegations contained in the complaint. n2

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 Ann Green was appellants' aunt.

n2 Dorothy Green died on October 9, 1999, and appellee, the executor of Green's estate, was substituted as the defendant in the action.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

Appellee filed a motion for summary judgment on December 27, 1999, arguing that he was entitled to judgment as a matter of law because there were no genuine issues of material fact in dispute. On January 13, 2000, appellants filed a brief in opposition to summary judgment in which they maintained that, although there was no direct evidence of interference, there was circumstantial evidence showing that Green had interfered with their expectancy of inheritance.

In a judgment entry filed on January 25, 2000, the trial court granted appellee summary judgment. In doing so, the court found that appellants had provided no evidence of an expectancy of inheritance from the estate of Ann Green. Moreover, the[*3] trial court also determined that there was no evidence showing any tortious conduct on Green's part. As a result, the trial court concluded that appellants failed to demonstrate Green actually prevented them from receiving property that they otherwise would have received.

From this judgment entry, appellants filed a timely notice of appeal. They now assert the following assignment of error for our review:

"The trial court erred in granting summary judgment for defendants-appellees."

At the outset, we note that [HN1] summary judgment is proper when: (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come but to one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence construed most strongly in his favor. Civ.R. 56(C); Leibreich v. A.J. Refrigeration, Inc. (1993), 67 Ohio St. 3d 266, 268, 617 N.E.2d 1068.

[HN2] Material facts are those facts that might affect the outcome of the suit under the governing law of the case. Turner v. Turner (1993), 67 Ohio St. 3d 337, 340, 617 N.E.2d 1123,[*4] citing Anderson v. Liberty Lobby, Inc. (1986), 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505. To determine what constitutes a genuine issue, the court must decide whether the evidence presents a sufficient disagreement to require submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law. Turner at 340.

[HN3] The party seeking summary judgment on the ground that the nonmoving party cannot prove its case bears the initial burden of informing the trial court of the basis for the motion and of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential elements of the nonmoving party's claims. Dresher v. Burt (1996), 75 Ohio St. 3d 280, 293, 662 N.E.2d 264. The moving party must be able to point specifically to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claim. Dresher at 293.

[HN4] If the moving party fails to satisfy this initial burden, summary judgment should be denied. Id. However, if this initial burden is met, the nonmoving party[*5] has a reciprocal burden to respond, by affidavit or as otherwise provided in the rule, in an effort to demonstrate that there is a genuine issue of fact suitable for trial. Id. If the nonmoving party fails to do so, the trial court may enter summary judgment against that party if appropriate. Id.

According to appellants, summary judgment was inappropriate because they introduced circumstantial evidence supporting every essential element of their claim. Specifically, appellants believe that their deposition testimony shows that Green was overbearing and exercised virtually total control over family matters. Moreover, appellants submit that the evidence, while not direct, also demonstrates that because they were related to Ann Green, in addition to the fact that comments had been made in the past suggesting that certain heirlooms would be kept in the family, they had a reasonable expectancy of inheritance.

The Supreme Court of Ohio first recognized the tort of intentional interference with an expectancy of inheritance in Firestone v. Galbreath (1993), 67 Ohio St. 3d 87, 616 N.E.2d 202. In doing so, the Supreme Court held that [HN5] the following elements must be proven[*6] to maintain such a cause of action:

2001 Ohio App. LEXIS 1555, *

"(1) an existence of an expectancy of inheritance in the plaintiff; (2) an intentional interference by a defendant(s) with that expectancy of inheritance; (3) conduct by the defendant involving the interference which is tortious, such as fraud, duress or undue influence, in nature; (4) a reasonable certainty that the expectancy of inheritance would have been realized, but for the interference by the defendant; and (5) damage resulting from the interference." Firestone at 88.

Here, the record shows that appellants had very little or no contact with Ann Green for approximately fifteen years prior to her death. As a matter of fact, Ann Green had not given appellants any gifts or money since the early 1980s. Furthermore, appellants could not testify to any promise made by Ann Green that they were going to inherit from her estate, and none of the appellants had seen a copy of Ann Green's will prior to her death. Instead, appellants base their claims almost entirely on the fact that they were the children of one of Ann Green's brothers, and that they were a part of a small family.

In addition, appellants also failed to introduce any evidence[*7] with respect to tortious conduct on Green's part. True, Green and her sister Ann had a close relationship, and actually lived together for a long time. Moreover, it appears to be undisputed that Green possessed a strong will and had a bad relationship with appellants after their parents died. That, however, standing alone, is not enough to sustain appellants' claim that Green somehow intentionally interfered with their expectancy of inheritance. The mere fact that Green had the opportunity to exert influence, along with the family dissention, is simply not enough.

As a result, appellee was entitled to summary judgment because there were no genuine issues of material fact in dispute. Rather, appellants, who obviously feel slighted for having not received a larger inheritance, attempt to base their claim on hunches and mere speculation. n3 Without evidence that Green actually prevented appellants' from receiving property that they otherwise would have received, their cause of action must fail as a matter of law.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n3 Appellants each received one dollar from Ann Green's estate at the time her will was probated.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*8]

Based on the foregoing analysis, appellants' sole assignment of error has no merit. Accordingly, the judgment of the trial court is affirmed.
JUDGE JUDITH A. CHRISTLEY

O'NEILL, P.J.,

GRENDELL, J.,

concur.

EXHIBIT B
DEFENDANT

1

1       UNITED STATES DISTRICT COURT

2       SOUTHERN DISTRICT OF OHIO

3       WESTERN DIVISION

4

5       EASTSIDE LINCOLN MERCURY, INC., :

6   et al.,                              :

7               Plaintiffs,      :

8               CASE NO. C-1-01-567

9   FORD MOTOR COMPANY, et al.,      :

10              Defendants.      :

11          - - -

12      The Deposition of WILLIAM

13  WOESTE taken by the defendants as upon

14  cross-examination, pursuant to the Ohio

15  Rules of Civil Procedure and pursuant to

16  agreement by counsel as to the time and

17  place and stipulations hereinafter set

18  forth, at the offices of Statman, Harris,

19  2900 Chemed Center, 225 East Fifth Street,

20  Cincinnati, Ohio, at 1:00 p.m. on Monday,

21  the 3rd day of March, 2003, before

22  Margaret M. Lynch, Registered Professional

23  Reporter, a Notary Public within and for

24  the State of Ohio.

25                              COPY

52

1    seeing one anyway.

2      Q.   Do you believe that Mr. Carter or

3    Ford had anything to do with anything

4    that's occurred in Northern Kentucky as

5    far as your Volvo opportunity?

6      A.   Sure.

7      Q.   What do you believe?

8      A.   Jerry actually brought me to the

9    table with Mr. Reichert --

10            MR. HENGEHOLD: Are we beyond

11   the parts that you wanted to --

12            MR. BERBERICH: I think

13   probably.  We're not talking about future

14   market?

15            MS. MCNELLIE: No.

16            MR. BERBERICH: Go ahead and get

17   him.

18            (Mr. Robert C. Reichert

19            present.)

20     Q.   Go ahead with your answer.

21     A.   Jerry actually brought me to a

22   meeting, asked me to come to a meeting,

23   and discussed the fact that I had this

24   letter of intent with Volvo and that, you

25   know, the possibility exists to dual it



53

1    with this Lincoln-Mercury store that was

2    not doing well in Northern Kentucky.  He

3    offered that as an opportunity, and he

4    offered it at many different meetings and

5    in different combinations of he would

6    trade me -- At first the decision was just

7    in the vein of getting rid of Jeff Wyler

8    as a dealer.  Because Jeff Wyler acquired

9    from Stillpass not just Lincoln-Mercury

10   but Lincoln-Mercury, Honda, and Volvo.

11   Previous to that, I had a letter of intent

12   with Stillpass on the Volvo part, but

13   Volvo had promised some money to go to the

14   purchase price and we allowed the letter

15   of intent to expire because the purchase,

16   price was too high without the Volvo

17   dollars support.  Mr. Wyler purchased all

18   three franchises while we were trying to

19   renegotiate the price with the

20   Stillpasses.  And several months after his

21   purchase, two or three months I would

22   guess, Jerry invited me to a meeting and

23   inquired about the possibility of my

24   interest in still acquiring their Volvo.

25   And my interest in -- if somehow he or he

54

1    and Bob could deliver that Volvo

2    dealership to me, then getting my

3    Lincoln-Mercury dealership in exchange.    I

4    later found out that -- or after I had

5    some time to think about it that that --

6    they needed me to be there because Volvo

7    -- Jerry had talked to the Volvo guys

8    that called my dealership.    I don't know

9    if they're regional managers or zone

10   managers.    I don't know what the specific

11   title was.    The two or three people that

12   directly called on my dealership had been

13   contacted by Jerry and he had asked them,

14   you know, about him acquiring that Volvo

15   dealership with the Lincoln-Mercury

16   dealership.    And Jerry indicated to me

17   that while he could operate the Volvo

18   dealership, he doesn't want to operate the

19   Volvo dealership and that he wanted me to

20   get it, and in exchange me lose my

21   Lincoln-Mercury dealership.    But then it

22   became quickly tied to the fact that Volvo

23   had, at one point in time, brought both

24   dealers and did it I think correctly where

25   they brought both dealers into a room,



55

1   myself and Stan Stillpass and Andy
2   Stillpass, sat in a room with the Volvo
3   regional management people and said, "It's
4   our desire to consolidate this market. And
5   we think a lot of both of you guys, but we
6   would like to have just one dealer.  There
7   may or may not be funds available, and if
8   you guys are interested in talking about
9   it we can go further." And then kind of
10  let it go.  So, there was discussion going
11  -- ongoing and that's how inevitably I
12  ended up talking with the Stillpasses
13  about acquiring their store.  But Volvo
14  had said that the money that goes along
15  with that, I don't know what you would   ,
16  call that, the budget or the funds that
17  were available to consolidate or close a
18  point, and they had specific budgeted
19  funds to do so were tied to me.  So, Jerry
20  needed to bring me into the discussion to
21  extract the money because he had tried.
22  I've seen E-mail where he had tried to get
23  the money straight from Volvo but they
24  didn't give it -- wouldn't give it to
25  Jerry.  They would only give it to me.

56

1    So, he needed to bring me into the

2    discussion with Bob so that he could,

3    number one, get the money that Volvo was

4    handing out there to buy that Volvo

5    dealership from the Stillpasses.  And,

6    somehow, which I still haven't figured out

7    exactly how, Jerry described it as a win,

8    win, win situation that I'm still trying

9    to figure out where I win.  But then

10   somehow I spend the money, I get this

11   store, and Bob got my Lincoln-Mercury

12   store as a result.  And it's confusing,

13   but it's -- I don't understand it either.

14   There were at least two or three meetings

15   along those discussion lines.

16       Q.  I think my original question was

17   whether you thought Mr. Carter had any

18   impact on your inability to open a Volvo

19   store in Northern Kentucky?

20       A.  And, yes, would be the answer based

21   on that stuff I just said, because the

22   delay, the delay, the delay of this

23   thing.  Also, Jerry had proposed this

24   Lincoln-Mercury, Volvo dual.  Jerry also

25   offered that there were funds available he

57

1    said to both remodel the Florence store to

2    meet the new Lincoln show room

3    requirements and that, in addition, he

4    would -- he thinks that there were funds

5    available and he would get funds to

6    remodel it to be suitable for Volvo.

7    Volvo said, "No."

8        Q.   Do you think Mr. Carter influenced

9    Volvo to say, no?

10       A.   I don't know that.

11       Q.   Do you think Ford in any way

12   influenced Volvo to say, no?

13       A.   I don't know that.

14       Q.   Do you have a consolidator

15   agreement with Volvo?

16       A.   No, I do not.

17       Q.   Have you had any conversations with

18   anyone or documents to show that Eastside

19   was part of the plan that you claim

20   existed in '95 or '96 to close down

21   Lincoln-Mercury points?

22       A.   Different than the one that I got

23   in the mail later?

24       Q.   Other than the '99 Growth Plan if

25   that's what you're pointing at?

123

1  is just to get the Lincoln-Mercury piece

2  done." And he -- at that point in time,

3  the next thing I heard, not from Jerry

4  just kind of in the rumor mill if you

5  will, was that Jeff Wyler Lincoln-Mercury

6  had been sold back to the factory.

7      Q.  How much prior to that were the

8  discussions that involved the Honda

9  property?

10     A.  They were all within the same year.

11  I mean, maybe a month prior to him closing

12  the -- a time frame?

13     Q.  Yes.  I'm just trying to get a time

14  frame established.

15     A.  This all happened within the first

16  six months of that year.  I would say by

17  about July as of what I recall, whatever

18  year that was, was when he closed the

19  Wyler thing.  You know, it might have been

20  a month or two before then where we had

21  the two meetings with Mr. Reichert,

22  myself, and Jerry, and various

23  conversations and proposals and things

24  like that.  At one of those meetings, he

25  threw out a Lincoln-Mercury of Florence

124

1  thing, which I know was not what you asked

2  me so I won't delve into that.  But I

3  called Jerry back a month or so later and

4  said, "Is there -- I'm really ready to

5  start this building now. It's August or

6  September.  I've got to start my Honda

7  thing. This is really the last time that I

8  can talk about this Lincoln-Mercury, you

9  doing the Eastside Lincoln-Mercury thing."

10  And he said, "Well, no. I'm busy with

11  something else now.  I can't do it." And I

12  said, "Well, that's great.  Thanks." And

13  the next thing that I heard from the rumor

14  mill was that he had built Tim Sheering

15  Lincoln-Mercury and he closed down the

16  Lincoln and did something else.  I don't

17  know what he did.  But then Jerry

18  recontacted me and asked me if we could

19  start the discussion up again.  And I

20  said, "Well, Jerry, this is really

21  frustrating for me. I've already started

22  Honda's stuff.  I'd be happy to talk with

23  you, but I can't.  The end of this year

24  has got to be the deadline.  I can't just

25  keep screwing around with this forever and

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - -

EASTSIDE LINCOLN MERCURY,     :

INC., et al.,                 :     **COPY**

    Plaintiffs,               :

    vs.                       : CASE NO. C1-01-567

FORD MOTOR COMPANY, et al.,: Volume II

    Defendants.               :

- - -

    Continued deposition of WILLIAM F. WOESTE,

JR., a witness herein, taken by the defendants

as upon cross-examination, pursuant to the

Federal Rules of Civil Procedure and pursuant

to agreement by counsel as to the time and

place and stipulations hereinafter set forth,

at the offices of Statman, Harris, Siegel &

Eyrich, 2900 Chemed Center, Cincinnati, Ohio,

at 8:50 a.m. on Tuesday, March 4, 2003, before

M. Sue Lopreato, a Registered Merit Reporter

and Notary Public within and for the State of

Ohio.

- - -

*Vol. II*    5

1              WILLIAM F. WOESTE, JR.

2    of lawful age, a witness herein, having been

3    duly sworn, as hereinafter certified, was

4    examined and deposed as follows:

5              CONTINUED CROSS-EXAMINATION

6    BY MS. McNELLIE:

7         Q.    Mr. Woeste, has anyone besides

8    Ford or Mr. Reichert made an offer for Eastside

9    Lincoln Mercury?

10        A.    No one has made an offer.  I

11   received a phone call about two weeks ago from

12   some guy that said that he heard and was I

13   interested, but I really wouldn't consider that

14   an offer.

15        Q.    Did he identify himself?

16        A.    No, he did not.  Well, I'm sorry,

17   yes, he did, but I don't recall what his name

18   was.  He was -- I believe he was a Ford dealer

19   from somewhere up north.

20        Q.    Have you ever had anybody do an

21   appraisal of Eastside Lincoln Mercury?

22        A.    Appraisal being real estate?

23        Q.    The business.

24        A.    Value of the business?

25        Q.    Yes.

*Vol. II*    6

1    A.    No.  When I purchased Eastside

2  Lincoln Mercury, there was an appraisal done by

3  Randy Taylor, and that's the only one that I've

4  seen.

5    Q.    Mr. Taylor was the owner of the

6  store when you bought it, right?

7    A.    Correct.

8    Q.    What did he appraise it at?

9    A.    It wasn't an appraisal such like

10  of the blue sky.  It was like, here's a stapler

11  and six chairs and a desk.  It was more

12  appraisal of the assets.

13    Q.    Do you own the real estate on

14  which Eastside Lincoln Mercury sits?

15    A.    A partnership; myself and my

16  sister is the owner of the real estate.

17    Q.    Do you have an opinion as to the

18  value of Eastside Lincoln Mercury as of 1995?

19    A.    Again, just to clarify, based on

20  what I know today, or what I would have been

21  thinking in 1995?

22    Q.    What you were thinking in 1995.

23    A.    No, I do not.

24    Q.    As of today?

25    MR. BERBERICH:  Objection.  Go

Vol. II    7

1    ahead.

2            A.    When I purchased Eastside Lincoln

3    Mercury, I paid a lot of blue sky for Eastside

4    Lincoln Mercury.  It was a valuable business

5    then, and it's a valuable business to me today.

6    I think that it becomes or is becoming even

7    more valuable every time Lincoln Mercury and

8    Mr. Reichert closed, or purchased and

9    consolidated the market.  I think being the

10   last guy standing has a lot of value in a

11   situation where there's trying to create a

12   monopoly and I'm the last block there, so I

13   think it has tremendous value today.

14           Q.    Could you put a number on it?

15                 MR. BERBERICH:  Objection.  Go

16   ahead.

17           A.    Not off the top of my head, no.

18           Q.    Do you know exactly when Eastside

19   Lincoln Mercury entered the warrant counseling

20   process?

21           A.    I do not know exactly when.  I

22   know that the names of the -- what I would call

23   audits changed at some point in time.  I

24   believe that the last two audits were we were

25   in the warranty counseling process, but I can't

41

1    service department in a dealership is where all

2    of your salaried people are; not all, but a

3    large percent of your salaried personnel are

4    there.  You'd be able to share some management

5    functions between parts service, also.

6              There are just numerous general

7    management functions could be shared; computer,

8    telephone system, obviously the lot,

9    electricity that we were already paying for the

10   lights.  There are a lot of other overhead

11   things.  It's a huge number that we kind of

12   thought was somewhere between three and five or

13   $600,000 a year in savings to doing that.

14             And in my particular case, I think

15   as I spoke yesterday, I was getting ready to

16   embark on a Honda remodeling.  What this would

17   have allowed me to do is to shed myself of an

18   entire parcel of property on Beechmont Avenue,

19   which would be the Honda property, and if I had

20   accomplished that, I would have then remodeled

21   the Lincoln Mercury facility to the Honda

22   image, and moved Honda down there and sold the

23   Honda property.

24             Q.    You're saying if you had been able

25   to do this, you would put Honda in where

43

1          A.    Correct.

2          Q.    Did you ever have any discussions

3    with Chevy about dualing their service

4    department with Lincoln Mercury?

5          A.    No, I did not.

6          Q.    Who was the person at Chevrolet

7    that you were dealing with at that point in

8    time?

9          A.    Specifically, do you mean the

10   person that called on the realtor?

11         Q.    Yes.

12         A.    I don't recall who that person

13   would have been.  We would have, similar to

14   Lincoln Mercury, a salesperson, a service

15   person, and I don't recall who they were.

16         Q.    You don't recall either one of

17   those people?

18         A.    No, I do not recall specifically.

19         MS. McNELLIE:  I still haven't

20   received a copy of his Chevy dealer.

21         MR. BERBERICH:  Let's go off the

22   record.

23         (Off the record.)

24         Q.    Other than this occasion we've

25   talked about, in late '97 or early '98, have

SILVER CLOUD, INC., Plaintiff-Appellee, v. QUIKUT DIVISIONOF SCOTT FETZER COMPANY, Defendant-Appellant.
No. 92-4373

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

1994 U.S. App. LEXIS 23860; 1994-2 Trade Cas. (CCH) P70,711

August 26, 1994, Filed

NOTICE:

[*1] NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 24 LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 24 BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

SUBSEQUENT HISTORY: Reported in Table Case Format at: 35 F.3d 566, 1994 U.S. App. LEXIS 32562.

PRIOR HISTORY: On appeal from the United States District Court for the Northern District of Ohio. District No. 89-01729. Bell, District Judge.

DISPOSITION: AFFIRMED

CASE SUMMARY:

PROCEDURAL POSTURE: Defendant distributor appealed a decision by the United States District Court for the Northern District of Ohio, which denied its motion for judgment as a matter of law, pursuant to Fed. R. Civ. P. 50(b), and its motion for a new trial and entered a jury verdict in favor of plaintiff manufacturer on its claim for breach of the parties' distributorship contract.

OVERVIEW: A distributor brought motions for judgment as a matter of law under Fed. R. Civ. P. 50(b) and for a new trial in a manufacturer's action against it for breach of the parties' distributorship contract. The court affirmed the judgment in favor of the manufacturer and found that the trial court did not err in denying the rule 50(b) motion where the manufacturer pleaded, but failed to prove, the distributor's motive for breach. The trial court did not err by not instructing the jury that a related antitrust claim had been resolved in the distributor's favor because the distributor failed to object to jury instruction. The court found that the manufacturer presented sufficient evidence of its performance to warrant submitting to the jury the issues of whether it provided a merchantable product to the distributor and whether it assigned the contract in violation of an express prohibition and therefore the distributor was not entitled to judgment as a matter of law. The court ruled that the manufacturer established lost profit damages with the certainty required by applicable state law and gave the jury an adequate factual basis on which to calculate damages for lost profits.

OUTCOME: The court affirmed the denial of the distributor's motions for judgment as a matter of law and for a new trial because it was not entitled to judgment as a matter of law based merely on the manufacturer's failure to prove the distributor's motive for breach of the parties' distributorship contract after pleading it. The evidence established the manufacturer's performance under the contract and it adequately proved damages from the breach.

CORE TERMS: slicer, antitrust, breach of contract, distributor, matter of law, failed to prove, contract claim, merchantable, marketing, selling, motive, knife, per unit, requisite, mold, sufficient evidence, claim of error, terminated, vegetable, slicing, pleaded, booth, food, duty, calculation, overhead, general prohibition, agreement contained, directed verdict, trial testimony

1994 U.S. App. LEXIS 23860, *; 1994-2 Trade Cas. (CCH) P70,

LexisNexis (TM) HEADNOTES - Core Concepts:

Civil Procedure: Trials: Judgment as Matter of Law
Civil Procedure: Jury Trials: Province of Court & Jury
[HN1] Appellate courts review Fed. R. Civ. P. 50(b) motions for judgment as a matter of law pursuant to the same standard applied to the motion for judgment notwithstanding the verdict. Because state substantive law is controlling where the claim was before federal court on pendent jurisdiction, a rule 50(b) motion is governed by state law in such a case. In Ohio, an issue is in the province of the jury when there is sufficient evidence relating to that issue to permit reasonable minds to reach different conclusions on that issue. The test is not whether the trial judge would grant a new trial on the weight of the evidence.

Civil Procedure: Pleading & Practice: Pleadings: Interpretation
Contracts Law: Breach: Causes of Action
[HN2] In order to plead a breach of contract action adequately under Ohio law, plaintiff need set forth only the terms of the contract, the performance by plaintiff of his obligations, the breach by defendant, damages, and consideration. A plaintiff's claim of breach is not insufficient merely because he pleaded, then failed to prove, unnecessary facts. The fact that plaintiff pleaded motive, in addition to the requisite elements of an action for breach, then failed to prove motive, does not require the trial court to enter judgment in favor of defendant.

Civil Procedure: Jury Trials: Jury Instructions
Civil Procedure: Appeals: Standards of Review: Standards Generally
[HN3] The question before a reviewing court determining the propriety of challenged jury instructions in a civil trial, is whether the instructions taken as a whole are an adequate representation of the law. In addition, Fed. R. Civ. P. 51 expressly provides that an appellate court's role in reviewing jury instructions is conditional by providing that: No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection. Fed. R. Civ. P. 51. Strict compliance with rule 51 is required, and failure to state specific grounds for objection is fatal.

Civil Procedure: Trials: Judgment as Matter of Law
[HN4] In entering judgment as a matter of law, the district court holds only that a plaintiff has not proved its claim, not that defendant is factually blameless.

Contracts Law: Third Parties: Assignment of Rights
[HN5] Under Ohio law, the effect of a general prohibition on assignment is to forbid assignment only of contract duties, not rights. Ohio Rev. Code Ann. § 1302.13(C).

Evidence: Procedural Considerations: Inferences & Presumptions
Contracts Law: Remedies: Foreseeable Damages
[HN6] Lost profits may be recovered in a breach of contract action in Ohio if profits were within the contemplation of the parties at the time the contract was made, the loss of profits is the probable result of the breach of contract, and the profits are not remote and speculative and may be shown with reasonable certainty. The reasonable certainty standard applies to both the fact and the amount of the alleged lost profits. Substantial certainty requires more than a conclusory statement as to the amount of lost profits. Rather, plaintiff must substantiate the claimed amount by placing in evidence facts with respect to overhead costs or a breakdown of expenses.

Civil Procedure: Jury Trials: Province of Court & Jury
Civil Procedure: Appeals: Standards of Review: Standards Generally
[HN7] Given the jury's advantage in having the opportunity to judge the credibility of all the testimony, an appellate court may not disturb its choice.

JUDGES: Before: RYAN and NORRIS, Circuit Judges; and CELEBREZZE, Senior Circuit Judge.

OPINIONBY: RYAN

1994 U.S. App. LEXIS 23860, *; 1994-2 Trade Cas. (CCH) P70,

OPINION: RYAN, Circuit Judge. The defendant, Quikut Division of Scott Fetzer Co., appeals the district court's denial of its motion for judgment as a matter of law, pursuant to Fed. R. Civ. P. 50(b), in this action alleging that the defendant violated federal antitrust laws and breached its distributorship contract with the plaintiff, Silver Cloud, Inc. The district court dismissed the plaintiff's antitrust claims on directed verdict, submitting only the contract claim to the jury, which returned a verdict in the plaintiff's favor.

On appeal, the defendant raises four issues: (1) Where the plaintiff pleaded, but failed to prove, the defendant's motive for breach, [*2] did the district court err in denying the defendant's Rule 50(b) motion? (2) Did the district court err in instructing the jury on the impact the court's directed verdict on the antitrust claims had on the plaintiff's contract claim? (3) Did the plaintiff's evidence at trial sufficiently establish its performance of the contract? (4) Did the plaintiff adequately prove damages flowing from the breach of contract?

We find all of the defendant's points of error without merit, and affirm the district court's order of judgment.

I.

Reluctantly, we must burden our opinion with an extensive discussion of the facts in order to adequately explain our disposition of the issues.

The plaintiff's primary business is the manufacture and marketing of plastic injection-molded products, including plastic household containers and window components. The plaintiff's president and sole shareholder is Stephen Motosko II, who, in addition to his interest in the plaintiff, has long operated as a pitchman selling products for the defendant and others at consumer shows and flea markets. The defendant's primary product in this market is the AN-800 knife, which is sold under such trade names as the "Ginsu[*3] Knife" or "The Blade."

In 1983, Motosko approached the defendant with an invention he planned to patent, a manually-operated vegetable slicer. Motosko considered his slicer to be an improvement over the only comparable slicer on the market, the Combi-Chef, which was manufactured by "Ruby" Morris of National Kitchen Products. After initial negotiations with the defendant, Motosko prepared blueprints to accommodate his slicer to the unique dimensions of the defendant's AN-800 knife, and applied for a patent. According to Motosko's trial testimony, the defendant's sales manager, Edward Ellis, and general manager, Steve Valliant, told Motosko that the defendant's marketing studies demonstrated that the defendant could sell 300,000 of Motosko's proposed slicers annually through demonstrations, and up to 1 million slicers per year through television sales.

The negotiations between Motosko, Ellis, and Valliant culminated in a distributor agreement, signed on February 24, 1984, between the defendant and the plaintiff. The agreement provided that the defendant was to be the exclusive distributor of the slicer for two years. During the life of the contract, the defendant was to purchase 50,000[*4] slicers each year at a cost of $1.75 per unit, exclusive of blades, which the defendant was to supply. However, the defendant's failure to purchase the requisite 50,000 slicers the second year of the contract would result only in loss of exclusivity. The agreement also provided that the defendant was to use its best efforts to promote the interest and business of the plaintiff. The plaintiff, on the other hand, warrantied the slicers to be free from defects in material and workmanship, and merchantable and fit for their intended purpose. Either party could terminate the contract for cause upon 30 days written notice. In addition, the agreement contained a general prohibition on assignment.

Mass production of the slicer required the plaintiff to purchase a heat-treated insert mold at a cost of approximately $80,000. In order to purchase the mold, Motosko secured a loan from the Dollar Bank of Niles, Ohio, by assigning the plaintiff's proceeds under the distributor agreement. Before signing the loan agreement, Motosko notified Valliant of the intended assignment.

By the latter part of 1984, the plaintiff was ready to test-market the slicer. After discussing the matter with Ellis, [*5] Motosko booked booth space at a December 1984 trade show in Detroit, Michigan, and at a January 1985 home show in Philadelphia, Pennsylvania. About this same time, Ellis reported to Motosko that he had met with "Ruby" Morris, who was the defendant's largest customer. According to Motosko's trial testimony, Ellis had met with Morris in order to learn whether Morris objected to the defendant's marketing of the plaintiff's slicer, in competition with Morris's Combi-Chef. Motosko was furious that Ellis had informed the competition of the slicer, and complained to David Bryant, who had replaced Valliant as the defendant's general manager. Bryant promised to resolve the situation.

1994 U.S. App. LEXIS 23860, *; 1994-2 Trade Cas. (CCH) P70,

Shortly after Motosko's conversation with Bryant, the defendant demanded that the plaintiff procure $5 million in liability insurance, without which the defendant would not market the slicer. Under protest, the plaintiff paid approximately $2,000 to obtain the requisite insurance, and proceeded to test-market the slicer at the Detroit show as scheduled.

Test-marketing at the Detroit show was, in Motosko's opinion, successful. However, while setting up the plaintiff's booth at the Philadelphia show, Charles Motosko, [*6] Stephen Motosko's brother, was approached by Morris, who asked what Charles Motosko planned to sell. When Charles Motosko responded that he intended to market the plaintiff's slicer, Morris responded that the defendant would not allow it. After phone calls between and among Morris, Motosko, Charles Motosko, and Ellis, Motosko instructed his brother to close the booth.

A few days later, on February 4, 1985, the defendant notified the plaintiff that it was activating the distributor agreement, formally invoking the defendant's exclusivity arrangement. However, the defendant did not order enough slicers to supply even its own distributors, nor did the defendant prepare advertising or begin television marketing efforts.

On this basis, Motosko, Charles Motosko, and another demonstrator, Richard Reese, began demonstrating the slicer themselves, which required buying the slicers from the defendant. As Motosko testified at trial, Bryant agreed to sell Motosko the plaintiff's slicers to market at those trade shows that Morris did not plan to attend.

Shortly thereafter, the defendant demanded that the plaintiff alter the slicer, requiring the expenditure of approximately $17,000 in order to[*7] reconfigure the manufacturing mold. The plaintiff altered the mold as requested, but, according to the defendant, the slicer never performed as anticipated under the agreement. By letter dated September 11, 1985, the defendant terminated the distributor agreement on the ground that the product was not merchantable.

Motosko, Charles Motosko, and Reese continued efforts to market the slicer, purchasing the AN-800 knives directly from the defendant. However, after a heated exchange over pricing between Charles Motosko and Morris at a January 1987 home show, the defendant refused to continue supplying knives to Motosko or his brother.

Reese, on the other hand, continued to purchase the AN-800 knife from the defendant, and used it to market the plaintiff's slicer until February 1988. At that time, at the New Orleans trade show, one of the defendant's employees asked Reese what he was selling. Shortly thereafter, Reese received a letter from the defendant terminating his account. The defendant reinstated Reese's account upon his promise not to market the plaintiff's slicer. However, when the defendant learned that Reese was marketing the slicer despite his promise, it again terminated Reese's[*8] account. The defendant also terminated the account of another demonstrator, James Frenier, in 1989, because it believed Frenier was selling the plaintiff's slicer. While Motosko, Reese, and Frenier marketed the slicer after this time, they were forced to do so using a knife that was ill-fitted to the design.

In September 1989, the plaintiff filed an eight-count complaint against the defendant and Morris, but pursued only two antitrust counts and the breach of contract count at trial. Prior to submitting the case to the jury, the district court granted the defendant's Fed. R. Civ. P. 50(a) motion for judgment as a matter of law as to the two antitrust counts. The court also dismissed Morris as a party. The court then submitted the breach of contract claim to the jury, with an instruction that the jury could consider evidence relating to the antitrust claims only insofar as the evidence was probative of the contract claim. The jury returned a verdict in the plaintiff's favor, awarding general damages totalling $70,000. After the verdict was reduced to final judgment, the defendant renewed its motion for judgment as a matter of law, pursuant to Rule 50(b), or in the alternative moved[*9] for a new trial. The district court denied the motion on November 16, 1992. The defendant's timely appeal followed.

II.

We [HN1] review Rule 50(b) motions for judgment as a matter of law pursuant to the same standard applied to "the forerunner to this motion, the motion for judgment notwithstanding the verdict." Black v. Ryder/P.I.E. Nationwide, Inc., 15 F.3d 573, 583 (6th Cir. 1994). Because state substantive law is controlling where, as here, the claim was before the district court on pendent jurisdiction, see United Mine Workers of America v. Gibbs, 383 U.S. 715, 726, 16 L. Ed. 2d

1994 U.S. App. LEXIS 23860, *; 1994-2 Trade Cas. (CCH) P70,

218, 86 S. Ct. 1130 (1966), the Rule 50(b) motion is governed by state law. Bank of Cumberland v. Aetna Cas. & Sur. Co., 956 F.2d 595, 597 (6th Cir.), cert. denied, 121 L. Ed. 2d 146, 113 S. Ct. 204 (1992). Accordingly,

Under the test in Ohio, . . . an issue is in the province of the jury "when there is sufficient evidence relating to that issue to permit reasonable minds to reach different conclusions on that issue. . . ." The test[*10] is not whether the trial judge would grant a new trial on the weight of the evidence.

Moran v. Johns-Manville Sales Corp., 691 F.2d 811, 813 (6th Cir. 1982) (citations and footnote omitted).

III.

A.

Because the plaintiff alleged that antitrust considerations motivated the defendant's breach, the defendant argues that the plaintiff's contract claim was predicated on the success of its antitrust claims. Thus, contends the defendant, once the district court found that there was insufficient evidence to submit the antitrust claims to the jury, it should have entered judgment for the defendant on the contract claim as well.

[HN2] In order to adequately plead a breach of contract action under Ohio law, the plaintiff need set forth only the following elements:

(1) the terms of the contract, (2) the performance by the plaintiff of his obligations, (3) the breach by the defendant, (4) damages, and (5) consideration.

American Sales, Inc. v. Boffo, 71 Ohio App. 3d 168, 593 N.E.2d 316, 321 (Ohio App. 1991). As the Ohio Supreme Court stated a long time ago, a plaintiff's claim of breach is not insufficient[*11] merely because he pleaded, then failed to prove, unnecessary facts. Gartner v. Corwine, 57 Ohio St. 246, 48 N.E. 945, 945 (Ohio 1897). Accord Cusack v. De Witt-Jenkins Realty Co., 104 Ohio App. 457, 149 N.E.2d 924, 926 (Ohio App. 1957).

The gist of the defendant's first assignment of error is that the plaintiff did not allege a mere breach of contract, but rather alleged a breach motivated by the defendant's conspiracy with Morris, in violation of federal antitrust laws. However, the plaintiff was under no obligation to plead or prove the defendant's motive for breaching the contract. Motive is not an element of a breach of contract action in Ohio. See Boffo, 593 N.E.2d at 321. The fact that the plaintiff pleaded motive, in addition to the requisite elements of an action for breach, then failed to prove motive, did not require the district court to enter judgment in favor of the defendant. Accordingly, the defendant's first claim of error is without merit.

B.

The defendant next argues that the district court was required to instruct the jury[*12] that the antitrust claims had been resolved in the defendant's favor. According to the defendant, the district court's failure to do so confused the jury as to which facts it could consider, thus requiring reversal of the verdict.

[HN3] The question before a reviewing court determining the propriety of challenged jury instructions in a civil trial, is whether the instructions "taken as a whole. . . ," are an adequate representation of the law. Davis v. Combustion Eng'g, Inc., 742 F.2d 916, 921 (6th Cir. 1984). See also Rimer v. Rockwell Int'l Corp., 739 F.2d 1125, 1128 (6th Cir. 1984). In addition, the Federal Rules of Civil Procedure expressly provide that our role in reviewing jury instructions is conditional:

No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.

Fed. R. Civ. P. 51. "Strict compliance with Rule 51 is required and failure to state specific grounds [for objection] is fatal." Rimer, 739 F.2d at 1127. [*13]

1994 U.S. App. LEXIS 23860, *; 1994-2 Trade Cas. (CCH) P70,

Here, the district court began its jury instructions by notifying the jury that they were not to consider the antitrust claims during deliberations:

During the period of your absence the antitrust issues have been resolved. They will not be before you for your consideration. The remaining issue for your determination will be the claim of plaintiff for breach of contract. You are instructed now that in reaching your verdict in this case you shall consider only that evidence introduced during trial which relates to the issue given to you for your decision. You may consider any evidence adduced and relating to the antitrust issues only, and [sic] if this evidence bears on the issuing [sic] of breach of contract which is to be the subject of your verdict in this case.

In addition, the district court correctly instructed the jury on the elements of a contract breach, and gave comprehensive instructions regarding the standards by which the jury was to determine whether the plaintiff had adequately established these elements. Thus, taken as a whole, the district court's instructions sufficiently advised the jury of the claim it was to consider.

Moreover, in violation of Fed. R. Civ. [*14] P. 51, the defendant--to date--has not identified the basis for its contention that the district court should have informed the jury that the antitrust claims had been resolved in the defendant's favor. The Federal Rules certainly do not require such an instruction. [HN4] In entering judgment as a matter of law, the district court holds only that a plaintiff has not proved its claim, not that the defendant is factually blameless. Nor does any authority cited by the defendant support its position. While the district court's instruction certainly could have been phrased more artfully, the defendant did not object to the form of the instruction. Accordingly, we reject the defendant's second claim of error.

C.

Next, the defendant maintains that the plaintiff failed to prove its performance under the contract, because the plaintiff never provided the defendant with a merchantable product and because the plaintiff assigned the contract in violation of an express prohibition in the agreement. We conclude that the plaintiff produced sufficient evidence of its performance to submit both issues to the jury. Accordingly, the defendant was not entitled to judgment as a matter of law.

First, as [*15] to the plaintiff's failure to provide a merchantable product, the plaintiff's duty under the contract was to provide an exclusive distributorship to the defendant for "a food slicer into which is inserted a slicing knife which then becomes the cutting edge of the device." In addition, the food slicer was to be "suitable for the slicing of fruits, vegetables, and other food products."

The jury heard the testimony of Reese and Frenier that they both had sold the plaintiff's slicer, that it was a good product, and that it was suitable for slicing vegetables. In addition, Motosko demonstrated the product for the jury. Given this evidence, the district court properly submitted to the jury the question of whether the plaintiff fulfilled its duty to supply a merchantable product.

As to the defendant's claim that the plaintiff breached the contract by assigning proceeds, it is uncontested that the distributor agreement contained a general prohibition on assignment. However, [HN5] under Ohio law, the effect of such a clause is to forbid assignment only of contract duties, not rights. Ohio Rev. Code Ann. § 1302.13(C). Here, the jury heard Motosko's testimony that he informed Valliant of the assignment[*16] before agreeing to it, and that Valliant lodged no objection.

Accordingly, as with the issue of merchantability, the plaintiff presented sufficient evidence to submit the assignment issue to the jury.

D.

Finally, the defendant argues that, in order to prove lost profits, the plaintiff had to demonstrate with certainty the amount of such damages. According to the defendant, the plaintiff failed to adequately prove the cost of its performance, and thus failed to meet the requisite certainty standard.

1994 U.S. App. LEXIS 23860, *; 1994-2 Trade Cas. (CCH) P70,

The Ohio Supreme Court has adopted a three-pronged test in order to ascertain the propriety in any particular case of an award of lost profits:

" [HN6] Lost profits may be recovered . . . in a breach of contract action if: (1) profits were within the contemplation of the parties at the time the contract was made, (2) the loss of profits is the probable result of the breach of contract, and (3) the profits are not remote and speculative and may be shown with reasonable certainty."

City of Gahanna v. Eastgate Properties, Inc., 36 Ohio St. 3d 65, 521 N.E.2d 814, 817 (Ohio 1988) (citation omitted). The reasonable certainty standard applies to[*17] both the fact and the amount of the alleged lost profits. 521 N.E.2d at 818.

Substantial certainty requires "more than a conclusory statement as to the amount of lost profits." Rhodes v. Rhodes Indus., Inc., 71 Ohio App. 3d 797, 595 N.E.2d 441, 448 (Ohio App. 1991). Rather, the plaintiff must substantiate the claimed amount by placing in evidence facts "with respect to overhead costs or a breakdown of expenses, parts, labor, etc." 595 N.E.2d at 449. Using this standard, the Rhodes court rejected a plaintiff's summary statement that he operated at a 25% profit margin. Id. Similarly, another Ohio appellate panel rejected a plaintiff's profit calculation that took into account only its direct operating expenses. Kinetico, Inc. v. Independent Ohio Nail Co., 19 Ohio App. 3d 26, 482 N.E.2d 1345, 1350 (Ohio App. 1984) (quoting R. Dunn, Recovery of Damages for Lost Profits 2d 223, § 5.4 (1981)).

Here, the plaintiff established lost profits with the certainty required by Ohio law. Motosko detailed the plaintiff's costs per unit, including materials, overhead, insurance, and depreciation. The distributor[*18] agreement itself set forth the number of units the defendant had agreed to purchase, as well as the agreed price per unit. Thus, the jury had an adequate factual basis on which to calculate an award of lost profits. Indeed, the jury's award conforms precisely with the plaintiff's anticipated profits during the first year of the contract.

The defendant argues, however, that the plaintiff failed to prove damages because it based its calculation on a faulty formula. It is true that Motosko at one point testified, rather equivocally, that his initial profit projections contemplated selling 300,000 units per year. However, Motosko elsewhere testified that he anticipated selling 50,000 units the first year of the contract, at a profit of $1.40 per unit and a total profit of $70,000, regardless of the plaintiff's performance in subsequent years. Given this conflicting testimony, it was for the jury to determine which evidence to accept. The jury obviously chose the latter explanation. [HN7] Given the jury's advantage in having the opportunity to judge the credibility of all the testimony, we may not disturb its choice.

Accordingly, the defendant's fourth claim of error is without merit, and [*19]the district court properly denied the defendant's Rule 50(b) motion.

IV.

We AFFIRM the district court's order of judgment.

**EXHIBIT D**
**DEFENDANT**

Page 4

JOHN T. MASSERA, Plaintiff-Appellee v. GULF OIL CORPORATION, ET AL., Defendant-Appellants
No. 54539

Court of Appeals of Ohio, Eighth Appellate District,Cuyahoga County

1988 Ohio App. LEXIS 5426

October 27, 1988, Decided

PRIOR HISTORY:

[*1]

CHARACTER OR PROCEEDING: Civil appeal from Common Pleas Court Case No. 108,621.

DISPOSITION: JUDGMENT: Reversed and Remanded.

CASE SUMMARY:

PROCEDURAL POSTURE: Defendant landlords challenged a judgment of the Common Pleas Court (Ohio), which found in favor of plaintiff tenant, after jury trial, on his claims that the landlords breached a rental agreement and wrongfully evicted him. The trial court also awarded damages to the tenant.

OVERVIEW: The landlords argued that the trial court permitted the jury to assess damages without supporting evidence, misstated their duty to pay utility bills, and permitted punitive damages for a contract claim. On appeal, the court held that the landlords demonstrated no reversible error regarding their liability, but the jury instructions and the resulting verdict incorrectly assessed the tenant's damages. In reversing and remanding for a new trial on the issue of damages, the court found that the trial court improperly instructed the jury about damages by inviting them to speculate. There was no evidence to value most of the tenant's claimed damages. Although the tenant presented some evidence about his previous gross receipts, no one testified regarding his prospective business or past expenses, profits, or good will. The jury could not properly consider punitive damages without concurrently assessing compensatory damages. The court held that the tenant would be required to demonstrate any claimed damages and whether egregious conduct justified punitive damages.

OUTCOME: The court held that the tenant had properly demonstrated the landlord's liability for breach of the rental agreement, but reversed and remanded the case for a new trial on the issue of damages only.

CORE TERMS: tenant, landlords, water, punitive damages, compensatory damages, conversion, personalty, repair, plain error, wrongful eviction, duty to pay, new trial, assigned, manifest injustice, jury instruction, overrule, consequential damages, reckless disregard, evidence supported, return a verdict, sound discretion, general verdict, agreed to pay, water service, food service, wrongfully, ordinance, breached, disputed, ceiling

LexisNexis (TM) HEADNOTES - Core Concepts:

Civil Procedure: Jury Trials: Jury Instructions
Civil Procedure: Appeals: Reviewability: Preservation for Review
Civil Procedure: Appeals: Records on Appeal
[HN1] Ordinarily, a party waives any complaint about a jury instruction by failing to object to that instruction or to submit a different instruction. Ohio R. Civ. P. 51(A). An appellate court must rely on the appellate record to determine whether a party made such a request or objection.

Civil Procedure: Jury Trials: Jury Instructions

1988 Ohio App. LEXIS 5426, *

Civil Procedure: Appeals: Standards of Review: Plain Error
[HN2] An appellate court should reverse a judgment if improper instructions constitute plain error which causes manifest injustice. They are not plain error unless they had a high likelihood of changing the result.

Evidence: Procedural Considerations: Inferences & Presumptions
Real & Personal Property Law: Landlord & Tenant
Contracts Law: Remedies: Foreseeable Damages
[HN3] In a dispute between a landlord and a tenant, the tenant has a burden to prove any lost profits by clear and convincing evidence. Without any evidence about the tenant's lost profits or good will, the court should not permit the jury to speculate on those matters.

Civil Procedure: Remedies: Damages
[HN4] The jury cannot properly consider punitive damages without concurrently assessing compensatory damages.

COUNSEL: For Plaintiff-Appellee: THOMAS G. LOBE, ESQ., Cleveland Ohio.

For Defendant-Appellants: GERALD A. MESSERMAN, ESQ., Cleveland, Ohio.

OPINIONBY: MARKUS

OPINION: JOURNAL ENTRY and OPINION

RICHARD M. MARKUS, J.:

The defendant landlords appeal from a $300,000 judgment for the plaintiff tenant, on his claims that they breached the rental agreement and wrongfully evicted him. They argue that the court permitted the jury to assess damages without supporting evidence, misstated their duty to pay utility bills, and permitted punitive damages for a contract claim. They demonstrated no reversible error regarding their liability, but the jury instructions and the resulting verdict incorrectly assess the tenant's damages. Consequently, we reverse and remand for a new trial on damages.

I

The tenant testified that he orally rented the landlords' building at $250 per month for his food service business. He said the landlords agreed to pay the water and sewer bills. The parties stipulated that the landlords received the agreed rent from October 15, 1983, to August 15, 1985.

When no one paid the water bill[*2] for an extended interval, the city terminated the building's water service on July 19, 1985. In August, the city's health inspector directed the tenant to discontinue his food service business there, because the roof leaked and he had no hot water. The tenant then closed his business temporarily while he attempted to resolve those problems.

According to the tenant, in October an unidentified man threatened him with a gun and prevented him from interfering while others changed the building's locks. He and other witnesses testified that his store still contained his fixtures and equipment, non-perishable food, and business records. When the tenant later tried to recover his property from the store, it was gone.

The landlords denied any knowledge about the men who reportedly changed the locks, or the whereabouts of the tenant's property. They also disclaimed responsibility for the water bills, and any knowledge about delinquent water bills or the termination of water service there. They asserted that the tenant had agreed to perform any necessary repairs in exchange for a low rental charge.

II

The court instructed the jury to consider the tenant's claims that the landlords (a) converted[*3] his personalty, (b) breached alleged duties to repair the ceiling and to pay the water bill, and (c) wrongfully evicted him. Some evidence supported each of these claims, and the landlords failed to explore the jury's general verdict with interrogatories. In their

1988 Ohio App. LEXIS 5426, *

first assigned error, the landlords contest the court's jury instructions about the measure of compensatory damages for those claims. Their third assignment disputes the propriety of punitive damages.

[HN1] Ordinarily, a party waives any complaint about a jury instruction by failing to object to that instruction or to submit a different instruction. Civ. R. 51(A); Cleveland Elec. Illum. Co. v. Astorhurst Land Co. (1985), 18 Ohio St. 3d 268, 274-275; Schade v. Carnegie Body Co. (1983), 70 Ohio St. 2d 207, paragraph one of the syllabus.

An appellate court must rely on the appellate record to determine whether a party made such a request or objection. Szymczak v. Midwest Premium Finance Co. (1984), 19 Ohio App. 3d 173, 177. In this case, the record contains neither a written request nor an objection to the court's instructions on these matters. The landlords' motion for a directed verdict did not preserve[*4] their complaint about jury instructions relating to specific types of alleged damages.

However, [HN2] an appellate court should reverse a judgment, if improper instructions constitute plain error which caused manifest injustice. Cleveland Elec. Illum. Co. v. Astorhurst Land Co., supra; Schade v. Carnegie Body Co., supra. They are not plain error unless they had a high likelihood of changing the result. Id.

In this case, the jury returned a general verdict for $200,000 compensatory damage plus $100,000 punitive damages. There was no evidence, expert or otherwise, to value most of the tenant's claimed damages. Although the tenant presented some evidence about his previous gross receipts, no one testified regarding his prospective business or his past expenses, profits, or good will. Evidence valued part of the missing personalty, but some of it remained completely unvalued. The only quantified damages were repairs estimated at $5,000 and personalty valued at $20,000 to $23,000.

Consequently, the court improperly instructed the jury about damages by inviting them to speculate. For the alleged conversion of personalty, the court said:

"Ordinarily the measure of damages[*5] for compensating the [tenant] for the conversion, if you so find, is the reasonable and fair market value at that time. If you find that the goods have a market value, then that value would govern and you should apply common standards in determining the value.

"If you should find that the [landlords'] alleged conversion caused the loss of [the tenant's] business, you may, if you so find, award the [tenant] for the loss of business.

"If you find that the [landlords] not only committed the conversion about the personalty of the [tenant], but that they also did it wantonly and maliciously, and/or with reckless disregard for the [tenant's] rights, then you may return a verdict which would not only include compensatory damages, but exemplary or also known as punitive damages. [The court then defined punitive damages more completely]."

The court instructed the jury that damages for the landlords' breach of the alleged duty to pay the water bill would be:

"[A]ll consequential damages, including loss of business, good will, profit, and the like, as I have previously defined for you."

The court told them that damages for wrongful eviction would be:

"[S]uch amount of damages or money as[*6] you may find from the evidence that the [tenant] suffered as a result of the wrongful eviction, and/or water situation at the premises in question."

The court defined the measure of damages for the breach of a duty to repair the ceiling as "all consequential damages." It then added:

"There is no precise rule by which to fix the amount of damages. The measure of damages is a question for the sound discretion of the jury under circumstances disclosed by the evidence. This is to be sound discretion uninfluenced by passion or prejudice; the amount of damages is to be such a sum as the jury, exercising such judgment and discretion, under all the circumstances of the case as shown by the evidence, determine and find as proper and adequate for the injury sustained by the [tenant], if any.

1988 Ohio App. LEXIS 5426, *

"The issue of the direct and proximate cause of the [landlords'] neglect, if any, to repair the premises and the issue of the [tenant's] inability to continue his business is for your determination.

"Further for your consideration, is the issue as to whether or not the failure to repair and the water situation at the premises in question was willfully, deliberately done or with reckless disregard to the[*7] [tenant] and his business.

"If you find the foregoing, then you may again consider not only compensatory damages as previously discussed, but you may again consider punitive damages against the [landlords].

[HN3] The tenant had a burden to prove any lost profits by clear and convincing evidence. Gahanna v. Eastgate Properties, Inc. (1988), 36 Ohio St. 3d 65, syllabus. Without any evidence about the tenant's lost profits or good will, the court should not have permitted the jury to speculate on those matters. Id. at 67-68; Independence Tire, Inc. v. Goodyear Tire & Rubber Co. (June 30, 1988), Cuyahoga App. No. 54064 (unreported). Without considering those claimed items, the jury could not rationally return a verdict for $200,000 compensatory damages.

Some evidence supported the jury's consideration of punitive damages on the tenant's conversion supported the jury's consideration of punitive damages on the tenant's conversion and wrongful eviction claims. Cf. Brookridge Party Center, Inc. v. Fisher Foods, Inc. (1983), 12 Ohio App. 3d 130, 131-132; Dirnberg v. Hack (Mar. 20, 1987), Sandusky App. No. 5-86-39, unreported; Gerger v. Wallace (Kans. [*8] 1983), 664 P.2d 846, 851-852. Therefore, we overrule the landlords' third assigned error.

However, the paucity of evidence to support the instructions about compensatory damages and the resulting extraordinary verdict require us to sustain the first assignment. Since [HN4] the jury cannot properly consider punitive damages without concurrently assessing compensatory damages, we reverse the judgment and remand for a new trial on damages alone. The tenant has established the landlords' liability on his three claims and need not demonstrate that liability again. However, the tenant must still demonstrate any claimed damages and whether egregious conduct justifies punitive damages.

III

The landlords' remaining second assignment of error challenges the court's jury instruction about their duty to pay the water bill. The court directed the jury to apply a city ordinance that requires the property owner to pay the water bill. The landlords argue that this was a disputed factual matter, in view of their testimony that this tenant agreed to pay the water bill.

Without deciding whether the parties' agreement could supercede the city's ordinance for these purposes, we reject the landlords' argument. [*9] The disputed instruction was not the subject of an objection. It was not plain error, when it concerned only one of several bases for the tenant's recovery. It did not cause manifest injustice, since it had no great likelihood of changing the result.

We overrule the second assigned error, which is the landlord's sole about the liability phase of the trial. For the previously stated reasons, we remand the case for a new trial on damages.

**EXHIBIT E**
**DEFENDANT**

1          UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF OHIO

3              WESTERN DIVISION

4

5    EASTSIDE LINCOLN MERCURY, INC., :

6    et al.,                       :

7              Plaintiffs,    :

8                   CASE NO. C-1-01-567

9    FORD MOTOR COMPANY, et al.,      :

10                  Defendants.    :

11              - - -

12          The Deposition of GEORGE

13    BEATTIE taken by the defendants as upon

14    cross-examination, pursuant to the Ohio

15    Rules of Civil Procedure and pursuant to

16    agreement by counsel as to the time and

17    place and stipulations hereinafter set

18    forth, at the offices of Statman, Harris,

19    2900 Chemed Center, 225 East Fifth Street,

20    Cincinnati, Ohio, at 9:00 a.m. on

21    Wednesday, the 12th day of March, 2003,

22    before Margaret M. Lynch, Registered

23    Professional Reporter, a Notary Public

24    within and for the State of Ohio.

25

163

1          MR. BERBERICH: Objection.

2      A.   I don't have access to all of the

3   financial information that Mr. Woeste

4   has.  You know, all I see is a little

5   window of a Ford financial statement which

6   is not, I'm sure, the entire picture of

7   his complex.  So, when you say

8   profitability, you know, it's hard for me

9   to determine in the years that we lost

10  money if we really did lose money.  Do you

11  understand what I'm saying?

12     Q.   I have no idea what you're saying.

13          I'm looking at the little window

14  that you're responsible for.  You told me

15  that you had managerial responsibility

16  over providing the financial statements to

17  Lincoln-Mercury?

18     A.   The overseeing of that to make sure

19  they were verified but, yes.

20     Q.   And part of looking at those

21  statements, you would see what the bottom

22  line was whether it had a parenthesis

23  around it or not, correct?

24     A.   That is correct.

25     Q.   Can you tell me in which years

183

1    between the dealerships?

2         MR. BERBERICH: Objection.  That

3    presumes it wasn't chilled already.

4         MR. BERBERICH: And can get

5    colder.

6    Q.   That was a question.

7    A.   Would you restate it?  I didn't

8    understand it.

9    Q.   She will.  She'll read it back.

10        MR. BERBERICH: Objection.

11   A.   I wouldn't agree with that.

12   Q.   What financial reports or documents

13   are you privy to with respect to the

14   dealership?

15   A.   The monthly statement that is sent

16   to Ford Motor Company.

17   Q.   Okay.  Anything else?

18   A.   No.

19   Q.   Have you been requested to prepare

20   any analysis or calculation of the damages

21   resulting from the persecution of Ford

22   Motor Company to Eastside Lincoln-Mercury?

23        MR. BERBERICH: Objection.

24   A.   Analysis of damages?  No.

25   Q.   Do you know of any evidence other

EXHIBIT F
**DEFENDANT**

1

1    UNITED STATES DISTRICT COURT

2    SOUTHERN DISTRICT OF OHIO

3    WESTERN DIVISION

4    - - -

5    EASTSIDE LINCOLN MERCURY,    :    ORIGINAL

6    INC., et al.,    :

7        Plaintiffs,    :

8        vs.    :    CASE NO. C1-01-567

9    FORD MOTOR COMPANY, et al.,:

10        Defendants.    :

11    - - -

12        Deposition of JAMES M. WOODALL, a witness

13    herein, taken by the defendants as upon

14    cross-examination, pursuant to the Federal

15    Rules of Civil Procedure and pursuant to

16    agreement by counsel as to the time and place

17    and stipulations hereinafter set forth, at the

18    offices of Statman, Harris, Siegel & Eyrich,

19    2900 Chemed Center, Cincinnati, Ohio, at

20    9:45 a.m. on Friday, February 21, 2003, before

21    M. Sue Lopreato, a Registered Merit Reporter

22    and Notary Public within and for the State of

23    Ohio.

24    - - -

25

40

1   that meeting, why it was not acceptable to him?

2          A.    To the best of my recollection, it

3   was just a simple blanket statement that the

4   proposal had been turned down.  My impression

5   was that it had been turned down by somebody --

6   by Mr. Carter, I don't know, but it was turned

7   down was my impression, but no specific reasons

8   as to why it had been turned down.

9          Q.    I just lost what you were saying.

10  Can you repeat that, the last part of that?

11  There were no reasons given?

12         A.    Not to my recollection.

13         Q.    And you didn't ask for any was my

14  question to you?

15         A.    Personally, no, I did not.

16         Q.    Do you recall Mr. Woeste asking

17  for any?

18         A.    Not that I recall, no.

19         Q.    Have you done any analysis of the

20  impact of that decision on the finances of

21  Eastside?

22         A.    It would have been significant.

23         Q.    Have you done any specific

24  analysis yourself?

25         A.    Of the impact of being able to

1    consolidate and relocate operations?

2            Q.    Yes.

3            A.    Yes.

4            Q.    Is there a document that reflects

5    that?

6            A.    No.

7            Q.    Can you explain what that impact

8    is in your mind?

9            A.    Of the cost savings, is that your

10   question?

11           Q.    Yes.

12           A.    Well, yeah.  And this is certainly

13   not conclusive and certainly not a formal

14   analysis of this.  I think that's best left to

15   people who are accountants and who are experts

16   in not only variable expenses, but also fixed

17   expenses, depreciation, et cetera, et cetera;

18   but certainly, if you consolidate an operation,

19   you would be able to save a service manager

20   head count, you would be able to save a parts

21   manager head count, you would be able to save a

22   general manager head count, you would probably

23   be able to provide a higher level of service

24   and still save some of the lower level type

25   positions.  And I would say easily, off the top

104

1    I think for any franchise, that's a very low

2    number, certainly one that I don't even think

3    was worth considering, in my opinion.

4          Q.    Do you have any idea what the

5    dealership is worth today?

6                MR. BERBERICH:   Objection.   Go

7    ahead.

8          A.    You'd have to ask an accountant.

9          Q.    You mentioned earlier that there

10   were other dealers that were listed in the

11   dealer replacement opportunity box on the

12   business plan that was mailed to Eastside?

13         A.    Uh-huh.

14         Q.    Do you have any information or do

15   you have any belief, let's start there, that

16   any of those dealerships were pressured to give

17   up their stores, the ones that are no longer

18   there?

19         A.    Mr. Dixon.   I was aware of the

20   fact that Mr. Dixon had called Mr. Woeste and

21   discussed the fact that he had undergone a

22   warranty audit and had expressed the fact that

23   he thought he was being pressured by Ford.   I

24   was aware from discussions -- Jerry Carter and

25   from discussions, I was aware of -- with the

123

1    ahead.

2              MS. McNELLIE:   That's fine.

3         Q.   But I mean, you would have

4    sustained the same damages you talked about

5    right now?

6         A.   I don't know anything about

7    damages.  I think that's a legal term.

8         Q.   The same thing would have happened

9    to you, you wouldn't have had hot product, you

10   wouldn't have been able to sell them, you

11   wouldn't have been able to do the additional

12   things that you described in your prior answer,

13   right?

14        A.   Based on my experience as a

15   general manager that's trying to support his

16   dealers equally, uses some rationale for

17   distributing existing pull.

18        Q.   That's fine.  But if he tells you

19   flat out, I'm not going to give you the cars,

20   does it make any difference whether he lies to

21   you about it?

22        A.   If a regional manager who is

23   working with us comes out and lies to us, that

24   that doesn't impact how --

25        Q.   What did you do in reliance on

**EXHIBIT G**
DEFENDANT

Page 4

PROPERTIES DEVELOPMENT CO., Plaintiff-Appellant, v. EILEENR. BINGHAM, EXECUTOR OF THE ESTATE
OF PRENTICE W. REYNOLDS, et al.,Defendants-Appellees
Case No. 89-L-14-010

Court of Appeals of Ohio, Eleventh Appellate District, LakeCounty

1990 Ohio App. LEXIS 3512

August 17, 1990

PRIOR HISTORY: [*1]

Character of Proceedings: Civil Appeal from the Court of Common Pleas Case No. 86 CIV 1606.

DISPOSITION: JUDGMENT: Affirmed.

CASE SUMMARY:

PROCEDURAL POSTURE: Appellant, a would-be purchaser of real estate, sought review of a decision of the Court of
Common Pleas (Ohio), which found in favor of appellee sellers in the purchaser's action for breach of an alleged
contract to sell real estate.

OVERVIEW: The parties began negotiations with a view toward sale and purchase of the real estate in question. A letter
of intent was signed, but negotiations continued. After the sellers sent a proposal, the purchaser sent a counterproposal;
before receiving it, the sellers agreed to sell to another party and sent a letter to the purchaser withdrawing their
proposal. The buyer argued that the letter of intent was a binding contract and that the sale to the other party was
fraudulent. The trial court found in favor of the sellers. The court affirmed. The question of whether the parties intended
a contract was factual, and great deference had to be given to the trial court's decision. Numerous important items had
not been agreed on at the time the letter of intent was signed, including how earnest money would be paid, whether
special assessments were to be prorated, whether a sewer easement would be granted, and the date of execution of the
purchase agreement. The letter of intent clearly signified the beginning of the negotiation process rather than the end of
it. Because the letter of intent was not an enforceable contract, the sellers had no duty to disclose the other party's offer.

OUTCOME: The court affirmed the judgment in favor of the sellers.

CORE TERMS: letter of intent, purchase agreement, negotiation, signing, enforceable contract, assignment of error,
binding contract, real estate, negotiate, mutual intent, promissory note, first mortgage, earnest money, third party,
counterproposal, transferred, diligently, embodying, escrow

LexisNexis (TM) HEADNOTES - Core Concepts:

Civil Procedure: Jury Trials: Province of Court & Jury
Contracts Law: Formation: Formation Generally
[HN1] The question of whether parties intended a contract is factual rather than legal and must be resolved by the finder
of fact. Great deference must be given to the trial court's decision because the weight to be given the evidence and the
credibility of the witnesses are primarily for the trier of facts. The enforceability of an agreement depends on whether
the parties manifested a mutual intent to be bound by its terms and whether these intentions are sufficiently definite to be
specifically enforced.

1990 Ohio App. LEXIS 3512, *

COUNSEL: ATTY. JOSEPH P. TULLEY, Willoughby, Ohio, for Plaintiff-Appellant.

ATTY. EMIL F. SOOS, JR., Chesterland, Ohio, for Defendants-Appellees.

JUDGES: Hon. Edward A. Cox, P.J., Seventh Appellate District, Hon. Edward J. Mahoney, J., Ret., Ninth Appellate Dist., Hon. Randall L. Basinger, J., Putnam County Court of Common Pleas, sitting by assignment.

OPINIONBY: COX

OPINION: OPINION

In August of 1986, appellant, Properties Development Co., began negotiations with the estates of Prentice and Claude Reynolds, appellees, for the purchase of a fifty-three acre parcel of undeveloped real estate located on Bellflower Road in Mentor. Appellee, Eileen Bingham, is the executor of both estates. On October 22, 1986, the parties signed a letter of intent drafted by appellees' attorney. The letter of intent stated, in its entirety:

"The parties to this Agreement are Properties Development, Inc. or nominee, Purchaser and the Estate of Claude R. Reynolds, Eileen R. Bingham, Executrix and the State of Prentice W. Reynolds, Wileen R. Bingham, Administratrix; [*2] Seller. Purchaser desires to buy and Seller desires to sell 53 acres of real estate situated north of Bellflower Road, Mentor, Ohio, Permanent Parcel No. 16C-076-00-001. The purchase price shall be Three Hundred Eighty Thousand Dollars ($380,000) payable as follows:

"(a) Earnest money payable at time of signing Purchase Agreement $5,000.

"(b) Cash to be deposited in escrow $170,000.

"(c) A promissory note in the amount of $205,000 secured by a first mortgage on the real estate and payable $70,000 at the end of one year, $70,000 at the end of year two, and $65,000 at the end of year three. Said promissory note shall bear interest at the rate of one percent (1%) below the prime rate. $205,000.

"The Agreement of sale shall not be contingent upon Purchasers (sic) obtaining residential subdivision approval from the City of Mentor. Seller is not required to subordinate its first mortgage position. The property shall transfer and the $175,000 in funds shall be paid on or before December 31, 1986.

"The parties to this Letter of Intent acknowledge that the sale of this real estate is subject to the approval of the Lake County Probate Court. The parties also agree to [*3] work diligently toward getting the approval of the Lake County Probate Court and to signing a Purchase Agreement embodying the above terms and conditions."

Following the signing of the letter of intent, the parties continued to negotiate for the sale of the property. However, on October 30, 1986, Ricky Homes, Inc. presented appellees with an offer to purchase the parcel of land in question. The offer was rejected at the time by Bingham because of the pending negotiations with appellant.

Also on October 30, 1986, appellees sent a proposed purchase agreement to appellant's attorney. The proposal was more detailed than the letter of intent but misstated the price and contained numerous provisions objected to by appellant. Other provisions that appellant wanted included were left out.

Conversations between the parties continued during the month of November. On November 25, 1986, appellant's attorney sent a second proposed purchase agreement to appellees' attorney. This proposal modified four sections of the first proposal, but the changes were unacceptable to appellees.

Concurrently, on November 25, 1986, appellees reopened negotiations with Ricky Homes, [*4] Inc., and an agreement was reached. On November 26, 1986, prior to receiving appellant's counterproposal, appellees sent appellant's attorney a letter withdrawing their offer of October 30, 1986. Once appellees received appellant's counterproposal, they sent a letter stating that it was not timely and not acceptable to the estates. The real estate was transferred to Ricky Homes, Inc. on December 31, 1986.

1990 Ohio App. LEXIS 3512, *

Appellant brought an action in Lake County Common Pleas Court for breach of contract and fraud. Appellant sought compensatory and punitive damages. Appellant claimed the letter of intent executed on October 22, 1986 was an enforceable contract which appellees breached by selling the land to Ricky Homes, Inc.

A bench trial was held beginning on June 9, 1988. On December 30, 1988, the trial court found in favor of appellees based on its conclusion that neither party intended the letter of intent to be a binding contract. From that decision, appellant timely filed a notice of appeal.

Appellant presents the following two assignments of error:

"1. The trial court erred as a matter of law in not finding that the letter of intent constituted a binding contract.

"2. The court erred in[*5] not finding that fraud existed in the actions of appellees-estates when the subject real estate was transferred to a third party."

In the first assignment of error, appellant argues that the letter of intent executed on October 22, 1986 was a binding contract. Appellant asserts that it contained no ambiguities but was clear and contained the essential terms necessary to create an enforceable contract.

[HN1] The question of whether the parties intended a contract is factual rather than legal and must be resolved by the finder of fact. Arnold Palmer Golf Co. v. Fuqua Industries, Inc. (C.A. 6, 1976), 541 F. 2d 584, 588. Great deference must be given to the trial court's decision because the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of facts. State v. DeHass (1967), 10 Ohio St. 2d 230.

The enforceability of an agreement depends on whether the parties manifested a mutual intent to be bound by its terms and whether these intentions are sufficiently definite to be specifically enforced. Normandy Place Assoc. v Beyer (1982), 2 Ohio St. 3d 102.

In the present case, there were numerous important items that had not been [*6]agreed upon at the time the letter of intent was signed. Appellant wanted the earnest money placed in escrow with a title company, while appellees wanted the earnest money paid directly to the estates. With respect to the payment of special assessments, appellees' proposal stated that assessments were to be prorated as of the date of transfer of title, whereas appellant wrote the words "no assessments" across appellees' proposal. The parties also disagreed as to whether a preliminary title report was necessary. Additionally, at the time of signing the letter of intent, the parties had not agreed on selecting a title company. Also, there was no agreement regarding the granting of a sewer easement. Finally, there was no agreement as to the date of execution of the purchase agreement.

Further evidence that an enforceable contract did not exist at the time of execution of the letter of intent is the language of the letter itself wherein it is stated:

"* * * The parties also agree to work diligently toward getting the approval of the Lake County Probate Court and to signing a Purchase Agreement embodying the above terms and conditions."

Then, in the second proposed purchase agreement, [*7] submitted on November 25, 1986, appellant included the following language:

"This Agreement merges all prior negotiations and understandings, and there are no other agreements or understandings, oral or otherwise, between the parties [pertaining] to the subject matter of this Agreement."

This is consistent with testimony in the record that the parties continued to negotiate after the letter of intent had been executed. Appellee, Eileen Bingham, testified that the estates did not consider the letter of intent to be a binding contract. Irving Fine, a partner in Properties Development Co., testified on behalf of his company that he thought the letter of intent was binding; however, such conclusion was inconsistent with the continuing negotiations that occurred and subsequent proposed purchase agreement that they submitted. It is clear that the letter of intent signified the beginning of the negotiation process rather than the end of it.

1990 Ohio App. LEXIS 3512, *

Based on the foregoing, the trial court's decision that the parties did not manifest a mutual intent to be bound was proper as it was supported by some competent, credible evidence.

Appellant's first assignment of error is without merit.

In the second[*8] assignment of error, appellant maintains the trial court erred in not finding that appellees committed fraud in transferring the property in question to a third party, Ricky Homes, Inc.

Since the trial court found that the letter of intent was not an enforceable contract and, further, that the offer from Ricky Homes, Inc. on October 30, 1986 was turned down by appellees, it is difficult to see how the concealment of said offer from appellant would constitute fraud. Appellees were free to negotiate with whomever they pleased. Appellant was not entitled to rely on appellees' silence because appellees owed no duty to appellant. For the foregoing reasons, the trial court correctly concluded that appellant did not establish constructive or actual fraud.

Appellant's second assignment of error is not well taken.

The judgment of the trial court is affirmed.

**EXHIBIT H**
DEFENDANT

## BEFORE THE MOTOR VEHICLE DEALERS BOARD OF OHIO

IN THE MATTER OF:

| | | |
|---|---|---|
| David Flynn, Individually and Columbiana Buick Olds Cadillac, Inc. et al | : : | Case No: 02-02-MVDB-263-SS |
| Protestant | : : | Hearing Examiner: |
| vs | : : | Scot A. Stevenson |
| General Motors Corporation | : : | **RECOMMENDATION** |
| Respondent | : : | **ON MOTION TO DISMISS** |
| | : : | **AND MOTION FOR** |
| | : | **SUMMARY JUDGMENT** |

For the Protestant:
Attorney Christopher M. DeVito:
Morganstern, MacAdams & DeVito Co., Burgess Building, Suite 400, 1406 West Sixth Street, Cleveland, Ohio 44113-1300

For the Respondent:
Attorney Jeffrey Jones:
Jones, Day, Reavis & Pogue, 1900 Huntington Center, 41 South High Street, Columbus, Ohio 43215

This case came to be heard by the Hearing Officer upon a Motion to Dismiss filed by General Motors Corporation, and a Motion for Summary Judgment filed by Columbiana Buick Olds Cadillac Co. and David Flynn. The Hearing Officer recommends the Board dismiss the protest as Ohio law provides no remedy for a new motor vehicle dealer approving a transfer of a franchise but denying a proposed relocation as part of the franchise transfer.

The protest in this case was filed on February 7, 2002. The protest was filed by both David Flynn as an individual, the principal share holder of Columbiana Buick Olds Cadillac

1

Co., and Columbiana Buick Olds Cadillac Co. (Columbiana B-O-K). In the protest Flynn individually and Columbiana B-O-K alleged that General Motors Corporation, (GM), wrongfully denied the proposed transfer and relocation of a GM franchise which Flynn and his corporation were attempting to purchase. In the protest, Flynn and Columbiana B-O-K acknowledge receiving letters on January 18, 2002, and January 19, 2002. In the January 18, 2002, letter, GM initially indicated that it was denying the proposed transfer. However, in the letter received January 19, 2002, GM clarified its position that it was not denying the proposed sale of the franchise but rather was only denying the relocation of the franchise. This distinction is also noted in Protestant's response to Motion to Dismiss.

GM moved to dismiss this protest alleging that Ohio law did not provide a remedy for the denial of a relocation and that Mr. Flynn did not have standing. Protestant, David Flynn, and Columbiana B-O-K move for Summary Judgment in this case.

The hearing officer has had an opportunity to review the briefs filed by the parties in this case, the relevant case law, and Ohio statutes and has determined that it would be appropriate to recommend dismissal of this case.

In reviewing a Motion to Dismiss under Civil Rule 12(B)(6) the trier of fact must accept all the facts or allegations of the complaint or protest as true and all reasonable inferences must be drawn in favor of the non-moving party. Byrd v. Faber (1991) 57 Ohio St. 3d 56. In order to grant a Civil Rule 12(B)(6) Motion to Dismiss it must appear beyond doubt that Plaintiff can prove no set of facts in support of his claim which would entitle him to relief. O'Brien v. Univ. Community Tennants Union, Inc. (1975) 42 Ohio St. 2d 242, 245. In this case, the Protest references two letters sent by General Motors Corporation on January 17th

2

and 18th, 2002, and received by Protestants on or about January 18th and 19th, 2002. The parties do not dispute that the first letter sent by General Motors and received by the Protestants provided that GM was denying the proposed transfer of the franchise and that the second letter sent by GM to the Protestants clarified GM's position and provided that the proposed transfer was approved but the relocation proposed by Flynn and Columbiana B-O-K was denied. Thus, the legal issue to determine in this case is whether there was a remedy for a new motor vehicle dealer permitting a proposed transfer of a franchise but denying the relocation of that franchise at the same time.

There are two potential sections of the Ohio Revised Code which may be relevant. The first cited in Flynn's Protest is Ohio Revised Code Section 4717.50. That section provides in part for notice of relocation of a new vehicle dealer and protests of those relocations. However, nowhere in Ohio Revised Code Section 4517.50 is there any remedy to a franchisee to appeal or protest the denial of a relocation of a franchise. Nor does Flynn or Columbiana B-O-K point to any case law that provides for that remedy in Revised Code 4517.50. In construing statutes, a Court or Administrative Bodies' paramount concern is the legislative intent in enacting that statute. State v. S.R. 63 Ohio St. 3d 590, 594. A trier of fact first looks to the language of the statute itself to determine the legislative intent and may not delete words used or insert words not used. Shover v. Cordis, (1991) 61 Ohio St. 3d 213, State v. S.R., Supra; Kline v. Ohio Bureau of Motor Vehicles, (1991) 62 Ohio St. 3d 93. If the language of a statute is clear and unequivocal, a Court or Administrative body must apply this statute accordingly. Providan Bank v. Wood, (1973) 36 Ohio St. 2d 101. The language of Revised Code Section 4517.50 is clear and unequivocal and does not provide a remedy for any denial

3

of a proposed relocation.

The only other possible location for any remedy for the Protestants in this case would be Revised Code Section 4517.56. That section provides for the procedure upon the proposed transfer of a franchise. That section initially provides that the franchisee shall notify the franchisor of an intent to sell or transfer a business involving a new motor vehicle franchise. That section then provides in Paragraph C

> "Within ninety days of receipt of a notice of refusal as provided in division B of this section, the franchisee or prospective transferee may file a protest with the board against the Franchisor's failure to approve the propose sale or transfer...."

That section then provides in Paragraph (E) that in reviewing whether the franchisor had good cause for failing to approve a sale or transfer it is not good cause to deny the transfer solely because the proposed transferee proposed to relocate the business of the transferor. See R.C. 4517.56 (E)(5). Again, this hearing officer is required to review the language of the statute involved to determine the legislative intent regarding whether a remedy exists to protest the approval of a sale or transfer of a motor vehicle franchise but the denial of a proposed relocation included in that sale or transfer.

It must be noted initially that Revised Code Section 4517.56 applies only to a sale or transfer of the business and assets and not a proposed relocation. Revised Code Section 4517.56(E)(5) only provides that one element in determining whether good cause exists to deny the sale or transfer is whether the proposed transferee proposes to relocate the business of the transferor. Nowhere in that section is it required that a Franchisor must permit a

4

relocation if it is included in a buy-sell agreement. Absent specific statutory language from the Ohio General Assembly creating that remedy, this Hearing Officer does not recommend that it is appropriate to authorize it.

Further, GM points out that Protestant's interpretation of Revised Code 4517.56 would place franchisor in the untenable position of having first to argue that there was not good cause to approve the transfer with the relocation in an action against a franchisee, and, then, if the franchisor lost it would then have to present a case that there was good cause for the relocation if other dealers opposed the relocation. Under the Protestant's theory, GM is required to approve the proposed relocation if it approves the proposed sale or transfer of the business. GM would be required to do this even if it did not think there was clear and sufficient good cause evidence to justify the proposed relocation under the standards of Ohio law and its dealers agreements or GM would be required to deny the entire buy/sell agreement. Under that theory GM would have to prove at the first trial that there was not good cause to turn down the proposed relocation. GM would then bear the burden of proving that existing marketing conditions and other factors did not warrant the proposed relocation. If GM lost in that case they could be ordered to pay the Protestant's attorneys fees. At that point GM would have to send out a notice to all the other dealers who would be eligible to protest the proposed relocation as required by Revised Code Section 4517.50. If any other dealer protested, GM would have to prove at a second trial that there was good cause to justify the relocation. Thus, GM would be required to prove in different trials that there was good cause for their relocation and in a separate action there was not good cause for the relocation. It is a cardinal rule of statutory construction that the statute should not be interpreted to yield an

5

absurd result. <u>Mishr v Board of Zoning and Appeals</u>, (1996)76 Ohio St. 3d 238, 2397. In reading Ohio's Franchisor's protest rights as a whole it is clear that they do not provide a remedy for a denial of a relocation or require Franchisors to approve a relocation as a portion of a buy-sell agreement. Accepting Protestant's arguments would create a right to protest a denial of a relocation that does not exist under Ohio's statutes.

Also with their Motion for Summary Judgment, Protestants allege that GM violated R.C.4517.56 (B) by failing to provide written notice by certified mail of any refusal to approve a sale or transfer of the business and assets within thirty (30) days of the written notice advising them of the proposed transfer. In this case however, the hearing officer finds it is not relevant because there was no denial of the buy-sell agreement by GM. Further, the hearing officer does not reach the issue of whether the notice provided to GM provided all the requirements of R.C. Section 4517.56(A). If the notice did not meet all the requirements of R.C. 4517.56(A) then GM would not have been required to respond within thirty (30) days. Lastly, whether GM responded within thirty (30) days merely is one factor to use in determining whether good cause existed to deny the proposed sale or transfer of the franchise. <u>Chrysler v Bowshier</u> (March 28, 2002) Franklin App No: 01AP-921, unreported. Whether good cause existed for the denial of a proposed buy-sell agreement is only considered if there is a denial of a proposed buy/sell agreement. In this case, GM approved Flynn's offer to buy the franchise in question. Accordingly, Flynn and Columbiana B-O-K's motion for summary judgment on these grounds must be denied.

Lastly, GM alleges in its Motion to Dismiss that Flynn does not have standing to pursue this claim. Whether Flynn has standing would turn on a number of factual issues including

whether Flynn was a party to the agreement to purchase the franchise. As GM has brought a Motion to Dismiss, the Hearing Officer is required at this point to accept all the allegations of the Complaint as true and the Petition seems to allege that Flynn has an interest in the contract to purchase Midway Motor Sales, a GMC franchise. Accordingly, this hearing officer finds that the Motion to Dismiss based upon standing cannot be sustained at this point. The hearing officer would need to take further evidence to determine whether Mr. Flynn had standing to pursue this appeal. However, as the hearing officer has determined that there is no cause of action in the protest filed by Flynn in this case it is appropriate to recommend the dismissal of the appeal at this time.

Accordingly, it is the recommendation of this Hearing Officer that the Board dismiss the Protest of David Flynn and Columbiana B-O-K with prejudice and that each party be responsible for their own costs and attorneys fees.

Hearing Examiner Stevenson

C:\WORD\BM.V\COLUMBIANA.ORD

7

EXHIBIT I
DEFENDANT

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND

**RECEIVED**

**AUG 5 2002**

**AT SA&B**

In re:                                    *

NORMANDY FORD, INC.,                      *        Case Number: 96-5-9105-JS
                                                   (Chapter 11)
        Debtor                            *

*      *      *      *      *      *      *      *      *      *      *      *      *

NORMANDY FORD, INC.,                      *
CHARLES W. GRIM AND
ESTHER A. GRIM,                           *

                                                   Adversary Pro. No.: 97-5208-JS
        Plaintiffs                        *

v.                                        *

                                                   **FILED**
FORD MOTOR COMPANY, INC.                  *
AND FORD MOTOR CREDIT                               **AUG - 1 2002**
CORPORATION,                              *
                                                   CLERK'S OFFICE
                                                   U.S. BANKRUPTCY COURT
        Defendants                        *        DISTRICT OF MARYLAND
                                                   BALTIMORE

*      *      *      *      *      *      *      *      *      *      *      *      *

### MEMORANDUM OPINION GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND DISMISSING COMPLAINT

The defendants, Ford Motor Co. ("Ford Motor") and Ford Motor Credit Corp.

("Ford Credit") filed motions for summary judgment [PP. 55, 76 and 79]. This Court

entered an order denying summary judgment [P. 103], as set forth in the Memorandum

Opinion Denying Defendants' Motions for Summary Judgment ("Memorandum

Opinion") [P.102]. Ford Credit filed a motion to alter or amend the order [P. 104] and



AO 72A
(Rev 8/82)

Ford Motor filed a motion for reconsideration of the denial of summary judgment [P. 106]. Both motions asserted that the Court had not addressed arguments presented in the defendants' motions for summary judgment, had not acknowledged "the Plaintiffs' absolute failure to produce any evidence in support of their remaining causes of action," and that the Court had applied the wrong legal standard for summary judgment. For the following reasons, this Court will grant summary judgment to the defendants.

### THIS COURT APPLIED THE CORRECT LEGAL STANDARD TO THE ISSUES EXAMINED IN DENYING THE SUMMARY JUDGMENT MOTIONS

The Memorandum Opinion addressed three issues: 1) whether the plaintiffs provided a general release of liability to defendant Ford Motor upon termination of the dealer franchise; 2) whether the complaint was barred under the three-year statute of limitations on contract actions; and 3) whether the corporate parent Ford Motor and its subsidiary Ford Credit, as a matter of law, could engage in a civil conspiracy.

The Memorandum Opinion applied the following standard for summary judgment:

> Summary judgment is only appropriate when: (1) the pleadings, depositions, answers to interrogatories, admissions on file and affidavits show that there is no genuine issue of material fact; and 2) the moving party is entitled to judgment as a matter of law. "In determining the facts for summary judgment purposes, the court may rely on affidavits made with personal knowledge that set forth specific facts otherwise admissible in evidence and sworn or certified copies of papers attached to such affidavits." *Sharpel Properties, Inc. v. Insley (In re Insley)*, Adv. Pro. 98-

2

6038-SD, unpublished opinion of Judge E. Stephen Derby of this Court, dated Sept. 30, 1999, citing Fed.R.Civ.P. 56(c); Fed.R.Bankr.P. 7056; *Bailey v. Blue Cross & Blue Shield of Virginia*, 67 F.2d 53, 56 (4th Cir. 1995); *Miller v. FDIC*, 906 F.2d 972, 973 (4th Cir. 1990). Permissible inferences to be drawn from the underlying facts are viewed in the light most favorable to the nonmoving party. *Miller*, 906 F.2d at 973-74 (4th Cir. 1990) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 206 S.Ct. 1348, 1356 (1986). All of the facts and inferences set forth above have been construed in a light most favorable to the plaintiffs.

Memorandum Opinion Denying Defendants' Motions for Summary Judgment, p. 9, Normandy Ford, Inc., *Charles W. Grim and Esther A. Grim, v. Ford Motor Company, Inc. and Ford Motor Credit Corporation*, AP 97-5208-JS (*In re Normandy Ford, Inc.* Case No. 96-5-9105-JS).

This standard is the correct legal standard for summary judgment. The Court found specifically that the plaintiffs did not waive their rights to complain about the defendant's pre-petition conduct in refusing approval of the sale of the Normandy Ford dealership to Vincent Sheehy as part of their claims of conspiracy and breach of contract. Memorandum Opinion, p. 13. As stated in the Memorandum Opinion, there is a genuine material factual dispute "whether when the plaintiffs voluntarily terminated the franchise agreement, any and all claims held by the plaintiffs against the defendants were automatically waived, despite the plaintiffs' reservations of rights." *Id.*

3

The Court also found that whether the contract claims were untimely depended on a resolution of material facts in dispute. Memorandum Opinion, p. 10. Consequently, summary judgment is inappropriate with respect to the issue of limitations.

Finally, as to the legal issue of whether a parent and subsidiary may conspire, the Court noted that the defendants had incorrectly argued that the narrow holding of an antitrust case, *Copperweld Corp. v. Independence Tube Corp.,* 476 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), applied to the present case. Indeed, much of the defense to the conspiracy claim rests on the defendants' assertions that Ford Motor and Ford Credit exercised separate and independent business judgment in supplying (or not supplying) automobiles for the plaintiffs to sell and in providing credit to the debtor. The defendants never argued that one corporation was the alter ego of the other, or that their identities were so merged as to make them one. In Maryland, corporations are separate and distinct entities. Indeed, a subsidiary corporation, for whatever purpose it may exist, is a separate corporate entity, even if all of its stock is owned entirely by another. *See Food Fair Stores, Inc. v. Blumberg,* 234 Md. 521 (1964). Therefore, while one defendant was the subsidiary of the other, it would ignore the separate legal identity of each corporation to assume the defendants were incapable of conspiring with each other.

4

Nevertheless, while the Court properly denied the defendants' motions on the foregoing issues, reconsideration of Ford Motor's second motion for summary judgment and a careful re-examination of the plaintiffs' remaining causes of action requires that summary judgment be granted to the defendants on all remaining counts.

## FINDINGS OF FACT

The plaintiffs, Charles and Esther Grim, operated Normandy Ford, Inc. ("Normandy"), an independent Ford automobile dealership in Ellicott City, Maryland. Mr. Grim was president and general manager of Normandy, and upon his disability, was succeeded by Mrs. Grim as acting chief executive officer. Ford Motor is a manufacturer of motor vehicles and related parts and accessories which it sells to authorized dealers for resale to the public. Under a sales and service agreement executed on June 1, 1972, Ford Motor franchised Normandy as an authorized dealer for this purpose.

The sales and service agreement provided that Ford Motor would estimate the volume of and monthly production schedules based on orders submitted by the dealer, offer training and development advice, counseling, national advertising and other assistance. For its part, the dealer was required to make investments or commitments as needed for retail sales, facilities and equipment, working capital, inventories and lines of credit. Ford Motor reserved the right to cease doing business with any dealer

5

AO 72A
(Rev.8/82)

that did not contribute to the company's overall success and business objectives. The dealer reserved the right to cease doing business as a Ford franchisee.

Ford Credit is a wholly-owned subsidiary of Ford Motor and provides financing to authorized dealers for the purchase of Ford vehicles. Affidavit of Thomas Dezure, Exhibit B to Paper 57. Ford Credit entered into an agreement with Normandy to provide Normandy with a line of credit to finance the purchase of new and used vehicles from Ford Motor for sale to the public. Normandy executed financing agreements with Ford Credit that gave Ford Credit a first priority security interest in new and used vehicles, parts, accounts receivable, furniture, fixtures, general intangibles and proceeds. Normandy received a wholesale line of credit which required it to hold in trust for Ford Credit the proceeds from the sale of vehicles to the extent of the amounts owed to Ford Credit for the vehicles sold and to remit the proceeds to Ford Credit. Normandy was authorized to order vehicles from Ford Motor without the prior approval of Ford Credit, conditioned upon Normandy not being in default of the agreement.

In the late 1980s, Normandy encountered difficulties in meeting sales quotas set by Ford Motor. In February, 1987, Ford Motor representative Richard Volante met with Charles Grim to review Normandy's sales and profit performance. Plaintiffs' Exhibit 22. In order for Normandy to achieve the targeted increase in sales, Ford

Motor recommended: relocating to a new site; increasing advertising expenditures; hiring an additional new car manager; increasing the sales force; and implementing a sales control system. However, Mr. Grim responded that the current lease and zoning prevented him from relocating, the amount suggested for investment in advertising was too high and no additional manager or sales force would be hired. *Id.* The report also stated that termination of the franchise would be recommended if significant improvements were not made within six months. *Id.* In 1987, Mr. Grim requested permission to relocate his dealership to Columbia, Maryland, in an effort to expand the business and more effectively compete with other dealers in the area, but Ford Motor did not consent.

In 1990, Ford Motor conducted a market study for determining preferred new dealer locations. A Ford Market Representation Plan dated March, 1990, slated Columbia, Maryland as a "future preferred location," with Monument Ford of Baltimore City to be moved to that location. Plaintiffs' Exhibit 7, unnumbered seventh page. The same Market Representation Plan indicated "No Plan*" for Normandy Ford, but with an asterisk referencing that statement that "Although there are no plans presently recommended for this dealership, we recognize that circumstances or opportunities may emerge to expand, modernize or even relocate before the next study. Should such circumstances or opportunities exist, they will be evaluated on an

7

individual basis." *Id.*   The same study also slated the Inner Harbor Open Point for elimination. *Id.*

In May, 1990, Mr. Grim was informed again that the dealership's performance continued to be substandard.  Plaintiffs' Ex. 24.  Alternative actions discussed were increased investment in the dealership to increase sales performance or sale of the dealership with Ford Motor's assistance in finding a buyer.  *Id.*   The Dealer Contact Report referenced resolution of a dispute between Mr. Grim and his brother[1] that had prevented any consideration of sale until then.  *Id.*  He was told that failure to sell or improve sales to acceptable levels could lead to possible termination of the franchise. *Id.*

The Grims decided to sell the dealership.  On the recommendation of Ford Motor, Allan Szymkowiak was installed as general manager of Normandy while he negotiated a purchase agreement.

According to the complaint, during the same period, the Ford franchise for Monument Ford, a dealership in Baltimore City formerly known as Tower Ford, was transferred to one George Doetsch, alleged to have been a friend of Robert L. Rewey, who was then Ford Motor Vice President for Sales.  Early in 1991, with reports of

---

[1]The original Agreement provided that Charles Grim and Kenneth Grim were co-owners of the franchise.

8

financial trouble at Monument Ford, Mr. Rewey approved Mr. Doetsch's request to relocate the dealership to Columbia, Maryland. In July, 1991, Ford Motor bought Monument Ford for $1,180,000, and established it as a "Dealer Development" franchise, a type of dealership normally reserved for minority operators. During the same month, a Ford Motor representative met with Messrs. Grim and Szymkowiak. While sales performance had improved, sales still "fell far short of the assigned share," and the franchise remained a candidate for termination. Plaintiffs' Exhibit 27.

In November, 1991, Mr. Grim suffered a severe stroke and Mrs. Grim assumed responsibility for management and control of the dealership. In January, 1992, a Ford Motor representative met with Mr. Szymkowiak. Plaintiffs' Exhibit 28. Normandy's performance had improved, but remained below par. *Id.* Due to Mr. Grim's stroke, the buy/sell agreement between Messrs. Grim and Szymkowiak had not been completed. *Id.* This time, no mention was made of termination. *Id.*

In July, 1992, Mrs. Grim hired Mark Breidenstein to help run the business. In November, negotiations with Mr. Szymkowiak for the purchase of Normandy fell through and he left Normandy in a dispute over money.[2] Plaintiffs' Exhibits 23 and 25.

---

[2]Szymkowiak apparently sued Normandy Ford and Charles Grim. *See* Plaintiffs' Exhibit 25.

9

Thereafter, Mrs. Grim requested assistance from Ford Motor for renovations and other improvements to prevent further losses.

By the end of 1993, Ford Motor had spent over $3 million to "prop up" Monument Ford. The dealership closed, and in early 1994, Ford Motor bought the land, paid for the construction of Apple Ford in Columbia and installed Mr. Doetsch as the owner. Thereafter, Normandy experienced a dramatic deterioration in sales.

In the spring of 1995, Ford Motor encouraged Normandy to buy Ford Escorts and Taurus SHO vehicles in connection with a national promotion, in return for various incentive programs being offered other Ford dealerships. On behalf of Normandy, Mr. George Bowie placed orders for the vehicles. His rationale for going along with Ford Motor's request to take delivery of the vehicles was his belief that the dealership would thereby benefit from Ford's assistance in the future, including delivery of Explorers, which were in hot demand and short supply.

In May, 1995, Ford Credit discovered that vehicles included in the Normandy floor plan had been sold out of trust, that is, proceeds from the retail sales of vehicles had not been properly remitted. Ford Credit increased the amount of Normandy's available credit line. Finally, when Normandy's default continued, Ford Credit refused further financing, terminated its used car credit line and called in its notes.

10

In March, 1996, Ford Credit sued Normandy in the Circuit Court for Howard County, seeking payment under the agreements and turnover of its collateral. In response, the Grims attempted to sell the dealership. Several dealers expressed interest, including Miller Brothers Chevrolet ("Miller Brothers"), Herb Gordon Chevrolet, and Vincent Sheehy. Mr. Sheehy executed an agreement for the purchase of the dealership which was rejected by Ford Motor because he did not satisfy certain dealership criteria established by the company.

On September 9, 1996, Normandy filed the instant voluntary Chapter 11 petition in this Court. By letter dated November 6, 1996, Normandy resigned as a Ford dealership, thereby terminating the sales and service agreement with Ford Motor. On November 13, 1996, this Court approved Normandy's motion for a sale of the dealership and the land upon which it was located to Miller Brothers. The Grims joined in the sale because they held separate title to the real estate upon which the dealership was situated. All parties, including Mr. and Mrs. Grim, consented to the terms of the sale. Later, the Grims and the dealership filed the instant suit in State court, which Ford Motor and Ford Credit removed to this Court.

By order dated October 30, 1997, this Court dismissed three counts of the instant complaint, namely Counts 1, 4 and 7, that respectively alleged tortious interference,

11

violation of Section 15-211 of the Maryland Transportation Code and gender discrimination. The remaining four counts now before the Court are:

Count 2, alleging Ford Motor breached its obligation of good faith and fair dealing under the Dealer Sales and Service Agreement;

Count 3, alleging violations of Maryland Transportation Code Section 15-208, which prohibits manufacturers, distributors or factory branches from refusing to deliver new vehicles to a dealership in reasonable quantities and within a reasonable time after receipt of a written order for those vehicles, if the manufacturer, distributor, or factory branch advertises their immediate availability and the dealer has a contract for their sale to the public. MD. TRANS. CODE ANN. § 15-208(a)-(c)(1999);

Count 5, alleging violations of the Maryland Transportation Code Sections 15-207, which prohibits a manufacturer, distributor, or factory branch from coercing any dealer to accept delivery of any vehicle it did not voluntarily order. MD. TRANS. CODE ANN. § 15-207(c)(1999); and

Count 6, alleging that Ford Motor and Ford Credit conspired to force Normandy Ford out of business.

## CONCLUSIONS OF LAW

The purpose of summary judgment in the judicial process is "to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477

12

U.S. 317, 323-4 106 S.Ct. 2548, 2553 (1986). The threshold question in summary judgment is the determination "whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed. 2d 202 (1986). However, there simply is no issue for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.*

### THE LEGAL STANDARD FOR SUMMARY JUDGMENT WITH RESPECT TO SUFFICIENCY OF THE EVIDENCE

As the Supreme Court stated in *Celotex Corp. v. Catrett*:

> . . .Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

477 U.S. at 322, 106 S.Ct. at 2552.

The defendants argued that summary judgment is appropriate in this case under the standard of *Celotex* because after adequate time for discovery and upon motion, the

13

plaintiffs failed to make a showing sufficient to establish the existence of an element essential to that plaintiffs' case and on which the plaintiffs will bear the burden of proof at trial. The nonmoving party is not required to produce evidence in a form that would be admissible at trial in order to avoid summary judgment or to depose its own witnesses. 477 U.S. at 324, 106 S.Ct. at 2553. However, once a defendant makes a properly supported motion for summary judgment, the burden shifts to the plaintiff to set forth specific facts showing there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). As the Supreme Court stated in *Anderson:*

> If the defendant in a ... civil case moves for summary judgment ... based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 252, 106 S.Ct. at 2512.

Once the defendants' have raised the issue of the sufficiency of the evidence, it is incumbent on the Court to examine each of the challenged causes of action to determine whether plaintiffs have advanced sufficient evidence for each essential element of each action to permit them to go forward. Discovery has been completed. Accordingly, each of the remaining counts will be examined in turn.

14

## COUNT 2 - BREACH OF CONTRACT BY FORD MOTOR COMPANY

The complaint alleged that Ford Motor breached the Dealer Agreement that governed their relationship as franchisor and franchisee by violating its "obligation of good faith and fair dealing in performing its obligations under the Dealer Agreement." The specific allegations were:  1) Ford Motor refused to approve the sale of the dealership to anyone other than Miller Brothers; 2) Ford Motor refused to provide requested support and assistance to Normandy; and 3) Ford Motor failed to provide cars in high demand and instead delivered vehicles that Ford Motor knew Normandy would not be able to sell in sufficient quantities in a reasonable time, thus causing monetary damage.

In any contract dispute, the terms of the agreement will generally govern the outcome of the dispute.  In this case, the contract between Ford Motor and the plaintiffs provided that: "The parties intend this agreement to be executed as a Michigan Agreement and to be construed in accordance with the laws of the State of Michigan." Under Michigan law, the implied covenant of good faith cannot override an express provision in a contract. *Eastway & Blevins Agency v Citizens Ins Co of America,* 206 Mich.App 299, 303; 520 N.W.2d 640 (1994). "The implied covenant of good faith under Michigan Law ... neither overrides nor replaces any express

15

AO 72A
(Rev.8/82)

contractual rights." *Van Amem Co v Manufacturers Hanover Leasing Corp*, 776 F Supp 1220, 1223 (ED Mich, 1991).[3]

The contract at issue, however, contained an express provision defining good faith. Section 16 governs the good faith relationship between the dealer and Ford Motor, as follows:

> In the interest of maintaining harmonious relationships between the parties to this agreement, the Dealer shall report promptly in writing to the Company's Dealer Policy Board (hereinafter called "Policy Board") any act or failure to act on the part of the company or any of its representatives which the Dealer believes was not in accordance with this agreement or was not reasonable, fair, for good cause or provocation or in good faith to the Dealer. For the purposes of this agreement, the term "good faith" shall mean the Company and its representatives acting in a fair and equitable manner toward the Dealer so as to guarantee the Dealer freedom from coercion or intimidation from the Company.

Sales and Service Agreement, Section 16, p. 15, Exhibit C, Statement of Material Facts As to Which There is No Genuine Dispute In Support of Defendant Ford Motor Company's Motion for Summary Judgment [P. 57].

The provision can be divided into two parts. First, a dealer must report any bad faith act "promptly in writing to the Company's Dealer Policy Board." *Id.* Neither the

---

[3]Similarly in Maryland, "the implied duty of good faith and fair dealing" is "of limited scope and only operates where it would not contradict a contract's express terms." *Enfield Equipment Co., Inc. v. John Deere Co.*, 64 F.Supp.2d 483, 486 (D.Md. 1999)(citing *Dupont Heights Ltd. Partnership v. Riggs Nat'l Bank of Washington*, 949 F.Supp. 383, 389-90 (D.Md. 1996); *Cambridge Title Co. v. Transamerica Title Ins. Co.*, 817 F.Supp. 1263, 1275 (D.Md.1992)).

16

plaintiffs nor the defendants submitted any evidence of a written complaint to the Policy Board by Normandy or the Grims. Second, good faith is specifically defined as "acting in a fair and equitable manner toward the Dealer so as to guarantee the Dealer freedom from coercion or intimidation from the Company." *Id.* Of course, the plaintiffs have alleged that Ford Motor coerced Normandy into accepting vehicles it knew would sell slowly or not at all. However, before any evidence regarding coercion presented by the plaintiffs may be examined for its sufficiency, the statutory definition and case law definitions of coercion in this context must be considered.

Michigan's Compiled Laws governing motor vehicles and the relationship between the manufacturer/franchisor and the dealer/franchisee do not contain a definition of coercion. *See* MICH. COMP. LAWS ANN. §§ 445.1562, *et. seq.* (2002). However, "freedom from coercion or intimidation" is a standard defined in Federal law under the Automobile Dealers' Day in Court Act ("ADDCA"), *see* 15 U.S.C.A. §§ 1221-1225 (West 2002), in State law under the Maryland Dealers' Act ("MDA"), *see* MD. CODE ANN. TRANSP. §§ 15-207 & 15-208 (1999)(Counts 3 and 5 of this action), and in case law interpreting both. Where both Federal and State courts have provided prior guidance, there is no need to create a new definition or standard of coercion.

Section 1221(e) of the ADDCA provides the standard:

17

(e) The term "good faith" shall mean the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: Provided, That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.

15 U.S.C. § 1221(e)(West 2002). In interpreting the ADDCA, "[e]very circuit court of appeals that has addressed the issue has held that coercion or intimidation must include a wrongful demand accompanied by the threat of sanctions for noncompliance." *Colonial Dodge, Inc. v. Chrysler Corporation*, 11 F.Supp.2d 737,743 (D.Md. 1996), *aff'd* 121 F.3d 697 (4th Cir. 1997)(citations omitted). Further, under Maryland law,

[t]he State Act prohibiting coercion of dealers generally mirrors the ADDCA, although it provides more specific standards for coercion.

The Maryland Transportation Code § 15-207 states:

(a) "Coerce defined."–In this section:

(1) "coerce" means to compel or attempt to compel by threat of harm, breach of contract, or other adverse consequences: and

(2) "Coerce" does not mean to argue, urge, recommend, or persuade...

While there are slight differences between the state and federal statues, "coercion" under both the State Act and the ADDCA embodies the same concept, and accordingly the same analysis applies.

18

11 F.Supp.2d at 744 (*citing Cemar, Inc. v. Nissan Motor Corp. in U.S.A.,* 713 F.Supp. 725, 730 (D.Del. 1989). Similarly, the Fifth Circuit, in interpreting an automobile dealer's claim for breach of good faith and fair dealing held that the good faith standard under the Mississippi Motor Vehicle law was the same as that under the ADDCA and declined to read a broader definition of the term "coerce" into the Mississippi statute. *Hubbard Chevrolet Co. v. General Motors Corp.,* 873 F.2d 873, 876 (5th Cir. 1989)(manufacturer's alleged arbitrary denial of relocation requests did not rise to the level of coercion, and under Michigan law, the implied covenant of good faith and fair dealing did not apply to relocation dispute).

A plaintiff fails to state a claim for breach of the covenant of good faith absent a showing of coercion: the wrongful demand coupled with a threat of sanctions. *Sink v. Ford Motor Co.,* 549 F.Supp. 245, 249 (E.D. Mich. 1982)(*citing Overseas Motors, Inc. v. Import Motors, Ltd., Inc.,* 519 F.2d 119, 125 (6th Cir.) *cert. denied,* 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975)).

*THERE IS INSUFFICIENT EVIDENCE THAT FORD'S REFUSAL TO APPROVE THE SALE OF THE NORMANDY DEALERSHIP TO ANYONE OTHER THAN MILLER BROTHERS AMOUNTED TO COERCION OR INTIMIDATION.*

The plaintiffs asserted that Ford's refusal to approve the sale of Normandy to Vincent Sheehy, another Ford dealer, for a larger sum than the amount paid to Normandy and the Grims in the court-approved sale to Miller Brothers was in bad faith.

19

However, the contract specifically reserved Ford's right to approve such transfers.[4]

---

[4]The Preamble to the Sales and Service Agreement states:

F. In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement....the Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the company unless and until embodied in an appropriate amendment or assignment of this agreement, as the case may be, duly executed and delivered by the Company and the Dealer. The company shall not unreasonably withhold its consent to any such change.

*See* Statement of Material Facts as to Which There is No Genuine Dispute in Support of Defendant Ford Motor Company's Motion or Summary Judgment, Exhibit C, Ford Sales and Service Agreement, p. iii-iv. Section 24(a) of the Sales and Service Agreement also provides:

Company Right to Approve Change In Ownership.

(1) in view of the nature, purposes and objectives of the Company's Dealer Sales and Service Agreements, and the differences in operating requirements among dealerships of differing sizes and types of markets, the company expressly reserves the right to select the dealers with whom it will enter into such agreements so as to maintain as high quality a dealer organization as possible.

*Id.* at p. 28.

20

While Ford may not unreasonably withhold approval, it has the discretion to review the financial status and sales performance of a purchaser with respect to approval. The plaintiffs cannot show that Ford unreasonably withheld its approval because their own exhibit, an inter-office memo regarding Sheehy's application, indicated that Sheehy's performance in all three of his dealerships was below par.

Track Record of the Candidate

Mr. Sheehy presently has three Ford stores in the Washington Region. All three store[s] are performing considerably below average in terms of retail car and truck penetration and are trending downward. Collectively, the Sheehy organization in 1995 accounted for 3,022 retail units of lost business to the region.

Plaintiff's Memorandum of Law in Opposition to Defendant, Ford Motor Company's Motion for Summary Judgment, Exhibit 8 [P. 66]. Withholding approval of a sale to a poorly performing dealer is not unreasonable under the terms of the contract and it does not establish any evidence of coercion so as to amount to bad faith under case law or statute. *See In re Van Ness Auto Plaza, Inc.,* 120 B.R. 545, 546 (Bankr. N.D.Cal. 1990)("withholding consent is reasonable if it is based on factors related to the proposed assignee's performance as a dealer and is supported by substantial objective evidence, but...a court reviewing the manufacturer's decision may not substitute its judgment for that of the manufacturer.")

21

*THERE IS INSUFFICIENT EVIDENCE THAT FORD MOTOR REFUSED IN BAD FAITH TO PROVIDE NORMANDY WITH SUPPORT AND ASSISTANCE.*

As stated above, without a wrongful demand coupled with the threat of sanctions (*see Colonial Dodge, Inc. v. Chrysler Corporation*, 11 F.Supp.2d at 743; *Sink v. Ford Motor Co.*, 549 F.Supp. at 249), Ford Motor's actions do not constitute the kind of coercion, intimidation or harassment that amount to breach of the covenant of good faith. The plaintiffs allege that Ford Motor refused them permission to relocate to Columbia and did not provide assistance to them when requested. However, Ford Motor did permit another dealer, George Doetsch, to relocate Monument Ford to Columbia and did assist him in his relocation. Unfortunately for the plaintiffs, even if this is taken as true, it does not rise to the level of coercion. It is undisputed that Charles Grim first requested permission to relocate Normandy to Columbia in June, 1987. Complaint, ¶ 16. According to plaintiffs, Ford Motor refused the request because the relocation would place Normandy too close to dealerships in Laurel, Glen Burnie and Silver Spring, Maryland. Complaint, ¶ 17.

There is no evidence that Ford Motor's refusal of a Normandy relocation at that time was in any way connected to Normandy's failure to comply with a Ford demand. Moreover, there is absolutely no provision in the dealership contract that assures a

22

dealer  of  a  right  to  relocate  at  any  time  the  dealer  so  desires.[5]

---

[5]Section 9 of the Agreement provides:

DETERMINATION OF DEALER REPRESENTATION

9(a) *Representation Planning*.  The Company reserves the right to determine, from time to time, in its best judgment, the numbers, locations and sizes of authorized dealers necessary for proper and satisfactory sales and service representation for COMPANY PRODUCTS within and without the DEALER'S LOCALITY.  In making such a determination, the Company from time to time conducts, to the extent deemed adequate by the Company and subject to the ready availability of information, studies of the locality, including such factors as its geographic characteristics, consumer shopping habits, competitive representation patterns, sales and service requirements, convenience of customers or potential customers and past and future growth and other trends in marketing conditions, population, income, UIO, VEHICLE sales and registrations and COMPETITIVE and INDUSTRY CAR and TRUCK registrations.

9.(b) *Information to the Dealer*.  The Company will inform the Dealer of any proposed change in the Company's market representation plans for the DEALER'S LOCALITY, provided that if the Company's market representation plans do not provide for the continuation of representation of COMPANY PRODUCTS from the Dealer's DEALERSHIP FACILITIES (except for a relocation thereof), the company shall not be obligated to inform other dealers thereof, but shall give the Dealer written notice thereof. If, in the Company's opinion, such changes should be disclosed to other dealers in connection with the Company's market representation plans for their respective DEALERSHIP OPERATIONS, the company may inform such other dealers thereof, without liability to the Dealer, no earlier than thirty (30) days after such notice to the Dealer and shall inform such other dealers that the Dealer may maintain his DEALERSHIP OPERATIONS for so long as the Dealer desires and fulfills his responsibilities under this agreement.

23

Indeed, section 9(c) permitted Ford Motor to appoint additional dealers even within

ten driving miles of a dealer's locality so long as the company conducted a market

study that supported the need for an additional dealer. It is undisputed that Ford Motor

conducted such a market survey in 1990, three years after Mr. Grim first requested to

move Normandy to Columbia. Complaint, ¶ 18. In his deposition, Mr. Grim testified

---

9.(c) *Additional Dealers*.  The company shall have the right to
appoint additional dealers in VEHICLES within or without the
DEALER'S LOCALITY except that, if an additional dealer will be within
the DEALER'S LOCALITY AND within ten (10) miles driving distance
of the Dealer's principal place of business, the Dealer shall not appoint the
additional dealer unless a study made pursuant to subparagraph 9(a)
reasonably demonstrates, in the Company's opinion, that such
appointment is necessary to provide VEHICLES with proper sales and
service representation in such locality with due regard to the factors
referred to above in subparagraph 9(a). The company by written notice
to the Dealer will give the Dealer thirty (30) days in which to review the
applicable study (excluding information regarding other dealers
considered confidential by the Company) , to discuss such additional
dealer with representatives of the company and to give the company
written notice of objection to the proposed addition. If the Dealer fails to
give such written notice by such time, he shall be deemed to have
consented to the proposed addition....

9.(d) *Established Dealer Points.*

Nothing in this paragraph 9 shall restrict the right of the company
to appoint a dealer in VEHICLES as a replacement for a dealer in
VEHICLES, or to fill an established open point for a dealer in
VEHICLES, at or near a location previously approved by the company.

24

as follows regarding the market study and the subsequent decision to relocate

Monument Ford to Columbia rather than Normandy:

> Q. Sir, this is another 1692 form, dated April 11, 1990 and it's signed by Mr. Volante. It says at the beginning that "The writer met with Charles Grim to individually review the 1990 market study."
>
> Towards the bottom of the first page it says, "Monument Ford – relocate to Future Preferred Location – Columbia Auto Park off I-95/Route 175." Then on the second page, the last paragraph says, "Mr. Grim agreed with the majority of the study recommendations. He did voice a concern regarding the Monument relocation, but stated that he would not formally object at this time as his knowledge of the real estate situation in Howard County indicated that Ford Motor Company could not achieve this objective."
>
> A. Correct...
>
> Q. Did you formally object at that time to the relocation of Monument?
>
> A. Yes, I did.
>
> Q. How did you formally object?
>
> A. I told Mr. Volante.
>
> Q. Other than telling – what specifically did you tell Mr. Volante?
>
> A. I didn't see why they were moving Monument Ford all the way across the City of Baltimore and putting them in Columbia and wouldn't let me move there.
>
> Q. Did you tell Mr. Volante anything else?
>
> A. No.

25

AO 72A
(Rev.8/82)

Q. Other than making that statement to Mr. Volante, what else did you do to object to the relocation of Monument Ford?

A. Nothing.

Deposition of Charles William Grim, March 29, 1999, Exhibit 38, Amended Memorandum of Law in Support of Plaintiff's Opposition to Ford Motor Company's Second Motion for Summary Judgment [P. 93].

Mr. Grim acknowledged that he was informed of the proposed relocation of Monument to Columbia in 1990, and although he made an oral objection, he did not object in writing within 30 days as required by section 9(c) of the Dealer Agreement. Consequently, under the terms of the contract, Mr. Grim was deemed to have consented to the relocation of Monument Ford to Columbia. Further, under the terms of the contract, which expressly reserved Ford Motor's rights, even if Mr. Grim had objected in writing to the Dealer Policy Board, the company retained the express right to choose whom it would place in the new location. The contract did not limit the reasons upon which Ford Motor might base its relocation decisions. *Hubbard Chevrolet Co. v. General Motors Corp.,* 873 F.2d 873, 878 (5th Cir. 1989).

Plaintiffs attempt to connect the refusal of relocation with Ford Motor's periodic threats to terminate the dealership, and it is uncontested that on three occasions Ford Motor warned that the dealership might be terminated due to poor sales performance

26

AO 72A
(Rev.8/82)

and market penetration. Plaintiffs' Exhibits 22, 24, 28. However, the dealership was never actually terminated by Ford and there is absolutely no evidence that the denial of the relocation was causally connected as a sanction for Normandy's poor performance. The actual sanction should have been termination for non-performance, and where termination does not occur, there is no breach of contract. *See Wootton Enterprises, Inc. v. Subaru of America, Inc.,* 134 F.Supp.2d 698, 705 (D.Md. 2001), *aff'd,* 34 Fed.App. 57, 2002 WL 571791(4th Cir. Md.)(auto dealer had no cognizable claim for breach of contract by breach of covenant of good faith where only threats of termination were made, but termination never occurred.)

There is no evidence that Ford Motor's denial of the request to relocate Normandy was as a sanction for the failure of Normandy to comply with any wrongful demand by Ford Motor. Therefore, even though Ford Motor chose to place another dealership in the same Columbia location sought by the Grims, that choice did not rise to the level of coercion. Where a franchisor in the exercise of its expressly reserved contractual rights to approve the location and/or relocation of its franchisees, determines that a new franchise is needed, and where that franchisor may choose between two present franchisees to assign the new location, the franchisor is within its rights in the exercise its business judgment to make that choice, and a court may not

27

substitute its judgment for that of the franchisor. *See In re Van Ness Auto Plaza, Inc.,*

120 B.R. 545, 546 (Bankr. N.D.Cal. 1990).

### THERE IS INSUFFICIENT EVIDENCE OF MALALLOCATION.

Because this allegation is identical to the alleged harm under Counts 3 and 5, the

analysis under this part of Count 2 will be combined with those counts as well. The

question of malallocation was thoroughly discussed in *Colonial Dodge*.  As Judge

Blake stated:

> A manufacturer's duty toward a dealer is defined initially by its
> allocation agreement.  A dealer is entitled only to the cars due under the
> allocation system, not to all the automobiles it requests. *See Cabriolet
> Porsche Audi, Inc. v. American Honda Motor Co.,* 773 F.2d 1193, 1202-
> 04 (11th Cir.1985), *cert. denied,* 454 U.S. 1122, 106 S.Ct. 1641, 90
> L.Ed.2d 186 (1986); *see Bob Maxfield Inc. v. American Motors Corp.,* 637
> F.2d 1033, 1037 (5th Cir.), *cert. denied,* 454 U.S. 860, 102 S.Ct. 315, 70
> L.Ed.2d 158 (1981) (finding no coercion where there was no evidence that
> the defendant ever required the plaintiff to choose between accepting large
> automobiles and facing a cutoff of small automobiles); *Southern Rambler
> Sales, Inc. v. American Motors Corp.,* 375 F.2d 932, 935 (5th Cir.), *cert.
> denied,* 389 U.S. 832, 88 S.Ct. 105, 19 L.Ed.2d 92 (1967)(finding that
> because ADDCA does not afford the dealer a statutory right or formula for
> allocation or delivery of certain automobiles, "[plaintiff] must demonstrate
> that degree of bad faith allocation which has coercive and intimidating
> effects"); *Autohaus,* 567 F.2d at 914 (explaining that even if the dealer's
> order for new automobiles was bona fide and the manufacturer refused to
> deliver automobiles it had in stock, no lack of good faith exists without
> evidence that the manufacturer tried to coerce or intimidate the plaintiff
> by withholding the automobiles).

> Manufacturers are granted significant leeway in suggesting how a dealer can obtain automobiles in addition to those under the allocation agreement.

*Colonial Dodge, Inc. v. Chrysler Corporation,* 11 F.Supp.2d at 744. For a malallocation case to survive summary judgment, plaintiffs must provide some evidence that they were faced with an "either/or" choice or that the defendant failed to abide by the terms of the vehicle agreement. *Id.* As the following analysis demonstrates, the plaintiffs have failed to produce evidence of an "either/or" choice or that anything in the Dealer Agreement required Ford Motor to allocate specific numbers or types of vehicles.

### COUNT 5 - COERCED ACCEPTANCE OF UNDESIRABLE VEHICLES

The Maryland Transportation Code, Section 15-207 prohibits manufacturers, distributors, or factory branches from coercing any dealer to accept delivery of any vehicle it did not voluntarily order. MD. TRANS. CODE ANN. § 15-207(c)(1999). "Coercion" is defined as compelling, or attempting to compel, by threat of harm, breach of contract or other adverse consequences. MD. TRANS. CODE ANN. § 15-207(a)(1999). Coercion does not mean "argue, urge, recommend, or persuade..." *Id.*

Upon review of the evidence submitted in the form of depositions, exhibits and affidavits taken in the light most favorable to the plaintiffs, there is insufficient evidence that Ford Motor and Ford Credit coerced Normandy into accepting unwanted

Taurus SHOs.   According to the plaintiffs, Andrew Dixon of Ford Motor coerced Normandy to accept the unwanted vehicles.   Ford Credit was alleged to have participated in the coercion by providing Normandy additional credit beyond its usual credit line for the purpose of forcing the unwanted vehicles on it.   However, the depositions of Normandy employees George Bowie and Mark Breidenstein fail to support that contention.   George Bowie, Normandy's General Manager and the person who ordered the vehicles, testified in his deposition as follows that there was no coercion:

> Q.  Do you recall in approximately March of '95 ordering approximately 20 or more Taurus SHOs from Ford Motor?
>
> A.  I don't know the exact number, but I know we ordered some Taurus SHOs, yes.
>
> Q.  Did you make the decision to order those Taurus SHOs, to your recollection?
>
> A.  To be honest with you, I imagine so, yes...
>
> Q. ...is it fair to say you were the person who was responsible for that at that time?
>
> A.  I would say yes...
>
> Q.  Do you recall anything else about your discussions with Andrew Dixon in approximately March of '95, with respect to the Taurus SHOs in particular?
>
> A.  No.

30

Q.  Do you recall any comment by Mr. Dixon in connection with the Taurus SHOs that Normandy should take the vehicles or else suffer –

A.  No.

Q.  —some kind of adverse consequences?

A.  No...

Q.  Do you remember Mr. Dixon suggesting in any way that Normandy would be terminated if it did not accept the Taurus SHOs?

A.  No.

Q.  Do you recall anyone from Ford Motor Company, Andrew Dixon or otherwise, who threatened to coerce Normandy Ford into taking vehicles Normandy did not want?

A.  No.

Deposition of George Bowie, April 13, 1999, p. 27 - 29, Defendant's Exhibit G,

Memorandum in Support of Defendant Ford Motor Company's Second Motion for

Summary Judgment.

The testimony of Mark Breidenstein also flatly contradicted the theory of

coercion:

Q.  Did there come a time that Normandy Ford ordered approximately 26 Taurus SHOs from Ford Motor Company?

A.  Yes.

Q.  Were you involved in the process by which Normandy Ford ordered those vehicles from Ford Motor Company?

31

A. Indirectly.

Q. Describe for me what your involvement was in that process.

A. I recall that George Bowie and Andrew Dixon approached me about an allocation of SHOs that I guess were in abundance. It was put to me that Normandy had always done a fantastic job with the SHOs and that if we too – and I thought the number was 30 – if we took these vehicles, Ford would give us assistance in selling them, as well as remember us for units that were hard to get.

A. Who said that to you?

Q. There's a few different – George Bowie approached me about the SHOs, saying that he thought he could get the job done and sell those. Dixon was the one who said we remember those who help us and we help you...

Q. What do you specifically recall Mr. Dixon saying, other than what you've already testified to?

A. Just what I said.

Q. Do you recall anything else that Mr. Dixon said?

A. No.

Q. I'm sorry, I want to make sure. Mr. Bowie said to you that he felt he could get the job done, meaning he could sell the Taurus SHOs that Normandy was to purchase from Ford Motor?

A. Yes. And I also recall him saying, George, that look, we need to do this because then we'll be able to get the Explorers. I guess at that time that was probably the hottest vehicle that we were not getting at that time.

32

Deposition of Mark Breidenstein, March 25, 1999, p. 44 - 47, Exhibit 29, Appendix to Plaintiffs' Opposition to Ford Motor Company's Second Motion for Summary Judgment and Ford Motor Credit Company's Motion for Summary Judgment.

The evidence indicates that while there may have been persuasion, there were no threats of sanctions. Rather than a sanction threatened for non-compliance, it appears that a promise of reward was used to persuade. This simply does not amount to coercion under the statutory definition. MD. TRANS. CODE ANN. § 15-207(a)(1), (2)(1999).

The only other evidence regarding coercion came from Mrs. Grim, who had no involvement in the ordering of the inventory, and Mark Strand, who ran the accounting office and was not involved in the actual ordering of the vehicles. Mrs. Grim testified in her deposition in reference to the SHOs:

A. I was told about the pressure that was put on them to take them.

   Q. Who told you about the pressure?

A. Mark.

Q. What did he tell you?

A. Well, I saw a letter[6] from Andrew Dixon stating something about we will remember who accepts these SHOs....

---

[6]The deposition contains further colloquy regarding the existence of the letter or memo. Such a letter or memo was never produced. See p. 34-8, Plaintiffs' Exhibit 20.

33

Q.  Did Mr. Breidenstein explain to you why he had received the memorandum from Mr. Dixon?

A.  Did he explain to me why he received it? He was explaining why he, I guess, accepted them or why he – the pressure. He was showing me the pressure that was put on accepting them.

Q.  And the pressure was a statement in the memo to the effect that we remember people who do things for us?

A.  I don't know the exact wording, but that was the connotation.

Plaintiffs' Exhibit 20, p. 34, 38.

Ms. Grim's testimony did not provide evidence of coercion.  Even if such a memo existed, if it contained the promise that reward would be given for Normandy's cooperation, then as stated above, it constitutes at best persuasion, not coercion. Further, even Ms. Grim's testimony of feeling pressured is not sufficient to amount to coercion.  While "the existence of coercion may be inferred from a course of conduct," *David R. McGeorge Car Co. v. Leyland Motor Sales, Inc.*, 504 F.2d 52, 56, n. 7 (4th Cir. 1974), *cert. denied*, 420 U.S. 992, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1975), it is the defendants' conduct that is significant, not the dealer's perception of coercion or intimidation.  *Colonial Dodge, Inc. v. Chrysler Corp.*, 11 F.Supp.2d at 743 (*citing Wallace Motor Sales, Inc. v. American Motors Sales Corp.*, 780 F.2d 1049, 1056 (1st Cir.1985) and *Francis Chevrolet Co. v. General Motors Corp.*, 602 F.2d 227, 229 (8th Cir.1979)).

34

The plaintiffs make much of the account of a conversation with Dixon concerning the Tauruses, contained in Mark Strand's deposition. *See* Plaintiffs' Exhibit 30, p. 78. Mr. Strand, who was the accountant and not the person ordering the cars, stated:

> I asked Andrew how in the world we ended up with that and he had a wonderful smile. He was on his way out the door, the door was open, he was standing in the doorway, he just smiled back at me and said well, we figured it like this. Normandy Ford could corner the market on SHOs and he laughed.

Deposition of Mark Strand, March 24, 1999, Plaintiffs' Exhibit 30, p.78. Not included in the Plaintiffs' Exhibit is a follow-up of that discussion in the same deposition:

> A.    I did ask him how we ended up with that and I guess he told me that we figured "that Normandy could corner the market on SHOs," I'm imaging that's the pitch he used to whoever signed off on the purchase. I'm assuming that was George Bowie, I may be wrong. Maybe he was reiterating a sales pitch to me, but it was after the fact.
>
> Q.  Right, but is that how you understood his comment to you about cornering the market on SHOs?
>
> A.  Yeah.
>
> Q.  That it was a sales pitch?
>
> A.  Yes. That's what I asked him, I said how did you get these guys to buy all those SHOs and his response was that and I guess that's – how do you get someone to buy something? You pitch a sale at them.

35

Deposition of Mark Strand, March 24, 1999, Exhibits to Memorandum in Support of Defendant Ford Motor Company's Second Motion for Summary Judgment, Exhibit E, p. 88. Unfortunately for the plaintiffs, this evidence is evidence of persuasion, not coercion.

Taken altogether, in a light most favorable to the plaintiffs, the testimony regarding the Taurus SHO transaction between Ford Motor and Normandy does not amount to sufficient evidence on which a fair minded jury could reasonably find for the plaintiff that there was coercion rather than legally-permitted persuasion.

## COUNT 3 - FAILURE TO DELIVER ORDERED VEHICLES

The plaintiffs alleged that Ford Motor failed to deliver vehicles that were advertised as available for immediate delivery after receipt of a written order from the dealer violating MD. TRANS. CODE ANN. § 15-208(1999).[7]

---

[7]MD. TRANS. CODE ANN. § 15-208 (1999) provides:

**Refusal to deliver vehicles prohibited.**
    (a) *Manufacturers.* - A manufacturer may not refuse to deliver new motor vehicles, new two-stage vehicles, or truck component parts, as the case may be, to a licensed dealer or distributor, in reasonable quantities and within a reasonable time after receipt of a written order, if:
        (1) The manufacturer specifically advertises that these vehicles or truck component parts are available for immediate delivery; and
        (2) The dealer or distributor has a franchise or other contract with the manufacturer for the sale of these vehicles or truck component parts to the public.

36

The plaintiffs have provided no evidence of a specific date or dates upon which Ford Motor advertised the desired vehicles, Ford Explorers, as available for immediate delivery. The plaintiffs have produced no evidence of a written order from Normandy for a new vehicle that was not fulfilled. Consequently, there is no evidence that Ford Motor violated section 15-208 of the Maryland Transportation Code.

The plaintiffs did produce some evidence that Normandy received fewer Ford Explorers than it desired. However, it is undisputed that the desired vehicles were in

---

(b) *Distributors.* - A distributor may not refuse to deliver new motor vehicles, or new two-stage vehicles, as the case may be, to a licensed dealer, in reasonable quantities and within a reasonable time after receipt of a written order, if:

    (1) The manufacturer specifically advertises that these vehicles or truck component parts are available for immediate delivery; and

    (2) The dealer or distributor has a franchise or other contract with the manufacturer for the sale of these vehicles or truck component parts to the public.

(c) *Factory branches.* - A factory branch may not refuse to deliver new motor vehicles, or new two-stage vehicles, as the case may be, to a licensed dealer, in reasonable quantities and within a reasonable time after receipt of a written order, if:

    (1) The manufacturer specifically advertises that these vehicles or truck component parts are available for immediate delivery; and

    (2) The dealer or distributor has a franchise or other contract with the manufacturer for the sale of these vehicles or truck component parts to the public.

(d) *Exceptions.* - A failure to deliver vehicles because of a labor strike, government regulation, or other cause not the fault of the manufacturer, distributor, or factory branch is not a violation of this section.

37

"hot demand and short supply." The Dealer Agreement included a specific exculpatory clause for such situations. Section 2(c)(2) states;

> The Company shall not be liable to the Dealer in any respect for failure to ship or for delay in shipment of accepted orders for VEHICLES where such failure to ship or delay is due wholly or in part to (i) shortage or curtailment of material, labor, transportation, or utility services, (ii) any labor or production difficulty in any of its own or any of its suppliers' locations, (iii) any governmental action, or (iv) any cause beyond the Company's control or without its fault or negligence.

While it is not clear whether the shortage of Ford Explorers was due to a shortage under sections i or ii, given the undisputed testimony that the vehicles were in short supply, Ford Motor would be excused from liability under either. Further, section iv, which included a very broad exculpatory clause – "any cause beyond the Company's control" – will apply to excuse Ford Motor from any failure to ship vehicles in such demand.

Moreover, the agreement was silent as to Ford Motor's method of allocating vehicles to dealers. The situation here is parallel to that in *Wootton Enterprises, Inc. v. Subaru of America, Inc.* In that case,

> "the contract [did] not require that Subaru provide Wootton with sufficient inventory to meet its sales goals *regardless of other factors* (such as, for example, the overall supply of product allowed by the manufacturer within the region and Wootton's sales history). Nor does the contract (or the implied duty of good faith and fair dealing) require that Subaru provide support to *insure* Wootton's success as a Subaru franchisee."

38

134 F.Supp.2d at 704. Ford Motor did not guarantee Normandy all the vehicles it might desire, pursuant to its contract with Ford Motor. Under the contract, Normandy was not guaranteed all the support it could possibly need to insure its success as a dealer. The contract with Ford Motor did not guarantee Normandy delivery of vehicles in short supply. Even if Ford Motor had promised Normandy vehicles as a *reward* for accepting hard to sell Tauruses, Ford Motor did not breach its duty of good faith by failing to deliver as many Ford Explorers as Normandy desired.

### COUNT 6 – CIVIL CONSPIRACY

The elements of civil conspiracy required to be proven in order to recover damages are "an agreement by at least two persons to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, and that the act or means used resulted in damage to the plaintiff." *Stated in* MARYLAND CIVIL PATTERN JURY INSTRUCTIONS, ¶ 7:6, Maryland Institute for Continuing Professional Education of Lawyers, Inc. (MICPEL) (3rd ed. 2000), *citing inter alia Green v. Washington Suburban San. Comm'n.*, 259 Md. 206, 269 A.2d 815 (1970) and *Markey v. Wolf*, 92 Md.App. 137, 607 A.2d 82 (1992).

The plaintiffs assigned a malicious motive to Ford Credit's intentions in extending its line of credit, contending that it was part of a scheme to force Normandy out of business by increasing its indebtedness to a point beyond which Ford Credit

AO 72A
(Rev.8/82)

knew that repayment was impossible. The plaintiffs in effect contend that Ford Credit itself was content to sustain financial hardship by unreasonably extending Normandy's debt limit in order to help its parent, Ford Motor dispose of an unwanted dealership.

There is absolutely no evidence that the defendants made an agreement to injure the plaintiffs by forcing them out of business. There was no evidence produced of any such agreement. The only possible basis for the claim was based upon the allegations that Ford Credit provided additional credit to Normandy at the same time that the Taurus transaction occurred, and that when Normandy exceeded its credit line and fell out of trust, Ford Credit maliciously cut off Normandy's credit in its dealer floorplan.

As heretofore indicated, Ford Motor's actions with respect to the order of the Tauruses in 1995 amounted at best to persuasion, not coercion. Consequently, plaintiffs cannot base their claim of conspiracy on coerced purchases for which there is no evidence.

Moreover, the contention that Ford Credit would have been willing to suffer a $9 million dollar loss (the approximate amount Normandy owed Ford Credit when it fell out of trust and defaulted on its obligations on the floor plan and various other notes) in order to force Normandy out of business is simply absurd. The absurdity of the claim is supported by the fact that Ford Motor had ample opportunities to terminate Normandy under the agreement for years prior to the time that Ford Motor was alleged

40

to have conspired with Ford Credit for that purpose. From 1987 through 1992, as discussed earlier, Ford Motor representatives met with Messrs. Grim and later Szymkowiak to discuss poor sales performance and how Normandy might avoid termination. In fact, Ford Motor never terminated the Agreement. Rather, Ford Motor provided Mr. Szymkowiak to Normandy as a potential buyer and general manager. It was not Ford Motor's fault that the Grims and Mr. Szymkowiak disagreed over money and that purchase negotiations failed. Even after those negotiations fell through, and at a time when Mr. Grim was incapacitated by a stroke, Ford Motor did not terminate Normandy. From 1992 through 1996, Ford Motor continued to tolerate Normandy's poor sales performance.

The plaintiffs alleged that the Ford Motor's actions with respect to the Monument Ford relocation support the conspiracy theory. However, as discussed above, even if the upper level manager Bob Rewey favored Mr. Doetsch for the relocation, under the Dealer Agreement, Ford Motor was entitled to exercise its independent business judgment in selecting the dealer for the Columbia location. Additionally, those actions occurred before Ford Credit extended credit in 1995, and were *actions taken by Ford Motor alone and not by Ford Motor and Ford Credit in concert*. Therefore, those separate, unrelated actions cannot form the basis for a conspiracy between Ford Motor and Ford Credit.

41

Lastly, the plaintiffs seem to believe that the conspiracy extended to the disputed sale of the dealership and the real estate upon which it was located. However, as previously discussed, Ford Motor had the absolute right and the discretion to approve any buyer of the dealership. Consequently, because Ford Motor's denial of the Sheehy offer was not unreasonable given his sales penetration and did not amount to coercion under case law or statute, that action cannot be the basis for proof of a conspiracy to force Normandy out of business.

There is not even a scintilla of evidence on which a fair minded jury could base a verdict for the plaintiffs as to any overt agreement or circumstantial evidence of acts upon which a conspiracy claim could be founded. The plaintiffs have no cognizable claim for the termination of the Dealership Agreement because Ford Motor neither coerced the plaintiffs nor terminated the Agreement. *See Wootton*, 134 F.Supp. at 705.

WHEREFORE, Ford Credit's Motion to Alter or Amend the Memorandum Opinion Denying Summary Judgment will be GRANTED, Ford Motor's Motion for Reconsideration of the Memorandum Opinion Denying Summary Judgment will be GRANTED, summary judgment will be GRANTED to the defendants on Counts, 2, 3, 5, and 6 and the instant complaint will be DISMISSED WITH PREJUDICE.

ORDER ACCORDINGLY.

July 31, 2002

James F. Schneider
Chief U.S. Bankruptcy Judge

42

AO 72A
(Rev.8/82)

cc:    Stephen H. Kauffman, Esquire
       Debra Cruz, Esquire
       Levin & Gann, P.A.
       Mercantile Bank & Trust Bldg.
       2 Hopkins Plaza, 9th Fl.
       Baltimore, MD 21202

       Harry M. Rifkin, Esquire
       Hodes, Ulman, Pessin & Katz, P.A.
       901 Dulaney Valley Road, Ste. 400
       Towson, MD 21204

       Nicholas P. Christakos, Esquire
       Sutherland, Asbill & Brennan, LLP
       1275 Pennsylvania Avenue, N.W.
       Washington, D.C.  20004-2415

       George R. Pitts, Esquire
       Dickstein, Shapiro, Morin & Oshinsky, LLP
       2102 L Street, N.W.
       Washington, D.C.  20037-1526

       James A. Vidmar,  Jr., Esquire
       Linowes & Blocher, LLP
       1010 Wayne Avenue
       Silver Spring, MD 20919

       Mark A. Neal, Esquire
       Office of the U.S. Trustee
       300 W. Pratt Street, Ste. 350
       Baltimore, MD 21201

AO 72A
(Rev.8/82)

1          IN THE UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF OHIO

3                 WESTERN DIVISION

4                    - - -                    COPY

5   Eastside Lincoln               :
    Mercury, Inc., et al.,         :
6                                  :
         Plaintiffs,               :
7                                  :
         vs.                       :   Case No.
8                                  :   C-1-01-567
    Ford Motor Company,            :
9   et al.,                        :
                                   :
10        Defendants.              :

11                    - - -

12               DEPOSITION OF:

13            JERRY MARTIN CARTER

14                    - - -

15                         Thursday, March 6, 2003
                           10:30 o'clock a.m.
16                         65 East State Street
                           Suite 1200
17                         Columbus, Ohio  43215

18                    - - -

19            MELISSA STICHLER

20         PROFESSIONAL REPORTER

21                    - - -

22       ANDERSON REPORTING SERVICES, INC.
           3242 West Henderson Road
23          Columbus, Ohio  43220
             (614)326-0177
24          FAX (614)326-0214

1    agreement with someone who is not meeting our four

2    Cs.  Or we don't expect them to in a short span of

3    time.

4        Q.        Well, with regard to the Lincoln-Mercury

5    of Fairfield, he still has some requirements to meet

6    in order to get a long-term agreement?

7        A.        Not to my knowledge.

8        Q.        How about at the Northgate store?

9        A.        I believe Northgate has had a continuing

10    through the years.

11        Q.        What about Kings?

12        A.        I believe it has a continuing.

13        Q.        Can you tell me why you eventually

14    concluded that you were not going to allow Mr. Woeste

15    to dual his operation?

16        A.        I didn't see a whole lot of upside for

17    Lincoln-Mercury.  I look at it from the standpoint:

18    Am I going to be better off after than before?

19        Q.        What were the reasons that you didn't

20    believe there was an upside to allowing Mr. Woeste to

21    relocate and dual?

22        A.        I thought it was in a great location as it

23    were.  The move from the best to the lesser, and then

24    coupled with the fact that I'm not going to tell you

1    this didn't weigh heavily -- Chevrolet.  I just don't

2    see where I went in there.

3    Q.        So you're saying that the fact that the

4    Lincoln-Mercury store is next door to a Chevrolet

5    store was the determining factor of whether you would

6    recommend that dual?

7    A.        Part of it.

8    Q.        Do you have any other Lincoln-Mercury

9    stores that are adjacent to General Motors products?

10   A.        There may be some.  None that I can think

11   of off hand.

12   Q.        Well, in earlier testimony, you had

13   mentioned some foreign car competition to

14   Lincoln-Mercury in terms of being a target.  Do you

15   remember that?

16   A.        Volvo.

17   Q.        I think you mentioned Toyota or Honda or

18   something along those lines.

19             MS. MCNELLIE:  I certainly don't recall

20   that.

21   A.        Yeah.  You lost me.

22   Q.        You mentioned that you wanted that Lincoln

23   dealer or dealers to be out there competing with --

24   A.        True competition.  Oh, yes.  Yes.  Well --

**EXHIBIT K**
DEFENDANT

JAGUAR CARS, a Division of Ford Motor Company, PLAINTIFF, v.BLACKHORSE MOTORWORKS, LTD., and J. DOUGLAS ROOD, DEFENDANTS.
CIVIL ACTION NO. 94-289

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OFKENTUCKY, PIKEVILLE DIVISION

1998 U.S. Dist. LEXIS 22858

November 2, 1998, Decided
November 2, 1998, Filed

DISPOSITION: [*1] Plaintiff's motion for partial summary judgment [Record No. 263] GRANTED.

CASE SUMMARY:

PROCEDURAL POSTURE: Plaintiff franchisor filed a motion for partial summary judgment in its action against defendant franchisee. The franchisor had commenced the action and sought to terminate its franchise agreement with the franchisee after receiving overwhelming evidence that the franchisee had been submitting fraudulent warranty claims.

OVERVIEW: The franchisor received information that its franchisee had been submitting fraudulent warranty claims and sought to terminate its dealership. The court granted the franchiser's motion for partial summary judgment. A franchisor may not terminate a car dealer's franchise agreement unless it had acted honestly and observed reasonable commercial standards of fair dealing, i.e. good faith. Ky. Rev. Stat. Ann. §§ 190.045(1), 190.010. Based on the overwhelming evidence of fraud, the court found that the franchiser's actions were commercially justified. The fact that the franchisor might have misled the franchisee as to the nature of the audit was irrelevant. The good faith requirement related to the grounds upon which the franchisor based its decision to terminate the dealership, not its investigation. The franchiser's decision to terminate was not based on speculation and conjecture, which would have been bad faith, but rather on an extensive and fair investigation. Franchisee's counterclaims of fraud, discrimination, implied covenant, tortious interference, and business defamation lacked factual support in the record and were dismissed.

OUTCOME: The court granted the franchiser's motion for partial summary judgment and dismissed franchisee's counterclaims.

CORE TERMS: dealer, fraudulent, warranty, summary judgment, terminate, audit, termination, franchise, dealership, franchise agreement, former employees, counterclaim, franchisor, partial, contractual, videotape, manufacturer, commercially, submitting, contradict, undisputed, issues of material fact, overwhelming evidence, noted earlier, fair dealing, conducting, defrauded, financing, meritless, genuine

LexisNexis (TM) HEADNOTES - Core Concepts:

Business & Corporate Entities: Franchises & Distributorships: Terminations
[HN1] In Kentucky, a manufacturer can terminate a dealer's franchise if it meets the notice requirement, has good cause for termination, and acts in good faith. Ky. Rev. Stat. Ann. § 190, et seq.

Business & Corporate Entities: Franchises & Distributorships: Terminations
[HN2] A franchisor may not terminate a car dealer's franchise agreement unless it has acted honestly and observed reasonable commercial standards of fair dealing, i.e. good faith. Ky. Rev. Stat. Ann. § 190.045(1), 190.010. Good faith is defined as honesty in the conduct or transaction concerned and the observance of reasonable commercial standards of fair dealing in the trade.

Business & Corporate Entities: Franchises & Distributorships: Causes of Action: Fraud & Misrepresentation

1998 U.S. Dist. LEXIS 22858, *

[HN3] In order to maintain its fraud claim, the claimant must establish six elements by clear and convincing evidence: (1) a material misrepresentation, (2) which is false, (3) which was known to be false, or made recklessly, (4) made with inducement to be acted upon, (5) which is acted upon in reliance thereon, and (6) causes injury.

COUNSEL: For BOWLES, RICE, MCDAVID, GRAFF & LOVE, PLLC: Spencer D. Noe, Bowles, Rice, McDavid, Graff & Love, P.L.L.C., Lexington, KY.

For JAGUAR CARS, plaintiff: Carl J. Chiappa, Warren H. Colodner, Jason P. Isralowitz, John Sullivan, Greg Shaffer, Kirkpatrick & Lockhart LLP, New York, NY.

For JAGUAR CARS, plaintiff: Barbara B. Edelman, Mindy G. Barfield, Dinsmore & Shohl LLP, Lexington, KY.

For BLACKHORSE MOTORWORKS LTD., J. DOUGLAS ROOD, plaintiffs: Richard A. Getty, Gregory A. Keyser, Getty, Keyser & Mayo, LLP, Lexington, KY.

For BLACKHORSE MOTORWORKS LTD., J. DOUGLAS ROOD, defendants: Richard A. Getty, Gregory A. Keyser, Getty, Keyser & Mayo, LLP, Lexington, KY.

For JAGUAR CARS, defendant: Warren H. Colodner, Jason P. Isralowitz, Kirkpatrick & Lockhart LLP, New York, NY.

For JAGUAR CARS, defendant: Barbara B. Edelman, Dinsmore & Shohl LLP, Lexington, KY.

For BLACKHORSE MOTORWORKS LTD., J. DOUGLAS ROOD, counter-claimants: Richard A. Getty, Gregory A. Keyser, Getty, Keyser & Mayo, LLP, Lexington, KY.

JUDGES: JOSEPH M. HOOD, JUDGE.

OPINIONBY: JOSEPH M. HOOD

OPINION: MEMORANDUM OPINION AND [*2] ORDER

The plaintiff, Jaguar Cars ("Jaguar"), has moved the Court [Record No. 263] for partial summary judgment. The defendants, Blackhorse Motorworks and J. Douglas Rood (collectively, "Blackhorse"), have responded [Record No. 322], to which Jaguar has replied [Record No. 356]. This matter is now ripe for decision.

This action arises from Jaguar's eight-month investigation of Blackhorse's alleged fraudulent business practices. The investigation was initiated when, in November of 1993, Jaguar's warranty department received an unsolicited telephone call from David Kohlman, a service technician at Blackhorse. This investigation revealed that between 1992 and 1994, Blackhorse systematically defrauded Jaguar through the submission of sham warranty claims. Some of Jaguar's undeniable proof consists of sworn statements from former employees of Blackhorse Tom Cadwallader, Blackhorse's Service Director, Terri Wyatt, Blackhorse's Parts Manager, and Ken McLaughlin, a Blackhorse service technician, have all sworn that they participated in defrauding Jaguar through the submission of sham warranty claims. n1

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 Although Jaguar has much more evidence of Blackhorse's fraudulent activities, the statements of Cadwallader, Wyatt, and McLaughlin alone are enough to terminate Blackhorse's franchise. Whether Mr. Rood knew of his employees' fraudulent activities is irrelevant because it is clear that Blackhorse, via its management, was engaged in fraudulent activities.

1998 U.S. Dist. LEXIS 22858, *

- - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*3]

   With the overwhelming evidence of Blackhorse's fraudulent activities, Jaguar commenced this action alleging, inter alia, violations of the Racketeer Influenced and Corrupt Practices Act and seeking termination of its franchise agreement with Blackhorse. Confronted with Jaguar's allegations, Blackhorse filed a massive counterclaim asserting, inter alia, that Jaguar's investigation was conducted in an inappropriate manner and that Jaguar's fraud charges were meritless.

   This case has been going on since July 29, 1994, and is in its seventeenth volume at the time of this Opinion. The Court has given Blackhorse the benefit of the doubt on many of its claims and has allowed it to pursue a vigorous course of discovery. Discovery, however, is now complete, and the Court must shine the light of reality on Blackhorse's counterclaims and arguments.

   Jaguar has moved for partial summary judgment on the following points: (1) Jaguar asks that the Court authorize the termination of its franchise agreement with Blackhorse; and (2) Jaguar wants the Court to grant it summary judgment as to all of the claims in Blackhorse's third amended counterclaim. Each of Jaguar's points will be dealt with[*4] separately.

   The first issue to be addressed is whether to grant Jaguar summary judgment on its termination claim. In a previous opinion, denying Blackhorse's motion for partial summary judgment, the Court found that there were genuine issues of material fact surrounding Jaguar's termination of Blackhorse's franchise. The Court will now revisit that finding in light of Jaguar's motion.

   [HN1] In Kentucky, a manufacturer can terminate a dealer's franchise if it meets the notice requirement, has good cause for termination, and acts in good faith. See KRS 190, et seq. Because it is clear that the 15-day notice requirement has been satisfied, the only issues to be determined are whether Jaguar acted with good cause and in good faith in issuing the termination notice.

   First, it should be pointed out that Jaguar has the right to terminate any of its dealerships if one of them is engaging in fraudulent activity. Multiple employees of Blackhorse have sworn out affidavits that Blackhorse was submitting fraudulent warranty claims. n2 This undisputed testimony alone warrants summary judgment, but it should be noted, in order to be comprehensive, that Jaguar's auditors also found that Blackhorse[*5] routinely obtained reimbursement for repair work by falsely identifying the cars on which the work had allegedly been performed. n1 See L.J. Dreiling Motor Co. v. Peugeot Motors, 850 F.2d 1373, 1377-78 (10th Cir. 1988) (holding that submission of fraudulent warranty claims by a service manager constitutes proper grounds for termination); Ormsby Motors v. GMC, 842 F. Supp. 344 (N.D. Ill. 1994) (holding that a dealer may be terminated for warranty fraud). n4

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

   n2 Blackhorse's attack on the creditibility of its former employees is merely speculation. Blackhorse has produced no evidence that would contradict these former employees or show that these employees have committed perjury. In fact, the testimony from the employees is extremely credible because they acknowledge that their own conduct was improper. See Robinson v. Cheney, 277 U.S. App. D.C. 393, 876 F.2d 152, 162 (D.C. Cir. 1989).

   n3 The parts journal revealed a pattern of fraudulent activities. Additionally, Jaguar's National Warranty Manager, Don Krumholz, provided an affidavit supplying documentary evidence of fraud. Although Blackhorse notes the affidavits of Spurlock and Langley, customers of Blackhorse, they certainly do not contradict the statements of Blackhorse's former employees.

[*6]

1998 U.S. Dist. LEXIS 22858, *

n4 The fact that Rood may not have directed the warranty fraud is irrelevant because the conduct of his managers is imputed to him. See Frederick v. Collins, 378 S.W.2d 617 (Ky. 1964).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

Having found no genuine issues of material fact surrounding Blackhorse's fraudulent activities, the Court will now address whether there are any genuine issues of material fact as to whether Jaguar acted in good faith in attempting to terminate Blackhorse's dealership. As noted earlier, [HN2] a franchisor may not terminate a car dealer's franchise agreement unless it has acted honestly and observed reasonable commercial standards of fair dealing, i.e. good faith. See KRS 190.045(1), 190.010.

In Jim White Agency Co. v. Nissan Motor Corp., 126 F.3d 832, 834 (6th Cir. 1997), the provision at issue defined good faith as "honesty in the conduct or transaction concerned and the observance of reasonable commercial standards of fair dealing in the trade." The Sixth Circuit noted that the Ohio dealer statute, much like the Kentucky statute, derives the good faith definition from the Uniform[*7] Commercial Code. Id. at 834. The Sixth Circuit then held that the operative inquiry is whether the manufacturer's actions were "commercially justifiable." Id. at 835. Applying this standard, the Jim White court affirmed an entry of summary judgment for Nissan on the ground that the manufacturer had merely exercised its contractual rights, and thus, it had acted with commercial justification in refusing to grant a dealer's request to relocate its dealership. Id.

In the case at bar, Jaguar exercised its clear contractual right to audit Blackhorse's warranty records and to terminate the dealership based on the submission of fraudulent claims. The record clearly shows that Jaguar was acting out of commercial necessity when it asserted its contractual right to audit Blackhorse's books and terminate its franchise based upon clear fraud. n5 See Bill Call Ford, Inc. v. Ford Motor Company, 48 F.3d 201, 207 (6th Cir. 1994) (awarding summary judgment to a manufacturer on a good faith issue where it "exercised its clearly expressed contractual rights"); Hickman v. American Honda Motor Co., 982 F. Supp. 881, 885-886 (N.D. Ga. 1997)[*8] (finding no violation of Georgia's good faith requirement where franchisor acted "with a legitimate business interest in mind").

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n5 No business has to sit back and allow another business to cheat it. At the same time, Jaguar did not want to jump the gun and falsely accuse Blackhorse. Hence, Jaguar conducted a methodical investigation which yielded some of the overwhelming evidence before the Court today. The Court notes that Ginther's attacks on Jaguar's audit does not change the clear and undisputed testimony of Blackhorse's former employees.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

In rebuttal, Blackhorse claims that Jaguar was not honest and failed to observe reasonable commercial standards of fair dealing regarding its investigation. Specifically, Blackhorse asserts that Jaguar wrongfully disguised its investigation as a routine warranty audit when in fact it suspected fraud. In essence, Blackhorse is claiming that the "good faith" requirement dictates that Jaguar disclose its information to Blackhorse and give it an opportunity to [*9] dispose of incriminating evidence before the audit.

1998 U.S. Dist. LEXIS 22858, *

The Court, however, finds that good faith does not require a franchisor who is conducting a fraud investigation to apprise the target of its findings. n6 The appropriate inquiry, like in Jim White, is whether Jaguar's actions were commercially justified. Based on the overwhelming evidence of fraud, the Court finds that Jaguar's actions were commercially justified. The fact that Jaguar may have misled Blackhorse as to the nature of the audit is irrelevant.

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n6 The Court agrees with Jaguar that Blackhorse is attempting to use the good faith standard to carve out a procedural escape clause for perpetrators of fraud. Although Blackhorse's attempt is creative, it is also meritless. It should be pointed out that police often use deceptive tactics in order to investigate criminal activity. It would defy common sense for this Court to find that it is perfectly fine for the police to use deceptive tactics to help put people behind bars, but a business who suspects it is being cheated by one of its business partners has to be perfectly open and honest with the alleged perpetrator. This Court refuses to give Kentucky's good faith standard such a ludicrous interpretation.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*10]

Moreover, the good faith requirement relates to the grounds upon which Jaguar based its decision to terminate, not its investigation. See Scuncio Motors v. Subaru of New England, 555 F. Supp. 1121, 1131-33 (D.R.I. 1982). Jaguar's decision to terminate was not based on speculation and conjecture, which would have been bad faith, but rather an extensive and fair investigation. The fact that Jaguar may have mislead or withheld information from Blackhorse relating to its fraud investigation does not in any way mean that Jaguar did not have a good faith belief to conduct its investigation and seek to terminate Blackhorse's dealership. Based on the above analysis, the Court will grant Jaguar summary judgment on its termination claim. n7

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n7 In other words, Jaguar is free to terminate its franchise agreement with  Blackhorse.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

The Court will now address Blackhorse's counterclaims.  [HN3] In order to maintain its fraud claim, Blackhorse must establish six elements by clear and convincing evidence: "(1) a material[*11] misrepresentation, (2) which is false, (3) which was known to be false, or made recklessly, (4) made with inducement to be acted upon, (5) which is acted upon in reliance thereon, and (6) causes injury." See Compressed Gas Corp. v. U.S. Steel Corp., 857 F.2d 346, 349-50 (6th Cir. 1988). Blackhorse's fraud claims are based on the following: (1) the two alleged promises made by Lawrence Williams, Jaguar's National Franchise Development Manager; (2) statements made by Jaguar's president, Michael Dale, in a videotape distributed to all dealers on or about April 1991, and (3) Jaguar's alleged failure to disclose certain internal corporate information.

In a letter dated July 5, 1991 from Blackhorse's counsel n8 to First Security, Blackhorse's counsel summarized the state of affairs among Blackhorse, the bank, and Jaguar and candidly acknowledged that "Jaguar has not made a written commitment to Blackhorse, or for that matter any definitive oral commitment . . ." See Jaguar's Exhibit 27, p. 3. This

1998 U.S. Dist. LEXIS 22858, *

letter is subsequent to the dates upon which Lawrence Williams allegedly made his promises to Mrs. Rood that Jaguar would "step in" and act as a guarantor for financing if[*12] Blackhorse's application was denied and that Jaguar would "see to it" that Blackhorse had inventory.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n8 Blackhorse's counsel at that time was the late C. Gibson Downing.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

Furthermore, in a July 15, 1991 response to Blackhorse's letter, First Security's counsel, Charles Shivel, confirmed the Bank's understanding that Jaguar had made no commitments to Blackhorse. See Jaguar's Exhibit 26. On July 30, 1991, Blackhorse's counsel sent Mr. Shivel a follow-up letter, and it did not contradict or refute in any way Mr. Shivel's letter dated July 15.

The Court finds that Blackhorse's above correspondence precludes its fraud claims as a matter of law. See Glass v. Kemper Corp., 949 F. Supp. 1341, 1349 (N.D. Ill. 1997). Blackhorse's attempts to explain away its letter dated July 5, 1991 is disingenuous. n9 Blackhorse sent the letter to First Security at a time when the dealership was desperate to persuade First Security of Jaguar's commitment to the franchise. The letter, however, not only neglects to[*13] mention Jaguar's alleged commitments, it expressly states that no such written or oral commitments had been made.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n9 The letter is clear and unambiguous. Blackhorse is attempting to make a factual issue where there is not one. Additionally, Mrs. Rood does not dispute that she reviewed Downing's July 5 letter before it was sent to First Security.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

Notwithstanding the above analysis, it is not reasonable for Blackhorse to have relied on Williams's alleged promises. After the purported promises but before the settlement with First Security, Mrs. Rood acknowledged that Williams advised her that Blackhorse should give up its Jaguar franchise n10 and declare bankruptcy. n11 This advice renders any reliance by Blackhorse on Williams's alleged prior inconsistent statements unreasonable. n12

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n10 The pertinent testimony concerns a July 29 phone conversation between Williams and Mrs. Rood that occurred shortly after First Security had terminated Blackhorse's floor-plan financing. At that time, Williams allegedly advised Mrs. Rood that, in light of the loss of its floor-plan financing, Blackhorse did not have much of a choice but to go into Chapter 11. See Jaguar's Exhibit 17, p. 98-99. According to Mrs. Rood, Williams also advised her that Mr. Rood should

1998 U.S. Dist. LEXIS 22858, *

give up the franchise before he filed Chapter 11 and that he could apply to be reappointed as a Jaguar dealer in the future. Id. at 99-100. Based on Mrs. Rood's testimony, Williams advised the Roods to do the opposite of the course they ultimately chose.
[*14]

n11 This was a detailed conversation, and the implications of the conversation were clear.

n12 In other words, Williams advised the Roods to give up the franchise and ask the bank to release them from their personal debt in exchange for the deed on Palumbo Drive. Finally, on this point, the Court finds that there is no evidence of Jaguar's fraudulent intent or that Jaguar intended to induce Blackhorse to act upon any promise; as to this point, the Court adopts the reasoning laid out in Jaguar's motion and reply.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

As to the alleged promise made in the videotape by Michael Dale, president of Jaguar, Blackhorse stated in the above-mentioned letter that it had not received any oral or written commitments from Jaguar. Because this writing was made long after Blackhorse had received the videotape with Dale's alleged promise, Blackhorse has failed to meet its burden on this claim.

Moreover, Dale's generic statements to all Jaguar dealers about possible financial support are not actionable because no dealer could have reasonably relied on a non-specific videotape to incur substantial new debts and[*15] risks. See Schott Motorcycle Supply v. American Honda Motor, 976 F.2d 58, 65 (1st Cir. 1992) (holding that no reasonable person would rely on franchisor's "trade talk").

In regard to the nondisclosure claims, the Court finds that Blackhorse has failed to adduce any pertinent evidence in which to support these claims. There is simply no evidence demonstrating that the parties' relationship gave rise to a duty of disclosure on the part of Jaguar. See O'Neal v. Burger Chef Systems, 860 F.2d 1341, 1349-50 (6th Cir. 1988). Likewise, no evidence is presented which would show that Blackhorse relied to its detriment on the nondisclosures relating to Jaguar's financial condition. In fact, the record shows that Mr. Rood was aware that Jaguar was losing a million dollars a day. See Jaguar Exhibit 9. n13

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n13 If a company is losing a million dollars a day, there is a pretty good chance that it might not be able to offer financial assistance to others. Additionally, because Blackhorse concedes that the claim surrounding the budgets for repair expenses should be dismissed, the Court will summarily dismiss it.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*16]

Blackhorse also claims that Jaguar defrauded it by failing to disclose the real reason behind the warranty audits. As the Court has noted earlier, this is frivolous.

1998 U.S. Dist. LEXIS 22858, *

Furthermore, Blackhorse's claims concerning the 1992 and 1994 notices of termination fail to raise a genuine issue of material fact. The Court finds that Jaguar properly attempted to terminate Blackhorse based upon undisputed testimony from multiple employees of Blackhorse that it was submitting fraudulent warranty claims. Along with being employees of Blackhorse, the employees in question were central to the fraud and were able to provide explicit detail of how the fraud was carried out. Because the Court is granting Jaguar authorization to terminate Blackhorse, Blackhorse's claims in regard to the notices lack merit. n14

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n14 Blackhorse's contract claims based upon the auditing procedures are meritless. Jaguar had every right to conduct its audit as it saw fit so long as it was performed in good faith. There certainly was no set procedure it had to follow. It should also be noted that there is no evidence of an occasion where Jaguar refused to pay a goodwill claim that Blackhorse submitted. Even if such evidence was available, the dealer agreement imposes no obligation on Jaguar to pay goodwill claims on repairs of out-of-warranty vehicles.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*17]

As to Blackhorse's discrimination claims, there is nothing in the dealer's agreement that states that every dealer must be treated the same way. See Original Great American Chocolate Chip Cookie Co. v. River Valley Cookies, 970 F.2d 273, 279 (7th Cir. 1992) (holding that even if a franchisor treats other franchisees more leniently this is "no more a defense to a breach of contract than laxity in enforcing the speed limit is a defense to a speeding ticket"). Hence, Blackhorse's claims in this respect are dismissed. n15

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n15 It should also be noted that Blackhorse's claim that Jaguar violated the Dealership Agreement by threatening to file a RICO suit lacks merit.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Blackhorse also asserts that Jaguar refused to provide vehicles to Blackhorse in accordance with its own allocation system. Because, however, there is no evidence that Jaguar failed to provide Blackhorse with a single vehicle to which Blackhorse was entitled under the allocation system, the Court will grant Jaguar summary judgment as[*18] to this claim. n16

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n16 The Court finds that Article 5.2 does not impose any duty on Jaguar not to grant more than one Jaguar Dealer Agreement to another authorized dealer. Even if, however, this provision conferred some right on Blackhorse, it has

1998 U.S. Dist. LEXIS 22858, *

failed to produce any proof that Jaguar ever approved any such proposal by another dealer. Additionally, Blackhorse has failed to support its claim that Jaguar breached its duty to defend and indemnify Blackhorse pursuant to Articles 13.1 and 13.3(b). In other words, Blackhorse has failed to produce any documentary proof that it received or paid a legal bill for any of the cases in issue. Even if it could show that it had paid some legal fees, the language of Article 13.3(b) precludes the claim because Jaguar agreed to defend and indemnify Blackhorse as to each of the suits.

- - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

The next issue to be addressed is Blackhorse's implied covenant claim. After reviewing the pleadings, the Court finds that the record does not support the imputation of any such obligation on Jaguar. [*19] n17

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n17 The Court further finds that the parties' agreement does not give rise to any fiduciary duties on the part of Blackhorse. See Lagrew v. Hooks-Superx, Inc., 905 F. Supp. 401, 405 (E.D.Ky. 1995) (holding that "implied covenants can only rise where there is no express provision on the subject in the Agreement").

- - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

In regard to Blackhorse's tortious interference claim, the Court notes that the manufacturer-dealer relationship is governed by the contract between the parties. See Tractor & Farm Supply v. Ford New Holland, 898 F. Supp. 1198 (W.D. Ky. 1995). In this case, the record shows that Jaguar acted pursuant to its rights under the dealer agreement, and there was no wrong doing on the part of Jaguar. Notwithstanding the fact that the manufacturer-dealer relationship is governed by the dealer agreement, Blackhorse's claim would also fail because there is no pertinent evidence of an improper motive on Jaguar's part. See CMI, Inc. v. Intoximeters, Inc., 918 F. Supp. 1068, 1080 (W.D.Ky. 1995)[*20] (holding that the tort of interference with existing contractual relations requires the pleading party to proof an improper motive). n18

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n18 The Court adopts Jaguar's arguments on this point as set out in its memorandum in support of its motion for partial summary judgment as well as its reply.

- - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Moving on to the next issue, Blackhorse has failed to support its claims of business defamation with respect to the Bassett and Dealer Directory claims. Thus, these claims will be dismissed. As to the statement that Dale allegedly made

1998 U.S. Dist. LEXIS 22858, *

to the Roods at the Detroit Auto Show, the Court notes that there is insufficient evidence of publication to support this claim. n19 Hence, this claim will also be dismissed.

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n19 There is no evidence as to the pecuniary loss because of the alleged defamation. Once again, Jaguar has done a good job of setting out the defects of these claims in its briefs, and the Court will adopt Jaguar's arguments and reasoning on these claims.

- - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*21]

In summary, this action has been vigorously litigated for many years, but the dust has now settled, and it is clear that Blackhorse defrauded Jaguar by submitting fraudulent warranty claims. Hence, Jaguar was well within its contractual rights when it attempted to terminate Blackhorse. As noted earlier, the fact that Jaguar made some misrepresentations in conducting its audit investigation is irrelevant and does not preclude it from terminating its franchise agreement with Blackhorse. n20 Lastly, even though many of Blackhorse's counterclaims were skillfully crafted by able-bodied attorneys, this does not change the fact they lack factual support in the record and must be dismissed. n21 Accordingly,

IT IS ORDERED that the plaintiff's motion for partial summary judgment [Record No. 263] be, and the same hereby is, GRANTED.

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n20 Police departments everywhere use deception in investigating wrongdoing. There is certainly nothing in Kentucky law and/or the dealer agreement that would impose on Jaguar a more stringent standard in conducting its audit than what is appropriate for law enforcement; of course, law enforcement must also conduct its investigation in good faith.
[*22]

n21 In other words, many of Blackhorse's claims fail to meet one or more of the necessary elements and often do not have enough factual support for other elements in order to raise a genuine issue of material fact for the jury.

- - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

This the 2nd day of November, 1998.

JOSEPH M. HOOD, JUDGE

**EXHIBIT L**
DEFENDANT

# United States District Court
## Southern District of Ohio
### Western Division

CERTIFIED
COPY

GOLDING COURT REPORTERS

EASTSIDE LINCOLN MERCURY, INC., )
et al., )
                    Plaintiffs, )
                            )
      vs. )   Case No. C-1-01-567
                            )
FORD MOTOR COMPANY, et al., )
                            )
              Defendants. )
_____)

DEPOSITION OF JOHN E. CSERNOTTA

TAKEN AT:    90 Pacifica
                 Irvine, CA   92618

DATE/TIME:  Monday, March 24, 2003
                 10:39 a.m. - 4:29 p.m.

REPORTER:   Kimberly L. Bonnell
                 CSR No. 10668, RPR

JOB NO.:    2030478

**GOLDING COURT REPORTERS**
**Certified Shorthand Reporters**
17215 Studebaker Road, Suite 215
Cerritos, California  90703-2523
**(800) 556-5404 • (562) 924-2724 • FAX (562) 865-2755**

1  the Ford Blue Oval program developed completely

2  parallel to one another, or were they developed

3  cooperatively with one another?

4       A.   I would say cooperatively.

5       Q.   Was there a team leader for the Blue Oval

6  program?

7       A.   Yes.

8       Q.   Who was that?

9       A.   George Tardiff, T-a-r-d-i-f-f.

10      Q.   Was Mr. Tardiff a peer to you in terms of his

11  position with regard to Ford and your position with

12  Lincoln Mercury?

13      A.   Yes.

14      Q.   How similar do the two programs look?

15      A.   I would say that Ford and Mercury look

16  similar.  This is where it does split apart a little

17  bit.  And LPE is different.

18      Q.   What are the differences?

19      A.   The main difference is Lincoln is a luxury

20  brand, so we ask for considerably higher standards for

21  the Lincoln program than the Ford and Mercury programs

22  have.

23      Q.   By standards, what are you referring to?

24      A.   Facility standards, process check standards

25  for customer satisfaction processes, all designed to

1    improve the sales and service experience for our

2    consumers.

3         Q.    Are the financial -- I'll say financial

4    changes with regard to the dealer body the same for

5    Blue Oval as they are for LPE?

6         MS. MCNELLIE:  Object to the form.

7         THE WITNESS:  Could you repeat that question,

8    please.

9    BY MR. BERBERICH:

10        Q.    Well, it's my understanding that with the LPE

11   program, which would include Mercury Advantage, there's

12   an amount that the manufacturer holds back from the --

13   I'll just say rebate to the dealer, and then, depending

14   upon qualification, there's an amount that's paid back

15   to the dealer on the sale of a vehicle.

16            Is that a fair description of what happens, or

17   can you give me a better description?

18        A.    First of all, we don't charge the dealer for

19   any of these funds.

20        Q.    Okay.

21        A.    We are deemed -- as a manufacturer, we can

22   determine our prices to our dealers on a national

23   basis.  So we did establish a certain price level when

24   this program was launched, and dealers do receive bonus

25   monies based on their levels of satisfaction.

1    factory and retail knowledge.

2        Q.    Is it one person, or do you have a pool of

3    people?

4        A.    It's one person, and this individual has

5    attended a hundred percent of the meetings.

6        Q.    How is this person compensated?

7        A.    He is not.

8        Q.    Why does this person choose to participate?

9        A.    He's an educator right now, and he feels

10   staying close to the automotive industry will help him

11   teach his students.

12       Q.    And you mentioned that you're one of the board

13   members; is that correct?

14       A.    That's correct.

15       Q.    Is there -- do you have a permanent position

16   on the board?

17       A.    Virtually.  I've missed one meeting out of

18   probably about 15.

19       Q.    How are the other factory representatives

20   selected?

21       A.    They were selected by the dealer council, as

22   well.  The dealers felt that we should have equal

23   representation from the dealers and the company side

24   and an independent, so that's how we ended up with a

25   five-member board.

1    One is the meeting overview.  One is the document to

2    take notes on.

3        Q.    With regard to Eastside Lincoln Mercury's

4    second audit, was there any attempt by Lincoln Mercury

5    to guarantee or assure that Eastside was going to pass?

6        A.    No, no guarantees.

7        Q.    So no fix was in; is that correct?

8        A.    None whatsoever.  We treat all dealers

9    consistently.

10       Q.    I'd like to hand a document to you which is

11   marked as A 00487.  It's an Eastside Lincoln Mercury

12   document.  And see if you can identify that.

13       A.    That is correct.  This is a document from the

14   dealership's appeals case and all of the supporting

15   details that the dealer submitted for their appeal.

16       Q.    The letter on the top is your letter?

17       A.    That's correct.

18       Q.    And that letter advises that Eastside's been

19   denied, correct?

20       A.    That is correct.

21       Q.    And you said that was a 5-0 decision, correct?

22       A.    That is correct.

23       Q.    And can you tell me, based on your

24   recollection, what was the most critical factor with

25   regard to the denial of the appeal?

1    A.    Do you mind if I look at the subject document?

2    Q.    No, go ahead.  Take a look at it.

3    A.    Basically it's the digital photographs that

4  showed that the facility did not present a clean

5  appearance.  It was not free of discoloration, free of

6  stains, which are required elements in LPE and

7  Mercury Advantage.

8    Q.    So the biggest thing that you can remember,

9  and particularly after looking at the document, was

10  that the digital photographs were the reason the appeal

11  was denied?

12    A.    Again, I want to stress the charter of the

13  appeals board is to determine if the J.D. Power

14  evaluator did the right thing when they were on site,

15  followed the program rules.  Digital photography is one

16  thing, but it's the evaluator that's making the

17  pass/fail decision on site.  And the appeals board is

18  designed to review what the facts are of the case and

19  did the J.D. Power evaluator do the right thing on

20  site.

21    Q.    So you concluded as a group that the

22  photographs supported the J.D. Power's evaluator's

23  decision?

24    A.    That's correct.

25    Q.    Do you recall receiving a letter from

**EXHIBIT M**
DEFENDANT

1          UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF OHIO

3                    - - -

4   EASTSIDE LINCOLN MERCURY, ET AL,     )
                                         )
5                    PLAINTIFFS,         )
                                         )
6   VS                                   )   CASE NO:   01CV00567
                                         )
7   FORD MOTOR COMPANY, ET AL,           )
                                         )
8                    DEFENDANTS.         )
    - - - - - - - - - - - - - - - - - - - - - - -

9

10

11

12         DEPOSITION OF:  ROBERT C. REICHERT

13              CINCINNATI, OHIO

14              APRIL 1, 2003

15

16

17

18

19

20

21

22

23   REPORTER:  JILL M. DRAGON SANDY

24        *Dragon Reporting Service*
              5551 Seville Court
25        *Cincinnati, Ohio  45247*
              *(513)574-8319*

1

1          A.    On the customer satisfaction side.

2          Q.    Okay.  And when the LPE program was

3   rolled out, was your Fairfield store still located at the

4   old Jim Dixon facility?

5          A.    I don't think so.  I'm not sure.

6          Q.    When did you move from the old Fairfield

7   store to the new Fairfield store?

8          A.    Mid 2001.

9          Q.    Can you recall when the first LPE

10  inspection of Lincoln Mercury of Fairfield occurred?

11         A.    No, I cannot.

12         Q.    Do you recall whether or not you were

13  given a pass for the Fairfield store from an image

14  standpoint?

15         A.    I do not know that.

16         Q.    What was the problem with Fairfield's

17  customer satisfaction score?

18         A.    They had failed to schedule an oil

19  change on a number -- three Mercury new car deliveries.  I

20  believe the inspector pulls ten deals, and you have to have

21  nine of the ten, or eight of the ten, you have to have oil

22  changes scheduled.  We missed by one.  We had one oil change

23  that we didn't have scheduled, and that failed us.

24         Q.    Did Lincoln Mercury of Fairfield have to

25  be recertified?

EXHIBIT N
DEFENDANT

1              UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF OHIO

3                      - - -

4   EASTSIDE LINCOLN MERCURY, ET AL,    )
                                        )
5                   PLAINTIFFS,         )
                                        )
6   VS                                  )   CASE NO:   01CV00567
                                        )
7   FORD MOTOR COMPANY, ET AL,          )
                                        )
8                   DEFENDANTS.         )
    -----------------------------------

9

10

11

12          DEPOSITION OF:   ROBERT B. HUSER

13              CINCINNATI, OHIO

14              APRIL 2, 2003

15

16

17

18              ORIGINAL

19

20

21

22

23   REPORTER:  JILL M. DRAGON SANDY

24          *Dragon Reporting Service*
            *5551 Seville Court*
25          *Cincinnati, Ohio  45247*
            *(513)574-8319*

1

business level?

      A.   Just the state of affairs of Lincoln

Mercury, how were things going, sales, you know, how

everything was going, our individual scores.

      Q.   Was there a request made at that meeting

for financial assistance?

      A.   No.

      Q.   Was there an offer of financial

assistance made at that meeting relative to turning some

inventory, some aged inventory?

      A.   Yes, yes, yes.

      Q.   There was an offer by Mr. Carter to do

that?

      A.   Uh-huh.

      Q.   What did he offer?

      A.   As I recall, it was $10,000, between the

three stores.

      Q.   And did that just come out of the blue?

He said, "hey, guys, it's nice to see you.  And by the way,

I've got $10,000 for you to help move some old inventory."

      A.   Not quite to that extreme, but yes.

      Q.   Well, it was all his initiative?

      A.   Absolutely.

      Q.   Okay.  And were you surprised when that

came out of the conversation?

1    make any requests at all?

2         A.   Would you like me to explain the process

3    on the building?

4         Q.   Yes.

5         A.   Because there was no meeting with

6    Lincoln Mercury.  They were not involved.

7                   The way you get a waiver on the facility

8    is to go on to the LPE website, apply for a waiver, and the

9    stipulation, which we met at that time, was that you had to

10   be in the process of renovating the facility, which we were.

11        Q.   So there wasn't any independent meeting

12   on this subject?

13        A.   No.

14        Q.   So you just went on the website and

15   plugged in the information?

16        A.   Correct.

17        Q.   And then from there you went --

18        A.   You submit an application, and you had

19   to actually submit plans and a time line and what you were

20   doing with the facility.

21        Q.   And did you input data?

22        A.   Yes.

23        Q.   Was that your own personal task?

24        A.   Yes.

25        Q.   Okay.  Did you have discussions or

**EXHIBIT O**
DEFENDANT

1          UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF OHIO

3               - - -

4   EASTSIDE LINCOLN MERCURY, ET AL,    )
                                        )
5                  PLAINTIFFS,          )
                                        )
6   VS                                  )   CASE NO:  01CV00567
                                        )
7   FORD MOTOR COMPANY, ET AL,          )
                                        )
8                  DEFENDANTS.          )
    - - - - - - - - - - - - - - - - - - - - - - - - - - -

9

10

11

12        DEPOSITION OF:  JERRY L. MULLINS

13             CINCINNATI, OHIO

14              APRIL 2, 2003

15

16

17

18         ORIGINAL

19

20

21

22

23   REPORTER:  JILL M. DRAGON SANDY

24         *Dragon Reporting Service*
           *5551 Seville Court*
25      *Cincinnati, Ohio  45247*
            *(513)574-8319*

1    understand there was a dinner, but what type of business

2    issues were discussed there?

3                    A.    Market conditions.

4                    Q.    What else?

5                    A.    Aged inventory, prior year models.

6                    Q.    And was it presented to Mr. Carter that

7    your dealerships had some aged inventory that you needed to

8    turn?

9                    A.    As I recall, yes.

10                   Q.    Did he offer some financial assistance

11   to help you do that?

12                   A.    He did.

13                   Q.    How much?

14                   A.    I think $10,000.

15                   Q.    Do you know where that money came from?

16                   A.    I do not know.

17                   Q.    Do you know who the money was paid to?

18                   A.    As I recall, it was paid for -- on

19   models, Mountaineer models, and it was paid per dealership,

20   to try to reduce the prior year models, as best of my

21   recollection.

22                   Q.    Do you remember how much of that $10,000

23   came to Northgate?

24                   A.    No, I don't.

25                   Q.    Do you recall any other situations over

**EXHIBIT P**
**DEFENDANT**

1    UNITED STATES DISTRICT COURT

2    FOR THE SOUTHERN DISTRICT OF OHIO

3    - - -

4    EASTSIDE LINCOLN MERCURY, ET AL,    )

5                    PLAINTIFFS,    )

6    VS                              )    CASE NO:  01CV00567

7    FORD MOTOR COMPANY, ET AL,       )

8                    DEFENDANTS.    )
     ------------------------------------

9

10

11

12

13    DEPOSITION OF:  MANUEL EUGENE MULLINS

14    CINCINNATI, OHIO

15    JUNE 25, 2003

16

17

18    **ORIGINAL**

19

20

21

22

23    REPORTER:  JILL M. DRAGON SANDY

24    *Dragon Reporting Service*
       *5551 Seville Court*
25    *Cincinnati, Ohio  45247*
       *(513)574-8319*

1

1     it's a summary of what we anticipated were the areas that

2     you would testify to.

3                    THE WITNESS:  Okay.

4              A.    I can only address what my specific

5     answers are, but this would seem to me to indicate about a

6     contest or refer to a contest that we had with the Gentry

7     Shop, you know, on the previous allocation that we had

8     gotten, the additional allocations.  They had a little

9     contest that was specific to our dealer group, I was told by

10    my general manager and Pat Letart, that it was a -- if we

11    had sold so many cars, which obviously we were going to be

12    the only dealer, our dealer group would have been the only

13    ones that could have won the contest because we had the

14    cars.  If you have a contest that, you know, you limited the

15    other people's ability to win, then obviously we're going to

16    win, someone in our dealer group.  So that was, I can only

17    assume that's what the reference is here to a sham contest,

18    was we were taken -- Northgate Lincoln Mercury won the

19    little contest.  It was about Lincolns and Grand Marquis,

20    and Mountaineers, if I recall.  And we were taken to the

21    Gentry Shop on 747, and we were -- the store was closed for

22    us, our group of our sales staff, and, in the evening, I

23    don't recall what day it was, but we were allowed to shop,

24    and I was given like $700 in funds, I guess, not cash

25    directly, but I was given a store credit, if you will.  So I

1    bought a couple, two or three sport coats and some other

2    stuff, shirts, ties.  And then specific salespeople had, you

3    know, the salespeople had maybe 300 bucks or so of store

4    credit to go and shop and buy themselves, you know, some

5    clothing.  We had won the contest, supposedly, within our

6    organization, and --

7                    Q.   Was the Northgate group allowed to do

8    this shopping exclusive of Fairfield or Kings?

9                    A.   Yes.

10                   Q.   And it was because you --

11                   A.   As far as I know, yes.

12                   Q.   And it was because your dealership

13   outperformed the other dealerships?

14                   A.   Yeas, as far as I recall, that's true.

15                   Q.   So at least with respect to it being a

16   contest among the dealerships, it appears to have truly been

17   a contest and you won?

18                   A.   It was a contest -- what was your

19   statement?  Let's try --

20                   Q.   At least as much as it was a contest

21   between the three Lincoln Mercury dealerships inside the

22   Kenwood Dealer Group, it was a contest and your dealership

23   won?

24                   A.   It was a contest that was sponsored by

25   the Lincoln Mercury Division.

**EXHIBIT Q**
DEFENDANT



# LINCOLN
## Mercury

Joe Zimmerman                                  Cincinnati Region
Marketing Coordinator                              4680 Parkway Drive
                                                   Suite 440
                                                   Mason, OH  45040

Dale Snider
Eastside Lincoln- Mercury, Inc.
429 Ohio Pike
Cincinnati, OH 45255

Mr. Snider,

Congratulations!  Your sales department has obtained the highest percentage of your objective (103.7%)
for the Elite Group,  and has won a  **Dress for Success Shopping Spree** for you and your top eight sales
consultants.

As the Elite Group winner you are invited to attend a reception with Hors D'Oeuveres and soft drinks,
followed by a shopping spree held on your behalf at Gentrys on Friday July 7th, 2000 at 8:30 PM.   As per
the contest rules you will receive a $600 shopping spree, and your top eight Sales Consultants will each
have $300 to spend on clothing.

Below is the address of the event,  and I have attached a map to help guide you there.

Gentrys Men's Clothing
6475 E. Galbrith Road
Cincinnati, OH,  45236
(513) 791- 9800

Please feel free to contact me with any questions at 513-573-1023.

Joe Zimmerman
Marketing Coordinator
Lincoln Mercury Division
Cincinnati Region

**ELM3 8756**

Dress for Success- Zone A

| Elite | Base Obj | Actual 3/00 | Actual 4/00 | Total Act. | % of Obj. | Fast Start Obj | Actual | Achieve Bonus ? | % Obj + Bonus | Extra Emphasis Obj. | Actual 3/00 | Actual 4/00 | Total | Achieve Bonus? | % of Obj. + Bonus |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 46170 Fairfield | 108 | 43 | 34 | 77 | 71.30% | 59 | 43 | No | 71.30% | 11 | 4 | 6 | 10 | No | 71.30% |
| 46358 LM of KA | 189 | 93 | 70 | 163 | 86.24% | 104 | 93 | No | 86.24% | 0 | 0 | 0 | 0 | Yes | 91.24% |
| 46366 Northg | 118 | 55 | 47 | 102 | 86.44% | 65 | 55 | No | 86.44% | 11 | 9 | 2 | 11 | Yes | 91.44% |
| 46104 LM of Florence | 87 | 57 | 27 | 64 | 73.56% | 48 | 37 | No | 73.56% | 5 | 2 | 1 | 3 | No | 73.56% |
| 46362 Eastside | 81 | 57 | 27 | 84 | 103.70% | 44 | 57 | Yes | 108.70% | 6 | 5 | 1 | 6 | Yes | 113.70% |
| 46126 Centerville | 125 | 39 | 17 | 56 | 44.80% | 69 | 39 | No | 44.80% | 12 | 6 | 0 | 6 | No | 44.80% |
| Grand | | | | | | | | | | | | | | | |
| 46008 Harmon | 49 | 17 | 19 | 36 | 73.47% | 27 | 17 | No | 73.47% | 5 | 3 | 1 | 4 | No | 73.47% |
| 46026 32 For | 33 | 17 | 12 | 29 | 87.88% | 18 | 17 | No | 87.88% | 5 | 5 | 1 | 6 | Yes | 92.88% |
| 46239 Charli | 31 | 8 | 8 | 16 | 51.61% | 17 | 8 | No | 51.61% | 0 | 0 | 0 | 0 | No | 51.61% |
| 46379 Jeff W | 41 | 23 | 11 | 34 | 82.93% | 23 | 23 | Yes | 87.93% | 10 | 5 | 1 | 6 | No | 87.93% |
| 46648 Cronin | 30 | 10 | 24 | 34 | 113.33% | 17 | 10 | No | 113.33% | 2 | 0 | 2 | 2 | Yes | 118.33% |
| 46686 Tim Sh | 52 | 14 | 14 | 28 | 53.85% | 29 | 14 | No | 53.85% | 5 | 2 | 1 | 3 | No | 53.85% |

**46362 Eastside**

| | |
|---|---|
| Dale Snider | $600.00 |
| Consultant | $300.00 |
| Consultant | $300.00 |
| Consultant | $300.00 |
| Consultant | $300.00 |
| Consultant | $300.00 |
| Consultant | $300.00 |
| Consultant | $300.00 |
| **Total** | **$4,500.00** |

**46648 Cronin**

| | |
|---|---|
| Bill Flynn | $500.00 |
| Consultant | $250.00 |
| Consultant | $250.00 |
| Consultant | $250.00 |
| Consultant | $250.00 |

Page 1

ELM3 8757

1       IN THE DISTRICT COURT OF THE UNITED STATES

2           FOR THE SOUTHERN DISTRICT OF OHIO

3                 WESTERN DIVISION

4

5    EASTSIDE LINCOLN MERCURY,

6    INC., et al                    CONFIDENTIAL

7                 Plaintiffs,

8         -vs-                          No. C-1-01-567

9

10   FORD MOTOR COMPANY, et al

11                 Defendants.         COPY

12   _____/

13

14               RESTRICTED CONFIDENTIAL

15

16               The deposition of TIM FISHER,

17   a witness of lawful age, taken in the

18   above-entitled cause, wherein EASTSIDE LINCOLN

19   MERCURY, INC., et al, is the plaintiff and

20   FORD MOTOR COMPANY, et al, is the defendant,

21   pending in the District Court of the United

22   States for the Southern District of Ohio,

23   Western Division, pursuant to the Federal

24   Rules of Civil Procedure, before Rosanna

25   Gillette, Certified Shorthand Reporter and

                                                    1

1       coverage.

2   Q.   Would that pool be termed a manager's pool?

3   A.   It could be referred to as a manager's pool,

4        yes.

5   Q.   Is there another type of pool?

6   A.   No.

7   Q.   Now, in your history or life at Lincoln

8        Mercury, you have been on the national

9        planning side; correct?

10  A.   (Shaking head - no verbal response.)

11  Q.   Is that a yes?

12  A.   Yes.

13  Q.   And during your tenure at Lincoln Mercury do

14       you believe it is a goal of Lincoln Mercury to

15       assure that each dealer who wants a vehicle at

16       roll-out, that they will in fact have a

17       vehicle at roll-out?

18  A.   That is varied based on the volume of the

19       product that is offered.  So, I would agree

20       with most of that.  But, if we were talking

21       about the roll-out of the new Sable, the

22       volume ran up very quickly and we had a lot of

23       vehicles and that was not a challenge at all.

            If we look at the roll-out of

24       the Blackwood, the volume was extremely low.

                                          32

1         We took a long time to actually get quality

2         units produced out of the assembly process and

3         it took forever to get coverage on that

4         product.

5                     So, between those two extremes

6         there is a whole range of possibilities.

7    Q.   Well, during the last five years -- I'll try

8         to name the vehicles that were either a

9         reintroduction of an old vehicle or a new

10        vehicle.  One would be Navigator; correct?

11   A.   Yes.

12   Q.   It had both a launch and a refresh during the

13        last five or six years; correct?

14   A.   I believe that is true, yes.

15   Q.   Then another vehicle would have been the

16        Cougar; correct?  It had a cease in production

17        and then about a two year hiatus and then

18        reintroduction of the Cougar?

19   A.   I'm not sure on the exact date of the Cougar.

20        That may have been more than five years ago.

21        I'm not real sure on the date, but that seems

22        like quite a while in the past now.

23   Q.   Okay.  Was another vehicle that was rolled out

24        the LS?

25   A.   Yes.

                                                        33

Q.    Was that a completely new vehicle?

A.    At one point that was a new vehicle, yes.  And
      then this year it has got a redesign.

Q.    Okay. Which I called a refresh?

A.    Refresh is a good term for this year's.

Q.    Then the Blackwood was a very limited
      production vehicle?

A.    Yes.

Q.    It wasn't intended to be in mass production,
      is that correct, unless you hit a homerun?

A.    I guess I don't know specifically what the
      intention was there.

Q.    It began and has remained in very limited
      production?

A.    Yes, it has.

Q.    In fact it is no longer going to be produced;
      is that correct?

A.    That's right.

Q.    Then the Aviator has been rolled out in the
      last five years; is that correct?

A.    Yes, that is right.

Q.    And is the Aviator a new vehicle or a refresh?

A.    That would be a new vehicle for Lincoln
      Mercury and for the company.

Q.    What are the other vehicles that have been

                                                    34

1    rolled out either as a new vehicle or as a

2    refresh in the last five years?

3  A.   Mountaineer has been -- has had a refresh.

4    Grand Marquis and Town Car have both had

5    refreshments.  Did you mention Sable?  It had

6    a refresh.

7  Q.   Is that pretty much it?

8  A.   Pretty much all the vehicles that have been

9    refreshed.

10              MS. McNELLIE: Continental was

11   before five years ago?

12              THE WITNESS: Well, Continental

13   has discontinued.

14              MS. McNELLIE: But I was just

15   thinking there was a refresh, but I could be

16   wrong.  It might be more than five years ago.

17              THE WITNESS: I guess I don't

18   recall, specifically.

19   BY MR. BERBERICH:

20  Q.   The only, I'll term it, small production

21   vehicle in that group would have been the

22   Blackwood; correct?

23  A.   The Blackwood would have been the smallest

24   production, yes.

25  Q.   Now, with the Navigator and the Aviator and

                                              35

Warranty Audit Action Matrix
Process/Administrative (only) Findings

**EXHIBIT S**
DEFENDANT

*Initial Audit - Matrix One*



*Total Disallowance as % of Scope*

*Follow-Up Audit - Matrix Two*



*Total Disallowance as % of Scope*

*Additional Follow-Up Audit - Matrix Three*



*Total Disallowance as % of Scope*

**Actions:**

1. Business Counseling Meeting with facing FCSD and Vehicle Division Reg Managers.

2. Dealership is disqualified from award/program eligibility or recognition for the following: President's Award, Top 100 Club, NACE, 100 Champions, Premier Club or any other related award and program (with the exception of Ford Blue Oval, Lincoln Premier Experience and Mercury Advantage-see Action 5). In addition, the Dealer must personally sign all warranty claims. Additional franchise opportunities are removed or suspended. Action 2 is in effect for 12 months from audit close or the next WCP audit action, whichever is earlier.

3. Dealership Authorized AWA privileges (P05/P07) removed for six months.

4. Chargeback (incremental) assessed for all "Memo" items noted during Step 3 -- Follow up Review (previously not processed for actual chargeback).

5. Dealership is de-certified from Ford Blue Oval Certified / Lincoln Premier Experience / Mercury Advantage for one year.

6. Dealer is required to contract for Warranty In-Dealer Consulting Initiative at dealer's expense for a period of up to three months. If refused, Action Step 7 implemented.

7. Vehicle Division recommends Termination of Dealer/Account. If Termination is not pursued, Warranty Audit Action 6 is required.

*Note: where Actions above refer to "Dealer" substitute CEO/Site Manager in the case of Auto Collections.*

**Term Definition:**

Scope - Total Warranty and Policy Payments to the Dealership for the Period Examined.
Total Disallowance - The Total Dollars Charged Back as a Result of the Audit Findings.
Total Disallowance as a % of Scope - The Total Disallowance Divided by the Payments for the Period Examined.
G.T. /= to - Greater Than or Equal to
L.T. - Less Than

BSW DEVELOPMENT CORP., et al., Plaintiffs, vs. CITY OFDAYTON, et al., Defendants.
Case No. C-3-93-438

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OFOHIO, WESTERN DIVISION

1995 U.S. Dist. LEXIS 22173

March 23, 1995, Filed

DISPOSITION: [*1] PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. # 11) SUSTAINED IN PART AND OVERRULED IN PART; PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (DOC. # 12) OVERRULED; DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. # 25) SUSTAINED IN PART AND OVERRULED IN PART.

CORE TERMS: summary judgment, conspiracy, preliminary injunction, state law, Fifth Amendment, punitive damages, constitutional issues, verified, issue preclusion, judicata, ripe, Fourteenth Amendment, injunctive relief, supplemental, demolish, demolition permit, wit, genuine issue of material fact, entitled to summary judgment, color of state law, intracorporate, building code, eligible, statute of limitations, relitigating, premature, prevail, injunction, partial, permission

COUNSEL: For BSW DEVELOPMENT GROUP, WILLIAM I SCHOENFELD, plaintiffs: Dwight Dean Brannon, Dwight D Brannon & Associates, Dayton, OH.

For DAYTON CITY OF, BOARD OF ZOINING APPEALS, LANDMARK COMMISSION, TERESA PROSSER, defendants: Neil Frank Freund, Shawn Michael Blatt, Freund Freeze & Arnold, Jane Michele Lynch, Green & Green, Dayton, OH.

JUDGES: WALTER HERBERT RICE, UNITED STATES DISTRICT JUDGE.

OPINIONBY: WALTER HERBERT RICE

OPINION: DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. # 11); DECISION AND ENTRY OVERRULING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (DOC. # 12); DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. # 25)

In 1984, Plaintiff BSW Development Group ("BSW") purchased a parcel of real estate located on South Patterson Boulevard, within the City of Dayton, Ohio ("Dayton"). n1 After BSW had developed[*2] a three story office building on a portion of that real estate, it sought a permit from Dayton's Division of Inspectional Services to demolish a building ("Wilcon Building") which was located on the other portion of that property. Under Dayton's ordinances, a permit to demolish a building which is listed on or eligible to be listed on the National Register of Historic Places ("National Register") can not be issued unless the applicant obtains a Certificate of Appropriateness from the Landmark Commission ("LC"). Dayton Revised Code of General Ordinances ("RCGO") §§ 150.45 and 150.246. Since the Department of Inspectional Services determined that the Wilcon Building was eligible to be listed on the National Register, it refused to issue a permit and referred BSW to the LC. Under RCGO § 150.246(A)(4), the LC cannot issue a Certificate of Appropriateness unless the applicant for the demolition permit has provided clear evidence that "the square foot cost of meeting the minimum building code would exceed the square foot market value of similarly used and improved structures in the planning district." n2 In other words, the applicant must clearly show that the cost of renovating the structure [*3] in question, by bringing it up to code, would exceed its market value. On July 29, 1989, the LC met and concluded that BSW had not met its burden under § 150.246(A)(4). Therefore, the LC refused to issue a Certificate of Appropriateness to BSW, thus, in effect, denying permission to demolish the Wilcon Building.

1995 U.S. Dist. LEXIS 22173, *

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 The other named Plaintiff, in addition to BSW, is William Schoenfeld ("Schoenfeld"), one of BSW's partners. BSW's other partners are Dwight Brannon, who is also Plaintiffs' counsel, and Dennis Williams.

n2 Section 150.246(A) contains three other conditions which, if met, allow the owner of a building to obtain a demolition permit. None of these other conditions is pertinent in the present case.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

BSW then appealed the LC's decision to Dayton's Board of Zoning Appeals ("BZA"). When the BZA affirmed the LC's decision, BSW initiated this litigation, by filing an appeal in the Court of Common Pleas for Montgomery County, Ohio ("Common Pleas Court"), from the BZA's decision to deny it a demolition[*4] permit. n3 BSW alleged that the relevant Dayton ordinances, §§ 150.45 and 150.246(A), were unconstitutional and, in addition, that the BZA's decision was not supported by the preponderance of substantial, reliable and probative evidence. On December 4, 1991, the Common Pleas Court issued its opinion, n4 in which it reversed the BZA's decision to deny a demolition permit. The Common Pleas Court determined that the manner in which §§ 150.45 and 150.246(A) had been applied denied BSW property without due process of law and constituted a taking of property without just compensation. n5 In addition, the Common Pleas Court concluded that the BZA's decision was not supported by the preponderance of substantial, reliable and probative evidence.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n3 Whether the Plaintiffs named other Defendants/Appellees, in addition to the BZA, is not clear. No party has favored the Court with a copy of the initial complaint in this litigation. As is explained below, this litigation was not removed to this Court, until the Plaintiffs filed a verified, supplemental complaint. Plaintiffs filed that pleading after the Common Pleas Court entered judgment in their favor and the Montgomery County Court of Appeals affirmed that judgment (albeit on different grounds).
[*5]

n4 A copy of the Common Pleas Court's decision is attached to Defendants' notice of removal (Doc. # 1).

n5 In its Decision, the Common Pleas Court did not specify whether the denial of the Certificate of Appropriateness violated the United States Constitution or the Ohio Constitution. However, that Court relied upon cases decided by the United States Supreme Court interpreting the Takings Clause of the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment; therefore, this Court assumes that the Common Pleas Court concluded that the manner in which §§ 150.45 and 150.246(A) had been applied violated the United States Constitution.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

1995 U.S. Dist. LEXIS 22173, *

The BZA appealed the decision of the Common Pleas Court to the Court of Appeals for Montgomery County ("Court of Appeals"). On May 7, 1993, the Court of Appeals issued its decision, n6 affirming the Common Pleas Court. However, the Court of Appeals' decision was somewhat narrower than that of the Common Pleas Court. Judge Brogan, writing for the court, noted that it was inappropriate for a court to pass on the constitutionality of an ordinance[*6] if such a decision were not necessary. Based upon the record before it, the Court of Appeals concluded that BSW had met its burden of demonstrating that it was entitled to a Certificate of Appropriateness under § 150.246(A)(4), i.e., by clearly showing that the cost of renovating the Wilcon Building, by bringing it up to code, would exceed its market value. Accordingly, the Court of Appeals affirmed the Court of Common Pleas, without deciding whether the manner in which §§ 150.45 and 150.246(A) were applied violated the constitution. The BZA did not seek review of the Court of Appeals' decision by the Ohio Supreme Court.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n6 A copy of the Court of Appeals' decision is attached to Defendants' notice of removal (Doc. # 1).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

On May 18, 1993, Jeffrey Tyler, a Historic Preservation Officer for Dayton, wrote to BSW's counsel, informing him that BSW would receive a Certificate of Appropriateness and, thus, a demolition permit, when it complied with § 150.246(B) and (C). Subsection 150.246(B) provides that, in order[*7] to obtain a Certificate of Appropriateness, an applicant must submit a reuse plan which mitigates any adverse effects of the removal of the structure. Under subsection 150.246(C), in order to obtain such a certificate, an applicant must post a performance bond and pay a mitigation fee equal to the greater of $50.00 or 10% of the estimated cost of demolition, unless it has requested and obtained a waiver of those requirements from the LC. BSW did not pursue that avenue; rather, on October 18, 1993, Plaintiffs filed, in the Common Pleas Court, a supplemental, verified complaint in the same case as their administrative appeal. n7 In that pleading, the Plaintiffs named Dayton, the BZA, the LC and Tressa Prosser ("Prosser"), an employee of Dayton who serves as the Secretary of the LC, as Defendants. On November 16, 1993, Defendants removed Plaintiffs' supplemental, verified complaint to this Court. See Doc. # 1.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n7 A copy of Plaintiffs' supplemental, verified complaint is attached to Defendants' notice of removal (Doc. # 1).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*8]

In that pleading, Plaintiffs request declaratory relief, injunctive relief, appropriation/condemnation and damages. The Plaintiffs set forth the following 12 claims for relief, under both federal and state law, to wit:

Case 1:01-cv-00567-SJD    Document 61-2    Filed 09/10/2003    Page 135 of 149

Page 7
1995 U.S. Dist. LEXIS 22173, *

1. In their first claim for relief, Plaintiffs set forth a claim under 42 U.S.C. § 1983, and allege that the denial of the Certificate of Appropriateness and the determination that the Wilcon Building was eligible to be listed on the National Register have denied them property without due process of law and equal protection of the laws, as well as constituting a taking without just compensation, in violation of the Fifth and Fourteenth Amendments to the United States Constitution. n8

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n8 Plaintiffs base their allegations regarding the determination that the Wilcon Building was eligible to be listed on the National Register upon the decision of the City to seek such a listing without their consent.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

2. In their second claim for relief, Plaintiffs allege that the[*9] Defendants, by taking BSW's property without paying them just compensation, have violated the Due Process Clause of the Fifth and Fourteenth Amendments.

3. In their third claim for relief, Plaintiffs allege that the Defendants have knowingly, willfully and maliciously denied BSW's right to equal protection of the laws, in violation of the Fifth and Fourteenth Amendments, thus entitling them to an award of punitive damages.

4. In their fourth claim for relief, Plaintiffs allege that the denial of the demolition permit and the Certificate of Appropriateness and the determination that the Wilcon Building was eligible to be listed on the National Register constituted a conspiracy by the Defendants to deny them property without due process, to deprive them of equal protection of the laws and to take BSW's property without just compensation, all in violation of 42 U.S.C. § 1985.

5. In their fifth claim for relief, Plaintiffs allege that Prosser knowingly and maliciously made false statements to both the LC and the BZA, which constituted malicious interference with BSW's right to petition the government for redress of grievances.

6. In their sixth[*10] claim for relief, Plaintiffs allege that BSW relied to its detriment on the false statements made by Prosser and other employees of Dayton.

7. In their seventh claim for relief, Plaintiffs allege that Prosser and the other Dayton employees were under a duty to provide accurate information to BSW, that they failed to exercise reasonable care in executing that duty, thus providing false information, and that BSW relied upon the false information provided to it to its detriment.

8. In their eighth claim for relief, Plaintiffs allege and seek a declaratory judgment to the effect that Dayton's Revised Historic District Ordinance ("Historic Ordinance"), RCGO §§ 44.50-67, 150.45 and 150.230-259, violate the constitutions of the United States and Ohio.

9. In their ninth claim for relief, Schoenfeld sets forth a claim on behalf of all taxpayers, alleging that the Historic District Ordinance is unconstitutional and seeking injunctive relief preventing Dayton from enforcing it.

10. In their tenth claim for relief, Plaintiffs seek injunctive relief during the pendency of this litigation, preventing the Defendants from illegally and unconstitutionally interfering with[*11] and taking their property and from violating their constitutional rights.

11. In their eleventh claim for relief, Plaintiffs allege that the Defendants have violated their rights to substantive and procedural due process.

1995 U.S. Dist. LEXIS 22173, *

12. In their twelfth claim for relief, Plaintiffs seek an award of attorney's fees, pursuant to 42 U.S.C. § 1988.

   This case is now before the Court on the following motions, to wit: Plaintiffs' motion for partial summary judgment (Doc. # 11), Plaintiffs' motion for a preliminary injunction (Doc. # 12) and Defendants' motion for summary judgment (Doc. # 25). n9 As a means of analysis, the Court will initially set forth the standards which govern all motions for summary judgment. Then, the Court will turn to the three motions, discussing the two summary judgment motions together because they raise issues in common. n10

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - - -

n9 Defendants' motion to disqualify Plaintiffs' counsel (Doc. # 42) is also pending. The Court will rule on that motion by separate entry.

n10 Indeed, Defendants' motion for summary judgment (Doc. # 25) also serves as their memorandum in opposition to Plaintiffs' motion for partial summary judgment (Doc. # 11).

- - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*12]

I. Standards governing motions for summary judgment

   A motion for summary judgment "should be granted where the evidence is such that it 'would require a directed verdict [now a judgment as a matter of law] for the moving party.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986), quoting Sartor v. Arkansas Gas Corp., 321 U.S. 620, 624, 88 L. Ed. 967, 64 S. Ct. 724 (1944). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). Of course, the moving party:

always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

   477 U.S. at 323.[*13] See also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial." quoting Gutierrez v. Lynch, 826 F.2d 1534, 1536 [6th Cir. 1987]). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).

   Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). See also, Michigan Protection and Advocacy Service, Inc. v. Babin, 18 F.3d 337, 341 (6th Cir. 1994) ("The plaintiff must present more than a scintilla of evidence in support[*14] of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. Celotex Corp., 477 U.S. at 324. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the

1995 U.S. Dist. LEXIS 22173, *

moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. Anderson, 477 U.S. at 255 (emphasis added). Of course, if the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, Federal Practice and Procedure, § 2726. [*15] In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." Interroyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990). See also, L.S. Heath & Son, Inc. v. AT&T Information Systems, Inc., 9 F.3d 561 (7th Cir. 1993); Skotak v. Tenneco Resins, Inc., 953 F.2d 909, 915 n. 7 (5th Cir.), cert. denied, 506 U.S. 832, 113 S. Ct. 98, 121 L. Ed. 2d 59 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ...."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties. [*16]

II. Plaintiffs' motion for partial summary judgment (Doc. # 11) and Defendants' motion for summary judgment (Doc. # 25)

With these two motions, the parties focus primarily on the Plaintiffs' claims that the Defendants' actions have constituted a taking without just compensation, in violation of the Fifth and Fourteenth Amendments to the United States Constitution. n11

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n11 The Takings Clause of the Fifth Amendment provides, "nor shall private property be taken for public use, without just compensation." The Takings Clause of the Fifth Amendment is made applicable to the states (and their political subdivisions) by the Due Process Clause of the Fourteenth Amendment. Dolan v. City of Tigard, 512 U.S. 374, 114 S. Ct. 2309, 2316, 129 L. Ed. 2d 304 (1994) (citing Chicago, B. & Q. R. Co. v. Chicago, 166 U.S. 226, 41 L. Ed. 979, 17 S. Ct. 581 (1897)).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

Initially, Plaintiffs argue that the fact that an unconstitutional taking has occurred is established, as a matter of law, [*17] by the doctrine of res judicata and, thus, entitles them to summary judgment, as to liability, on their claims under the Takings Clause of the Fifth Amendment, as made applicable to the states and their political subdivisions by the Fourteenth Amendment. In particular, the Plaintiffs rely on the Common Pleas Court's decision. That court did decide that the decisions of the LC and the BZA to deny a Certificate of Appropriateness to BSW constituted a taking without just compensation. However, although the question of a taking without just compensation was presented to it by the parties, the Court of Appeals expressly declined to address that constitutional issue, noting that courts must avoid ruling on constitutional issues, unless such a ruling is absolutely necessary. BSW Development Group v. Dayton Board of Zoning Appeals, 1993 Ohio App. LEXIS 2544 (May 7, 1993) at 4-5. Accordingly, the Court of Appeals, while affirming the trial court, decided only that the decisions of the LC and the BZA that BSW had not met the criteria for a Certificate of Appropriateness, contained in § 150.246(A)(4), were not supported by the preponderance of substantial, reliable and probative[*18] evidence.

The doctrine of res judicata is divided into two distinct components, to wit: claim preclusion and issue preclusion (also known as collateral estoppel). See e.g., Montana v. United States, 440 U.S. 147, 59 L. Ed. 2d 210, 99 S. Ct. 970 (1979). Herein, Plaintiffs rely on issue preclusion, arguing that the Defendants are prevented from relitigating the question of

1995 U.S. Dist. LEXIS 22173, *

whether there was a taking without just compensation. Under Ohio law, n12 issue preclusion prevents the relitigation of an issue that was actually and necessarily decided in a prior action. National Distillers & Chemical Corp. v. Limbach, 71 Ohio St. 3d 214, 216, 643 N.E.2d 101, 103 (1994). The fatal flaw in Plaintiffs' argument regarding issue preclusion is that the Court of Appeals expressly concluded that it was not necessary to decide whether a taking without just compensation had occurred. n13 Moreover, under the doctrine of law of the case, the decision of the Court of Appeals must be followed. Under Ohio law, the doctrine of law of the case provides that a decision in a case by an appellate court must be followed subsequently by the trial court in that case. Nolan v. Nolan, 11 Ohio St. 3d 1, 462 N.E.2d 410 (1984);[*19] Weir v. Kebe, 29 Ohio App. 3d 53, 503 N.E.2d 177 (Cuyahoga County 1985). Indeed, the doctrine of law of the case requires a trial court to follow the "plain import" of the appellate court's decision. Local 4501 v. Ohio State University, 24 Ohio St. 3d 191, 193-94, 494 N.E.2d 1082, 1085 (1986). This Court must give the same preclusive effect to the Court of Appeals' decision as would a state court. Allen v. McCurry, 449 U.S. 90, 66 L. Ed. 2d 308, 101 S. Ct. 411 (1980). Therefore, if the Court of Appeals' decision established the law of the case for the Common Pleas Court, that decision similarly established it for this Court. Herein, not only the plain import of the Court of Appeals' decision but also its express language was that it was not necessary for it or for the Common Pleas Court to decide the constitutional issues upon which the Court of Common Pleas had ruled. Once again, the issue preclusion component of res judicata prevents the relitigation of an issue only when that issue was actually and necessarily decided in the prior action. n14 National Distillers, supra.

- - - - - - - - - - - - - - - - - Footnotes- - - - - - - - - - - - - - - - - -

n12 This Court must apply principles of Ohio law, because federal courts are bound by 28 U.S.C. § 1738 to give the same preclusive effect to state court judgments as would be given by state courts. Allen v. McCurry, 449 U.S. 90, 66 L. Ed. 2d 308, 101 S. Ct. 411 (1980); Gargallo v. Merrill Lynch, Pierce, Fenner & Smith, 918 F.2d 658, 662 (6th Cir. 1990).
[*20]

n13 In support of their argument that principles of res judicata prevent the Defendants from relitigating the question of whether a taking without just compensation has occurred, the Plaintiffs place primary reliance on the decision of Judge Thomas Lambros in Negin v. City of Mentor, 601 F. Supp. 1502 (N.D.Ohio 1985). In Negin, Judge Lambros concluded that a decision by the Ohio Supreme Court that the defendant's denial of a building permit violated due process prevented the defendant from relitigating that issue in a subsequent § 1983 action. However, in the present case, unlike Negin, the final state court to address the constitutional issues has concluded that resolution of those constitutional issues was not necessary to the court's decision. Therefore, Negin is distinguishable, since the constitutional issues were not actually decided by the state appellate court.

n14 Although the Court of Appeals expressly held that resolution of constitutional issues was not necessary, the Court of Appeals did not vacate that portion of the Common Pleas Court's decision in which it had concluded that there had been a taking without just compensation and a denial of property without due process. Technically, the Court of Appeals' failure to vacate the decision of the Common Pleas Court on the constitutional issues may mean that said decision remains "on the books." However, that fact is of no import, because the appellate court expressly concluded that it was not necessary for the Common Pleas Court to have reached those constitutional issues; therefore, issue preclusion does not prevent the relitigation of those issues.

- - - - - - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - - - -

[*21]

1995 U.S. Dist. LEXIS 22173, *

Since the Court of Appeals concluded that resolution of the constitutional issues was not necessary and since that court's decision must be followed, n15 this Court rejects the Plaintiffs' argument that res judicata entitles them to summary judgment on their claims under the Takings Clause of the Fifth Amendment, as made applicable to the states and their political subdivisions by the Fourteenth Amendment. n16

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n15 Since this Court has concluded that issue preclusion does not prevent the Defendants from relitigating the question of whether there was a taking without just compensation, it is not necessary to address another intriguing issue, which the parties have not raised. Issue preclusion prevents the relitigation of an issue decided in a prior action. National Distillers, supra. Herein, there is no prior action in which an issue was actually and necessarily decided; rather, Plaintiffs have filed a supplemental, verified complaint in the same action in which the trial court decided that BSW's property had been taken without just compensation. In other words, this Court need not decide whether the absence of a prior case prevents the Court from applying issue preclusion to prevent the Defendants from relitigating the constitutional issues. [*22]

n16 Plaintiffs also argue that principles of res judicata entitle them to summary judgment, as to liability, on their due process claims. For the reasons set forth above in its discussion of Plaintiffs' claims for damages under the Takings Clause of the Fifth Amendment, the Court rejects that argument.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

Defendants argue that they are entitled to summary judgment on Plaintiffs' claims under the Takings Clause of the Fifth Amendment, as made applicable to the states and their political subdivisions by the Fourteenth Amendment, because those claims are not ripe for adjudication. In Williamson County Regional Planning Comm. v. Hamilton Bank, 473 U.S. 172, 87 L. Ed. 2d 126, 105 S. Ct. 3108 (1985), the Supreme Court held that a claim under the Takings Clause of the Fifth Amendment is premature when the person seeking compensation has not taken advantage of procedures supplied by state law for obtaining compensation. The Williamson County Court wrote:

A second reason the taking claim is not yet ripe is that respondent did not seek compensation through the procedures[*23] the State has provided for doing so. The Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation. Hodel v. Virginia Surface Mining & Reclamation Assn., Inc., 452 U.S. [264, 297, n. 40 (1981)]. Nor does the Fifth Amendment require that just compensation be paid in advance of, or contemporaneously with, the taking; all that is required is that a "reasonable, certain and adequate provision for obtaining compensation" exist at the time of the taking. Regional Rail Reorganization Act Cases, 419 U.S. 102, 124-125, 42 L. Ed. 2d 320, 95 S. Ct. 335 (1974) (quoting Cherokee Nation v. Southern Kansas R. Co., 135 U.S. 641, 659, 34 L. Ed. 295, 10 S. Ct. 965 (1890)). See also Ruckelshaus v. Monsanto Co., 467 U.S. [986, 1016 (1984)]; Yearsley v. W. A. Ross Construction Co., 309 U.S. 18, 21, 84 L. Ed. 554, 60 S. Ct. 413 (1940); Hurley v. Kincaid, 285 U.S. 95, 104, 76 L. Ed. 637, 52 S. Ct. 267 (1932). If the government has provided an adequate process for obtaining compensation, and if resort to that process "[yields] just compensation," then the property owner "has[*24] no claim against the Government" for a taking. Monsanto, 467 U.S. at 1013, 1018, n. 21. Thus, we have held that taking claims against the Federal Government are premature until the property owner has availed itself of the process provided by the Tucker Act, 28 U.S.C. § 1491. Monsanto, 467 U.S. at 1016-1020. Similarly, if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation.

473 U.S. at 194-95 (footnote omitted). On a number of occasions, the Sixth Circuit has applied Williamson County in cases in which Ohio landowners have sought damages, alleging that governmental officials had taken their property

1995 U.S. Dist. LEXIS 22173, *

without just compensation. See e.g., Harris v. City of Akron, 20 F.3d 1396, 1405 (6th Cir. 1994); Silver v. Franklin Tp. Bd. of Zoning Appeals, 966 F.2d 1031, 1035 (6th Cir. 1992); Four Seasons Apartment v. Mayfield Heights, 775 F.2d 150 (6th Cir. 1985). n17 In those cases, the Sixth Circuit has consistently[*25] recognized that Ohio law provides a procedure, a Writ of Mandamus directing governmental officials to institute an eminent domain proceeding to determine just compensation, which a person must exercise before filing a claim under the Takings Clause of the Fifth Amendment, as made applicable to the states and their political subdivisions by the Fourteenth Amendment. n18 Herein, the Plaintiffs have not taken advantage of that procedure. Therefore, the Defendants are entitled to summary judgment, on the Plaintiffs' claims under the Takings Clause of the Fifth Amendment, as made applicable to the states and their political subdivisions by the Fourteenth Amendment, because those claims are not ripe. n19 Therefore, those claims must be dismissed, without prejudice.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n17 Indeed the claims in Silver and Four Seasons arose under very analogous situations, wherein plaintiffs also claimed an inverse condemnation. For instance, in Silver, a developer alleged that his property had been taken without just compensation because governmental officials had refused to grant him a conditional zoning permit, which would have permitted him to construct a subdivision. In Four Seasons, a developer alleged that the recission of a building permit constituted a taking without just compensation. Williamson County, itself, arose out a claim by a developer who was denied a zoning permit; however, in that case, the Supreme Court examined the availability of remedies under Tennessee law, rather than the Ohio law, which is at issue herein and  was at issue in Silver and Four Seasons.
[*26]

n18 Plaintiffs argue that the recent decision by the Ohio Supreme Court in State ex rel. Levin v. Sheffield Lake, 70 Ohio St. 3d 104, 637 N.E.2d 319 (1994), casts doubt on the availability of the remedy of mandamus. This Court does not agree. In Levin, the Ohio Supreme Court merely held that a person was not entitled to a Writ of Mandamus in that action, because he had an existing, adequate remedy, to wit: another pending action in which he also sought a Writ of Mandamus, directing the governmental entity to commence eminent domain proceedings to determine just compensation. In the course of its decision, the Levin court reaffirmed the principle that a landowner may seek a writ compelling governmental officials to commence eminent domain proceedings to determine just compensation.  Id. at 108-09, 637 N.E.2d at 323.

n19 Since the Court has concluded that the Plaintiffs' claims for damages under the Takings Clause are not ripe, it would be premature and, thus, inappropriate for the Court to address the parties' arguments regarding the merits of that claim. Therefore, the Plaintiffs' reliance on the Supreme Court's recent decision in Dolan City of Tigard, 512 U.S. 374, 114 S. Ct. 2309, 129 L. Ed. 2d 304 (1994) is misplaced, because, therein, the Supreme Court did not address the question of when a claim under the Takings Clause is ripe. It would be similarly inappropriate to address Defendants' argument that Prosser is entitled to qualified immunity on Plaintiff's taking claim, other than to note that Defendants did not argue that Prosser is qualifiedly immune and, thus, entitled to summary judgment on any other of Plaintiffs' federal claims. Similarly, the Court finds it unnecessary to address Defendants' arguments, contained in their reply memorandum (Doc. # 32), that Plaintiffs' claims under the Takings Clause are barred by the statute of limitations and/or res judicata. However, the Court does note that it has some difficulty understanding how a claim which, as Defendants have persuasively argued, is not ripe (therefore, in effect, does not now exist) could be barred either by the statute of limitations or res judicata.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*27]

1995 U.S. Dist. LEXIS 22173, *

Defendants also seek summary judgment on Plaintiffs' fourth claim for relief, in which Plaintiffs allege that the denial of the demolition permit and the Certificate of Appropriateness, as well as the determination that the Wilcon Building was eligible to be listed on the National Register, constituted a conspiracy by the Defendants to deny them property without due process and equal protection of the laws and a taking of BSW's property without just compensation, all in violation of 42 U.S.C. § 1985. Defendants point to the fact that the alleged conspiracy, which Plaintiffs set forth in their complaint, consisted solely of the Defendants, to wit: Dayton, the BZA, the LC and Prosser. Defendants argue that, under the intracorporate conspiracy doctrine, they are incapable of conspiring with each other. Plaintiffs, on the other hand, argue that summary judgment is premature, because Prosser may have been acting for personal reasons. n20

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n20 Plaintiffs also argue that summary judgment is premature, because the conspiracy may have included some persons who were not employees of Dayton. That argument is without merit. Quite simply, the Plaintiffs have alleged that a conspiracy existed only among the Defendants.

- - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*28]

It is axiomatic that to impose liability under § 1985(3), the plaintiff must prove the existence of a conspiracy among two or more persons. Griffin v. Breckenridge, 403 U.S. 88, 29 L. Ed. 2d 338, 91 S. Ct. 1790 (1971). The parties agree that a municipal corporation, such as Dayton, is not capable of conspiring with its employees, who are acting within the scope of their employment. Johnson v. Hills & Dales General Hospital, 40 F.3d 837 (6th Cir. 1994); Hull v. Cuyahoga Valley Joint Vocational School Dist. Bd. of Ed., 926 F.2d 505 (6th Cir. 1991); Doherty v. American Motors Corp., 728 F.2d 334, 339-40 (6th Cir. 1984); Rennick v. Champion Intern. Corp., 690 F. Supp. 603, 604 (S.D.Ohio 1987). However, as the Plaintiffs argue, the Sixth Circuit has recognized that a corporation can conspire with its employees, when those employees act outside the scope of their employment. Johnson, 40 F.3d at 840-41. n21 Herein, all the acts Plaintiffs allege Prosser to have done relate to her duties as an employee of Dayton and as the secretary of the LC. The Plaintiffs have not alleged that any act[*29] of Prosser's was taken outside the scope of her employment with Dayton, nor have they presented evidence of that fact. Indeed, as is discussed below, the Plaintiffs, contending that there is no genuine issue of material fact, seek summary judgment in their favor on the issue of whether Prosser was acting under color of state law while performing the actions set forth in their complaint.

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n21 To the extent that the Plaintiffs are arguing that this exception to the intracorporate conspiracy doctrine is broader, in other words, that it would include conspiracies between a corporation and its employees who are acting within the scope of their employment but who are motivated by personal reasons, the Court rejects such an argument. In Johnson, the Sixth Circuit concluded that the intracorporate conspiracy doctrine provided a shield to liability under § 1985(3), as long as the employees were acting within the scope of their employment. Of course, when an employee is not acting within the scope of his or her employment, that employee can conspire with his or her employer, and the intracorporate conspiracy doctrine does not provide a shield to liability for a claim under § 1985(3).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*30]

Consequently, this Court concludes that all of the acts, which Plaintiffs attempt to impose upon Prosser, were undertaken within the scope of her employment. Therefore, the Court agrees with Dayton that the intracorporate conspiracy doctrine prevents the imposition of liability upon the Defendants under § 1985(3). n22 Accordingly, the Court sustains the Defendants' motion for summary judgment (Doc. # 25), to the extent that Defendants seek summary judgment on Plaintiff's claim under § 1985(3), their fourth claim for relief.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n22 Even if the Court agreed with the Plaintiffs that genuine issues of material fact prevent the Court from concluding that the intracorporate conspiracy precludes the imposition of liability upon the Defendants under § 1985(3), the Plaintiffs' fourth claim would nonetheless be fatally flawed. To prevail on a claim under § 1985(3), the plaintiff must prove that a racial or otherwise class-based animus was behind the conspirators' action. United Brotherhood of Carpenters v. Scott, 463 U.S. 825, 77 L. Ed. 2d 1049, 103 S. Ct. 3352 (1983). Although Scott involved a private conspiracy, courts have concluded that the requirement that there be a racial or other class-based animus behind the conspirators' actions applies equally to conspiracies under color of state law, such as the conspiracy Plaintiffs allege herein. Gagliardi v. Village of Paulding, 18 F.3d 188, 194 (2d Cir. 1994) (and cases cited therein). The Plaintiffs have neither alleged nor presented evidence that the Defendants were motivated by a racial or some other class-based animus. Indeed, in his affidavit, Dennis Williams, one of BSW's partners, states that the Defendants were motivated to satisfy the ego of historic preservationists. See Doc. # 11 at Ex. 61.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*31]

Defendants also seek summary judgment on Plaintiffs' request for an award of punitive damages. The Court agrees that Dayton, the BZA and the LC are entitled to summary judgment on the Plaintiffs' request for such an award. Under § 1983, punitive damages cannot be imposed upon governmental entities such as Dayton, the BZA and the LC. City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 69 L. Ed. 2d 616, 101 S. Ct. 2748 (1981). In addition, state law provides that, subject to certain exceptions which are not pertinent to the present case, governmental entities are not liable for the torts committed by their employees in connection with governmental functions. Ohio Rev. Code § 2744.02(B). Herein, the Plaintiffs' allegations relate to the enforcement of land use and historic landmark regulations, which are clearly governmental functions. Id. at § 2744.01(C)(2)(p). Therefore, there is no basis in state law to impose punitive damages upon Dayton, the BZA or the LC. n23

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n23 In opposing this branch of Defendants' motion for summary judgment, Plaintiffs rely on cases decided by Ohio courts which have addressed the question of when a corporation can be held liable for punitive damages for the tortious conduct of its employees. However, none of those cases are relevant to the Defendants' motion, because they do not discuss the liability of governmental entities under Ohio's Political Subdivision Tort Liability Law, Ohio Revised Code Chapter 2744, which was the basis of this branch of the Defendants' motion, as to Plaintiffs' state law claims, and of the Court's decision, thereon.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

1995 U.S. Dist. LEXIS 22173, *

[*32]

The Defendants also seek summary judgment on Plaintiffs' request for an award of punitive damages against Prosser, arguing that the Plaintiffs have sued Prosser in her official capacity and that a suit against an employee of a governmental entity in her official capacity is a suit against the government itself. n24 The Court does agree with the Defendants that a suit against an employee of a governmental entity in her official capacity is a suit against the governmental entity. Brandon v. Holt, 469 U.S. 464, 83 L. Ed. 2d 878, 105 S. Ct. 873 (1985). However, this Court cannot agree with the Defendants that the Plaintiffs have sued Prosser in her official capacity. Rather, the Plaintiffs seek to impose liability upon Prosser for the acts she personally undertook. Merely because an employee is acting within the scope of her employment does not mean she cannot be sued in her individual capacity. Hafer v. Melo, 502 U.S. 21, 116 L. Ed. 2d 301, 112 S. Ct. 358 (1991). Therefore, Prosser is potentially liable for punitive damages.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n24 This argument is contained in Defendants' reply memorandum (Doc. # 32).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*33]

Accordingly, the Court sustains the Defendants' motion for summary judgment (Doc. # 25) to the extent that they seek summary judgment on Plaintiffs' request for an award of punitive damages against Dayton, the BZA and the LC, and overrules that motion to the extent that Defendants seek summary judgment on Plaintiffs' request for an award of punitive damages against Prosser.

In their reply memorandum (Doc. # 32), Defendants argue that they are entitled to summary judgment on Plaintiffs' state law claims which are predicated upon fraud or false statements (the Plaintiffs' fifth, sixth and seventh claims for relief), because those claims are barred by the four-year statute of limitations, Ohio Revised Code § 2305.09(D). n25 The Defendants also argue that the statute of limitations began to run when the alleged false statements were made, which occurred more than four years before October 18, 1993, when the Plaintiffs filed their verified, supplemental complaint, which was later removed to this Court. The Plaintiffs agree that § 2305.09(D) is the appropriate statute of limitations. See Doc. # 39 at 4. However, the Plaintiffs argue that their claims did not accrue until November 16, 1989, when[*34] the BZA released its decision affirming the LC. Under Ohio law, a cause of action for fraud does not accrue until the injured party discovers the fraud. Shover v. Cordis Corp., 61 Ohio St. 3d 213, 217, 574 N.E.2d 457, 461 (1991). Herein, the Defendants have not supplied any evidence which would establish, as a matter of law, that the Plaintiffs discovered the alleged fraud before the BZA released its decision, on November 16, 1989, a date which was less than four years before the Plaintiffs filed their verified, supplemental complaint. Therefore, the Court concludes that the Defendants are not entitled to summary judgment on Plaintiffs' state law claims which are predicated upon fraud or false statements.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n25 This argument is not contained in the Defendants' motion for summary judgment (Doc. # 25).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

1995 U.S. Dist. LEXIS 22173, *

Plaintiffs also seek summary judgment on two other issues, neither of which the Defendants have contested. First, the Plaintiffs argue that Dayton is a person under § 1983. This Court agrees. [*35] See Monell v. Department of Social Servs. of the City of New York, 436 U.S. 658, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978). Second, Plaintiffs argue that the Defendants' actions were taken under color of state law. Once again, this Court agrees. A person acts under color of state law when that actor has "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with authority of state law.'" West v. Atkins, 487 U.S. 42, 49, 101 L. Ed. 2d 40, 108 S. Ct. 2250 (1988) (quoting United States v. Classic, 313 U.S. 299, 326, 85 L. Ed. 1368, 61 S. Ct. 1031 (1941)). All of the allegations in the Plaintiffs' complaint relate to BSW's attempts to secure permission from Dayton to demolish the Wilcon Building. Decisions relating to land use constitute the exercise of power possessed by virtue of state law. Indeed, Dayton argues that punitive damages cannot be imposed upon it because the allegations in Plaintiffs' complaint relate to the execution of governmental functions. Accordingly, the Court sustains the Plaintiffs' motion for partial summary judgment (Doc. # 11), to the extent that they seek[*36] summary judgment on the issue of Dayton's status as a person and the question of whether the actions alleged to have been taken were performed under color of state law.

Based upon all of the foregoing, the Court sustains in part and overrules in part the Plaintiffs' motion for partial summary judgment (Doc. # 11). The Court sustains that motion, to the extent that Plaintiffs seek summary judgment on the issue of Dayton's status as a person and the question of whether the actions alleged to have been taken were performed under color of state law. Otherwise, the Court overrules that motion. In addition, the Court has sustained in part and overruled in part the Defendants' motion for summary judgment (Doc. # 25). The Court has sustained that motion in the following regards, to wit: 1) on Plaintiffs' claims under the Takings Clause of the Fifth Amendment (parts of the Plaintiffs' first, second, eighth, ninth and tenth claims for relief), without prejudice; n26 2) on Plaintiffs' claim under § 1985(3) (their fourth claim for relief), with prejudice; and 3) on Plaintiffs' request for an award of punitive damages against Dayton, the BZA and the LC, with prejudice. Otherwise, the Court has[*37] overruled that motion.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n26 The Court has concluded that those claims are not ripe; therefore, Plaintiffs' claims under the Takings Clause must be dismissed, without prejudice. After the Plaintiffs have exercised the remedy provided by state law (i.e., a Writ of Mandamus compelling Dayton to commence eminent domain proceedings and to establish just compensation), they may file a new claim under Takings Clause, if the state action fails to provide a remedy. Harris, 20 F.3d at 1405.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

III. Plaintiffs' Motion for Preliminary Injunction (Doc. # 12)

With their Motion for Preliminary Injunction (Doc. # 12), Plaintiffs seek to have the Court enjoin Dayton from enforcing a Notice of Violation and Orders of Compliance issued for the Wilcon Building and from directing the Plaintiffs to maintain the Wilcon Building, to correct hazardous conditions at that property and to remove an underground storage tank. The parties argued that an evidentiary hearing was not necessary on Plaintiffs' Motion for[*38] a Preliminary Injunction. See Doc. # 21. Therefore, that motion was submitted to the Court on the parties' memoranda and oral argument.

The Sixth Circuit recently restated the familiar standard which governs the granting of a Motion for a Preliminary Injunction:

In determining whether a preliminary injunction should issue, a court must consider the following four factors:

Case 1:01-cv-00567-SJD    Document 61-2    Filed 09/10/2003    Page 145 of 149

Page 17
1995 U.S. Dist. LEXIS 22173, *

1. whether the movant is likely to prevail on the merits;

2. whether the movant would suffer an irreparable injury if the court does not grant a preliminary injunction;

3. whether a preliminary injunction would cause substantial harm to others; and

4. whether a preliminary injunction would be in the public interest.

G & V Lounge, Inc. v. Michigan Liquor Control Comm., 23 F.3d 1071, 1074, 1076 (6th Cir. 1994). See also, Washington v. Reno, 35 F.3d 1093, 1099 (6th Cir. 1994). None of these factors warrants the granting of the requested preliminary injunction.

First, with respect to the likelihood that Plaintiffs will prevail on the merits, the Court cannot conclude that they will prevail on the merits of the claim upon which they predicate their [*39] request for injunctive relief. The Plaintiffs have not asserted a claim in which they allege that any of the actions they seek to enjoin violates federal or state law. In essence, the Plaintiffs seek to have the Court enjoin Dayton from enforcing its building code. The Plaintiffs do not allege that Dayton's building code violates federal or state law. Rather, Plaintiffs argue that they are entitled to injunctive relief, because the Defendants have taken their property, the Wilcon Building, without paying just compensation. Therefore, the injunctive relief the Plaintiffs seek is merely a request for status quo or stay put status, until the merits of their claims under the Takings Clause of the Fifth Amendment can be resolved. Above, in its discussion of the summary judgment motions, the Court has sustained the Defendants' motion for summary judgment on those claims, concluding that those claims are not ripe and that they must, therefore, be dismissed without prejudice. n27

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n27 The Plaintiffs also cite the fact that the Common Pleas Court found that they had been denied property without due process. The Plaintiffs argue that principles of res judicata prevent the Defendants from challenging that court's conclusion. Above, the Court has rejected the Plaintiffs' contention that principles of res judicata prevent the Defendants from challenging the decision of the Common Pleas Court that BSW's constitutional rights were violated. Accordingly, this Court concludes that the Plaintiffs have not, to this point, demonstrated a substantial likelihood that they will prevail on the merits of their claim that they suffered a deprivation of property without due process.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*40]

Second, the Plaintiffs have not demonstrated that they will suffer  irreparable injury if an injunction is not granted. In May, 1993, an employee of Dayton wrote to Plaintiffs' counsel, explaining what further steps were necessary under RCGO § 150.246, to obtain a Certificate of Appropriateness and, thus, a permit to demolish the Wilcon Building. Plaintiffs chose not to pursue that option. The alleged building code violations which have caused the Plaintiffs to seek the preliminary injunction all arise out of the fact that the Wilcon Building is still standing. Indeed, Plaintiffs do not contend that the Wilcon Building is not in violation of Dayton's building code; Plaintiffs contend only that they should have long since been given permission to demolish it. However, Plaintiffs have had available to them, since May, 1993, a process by which they could have obtained permission to demolish that building. n28 In other words, any harm the Plaintiffs may suffer if an injunction is not granted flows from their own failure to have sought permission, after May, 1993, to demolish the Wilcon Building. Moreover, the Plaintiffs have not convinced the Court that they cannot be compensated[*41] for any harm they may suffer, if an injunction is not issued, by an award of damages in this action or in some subsequent action (either in an eminent domain action instituted after a successful mandamus action or in a new action under the Takings Clause, should the mandamus action prove unavailing).

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

1995 U.S. Dist. LEXIS 22173, *

n28 In their verified, supplemental complaint, the Plaintiffs do point out that, before they could have received a Certificate of Appropriateness, they might have been required to post a bond or to pay a mitigation fee § 150.246(C)), and they would have been required to submit a reuse plan (§ 150.246(B)). Thus, the Plaintiffs challenge the viability, although, significantly, not the constitutionality of the process which was available to them. However, the stark fact is that the Plaintiffs chose not to pursue the process; therefore, to say that it would have been onerous is pure speculation. Moreover, § 150.246(C) provides that the an applicant for a Certificate of Appropriateness can seek and receive a waiver of the requirements that a bond be posted and a mitigation fee be paid.

- - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - -

[*42]

   Third, granting the requested preliminary injunction could cause substantial harm to others. Such relief would prevent Dayton from enforcing its building code. Moreover, the Wilcon Building is an eyesore and appears to be dangerous to passersby and to others using the neighborhood. See Doc. # 18 (Plaintiffs' evidence in support of their motion for preliminary injunction). If the requested injunctive relief is granted, the Wilcon Building will remain in its current, constantly deteriorating condition, posing an aesthetic blot and a potential health hazard. Therefore, neighbors of the Wilcon Building and the public generally face the prospect of substantial harm if an injunction is granted, harm greater than the harm to the Plaintiffs if the injunction is denied.

   Fourth, for the above reasons, the public interest does not warrant the issuance of the requested injunctive relief.

   Based upon the foregoing, the Court overrules the Plaintiffs' Motion for a Preliminary Injunction (Doc. # 12), with which Plaintiffs sought to have the Court enjoin Dayton from enforcing a Notice of Violation and Orders of Compliance issued for the Wilcon Building and from directing the Plaintiffs [*43]to maintain the Wilcon Building, to correct hazardous conditions at that property and to remove an underground storage tank.

   As a result of the Court's ruling on the present motions, the following claims of the Plaintiffs remain, to wit: 1) their claims under the Due Process and Equal Protection Clauses of the Fourteenth Amendment (parts of the first, second, third, eighth, ninth, tenth and eleventh claims for relief), claims upon which the Defendants have not sought summary judgment; n29 2) their claim that Prosser's false statements interfered with their right to petition the government for redress of grievances (the fifth claim for relief); n30 and 3) Plaintiffs' state law claims (the sixth and seventh claims and parts of the eighth and ninth claims). n31 In addition, Plaintiffs' request for an award of punitive damages against Prosser remains. Two trial dates are scheduled for this litigation, November 6, 1995 (a possible trial date) and January 22, 1996. See Docs. # 46 and # 44.

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n29 Plaintiffs also rely upon alleged violations of the Due Process and Equal Protection Clauses to support their fourth claim for relief, a claim under § 1985(3). This Court has sustained the Defendants' motion for summary judgment on that claim.
[*44]

n30 The Plaintiffs do not state whether that claim arises under state law, the First Amendment to the United States Constitution, or both.

1995 U.S. Dist. LEXIS 22173, *

n31 Plaintiffs' twelfth claim for relief, a claim for attorney's fees under 42 U.S.C. § 1988, also remains. However, that is not an independent claim; rather, Plaintiffs will be entitled to an award of attorney's fees under § 1988, only if they prevail upon another of their federal claims.


- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -


WALTER HERBERT RICE

UNITED STATES DISTRICT JUDGE

**EXHIBIT U**
DEFENDANT

```
 1              UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF OHIO

 3                      - - -

 4   EASTSIDE LINCOLN MERCURY, ET AL,    )
                                         )
 5                   PLAINTIFFS,         )
                                         )
 6   VS                                  )  CASE NO:  01CV00567
                                         )
 7   FORD MOTOR COMPANY, ET AL,          )
                                         )
 8                   DEFENDANTS.         )
     ------------------------------------

 9

10

11

12           DEPOSITION OF:  ALLEN W. WALLS

13                CINCINNATI, OHIO

14                MARCH 13, 2003

15

16

17                  COPY

18

19

20

21

22

23   REPORTER:  JILL M. DRAGON SANDY

24                Dragon Reporting Service
                    5551 Seville Court
25               Cincinnati, Ohio  45247
                    (513)574-8319
```

1          Q.   But you can't recall any specific

2    referrals to Eastside Lincoln Mercury because of its service

3    department?

4          A.   No.

5          Q.   Did you ever receive an e-mail from

6    Jerry Carter, after the results of the warranty audit of

7    2001 were made public, that suggested that no penalty be

8    given to Eastside Lincoln Mercury?

9          A.   No penalty?  I do not recall getting an

10   e-mail from Jerry saying that no penalty should be --

11         Q.   Was it fair to say that since the

12   April 2001 audit, that no penalty has been taken against

13   Eastside Lincoln Mercury related to that audit?

14         A.   Yes, that's correct.

15         Q.   In fact, no action has been taken

16   against Eastside Lincoln Mercury, of any type, related to

17   that audit; is that correct?

18         A.   That's correct.

19         Q.   Do you know how that action was stopped,

20   or what led to the suspension of any of those

21   recommendations?

22         A.   Because of the lawsuit that was filed.

23         Q.   Was that recommendation memorialized in

24   any documents that you saw?  And the recommendation I'm

25   talking about is to take no action because of the lawsuit.