```
00001
   1                 UNITED STATES DISTRICT COURT
   2               FOR THE SOUTHERN DISTRICT OF OHIO
   3                         - - -
   4   EASTSIDE LINCOLN MERCURY, ET AL,   )
                                          )
   5                     PLAINTIFFS,      )
                                          )
   6   VS                                 )  CASE NO:  01CV00567
                                          )
   7   FORD MOTOR COMPANY, ET AL,         )
                                          )
   8                     DEFENDANTS.      )
       -----------------------------------
   9
  10
  11
  12
  13            DEPOSITION OF:  MANUEL EUGENE MULLINS
  14                       CINCINNATI, OHIO
  15                       JUNE 25, 2003
  16
  17
  18
  19
  20
  21
  22
  23   REPORTER:  JILL M. DRAGON SANDY
  24                   Dragon Reporting Service
                          5551 Seville Court
  25                   Cincinnati, Ohio  45247
                          (513)574-8319
```

00002

```
 1          The deposition of MANUEL EUGENE MULLINS, taken on
 2   discovery, pursuant to agreement of counsel as to time and
 3   place, in the offices of Statman, Harris, Siegel & Eyrich,
 4   2900 Chemed Center, 255 East Fifth Street, Cincinnati, Ohio,
 5   on June 25, 2003, at 10:00 AM, upon oral examination, and to
 6   be used in accordance with the Ohio Rules of Civil
 7   Procedure.
 8                            - - -
 9
10
11              S T I P U L A T I O N S
12   It is stipulated by and between counsel for the
13   representative parties that the deposition of MANUEL EUGENE
14   MULLINS, the witness herein, may be taken at this time and
15   place pursuant to the Ohio Rules of Civil Procedure,
16   pursuant to agreement of counsel as to time and place; that
17   the proof of the notary is waived; that the deposition may
18   be recorded in stenotypy by the notary public, Jill M.
19   Dragon Sandy, who is also the court reporter, and
20   transcribed out of the presence of the witness, and that the
21   deposition is required to be submitted to the witness for
22   his examination and signature.
23                            - - -
24
25
```

```
00003
   1                    A P P E A R A N C E S
   2
   3   FOR THE PLAINTIFFS:
   4   Mr. Lawrence A. Flemer
       Statman, Harris, Siegel & Eyrich
   5   2900 Chemed Center
       255 East Fifth Street
   6   Cincinnati, Ohio  45202
       (513)621-2666
   7
   8
   9   FOR THE DEFENDANTS:
  10   Mr. Steven D. Hengehold
       Rendigs, Fry, Kiely & Dennis
  11   Suite 900
       One West Fourth Street
  12   Cincinnati, Ohio  45202-3688
       (513)381-9221
  13
  14   Ms. Elizabeth McNellie
       Baker & Hostetler
  15   Capitol Square, Suite 2100
       65 East State Street
  16   Columbus, Ohio  43215-4260
       (614)228-1541
  17
  18
  19   ALSO PRESENT:
  20   Mr. William Woeste
  21   Mr. James Woodall
  22   Mr. Robert Reichert
  23   Mr. Christopher Armstrong
  24
  25
```

```
00004
  1                    I N D E X
  2  DIRECT EXAMINATION BY:              MR. FLEMER
  3                 PAGES  5 - 33
  4  CROSS-EXAMINATION BY:               MR. HENGEHOLD
  5                 PAGES  33 - 72
  6  CROSS-EXAMINATION BY:               MS. MCNELLIE
  7                 PAGES  72 - 95
  8  REDIRECT EXAMINATION BY:            MR. FLEMER
  9                 PAGES  95 - 116
 10
 11
 12
 13             E X H I B I T   I N D E X
 14    Exhibit                               Page
 15  Mullins 1 - Affidavit of Gene Mullins      12
 16  Mullins 2 - Affidavit of Lawrence A. Flemer   14
 17
 18
 19
 20
 21
 22
 23
 24
 25
```

00005
```
 1                    MANUEL EUGENE MULLINS,
 2        called on behalf of the Plaintiff, after having been
 3   first duly sworn, was examined and deposed as follows:
 4                 D I R E C T   E X A M I N A T I O N
 5   BY MR. FLEMER:
 6              Q.   Mr. Mullins, I'm Larry Flemer, and we
 7   met briefly before the beginning of your deposition.  I
 8   represent the plaintiffs in a lawsuit that has been filed in
 9   the District Court here in southern Ohio, styled Eastside
10   Lincoln Mercury and others versus Ford Motor Company and
11   others, and you are here today pursuant to a subpoena which
12   I had issued by the Court, following some conversations and
13   communications between us, and relative to your appearance
14   as a witness in the case.
15                     I don't know if you've ever had a
16   deposition taken before, but there are a couple of ground
17   rules that I'll go over with you, so that you understand the
18   process.
19                     The first one is that it's important for
20   you give a verbal answer to any questions that are asked of
21   you.
22                     The second is that if you don't
23   understand, at least any questions I ask, and I'm sure this
24   applies for anybody here in the room who would ask you
25   questions, is to please ask for clarification or for
```

```
00006
 1  rephrasing of the question so that you are clear on what's
 2  being asked of you.
 3                  Thirdly, if you need to take a break at
 4  any time, let us know and we'll accommodate you.   Okay?
 5                  A.   Sure.
 6                  Q.   Would you state your full name, please?
 7                  A.   Manuel Eugene Mullins.
 8                  Q.   Is it Emmanuel?
 9                  A.   Manuel.
10                  Q.   Manuel, okay.
11                  And what is your address?
12                  A.   1698 Fairside Court, that's in Florence,
13  Kentucky, 41042, if that's --
14                  Q.   And how long have you lived at that
15  address?
16                  A.   One year.
17                  Q.   Are you employed?
18                  A.   I'm employed, yes.
19                  Q.   Who do you work for?
20                  A.   I work for National Liberty Mortgage.
21                  Q.   And what is your business address?
22                  A.   7368 Liberty One Drive, and that's in
23  Liberty Township, Ohio.
24                  Q.   You're in Mason?
25                  A.   I think it's technically Middletown.
```

```
00007
   1    Middletown is 45044.  I guess that's the name of the area.
   2                   Q .   And how long have you been employed by
   3    National Liberty Mortgage?
   4                   A.    Oh, since December of '02.
   5                   Q.    And what position do you hold with
   6    National Liberty?
   7                   A.    I'm a mortgage broker, loan officer,
   8    mortgage broker.
   9                   Q.    Prior to your employment with National
  10    Liberty Mortgage, did you previously work for the Kenwood
  11    Dealer Group?
  12                   A.    Yes.
  13                   Q.    What period much time did you work for
  14    them?
  15                   A.    April of -- well, Kenwood Dealer Group
  16    specifically, or Northgate Lincoln Mercury?
  17                   Q.    Why don't we talk about Northgate
  18    Lincoln Mercury?  I understand that you were employed there
  19    for a period of time.
  20                   A.    Right, it was from April, on about
  21    April the 1st of '96, to about April, the same month, of
  22    '01 -- excuse me, '02.
  23                   Q.    And what position or positions did you
  24    hold with Northgate Lincoln Mercury?
  25                   A.    The only position I had there was
```

```
00008
  1  general sales manager.  Well, I take that back.  About a
  2  week before my dismissal there, I was demoted to new car
  3  manager.
  4                  Q.    And you mentioned that you were
  5  dismissed from employment.  What were the circumstances of
  6  dismissal from your employment there?
  7                  A.    Well, ostensively, it was because I was
  8  meddling with one of our other employees which was accused
  9  of recruiting one of the employees for one of the other
 10  dealerships, and --
 11                  Q.    Is that the reason that was given to you
 12  for your termination?
 13                  A.    That was the ostensive reason.  It was
 14  told to me by my superior, Jerry Mullins, the reason for my
 15  dismissal is, "this particular issue had once again
 16  resurfaced and has cost you your job" was his quote, I
 17  think.
 18                  Q.    And what was the stated reason or how
 19  was it connected with meddling with another employee?
 20                  A.    The company's policy was really not to
 21  recruit salespeople from other dealerships.  Although it was
 22  a widely practiced thing, still it was something that was
 23  taboo.  You weren't supposed to call Joe, who was the top
 24  salesman at, you know, one other dealership, whoever, and
 25  try to get them to come to work for your firm, just to keep
```

00009
```
 1  people in their positions.
 2                  Q.    Are you referring to other dealerships
 3  that were part of the Kenwood Dealer Group?
 4                  A.    Yes, within our own group, yes.
 5                  Q.    And what were those other dealerships,
 6  what were the names of those other dealerships?
 7                  A.    Well, there was -- the one particular
 8  instance here that I'm talking about is the Saturn of
 9  Beechmont.  There was a woman salesperson there, I don't
10  really recall her name right now, but she was the one,
11  supposedly.
12                  Q.    And this individual, the salesperson
13  from Saturn of Beechmont, was the person that you were
14  allegedly trying to recruit?
15                  A.    Yes.
16                  Q.    Okay.  And Saturn of Beechmont was one
17  of the group --
18                  A.    One of the Kenwood Dealer Group,
19  Mr. Reichert's organization.
20                  Q.    And was there any investigation or
21  anything done to substantiate this charge against you?
22                  A.    No, it was just, you know, pretty much
23  it was already, the decision was already made by either
24  Jerry Mullins or, you know, someone else, to send me down
25  the road.
```

00010
```
 1                    Q.    And was there a time previous to this
 2  when you were accused of the same recruiting violation?
 3                    A.    No, no.
 4                    Q.    I think you testified earlier that the
 5  comment was made to you by Jerry Mullins that, once again,
 6  you were being accused of something?
 7                    A.    Well, he said -- we had talked about
 8  that.  I wasn't accused at the time previous.  We had talked
 9  about that issue before, you know.  And Jerry, in fact, on
10  occasion, would encourage the recruiting of this guy or that
11  guy or whatever, but to be careful with it, you know, just
12  don't -- so what I did in that particular case, she was
13  actually calling one of my salespeople and trying to
14  communicate to me, you know, through him, and what I did was
15  informed her, point blank, to talk with her general manager,
16  and if she had the blessing of him, then we'd be happy to
17  talk to her, and I left it at that.  And not until after I
18  was dismissed did I kind of put the stuff together and
19  think, yeah, that was a farce, it was a charade, you know,
20  that he had trumped up, for whatever, you know, expedient
21  reasons of his own, to, you know, send Gene Mullins down the
22  road.
23                    Q.    And you're referring to Jerry Mullins?
24                    A.    Yeah, Jerry Mullins.
25                    Q.    And what was Jerry Mullins' position?
```

00011
```
 1                    A.    He was the general manager of
 2    Mr. Reichert's store, which is, in effect, a dealer
 3    principal.
 4                    Q.    And he was the general manager of
 5    Northgate Lincoln Mercury?
 6                    A.    Yes.
 7                    Q.    Was he your direct report?
 8                    A.    Yes.
 9                    Q.    Okay.  Mr. Mullins, I want you to be
10    aware that I issued a subpoena for you in this case in
11    conjunction with a motion that our office prepared and filed
12    with the Court, relative to communications that I had with
13    you and you had with me about being a witness and signing an
14    affidavit in the case.
15                    A.    Yes.
16                    Q.    And following the filing of a motion
17    with the Court, the Court issued an order expressing the
18    Court's view that the proper thing to do would be to have
19    your deposition and find out a little bit more about what
20    was going on with respect to your willingness to sign an
21    affidavit that we had drafted and exchanged and sent to you
22    to be reviewed and signed.
23                         The subpoena that -- and I think you
24    brought your subpoena with you today, if I'm not mistaken;
25    is that correct?
```

```
00012
 1                   A.   Yes.
 2                   Q.   It was served upon you on June the 8th
 3  of this year; is that right?
 4                   A.   Yes.
 5                   Q.   At your residence address?
 6                   A.   Yes.
 7                   Q.   Okay.  And it commanded you to be here
 8  today for the purpose of getting a deposition.
 9                        Prior to receiving the subpoena, is it
10  accurate, sir, that you and I had several phone
11  conversations and exchanged some e-mails relative to an
12  affidavit?
13                   A.   Yeah.
14                   Q.   Okay.  What I'd like to do -- and also,
15  before we start today, I gave you a copy of the affidavit,
16  which I guess I'll refer to in the deposition as your signed
17  affidavit.  The document that you have before you is, in
18  fact, a copy of the affidavit that you signed on May the
19  20th; is that correct?
20                   A.   That's correct.
21                   Q.   I'm going to have the court reporter
22  mark -- would you mind if she marked the copy that I gave
23  you, and then I have some others that we can hand out to
24  other counsel?
25                        (THEREUPON, MULLINS EXHIBIT NO. 1 WAS
```

```
00013
  1  MARKED FOR IDENTIFICATION).
  2              Q.   Mr. Mullins, the court reporter has now
  3  marked, as Mullins Exhibit 1, your signed affidavit.  Would
  4  you just take a second and look at that and verify that that
  5  is, in fact, an accurate copy of the document that you sent
  6  back to me after signing it on May the 20th of 2003?
  7              A.   Yes, it is.
  8              Q.   And prior to starting your testimony
  9  today, did you have a chance to look that over?
 10              A.   Yes.
 11              Q.   Okay.
 12              A.   In fact, I edited, not this one, but you
 13  and I have exchanged e-mails and I've edited a few things,
 14  after reflection, you know, that just needed to be
 15  corrected.
 16              Q.   Right, and we'll talk about some of
 17  those earlier drafts of this document, but this is the final
 18  document which you signed?
 19              A.   Yes.
 20              Q.   And is it accurate to state, sir, that
 21  the content of this affidavit is true and correct, to the
 22  best of your knowledge?
 23              A.   To the best of my knowledge, it's
 24  factual.
 25              Q.   Okay.  Let's talk a little bit about the
```

```
00014
    1   chronology of events that got to where we are today.
    2                   In conjunction with a motion that I
    3   filed with the Court, I submitted my own affidavit, which
    4   had a number of attachments to it, and part of what the
    5   affidavit that I wrote was designed to do was to set out the
    6   chronology of events and communications between us.  And I'm
    7   going to -- counsel has already been served with copies of
    8   this, but I'm going to refer to this (indicating), and it's
    9   already been filed with the Court but I guess we can mark
   10   this as Mullins 2.  I'm going to refer to this and just ask
   11   you to address whether I've got the chronology right from
   12   some of our discussions.  Okay?
   13                   (THEREUPON, MULLINS EXHIBIT NO. 2 WAS
   14   MARKED FOR IDENTIFICATION).
   15                   Q.   Mr. Mullins, the court reporter has now
   16   marked, as Mullins Exhibit 2, my affidavit, and I'm just
   17   going to go through a couple of the dates to try to give a
   18   chronology here, but if you would take a few minute before I
   19   do that to just read over the first three pages.
   20                   A.   (Witness complies).
   21                   Q.   Did you have an opportunity to look over
   22   my affidavit and the attachments?
   23                   A.   Yes.
   24                   Q.   Okay.  For the purposes of these next
   25   several questions, I'm just going to try to hit some dates
```

00015
 1  and put in a time frame our discussions.
 2                    To your recollection, sir, is it true
 3  that around the middle of April, you and I first had a phone
 4  conversation, and I called you after you had spoken with
 5  Mr. Woeste; is that correct?
 6        A.    Right.
 7        Q.    And sometime prior to April 16 of this
 8  past spring, you had contacted Mr. Woeste and indicated that
 9  you had some information that might pertain to this lawsuit;
10  is that right?
11        A.    Right.
12        Q.    And you did that on your own initiative;
13  is that correct?
14        A.    Yes.
15        Q.    And then following your message to
16  Mr. Woeste, I then called you and interviewed you on or
17  about April the 16th; is that true?
18        A.    That's correct, that's correct.
19        Q.    And that interview was on a telephone
20  call; is that correct?
21        A.    That's right.
22        Q.    Okay.  And following that interview, it
23  was agreed that you would meet with Mr. Woeste, face to
24  face, and have a discussion with him about what you knew in
25  connection with some of the issues in the case; is that

00016
```
 1   right?
 2                   A.    That's right.
 3                   Q.    And did you, in fact, meet with
 4   Mr. Woeste, I think at a lunch?
 5                   A.    We had lunch, yes.
 6                   Q.    Around April the 18th of 2003?
 7                   A.    Yes.
 8                   Q.    And then following that meeting, did I
 9   then call you another time and we talked further about your
10   discussions with Mr. Woeste and some specific information
11   that you had shared with him?
12                   A.    Yes.
13                   Q.    Okay.  And at that time, did I suggest
14   that what we would want to do with your information was put
15   it in writing?
16                   A.    Yes.
17                   Q.    Okay.  And you agreed that that would
18   be -- you would be willing to do so at that time?
19                   A.    Yeah.
20                   Q.    Okay.  Is it also correct, Mr. Mullins,
21   that towards the end of April, I had further discussions
22   with you and I e-mailed a draft affidavit to you for your
23   review?
24                   A.    Yes.  Yes, sir.
25                   Q.    Okay.  And did you receive that sometime
```

00017
```
 1   towards the end of April of 2003, to the best of your
 2   recollection?
 3              A.    I think so, yes.
 4              Q.    And after receiving the document that I
 5   sent to you via e-mail, did you make some changes to it?
 6              A.    Yes, I did.
 7              Q.    Corrections or insertions with dates and
 8   things of that nature?
 9              A.    Yeah, some minor adjustments that needed
10   to be made.  And I don't have the -- you may have the
11   highlighted parts, I don't have them in front of me.
12              Q.    Right.
13              Attached to Mullins Exhibit 2 were a
14   number of exhibits, some of which I think you would have
15   knowledge of or at least could identify, but Exhibit A to my
16   affidavit, if you can find that, is something I printed off
17   at my computer which reflects that you had sent me an e-mail
18   on April the 29th at about 7:19 PM entitled "affidavit
19   edited."  Do you recall returning the draft that I sent to
20   you with some changes --
21              A.    Yes, I do.
22              Q.    -- on April the 29th at about 7:19 PM?
23              A.    Yes.
24              Q.    Okay.  And the copy that -- or the
25   document that you returned to me in the edited fashion had
```

00018
1    some changes made that showed up in red when I printed it.
2    Do you recall having a program on your computer where you
3    could --
4                   A.   Yeah, Microsoft Word has the ability to
5    highlight specific areas of text that -- for attention
6    purposes.
7                   Q.   Okay.  And you used that feature to
8    highlight new text that you were putting in to correct or
9    supplement the affidavit that I sent to you?
10                  A.   That's correct.
11                  Q.   Is that right?
12                  A.   Yes.
13                  Q.   What I have here, Mr. Mullins, is a copy
14   of the highlighted affidavit, which was also filed with the
15   Court.  I'm just going to show this to you but not mark it,
16   because what happened is that, when I photocopied Mullins
17   Exhibit 2 today, it didn't show up in red, of course,
18   because it just went through the copier with black toner.
19                  A.   Uh-huh.
20                  Q.   But the document that was attached to
21   the affidavit I filed with the court and served on all
22   counsel did have the red printing in it.
23                       Would you take a moment and compare the
24   exhibit that was attached to my affidavit and filed with the
25   court to the one that is stated as Exhibit --

```
00019
     1                   A.    This one (indicating)?
     2                   Q.    -- Exhibit A, I think?  Yeah.
     3                   Let's do it this way:  You have before
     4   you Mullins Exhibit 2 to your deposition, which has the
     5   e-mail cover on it, and then beneath that is a copy of your
     6   affidavit.  And if you could, just go through there and
     7   confirm that the sections that are highlighted in red on the
     8   document that I took out of my pleadings binder are, in
     9   fact, contained in this exhibit, just so -- and confirm that
    10   those are the same document.
    11                   A.    Yes, that's the same.
    12                   Q.    Okay.  And the next thing that happened
    13   where you and I had communication was that I made the
    14   changes on the affidavit per your highlighting, and then I
    15   called you, if you recall, to get your home address, so I
    16   could print it and mail it to you; is that correct?
    17                   A.    That's correct.
    18                   Q.    And according to my notes, we had a
    19   discussion or you left me a voice mail with your home
    20   address on May the 7th of 2003; is that correct?
    21                   A.    That's correct, yes, sir.
    22                   Q.    Okay.  And when you left me a message
    23   with your home address, I think I transcribed that message
    24   and made it an exhibit to my affidavit.  Would you look at
    25   Exhibit C to Mullins Exhibit 2?
```

```
00020
   1                    A.   Okay.
   2                    Q.   Exhibit C is the transcription of a
   3  voice mail that you left for me on May the 7th at 3:44 PM.
   4  Is that an accurate transcription of the message you left
   5  that day?
   6                    A.   Yes.
   7                    Q.   And at that point in time, the process
   8  was such that I was going to send you the affidavit to your
   9  home address, you would review it one final time, sign it
  10  and send it back to me; is that right?
  11                    A.   Yes.
  12                    Q.   And that was your intention as of that
  13  date?
  14                    A.   Yes, it was.
  15                    Q.   And Exhibit D to Mullins depo Exhibit 2
  16  is a letter that I used to forward the affidavit to you
  17  dated May the 8th.  Did you receive that letter in the mail,
  18  on or about May 9th or 10th?
  19                    A.   Yes.
  20                    Q.   And included in with that letter was a
  21  copy of your affidavit, was it not?
  22                    A.   Yes, it was.
  23                    Q.   And Exhibit E to Mullins depo Exhibit 2
  24  is, in fact, a copy of your affidavit; is that correct?
  25                    A.   That's correct.
```

00021

```
 1                    Q.   Okay.  And does Exhibit E have the
 2  changes that you had asked or suggested be made to the
 3  document?
 4                    A.   Yes.  Yes, it does.
 5                    Q.   Okay.  And I think the only thing I'm
 6  aware of that changed between the earlier version that was
 7  sent to you and the document marked Exhibit E is in
 8  Paragraph 11, the very last sentence of that paragraph,
 9  which states, "these additional monies were unavailable to
10  the other dealers in our area."  The prior version had a
11  period after the word "area," and in one of our phone
12  conversations I asked you how you knew that and you said
13  that was according to Pat Letart.
14                    A.   That's correct.
15                    Q.   So I added that phrase, "according to
16  Mr. Letart," right?
17                    A.   That's right.
18                    Q.   That would make that statement accurate
19  and complete, as per the document that's identified as
20  Exhibit E; is that right?
21                    A.   That's correct, yes.
22                    Q.   Okay.  And you would have received the
23  final document for signature a couple of days after my
24  letter dated May the 8th; is that right?
25                    A.   That's correct.
```

00022
```
 1                    Q.    Okay.  And then on May the 13th, you
 2  left me a voice mail after the close of business that day
 3  which I had transcribed and made Exhibit F to my affidavit.
 4  Do you see that transcription there?
 5                    A.    Yes, I do.
 6                    Q.    And as you review that, is an accurate
 7  transcription of the message that you left for me?
 8                    A.    It looks accurate, yes.
 9                    Q.    All right.  And following my receipt of
10  your voice mail, I called you on May the 14th and left you a
11  voice mail asking you to contact me, because, after
12  reviewing your voice mail, obviously I had some questions
13  with respect to what you told me in your voice mail and
14  asked that you call me.
15                    A.    Correct.
16                    Q.    Do you recall receiving a voice mail
17  from me on May the 14th?
18                    A.    Yes, I do.
19                    Q.    And then I sent the letter dated May the
20  14th, confirming that I was asking you to call me.
21                    A.    Right.
22                    Q.    Did you receive that letter on or about
23  May the 15th or 16th?
24                    A.    Yes.
25                    Q.    And am I correct, sir, that, despite my
```

00023
```
 1  voice mail and despite my letter, you did not contact me at
 2  that point in time?
 3                  A.    That's correct.
 4                  Q.    Okay.  Subsequently, we, as I told you
 5  earlier, filed the papers with the Court, and I prepared my
 6  affidavit, which you've been reviewing, on May the 20th, and
 7  filed that.  And as I indicated, the Court issued an order
 8  suggesting that the next step should be that we take your
 9  deposition.
10                  A.    Okay.
11                  Q.    Could you tell us what transpired
12  between the time when you were willing to sign the affidavit
13  and the time that you left me the voice mail on the evening
14  of May the 13th, indicating that you had changed your mind
15  and were not willing to sign the affidavit at that point?
16                  A.    Sure.  What transpired, aside from my
17  own internal thoughts, was I spoke with my wife on a number
18  of occasions about, you know, this particular issue, and she
19  had suggested to me to get over it, you know, forget about
20  it, move on, which I had pretty much done, but -- and as my
21  voice message states here (indicating), you know, there's no
22  real upside in it for Gene Mullins about these particular
23  issues here, other than maybe revenge, you know, for a
24  wrongful dismissal.  Those are the thought processes that
25  goes through ones head.
```

00024
```
 1                    In previous conversations with
 2  Mr. Reichert, calling my home on issues that are not really
 3  germane to this litigation here, he had threatened me, in no
 4  uncertain terms, with legal action if I continued, you know,
 5  whatever he had accused me of doing, planting an e-mail
 6  virus I think was his reasoning for the call, which was
 7  unfounded, but, nevertheless, he threatened me with legal
 8  action and threatened to go to the Hamilton County
 9  Prosecutor to prohibit my, whatever, you know, sending
10  viruses in the e-mail, which I did not do, and I told him
11  so.  And he had threatened me a couple of times with legal
12  action and those thoughts were in my head about, well, you
13  know, Bob Reichert is a smart guy, he's not going to, you
14  know, he can -- he's an attorney and, you know, he can
15  litigate pretty easily, pretty cheaply, although I'm sure
16  he's not going to do it on his own, but he has his hired
17  guns.  And my previous contacts with attorneys have been
18  less than positive.  So, you know, if you win, you lose,
19  that was my reasoning for that.  So I thought, you know
20  what, I don't want to -- there's no upside in me -- I'm done
21  with the organization, I don't want to be associated with
22  the organization any longer.  I gave them 100 percent of my
23  efforts and for that I got screwed.  So, that's about it,
24  you know, I made the decision that screw it, there's no
25  upside in it for me.
```

00025
```
 1                        And I'm not looking for an upside, I
 2  wasn't looking for any, you know, pay or any fee or any
 3  monies for this, you know, information, but I felt that, you
 4  know, Mr. Reichert's organization had a couple of people in
 5  it that had done me wrong and, you know, their image of --
 6  the Bow Peep image that they had projected was less than
 7  that and I let it be known.
 8                        And, you know, after thinking about
 9  that, I thought, you know what, I don't really want to go
10  through this litigation process.  You know, I end up with a
11  $20,000 legal bill and, you know, it's just not worth it.
12  So, at that point, I think you took that to mean that I was
13  threatened directly with regard to this, these issues, when
14  I was alluding to previous threats Mr. Reichert made to me,
15  you know, regarding other issues, after my departure from
16  the firm.
17                 Q.    From Northgate Lincoln Mercury?
18                 A.    Yes.
19                 Q.    Okay.  No, I didn't know --
20                 A.    Yeah, well, we didn't have a
21  conversation after that.
22                 Q.    Right, we didn't have a conversation, I
23  just had the voice mail.  And your voice mail stated what's
24  here in Exhibit F.
25                 A.    Uh-huh.
```

00026
```
 1                   Q.    And it didn't elaborate on when the
 2  threats were made.
 3                   A.    Right.
 4                   Q.    And I was trying to find out --
 5                   A.    Exactly.
 6                   Q.    -- what had happened.
 7                   A.    And I wouldn't return your calls.  I
 8  wasn't interested in it.  I was hoping you would go away,
 9  leave me alone, and I could move on with it.  So that was
10  the reasoning for it.
11                   Q.    So when you were leaving me a voice mail
12  on May the 13th, your reference to being threatened with
13  legal action was in conjunction with communications that you
14  and Mr. Reichert had had prior to any discussions with us
15  about the lawsuit --
16                   A.    Exactly.
17                   Q.    -- involving Mr. Woeste's dealership?
18                   A.    Exactly.
19                   Q.    And let me just be clear, has
20  Mr. Reichert, or anyone that works for him, contacted you
21  with respect to any issues involving the Eastside Lincoln
22  Mercury case?
23                   A.    No, I've had no contact.
24                   Q.    Or since the Eastside Lincoln Mercury
25  case came out?
```

00027
```
 1                   A.   No.  They're smart enough, I think, not
 2   to do that.
 3                   Q.   Okay.  Has anybody from Ford Motor
 4   Company contacted you --
 5                   A.   No.
 6                   Q.   -- with respect to the issues or your
 7   appearance as a witness in the Eastside Lincoln Mercury
 8   case?
 9                   A.   No.
10                   Q.   When did you have your discussions with
11   Mr. Reichert where he accused you of sending an e-mail virus
12   or something like that?
13                   A.   (No response).
14                   Q.   You said you were terminated in April of
15   '03?
16                   A.   No.
17                   Q.   I'm sorry, that's not right.
18                   A.   I don't have the exact date, but I would
19   think it's probably on or about February, maybe, of '02,
20   maybe March.
21                   Q.   You left in April of '02, according to
22   your affidavit.
23                   A.   I'm sorry, '03.
24                   Q.   All right.  So it would have been
25   February or March of the current year?
```

```
00028
    1                   A.   I think so.  As I said, I don't --
    2                   Q.   Well, it was after you left?
    3                   A.   Yes, it was.
    4                   Q.   So it couldn't have been February of
    5   '02, because you were still there?
    6                   A.   Right, right.
    7                   Q.   So it would have been this past
    8   February?
    9                   A.   Yes.
   10                   Q.   And did Mr. Reichert call you at home
   11   or --
   12                   A.   Yes, he did.
   13                   Q.   How many times did that happen?
   14                   A.   I think he just called me once at home.
   15   He called me and left a message at my home, "Gene, we need
   16   to talk," I think was his verbatim message.
   17                   Q.   And did you call him back?
   18                   A.   Yes, I did.  Yeah, I did call him back.
   19                   Q.   And what was the content of that
   20   conversation, as best you can recall?
   21                   A.   He had -- well, I think he had gotten
   22   information from Jerry Mullins, who had accused me of
   23   planting an e-mail virus on the company computer somehow,
   24   from afar, and --
   25                   Q.   After you had left the company?
```

```
00029
    1                 A.    Yeah, yeah.
    2                 Q.    Go ahead.
    3                 A.    Anyway, and then, you know, I told
    4    Mr. Reichert, I said, you know, Bob, I didn't plant it.  And
    5    he, you know, was convinced by his subordinates that I did
    6    it, and he threatened going to the Hamilton County
    7    Prosecutor and so forth.  And I told him, I said, you know,
    8    I'm not intimidated by your threats, because I knew I didn't
    9    do it.  So I tried to explain to him that this was a virus
   10    that's on Zoom Town DSL network that's really ubiquitous in
   11    the area.  Zoom Town knows it's a problem.  I've gotten
   12    e-mails from people within his organization, however, I had
   13    the computer acumen to know that, you know, it wasn't sent
   14    by one of his subordinates, and I wasn't calling him up, you
   15    know, crying to him that someone ruined my hard drive.  I
   16    knew it was unfounded.  And he just continued to do it, turn
   17    me over to the Hamilton County Prosecutor and whatever,
   18    so --
   19                 Q.    Did you have more than just one
   20    conversation with Mr. Reichert since you left his
   21    employment?
   22                 A.    Well, my contact with him has been
   23    pretty much nill, other than that conversation there.  I was
   24    trying to recall if there was one prior to that.
   25                 Q.    Or one subsequent?
```

```
00030
   1                     A.   No.
   2                     Q.   Were there any written communications
   3   you had with Mr. Reichert, or anybody on his behalf?
   4                     A.   Not germane to these issues here.  After
   5   my dismissal from the firm, I had sent him a couple of
   6   letters, you know, explaining my position.
   7                     Q.   When you were reflecting on whether to
   8   sign the affidavit which we've marked as an Exhibit here to
   9   your deposition, Mullins Exhibit 1, was your thought process
  10   one where you thought, well, if Mr. Reichert has already
  11   threatened me with legal action in connection with this
  12   e-mail virus, he's likely to do it again if I get involved
  13   in this lawsuit?
  14                     A.   Well, that was the whole point of this
  15   conversation here.  The message that I left was, you know, I
  16   still had -- although I guess I was intimidated by his
  17   threats of legal action, you know, but --
  18                     Q.   So that was in your mind when you left
  19   me the voice mail that's marked as Exhibit F; is that right?
  20                     A.   Yes, right.  I didn't mean to indicate
  21   that they had -- I noticed that, you know, somewhere in this
  22   paperwork here (indicating), that it was alluded to,
  23   perhaps, that someone had called me from their organization,
  24   which was not the case.  These were my thought processes,
  25   you know, my fears that there's going to be some litigation
```

```
00031
   1   here, and that was my wife's fears as well, you know, that
   2   you don't want to get in bed with a lawyer.
   3                  Q.   But am I accurate in stating that your
   4   fear, as expressed on May the 13th in this voice mail, was
   5   based on the threats that Mr. Reichert had made to you a
   6   couple of months earlier?
   7                  A.   Yes.
   8                  Q.   And you still had that fear in your head
   9   in May?
  10                  A.   Yes.
  11                  Q.   Even though you hadn't had any further
  12   communication with Mr. Reichert at that point in time?
  13                  A.   Right, right.
  14                  Q.   Okay.  After the subpoena was served on
  15   you on or about May the 20th, then you signed the affidavit
  16   and sent it back to me; correct?
  17                  A.   That's correct.
  18                  Q.   And what was it that made you decide to
  19   do that?
  20                  A.   I was commanded by this person here
  21   (indicating).
  22                  Q.   You're referring to the subpoena?
  23                  A.   Yeah.
  24                  Q.   Okay.
  25                  A.   Other than that, I thought, well, you
```

```
00032
   1   know, I'll just send them that.  It was all factual, you
   2   know, per our discussions.  I'll just send it and I thought,
   3   well, maybe they'll go away (indicating).
   4              Q.   All right.  Is it accurate, Mr. Mullins,
   5   that there is nothing contained in your affidavit marked as
   6   Mullins Exhibit 1 that is anything other than true and
   7   accurate; is that true?
   8              A.   Absolutely.
   9              Q.   And other than our brief conversation in
  10   our lobby before the deposition started this morning, in
  11   which you indicated that you didn't have a copy of your
  12   affidavit and I gave you one to look at, have you and I had
  13   any other communication?
  14              A.   No.
  15              Q.   Either e-mail or telephone or the like?
  16              A.   No.
  17              Q.   I guess the only other thing that I
  18   would ask at this point is:  Does your affidavit, Mullins
  19   Exhibit 1, also accurately reflect what you told Mr. Woeste
  20   when you met with him for lunch that day?
  21              A.   Yeah.  Oh, yeah, it's accurate.  You
  22   know, not verbatim, obviously, but it is accurate.
  23              Q.   The content of it is as accurate in its
  24   written form as it was when you spoke to Mr. Woeste over
  25   lunch?
```

```
00033
 1                    A.    That's correct, right.
 2                    MR. FLEMER:  Okay.  I don't have any
 3  further questions, Mr. Mullins, thank you.
 4                    MS. MCNELLIE:  Can we take a break?
 5                    (THEREUPON, A SHORT RECESS WAS TAKEN).
 6             C R O S S - E X A M I N A T I O N
 7  BY MR. HENGEHOLD:
 8                    Q.    Mr. Mullins, my name is Steve Hengehold.
 9  I'm an attorney with Rendigs, Fry, Kiely and Dennis, and our
10  firm represents the Kenwood Dealer Group and Bob Reichert in
11  the case pending in Federal Court, which is the matter
12  through which you were subpoenaed here today.  And I have a
13  few questions to follow-up a little bit on the questioning
14  of Mr. Flemer, and then more particularly to question you
15  about the areas in which Mr. Flemer's firm has identified
16  that you will testify.
17                    The first item indicated in what was
18  originally disclosed for your testimony is identified as the
19  preferential allocation of vehicles to KDG and reduction of
20  ELM's vehicle allocation.  Can you tell me, Mr. Mullins, and
21  I don't believe that -- I'm not reading that off of your
22  affidavit, I'm reading that off of a pleading that was filed
23  with the Court that you probably haven't seen.  Do you have
24  any specific knowledge as to vehicles being preferentially
25  allocated to the Kenwood Dealer Group by Ford Motor Company?
```

```
00034
 1                    A.    Do I have any specific knowledge?
 2                    Q.    Yes, can you identify an allocation, a
 3  group of vehicles, an individual vehicle, that you believe
 4  was allocated to the Kenwood Dealer Group dealerships by
 5  Ford Motor Company that was preferential?
 6                    A.    Can I identify a specific lot of
 7  vehicles that was sent to us, do I have documentation for
 8  it, no.
 9                    Q.    You sort of gave me -- and you probably
10  answered the question and perhaps my next question.
11                    There's no specific lot of vehicles that
12  you can testify to today, nor do you have any documentation
13  as to any specific lot or vehicle?
14                    A.    I don't have any documentation that
15  obviously will confirm.  My affidavit states, or my
16  testimony was that, you know, if I knew of specific vehicles
17  that were allocated to us on a preferential basis.  Specific
18  lots, do I have them, this car, those serial numbers, no.
19                    Q.    Can you describe a preferential
20  allocation by model?
21                    A.    Lincolns and Grand Marquis.
22                    Q.    Okay.  What model of Lincoln?
23                    A.    Town Cars, mostly.  Those were the only
24  Lincolns that were really, you know, a factor in the market.
25  I mean the Town Cars were the only Lincoln, other than maybe
```

00035

1  the Navigator, that anybody actually even wanted.
2                  Q.    Okay.  So your information about
3  preferential allocation would deal with Lincoln Town Cars
4  and Mercury Grand Marquis?
5                  A.    That's correct.
6                  Q.    What time frame?
7                  A.    Well, I'd have to go back and check my
8  notes, but, you know, we were allocated approximately, maybe
9  40 or 50 extra Lincolns and Grand Marquis, not just our
10 specific dealership but his other store, Lincoln Mercury of
11 Kings Auto Mall, and I'm thinking these were 2000 models.
12                 Q.    When you say 40 or 50, is that 40 or 50
13 of each or 40 or 50 total?  There's two, as I understand it,
14 we're talking about two different cars, the Town Car and the
15 Grand Marquis; right?
16                 A.    Right, 40 or 50 of each.
17                 Q.    Okay.  Now I know that the 2000 model
18 year doesn't necessarily mean the year 2000, or any
19 particular time.  Do you have a better idea or can you give
20 me a more specific --
21                 A.    As specific as I can get without going
22 over some data that, you know, one of these other people
23 could supply, would be in the sell-out season, which would
24 be the summer selling season, as we refer to it, or the
25 close-out season, which is typically from, I would say July

00036
```
 1  through September.
 2              Q.   July through September, is that both the
 3  sell-out season and the close-out season, those are two
 4  terms for the same time frame?
 5              A.   Yeah.
 6              Q.   And it's your recollection that -- in
 7  what year would that be, 2000?
 8              A.   I think it would be 2000.
 9              Q.   So, between July and September of 2000,
10  it's your recollection that all of the Kenwood Dealer Group
11  Mercury dealerships and Lincoln dealerships received 40 to
12  50 Town Cars and 40 to 50 Grand Marquis, in addition to
13  their regular -- or their in addition to their allotment?
14              A.   I would say, my statement would be, in
15  the aggregate, we got an additional 40 or 50 of each of
16  those vehicle lines to be dispersed amongst the three
17  dealerships that the gentlemen owned.
18              Q.   So if there are three dealerships, one
19  might have gotten 15, another got 15 and the other ten, if
20  40 was the number; correct?
21              A.   Right, correct.  The largest volume
22  store would obviously get the bulk of the inventory, and we
23  were instructed by our general managers, at least I was,
24  that we could pick and choose, at random, between their
25  inventories, and vice versa.
```

00037

```
 1                    Q.    The inventories of all of the Kenwood
 2    Dealer Group Lincoln Mercury dealerships?
 3                    A.    Yes.
 4                    Q.    Now, you referenced a few minutes ago,
 5    in one of my earlier questions, you said, "without reviewing
 6    my notes".  What kind of notes do you have?
 7                    A.    Mental notes is what I have.  I would
 8    review my mental notes, any mental notes that I make.  If I
 9    had copies of the allocation reports from the district and
10    from, you know, within our organization.
11                    Q.    What was the, if you can recall, the
12    number of Town Cars that were to be allotted,
13    non-preferentially, during this time frame?
14                    A.    Non-preferentially, we would get
15    typically enough cars to last us through what our daily
16    selling rate -- to match our daily selling rate, or our
17    monthly averages over a period of time.  The district -- Pat
18    Letart would come and sit down with me and say, "these are
19    the vehicles that you sold last time, the market is as such
20    now, so we're going to allocate to you these vehicles, based
21    on empirical data.  In addition to that, we were allocated
22    other vehicles, 40 to 50, or thereabouts, as I mentioned.
23                    Q.    My question -- or more specifically,
24    over this July to September time frame, which is where we've
25    bracketed the 40 to 50 vehicles of each model, how many
```

00038
```
 1  would the dealership receive pursuant to non-preferential
 2  allotment during those three months, of these models?
 3              A.    On the Lincolns, we would normally
 4  get -- well, it's also subject to what your current
 5  inventory is, if you have a current inventory.  We're
 6  allocated a certain amount of cars, but allocating just
 7  means that, you know, these are the numbers that we've
 8  picked for you, do you concur with these numbers or what
 9  numbers do you have on your own.  So therein lies the
10  process, dealing back and forth with the factory managers,
11  negotiating with them.
12              We would normally be allocated, to
13  answer your question, you're looking for a number and I'm
14  going to try to give you the best guesstimate that I can
15  without, you know, looking at hard facts of what our
16  inventory was in that period, and I can't answer it exactly,
17  no more than you can answer me how much was in your checking
18  account on that day, you know, in time, because it's not a
19  number that's some milestone in my head, so, given that, you
20  know, we would normally get, to answer it broadly, we would
21  normally get maybe five Town Cars per month, and maybe we
22  would normally get maybe ten Grand Marquis or 12 Grand
23  Marquis per month.
24          Q.    Is that Northgate?
25          A.    Northgate, our store.  I can speak to
```

```
00039
 1   our store.
 2                    Q.    How many would the Kenwood Dealer Group
 3   get in total?
 4                    A.    Well, I can only offer an educated guess
 5   to that.  Mr. Reichert could probably better answer that.
 6                    Q.    Well, here's what I'm trying to do:  You
 7   testified that they got 40 to 50 additional Town Cars in
 8   this three-month period, an additional allotment.
 9                    A.    Okay.
10                    Q.    And I'm trying to compare that number
11   with what they got in their non-preferential allotment.  So,
12   however, whatever mental notes you refer to or whatever
13   calculations, however rough they might be, to come up with
14   the 40 to 50 number, I'm trying to compare that with the
15   regular number to see what the additional inventory was.
16                    A.    Okay.  Well, as I stated, we would get
17   Grand Marquis, typically, over a three-month period, they
18   would space them out over a three or four-month period
19   depending on what the factory's schedule was, the production
20   schedules, so we would, our store, which would be Northgate
21   Lincoln Mercury, would get 15 Town Cars, or thereabouts,
22   allocated to us over that three-month period, and we would
23   get 45, maybe, Grand Marquis over that particular period.
24                    Q.    Of the 40 or 50 additional allotment
25   that was provided, or the preferential allotment, how many
```

00040
```
 1  of those vehicles were housed on the Northgate Lincoln
 2  Mercury lot?
 3              A.   Those cars don't come in all at one
 4  time.  You must understand, they come in -- they're
 5  distributed on a monthly basis.  So, you know, it's not
 6  like, hey, here's 40 cars.  And we had space problems at
 7  Northgate Lincoln Mercury.  We couldn't -- we would have to
 8  store them.  We had so many cars that we had to store them
 9  at other locations.  We had to store them at Chuck E.
10  Cheese, across the street.  We had to store them at a -- we
11  had a satellite used car operation at Northgate, so we had
12  to store the new cars, we had so many that we had to store
13  new Lincolns and new Mercuries up there, at the separate
14  location.  So we were swollen with inventory.  We had to --
15  we used space, for awhile, across the street at Joseph's
16  organization, and then when that got wore out, our welcome
17  there, you know, then they put cars up at the other
18  locations.
19              Q.   But the preferential allotment of Town
20  Cars and Grand Marquis, do you have any idea, as you sit
21  here today, how many of those were sold through your
22  dealership?
23              A.   How many of the vehicles that we were
24  allotted preferentially were sold through our store, is that
25  your question?
```

00041
```
 1                   Q.   Yes.
 2                   A.   I can give you an estimate.  Is that
 3   what you're looking for?
 4                   Q.   Only if you have some facts upon which
 5   you'll base your estimate.  I don't want you to simply pick
 6   a number.
 7                   A.   Well, you know, I can return with some,
 8   you know, spreadsheets.  I have some spreadsheets on my
 9   computer where I compiled, you know, the types of cars that
10   we sold over a five-year, you know, four or five-year time
11   frame in Microsoft Excel.  I could find the make and model
12   of each car that was sold by our store.  I mean, if you want
13   that data, I can get it.  I don't have it with me,
14   obviously, but I could refer back to it.
15                   Q.   Okay.  Do you have any knowledge of what
16   other Lincoln Mercury dealerships in the Cincinnati market
17   were allotted during the sell-out/close-out season?
18                   A.   Well, I was told by my general manager,
19   and also one of the shareholders of Mr. Reichert's firm,
20   Larry Feldhaus, that the other dealers weren't going to get
21   a whole lot of automobiles, they were going to get very few
22   cars.
23                   Q.   And --
24                   A.   Given their -- go ahead, I'm sorry.
25                   Q.   The few cars that you understood them to
```

```
00042
   1  be referring to are these preferential allotments.
   2                    A.   Yes.
   3                    Q.   Okay.
   4                    A.   Well, I understood them to be few cars
   5  in general, not few cars preferentially dispersed, but --
   6                    Q.   Do you have any information other than
   7  what you were told by Mr. Mullins and Mr. Feldhaus,
   8  concerning the allotment of vehicles to other non-Kenwood
   9  Dealer Group Lincoln Mercury dealerships?
  10                    A.   Well, it was, you know, Mr. Pat Letart,
  11  which at that point in time was the district manager, and he
  12  would come in peddling his cars to us.  That indicated to me
  13  that, you know, because of the practices of Eastside Lincoln
  14  Mercury, advertising and giving away of cars, that they were
  15  going to be collared, I think he said, I don't recall the
  16  exact quote but it was something along those lines, they
  17  were going to be restrained in their ability to sell cars.
  18  You know, they could advertise them at five grand off, he
  19  would say, but if they don't have any inventory, what good
  20  is it going to do them?
  21                    Q.   When did you have that conversation with
  22  Pat Letart?
  23                    A.   Somewhere in that time frame referred to
  24  previously.
  25                    Q.   The July to September, 2000, time frame?
```

00043

```
 1                    A.    Somewhere around there, yeah.  I didn't
 2  keep a contemporaneous log of my daily appointments, so I
 3  don't have exact dates.
 4                    Q.    Did you have access to or did you
 5  otherwise have any information concerning the allotments to
 6  other vehicles, the actual allotments, how many vehicles
 7  they got, what models?
 8                    A.    The question was -- would you repeat
 9  that again?  What was it?
10                    Q.    Did you have access to or have any
11  information concerning the actual allotment of vehicles,
12  whether ordinary or preferential, during this time frame, to
13  other dealerships?
14                    A.    Not other than just, you know,
15  conversation from, you know, Pat Letart to me, telling me
16  what their plans were.
17                    Q.    Okay.  And --
18                    A.    I didn't have any access, not privy to
19  any of Ford's data or -- we only know what we can get, and
20  we only hear what others get.  We did know, at that point in
21  time, we did know, in fact, what, you know, Lincoln
22  Mercury -- Pat Letart would tell us that Lincoln Mercury of
23  Kings Auto Mall was given this many vehicles and, you know,
24  we were given this many vehicles, and maybe Fairfield
25  Lincoln Mercury was given so many vehicles.  So it was
```

00044
1    communicated to us that we had these cars in the aggregate.
2                    Q.    Were you ever told what Eastside Lincoln
3    Mercury was given by Pat Letart?
4                    A.    What specific numbers?
5                    Q.    Yes.
6                    A.    Not that I recall.
7                    Q.    Okay.  The conversation that you just
8    related from Pat Letart, in the reference that I started
9    your questioning with, which indicated reduction of ELM's
10   vehicle allocation, is that where your understanding that
11   that was the intention came from, the conversation with Pat
12   Letart?
13                   A.    Were the cars coming from their
14   particular allocation given to us, is that the question?
15                   Q.    Yes.
16                   A.    It was intimated that, yes, it was.
17                   Q.    During any of your conversations with
18   Pat Letart, did you encourage him to send you vehicles
19   versus sending them to Eastside Lincoln Mercury?
20                   A.    Me, personally, did I encourage him?
21                   Q.    Yes.
22                   A.    No.  I mean, me, personally, I didn't,
23   but, you know, our general manager, in conversation, I would
24   be present if they had a conversation, most of the time,
25   about cars, and that was the plan, you know, give the dealer

00045
```
 1    group all the cars, you know, to get them sold.
 2                    Q.    Can you recall any conversations where
 3    it was suggested by Mr. Letart that the dealer group was
 4    given the cars exclusive of Eastside Lincoln Mercury?
 5                    A.    No, I couldn't say that to be a fact.
 6    The cars, once again, are dispersed in the aggregate.  So I
 7    don't know, you know, if these cars were ordered by -- you
 8    know, a lot of times the cars may come in, maybe they can
 9    get cars from additional regions, maybe an additional region
10    outside of ours has an overabundance of supply of cars.  The
11    factories track the daily supply of vehicles on a regional
12    and a city-by-city, I'm sure, basis.  And then if other
13    areas have cars that maybe have been turned down, as I
14    specifically mentioned before, by, you know, the peddling
15    back and forth between the wholesaler and then back to us,
16    then those cars would be subsequently available to maybe
17    another region.  So many times we were offered cars, in and
18    outside of this time frame, that were maybe cars that were,
19    you know, originally supposed to go to maybe Lexington or
20    Louisville or -- you know, in the car business, it's, you
21    know, turn and earn almost.  And if you're selling the cars,
22    then they're going to pump you the inventory, when it's
23    available to them.
24                    Q.    Okay.  Can you provide me any specific
25    examples of the distribution of marketing money to the
```

00046
1  Kenwood Dealer Group, or even specifically Eastside Lincoln
2  Mercury, which you believe to have not been available to
3  other dealerships?
4          A.   Yeah, as I referred to in my affidavit,
5  there were monies that were sent to us on specific car
6  lines.  For instance, you know, a dealer's inventory is such
7  that if you have a bunch of leftover automobiles from, for
8  instance, 2001 models, and now you move into the 2002 models
9  that are out, and then here in January and February and
10 March you still have last year's inventory, you know,
11 because of the additional allocation that we got, we were
12 heavy in cars.  You know, we sold a lot of them but we were
13 heavy in cars.  And well into January and February of a
14 subsequent year, we would have an abundance of these
15 leftover cars.  And the factory had already paid us out, if
16 you will, in cars.
17          The factory has programs to liquidate
18 the dealer's inventory, for obvious reasons.  If they
19 liquidate the old inventory, then in comes the new and keeps
20 the production ongoing.  So, you know, after we have been
21 paid out, the factory had pretty much absolved themselves of
22 their responsibility of merchandising these leftover
23 vehicles that we had, and I'm talking specifically about
24 Lincolns, Town Cars.  Our store, Northgate Lincoln Mercury,
25 and I'm sure the other -- I know that Kenwood, or, excuse

```
00047
   1  me, Lincoln Mercury of Kings Auto Mall had Town Cars, for
   2  instance, and Pat Letart came to Jerry Mullins with a little
   3  program to help liquidate, additional monies to liquidate
   4  these vehicles.
   5                Now, at that point in time do I know
   6  that other dealers had them, do they have those vehicles in
   7  stock?  I didn't really know.  Maybe they did or maybe they
   8  didn't.  But it was told to me, in no uncertain terms, that
   9  here's some additional monies available, you know, to
  10  liquidate your position in these cars, get rid of them.
  11  And, you know, this was like the last, the last funds
  12  available to, you know, to liquidate these cars.
  13                They would have specific programs to,
  14  you know, put the cars in.  You can't sell them, put them in
  15  rental inventory.  Here's some additional monies, put them
  16  in your rental inventory.  Let your Lincoln customers drive
  17  them when they come in.  So buy them down, just get them out
  18  of inventory.
  19         Q.   You don't know whether or not those same
  20  or similar programs were offered to other dealers that had
  21  old inventory as well?
  22         A.   I was told that this was specific to us
  23  by Pat Letart and my general manager, Jerry Mullins.  They
  24  would say, hey, we got monies here that these other dealers
  25  aren't privy to, don't have, you know, we're going to be in
```

00048
1  a unique position, let's roll.
2                Q.   You don't know whether or not other
3  dealers had the similar inventory situation, that is the
4  group of old Town Cars, by example?
5                A.   I don't think they had a whole lot of
6  inventory to begin with, so I don't think they had a lot of
7  leftover cars either.
8                Q.   Do you have any specific recollection or
9  can you provide me with a specific example of what has been
10 termed a "sham contest"?
11               A.   Who was the author of that quote, "sham
12 contest"?  Not me.
13               Q.   No, that's what counsel has predicted
14 that you would testify about.
15               A.   Let me go back and review that in its
16 context.  What exhibit is that on?
17               Q.   I think it's Exhibit 2 to your
18 deposition, and it's an exhibit within the exhibit.  And it
19 is Exhibit B within Exhibit 2 of the deposition.
20               A.   If somebody can find it for me in here,
21 I'll be glad to refer to it.
22               MR. FLEMER:  Mr. Mullins, I'm handing
23 you the page Mr. Hengehold has referred to.  And I think he
24 mentioned this, but I want the record to reflect, for your
25 knowledge, that this document was prepared by our office and

00049
```
 1  it's a summary of what we anticipated were the areas that
 2  you would testify to.
 3              THE WITNESS:  Okay.
 4              A.   I can only address what my specific
 5  answers are, but this would seem to me to indicate about a
 6  contest or refer to a contest that we had with the Gentry
 7  Shop, you know, on the previous allocation that we had
 8  gotten, the additional allocations.  They had a little
 9  contest that was specific to our dealer group, I was told by
10  my general manager and Pat Letart, that it was a -- if we
11  had sold so many cars, which obviously we were going to be
12  the only dealer, our dealer group would have been the only
13  ones that could have won the contest because we had the
14  cars.  If you have a contest that, you know, you limited the
15  other people's ability to win, then obviously we're going to
16  win, someone in our dealer group.  So that was, I can only
17  assume that's what the reference is here to a sham contest,
18  was we were taken -- Northgate Lincoln Mercury won the
19  little contest.  It was about Lincolns and Grand Marquis,
20  and Mountaineers, if I recall.  And we were taken to the
21  Gentry Shop on 747, and we were -- the store was closed for
22  us, our group of our sales staff, and, in the evening, I
23  don't recall what day it was, but we were allowed to shop,
24  and I was given like $700 in funds, I guess, not cash
25  directly, but I was given a store credit, if you will.  So I
```

00050
```
 1   bought a couple, two or three sport coats and some other
 2   stuff, shirts, ties.  And then specific salespeople had, you
 3   know, the salespeople had maybe 300 bucks or so of store
 4   credit to go and shop and buy themselves, you know, some
 5   clothing.  We had won the contest, supposedly, within our
 6   organization, and --
 7                  Q.   Was the Northgate group allowed to do
 8   this shopping exclusive of Fairfield or Kings?
 9                  A.   Yes.
10                  Q.   And it was because you --
11                  A.   As far as I know, yes.
12                  Q.   And it was because your dealership
13   outperformed the other dealerships?
14                  A.   Yeas, as far as I recall, that's true.
15                  Q.   So at least with respect to it being a
16   contest among the dealerships, it appears to have truly been
17   a contest and you won?
18                  A.   It was a contest -- what was your
19   statement?  Let's try --
20                  Q.   At least as much as it was a contest
21   between the three Lincoln Mercury dealerships inside the
22   Kenwood Dealer Group, it was a contest and your dealership
23   won?
24                  A.   It was a contest that was sponsored by
25   the Lincoln Mercury Division.
```

```
00051
 1                    Q.    Right.
 2                    A.    And was it exclusive to our dealerships?
 3  I think so.
 4                    Q.    Okay.
 5                    A.    And we won, yes.
 6                    Q.    All right.  And Paragraph No. 2, that I
 7  quoted before, goes on to say, "contest and vehicle
 8  programs."  Do you have a recollection of any vehicle
 9  programs which you would classify as a "sham"?
10                    A.    You know, as I stated before, my view
11  was they were looking for a way to disperse some monies to
12  liquidate our position in these vehicles.  So, you know, if
13  they wanted to make up a contest specific to us, you know,
14  that's what they would do, just as long as they achieve
15  their ultimate goal of liquidating the inventory.  A sham
16  contest, I mean, you could, you know, as I've stated before,
17  the clothing contest would be one.
18                    Q.    Do you know if any vehicle programs or
19  contests were offered to Eastside Lincoln Mercury during
20  this same time frame?
21                    A.    Can't really speak to that, no.
22                    Q.    Okay.  Who was the training sales staff
23  at Northgate?
24                    A.    Who was the training sales staff?
25                    Q.    Right.
```

00052

```
 1                   A.   Well, the question "who" refers to one,
 2  and then "staff" refers to multiple people, so I don't
 3  understand that question.  What was the question?
 4                   Q.   Well, who was or were the training sales
 5  staff at Northgate, and let's stick with the 1999-2000 time
 6  frame?
 7                   A.   Well, it would be Gene Mullins and, you
 8  know, other managers.  We were the -- I mean, it's part of
 9  the job description to motivate and train the sales staff,
10  so that would be me and the other managers.
11                   Q.   And did you advise your salesmen to tell
12  customers that KDG, Kenwood Dealer Group, received
13  preferential treatment from the manufacturer?
14                   A.   Yes.
15                   Q.   Yes?
16                   A.   Yes.
17                   Q.   What preferential treatment did you
18  believe you were receiving from the manufacturer?
19                   A.   Distribution of inventory.  The issue
20  was that, if I can elaborate, the issue was that Eastside
21  Lincoln Mercury was on a campaign.  They were advertising
22  vehicles, and I, you know, even in the meeting, I thought
23  that it was brilliant.  They were advertising $5,000 off and
24  $10,000 off.  It seemed to me that they wanted to be a thorn
25  in the side to our organization, and how else could they
```

00053
```
 1  compete but just undercut the pricing, you know, undercut
 2  the pricing.  So what I was told to do was to address, in
 3  the sales meetings, upon conferring with the general
 4  managers, hey, how are we going to combat this $5,000, what
 5  are we going to do to counteract that when a customer comes
 6  to us and says, hey, they have $5,000 off of this specific
 7  car or that specific car, and my job was to load their lips,
 8  if you will, to give them more tracts that were part of the
 9  sales process.  When a customer comes and asks you a
10  question, hopefully you have an answer to their objection or
11  their question or their statement.  So when they would come
12  to us and say, well, Eastside Lincoln Mercury has five grand
13  off, I would instruct the salespeople to say, well, then
14  tell your customer they can have ten grand off but they
15  don't have any cars to sell.  Let's make it 15 grand, but
16  they don't really have much of an inventory to choose from.
17  If you don't want the purple car with the green roof that
18  they've added to it, then -- so that was the training, was
19  to load their lips with word tracts to combat the
20  advertising of competitors.  And that was, once again, after
21  conferring with my immediate superior in what to do, how can
22  we combat this.  I didn't really, I didn't feel, personally,
23  as a general sales manager, that it was impactful to our
24  store.  You know, Eastside or some of the other ones, I
25  mean, we dominated, in terms of sales, our organization, so
```

```
00054
  1    it was like a minor thorn in the side.
  2                 Q.   Was one of the word tracts that you
  3    provided to your salespeople that the Kenwood Dealer Group
  4    would soon be the only Lincoln Mercury dealer in this area?
  5                 A.   Yeah, yeah.  Did I say that?  I'm sure I
  6    did say that at some point in the meetings.
  7                 Q.   What was your basis for saying that?
  8                 A.   Well, the reasoning for it was just
  9    motivation, to once again re-enforce to the customer that,
 10    hey, we're going to have all the cars, we're going to be
 11    dominant, we're going to enjoy the geminy in our market,
 12    because we have all the cars.  That was the plan.  If there
 13    was a grand plan, that was it, written or unwritten.
 14                 So what I -- my job is to motivate the
 15    sales staff.  So when I'd get with the sales staff I'd say,
 16    hey, they can advertise the cars for whatever they want.  If
 17    they don't have an inventory from which to choose, then it's
 18    not going to be a factor.  And I would also tell them, you
 19    know, that the cars they're advertising for 15 grand off, or
 20    excuse me, for ten grand off on a Lincoln was not ten grand
 21    off MSRP, it was ten grand off their price of the car, which
 22    made have included additional options to the vehicle.  So
 23    part of the training process was to keep the sales staff
 24    fully informed of what exactly 10,000 off was, so you don't
 25    lose a customer, you know, just on price.
```

00055
```
 1                  Q.   Okay.
 2                  A.   Even in communication with -- I had
 3  friends at the other organizations that I had worked with
 4  previously, and they would call to, you know, trade for cars
 5  with us, you know.  Their dealership, Eastside, would call
 6  and say, hey, look, you guys show this specific car, do you
 7  want to trade it?  And I would, you know, because I knew
 8  people over there, I would still go ahead and trade with
 9  them.  They weren't really a factor, so I would go ahead and
10  trade with them.  And I was told in no uncertain terms by
11  Larry Feldhaus that, you know, they're the enemy, don't
12  trade with them.  What are you doing trading with them?
13  Well, I wasn't told by anybody, up until this point, not to
14  trade with them.
15                  Q.   What was the time frame of Larry
16  Feldhaus telling you not to trade with Eastside?
17                  A.   I don't know.  There again, I could, you
18  know, with some thought, I could probably be more specific.
19  But do I have an exact date?  No.  Somewhere around that
20  time zone that we specifically referred to.
21                  Q.   The July --
22                  A.   Somewhere around there.
23                  Q.   -- to September of 2000?
24                  A.   The best that I can recall.
25                  Q.   Okay.  Prior to your last answer, your
```

00056
```
 1   second to last answer, my question was:  Upon what
 2   information, if any, did you base your statement to your
 3   salespeople that the Kenwood Dealer Group would soon be the
 4   only Lincoln Mercury dealer in the area?
 5                   A.    What did I base that information on?
 6                   Q.    What information did you base that
 7   statement on?
 8                   A.    General statements from, you know, my
 9   immediate superior and his, Mr. Reichert not included, but,
10   you know, through our conversations, not specific meetings.
11   There were no -- we never had any formal meetings
12   addressing, you know, or talking about these issues, but in
13   conversations, maybe Mr. Feldhaus, for instance, or even one
14   of his subordinates, would call up looking for a car and you
15   would get to talking about general business.  You know,
16   during the course of the conversation it would be, you know,
17   we're looking for this car or that car and we would talk
18   about the other dealers in the area and how weak their sales
19   were.  And it was one of our goals, not a written goal, but
20   it was one of our goals, originally, to put Jim Dixon out of
21   business, or at least dominate the market in such a fashion
22   that, you know, he would have to sell and move on.  And
23   then, you know, we did that.  I mean, you know, Dixon was a
24   viable force in the market up until 1996 or so.  Our
25   particular store, at that time, what was told to me was we
```

00057
```
 1    wanted to be a strong third in the city, and I found it
 2    laughable.  I thought, well, how about No. 1.  But anyhow,
 3    we were on a mission to -- and there again, it was from, you
 4    know, our general manager, and I don't know where he got his
 5    information, I can't speak to that, but one of the goals was
 6    let's put the SOBs out of business, so --
 7                   Q.   You referred earlier, when you were
 8    talking about the dealer trade, that you had friends at
 9    Eastside Lincoln Mercury that you would occasionally trade
10    vehicles with.  Who were those individuals?
11                   A.   Dale Snider was -- actually, I had hired
12    him as a salesperson back in, you know, '96 or '97, and then
13    he left our company and went to work for Eastside Lincoln
14    Mercury, but him and I have worked together at another
15    Lincoln Mercury ten years prior, for a number of years.  So
16    I just knew him from, you know, in the business, and I knew
17    him personally.
18                   (THEREUPON, AN OFF-THE-RECORD DISCUSSION
19    WAS HELD).
20                   Q.   Now, stepping back for a minute, when
21    Mr. Flemer was questioning you at the outset of your
22    deposition, you indicated that you started at Northgate
23    Lincoln Mercury in 1996.
24                   A.   Yeah.
25                   Q.   And now you just referenced a prior
```

00058
```
 1  Lincoln Mercury dealership.  Can you, very quickly, in a
 2  chronological order, go through your employment history,
 3  from either -- how far did you go in your education, how far
 4  did you go in school?
 5              A.   High school and some college.
 6              Q.   What's your date of birth?
 7              A.   8/25/52.
 8              Q.   And starting in 1980, tell me what you
 9  were doing in 1980 and who you were doing it for, and then
10  come forward chronologically.
11              A.   Okay.  Well, on 5/12 of 1973, I was
12  employed by Ridgeview Lincoln Mercury.  As a milestone, that
13  was also the day that my daughter was born, so I can refer
14  to that one specifically.  I was employed there until 1994,
15  and it seems maybe June-something of '94, I left Ridgeview
16  Lincoln Mercury.  And then August the 25th, I think, of '94,
17  was my first day at one of the Kenwood Dealer Group's other
18  stores, which was Kings Toyota.  I remember that because I
19  got a ticket on my way home from my first day.  So, after a
20  few months at Kenwood -- or at Kings Toyota, I resigned from
21  there and went to work for one day at Glenway Chevrolet.
22  Didn't like the product, and the dealership more, I guess,
23  because I had come from a state-of-the-art facility to -- I
24  didn't like the product, didn't like the dealership, so I
25  called and got a position with Mr. Reichert's firm at the
```

00059
1    Dodge store, which was Kings Dodge, and I worked in the
2    business office there, which was the F&I office, the finance
3    office.  And then Jerry Mullins was hired as the general
4    manager at Northgate Lincoln Mercury in '96, I think, in
5    January.  I'm not too sure, exactly.  And then, at that
6    point in time, from January on, he recruited me for about
7    three months to be his sales manager, although that was
8    strictly against company policy.  I mean, he called me
9    numerous, numerous times a day, "you're my man, as soon as I
10   get these other guys out of here, you're the man, you're the
11   man.  So, plus my anger, if you will, about being dismissed,
12   summarily dismissed because of some other issue, that I've
13   talked about before.  In other words, some of the people in
14   the firm, it's common practice to recruit.  You know, I was
15   recruited.  And then I'm dismissed after, you know, six,
16   seven, eight years of outstanding performance with the firm
17   because of some bullshit reason like, you know, meddling or
18   whatever, so that was my, why I was angry.  So there is my
19   chronological answer for you.  Sorry about that.
20              Q.   I missed the date of when you went from
21   Kings Dodge F&I to, I assume, Northgate Lincoln Mercury
22   General Sales Manager.
23              A.   That would be in April of '96, I think,
24   April of '96.
25              Q.   Okay.  So it was at the Ridgeview

00060
1   Lincoln Mercury that you worked with Dale Snider?
2               A.   Yes, and also at Northgate, as I
3   referred to before, I had hired him as a salesperson there
4   in '96 or '97.  I don't recall the exact date, but --
5               Q.   Paragraph 10 of your affidavit -- you
6   can take a minute to go ahead and look at that.  I have a
7   few questions about that.
8               A.   (Witness complies).  Okay.
9               Q.   What time frame were you referring to
10  with respect to the call from Don Bach?
11              A.   Well, I'd need to reflect on that.  Our
12  company, at that point in time -- or Mr. Reichert's company
13  I should say, bought that store like in '99, I'm not really
14  exactly sure, so it would have been prior to that, maybe
15  about 2000, I don't recall.  But Don Bach and I were peers I
16  guess, you know, he was the manager there, and we would talk
17  many, many times about, you know, dealer trade programs.  I
18  was his comforting ear when he wanted to moan and groan
19  about the business in general.  I really can't give you an
20  exact date, I don't have it, but I remember specifically him
21  calling me to compare the size of, you know, how much did
22  you get from, you know, Lincoln Mercury with respect to this
23  Lincoln contest or Mountaineer contest, you know, whatever
24  the reference was.  So I can't really give you an exact
25  date.

00061
```
 1                    Q.    Is it your recollection that whatever
 2    that time frame was, obviously prior to the acquisition of
 3    that dealership by the Kenwood Dealer Group, that Jim Dixon
 4    Lincoln Mercury was receiving a payment from Ford Motor
 5    Company or from Lincoln Mercury that you were also
 6    receiving, perhaps in different amounts, but you were both
 7    involved in the same program, so that you could compare your
 8    results?
 9                    A.    They had programs that were commonplace
10    throughout the nation, not just in our region.  But they
11    would have programs, national programs, that you would have
12    to go on-line and claim the monies.  And some of them were
13    district-oriented contests that would be oriented from the
14    district office.  So, over the course of, you know, five or
15    six years, seven years, 20 years in the business, it was
16    routine that the factory would give money on specific cars
17    as an incentive to move specific inventory.
18                    Q.    Those programs were offered both to
19    Kenwood Dealer Group dealerships and others as well?
20                    A.    Yes, they had programs that were
21    available to everybody, of course.
22                    Q.    Was it prohibited to share the amount of
23    your payment with another dealer?
24                    A.    Was I specifically prohibited from
25    giving the information out?
```

00062
```
 1                    Q.    Either by your employer or by the
 2  manufacturer, did you understand there to be a prohibition?
 3                    A.    No.
 4                    Q.    Okay.
 5                    A.    What Mr. Bach was doing at that point in
 6  time, if I recall, was just digging for information.  He was
 7  looking for specific data that he could then say that we had
 8  preferential treatment.  We all knew and assumed that we had
 9  the preferential treatment.  He was looking for a reason to
10  go to his immediate superior, in my opinion, he was looking
11  for a reason to go to him as his basis for performance, or
12  the lack thereof.
13                    Q.    Did the amount of the checks demonstrate
14  that, the preferential treatment that Mr. Bach was trying to
15  ferret out?
16                    A.    He called to compare the size of the
17  checks.  I don't really recall, after that, what the size of
18  the checks were.  I mean, I just remember the conversation
19  in its general form.
20                    Q.    Who was the office manager at Northgate
21  during your tenure?
22                    A.    We had a couple of them.  We had Tina
23  Hite.  Actually, we had three.  We had Tina Hite, and then
24  Tina left.  I don't have the dates, but others here could
25  supply you with those.  But she left and then one of her
```

```
00063
    1  office people was named interim office manager.  It was
    2  Sherry Kennedy.  And she wasn't in the capacity for long,
    3  maybe three, four, five months, I don't recall.  But she, in
    4  my opinion, wasn't qualified to do the job.  And then we
    5  hired, Gary Mullins hired, I think Pat Edelstein was her
    6  name, and she actually had worked for Dixon Dealer Group, I
    7  think.
    8             Q.    When you refer in Paragraph 9 of your
    9  affidavit to "the office manager," are you referring to all
   10  three of these individuals or one in specifically?
   11             A.    At least a couple of them.  Sherry would
   12  be one, and Pat Edelstein would be the other one.  I'm
   13  trying to recall if Tina would come to me.  You know, I
   14  would try to refer them to the general manager that, hey,
   15  you know, where should these funds go?  Under the
   16  accounting, you know, we would get monies specific to
   17  certain cars, and we would base our advertising and pricing
   18  of cars based on the amount of monies that we were
   19  receiving.  So we would, for instance, if we were given a
   20  sales quota of 50 cars, for instance, and we were on what
   21  would call stair-step program, once we had achieved the 50
   22  car mark, then the monies payable to the dealer group, or at
   23  least to our store, retroactive back, was fully accounted
   24  for.  In other words, when I would make a sale, when we
   25  would make a sale, we would accrue monies that were yet
```

00064
1  unearned.  We would make an accounting entry, a receivable
2  from Lincoln Mercury of X number of dollars on a specific
3  car, as unearned income.  In other words, we would accrue it
4  as income, and if we didn't hit the buggy, there was a
5  charge to be taken at the end of the month.
6           Q.   Is that what you're referring to in
7  Paragraph 9, the allocation of the receipt of the cash on
8  these accrued charges?
9           A.   Some of that, yes, some of that.  And
10 then there may be other checks that would come in.  I mean,
11 they would only come to me to ask about a check that they
12 didn't know what they were supposed to do with it, you know,
13 what's this $500 for, what's this $1,000 for.  So I would go
14 to the back and think for a minute, well, what was it for.
15 Oh, put it toward this particular account, the Town Car cost
16 of sales account, or put it toward this specific car.  So
17 they would come to me with monies and I tried to refer them
18 to the GM and say, hey, find it out from him.  And then he
19 would just send them right back, so then I've got to handle
20 to.  So I would say, okay, let's put it to this specific
21 car, this amount of money goes to this specific car, these
22 monies that you're asking about goes to the Town Car line in
23 the aggregate.
24           So there's many, many checks that came
25 through the organization, some of which were routine, and

00065

1  some of which were, in my estimation, obviously available to
2  every other dealer on the planet earth that sold Lincoln
3  Mercuries, and some of which were, you know, to us,
4  specifically, to move these extra cars.  That's my
5  recollection.
6           Q.    Do you have any specific recollection of
7  a payment that you know was unique to Northgate Lincoln
8  Mercury that neither the amount nor the type of payment were
9  paid too any other dealership?
10          A.    Don't ask specific dates, but my
11  recollection is that we had monies available to us on
12  Mountaineer and on Town Car that was intimated to me, as I
13  stated before, that were unique to our dealer group.
14          Q.    Who intimated that to you?
15          A.    Mr. Patrick Letart.
16          Q.    With respect to the Mountaineers, do you
17  have any time frame that you recollect that you were
18  receiving at Northgate Lincoln Mercury these intimated
19  unique payments?
20          A.    That's going to be difficult, once
21  again, to address that without reference to data that would
22  be better gotten from other people in the room here,
23  Mr. Reichert or, you know, Lincoln Mercury.  In other words,
24  what I'm saying is, if I could go back and compare, at least
25  what spreadsheets I have, the amount of sales -- excuse me,

00066
1    the amount of sales that we did compared to what the
2    allocation of the flow of inventory was from the district to
3    the group, I could maybe identify a better time frame.  But
4    to go off a general recollection, you know, some of those
5    statements I made obviously are in general.  All of them, I
6    feel, I know to be 100 percent accurate.  But, you know, if
7    you're looking for specific dates, it's going to be
8    difficult for me to give you very, very specific dates,
9    other than during my tenure at this company.
10                    Q.    The spreadsheets that you're referring
11   to, is that a record that you created personally and still
12   maintain?
13                    A.    I don't maintain it, I mean, it's --
14                    Q.    Do you still have it?
15                    A.    I have it on a floppy disc somewhere.
16   My hard drive is, you know, destroyed.  I had to reformat
17   it, so a lot of them were lost.  But I made a program just
18   to track, you know, to make my job easier.  I mean, I
19   actually hired somebody to build me a little spreadsheet to
20   make my job easier.  At the end of my month, I put in my
21   last deal and I'm done.  I could move on to the next month.
22   And I've shared that spreadsheet with a few other people in
23   the firm, so they could use the same thing.  So I had data
24   that was, you know, in Microsoft Excel format, that had
25   January through December sales, you know, of specific years,

00067
1  some of which was destroyed by my computer being reformatted
2  and some of which I have -- well, I've since bought another
3  computer, and I still have the old one that I had, so --
4            Q.   Who did you share your Microsoft Excel
5  program with at the firm?
6            A.   At that point in time, it was Ralph Ely,
7  which at that point in time was the sales manager for
8  Lincoln Mercury of Kings Auto Mall; and then there was Dave
9  Hyatt, which was, for a short time, sales manager at one of
10 the other stores, I think it was Saturn, maybe.  And any of
11 the people that had worked with me had seen the spreadsheets
12 that I would keep.  All it was was compilation of data that
13 was specific to us, you know, what we sold, what we grossed,
14 what they were paid in commissions.  And then from that I
15 generated an end-of-the-month report that I could give to my
16 superior, you know, on what we did, what we grossed, and so
17 forth.  So it wasn't a -- you know, I mean, it's a program
18 in generic form that other people could use and put in their
19 own numbers.
20            Q.   There's no comparison information on
21 there, comparing Northgate Lincoln Mercury with other
22 dealerships in the city or to other dealerships in the
23 Kenwood Dealer Group?
24            A.   No.
25            Q.   Okay.  Do you still maintain any written

00068
1  records of sales, sales programs, revenue or expenses from
2  your time at Northgate Lincoln Mercury?
3          A.    When I left the company, I packed up a
4  bunch of stuff that was, that I felt was what I needed for,
5  you know, not knowing what my position was going to be.  I
6  thought, well, since I'm experienced in Volkswagen and
7  Lincoln Mercury both, you know, I packed up all the, you
8  know, stuff that I had stored and filed myself.  This was
9  something that I could refer to for future use, not
10 specifically addressing this, but if I were to gain
11 employment at some other firm, then I could take the
12 procedures and programs and so forth with me, so I could
13 jump start or hit the ground running, if you will, to
14 another agency.
15         Q.    Can you provide me, a little more
16 specifically, what the stuff is, the titles, or are they
17 manuals and brochures and stuff?  Specifically, can you give
18 me any examples of that which you took with you?
19         A.    Well, just as I said, just maybe sales
20 training manuals, not specifically from our firm, but stuff
21 that I had acquired over a number of years, stuff that I had
22 filed away, maybe programs, you know, that I had.  We have a
23 file cabinet, as you do in your business, and we've got
24 stuff that we refer to, and it may be programs that were
25 from Volkswagen, from Lincoln Mercury.  "Programs" meaning,

00069
1  you know, anything.  It could be an APR program or whatever,
2  whatever.  So, you know, --
3          Q.   When you say "programs," are you
4  referring to computer programs or --
5          A.   Written documentation from the factories
6  about incentives to dealers; finance programs available, you
7  know, from the captive finances companies, Volkswagen
8  Credit, Ford Motor Credit, that I could take and use at -- I
9  mean, it's information that I could get, you know, from the
10  other dealer, but yet, if I were to -- after I'd left, if I
11  was going to go to work at another firm, I would take these
12  programs, we just referred to a factory program, a factory
13  outline of their factory-to-dealer incentives that were not
14  specific to us, but, you know, for general use of that about
15  the country.
16          Q.   Did you take with you in this bunch of
17  stuff anything that was specific to either the Kenwood
18  Dealer Group or Northside (sic)?
19          A.   Northgate?
20          Q.   Northgate, I'm sorry.
21          A.   No, not that I recall.
22          Q.   Did you have anything electronic, any
23  discs, floppy discs, CDs?
24          A.   I did have a CD ROM I burned that had
25  documents that I used to communicate either to the sales

00070
1   force or to customers or, you know, within the organization.
2   And I took it out and, you know, I just downloaded stuff
3   that I felt that I needed from stuff that I had originated
4   or it was sent to me.  Any documents from the company,
5   specifically, I didn't really have a whole lot of interest
6   in them.  So I took whatever was under Windows in "My
7   Documents."
8           Q.   Do you still have that CD?
9           A.   No, I don't have it any longer.  It
10  cracked.  It was a CD ROM and I put it in the bottom of just
11  a box of the awards that I got, you know, other stuff that
12  you acquire, a desk top, whatever, and just in transporting
13  it it got cracked.  It was no big deal.  I mean, I wanted
14  it, but it's gone.
15          Q.   How about e-mail addresses, web sites,
16  and company, by that I mean Ford or Lincoln Mercury,
17  electronic communication, addresses, did you download any of
18  that information and take it with you?
19          A.   It may have been in My Documents on that
20  particular CD ROM.
21          Q.   But before this CD was destroyed, did
22  you have an opportunity to load it in your computer at home
23  and read it?
24          A.   I just kept it on the CD.
25          Q.   Did you ever transfer any of the

```
00071
    1  electronic information to your home off of the CD?
    2                  A.   I may have, I don't really recall, but I
    3  may have.
    4                  Q.   Did you ever transfer, perhaps over the
    5  Internet or through electronic ways, rather than on a floppy
    6  or a disk, information from your computer at the dealership
    7  to your computer at home which would maintain e-mail
    8  addresses of either co-workers, manufacturers, things like
    9  that?
   10                  A.   In some of the papers that I referred to
   11  I had some e-mail addresses of some people who work for
   12  Lincoln Mercury.  Some of them you could -- some of them
   13  were, you know, unique to the people, and a lot of them you
   14  would memorize.
   15                  Q.   Going back to the bunch of stuff that
   16  you packed up, you told me about training manuals, financing
   17  information, some information that was downloaded onto the
   18  CD, perhaps some that was electronically transferred to your
   19  home, anything else?
   20                  A.   Did I take --
   21                  Q.   That you took with you upon your
       termination.
   22                  A.   Not anything that was, you know,
   23  meaningful to me.
   24                  Q.   Without being argumentative, it may be
   25  meaningful to me.  Can you think of anything else that you
```

00072
1   took with you?
2                    A.   No.
3                    MR. HENGEHOLD:  Let me take a short
4   break and talk to my clients, and then we can come back in.
5                    (THEREUPON, A SHORT RECESS WAS TAKEN).
6                    MR. HENGEHOLD:  Those are all the
7   questions I have at this time, thank you.
8                    C R O S S - E X A M I N A T I O N
9   BY MS. MCNELLIE:
10                   Q.   Mr. Mullins, my name is Beth McNellie
11  and I represent the Ford Motor Company and Jerry Carter and
12  Al Laub, who have all been sued in this litigation.
13                   When did you first find out about this
14  case?
15                   A.   This?  I don't know when the case was
16  first filed, I have no knowledge of that, but, you know, it
17  was my understanding that the case had been ongoing for a
18  couple of years, so --
19                   Q.   Who told you about that?
20                   A.   I don't recall, specifically, maybe Pat
21  Letart may have mentioned it.  I don't -- like I said, I
22  didn't really reflect on that, didn't think about it, but
23  now that I do, he may have indicated to me that there was
24  litigation, and I know that through my conversations with
25  some of the other members of his staff, as I alluded to

```
00073
 1  before, or referred directly to before, that they had
 2  mentioned litigation.  And also Larry Feldhaus, now that you
 3  ask, had mentioned to me that, you know, the company is
 4  involved in litigation with his company, so don't do this
 5  and don't do that.
 6              Q.   Did someone give you a copy of the
 7  complaint?
 8              A.   Of course not, no.
 9              Q.   You talked about, you said "his staff,"
10  you were referring to Mr. Woeste's staff?
11              A.   Mr. Woeste's staff, a couple of people
12  on the staff that I referred to earlier.
13              Q.   And you talked about Mr. Snider that had
14  worked with you previously.  Is there anyone else on
15  Mr. Woeste's staff that you're friends with?
16              A.   Well, I know Art Schultz, who has been a
17  long-time loyal employee of Mr. Woeste's.
18              Q.   What position does Mr. Schultz have?
19              A.   As far as I know, he's a salesperson.
20  He may have another capacity that I'm not familiar with.
21              Q.   Anyone else on Mr. Woeste's staff that
22  you're friends with?
23              A.   No, not that I can recall.  I mean, I
24  didn't know Mr. Woeste here (indicating).  I never met him
25  personally until, you know, I had called him, so --
```

```
00074
   1                    Q.    When is the last time that you spoke
   2  with Mr. Snider?
   3                    A.    The last communication I had with him, I
   4  left him an e-mail message, trying to recruit him, but he
   5  didn't respond to that.
   6                    Q.    Was that before you were terminated?
   7                    A.    No, that was after I was terminated.
   8                    Q.    You were trying to recruit him for what
   9  purpose?
  10                    A.    To work with me in the mortgage
  11  business.
  12                    Q.    Have you had a conversation with
  13  Mr. Snider about this case?
  14                    A.    No.
  15                    Q.    Has Mr. Snider tried to recruit you to
  16  go to work for Eastside?
  17                    A.    No.
  18                    Q.    When is the last time that you spoke to
  19  Pat Letart?
  20                    A.    On or about the month of my termination
  21  from the Kenwood Dealer Group.  I don't really recall the
  22  specific instance where I talked to him.  But, you know,
  23  that last month that I was there, I would have had obvious
  24  contact with him, just the general nature of the business.
  25                    Q.    Did you speak with Pat about the
```

00075
1  termination?
2                    A.   Let me reflect on that a minute.  Not
3  that I recall.  At this point, I don't recall.
4                    Q.   Were you social friends with Mr. Letart?
5                    A.   No, I had been to social events with him
6  that were, that were company produced.  That would be, you
7  know, for instance, we would have a boat ride in celebration
8  of our sales, and Mr. Letart and his wife were invited.  And
9  they were frequently invited to other company functions that
10 we would have, in which me and Jerry Mullins and him were
11 socially connected.  Me, specifically, you know, I dealt a
12 lot with Pat Letart, didn't have an enormous amount of
13 respect for him, but, you know, he would not be somebody
14 that I would call and ask out to dinner, if that's the
15 definition of social.
16                   Q.   Can you explain to me how the allocation
17 system works for Lincoln Mercury?
18                   A.   Well, my knowledge of it is that it
19 originates, obviously, from Ford headquarters somewhere.
20 They track a daily supply of inventory that, you know, a
21 specific dealer or all dealers have.  And my belief, my
22 understanding is, they take the compilation of data, compare
23 it to empirical data, which would be the vehicles past sales
24 in the year-over-year comparison or maybe the year and prior
25 year, two years prior, comparison, and then they would

00076
```
 1  allocate or distribute cars based on the production, the
 2  sales production of the particular selling season, for
 3  instance.  If we had available to us a large assortment of
 4  cars, then they would be, if the factory would bring us an
 5  offering, it was almost like a -- they would have specific
 6  units in specific vehicle lines made available to us.  We're
 7  going to offer you, for instance, this month, ten Town Cars,
 8  five Grand Marquis, whatever, whatever, depending on the
 9  production schedules, etcetera, with the company, and then
10  we were allocated cars based on that.
11                      Sometimes they would, the factory would
12  like to pressure you to take slow selling cars in order to
13  get this allocation or that allocation of maybe a hot
14  selling car, specifically Navigator.  You know, the
15  Navigator was allocated to our stores based on how much
16  garbage we took.  Garbage would mean, you know, some other
17  vehicle line, whether it be a, you know, some car where we
18  didn't have a big market presence, in the macro sense.  If
19  Lincoln Mercury didn't do well in Cougar, for instance, and
20  they had an abundance of them available, then we were
21  pressured by Mr. Letart and company to, if you want your
22  Navigators, you need to buy some of this crap.  So it was
23  politics in some sense, and it was based on empirical data
24  in others.
25                      And at that point in time, it was my
```

00077
```
 1  understanding and, I think, in the overall sense, the
 2  objective of the company was to, whether published or
 3  unpublished, was to consolidate dealerships in specific
 4  markets -- did you get that spelling right? -- to have them
 5  under one umbrella owner for expedient reasons.  So the
 6  factory could, you know, it was my belief that they could
 7  better control the distribution of cars and pricing,
 8  etcetera, and didn't want their particular vehicles debased
 9  by Mr. Woeste's advertising.
10              Q.    Did someone from Ford tell you that?
11              A.    I think it was obvious to anybody with
12  half a brain within the organization.  Ford's mission or
13  their goal, it seemed to me, was pretty much widely
14  published throughout the Automotive News, which is a, you
15  know, vertical market magazine that most of the dealers
16  subscribe to.
17              Q.    Do you know how far back you were
18  reading about that in the Automotive News?
19              A.    I know that after, you know, after their
20  dismissal of Jack Nassera, the plans were then changed.
21  But, you know, I really can't address that.  I mean, it goes
22  back a few years, maybe three or four years ago.
23              Q.    Did you ever read anything specific to
24  the Cincinnati market in the Automotive News?
25              A.    No, I read specifics in the Denver
```

```
00078
   1  market.  At that point in time, the Denver market, I think,
   2  was consolidated under Autoway or whatever.  And other
   3  markets where -- I don't know.  The Denver market is the
   4  only one I can specifically recall.
   5                    Q.   And those were Ford dealerships in
   6  Denver, not Lincoln Mercury dealerships; right?
   7                    A.   Yeah, the Elway stores, at the time,
   8  were four stores, and they may have had a Lincoln Mercury.
   9  You know, my view was that Ford and Lincoln Mercury are one
  10  in the same.
  11                    Q.   We were talking about allocation before,
  12  and you talked about the factory bringing an offering.  Is
  13  that sometimes referred to as a wholesale meeting?
  14                    A.   That's exactly what they refer to it as.
  15                    Q.   Did you attend wholesale meetings when
  16  you were at Northgate?
  17                    A.   Oh, absolutely.
  18                    Q.   How often did those happen?
  19                    A.   At least monthly, we would have
  20  wholesale meetings.  Did I attend every one of them?  No, I
  21  probably attended 75 percent of them.  I worked for what I
  22  would refer to as an absentee general manager that just,
  23  here comes Pat Letart, I don't have time for him, go do it,
  24  whatever, which I didn't mind doing it, you know.
  25                    Q.   So, the wholesale meetings, 75 percent
```

```
00079
  1  of the time, would just be you and Mr. Letart?
  2                A.   I was involved -- it's probably better
  3  said that I was involved with the wholesale meetings
  4  75 percent of the time in the aggregate.  In that
  5  75 percent, it may have been cohabited by Jerry Mullins,
  6  which is our general manager.  So when he felt it necessary
  7  to get involved in it, he would, for whatever reason.
  8                Q.   Was Jerry Mullins there more than half
  9  of the time for those wholesale meetings?
 10                A.   He didn't punch a time clock.  He was on
 11  salary and he was free to come and go whenever he wanted.
 12  Was he there more than half of the time in general, or for
 13  particular meetings?
 14                Q.   No, no, for the wholesale meetings.
 15                A.   No, I would say less than half the time.
 16  It would be more like 25 percent of the time.
 17                Q.   Have you ever heard of the allocation
 18  system referred to as "turn and earn."
 19                A.   Yeah, by someone from -- be more
 20  specific, someone from --
 21                Q.   Just in general.
 22                A.   In general?  Sure, of course.
 23                Q.   And the number crunching that you
 24  described earlier that you thought was done at Ford
 25  headquarters, that reflects the turn and earn part of the
```

```
00080
    1   allocation; right?
    2               A.   Repeat that again.
    3               Q.   You talked, you testified earlier that
    4   you believed that somewhere at Ford headquarters there was
    5   an analysis done of the day supply compared against past
    6   sales of a particular product line, and that's how the
    7   allocation was determined, based on what was produced by the
    8   factory.
    9               A.   Right.
   10               Q.   Is that the part that's called "turn and
   11   earn?"
   12               A.   That part is referred to as "turn and
   13   earn," yes.
   14               Q.   And when the wholesale meeting occurred,
   15   Pat Letart would come out and tell you what you had turned
   16   and earned for that three-month period that was coming up?
   17               A.   When he would come out, he would offer
   18   his numbers to us, based somewhat, I can't weight it
   19   specifically, but based somewhat on turn and earn.  Also
   20   part of the process was his idea of what we could do, based
   21   on, you know, if we had this many cars or that many cars.
   22   So his offering was not strictly on turn and earn, that was
   23   a part of the formula, if you will.
   24               Q.   Was there a sheet he would bring to you,
   25   to the wholesale meeting, that would have your allocated
```

00081
1  numbers on it?
2              A.   Yes.  It would have -- he would compile
3  a little spreadsheet on most of those.  It wasn't
4  electronic, but it was printed.  And for instance, I refer
5  to a specific time frame that I like to refer to as like a
6  summer selling season, and he would say, well, like, you
7  know, in July of last year, you sold this many of that and
8  that many of this and this many of that.  This market today,
9  in the aggregate, is a little more, so we think you could do
10  this many, that many or this many.  So he would come to us
11  with his offerings, and then it was our prerogative to
12  either take those cars or to pass on the allotment of cars
13  or to change it, and then thus the bartering would begin,
14  here's what we can do.  We already had our numbers that we
15  had forecast, and we would put our numbers up and compare
16  them to his, and then we would just beat each other back and
17  forth up.  He had some cars that he needed to pedal that
18  were, you know, aged inventory, maybe inventory of other
19  agents, you know.
20              Q.   Is that extra stuff that he had to sell
21  the 30 or 40 cars that you referred to earlier when you were
22  talking to Mr. Hengehold?
23              A.   He had -- let me make sure your question
24  is clear.
25              Q.   You testified previously that you got 30

```
00082
   1  or 40 Town Cars and Grand Marquis, I believe it was.
   2               A.    Right.
   3               Q.    My question to you is:  Did those 30 or
   4  40 cars come from that aged inventory or places where
   5  dealerships had rejected parts of their allocation?
   6               A.    Maybe a few of them would have, could
   7  have.  Some of them, in my belief, was that they came from
   8  maybe a dealer that had closed a point, maybe a dealer that
   9  had rejected inventory because their inventory was swollen,
  10  maybe it was an overproduction of cars, maybe another market
  11  didn't meet their's.  So, I mean, I really can't answer
  12  where the cars came from.  It was my belief that they were
  13  in the pool of cars that needed to be dispersed,
  14  distributed, whatever you want to refer to them as, and we
  15  had our pick from.
  16               Q.    Did you ever have any reason to believe
  17  that those 30 to 40 extra cars that you got came from some
  18  other dealership's earned allocation?
  19               A.    Well, yes, I did.  I was -- you know, as
  20  I've said before, through conversations with Jerry Mullins
  21  and through Pat Letart, who was obviously careful not to say
  22  that this is Eastside's inventory or these other people's
  23  inventory in front of Jerry Mullins, and I don't know what
  24  conversation they had, but what he would tell me was that,
  25  hey, these are cars that are normally going to Eastside or
```

00083
```
 1  to, you know, maybe to Florence, which was a, you know,
 2  another dealer in our area.  So it was intimated as well as
 3  stated to me by Jerry Mullins that, hey, these are cars that
 4  these other guys aren't going to get, they're unique to us,
 5  you know, we've earned them, we're the kings of the world,
 6  so this is what we get.
 7             Q.   So did Jerry Mullins or anyone else tell
 8  you that those were cars that had been specifically
 9  allocated to Eastside or Florence that they weren't even
10  going to get offered?
11             A.   Jerry Mullins had indicated to me that
12  cars were taken from Eastside and some of the other ones
13  inventory and were given to us as their punishment, if you
14  will, for their whoring out of their advertising, as he was
15  quoted as saying.
16             Q.   Did anyone besides Jerry Mullins tell
17  you that?
18             A.   No.
19             Q.   Did Jerry Mullins tell you who he heard
20  that from?
21             A.   Well, he would, yeah, I mean, he would
22  say that, you know, if he would make a statement like that,
23  then he would qualify that it came from somebody at Lincoln
24  Mercury, whether it be, you know, can I point to Pat Letart
25  or to -- what's the gentleman's name? -- maybe the manager.
```

```
00084
 1   I'm sorry, his name just slipped my mind.
 2              Q.   You were never present for any of those
 3   conversations between Mr. Mullins and anyone from Lincoln
 4   Mercury where that statement was made?
 5              A.   Could you answer my question first, who
 6   the other guy was?
 7              Q.   I don't know which other guy you're
 8   referring to, Mr. Carter, Mr. Wilson --
 9              A.   Jerry Carter, thank you.
10              So I couldn't point to those particular
11   people and say he got them from them or I got it from them.
12   I just don't, you know, --
13              Q.   So you weren't present for any
14   conversation between Mr. Jerry Mullins and anyone from
15   Lincoln Mercury saying that cars had been taken from
16   Eastside or Florence and given to your dealership?
17              A.   I may have been, but not that I can
18   recall specifically.  It wasn't an eventful part of my life,
19   as can be understood.  I mean, it wasn't like it was a
20   milestone, so it's not anything that I can recall.
21              Q.   So, sitting here today, you don't know
22   where those 30 or 40 extra cars that you perceived that the
23   Kenwood Dealer Group got came from?
24              A.   I think I know where they came from.  Is
25   it provable?  That's up to you guys.  I know where they came
```

```
00085
    1   from.  They came from his inventory (indicating) and they
    2   came from other dealer's inventory.  That's what was told to
    3   me.
    4              Q.   And other than your conversation with
    5   Mr. Mullins where he said that's where they came from, you
    6   have no other basis to believe that?
    7              A.   No, what I base my data on is statements
    8   that I take data in and process it and then form a belief,
    9   like everybody else does.  So, my belief is that's where the
   10   cars came from, that was what was intimated or told to me
   11   directly by various sources, and that's what I stand on.
   12              Q.   I'm just trying to find out what your
   13   various sources of data are.  Other than your conversations
   14   with Mr. Mullins, are there any other sources of data you
   15   had to believe that those cars came from Eastside's
   16   inventory?
   17              A.   I don't have anything that I can give
   18   you concrete and say here it is written in writing, of
   19   course not.  You know it and I know that, so let's move on.
   20              MR. FLEMER:  Can I clarify for the
   21   record that as you answered her earlier question, when you
   22   pointed to the end of the table and said "his inventory,"
   23   were you referring to Mr. Woeste?
   24              THE WITNESS:  Yes.
   25              MS. MCNELLIE:  Thank you.
```

```
00086
 1                    Q.    Earlier, you testified about the contest
 2      that allowed you to go to the Gentry Shop and get some
 3      suits?
 4                    A.    Yes.
 5                    Q.    In regard to that contest, did any money
 6      go directly to the Northgate dealership or to Mr. Reichert
 7      or to the Kenwood Dealer Group, to your knowledge, or was it
 8      just suits to the sales staff?
 9                    A.    Each, you know, I really don't -- I
10      can't answer to the fact that did we have a line of credit
11      set up, you know, with this organization (indicating), the
12      Gentry Shops, or where we presented a bill and that was
13      taken care by someone.  I can't really address that.  All I
14      know is I was given an amount that I had to spend.  Was it
15      in writing, no, you know, and was there any checks issued,
16      no.  I didn't see any if there were, and I think that's
17      your --
18                    Q.    Well, actually, it's a little different
19      question.  I understand that you got suits and either Ford
20      paid Gentry or however that worked.
21                    A.    Right.
22                    Q.    But aside from the suit issue, was there
23      any money that was paid to the dealership, as opposed to the
24      suits going to the salespeople, with regard to that contest?
25                    A.    There could have been and I may not be
```

```
00087
  1  privy to it.  I can't recall.
  2                 Q.    You have no knowledge of that?
  3                 A.    I can't recall it.
  4                 Q.    Paragraph 7 of your affidavit, --
  5                 A.    Uh-huh.
  6                 Q.    -- the first full sentence on Page 3, it
  7  states, "it was also the goal of Ford and Mr. Reichert to
  8  put Eastside Lincoln Mercury out of business so that it
  9  could also be sold to Mr. Reichert."  Did someone tell you
 10  that?
 11                 A.    Did who tell me that?
 12                 Q.    Did someone tell you that, anyone tell
 13  you that?
 14                 A.    Just my immediate superior, that was a
 15  conversation that we had, which was that given the
 16  consolidation within the industry at that point in time,
 17  that was pretty much well documented through the media, that
 18  in the Cincinnati market, you know, the dealer of choice was
 19  Bob Reichert, based on sales volume, based on customer
 20  satisfaction.  Whatever data that goes into that decision, I
 21  don't really have knowledge of.  But it was told to me that,
 22  you know, we will be the dominant force.  We already are and
 23  we will continue to be the dominant force in our market, and
 24  the dealerships will be consolidated under one, you know,
 25  under one ownership.  I think that was the goal.
```

```
00088
 1                    Q.    And you were told that by Mr. Jerry
 2 Mullins?
 3                    A.    Absolutely.
 4                    Q.    Anyone from Ford ever tell you that?
 5                    A.    I don't recall.  They could have, but I
 6 don't recall.
 7                    Q.    In Paragraph 11 of your affidavit, you
 8 talk about money that was made available as year-end
 9 incentives.
10                    A.    I'm sorry, what was the --
11                    Q.    Paragraph 11.
12                    A.    What was the question?
13                    Q.    Right now, I'm just trying to focus you
14 on Paragraph 11.
15                    A.    Okay.
16                    Q.    Does that refer to the time frame as
17 when the additional allocation was made available, are we
18 still talking about that same sell-down period in 2000?
19                    A.    In the first part of the sentence, I'm
20 referring to Ford's practice, Lincoln Mercury's practice of
21 supporting the dealers in liquidation of the product at
22 year's end.  The close-out allowances refers to a number of
23 things, which could be support in dollars, financing
24 programs, in addition to what is available on specific car
25 lines, just to help liquidate the owner.  I go on to say
```

00089

```
 1  that, outside of those programs, I was told by our general
 2  manager and others that we had some special programs that
 3  were exclusive to us, monies on specific cars or product
 4  lines to move them out.
 5              Q.   So it was Mr. Mullins who told you that
 6  these programs were specific to Northgate or to the Kenwood
 7  Dealer Group?
 8              A.   Yeah.  Most of the stuff, the
 9  information that I'd get, was, a lot of it was from
10  Mr. Mullins, and some of it may have been from Pat Letart,
11  some of it may have been in the meetings that we've had,
12  cooperative meetings with all parties.
13              Q.   Can you tell me any specific comment
14  that Mr. Letart made to you that indicated that there was a
15  special program that was not available to other dealers for
16  close-out purposes?
17              A.   Can I address a specific program --
18              Q.   Yes.
19              A.   -- that was available to us that wasn't
20  available to other dealers, is that your question?
21              Q.   Yes.
22              A.   Okay.  In this environment, I can't.  If
23  I had access to program data that was in force during the
24  time frame, I could probably identify it.  I mean, there
25  were programs that were available to us as well as every
```

```
00090
    1  other dealer on the planet, and then we had additional
    2  programs that were made available to us by the fact that we
    3  could liquidate our position in those cars, as I stated
    4  before.  Was it told to me directly by Pat Letart?  Directly
    5  and indirectly, he alluded to specific monies that we had
    6  available to us, and Jerry Mullins, in the same meetings,
    7  would say, you know, this was in our 25 percent meetings
    8  that I referred to before.  The only time he would get
    9  involved in it would be in situations where we had extra
   10  cars available to us, you know.  What he wanted, my superior
   11  wanted, to do was to protect the dealer group from becoming
   12  overburdened with inventory.
   13                   In other words, my view, as a
   14  professional, was going to be that I'll take all I can get.
   15  You know, if I've got room for them, and we were running out
   16  of room, I'd still take the cars.  The theory in the
   17  automobile business that volume, or excuse me, inventory
   18  creates selling pressure.  I think that is to say that the
   19  more inventory you have, the more likely you are to take a
   20  cheaper deal or to take a less profitable deal.
   21                   So I hope I've answered your question.
   22          Q.   Can you tell me of any specific
   23  conversation where Pat Letart said to you we're giving you
   24  money that's not available to other dealers to help you sell
   25  excess inventory?
```

00091
```
 1                    A.   I can refer to it that that was a
 2  conversation that we had.  Can I give you a specific time,
 3  date, time line, and a verbatim conversation, no.  But I
 4  know that we had that conversation and that these monies
 5  were available.  But can I give you a specific time, no,
 6  because it was not impactful to my life.  It was not a
 7  milestone that I can recall.
 8                    Q.   Can you give me a year in which that
 9  occurred?
10                    A.   I can, outside of this.  You know, I can
11  go back and reflect and maybe review my Excel spreadsheet or
12  something that I may have.  You know, I don't know what it
13  has.  It's not something that I look at.  It's not a -- but
14  I may be able to do that.  I cannot right now.
15                    Q.   So you can't tell me any of the words
16  that he used when he said that to you?
17                    A.   Can you remember what somebody said to
18  you two years ago, verbatim?  No, nobody can.  What I said
19  was, in general, what happened, you know, and what was said,
20  in general terms.  I can't -- can I speak to verbatim?  No,
21  no more than you could to what, you know, one of your
22  parents said to you five years ago.  You can't, you can't do
23  that.
24                    Q.   Can you tell me in regard to which
25  program that comment was made?
```

00092
```
 1                    A.    The comment was made about a program
 2  with Lincolns and Grand Marquis, specifically.  And as I
 3  referred to before, it could have been, I don't recall, but
 4  it could have been Mountaineers.
 5                    Q.    Do you know how much money was involved
 6  with it?
 7                    A.    With the Lincoln, I know it was another
 8  $1,000 per car.  That was the number that was bandied about
 9  and that was the number that we would get a check for.
10                    And how that check was distributed, how
11  it was funneled, how it was channeled down through the
12  organization, all I know is I would set up a receivable for
13  1,000 bucks from Ford Motor Company, which I couldn't claim
14  via the on-line, you know, program.  But when the office
15  manager would come to me, as I specifically said, and said,
16  "what do we do with these monies," she wouldn't do that
17  because -- or she would do it on that because she wouldn't
18  have a report in that specific dealer jacket about, you
19  know, where is this money coming from, you know.  And I
20  didn't make it up, it was a -- it's monies that were, that's
21  set up for us as a receivable, and how it's going to be
22  funneled and channeled through there, I have no idea.
23                    And she would come to me for the money
24  in my -- you know, and we would have a check for X number of
25  thousands of dollars, and, well, what do we do with it?
```

00093
```
 1  Well, the GM really didn't know, so he's left to me to, you
 2  know, put it here or put it there.  So I would set it up as
 3  a receivable, and then, hopefully, it got accounted for at
 4  month's end.
 5                  Q.    Whenever this thing happened with the
 6  Lincolns and the Grand Marquis, do you have any idea what
 7  Eastside's inventory was like at that time?
 8                  A.    I did, because -- did I have an actual
 9  number, no.  But here is what I did know:  I would call up
10  as a -- I want, as a professional manager, I want all the
11  information available to me, so that I can distribute the
12  information to the people that worked for me.  So, I,
13  personally, would call Eastside Lincoln Mercury and ask for
14  a salesperson, and if it was Dale Snider or the other guy,
15  I'd hang up.  So I would call up, acting like a customer,
16  and find out what inventory they have.  I would pretend as
17  if I was a customer and quiz them about the 10,000 off, what
18  is it off of.  Well, it's just on this car or it's on that
19  car.  So I'm going to take the data that I received from
20  them, and then I'm going to formulate a training session
21  based on the data that I'd got from that organization.  As I
22  said, if I call up and it's one of the guys that I know,
23  obviously I'm going to hang up.  They're going to recognize
24  my voice.  But an inexperienced salesperson, I can grill
25  them pretty good.  So I find out their inventory by calling
```

00094
 1  them.  I'm not going to get it from Lincoln Mercury.  I'm
 2  sure that's something they don't share.  I don't know, I
 3  don't think they do.  But it's easy to call up and find out
 4  what other dealers have in stock.
 5              Q.   So you would actually call Eastside
 6  Lincoln Mercury at the time that you were getting this
 7  special program, to find out how much they had at that time?
 8              A.   To find out what kind of inventory they
 9  had, yeah.  And then I would have a sales meeting and report
10  to my troops, as I call them.  I'd say, hey, you know, we've
11  70 Lincoln, 150 available to us throughout the organization,
12  and they have five or ten, or whatever the number is.  I'm
13  speculating.  They're advertising them for ten grand off,
14  but it's not ten grand off MSRP, it's ten grand off
15  inclusive of rebates, inclusive of additions they've made to
16  the car, you know, maybe they put a roof on for 1500 bucks,
17  you know, and maybe it cost them 500 to do it, whatever.
18              Q.   Do you recall how many Town Cars or
19  Grand Marquis Eastside had at the time that you got this
20  special program to sell down excess inventory?
21              A.   Relative to our inventory, I can speak
22  to that, would that do?
23              Q.   That will help me.
24              A.   Relative to our inventory, I would say
25  it would probably be 20 percent of our inventory.

```
00095
    1                    MS. MCNELLIE:  Give me a minute, I may
    2  be done.
    3                    (THEREUPON, A SHORT RECESS WAS TAKEN).
    4            Q.    Other than Pat Letart, is there anyone
    5  else from Ford or Lincoln Mercury that had anything else to
    6  do with your affidavit?
    7            A.    No.
    8                    MS. MCNELLIE:  That's all the questions
    9  I have, thank you.
   10                    THE WITNESS:  You're welcome.
   11            R E D I R E C T   E X A M I N A T I O N
   12  BY MR. FLEMER:
   13            Q.    Do you have a specific -- I'm going to
   14  follow-up on that last question and a couple of other items.
   15  But do you have a specific recollection of never talking to
   16  Matt Wilson about any of these?  Matt would have been the
   17  general zone manager and then Pat would have reported to
   18  him, during some segment of time.
   19            A.    I, when I saw that name, Matt Wilson, in
   20  this, I don't know who he is.  I've never had any contact
   21  with him.  I really didn't recognize the name.
   22            Q.    All right.
   23            A.    In fact, it may have been someone else.
   24  I don't know how he had been there, but I never had a lot of
   25  conversation with him.
```

```
00096
 1                  Q.   Okay.  And were there any of the Ford
 2  reps that would come to the dealership with Mr. Letart, do
 3  you remember?
 4                  A.   On occasion, they would have interns, I
 5  guess, maybe, but that was very rare.  Jerry Carter would be
 6  very rare.  You know, maybe, on occasion, a parts and
 7  service guy would accompany a sales guy.  You know, there
 8  again, that would be very infrequent.  So that's about
 9  the --
10                  Q.   Okay.  During your tenure with Northgate
11  Lincoln Mercury, was your store ever audited by Ford?
12                  A.   A warranty audit or financial audit
13  or --
14                  Q.   A warranty based audit.
15                  A.   You know, it seems that we were, but I
16  really can't recall.  I can't recall right now.  I mean, I
17  wasn't involved in it.  I was a general sales manager, which
18  is self-explanatory.  I was involved mainly in the sales,
19  general sales of the store, and not so much with the service
20  operation, so I couldn't address that.
21                  Q.   Okay.  You don't recall any specific
22  time frame when the store was in a state of upheaval because
23  there was a warranty audit being conducted; is that right?
24                  MS. MCNELLIE:  I'll object to the form.
25  I'm just making a record.
```

00097
```
 1                   A.   I can't object to any point in time that
 2    we were in a state of upheaval, it really wasn't.  You know,
 3    we pretty much controlled the environment.
 4                   Q.   So if there was an audit going on, it
 5    wouldn't have even been upsetting enough for you to hear
 6    about it; is that right?
 7                   A.   I may be -- you know, I would be made
 8    aware of it, but I don't really recall any specific time
 9    that I was impacted by a warranty audit.
10                   Q.   Okay.
11                   A.   And really, I don't know if it existed,
12    actually.  You know, I heard whisperings of a warranty
13    audit.  I don't know if they were threatened or they were
14    real or they were imagined or what.  I mean, you would hear
15    that phrase, you know, tossed about every now and then,
16    but --
17                   Q.   Okay.  You were testifying earlier about
18    strategies that you employed to help your salespeople deal
19    with issues surrounding Eastside Lincoln Mercury's pricing
20    structure.
21                   A.   Uh-huh.
22                   Q.   And I just wanted to get some
23    clarification on how these strategies came into existence.
24    Were they things that you would think to do in discussing
25    the situation with Jerry Mullins, would you work
```

00098
```
 1  collaboratively with him to come up with things to tell your
 2  salespeople, who could, in turn, respond to customer's
 3  queries about, well, they're selling a car for $5,000 off,
 4  what are you going to do for us?
 5                    A.    On occasion, we would work together to
 6  address, you know, other dealer's advertising.  And we
 7  addressed Eastside's advertising specifically.  And we had a
 8  meeting, although the focus of the meeting may not be, that
 9  might not have been on the top of the agenda, you know, but
10  obviously it came up during the meeting.  We would have a
11  meeting and we'd address sales issues, and, you know --
12                    Q.    When you say "we" --
13                    A.    We, Jerry Mullins and I.
14                    Q.    Jerry and you.  And anyone else?
15                    A.    Well, Randy Pelphery was a, you know, a
16  sales manager for me, a used car sales manager, and, you
17  know, we would formulate a strategy.  I mean, I obviously
18  would, being the experienced one of the bunch, would offer
19  my ideas of, hey, here's how we combat it, what do you
20  think, let's get some feedback, you know.  So I would offer
21  word tracts and so forth to combat the advertising.  And it
22  really wasn't, you know, it wasn't a really hard obstacle to
23  overcome.  You can advertise for, you know, we joked about
24  it, but let them go ahead and advertise ten grand off, you
25  know, I can overcome it in a heartbeat (snapping fingers).
```

```
00099
    1   It doesn't matter.  Will we lose a sale on it, yeah, we'll
    2   lose a couple, but we know we'll get most of them.
    3                 Q.    And was this process you've described
    4   about having these meetings with Jerry Mullins and the used
    5   car sales manager from time to time, is that kind of
    6   ongoing, or was there a period of time when it began and a
    7   period of time when that effort ended?
    8                 A.    We would have, you know, we would have
    9   impromptu meetings, just whenever time was available.  I
   10   would go in and we would have a little, just a conversation,
   11   not necessarily a meeting, but a conversation that I may
   12   even strike up, hey, here's what we're doing, you know, give
   13   me some input back, what do you think.  Yeah, that's a good
   14   idea, yeah, that's a bad idea.  I mean, we'd have a little
   15   brainstorming session.  So we would have impromptu meetings
   16   as well as just conversations about it, you know, how do we
   17   address it.  Not just that but also with our other
   18   franchises, you know, with Volkswagen or with -- you know,
   19   that was just one of the issues that we're addressing here.
   20   I mean, there was many times that we'd have conversations
   21   about how do we handle, you know, how do we address the
   22   trade-in issue, you know, how do we address that, what kind
   23   of word tract can we have to -- I'm not getting enough on my
   24   trade, how do you handle that, and I would offer -- and my
   25   job was to train and motivate the sales staff.  And on a
```

```
00100
    1  weekly basis, I would chair a meeting with, you know, eight,
    2  ten seasoned sales veterans and two or three managers, and
    3  tell them what our strategy was.
    4             Q.   Were there times when you took the
    5  strategy that you devised for your store at Northgate and
    6  shared it with Kings and shared it with Fairfield, those
    7  stores?
    8             A.   Even though we were under the same
    9  umbrella, there's an intense competition of jealousies,
   10  envies, whatever words you want to inject here, with respect
   11  to our performances.  The organizations would publish a
   12  ten-day sales report within the organization, listing the
   13  performances of each individual store, vis-a-vis the
   14  previous year's sales data.  So, when I had a meeting, if I
   15  had a ten-day report, I would demonstrate that to the others
   16  and say here's where we stand up in relation to our other
   17  stores.  So, you know, that was a frequent meeting that I
   18  had.  We were goal oriented, and our goal was to be the
   19  No. 1 Lincoln Mercury dealer in the city, regardless of our
   20  relationship with, you know, our umbrella stores.  Did I
   21  want to beat the other stores?  Damn right.  In fact, there
   22  were a lot of jealousies and a lot of animosity between that
   23  store and us because the general manager from the store that
   24  I ran was promoted to the mother ship, you know, and then I
   25  knew, and it was told to me, that I was stepping on toes
```

00101
```
 1   within the organization.  You know, you're doing this or
 2   you're doing that.  Hey, I'm just trying to be No. 1.  So if
 3   somebody gets offended, screw them.  I can't help that.  I'm
 4   not going to be a patsy to corporate politics.  No, not me,
 5   I'm not going to do that.
 6              Q.   When you were referring to the general
 7   manager being promoted to the mother ship, you're talking
 8   about Larry Feldhaus?
 9              A.   Larry Feldhaus was the previous general
10   manager and --
11              Q.   At Northgate?
12              A.   Yes.
13              -- and I had indirectly insulted him
14   within some meetings about their past performance.
15              Now, we're doing, when we took over the
16   store -- I don't say me, it wasn't just me, it was a team, a
17   collaborative effort from the team.  And what we did, we
18   went from 80 cars a month, which they were happy with, to
19   over 250 cars a month at our apex, new, used, Volkswagen,
20   Lincoln, Mercury and all.  And then we started outselling
21   the other store.  Now, all these little petty jealousies
22   started.  You know, they're not going to give you this car,
23   we're not going to trade with you here, and then he would
24   call up to speak with me about what seemingly was a dealer
25   trade, but he wanted to let me know, you know, in no
```

```
00102
    1   uncertain terms, that I'm a shareholder in this organization
    2   and you'll follow my line, boy.
    3                        In other correspondence that I've had
    4   with people in the organization, I refer to a lot of the
    5   issues that the company had out of anger, out of whatever,
    6   you know, that were other issues that the company had that,
    7   you know, when I talked about Mr. Reichert had threatened me
    8   verbally, it was more of a reference to the previous
    9   correspondence that he and I and others had had within the
   10   organization, not this issue here (indicating).
   11              Q.   Okay.  On the Gentry Shop sales contest,
   12   you've testified about it at some length, but did you know
   13   there was a sales contest whereby there was going to be an
   14   opportunity to go get clothes at Gentry before it happened,
   15   or were you informed after the fact that, hey, your store
   16   just won a contest among the three Kenwood Dealer Lincoln
   17   Mercury stores, and as a result, you get to go shop at
   18   Gentry, which way was it, if you remember?
   19              A.   Well, yeah, my recollection of it is
   20   this:  We were allocated a certain amount of funds.
   21              Q.   Okay.
   22              A.   Through Pat Letart and Jerry Mullins'
   23   meetings that they had, I can't, you know, speak to them
   24   specifically, but Jerry Mullins and, you know, Pat Letart
   25   had got together and devised this particular contest.  This
```

00103
```
 1   wasn't a contest that came about with Lincoln Mercury or
 2   from Mr. Reichert or anybody else.  This was a contest that
 3   these two had kind of gotten together, and my knowledge was
 4   that we had allocated a certain amount of funds to, you
 5   know, what do you want to do with the money?  Well, do we
 6   want to make it a trip to Cancun or do we want to do this?
 7   Well, this was the pick of my superior, to do it this way.
 8                Q.   Okay.  So someone advised Mr. Mullins,
 9   Jerry Mullins, that there was money to help your dealership
10   with, what should we do with it, and he and Pat, if I'm
11   understanding you correctly, --
12                A.   That's exactly what I'm saying.
13                Q.   -- he and Pat took the amount that there
14   was to work with and said, well, let's turn it into a sales
15   contest between our three dealerships?
16                A.   As far as I know, that's it.
17                Q.   And the payoff would be that the highest
18   producing salespeople will get to go, the company with the
19   highest producing salespeople gets to take their folks to
20   shop at Gentry on Ford's tab; is that accurate?
21                A.   That's accurate.  And I have no
22   knowledge of -- it was Pat Letart and Jerry.  And I know
23   this, that, you know, I could be given information by Jerry
24   Mullins that, I mean, it could have been all bullshit, but I
25   was -- it was told to me, exactly, that that's what
```

```
00104
    1  happened.  And can I prove that --
    2                   Q.   That's what Jerry told you?
    3                   A.   Can I prove it?  No.  There's no
    4  documentation of that but --
    5                   Q.   If he told you and you're testifying to
    6  it, then that's your proof.
    7                   A.   Yeah, that's the only thing I can do, is
    8  offer up what I believe is true.
    9                   Q.   Right.  And I think my other question in
   10  this regard was:  Did you know before the contest -- I mean,
   11  I assume the contest had a start date and a close date, some
   12  time frame within which to track sales; is that right?
   13                   A.   Right.
   14                   Q.   But did you know before the fact that
   15  the contest was going to run for a certain period of time,
   16  or was it not until after a period of time when somebody
   17  said, hey, by the way, your store won this contest?
   18                   A.   I think the contest was premeditated,
   19  you know, here's what we're going to do.  We've got funds
   20  and these two got together and devised a little program.  We
   21  had X amount of dollars and it's going to run from this
   22  point to that point.
   23                   Q.   Do you remember how long it ran, was it
   24  two weeks or --
   25                   A.   It seems to me like it was a month and a
```

```
00105
    1   half, maybe.
    2                   Q.   Okay.   Maybe six weeks?
    3                   A.   Yeah.   And some of the stuff, as it was
    4   referred to, that I took with me, that wasn't part of it.   I
    5   mean, that wasn't stuff that I would have any use for, you
    6   know.
    7                   Q.   So you don't have any records that would
    8   verify what the time frame was on this?
    9                   A.   No.
   10                   Q.   Okay.   Do you know how much money was
   11   put aside to be spent in this fashion, how much money Ford
   12   was making available to the Kenwood Dealer Group?
   13                   A.   I can only guesstimate, you know.   I
   14   don't really think that the general manager, as far as I
   15   knew, got any monies.   It was just for the sales staff.   I
   16   know I was allocated, like I could spend $500, I think, if I
   17   recall.   The whole deal was like, it was a good contest, we
   18   won, but it was a bit of a sour taste in our mouth because
   19   it was like, you know, you're going retail.   I mean, would I
   20   spend my $500 at a Gentry Shop at a retail level?   You know,
   21   did I get a 1099 for it?   If I did, I probably didn't report
   22   it.   I don't know that I did.   I don't recall getting a 1099
   23   from the factory about that, but he says --
   24                   Q.   What do you think the amount was, in the
   25   aggregate, that was put aside?
```

00106
1                    A.   Well, we had eight salespeople at 250 a
2   pop, thereabouts, and two managers at 500 and 300, for me
3   and the other guy, respectively.  And the other guy, I
4   think, was Randy Pelphery.  So whatever that totals to be.
5                    Q.   So you had 500 put aside for you and
6   Randy had 300?
7                    A.   I had a store credit for 500 and I think
8   Randy had one for 300, and I think the salespeople each the
9   had 250, and there was approximately eight.  So, you know,
10  it would be a couple thousand for the salespeople, so 2800
11  bucks I guess, I don't know, something like that.  Like I
12  said, I've never seen the bill.  We never got a bill, per
13  se.  We got a store credit.
14                   Q.   Were there any other contests similar to
15  this, where the genesis of it was that Ford had money that
16  they wanted to supply to the Kenwood Dealer Group, and then
17  figure out a way and make it happen?
18                   A.   You know, after doing this, and, you
19  know, trying to reflect a little bit and see if there was, I
20  really couldn't address a specific instance that we did.
21  You know, we would go out on the town, if you will, to
22  specific restaurants and have dinner.  Was that funded by
23  Lincoln Mercury or our dealership?  I don't really know.  So
24  the answer would be that I don't know.  I don't think so,
25  but I don't know.

00107
```
 1                      Q.   When you're describing these scenarios
 2 of going out on the town for a dinner, who would go, would
 3 it just be your sales department or would it be --
 4                      A.   The sales department, the general
 5 manager, Jerry Mullins, and the wives or fiances of a few.
 6 On a couple of occasions, the management team was taken out.
 7 And was that by Ford?  I don't really think so, but I don't
 8 know.
 9                      Q.   When the sales department and the
10 general manager and their spouses would go, would we be
11 talking about a group of 20 people?
12                      A.   Yeah.
13                      Q.   Roughly?
14                      A.   Yeah.
15                      One time we went to the LaNormandie
16 Club, and another time we went with the prior, we went to a
17 dinner with the prior factory rep.  His name was John Ogden,
18 I think.  He went out to Utah or somewhere.  And it was a
19 bit uncomfortable because he was the only one that was not
20 drinking, him and his wife, and everyone else had a casual
21 social drink, and you felt like you didn't want to drink in
22 front of this guy, out of respect to him.
23                      Q.   Were the dinners that you've described
24 here, Mr. Mullins, in conjunction with some type of sales
25 promotion or event?
```

```
00108
 1                    A.    I couldn't speak to that, really.  If I
 2  had to answer that point blank -- well, I really can't
 3  answer it.
 4                    Q.    Okay.
 5                    A.    It could have possibly been, but I don't
 6  know specifically.
 7                    Q.    Okay.
 8                    A.    We were -- you know, you get all sorts
 9  of little freebies here and there, but from the district.  I
10  know we would get -- I don't know whatever happened to them,
11  but I remember one specific instance that our general
12  manager was trying to extract, from the district office, two
13  or three golf school trips.  And what the origin of those
14  were, I don't know.  But I was interested in it, being an
15  avid golfer.  So I was prodding my GM to, if he has any way
16  of extracting those -- they were already bought and paid
17  for.  Where they went, I have no knowledge, I can't address.
18  But I was interested in getting them, for personal reasons.
19                    Q.    And did they happen?
20                    A.    I don't know.  I don't know.  I know
21  that they were -- I think --
22                    Q.    Jerry Mullins was trying to get that
23  worked out and you don't know if he ever did.
24                    A.    Well, I know that he and Pat Letart took
25  a trip to Florida that was, I don't know if it was business
```

```
00109
    1   or if it was pleasure, but I know that they used up one of
    2   those trips.  Jerry was -- he kind of bragged about it, you
    3   know, I got this, I got that.
    4               Q.   Was it for golf, is that what you're
    5   referring to, or just --
    6               A.   It was almost like a golf school.  And I
    7   don't really recall the name of it.  That's all I can
    8   address.  I didn't get it, you know, so --
    9               Q.   Do you remember when that was?
   10               A.   (Shaking head negatively).  You know, I
   11   can't remember.  I could probably investigate it and find
   12   out, but I don't really -- I don't know.  I know that it's
   13   in my last couple of years of employment there, the last
   14   year and a half of my employment.  That's about the best
   15   time frame I could give.
   16               Q.   I'm not a golfer.  How long would one of
   17   these golf school sessions go, was it about a week or is
   18   it --
   19               A.   Well, three to five days.  They have
   20   schools that are available that are referred to as commuter
   21   trips, where you stay somewhere and commute back and forth.
   22   They have a trip where you can stay on the grounds and go to
   23   their school or, you know, --
   24               Q.   And it was all expenses paid for Jerry?
   25               A.   As far as I know it was.  He kind of
```

```
00110
    1   bragged that it was this, that or the other.  I don't really
    2   know if -- Jerry was not a golfer, as such.  I mean, he had
    3   clubs and he had this and he had that.  He didn't have a
    4   game, I know that.  I think it was just more of a getaway
    5   type of thing.
    6              Q.   You also mentioned and were questioned
    7   to some extent about conversations where you were informed
    8   or learned that Ford's plan was to get Jim Dixon's store out
    9   of business, out of the way; is that right?
   10              MS. MCNELLIE:  I'm going to object to
   11   the form, but you can answer.
   12              A.   You need to restate it, if you would,
   13   please.
   14              Q.   Well, maybe I haven't stated it
   15   accurately, but I thought you testified earlier that there
   16   was a plan to help or to see that Jim Dixon's store got
   17   closed and then sold to Bob Reichert?
   18              A.   Yeah, I had addressed before that the
   19   goal of the consolidation of Lincoln Mercury stores was a
   20   goal published by the factory.  I mean, that, I think, is
   21   pretty much common knowledge, that that was their agenda,
   22   was to consolidate the stores, whether it be Ford or Lincoln
   23   Mercury.  And, you know, we were the chosen one, our dealer
   24   group.  And then, you know, we were going to try to acquire,
   25   if Jim Dixon was to sell, you know, we would probably get
```

```
00111
   1  that store.  And then if we could, you know, cause the same
   2  thing to happen with Eastside, then we could get that store.
   3                 And then it was intimated to me that,
   4  Gene, you're going to be, you know, you're doing a great
   5  job, you excelled in this area, so my general manager would
   6  intimate to me that I had the possibility of getting one of
   7  those stores.  You know, my goal, I let my goals within the
   8  organization be well known, that my goal was to be a general
   9  manager of one of the stores.  And my general manager knew
  10  it, you know.  I felt he was threatened by it, for whatever
  11  reason.  I felt that Larry Feldhaus was threatened by, you
  12  know, he's going to come over here and do this, and his crew
  13  is going to make us look bad again with Dixon.
  14                 And so, you know, after a couple of
  15  passings in advancement, you know, I made some statements
  16  within the organization about, you know, I just wanted it to
  17  be known, hey, will I have that position in the future with
  18  the firm or am I -- if I'm to be ostracized from this crowd,
  19  let me know.  I can live with it, but just let me know.  So,
  20  the goal was to, hey, you know you are an integral part of
  21  the organization.  If, in fact, we do consolidate, you know,
  22  if we do acquire these other stores, you'll be given a fair
  23  shot at the general managership, and based on your past
  24  performance and skills, etcetera, that you would be a fine
  25  candidate.  So --
```

00112
1                         Q.    I took a note that it was stated in
2     reference to Jim Dixon's store that Jerry Mullins had said
3     "let's put the SOBs out of business."
4                         A.    Right.
5                         Q.    You remember him saying that in
6     reference to Jim Dixon?
7                         A.    Yes, right.
8                         Q.    Was a comment ever made along those
9     lines about Eastside Lincoln Mercury?
10                        A.    I can't recall.  I recall that specific
11    comment.  But to say that the same was said in a similar
12    fashion about Eastside, I can't honestly say that that
13    happened, no.  It was intimated that if Eastside was like
14    the last remaining holdout, if you will, in the
15    consolidation process, it was our view.  And --
16                        Q.    The last non-KDG store standing, so to
17    speak?
18                        A.    Within the, you know, greater
19    Cincinnati -- well, within the 275 loop, if you will, not
20    including Florence Lincoln Mercury, which was a non-entity
21    as far as we were concerned.  It was a non-performing
22    agency.  It was a mausoleum.  They had many monikers
23    attached to that place because of its non-performance.  So
24    it really wasn't -- and who wanted it anyway.  They had a,
25    you know, a ten or 15 million dollar facility with a high

```
00113
   1   debt load and a sagging product line.
   2             Q.    I don't know if you completed your
   3   earlier thought about Eastside being the last store that was
   4   really in competition with you, and you differentiated how
   5   it was different than Florence.  Was there something else
   6   that you were going to --
   7             A.    No, other than the fact that, you know,
   8   once they acquired Dixon Lincoln Mercury.  And, you know, we
   9   get the sales reports supplied by the factory on the
  10   performances of the other stores, you know, compared to ours
  11   and our group, not our group specifically but the group of
  12   stores in the aggregate.  We would get a sales report on a
  13   monthly basis, or even a mid-monthly basis, as to the
  14   monthly performance and then annual performance of the
  15   stores.  And we could see the deterioration of sales in the,
  16   you know, in Eastside, mostly as a result of, you know, the
  17   dominance of Kenwood Dealer Group, one, and, you know, our
  18   ultimate goal, it seemed, whether it was real or stated, was
  19   to be the dominant, the lone, singular Lincoln Mercury store
  20   in the area.
  21             Q.    From your tenure there in your position,
  22   was it your belief that Ford was helping that process go
  23   forward?
  24             A.    That was my belief, that that was part
  25   of the process, given their attitude toward their
```

```
00114
   1   advertising.  It was my belief that that was the agenda, was
   2   to, you know, complete the consolidation of the stores.  And
   3   once you enjoy that consolidation of stores, then you
   4   control the market.  We controlled the market anyway, you
   5   know, but I guess they wanted to be Microsoftish, I guess, I
   6   don't know.
   7              Q.   Well, I guess there are other various
   8   levels of control, and if there's another dealership out
   9   there that you still have to compete with, then you don't
  10   have complete control; is that true?
  11              A.   In conversations with Mr. Feldhaus, that
  12   once we acquired this -- if we were to acquire, once we
  13   acquired, whatever -- this last point of Lincoln Mercury,
  14   then we could price fix, almost.
  15                   You know, I mean, I would be chastised
  16   from time to time about advertising, my advertising, and not
  17   so much by the factory but within our organization, that
  18   what are you doing pricing these cars like that, why are you
  19   advertising a lease car like that.  Well, hey, we're under
  20   the same umbrella, but I'm still in direct competition with
  21   them other stores, so that's why I'm advertising.  And then
  22   ultimately, I was told by members of the organization to
  23   quit advertising like a freaking renegade, you know, tow the
  24   line with respect to the company's advertising.  And it
  25   seemed to me that it was price fixing.  That's what it was.
```

00115
1  I mean, you can call it anything you want, but the net
2  result is, if three dealers in the area enjoy domination and
3  you have meetings to control the amount of gross profit per
4  sale, well, it's price fixing to me.  You know, I bitched
5  about it, but he's a renegade over there, I guess, I don't
6  know.
7              Q.    If I understand you, Mr. Mullins, you
8  were corrected or chastised for pricing your vehicles at an
9  amount or at amounts that were lower than what the other
10 Kenwood Dealer Group Lincoln Mercury stores were using --
11             A.    Right.
12             Q.    -- and they felt that that was
13 Mr. Feldhaus, I think it was, who you attributed this
14 comment to -- felt that that was undercutting the company's
15 profitability?
16             A.    Yes, and I would tell Mr. Jerry Mullins
17 that that was -- I would say, Jerry, that's just his weak
18 excuse for his lack of performance.  You know, what else is
19 he going to hang it on besides us?  Us being our store.  So
20 whatever he could do to undermine our success.  It seemed to
21 me, and it seemed to Jerry Mullins, through our
22 conversations, that Larry Feldhaus, a shareholder of the
23 organization, was trying to undercut our success.  We had
24 that conversation numerous, numerous times.  And that if I
25 persisted in my, I guess, style of management, then, you

```
00116
    1   know, if you're not a company man, then you're going to be
    2   outside the company, was the intimation, or the statement.
    3                    Q.    And when you expressed those thoughts,
    4   your viewpoint, to Mr. Mullins, what was his response?
    5                    A.    Well, it was just like, you know, if
    6   your goal is to be, you know, a general manager within this
    7   organization, you need to go along with the programs,
    8   whatever they are.
    9                    MR. FLEMER:  Let's take a break for a
   10   second.
   11                    (THEREUPON, A SHORT RECESS WAS TAKEN).
   12                    MR. FLEMER:  Mr. Mullins, I don't have
   13   any further questions.  Thank you.
   14                    MR. HENGEHOLD:  Nothing on my part.
   15                    MS. MCNELLIE:  Nothing for me either.
   16                    Mr. Mullins, when we're done here, we're
   17   going to probably ask this nice lady here to type up a copy
   18   of this transcript for us.
   19                    THE WITNESS:  Uh-huh.
   20                    MS. MCNELLIE:  You have an opportunity,
   21   as a witness, to be able to review it to make sure that she
   22   has taken down what you said accurately, to make sure that
   23   she hasn't gotten something you said that was wrong.  Do you
   24   want to exercise that right, or you can waive that right and
   25   she can just type it up and send it to us?
```

```
00117
 1                          THE WITNESS:  No, I think it would be
 2    prudent to look at it and make sure that the statements I
 3    said are not misstated or misquoted or whatever.
 4                          That would not be now, would it?
 5                          MR. FLEMER:  No, it will take her a
 6    little while to get it typed up.
 7                          Can we all just agree among ourselves
 8    that the court reporter can send the document directly to
 9    Mr. Mullins, with instructions for the --
10                          MS. MCNELLIE:  Object.  No, I don't want
11    her to send it directly.
12                          MR. HENGEHOLD:  Well, then it's up to
13    her whether or not she releases the transcript.
14                          MR. FLEMER:  Or have him come in.
15                          I think we've agreed that the court
16    reporter can send the original to Mr. Mullins for his review
17    and signature, unless you require him to come in to your
18    office.
19
20                          (MANUEL EUGENE MULLINS)
21                          (DEPOSITION CONCLUDED)
22                               - - -
23
24
25
```

```
00118
 1                    C E R T I F I C A T E
 2  STATE OF OHIO           )
                            )      SS
 3  COUNTY OF HAMILTON      )
 4       I, Jill M. Dragon Sandy, the undersigned, a duly
 5  qualified and commissioned notary public within and for the
 6  State of Ohio, do hereby certify that before the giving of
 7  his aforesaid deposition the said MANUEL EUGENE MULLINS, was
 8  by me first duly sworn to depose the truth, the whole truth,
 9  and nothing but the truth; that the foregoing is the
10  deposition given at said time and place by the said MANUEL
11  EUGENE MULLINS; that said deposition was taken in all
12  respects pursuant to agreement as to time and place, that
13  said deposition was taken by me in stenotypy and I am
14  neither a relative of, nor attorney for, any of the parties
15  to this cause, nor relative of nor employee of any of their
16  counsel, and have no interest whatever in the result of the
17  action.
18     IN WITNESS WHEREOF, I hereunto set my hand and official
19  seal of office, Cincinnati, Ohio this_____day
20  of_____, 2003.
21
22         _____
              Jill M. Dragon Sandy-Notary Public
23         My commission expires:  January 31, 2005.
24
25
```