1                    UNITED STATES DISTRICT COURT

2                      SOUTHERN DISTRICT OF OHIO

3                          WESTERN DIVISION

4

5

6   EASTSIDE LINCOLN MERCURY, INC., )
    et al.,                         )
7                      Plaintiffs,  )
                                    )
8       vs.                         )  Case No. C-1-01-567
                                    )
9   FORD MOTOR COMPANY, et al.,     )
                                    )
10                     Defendants.  )
    _____)
11

12

13              DEPOSITION OF JOHN E. CSERNOTTA

14

15              TAKEN AT:   90 Pacifica
                            Irvine, CA 92618
16
                DATE/TIME:  Monday, March 24, 2003
17                          10:39 a.m. - 4:29 p.m.

18              REPORTER:   Kimberly L. Bonnell
                            CSR No. 10668, RPR
19
                JOB NO.:    2030478
20

21

22

23

24

25

```
1

2    APPEARANCES:

3    FOR PLAINTIFFS:

4        STATMAN, HARRIS, SIEGEL & EYRICH
         BY:  GREGORY J. BERBERICH, ESQ.
5        2900 Chemed Center
         255 East Fifth Street
6        Cincinnati, Ohio 45202
         (513) 621-2666
7    -and-
         MYERS & FULLER
8        BY:  LOULA M. FULLER, ESQ.
         402 Office Plaza Drive
9        Tallahassee, Florida 32301
         (850) 878-6404
10

     FOR DEFENDANTS:
11
         BAKER & HOSTETLER
12       BY:  ELIZABETH A. MCNELLIE, ESQ.
         Capitol Square, Suite 2100
13       65 East State Street
         Columbus, Ohio 43215-4260
14       (614) 462-2651

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2    WITNESS                              EXAMINATION

 3    JOHN E. CSERNOTTA

 4                    By Mr. Berberich          4

 5

 6

 7

 8                    E X H I B I T S
      PLAINTIFFS'
 9    EXHIBIT NO.                           MARKED

10    20    Copy of set of 4 photos          177
            (Retained by counsel)
11

12

13

14              INFORMATION REQUESTED

15                    (None)

16

17      QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

18                    (None)

19

20

21

22

23

24

25
```

```
 1           Irvine, California; Monday, March 24, 2003;

 2                        10:39 a.m.

 3                          * * *

 4                   JOHN E. CSERNOTTA,

 5    having been first duly sworn, was deposed and testified

 6    as follows:

 7

 8                       EXAMINATION

 9    BY MR. BERBERICH:

10         Q.   Sir, could you please state your full name.

11         A.   Yes.  John E. Csernotta, C-s-e-r-n-o-t-t-a.

12         Q.   Mr. Csernotta, what is your age?

13         A.   Forty-three.

14         Q.   What is your present business address?

15         A.   One Premier Place, Irvine, California 92618.

16         Q.   And by whom are you employed?

17         A.   Ford Motor Company.

18         Q.   How long have you been employed by Ford?

19         A.   Eighteen years.

20         Q.   Are you planning on moving your business

21    location in the near future?

22         A.   Yes.

23         Q.   Where are you going to move to?

24         A.   Dearborn, Michigan.

25         Q.   Is Lincoln Mercury being relocated?
```

4

```
 1      A.   Yes.  The entire division is being relocated.

 2      Q.   Have you ever had your deposition taken

 3 before?

 4      A.   Yes, I have.

 5      Q.   How many times?

 6      A.   Twice.

 7      Q.   How long ago?

 8      A.   1995, if I'm not mistaken.

 9      Q.   Were both of the depositions taken in the same

10 year?

11      A.   Yes.

12      Q.   Did they relate to your work with Ford?

13      A.   Yes.

14      Q.   What kind of cases were they?

15      A.   Franchising.

16      Q.   Was there any particular element of

17 franchising that they related to?

18      A.   Relocation.

19      Q.   Did you have your deposition taken in relation

20 to two cases or --

21      A.   One.

22      Q.   Two times in one case?

23      A.   Two times, yes.

24      Q.   Wow.

25      A.   Different issues, two times.
```

1    MS. MCNELLIE:  Lucky you.

2    MR. BERBERICH:  That's like pulling -- having your

3  teeth pulled.

4  BY MR. BERBERICH:

5    Q.   I'm going to be asking you a series of

6  questions today.  If you don't understand my questions,

7  just go ahead and let me know and I'll rephrase or

8  explain them.

9         Is that agreed?

10    A.   That's agreed.

11    Q.   If you answer, I will -- if you answer my

12  question, I will assume that you understood it.

13         Is that also agreed?

14    A.   That's agreed.

15    Q.   If you need to take a break at any time or for

16  any reason, then let me know and we'll go ahead and

17  take a break.

18         Is that also agreed?

19    A.   That's agreed.

20    Q.   A very important rule is that you answer with

21  words so the court reporter can type it down.

22         Is that also understood?

23    A.   That's understood.

24    Q.   What is your highest completed degree of

25  education?

1    A.    Master's degree, business.

2    Q.    Where did you get your M.B.A.?

3    A.    Baldwin Wallace College; Berea, Ohio.

4    MS. MCNELLIE:  Excellent institution, I might add.

5    Three of my family members are graduates of that

6    institution.

7    BY MR. BERBERICH:

8    Q.    When did you get your M.B.A.?

9    A.    Now you're testing my memory.  '86.

10    Q.    At the time you received your M.B.A., you were

11    already employed by Ford?

12    A.    Yes.

13    Q.    Did you have any particular concentration in

14    your M.B.A.?

15    A.    No.  Marketing.

16    Q.    Do you have any other training or education

17    after college?

18    A.    Private pilot.

19    Q.    How long have you been a private pilot?

20    A.    About two years.

21    Q.    What is your undergraduate degree in?

22    A.    Business.

23    Q.    Where did you get that degree?

24    A.    Same school.

25    Q.    Are you an Ohio native?

1     A.   Yes.

2     Q.   Do you have any connection to the Cincinnati,

3  Ohio area?

4     A.   None.

5     Q.   Do you have any Ford in-house or technical

6  training?

7     A.   Other than zone manager training, kind of

8  Zone Manager 101 back when I first started, but no

9  other formal training courses.

10     Q.   Do you have any expertise as a mechanic --

11     A.   No.

12     Q.   -- automobile mechanic?

13     A.   No.  You wouldn't want me working on your car.

14     Q.   Have you ever worked for an automobile

15  dealership?

16     A.   No, I have not.

17     Q.   Are you presently employed by a particular

18  Ford division?

19     A.   Lincoln Mercury division.

20     Q.   Why don't you give me a reverse chronological

21  history of your positions with Ford Motor Company.

22     A.   Started as a zone manager, Cleveland district

23  office, calling on a variety of dealers in Ohio;

24  southernmost portion was Columbus.  Typical

25  responsibilities:  Marketing sales career path of

1    inventory levels, advertising, dealers business

2    management, things of that nature.

3            Moved on to Chicago as what we classify

4    department manager.  Held four key responsibilities

5    there:  Distribution, merchandising, franchising and

6    customer satisfaction departments.

7            Detroit, moved to national training

8    coordinator for Ford and Lincoln Mercury divisions in

9    charge of doing training for entry level zone manager.

10   Then moved on to Lincoln Mercury communications manager

11   for Lincoln Navigator and Lincoln Town Car.

12           Marketing communications -- excuse me.

13   Central marketing communications manager was the next

14   position.  Responsible for auto shows, advertising,

15   event marketing, training, all in the communications

16   area for Lincoln and Mercury.

17           And then my current position is manager of the

18   Lincoln Premier Experience and Mercury Advantage

19   programs.

20       Q.   How long have you been in your present

21   position as manager of LPE and Mercury Advantage?

22       A.   Three years.

23       Q.   Were you the first and only holder of that

24   position?

25       A.   Yes.

1      Q.    How long were you central marketing

2   communication manager?

3      A.    Probably about two and a half years.

4      Q.    In that position, did you control any budget,

5   or did you simply roll out the program for the --

6      A.    Central marketing -- yes, I was in control of

7   the fixed marketing budget.

8      Q.    What is a fixed marketing budget?

9      A.    That's the budget that funds all the

10  advertising promotions and things that I mentioned as

11  my job responsibility.

12     Q.    Did you distribute those funds to the various

13  regional managers?

14     A.    No, I did not.

15     Q.    Did anyone that was under your supervision

16  distribute those funds?

17     A.    No.

18     Q.    How are funds distributed from Lincoln Mercury

19  at the national level to the regions in terms of

20  marketing assistance or auto show money, event-type

21  money?

22     A.    Well, all of the auto show and event-type

23  monies are all controlled centrally on a national

24  basis.

25     Q.    Who controls those budgets?

1      A.    That would be the central marketing

2   communications manager.

3      Q.    And who was that during your tenure as --

4   oh --

5      A.    That was me.

6      Q.    Oh, that was you?

7      A.    Yes.

8      Q.    Okay.  How was that money distributed from the

9   central operation to the regions?

10     A     Through our field operations activity.

11     Q.    Can you describe for me how you took your

12   budget from an abstract number at the beginning of the

13   year to actually distributing that money to the

14   dealerships?

15     A.    Well, I need to correct you.  It was never

16   distributed to a dealership or any dealership.

17     Q.    Okay.

18     A.    It was moved over to our field operations

19   activity, who, in turn, distributed to the regions.

20     Q.    What happened to the money when it was

21   distributed to the regions?

22     A.    I can't answer that.

23     Q.    Okay.  So you would take your budget and you

24   would turn that budget over to field operations; is

25   that correct?

1      A.   A portion of it, yes.

2      Q.   And then field operations would divvy that

3   money up to each region, correct?

4      A.   That's correct.

5      Q.   And then at that point, you had no idea how

6   the money was subdivided in the region; is that

7   correct?

8      A.   That's correct.

9      Q.   When you did distribute money to field ops to

10  be communicated to the regions, did you ever have

11  program rules in terms of how that money was to be

12  distributed?

13     A.   Well, that money was set mainly for

14  advertising, so it was up to the regions to determine

15  how they wanted to go and market within their own

16  region.  It wasn't set aside specifically for any

17  dealer.

18     Q.   Did the money that you provided as central

19  marketing communications manager turn into co-op money?

20     A.   I can't answer that.

21     Q.   Okay.  So literally once you turned the money

22  over to field ops, it was out of your hands?

23     A.   That's correct.

24     Q.   I guess my question, though, is did you ever

25  give rules or guidelines to field ops as to how that

1    money was to be distributed?

2        A.    No, I did not.

3        Q.    Who set your budget for how much money you

4    would have to distribute to field ops?

5        A.    Our corporate controllers office.

6        Q.    Who would that have been?

7        A.    I can't answer that.  I don't know.

8        Q.    Did you ever requisition money before a

9    program was introduced?

10       A.    Could you explain or rephrase that.

11       Q.    Did you ever put any budget requests for a

12   particular program or a particular vehicle line?

13       A.    I'm not sure I understand your question.

14       Q.    Okay.  Well, let's say with the launch of a

15   car like the Navigator or the Town Car, or a refresh on

16   one of those cars, as central marketing communications

17   manager, did you develop a budget of how much money you

18   thought you needed to advertise that vehicle

19   effectively?

20       A.    Yes.

21       Q.    How did you put that budget together?

22       A.    Mainly with the assistance of our advertising

23   agents.

24       Q.    Okay.  Was it anticipated by you as the

25   central marketing communications manager that the money

1    that you would turn over to field operations would be

2    distributed in a fair or equitable manner to the dealer

3    body?

4        A.   Could you repeat the question.

5        MR. BERBERICH:  Why don't you go ahead and read

6    that one back.

7                (The record was read by the reporter

8        as follows:

9                "Q.  Was it anticipated by you

10               as the central marketing communications

11               manager that the money that you would

12               turn over to field operations would be

13               distributed in a fair or equitable

14               manner to the dealer body?")

15       THE WITNESS:  Yes.  However, it was not my

16    responsibility to make the allocations to the regions.

17    BY MR. BERBERICH:

18       Q.   Right.

19       A.   Again, it was just a lump sum, but I would

20    have to assume that field operations did some type of

21    calculation to divide the monies.

22       Q.   But it was your hope that the money would be

23    distributed fairly to the dealers, correct?

24       A.   Well, I don't hope for anything.  Once I turn

25    over the lump sum, it is out of my control in this

1    position.

2        Q.   Okay.  But just as an overall manager or

3    supervisor of a program or a rollout, would you

4    anticipate that the money that you distribute to field

5    ops would, in turn, be fairly and equitably distributed

6    to the dealers?

7        A.   I would anticipate that, yes.

8        Q.   Your job as marketing person is to sell as

9    many vehicles as possible, correct?

10       A.   Correct.

11       Q.   I mean, just from an overall standpoint,

12   correct?

13       A.   Yes, correct.

14       Q.   And from your viewpoint, I'll just say as

15   central marketing communications manager, did you feel

16   that you were assisting or servicing the dealer body in

17   helping achieve that objective?

18       A.   Well, in this position, it's mainly -- this

19   whole position in a fixed marketing budget that we're

20   speaking to is all around developing a national

21   campaign, whether it be advertising or promotions or

22   merchandising activities.  And they are designed -- the

23   strategy is designed to sell as many cars as possible,

24   but it doesn't go down to the dealer level.  It's

25   strictly national advertising.

1    Q.    But from a global standpoint, did you, as

2    central marketing manager, understand that the

3    franchisees were the ones that built the

4    Lincoln Mercury brand?

5    A.    Could you restate that, please.

6    Q.    Well, did you believe, as central marketing

7    communications manager, that the franchisees who were

8    out in the field selling cars were building the

9    Lincoln Mercury brand?

10   A.    I think they were assisting in building the

11   Lincoln brand, but it all starts at the national level

12   and cascades down.

13   Q.    Okay.  So you viewed it more as a cooperative

14   relationship between Ford and the franchisees in

15   building the brand?

16   A.    Yes.

17   Q.    Who did you report to as central marketing

18   communications manager?

19   A.    Reported to the marketing communications

20   manager.

21   Q.    Who was that?

22   A.    There were a variety at the time.  We have had

23   two that I work for personally.  One was Ian Beavis and

24   one was Deborah Wahl, W-a-h-l.

25   Q.    To whom does the marketing communications

1    manager report?

2        A.    The general marketing manager.

3        Q.    And to whom does the general marketing manager

4    report?

5        A.    The president of Lincoln Mercury.

6        Q.    What was your role as communications manager?

7        A.    Could you give me a little more detail, what

8    you're asking for?

9        Q.    Well, before central marketing communications

10    manager, you were Lincoln Mercury communications

11    manager; is that correct?

12        A.    Okay.

13        Q.    I'm asking about the previous job.  What did

14    you do in the previous job?

15        A.    Previous job, I need to correct that.  That

16    was Navigator/Town Car communications manager.  It was

17    not Lincoln Mercury.

18        Q.    I understand.

19        A.    So at that time, I was responsible for the

20    advertising of those two specific vehicle lines.

21        Q.    And was it your job to work with an

22    advertising agency to put together a national program?

23        A.    Yes, it was.

24        Q.    So you wanted to create as much buzz or as

25    much excitement about these vehicles as you could,

1    correct?

2        A.    Absolutely.

3        Q.    Were you the one responsible for providing all

4    those commercials during my Sunday golf viewing?

5        A.    Yes, that's correct.

6        Q.    So did you buy the national ad space?

7        A.    Not personally.  The agency buys the ad space,

8    but obviously it's part of a communications plan that

9    we approve.

10        Q.    As communications manager, did you believe

11    that each of your contact dealers at rollout should

12    have an example of the product to sell or show?

13        A.    That was not my area of responsibility.

14        Q.    I understand you weren't responsible for that,

15    but did you desire that each one of your contact

16    dealers have a sample of the vehicle to show at

17    rollout?

18        A.    In that position, I was responsible for

19    advertising and marketing of those two vehicles and had

20    absolutely no responsibility for distribution of those

21    vehicles.

22        Q.    I'm just asking you, as a general question,

23    did you anticipate that your contact dealers would have

24    an example of the vehicle to sell at rollout?

25        A.    Again, I had no responsibility over that area.

18

1    If you want to talk about assumptions, yes, but I had

2    no responsibility in that area.

3        Q.    Okay.  Did you ever hear of the term or the

4    concept called "coverage"?

5        A.    No.

6        Q.    Do you work with any of the allocation

7    planning folks in Detroit?

8        A.    No, I do not.

9        Q.    Do you know a gentleman by the name of

10   Tim Fisher?

11       A.    Yes.

12       Q.    What do you understand Tim's role to be

13   presently?

14       A.    I couldn't tell you presently.  I can tell you

15   back when I was there, but I can't tell you presently.

16       Q.    How about when you were back in Detroit?

17       A.    He did a lot with the distribution of our

18   vehicles.

19       Q.    Did you believe Tim was fairly competent in

20   his position?

21       A.    Yes.

22       Q.    As communications manager for the Navigator

23   and the Town Car programs, did you do any site visits

24   to any dealerships to see how the program was rolling

25   out?

1      A.    I did site visits, but not for any reason

2    other than to see how the vehicle was being perceived

3    by the customer and the dealer and their sales

4    consultant.  We have very formal metrics in place to

5    track advertising and marketing after the fact, so --

6      Q.    But did you rely exclusively on the metrics

7    that were in place and the ad agency, or did you

8    actually do some on-the-ground work yourself?

9      A.    Well, personally, I went to a few dealerships,

10   not a representative sample, because that's why we have

11   a whole series of regional managers.  And that's part

12   of their job, is to make sure that it's rolling out

13   properly within their dealers.

14     Q.    How long were you in the position as

15   communications manager for Navigator and Town Car?

16     A.    Around two years.

17     Q.    And your position as central marketing

18   communications manager was a promotion from your

19   previous position?

20     A.    Yes, it was.

21     Q.    And your current position of LPE and

22   Mercury Advantage experience manager is a promotion

23   from your earlier one?

24     A.    That's correct.

25     Q.    Now, before you were in communications, you

1    were national training coordinator?

2        A.    Uh-huh.

3        Q.    In Detroit; is that correct?

4        A.    That's correct.

5        Q.    What particular programs did you train?

6        A.    That position was responsible for the

7    entry-level training of all of our Ford college

8    graduates that come on board that are going to be zone

9    manager as part of their career path.

10        Q.    And you had early life experience as a zone

11    manager, correct?

12        A.    Yes, I did.

13        Q.    While you were acting as a zone manager, did

14    you develop a sensitivity to the business issues and

15    concerns that your franchisees experienced?

16        A.    Yes.

17        Q.    How long were you in the training position?

18        A.    Three years.

19        Q.    As part of that zone manager training program,

20    was allocation addressed?

21        A.    Yes.

22        Q.    What was the training or the program that

23    addressed allocation like?

24        A.    Well, it was all computerized system -- I've

25    been away from it for many years, but a computerized

1    system based on sales and stocking patterns within a

2    dealer's market.  But that is from memory.

3        Q.    Did you train zone managers on the concept of

4    a pool when it came to allocation?

5        A.    No.

6        Q.    Are you aware of the concept of a pool?

7        A.    For allocation purposes?

8        Q.    Correct.

9        A.    Yes.

10        Q.    How would a zone manager learn about a pool if

11    it wasn't part of the training program?

12        A.    Well, that is after you go out to the field

13    and start calling on dealers, there is a pool that's

14    set aside for actions such as a dealer building a new

15    facility, a dealer that is maybe -- a new dealer going

16    into business replacing an outgoing dealer that did not

17    have the sales history.  So the pool is then used at

18    that point.  There's no formal training on it.

19        Q.    Is there any other use or application for a

20    pool?

21        A.    None that I'm aware of.

22        Q.    Was there a training program established at

23    Ford for zone managers on how to use a pool or how to

24    create a pool?

25        A.    Not during my tenure on that assignment.

1    Q.    And the statement that you made about uses of

2    a pool was then based on your actual field experience

3    as a zone manager?

4    A.    Yes, it was.

5    Q.    Did you ever see a pool used to provide a

6    vehicle to a dealer at rollout when that dealer

7    otherwise would not have earned a vehicle through the

8    turn-and-earn system?

9    A.    Occasionally.

10    Q.    Did you ever endeavor to see that one of your

11    dealer franchisees who was not allocated a vehicle

12    received one at rollout?

13    A.    That would be dependent on management

14    prerogative at the time of that vehicle rollout.  It's

15    not really a zone manager's decision.

16    Q.    Did you ever do that, though, for one of your

17    franchisees?

18    A.    Yes, but not in a contact store.  Only for a

19    telemarketing dealer.

20    Q.    And that dealership type is termed "select";

21    is that correct?

22    A.    Select, yeah.

23    Q.    But contact dealers are actually given a

24    greater degree of support by Ford for their sales

25    function, correct?

1     A.    You'll have to explain your question in more

2   detail.

3     Q.    Don't the contact stores get a greater degree

4   of involvement with their zone manager to sell the

5   product?

6     A.    Yes.

7     Q.    How long were you in the training -- oh, you

8   said three years.  I'm sorry.

9     A.    Uh-huh.

10     Q.    How about this department manager position in

11   Chicago, what was that all about?

12     A.    Well, I had four individual assignments during

13   that period.  That would be the period of 1990 through

14   1995, so four positions over a five-year period.  And

15   one was dealing with customer satisfaction initiatives

16   at the regional level.  This was probably 160 dealers.

17   One was dealing with merchandising promotion of

18   vehicles within that region.  One was dealing with

19   distribution of vehicles within that region.  And one

20   was franchising market representation issues within

21   that region.

22     Q.    What did you do in the distribution position?

23     A.    Distribution position faced off with Detroit

24   to make sure you had proper allocation of vehicles in

25   the appropriate body styles, the appropriate engines

1   and power trains and things of that nature that our

2   dealers needed to sell.

3        Q.   When you say "faced off with," were you put in

4   a position where you competed with other regions for

5   allocation for your dealers?

6        A.   I wouldn't say competed, but it would be more

7   along the lines of drive trains, transmissions, things

8   of that nature.  We did a lot of trade-offs with other

9   regions, but it all funneled through the distribution

10  section in Detroit.

11       Q.   Did you have any role regarding vehicle

12  allocation when you were in that distribution position?

13       A.   Yes.

14       Q.   How did you impact allocation, or what did you

15  do?

16       A.   Well, I didn't so much impact it, but I ran

17  the system to make sure that our dealers were getting

18  fair allocations of vehicles, both vehicles in high

19  demand and vehicles in long supply.

20       Q.   You used the term "fair allocation."  What is

21  a fair allocation?

22       A.   Well, a fair allocation is what the computer

23  prints out; the system we've had in place for many

24  years.  It's been honed to perfection and based on a

25  dealer's sales rate and their stocking rate.

1    Q.   Well, if the system is honed to perfection,

2    then how would it be unfair to the point where you

3    would have to intervene and do anything?

4    A.   Well, the allocation system -- and I'm going

5    from memory.

6    Q.   Sure.

7    A.   -- allocates vehicles.  But there are many

8    commodities that go into the manufacture of a vehicle.

9    Transmissions, automatic and manual; colors; wheels;

10   things of that nature.  So along the lines of doing a

11   lot of trade-offs, you may have to trade off power

12   trains and different types of optional equipment.

13   Q.   How would you know what unfair treatment would

14   be in terms of allocation?

15   A.   I can't answer that.  Maybe if you could

16   clarify the question.

17   Q.   Well, you said that you wanted to make sure

18   that people in your region had a fair allocation of

19   vehicles.  That presumes that there were times when

20   things weren't fair.  I'm just asking you the question,

21   what do you mean by that?

22   A.   Oh, I wouldn't presume there would be unfair,

23   but there's always a faster turning vehicle that could

24   be sold, whether it be most likely automatic

25   transmission or manual transmission.

26

1      Q.    So if you saw that your particular region

2    wasn't receiving the right vehicle mix for the sales

3    that your dealers anticipated, then that's when you

4    would intervene?

5      A.    Could you restate the question or repeat the

6    question.

7      Q.    Well, let me ask it in a different way.

8      A.    Okay.

9      Q.    What did you do in order -- well, I'll ask a

10   completely different question.

11          When you use the term "fair allocation" for

12   your group of dealers, it presumes that there were

13   times when things weren't fair.  And I'm trying to find

14   out from you what you meant by fair and what unfair

15   would be.

16     A.    Well, I'm not sure it's fair or unfair.  It's

17   where -- a manufacturing concern.  And we deal in a lot

18   of these commodities, like wheels and tires and

19   transmissions, and you need to look at what the dealers

20   are ordering on one side, what their requests are, and

21   what we can build on the other side.  And a lot of

22   times there are trade-offs, especially when it comes

23   down to the fact of having enough of the right option

24   or commodity to build to what the dealers want as how

25   they've ordered their vehicles.

1    Q.   And by "commodity," are you talking about a

2  high demand part or component that might bottleneck the

3  production?

4    A.   Could be.

5    Q.   As distribution manager, did you take on the

6  role of advising the dealer body on what vehicles were

7  going to be difficult to get because of commodity

8  constraints?

9    A.   Yes.

10    Q.   Did you send out a memo or some type of flyer

11  to your dealer body?

12    A.   I think we did.  I think it was all done

13  electronically.

14    Q.   Did you ever flag a dealer's orders and advise

15  them in advance that they were probably not going to

16  get them on time because of commodity constraints?

17    A.   No.  That would be the zone manager's

18  responsibility.

19    Q.   So you supported the zone managers?

20    A.   That's correct.

21    Q.   What did you do in regard to franchising, when

22  you were franchise manager?

23    A.   Well, I handled all the dealer buy/sells,

24  relocations, new facilities.

25    Q.   How long has it been since you were involved

1   in franchising?

2       A.   Probably '93, so probably ten years.

3       Q.   From a franchising standpoint, has

4   Lincoln Mercury always had a policy to -- I'm talking

5   about a general policy -- to free stand its

6   Lincoln Mercury stores versus allowing it to dual with

7   another dealership?

8       A.   I can't answer that question.  My apologies.

9   The regional experience was all Ford division.

10      Q.   Oh, okay.  I'm sorry.

11      A.   So I can't speak to Lincoln Mercury

12  franchising issues back then.

13      Q.   How about since you've been with

14  Lincoln Mercury?

15      A.   That is not my area of responsibility, so I

16  can't answer that.

17      Q.   Have you ever attended meetings where

18  Mr. Hutchins has issued a -- either a letter or some

19  other type of edict in which he said that he preferred

20  all Lincoln Mercury stores to be freestanding?

21      A.   No.

22      Q.   So if there was a letter that went out in '99

23  that discussed that concept or that issue, you wouldn't

24  be aware of it?

25      A.   I haven't been in the franchising area, so --

1    Q.    Okay.  How long were you a zone manager in

2  Cleveland?

3    A.    Five years.

4    Q.    Did you enjoy a good relationship with your

5  dealers?

6    A.    Yes.

7    Q.    What was your role with regard to the dealers?

8  What was your job?

9    A.    To assist them with inventory, merchandising,

10  advertising, competitive market information on their

11  major competitive facing dealers and business

12  management, making sure their operations were

13  profitably running.

14    Q.    As zone manager, were you aware when your

15  dealer franchisees had trouble with their warranty

16  repair work?

17    A.    No.  It wasn't part of my area.

18    Q.    You strictly worked on the retail side?

19    A.    Sales side, yes.

20    Q.    As zone manager, did you have any direct

21  involvement regarding vehicle allocation or pooling?

22    A.    Other than if you had a new dealer going into

23  business or a new facility going up.

24    Q.    Have you ever read an allocation report?

25    A.    Quite some time ago, yes.

1    Q.    Does market rep action describe when you're

2    giving vehicles to a new dealer?

3    A.    I can't answer that.  I don't know.

4    Q.    That's fine.  That's fine.

5          Can you recall what you would see on an

6    allocation report if you were giving a new dealer

7    vehicles?  I'm talking about pooled vehicles.

8    A.    I can't recall.

9    Q.    That's fine.

10         Now we'll get to your present job.

11   A.    Okay.

12   Q.    What do you do as LPE manager?

13   A.    Well, I have been in charge of the strategy

14   and the launch and the rollout and the continuing

15   operations of Lincoln Premier Experience and

16   Mercury Advantage.

17   Q.    Is LPE -- strike that.

18         Before I get into this whole line of

19   questioning, is it fair to say that the LPE program and

20   the Mercury Advantage program is similar?

21   A.    Yes.

22   Q.    Are their aims or goals with regard to the

23   product the same?

24   A.    Could you clarify that, please.

25   Q.    If I ask you a question about why Ford decided

1    to do the LPE program and you tell me the reasons why,

2    would that be similar or the same, actually, for the

3    Mercury Advantage Program?

4        A.    Yes.

5        Q.    Okay.  Can I refer to those synonymously?

6        A.    Yes, you can.

7        Q.    So if I just say LPE, would you agree that it

8    also relates to Mercury Advantage?

9        A.    Yes.

10       Q.    And if there's an area where they differ --

11   and I don't know that there ever would be -- I would

12   like for you to tell me how the Mercury Advantage

13   differs from the LPE.  Is that agreed?

14       A.    That's agreed.

15       Q.    Was LPE your idea?

16       A.    No, it was not.

17       Q.    Whose idea was LPE?

18       A.    Couldn't tell you.  Can't answer that.

19       Q.    But you were the first LPE czar, correct?

20       A.    Yes, I was.

21       Q.    Who put you in that position?

22       A.    Anne Belec, B-e-l-e-c.

23       Q.    What was Anne's position?

24       A.    Network and retail development manager.

25       Q.    Who's in that position now?

1      A.    Jim O'Sullivan.

2      Q.    How long has Jim had that position?

3      A.    About 18 months.

4      Q.    Was Anne in that position until Jim took it

5  over?

6      A.    Yes.

7      Q.    To whom does the network and retail

8  development manager report at Lincoln Mercury?

9      A.    General sales manager.

10      Q.    And who was the general sales manager during

11  your start as LPE manager?

12      A.    Jim Gwaltney.

13      Q.    And who's in Jim's position today?

14      A.    Al Giombetti.

15      Q.    And did Al recently take over that position?

16      A.    Yes, he did.

17      Q.    Have you had any involvement in

18  Lincoln Mercury consolidations?

19      A.    No, I have not.

20      Q.    Do you understand what I mean by the term

21  "consolidation"?

22      A.    Yes, I do.

23      Q.    What does consolidation mean to you in the

24  context of Lincoln Mercury stores?

25      A.    Well, that's not my area of expertise, nor my

1  area of responsibility, so I feel that I shouldn't have

2  to answer that question.

3      Q.   What's your general understanding?  I'm not

4  going to --

5      A.   My general understanding is that we get the

6  right number of dealers in every market around the

7  country that support the franchise.

8      Q.   Have you ever sat in on planning and strategy

9  meetings where market consolidation is discussed?

10     A.   No.

11     Q.   Do you know who came up with the LPE strategy

12  or the LPE program?

13     A.   Well, it was brought together right before I

14  came on the assignment, so I don't know exactly by name

15  who was the original czar behind this program.  I would

16  say Anne Belec had a lead in it, but she was not the

17  only one.

18     Q.   Can you give me a list of the people who you

19  thought were the architects of the program, or who was

20  represented to you to be the architect?

21     A.   Okay.  I would say Mark Hutchins, Anne Belec,

22  and Dr. Wolfgang Reitzle.

23     Q.   How do you spell Dr. Reitzle's name?

24     A.   R-e-i-t-z-l-e.

25     Q.   And Mark is the president of Lincoln Mercury;

1    is that correct?

2        A.    He was at the time.

3        Q.    When did he leave that post?

4        A.    I can't give you an approximate year.

5        Q.    Roughly.

6        A.    He left about two years ago.  He retired from

7    the company.

8        Q.    Who's the president of Lincoln Mercury now?

9        A.    Darryl Hazel, H-a-z-e-l.

10       Q.    How many presidents have you gone through in

11   that intervening two years?

12       A.    Two.

13       Q.    Who would it be?

14       A.    It was Hutchins, and then Brian Kelley, and

15   now Darryl Hazel.

16       Q.    How long was Brian Kelley in the position?

17       A.    Short amount of time.

18       Q.    Was he terminated or did he voluntarily

19   resign?

20       A.    I can't answer that.

21       Q.    When you took the position as LPE manager, did

22   you have a sit-down with Mr. Hutchins, Ms. Belec and

23   Dr. Reitzle to discuss the goals of the program?

24       A.    With Hutchins and Belec, yes.

25       Q.    What did Dr. Reitzle's input consist of?

1     A.     Mainly input through Mark Hutchins.

2     Q.     What did Dr. Reitzle do?

3     A.     He was the president of the Premier Automotive

4     Group.

5     Q.     Is Lincoln Mercury being removed from the

6     Premier Automotive Group?

7     A.     They've already been removed.  Correct.

8     Q.     Is there any reason why that happened, that

9     was communicated to you?

10    A.     Well, the reason is that Lincoln and Mercury

11    are North American brands.  It's where we sell all of

12    our products.  And it is much more of a business model

13    to fit under Ford North America than it is under the

14    Premier Auto Group, which are European brands.

15    Q.     So Ford concluded that Lincoln Mercury was a

16    bad fit for PAG?

17    A.     No.  I think it was a better fit to be under

18    Ford North America because they're common vehicles and

19    common platforms.

20    Q.     Can you tell me of any specific input that

21    Dr. Reitzle provided regarding the LPE program?

22    A.     No.

23    Q.     What was your first conversation with

24    Mr. Hutchins and Ms. Belec about the LPE program?  Why

25    don't you describe what happened.

36

1    A.    Well, it was a strategy meeting on what the

2    objectives of this program were, what the future of the

3    LPE and Mercury Advantage programs were going to look

4    like, what other manufacturers are doing for dealer

5    certification programs and basically taking first steps

6    on how we would develop and soon thereafter launch the

7    program to our dealer body.

8    Q.    Did you model the LPE program on any other

9    existing program?

10    A.    We benchmarked many other manufacturers who

11    have programs similar to LPE.

12    Q.    What do you mean, you benchmarked many?

13    A.    We took a look at what their requirements were

14    and how the programs operated.

15    Q.    Can you think of any specific ones that you

16    attempted to emulate or model after?

17    A.    We didn't model or emulate any.  We developed

18    our own program from a clean sheet of paper, but we

19    did, again, benchmark by just reviewing what those

20    elements were of Volvo, Mazda, Cadillac, BMW,

21    Land Rover.

22    Q.    Did you in any way use the Ford Blue Oval

23    program as a model or a benchmark?

24    A.    No.  They were developed simultaneously.

25    Q.    Were the Lincoln Mercury and LPE program and

1    the Ford Blue Oval program developed completely

2    parallel to one another, or were they developed

3    cooperatively with one another?

4        A.    I would say cooperatively.

5        Q.    Was there a team leader for the Blue Oval

6    program?

7        A.    Yes.

8        Q.    Who was that?

9        A.    George Tardiff, T-a-r-d-i-f-f.

10       Q.    Was Mr. Tardiff a peer to you in terms of his

11   position with regard to Ford and your position with

12   Lincoln Mercury?

13       A.    Yes.

14       Q.    How similar do the two programs look?

15       A.    I would say that Ford and Mercury look

16   similar.  This is where it does split apart a little

17   bit.  And LPE is different.

18       Q.    What are the differences?

19       A.    The main difference is Lincoln is a luxury

20   brand, so we ask for considerably higher standards for

21   the Lincoln program than the Ford and Mercury programs

22   have.

23       Q.    By standards, what are you referring to?

24       A.    Facility standards, process check standards

25   for customer satisfaction processes, all designed to

1    improve the sales and service experience for our

2    consumers.

3        Q.    Are the financial -- I'll say financial

4    changes with regard to the dealer body the same for

5    Blue Oval as they are for LPE?

6        MS. MCNELLIE:   Object to the form.

7        THE WITNESS:   Could you repeat that question,

8    please.

9    BY MR. BERBERICH:

10       Q.    Well, it's my understanding that with the LPE

11   program, which would include Mercury Advantage, there's

12   an amount that the manufacturer holds back from the --

13   I'll just say rebate to the dealer, and then, depending

14   upon qualification, there's an amount that's paid back

15   to the dealer on the sale of a vehicle.

16           Is that a fair description of what happens, or

17   can you give me a better description?

18       A.    First of all, we don't charge the dealer for

19   any of these funds.

20       Q.    Okay.

21       A.    We are deemed -- as a manufacturer, we can

22   determine our prices to our dealers on a national

23   basis.  So we did establish a certain price level when

24   this program was launched, and dealers do receive bonus

25   monies based on their levels of satisfaction.

1          The programs are different for Lincoln and

2    Mercury in this aspect.

3      Q.    What was the price level and the bonus level

4    before LPE and Mercury Advantage were established?

5      A.    Well, I mean, each vehicle's different, so

6    it's hard to establish a price level.  But every dealer

7    in the country, regardless of their level of

8    certification, regardless of their location, is able to

9    purchase a like vehicle for the same price.

10     Q.    In the old days before LPE and

11   Mercury Advantage, how much did the dealer get back in

12   terms of bonus money or for the sale of a vehicle?

13     A.    Prior to LPE and Mercury Advantage, they got

14   zero bonus money back.

15     Q.    Did they get any money from the manufacturer

16   for the sale of the vehicle?

17     A.    Prior to?

18     Q.    Yes, before LPE.

19     A.    There are certain types of incentive programs

20   that are available to all dealers nationally, but that

21   is not my area of experience.

22     Q.    Wasn't there some type of holdback?

23     A.    Yes, there is a holdback.

24     Q.    What was the holdback before LPE?

25     A.    On Lincoln, it was three percent of the MSRP.

1    And on Mercury, it was three percent of the MSRP.

2        MS. MCNELLIE:  You said three for both.

3        THE WITNESS:  That's prior to LPE.

4    BY MR. BERBERICH:

5        Q.    Correct?  Is that correct?

6        A.    Okay, yes.

7        Q.    And if the dealer sold the car, they got the

8    three percent holdback, correct?

9        A.    That's correct.

10       Q.    Why would somebody not get a holdback?  And

11   I'm talking about before LPE and Mercury Advantage.

12       A.    You'll have to clarify your question because

13   every dealer got it.

14       Q.    I guess that kind of answers my question.

15       A.    Okay.

16       Q.    The holdback in some respects seems to be Ford

17   held the money for the sale of the car for a short

18   period of time until the vehicle was sold, correct,

19   from the time of delivery to the time of sale?

20       A.    Correct.

21       Q.    And then all you had to do to get your money

22   back is just sell the car, correct?

23       A.    That's correct.

24       Q.    Was there some level of -- I read something in

25   the program materials about profitability or some 12 or

1    14 percent number that, when the LPE program was

2    instituted, you actually raised some percentage to

3    14 percent and then offset the overall program by

4    giving the dealers back more money.  Why don't you

5    describe that --

6        A .  Well, the margins were adjusted at the launch

7    of LPE and Mercury Advantage.

8        Q.   What do you mean by "the margins"?

9        A.   The dealer trading margin that they have

10   available to transact the car deal or truck deal with

11   their customers.

12       Q.   What is a dealer trading margin?  Why don't

13   you explain that so that my mom can understand.

14       A.   That's the difference between what the dealer

15   purchases the vehicle from the company and what the

16   manufacturer's suggested retail price is on the window

17   sticker.

18       Q.   So a dealer could theoretically sell the

19   vehicle at the dealer trading margin number, or at the

20   zero profit number, and he simply wouldn't make

21   anything on the car; is that correct?

22       A.   That's correct.  A dealer's welcome to sell

23   cars at any price he deems fit.

24       Q.   And before LPE was instituted, the difference

25   between the dealer trading margin and the MSRP was

1    12 percent, correct?

2        A.    Well, it varies by vehicle.

3        Q.    Was there a standard or was there a --

4        A.    On Lincoln cars, it was 14 percent.

5        Q.    What was the Mercury margin?

6        A.    I think it varies.  I don't have the specific

7    information.  It was similar, but I don't have the

8    exact numbers.

9        Q.    How did that dealer trading margin change

10   after LPE was instituted?

11       A.    It was reduced.

12       Q.    What was it reduced to?

13       A.    By one percentage point.

14       Q.    So before LPE was instituted, the dealer

15   trading margin was 14 percent and the dealer could get

16   3 percent of that back upon the sale of a vehicle,

17   correct?

18       A.    Correct, with a caveat.  I'm not sure if

19   holdback -- I'm not that close to it and I'm not an

20   expert in holdback.  I don't know if they have to wait

21   until they sell the vehicle.  I'm not clear on that.

22   They do get the holdback back.

23       Q.    There's some process where you can notify the

24   company that a vehicle was sold?

25       A.    Uh-huh.

1      Q.   Like electronically?

2      A.   Yes, correct.

3      Q.   But that doesn't always necessitate a customer

4   driving off the lot with that vehicle for it to be

5   sold, correct?

6      A.   Well, it's -- the dealer is always subject to

7   audit.  And if they're reporting sales and they're not

8   truly delivering cars to consumers, they could be

9   found -- in some cases it could be fraud because of

10  contest incentive monies.

11     Q.   But there is a way to lock in a particular

12  date for the sale of a vehicle; is that correct?

13     A.   Yes, electronically, yes.  Correct.

14     Q.   And you think that's when the holdback is

15  triggered?

16     A.   I can't answer that.

17     Q.   That's fine.

18     A.   I don't know the technical piece of that.

19     Q.   I'm really just talking now, though, in terms

20  of a general scheme or a general theory.  I'm not using

21  scheme in a pejorative way.  I'm talking about a

22  general plan of operation of LPE versus what went on

23  before.

24          Is that understood?

25     A.   That's correct.

1    Q.    Then after LPE, the dealer trading margin

2    dropped to 13 percent; is that correct?  I'm just

3    talking about Lincoln as an example.

4    A.    Well, Lincoln cars dropped to 12 percent.

5    Q.    And then how was that made up?

6    MS. MCNELLIE:  Object to the form.

7    BY MR. BERBERICH:

8    Q.    How was LPE designed to make up the difference

9    between the old program and the new program?

10   A.    There was no relationship between LPE and

11   invoicing.

12   Q.    Okay.  In the old days with invoicing, the

13   dealer just simply had to sell the car or do that

14   commitment process where the car was sold to get the

15   holdback; is that correct?

16   A.    Could you restate that question.

17   Q.    In the old days, the dealer simply had to sell

18   the car or commit to sell the car in order to get the

19   holdback money; is that correct?

20   A.    That's correct.

21   Q.    And when they got it, they got all 14 percent,

22   as an example; is that correct?

23   A.    That's not correct.

24   Q.    Okay.  What did they get back?

25   A.    They set their own prices, so they determined

45

1    what they're going to get.

2        Q.   Right.  But theoretically, they would get

3    whatever that gap was, that dealer trading margin,

4    correct?

5        A.   No, that's not correct.  Each dealer can sell

6    their vehicle for whatever price they determine.

7        Q.   But I'm saying, theoretically, they had the

8    opportunity to get the balance of their dealer trading

9    margin back, which would be the three percent; is that

10   correct?

11       A.   Could you repeat the question.

12       Q.   Well, for purposes of the question, assume the

13   vehicle was sold at MSRP.

14       A.   Okay.

15       Q.   In the old days, the dealer simply sold or

16   committed to sell a vehicle, and then he got the entire

17   14 percent?

18       A.   That's correct.

19       Q.   Okay.  Now under the new program, if the

20   dealer sells the vehicle at MSRP, he gets 12 percent

21   without qualification under LPE; is that correct?

22       A.   In the circumstance of selling the vehicle at

23   MSRP, that is correct, it would be 12 percent.

24       Q.   But if the dealer qualifies for LPE in both

25   customer service and image, they're entitled to get an

1  additional 2.5 percent; is that correct?

2      A.   That is not quite correct.  It is 2.75

3  percent.

4      Q.   Why don't you tell me what the LPE bonus is.

5      A.   The LPE bonus is a separate cash bonus paid

6  for dealers who have passed our requirements for

7  customer satisfaction and for image.

8      Q.   How much does that equal?

9      A.   It is 2.75 percent of the MSRP.

10     Q.   When the program was rolled out, was it the

11  same percentage?

12     A.   No, it was not.

13     Q.   What was the percentage?

14     A.   2.5 percent.

15     Q.   So it's been increased; is that correct?

16     A.   That's correct.

17          I need to clarify that this is Lincoln only.

18     Q.   Sure.  I understand.  I understand.

19          When Lincoln was rolled out, how was the LPE

20  bonus calculated, or what were the components?

21     A.   There were two components:  Customer

22  satisfaction and image.  And when it was rolled out, it

23  was 1.25 percent for each category.

24     Q.   And I assume there was a change in that

25  number, correct?

 1        A.    An increase, correct.

 2        Q.    What is the present number or the changed

 3   number?

 4        A.    It is 1.375 percent for each category.

 5        Q.    Is there any reason that number was changed?

 6        A.    Yes.  We increased the requirements for the

 7   dealers to pass; and, therefore, we elected to increase

 8   the bonus money to coincide with that.

 9        MR. BERBERICH:  Let's take a break.

10              (Recess taken.)

11   BY MR. BERBERICH:

12        Q.    Mr. Csernotta, was there a time where Ford

13   addressed the issue of doing away with the bonus,

14   either the LPE or the Blue Oval?

15        A.    I can't speak for the Blue Oval program, but I

16   can speak for the Lincoln Premier program.  And no.

17        Q.    So to your knowledge, within the last

18   two years, there's been no discussion among

19   Lincoln Mercury of doing away with the bonus program?

20        A.    There has been no discussion with doing away

21   with the Lincoln Premier bonus program.

22        Q.    Okay.  Is there any other bonus program that's

23   out there?

24        A.    None that I'm aware of.

25        Q.    Okay.

1      A.    I think we need to clarify this, though.   This

2    is where we do need to split Mercury again.   This was

3    Lincoln discussion.

4      Q.    Was there any discussion about doing away with

5    the Mercury bonus program?

6      A.    Yes.

7      Q.    And what happened?

8      A.    As I said before, Mercury is aligned closely

9    with the requirements of Ford and the Blue Oval

10   program.   And therefore, we have announced to our

11   dealers on April 1st of '05 that the Blue Oval and the

12   Mercury payments will cease.

13     Q.    Is there any reason why those payments for

14   those programs is going -- are going to cease?

15     A.    We have elected to replace both of those

16   programs with a recognition-type customer satisfaction

17   program for our dealers.

18     Q.    Is the program going to strictly be driven by

19   customer satisfaction?

20     A.    I can't answer that because we have yet to

21   develop that program.

22     Q.    Will that program impact the price to the

23   dealer for the vehicle?

24     A.    I can't answer that at this time.   I don't

25   think there's been a final decision made on that.

49

1      Q.    Are there any preliminary plans?

2      A.    There is a plan to restore the one percent

3   margin on Ford and Mercury vehicles.

4      Q.    So in essence, you'll be stepping back to the

5   program that was in place before Mercury Advantage?

6      A.    Clarify your question, please.

7      Q.    After this new program is implemented in 2005,

8   will the program be the same as it was before

9   Mercury Advantage was created?

10      A.    No.  The program will be different.  Those

11   requirements will be -- they are still in a

12   to-be-determined status.  It's a program that we still

13   need to develop for the Ford and the Mercury

14   franchises.

15      Q.    What about the dollars?  Will the dollars be

16   the same?

17      A.    We will restore one percent of the dealer

18   trading margin to Ford and Mercury vehicles at some

19   point prior, or soon thereafter, April 1st of '05.

20      Q.    So will the dealer trading margin be the same

21   as it was before the program, before Mercury Advantage?

22              (Interruption in the proceedings.)

23      THE WITNESS:  Could you repeat the question,

24   please.

25              (The record was read by the reporter

1          as follows:

2              "Q.  So will the dealer trading

3          margin be the same as it was before the

4          program, before Mercury Advantage?")

5      THE WITNESS:  I can't determine that.  It's not in

6  my area of expertise.  But I can say that our plan is

7  to restore one percent of the trading margin to

8  Ford Mercury vehicles.

9  BY MR. BERBERICH:

10     Q.   So if I can summarize, after the Mercury

11  Advantage program is implemented, you removed one

12  percent of the trading margin; is that correct?

13     A.   No.  Prior to the implementation of

14  Mercury Advantage, we elected to make a change to our

15  invoice pricing for all of our dealers.

16     Q.   And the net effect of that change in invoice

17  pricing was to remove one percent from the trading

18  margin; is that correct?

19     A.   That is correct.

20     Q.   And you intend to, in the future, restore that

21  one percent to the trading margin, correct?

22     A.   The intent is to do that currently.

23     Q.   But you don't know what program requirements

24  you're going to continue or maintain with regard to the

25  Mercury Advantage program; is that correct?

1    A.    That's correct.

2    Q.    Did you make a promise to dealers when the

3   Lincoln Premier Experience was rolled out that they

4   would -- strike that.

5         Did you agree, when the Lincoln Premier

6   Experience program was rolled out, that you would agree

7   to raise the price of the car with the promise that the

8   monies that were lost to the dealer would come back

9   through qualification in the LPE program?

10   A.    Well, the pricing action was not associated

11  with the LPE program.  Pricing action was independent

12  of the program.

13   Q.    Was the pricing action and the LPE program

14  implemented on or about the same date?

15   A.    No.

16   Q.    How far apart were those two actions taken?

17   A.    Approximately six months.

18   Q.    So you're saying the pricing action -- strike

19  that.

20         When did the pricing action take place in

21  relation to the LPE program?

22   A.    The pricing action takes place with the model

23  year, which is different for every vehicle, but it's on

24  or around October 1st.

25   Q.    I guess my question is, what came first, the

1  LPE change or the pricing change?

2      A.   Well, I can't speak to the pricing change

3  timing.  I just know the effective date.  The pricing

4  change development is through our controller's office

5  and our pricing activity.  I do know that it was

6  implemented on or around October 1st with the 2001

7  model year.  The program itself was in development for

8  many months.

9      Q.   Did the pricing change implementation happen

10  before the LPE bonus program was implemented?

11      A.   Yes.  Strictly the bonus program.

12      Q.   Okay.  So even before LPE bonus money was made

13  available, the dealers lost two percentage points on

14  their trading margin?

15      A.   Could you repeat the question, please.

16      Q.   Well, maybe my math is wrong, but was the

17  dealer trading margin reduced from 14 to 13 percent or

18  from 14 to 12 percent?

19      A.   It was reduced by two percentage points on all

20  Lincoln vehicles.  I think we should clarify that all

21  vehicles started -- potentially started with a

22  different percentage.  Lincoln cars were 14.

23      Q.   What was the trading margin on the trucks?

24      A.   I think it was 18.

25      Q.   And how was that changed or reduced?

1    A.   Adjusted by two percentage points.

2    Q.   Is that the pricing action that you're talking

3 about?

4    A.   That is correct.

5    Q.   Did the dealer body complain about the pricing

6 action?

7    A.   Well, anytime you change prices, there's going

8 to be an obvious reaction.  I would have to say that

9 the bulk of our dealers, who represent a lot of the

10 volume of Mercury Lincoln division, were in favor of

11 the pricing and the program.

12    Q.   Was the pricing done as a prelude to the LPE

13 program?

14    A.   Repeat the question again.

15    Q.   Let me ask it differently.

16    A.   Yeah.

17    Q.   Did you explain to the dealers that the

18 pricing change would be followed by an LPE program in

19 which they would get some of this money back?

20    A.   Well, there was a lot of parallel development

21 here.  Again, the pricing issue was strictly in our

22 finance and controller's office.  The program was being

23 developed parallel.  And yes, when we rolled it out, we

24 did roll it out together because the bonus payment is

25 funded from that margin change.

1    Q.    So let me ask the question again.

2          Did you promise the dealers at the time when

3    the pricing change was implemented that they would be

4    able to get that margin change back, plus more, if they

5    qualified through the LPE program?

6    A.    We explained to them that there was a margin

7    change, and we explained to them that there was a

8    separate and distinct LPE program that they could

9    qualify for a bonus.

10    Q.    At the time that the margin change was

11    explained to the dealer body, was it also explained

12    that there would be this LPE program coming along where

13    they could make up that difference?

14    A.    Well, we did not specifically say "make up the

15    difference."  We did say that there would be margin

16    change and there would be a separate and distinct LPE

17    certification program that they could earn up to two

18    and a half percent.

19    Q.    I guess my question was, did you give them all

20    stick, or did you give them stick with a promise of a

21    carrot in the future?

22    MS. MCNELLIE:  Object to the form.

23    BY MR. BERBERICH:

24    Q.    I'll ask my question differently.

25          Do you understand what the term "quid pro quo"

1    means, a this for that?

2        A.    That's correct, yes.

3        Q.    Was the pricing change implemented with a quid

4    pro quo promise that there would be an LPE program in

5    the future?

6        A.    I'm thinking right now, testing my memory of

7    what we said to them at our national dealer meeting.

8        Q.    Sure, sure.

9        A.    I can tell you that we announced the pricing

10   change and we announced the LPE program and the

11   potential bonus within the same meeting.

12       Q.    Okay.  Did you communicate at all with the

13   folks at Ford or the controllers office that were

14   rolling out the price change?

15       A.    Could you clarify that question.

16       Q.    Did you talk to the people that were rolling

17   out the price change before it was rolled out?

18       A.    Yes.

19       Q.    Did you discuss coordination of your program

20   and their program so that they would be presented at

21   the same time?

22       A.    No, we did not.

23       Q.    Who made the decision that these two programs

24   were rolled out in the same meeting?

25       A.    I would say that's probably a Mark Hutchins

1    level decision.

2        Q.    Do you remember discussing with Mr. Hutchins

3    that your program would be rolled out at the same time

4    the price change was rolled out?

5        A.    We had discussion to that extent, yes.

6        Q.    And did Mr. Hutchins explain to you why they

7    were being done simultaneously?

8        A.    No, he did not.

9        Q.    Was there any discussion that there would be a

10    mutiny if the -- among the dealer body if the price

11    change was rolled out without the LPE program?

12        A.    No, there was no discussion.

13        Q.    Did you do any focus group or market testing

14    to determine how happy the dealer body would be with

15    the change in price?

16        A.    Yes, we did.

17        Q.    What was the conclusion?

18        A.    The conclusion was very supportive in favor of

19    launching both the price change, as well as the program

20    and the related bonus monies.

21        Q.    Was there a discussion about launching the

22    price change without launching the bonus program?

23        MS. MCNELLIE:   You mean with the dealers?

24        MR. BERBERICH:   Yes.

25    ///

1    BY MR. BERBERICH:

2        Q.    Was there any market testing that was done

3    about how the dealer body would react to the

4    two percent raise in price without the bonus?

5        A.    We polled, I would say, 120 of our key

6    large-volume dealerships around the country to get

7    their input prior to launch, and the response was

8    favorable.

9        Q.    It was favorable for a dual program, correct,

10    price change and LPE?

11        A.    Well, I wouldn't classify it a dual program.

12    They are two separate, independent actions.

13        Q.    Well, the market testing that you did focused

14    on both programs being implemented and not one over the

15    other?

16        A.    That's correct.

17        Q.    Are the funds for LPE generated by the change

18    in price?

19        A.    Yes, they are.

20        Q.    So in that respect, the two programs work hand

21    in hand, correct?

22        A.    From that aspect, correct.  Yes, you're

23    correct.

24        Q.    And does -- strike that.

25            Has Lincoln done any studies to determine

1    whether it has saved money as a result of this

2    restructuring of the price of the vehicle and the LPE

3    program being implemented?

4        A.    You'll need to clarify saving money.

5        Q.    Has the net effect of both of these programs

6    being rolled out been that Lincoln Mercury is more

7    profitable than it was under the old system?

8        A.    Lincoln Mercury is less profitable now than

9    versus the old system.

10        Q.    Okay.  I'm not asking you whether or not the

11    company is doing better financially or from a marketing

12    standpoint or from a market penetration standpoint.

13    What I'm asking you is, based on the same volume of

14    units, same number of units, has the implementation of

15    the price change in the LPE program netted

16    Lincoln Mercury more or less money than the old system?

17        A.    Less.

18        Q.    Okay.  How much less?

19        A.    About $20 million.

20        Q.    So what you're saying is, LPE cost

21    Lincoln Mercury 20 million more than the old system?

22        A.    That's correct.

23        Q.    Why is Lincoln Mercury doing this system if

24    it's costing it $20 million?

25        A.    The original objective of the program was to

1    reward dealers who are committed to improving customer

2    satisfaction, and that's what we're doing.

3        Q.   Is the money that it's costing

4    Lincoln Mercury -- I'll just say the change in money --

5    going to some dealers to the exclusion of other

6    dealers, meaning is it favoring any particular dealer

7    group over another?

8        A.   No, it is not.

9        Q.   Has the LPE program favored the contact

10   dealers over the select dealers?

11       A.   No, it has not.

12       Q.   Has there been any research or study done to

13   determine whether or not the select dealers are

14   qualifying for LPE as often as contact dealers?

15       A.   We have compliance rates.  We know which

16   dealers and dealer groups are certified and which are

17   not.

18       Q.   What's the compliance rate or the

19   certification rate for the select group?

20       A.   Estimated at about 70 percent of dealer

21   outlets.

22       Q.   And by qualification, are you talking about

23   full qualification, one hundred percent, or full and

24   partial?

25       A.   That would be -- the majority of that is full

1   certification.

2       Q.   So it's my understanding -- correct me if I'm

3   wrong -- that you can qualify for customer service

4   index, but not image, correct?

5       A.   That's correct.

6       Q.   So you can get half the nut instead of the

7   whole nut?

8       A.   That's correct.

9       Q.   Of the 70 percent of the select dealers that

10  qualify, what percentage of those are full, meaning

11  they qualify for both sides of the bonus?

12      A.   I would say the majority, but I can't answer

13  that question.  I don't have numbers in front of me.

14      Q.   Is it measured, though, by Ford?

15      A.   We know who is passing which element of the

16  program.  Yes.

17      Q.   Right.  But is it measured, of that subset of

18  70 percent that qualify, how many of those dealers are

19  full compliant?

20      A.   Yes.

21      Q.   How about on the contact dealer side, what's

22  the compliance rate on the contact side?

23      A.   I would estimate that at 85 percent.

24      Q.   And how much or how many of that 85 percent

25  are in full compliance, meaning earn both parts of the

1  bonus?

2      A.   I would say, estimated, is 75 to 80 percent of

3  that 85 is in full compliance.

4      Q.   Now, these certifications and these

5  qualifications are occurring at a time where the

6  overall pool of Lincoln Mercury dealers are being

7  reduced through consolidations, correct?

8      A.   Could you restate that, please.

9      Q.   Are these qualifications for the LPE program

10  occurring at a time where the overall pool of

11  Lincoln Mercury dealers is being reduced through

12  consolidation?

13      A.   Yes.  The program is running at the same time.

14      Q.   Have you done any estimates to determine what

15  the qualification rate would have been if the overall

16  number of Lincoln Mercury dealers had remained the same

17  as it was three years ago?

18      A.   No, we have not done any calculations to that

19  effect.

20      Q.   Have the market consolidations eliminated the

21  smaller dealers?

22      A.   No.

23      MS. MCNELLIE:  I'll object to the form.

24      THE WITNESS:  No, they have not.

25  ///

1    BY MR. BERBERICH:

2        Q.    Who has been targeted for market

3    consolidation?

4        MS. MCNELLIE:    I'll object to the form.

5        THE WITNESS:    That is not part of my area of

6    responsibility.

7    BY MR. BERBERICH:

8        Q.    So at the time that you were developing the

9    LPE program, you didn't evaluate the entire pool of

10   Lincoln Mercury dealers to see what that group looked

11   like from a makeup standpoint?

12       A.    We did look at it as a makeup standpoint of

13   our entire network, yes.

14       Q.    Can you tell me how the consolidations have

15   impacted the makeup of the Lincoln Mercury group?

16       A.    I cannot.    It's not my area of expertise.

17       Q.    But do you track that?

18       A.    No, I do not personally, and my department

19   does not.

20       Q.    Do you know whether or not the select dealers

21   were more or less impacted by market consolidation than

22   the contact dealers?

23       A.    Again, it's not my department, not my area of

24   expertise.

25       Q.    I understand it's not your area of expertise,

1    but have you been made aware of that?

2        A.    Yes.

3        Q.    What has the overall impact been on the select

4    dealers?

5        A.    We have had a reduction in the number of

6    select dealer outlets.

7        Q.    Do you know how many?

8        A.    No, I do not.

9        Q.    Of the select dealers that have been

10   consolidated or eliminated from the market, do you know

11   how many of those dealers would have qualified for LPE?

12       A.    No, I do not.

13       Q.    How about the larger market group?  Have you

14   been generally advised how the larger market dealers

15   have been consolidated or how many have been in that

16   consolidated group?

17       A.    I know that program has gone on, but I'm not

18   aware of the exact numbers.

19       Q.    Of the dealers that were consolidated, do you

20   know how many of those from a large market standpoint

21   would have qualified for LPE?

22       A.    No, I do not.

23       Q.    Do you know whether or not any part of the LPE

24   unearned bonus was used to fund market consolidation

25   actions?

1      A.    None of that money was used to fund market

2    consolidation actions.

3      Q.    Is there a fund or a pool that's called LPE

4    nonearned bonus?

5      A.    No, there is not.

6      Q.    Is that number tracked by Lincoln?

7      A.    Could you clarify that question.

8      Q.    Is the amount of money that is nonearned by

9    the dealer body through the LPE program tracked by

10   Lincoln?

11     A.    No; it is one central fund.

12     Q.    Well, does Lincoln do any calculation of the

13   number of vehicles sold by non-LPE qualified dealers to

14   determine what that theoretical missed bonus is?

15     A.    No, we don't do any specific calculations of

16   unearned bonuses.

17     Q.    Would it be fairly simple for you to calculate

18   the number of dealers that are not qualified through

19   LPE and multiply that by the number of vehicles sold to

20   determine what that nonearned bonus number is?

21     A.    It would be reasonable to do that, yeah.

22     Q.    Has that ever been done during the time that

23   you've run the LPE program?

24     A.    Yes.

25     Q.    When was that done?

1      A.    We've probably looked at that once or twice

2  per year during the course of the last three years.

3      Q.    Can you tell me what those numbers have looked

4  like over the last three years?  I'll just say from

5  2001 to the present.

6      A.    No, I can't speak to it without having

7  documentation present.

8      Q.    Can you give me a ballpark?

9      A.    I would say it's about 10 percent of the

10 volume is that noncertified dealerships.  And that is

11 total population of dealerships.

12     Q.    And what kind of number, in terms of dollars,

13 has that 10 percent blossomed into?

14     A.    Can't put it into dollar terms.  I could put

15 it into volume, but I can't put it into dollar terms.

16     Q.    So you can't translate the volume into

17 dollars?

18     A.    You could; but since the payment on each

19 vehicle's different, you'd have to really do some

20 calculation.

21     Q.    Has anyone at Ford done that calculation?

22     A.    Yes.

23     Q.    Have you ever seen those numbers?

24     A.    Yes.

25     Q.    Can you give me a description of what that

1  number looks like?  I'm not talking about volume.  I'm

2  talking about actual dollars for nonearned LPE money.

3       A.   Could you restate the question.

4       Q.   At any time during the existence of the LPE

5  program, have you ever calculated what the nonearned

6  bonus figure was?

7       A.   Yes.

8       Q.   Could you tell me what those figures were?

9       A.   No, I can't, without having analysis or a

10  schedule presented for me.

11       Q.   I'm not asking you to do it for every year,

12  but can you tell me what, for instance, in the first

13  year of the program, the nonearned bonus looked like in

14  terms of gross dollars?

15       A.   No, I can't tell you that without having the

16  schedule.

17       Q.   Was it more or less than 50 million?

18       A.   Less.

19       Q.   Was it more or less than 25 million?

20       A.   At this point, I can't tell -- I can't answer

21  that.  We're getting into assumptions, but it's

22  probably close to that.

23       Q.   So you would approximate -- again, I'm not

24  holding you to a specific number, but you would

25  approximate that the first year of LPE, the nonearned

1   bonus was in the neighborhood of 25 million; is that

2   correct?

3       A.   I would say it's probably less than that, now

4   that I'm thinking it through.  It's probably a range of

5   15 to 20 million.

6       Q.   How about the second year of the program, what

7   was the gross amount of nonearned bonus in an

8   approximate range?

9       A.   It's going to be consistent for all

10  three years.

11      Q.   And you're saying that the dealers that do

12  qualify not only eat up that nonearned bonus of 15 to

13  20 million, but then they also, in turn, cost Ford an

14  additional $20 million in earned bonus; is that

15  correct?

16      A.   Well, that is correct; however, we're probably

17  talking about the same money.

18      Q.   Oh, okay.

19      A.   Yes.

20      Q.   So you're saying that the nonearned bonus

21  tends to balance out with that figure that you quoted

22  me for what the LPE program cost Ford; is that correct?

23      A.   I need you to clarify or restate that.

24      Q.   Okay.  Earlier you mentioned that the LPE

25  program cost Ford approximately $20 million; is that

1  correct?

2      A.    That is the sum of the funds that we do pay

3  out that we do not generate.  That is correct.

4      Q.    I guess my question is, is that amount that it

5  costs Ford offset by the amount that comes back to Ford

6  through nonearned LPE bonus?

7      A.    Okay.  No, it is not.  That $20 million figure

8  w e are referring to is in addition to the unearned

9  bonus.

10      Q.    Is the unearned bonus consumed by the dealers

11  that remain in the market that are earning more bonus

12  than they earned in the past?

13      A.    I need you to rephrase that.

14      Q.    Okay.  The 15 or $20 million of unearned LPE

15  bonus, what happens to that money?

16      A.    That is being paid to the certified dealers.

17      Q.    Okay.  And in addition to that amount of

18  money, the certified dealers wind up costing Ford an

19  additional $20 million; is that correct?

20      A.    That is correct.

21      Q.    Okay.  Have you discussed or attended any

22  meetings at Lincoln Mercury where the consolidation has

23  been discussed from a going-forward standpoint?

24      A.    No, I have not.

25      Q.    Do you know whether or not Lincoln Mercury

1  plans to complete its consolidation at any particular

2  time?

3      A.   No, I do not.

4      Q.   Do you know whether or not the market

5  consolidation is still going on?

6      A.   No, I do not.

7      Q.   Was it discussed at any time before the LPE

8  program was rolled out that the program itself would

9  have any impact on the number of Lincoln Mercury

10  dealers that remained in the market?

11      A.   Could you repeat the question, please.

12      Q.   Was it discussed at the time that the LPE

13  program was planned that the presence of the program

14  would impact the number of Lincoln Mercury dealers in

15  the market?

16      A.   There could have been a potential impact with

17  the launch of LPE, yes.

18      Q.   What was discussed or what was anticipated?

19      A.   The infrastructure of our Lincoln Mercury

20  dealer network was a concern because our facilities in

21  general are older facilities than other luxury

22  franchises, and that the amount of investment to bring

23  them up to speed to our LPE requirements could be

24  substantial.

25      Q.   I guess to rephrase my question, was it

1    anticipated at the time that LPE was launched that you

2    would lose some dealers because they would be unwilling

3    to make the financial commitment to their facility?

4        A.    I was never in a meeting that discussed losing

5    Lincoln Mercury dealers.  It was more on the lines of

6    dealers that would elect not to participate with LPE.

7        Q.    And by not participating with LPE, the dealer

8    would be at a net loss compared to the prior structure

9    before LPE and the price change were implemented; is

10   that correct?

11       A.    Could you repeat that, please.

12       Q.    Well, would you agree with me that a dealer

13   who did not qualify for LPE would actually be at a loss

14   compared to the old program that was in existence

15   before the price change and LPE were coimplemented?

16       A.    He would be operating at a lesser margin than

17   an LPE certified dealer.

18       Q.    Was it anticipated that these dealers who

19   operated at a less margin would agree to either sell or

20   relinquish their dealerships?

21       A.    No.  That was not brought up in any meetings

22   or any strategy for LPE.

23       Q.    Was it ever discussed that LPE would impact

24   the number of dealers in the market in any way?

25       A.    Again, the only impact would be their amount

1    of potential investment to bring their facilities and

2    their people up to LPE standards.

3        Q.    If the concept of dealer investment to bring a

4    facility up to LPE standards was discussed, was it also

5    discussed that that would probably lead to resignations

6    or sales of Lincoln Mercury stores?

7        A.    No, no discussion on resignations or sales of

8    stores.

9        Q.    Did you anticipate that the LPE program

10   coimplemented with the price change would in any way

11   reduce the number of Lincoln Mercury dealers?

12       A.    No.

13       Q.    You didn't think about it or you didn't think

14   it would impact the numbers?

15       A.    LPE was designed separately from any market

16   representation actions; therefore, it was not in the

17   strategy nor was it part of the plan to affect dealers.

18       Q.    I'm not asking whether it was part of the

19   strategy or part of the plan.

20            I'm saying, did you, as the director of LPE,

21   believe that the implementation of the LPE program in

22   conjunction with the price change would cost you any

23   dealers, meaning would any Lincoln Mercury dealers

24   leave or resign their dealerships because of the impact

25   of those programs being coimplemented?

1    A.   No.

2    Q.   You didn't think that would happen?

3    A.   I did not think that would happen.

4    Q.   Why was it a concern, then, that the

5    implementation of LPE would cost your dealer body more

6    money to bring their facilities up to the standard?

7    A.   Again, I said the majority of our facilities

8    are from an older infrastructure.  And to get them

9    competitive in the luxury marketplace, it would need

10   certain amounts of financial investment to bring their

11   facilities up to today's standards for LPE.

12   Q.   Did you expect that that process would lead

13   any of your dealer body to resign their dealership?

14   A.   No.

15   Q.   I think we got a bit far afield before we --

16   before I wanted to.

17        How was the Mercury Advantage program

18   different in terms of the pricing level and bonus

19   monies?

20   A.   Dealer trading margin was reduced by

21   1 percent, and the available bonus was 1.25 percent.

22   One single program from Mercury.

23   Q.   And the single program, is that qualified --

24   do you have to qualify for both CSI and image?

25   A.   They are combined in a single program for

1    Mercury.

2        Q.    So you can't earn half the bonus through

3    Mercury Advantage, correct?

4        A.    That is correct.

5        Q.    Has that number been increased like the

6    Lincoln number was increased?

7        A.    No, it has not.

8        Q.    Was the Mercury Advantage Program rolled out

9    at the same time the LPE program was rolled out?

10       A.    Yes, it was.

11       Q.    So when we talk about -- strike that.

12             When I use the term "coimplemented," I'm

13   referring to the fact that the price change and the

14   bonus programs were rolled out at the same meeting.

15             Can we agree on that?

16       A.    No, I cannot agree on that because you are

17   testing my memory back to May of 2000 when we had our

18   launch meeting.  I cannot tell you as a fact that those

19   two subjects were presented in the same meeting.

20       Q.    You explained to me earlier, though, you

21   thought they were explained at the same meeting,

22   although there was a gap when their effective

23   implementation date was.

24       A.    That is correct.  They were on or around a

25   similar six-month period in 2000.

1      Q.    And when you did your market testing of your

2   dealers, you explained to them the price change and the

3   bonus program in order to test their feedback; is that

4   correct?

5      A.    We explained the pricing change, and then we

6   announced and asked for their input on a separate and

7   distinct dealer certification program in the same

8   meeting.

9      Q.    And by "dealer certification program," you

10   meant dealer certification and bonus program, correct?

11      A.    That's correct.  That would be LPE and

12   Mercury Advantage.

13      Q.    I guess just to clear up any misconceptions in

14   my mind, at no time did you explain that there would be

15   a price change without also explaining that they would

16   have another way to earn money through a bonus; is that

17   correct?

18      A.    We explained the price change and we did

19   explain that there would be a separate bonus program

20   developed that they could be eligible for additional

21   bonus monies.

22      MR. BERBERICH:  Want to take a lunch break, or how

23   long do you want to go?

24      MS. MCNELLIE:  It's up to John.

25      THE WITNESS:  Keep going.  I'm fine.

1      MR. BERBERICH:  Do you have any time constraints

2  today?

3      THE WITNESS:  No.  I got to catch a flight at 6:30

4  tomorrow morning, so --

5      MR. BERBERICH:  We've done that.

6      MS. FULLER:  Unfortunately, too many times.

7  BY MR. BERBERICH:

8      Q.   Would you describe for me in a general sense

9  the goals of the LPE program?

10      A.   Reward dealers who are committed to improving

11  customer satisfaction.

12      Q.   Are you familiar at all with Eastside Lincoln

13  Mercury?

14      A.   No, I'm not.

15      Q.   In preparation for your testimony today, have

16  you reviewed any of Eastside Lincoln Mercury's CSI

17  numbers?

18      A.   No, I have not.

19      Q.   From your standpoint as the manager of the LPE

20  program, how important is CSI compared to image?

21      A.   They're equally important.

22      Q.   Is CSI in any respects more important than

23  image?

24      A.   No, they're equal in importance.

25      Q.   Was there a Web program that was developed to

1  explain the LPE program to Lincoln and Mercury dealers?

2      A.    Yes.

3      Q.    And did that Web-based program explain the

4  reason why Ford was implementing the changes or the new

5  program?

6      A.    I think it put some things on the first page

7  of strategy of why.  Yes.

8      Q.    What were the strategies?  Why don't you

9  explain those to me.

10     A.    Well, without seeing the document, the Web

11  site, basically it's very important for the future of a

12  luxury brand to improve the sales and customer

13  experience -- sales and service experience for our

14  customers.  And therefore, we are launching this

15  separate and distinct program called LPE and

16  Mercury Advantage.

17     Q.    Lincoln and Mercury had always had a CSI

18  program, correct?

19     A.    That's correct.

20     Q.    Is there any reason why linking the CSI to the

21  bonus program would affect Lincoln's goal?

22     A.    Would you repeat that question.

23     Q.    Well, didn't Lincoln and Mercury always have

24  the goal of obtaining a high CSI?

25     A.    Yes.

1    Q.   That means make as many customers as happy as

2  possible, correct?

3    A.   Correct.

4    Q.   The LPE program didn't change the goal, did

5  it?

6    A.   No.

7    Q.   Was the LPE program instituted as a way to

8  control whether or not the dealers changed their CSI

9  performance?

10    MS. MCNELLIE:  Object to the form.

11    THE WITNESS:  Could you repeat that question,

12  please.

13  BY MR. BERBERICH:

14    Q.   Was the LPE program designed to control

15  whether a dealer changed his or her LP -- excuse me --

16  customer satisfaction performance?

17    MS. MCNELLIE:  Same objection.

18    THE WITNESS:  I'm sorry.  I need you to restate it

19  one more time.

20  BY MR. BERBERICH:

21    Q.   Was the LPE program designed to control

22  whether a dealer changed its CSI performance?

23    MS. MCNELLIE:  Same objection.

24    THE WITNESS:  No, it's not designed to control

25  that.  CSI is one element of these programs, not the

1    only element.

2    BY MR. BERBERICH:

3        Q.    Well, CSI is roughly half of the LPE program,

4    correct?  Half of the bonus qualification?

5        A.    The customer satisfaction portion of the

6    requirements, yes, is 50 percent of the bonus funding.

7        Q.    And customer satisfaction is measured by your

8    industry, meaning the car industry, as CSI, correct?

9        A.    In general terms, the industry, yes, is

10   measured by CSI.

11       Q.    And the subcomponents of the LPE program that

12   deal with customer satisfaction are designed to drive

13   up CSI; is that correct?

14       A.    Yes.  All the requirements are designed to

15   improve customer satisfaction.

16       Q.    Was tying the CSI rating of a dealer to

17   financial reimbursement designed by Lincoln Mercury as

18   a method to control whether a dealer increased their

19   CSI?

20       MS. MCNELLIE:  Object to the form.

21       THE WITNESS:  Could you restate that, please.

22   BY MR. BERBERICH:

23       Q.    Did you try to control the dealer franchisee's

24   CSI rating by tying it to a financial incentive?

25       MS. MCNELLIE:  Same objection.

1        THE WITNESS:  No, we did not.

2    BY MR. BERBERICH:

3        Q.   Why did you make, as a component to the bonus,

4    customer satisfaction?

5        A.   I think you'll need to elaborate on the

6    question because it's all customer satisfaction

7    elements.

8        Q.   Why is customer satisfaction a component of

9    the bonus program?

10       A.   Could you clarify.  Are you speaking to the

11   customer satisfaction rating?

12       Q.   I'm just asking in the broadest possible

13   sense.

14       A.   Okay.  The elements that we measure in the

15   customer satisfaction category for LPE are responsible

16   for driving up, being the driving factors behind the

17   industry CSI and SSI ratings.

18       Q.   Why did you make customer satisfaction a

19   component of the bonus program?

20       A.   Well, the five or six elements that make up

21   customer satisfaction are key drivers to the way our

22   sales and service customers are treated when they show

23   up at a Lincoln Mercury dealership, so, therefore, we

24   have those elements as part of our program.

25       Q.   Did you expect to change the conduct of your

1  dealer franchisees by incentivizing them to make the

2  customer happy?

3      A.   Yes.

4      Q.   Did you attempt to use the bonus part, the CSI

5  bonus part of the LPE program to weed out any dealers

6  who you did not believe were performing well in those

7  areas?

8      A.   No, we did not.

9      Q.   And I think you previously stated you did not

10 use the bonus part of the program to attempt to control

11 a dealer's conformance or the dealer body's conformance

12 with your CSI objectives; is that correct?

13     A.   I need you to restate that or rephrase that

14 question.

15     Q.   Did you attempt to use the bonus program to

16 control the dealer body's conformance with your CSI

17 objectives?

18     MS. MCNELLIE:  Objection.

19     THE WITNESS:  Yes.  The bonus program was used to

20 improve and have the dealer body follow with our

21 customer satisfaction requirements.

22 BY MR. BERBERICH:

23     Q.   If a dealer had high CSI scores but was

24 noncompliant with all the elements of the LPE program,

25 was there any waiver provided?

1      A.    No waiver provided for customer satisfaction

2   elements.

3      Q.    How about if a dealer did not comply with the

4   CSI part of the program, was there a waiver that was

5   issued?

6      A.    There were no waivers issued for customer

7   satisfaction portions of this program.

8      Q.    Was one of the parts of the customer

9   satisfaction program the qualification of a certain

10  number of dealer sales personnel?

11     A.    Training of those dealership sales personnel,

12  correct.

13     Q.    So a certain percentage of dealer personnel

14  needed to be trained in order to meet the bare minimum

15  of the customer satisfaction portion of the program,

16  correct?

17     A.    That is correct.

18     Q.    And that element was nonwaivable, correct?

19     A.    That is correct.

20     Q.    Do you know whether or not any dealer in the

21  Cincinnati region was given a waiver for the customer

22  satisfaction portion of the LPE program?

23     A.    None that I'm aware of.

24     Q.    Is there any way to circumvent the LPE system

25  in regard to qualification of a certain percentage of

1    sales personnel?

2        A.    Could you restate that, please.

3        Q.    Is there any way to circumvent the system and

4    be LPE certified without having the correct percentage

5    of sales personnel who were trained?

6        A.    None that I'm aware of.

7        Q.    How about not putting the sales personnel in

8    the STARS system?

9        A.    Well, that institutes fraud at the Ford Motor

10   Company.  And because of that, we would have the

11   ability to audit that dealership.

12       Q.    So if a dealer attempted to change his

13   percentage by not entering unqualified salespeople in

14   the STARS system, you would consider that to be fraud?

15       A.    It would be certainly an item that we could

16   place an audit for.

17       Q.    But I guess my question is I'm asking you, is

18   it fraud for a dealer to refuse to place or fail to

19   place a salesperson in the STARS system in order to

20   inflate their percentage of certified or trained

21   salespeople?

22       A.    I wouldn't be the one to say it was fraud; it

23   would be our general auditor's office that would say

24   that.  But potentially the dealer is not fulfilling the

25   requirements of the program and therefore is gaining

1    bonus money on a basis that he or she should not be

2    entitled to that bonus money.

3        Q.    At bare minimum, should that dealer be

4    disqualified from the LPE program?

5        A.    We do not have rules to disqualify a dealer

6    for that.

7        Q.    If a dealer doesn't have the appropriate

8    percentage of trained sales personnel, should that

9    dealer be either disqualified or nonqualified from LPE?

10       A.    Nonqualified, yes.

11       Q.    Okay.  Do you know whether or not anyone at

12    Ford assisted or encouraged anyone in the Cincinnati

13    region to circumvent the STARS system in order to

14    artificially inflate the percentage of trained

15    salespeople?

16       A.    I have no knowledge of that.

17       Q.    If someone in a region explained a process to

18    a Lincoln Mercury store about how to, I'll call it,

19    circumvent the STARS system in order to artificially

20    influence the percentage of trained personnel, would

21    that violate the LPE program?

22       A.    Well, the dealer obviously wouldn't have the

23    appropriate number of sales consultants that are

24    employed there at that specific store trained, and,

25    therefore, they wouldn't qualify for the customer

84

1   satisfaction side of LPE bonus money.

2        Q.   Does the LPE program -- strike that.

3             Did Ford, at rollout of the LPE program,

4   represent to the dealer body that the program would

5   have integrity?

6        A.   Yes.

7        Q.   How critical was that to the success of the

8   program?

9        A.   Very much so.

10       Q.   Because if the program didn't have integrity,

11  then the dealer body would not support it, correct?

12       A.   That's correct.

13       Q.   And you run the LPE program, correct?

14       A.   That's correct.

15       Q.   Would you be upset to learn that anyone in the

16  Cincinnati region encouraged a dealer franchisee to

17  circumvent the STARS system in order to artificially

18  inflate the number of trained salespeople so that they

19  could qualify for LPE?

20       A.   Well, as the manager of the program, I have to

21  make sure that every dealer in the country is treated

22  consistently; so, yes, I would be -- I wouldn't call it

23  upset.  I would have to have some type of discussion if

24  that surfaced.

25       Q.   Why do all the dealers have to be treated

1  consistently?

2      A.   Because of the program of this magnitude, it

3  needs to be objective and fair and consistent from the

4  standpoint of J.D. Powers going onto the dealership

5  location to make sure that all dealers get an equal

6  chance at obtaining certification and, therefore, the

7  related bonus and benefits that go along with

8  certification.

9      Q.   If a dealer was not treated fairly, would that

10  be a violation of the franchise agreement by Ford?

11      MS. MCNELLIE:  Object to the form.  Calls for a

12  legal conclusion.

13      THE WITNESS:  I can't answer that because it's not

14  related to the franchise agreement.

15  BY MR. BERBERICH:

16      Q.   Would you take any action either with your

17  supervisor or with anyone that reports directly to you

18  if you found out that a dealer was circumventing the

19  STARS system in order to artificially inflate the

20  number of trained salespeople?

21      A.   Yes, we would take action.

22      Q.   Would you disqualify that dealer for LPE

23  money?

24      A.   I can't answer that at this point without

25  having all the relevant facts put in front of me.

1    Q.   I'm just asking you to assume that a dealer is

2    using the STARS system in order to evade the percentage

3    of trained salespeople requirement, which you indicated

4    was nonwaivable.  Would you demand that that dealer be

5    disqualified?

6    A.   I would demand that research be undertaken on

7    that dealership to determine the extent of the issue

8    and determine if or if not those sales consultants were

9    actually there on the premises.

10    Q.   If you're assuming as true that there aren't

11    the correct number of certified sales personnel, if

12    that's a given and the dealer has been evading this

13    STARS system and truly doesn't have the appropriate

14    percentage, would you disqualify that dealer from

15    receiving LPE money?

16    A.   Yes, we would.

17    Q.   And if someone at Ford was encouraging a

18    dealer to avoid the STARS system in order to

19    artificially inflate their percentage of trained

20    salespeople so they could qualify for LPE money, would

21    you ask that that person be prevented from doing that

22    in the future?

23    A.   Yes, I would assume there needs to be some

24    appropriate discussion from management with that

25    individual.

1      Q.    And do you believe that in order to preserve

2    the integrity of the LPE program that that practice

3    would have to be stopped?

4      A.    Yes.

5      Q.    To my understanding -- and correct me if I'm

6    wrong -- there are only two waivers for LPE; is that

7    correct?

8      A.    There's a facility waiver.

9      Q.    Okay.

10     A.    Yes, correct.

11     Q.    And what other type of waiver is there?

12     A.    I don't recall one.

13     Q.    Well, okay.  Are there two types of facility

14   waivers?

15     A.    No.  We have a facility waiver and potentially

16   a facility letter of understanding that may -- you may

17   be referring to as two separate --

18     Q.    Is there any waiver for any part of the

19   customer satisfaction rating?

20     A.    There are no waivers per se for customer

21   satisfaction.  Maybe if you could clarify your

22   question, what area you're looking at, I'd be happy to

23   answer it.

24     Q.    I'm just asking you as the manager of the

25   program how many waivers that can possibly be issued

1    for the LPE program.

2        A.    You can have a facility waiver.

3        Q.    Meaning that somebody doesn't have to qualify

4    with all the facility components to still make the

5    program?

6        A.    That is -- up through 2002, that was for the

7    image portion only.  As of 2003, that is now the image

8    and customer satisfaction portion.

9        Q.    Is there any reason why a facility waiver can

10    be issued for a customer satisfaction score?

11        A.    Yes.  Through initial facts that we uncovered

12    looking at dealerships that were under construction

13    over the first two years of this program, the

14    construction and modernization process at the

15    dealership facilities affects their business in more

16    ways than just the facility.  It affects customer

17    satisfaction, as well.

18            So, therefore, for the 2003 model year,

19    effective 10/1 of '02, that waiver has been expanded to

20    include image and customer satisfaction elements.

21        Q.    If a dealer has a facility waiver, does that

22    mean that the dealership at which they're operating can

23    look awful and still qualify?

24        A.    Yes.  There is no J.D. Power on site for any

25    dealer with a facility waiver.

```
 1        Q.   I thought there was a requirement that even
 2   though a facility waiver had been issued because the
 3   dealer is either building a new operation or at one
 4   that's being renovated, that the requirement to be
 5   clean, neat and uncluttered still existed.
 6        A.   That is not correct.
 7        Q.   Okay.  What's that term called?  I used clean
 8   neat and uncluttered --
 9        A.   Clean and uncluttered.
10        Q.   So you're saying that in any circumstance
11   where a facility waiver is issued because of a letter
12   of understanding or some agreement with Ford as to
13   what's going to happen to the dealer, that you never
14   look to see if the facility is clean and uncluttered?
15        A.   That is correct.  J.D. Power does not evaluate
16   that portion during the on-site evaluation.
17        Q.   What if Ford itself notices that the facility,
18   while subject to either a letter of understanding or
19   some relocation action, notices that the dealership
20   looked awful?
21        A.   They would counsel with the dealer.  However,
22   it has no effect on LPE bonus money.
23        Q.   Do you know whether or not facility waivers
24   were issued more or less frequently to market
25   consolidators versus dealers who were not market
```

1  consolidators?

2      A.   I can't answer that.  I don't have a list of

3  the consolidators or nonmarket consolidators that you

4  refer to.

5      Q.   Have you ever evaluated a consolidator

6  agreement?

7      A.   No.

8      Q.   Did you ever look at one?

9      A.   No.

10     Q.   Did you ever discuss what a consolidator

11  agreement meant with regard to Lincoln Mercury?

12     A.   Yes, I had an overview of what it means.

13     Q.   Does a consolidator typically commit to Ford

14  to perform certain market actions which include

15  facilities upgrades?

16     A.   I can't answer that.  I'm not familiar with

17  that.

18     Q.   The philosophy behind LPE is to establish

19  Lincoln as a premium luxury brand; is that correct?

20     A.   That's correct.

21     Q.   And that's the goal that you're committed to,

22  correct?

23     A.   That's correct.

24     Q.   The first element of that is an enduring brand

25  that our target customer will want to identify with; is

1    that correct?

2        A.    That's correct.

3        Q.    Is that goal a function of the type of product

4    that Lincoln Mercury puts on the road?

5        A.    Yes, it is.

6        Q.    How has that fared in the last three or four

7    years?  Is Lincoln Mercury putting the product on the

8    road that the customer is looking for?

9        A.    I believe so.

10       Q.    Has Lincoln Mercury's market share declined

11   over the last three or four years?

12       A.    Yes, it has.

13       Q.    And has Lincoln Mercury figured out the reason

14   why it has declined?

15       A.    I think it's a whole host of reasons why it's

16   declined.

17       Q.    Why don't you throw some of those reasons out.

18       A.    Our current clientele is an older clientele.

19   Our current product lineup is targeted toward an older

20   clientele.  Until we get newer products in the

21   marketplace plus higher quality to align with the

22   manufacturers we deal up against, competitive

23   marketplace, and until our sales and service experience

24   gets to those of our major competitors, it is going to

25   be difficult to grow market share.

1      Q.    Do those problems that you just mentioned make

2    your job more difficult?

3      A.    I think it makes everyone's job at

4    Lincoln Mercury more difficult.

5      Q.    The second point says a high level of quality

6    and design engineering and manufacturing.

7            Are those some of the problems that you

8    mentioned earlier?

9      A.    That's correct, yes.

10     Q.    You've got a lagging design and there's some

11   engineering and manufacturing difficulties that have

12   impacted quality; is that correct?

13     A.    That's correct.

14     Q.    And you haven't reimaged or refashioned the

15   brand to fit the market that you're seeking to hit?

16     A.    I would say in all three of those areas we're

17   progressing; we're not there yet, but we're

18   progressing.

19     Q.    The third element is a broad line of products

20   that deliver on the promise of American luxury; is that

21   correct?

22     A.    Uh-huh, correct.

23     Q.    And the truth is, though, that in the last

24   couple of years, Lincoln Mercury has actually

25   eliminated some of its product lines, correct?

1    A.    That's correct.

2    Q.    What percentage of product lines has

3  Lincoln Mercury eliminated?

4    A.    I can't tell you in percentage terms, but we

5  did eliminate a Cougar, a Villager and a Continental

6  and a Tracer.  So we've eliminated four vehicles over

7  the past four years.

8    Q.    Have those vehicles been replaced with

9  anything?

10    A.    The Villager has a replacement coming this

11  year.  The Continental has not, nor have the Tracer

12  and -- actually, I need to add in the Mystique, as

13  well.  So we have five vehicle lines.  And the Villager

14  will be replaced, and we've added product in the way of

15  a Lincoln Aviator, which is an all-new product for

16  Lincoln.

17    Q.    How similar is the Aviator to the Mountaineer?

18    A.    It's very different.

19    Q.    The philosophy section describes the Lincoln

20  Premier Experience as not being a marketing program; is

21  that correct?

22    A.    That's correct.

23    Q.    So it's a new way of doing business.

24          What do you mean by "a new way of doing

25  business"?

1      A.    It's a program that is going to be instilled

2   in the dealers and in our customers' minds, and it's

3   here for the long term.  Marketing programs are very

4   much short term in nature.

5      Q.    The two components of the program are customer

6   satisfaction and image; is that correct?

7      A.    For Lincoln Premier Experience, correct.

8      Q.    With regard to Mercury Advantage, it's simply

9   customer satisfaction?

10     A.    No.  There are elements of image, as well.

11     Q.    So it's a toned-down image?

12     A.    It's a toned-down customer satisfaction and

13  image program.  Yes.

14     Q.    Now, when I talk about CSI, is that the

15  measure that you're using to determine the level of

16  customer satisfaction?

17     A.    No.  Actually, we use a terminology called

18  "voice of the customer."

19     Q.    How long has that been in place?

20     A.    Since the launch of LPE and Mercury Advantage.

21     Q.    But when you're referring to customer

22  satisfaction in the LPE materials, are you talking

23  about elements in the program that are designed to

24  increase the customer satisfaction -- or CSI index?

25     A.    Could you restate that, please.

1      Q.    Is customer satisfaction measured by CSI

2   index?

3      A.    That is one element -- no.  If you could go

4   back, please, and strike that.

5            CSI index is not related.  It is "voice of the

6   customer" is one element of the customer satisfaction

7   category within LPE.

8      Q.    Okay.  Well, is voice of the customer

9   synonymous with CSI?

10     A.    No.

11     Q.    What is voice -- I've never heard that term

12   before.  What is voice of the customer?

13     A.    That is a calculation based on the customer

14   viewpoint surveys that our customers return into -- or

15   render based on their sales and service experience at a

16   particular Lincoln Mercury dealership.

17     Q.    Does customer viewpoint generate a CSI rating?

18     A.    No; it is a customer viewpoint rating and it

19   generates a voice of the customer rating.

20     Q.    So are you saying you don't use a CSI rating

21   for Lincoln Mercury?

22     A.    That is correct.

23     Q.    Okay.

24     A.    That is an industry term, not specific to

25   Mercury.

1    Q.    Right.  I've used it in a very generic

2    fashion.

3         Is CSI a generic term for things like voice of

4    the customer or customer viewpoint ratings that

5    Lincoln Mercury uses?

6    A.    Technically, CSI is driven by J.D. Power &

7    Associates.

8    Q.    So CSI --

9    A.    Customer satisfaction index.

10   Q.    -- CSI is J.D. Power's way to describe what

11   you call voice of the customer and customer viewpoint?

12   A.    That's correct.  That's their industry term

13   for all manufacturers.

14   Q.    And with regard to LPE and Mercury Advantage,

15   qualification under the customer satisfaction piece is

16   not negotiable; is that correct?

17   A.    Could you restate that, please.

18   Q.    There's no waiver for the customer

19   satisfaction part of the program; is that correct?

20   A.    That's correct, yes.  Until 10/1 of '02 for

21   the '03 model year program.

22   Q.    I'm talking about -- and let me restrict my

23   questions right now to the launch of the program and

24   through '01.

25   A.    Okay.

1    Q.    When was the program officially launched?

2    A.    Announced to the dealers May of 2000, and

3    launched 10/1 of 2000 as a 2001 model year program.

4    Q.    So we can call 2001 the first year?

5    A.    Correct.

6    Q.    When did the waiver start for the customer

7    satisfaction piece?

8    A.    2003 model year, October 1st of 2002.

9    Q.    Is the evaluation that's done by J.D. Power &

10    Associates for LPE qualification supposed to be

11    performed by unbiased personnel?

12    A.    Yes.

13    Q.    Does unbiased mean unaffiliated with Ford

14    Motor Company?

15    A.    Yes.

16    Q.    If any one of your J.D. Power's examiners was

17    determined to be a Ford Motor Company employee, would

18    they be removed from the program?

19    A.    Yes.

20    Q.    Would you reaudit the dealerships that they

21    had audited in order to give that dealer an unbiased

22    evaluation?

23    A.    Well, there would be no need for that because

24    with J.D. Power, they've been instructed to hire

25    non-Ford employees for these positions.

1      Q.    But if you found that one was a Ford employee,

2    would you have that person reaudited?

3      A.    Under that assumption, yes, absolutely.

4      Q.    What if that person was perhaps not a Ford

5    employee, but affiliated with Ford Motor Company,

6    meaning a vendor to Ford, would that person be required

7    to disqualify themselves from J.D. Power's

8    participation?

9      A.    I can't answer that because J.D. Power signs

10    their own contracts with these individuals, so it

11    behooves them to make sure that they're not related to

12    Ford.

13      Q.    Well, if the J.D. Power auditor is perhaps not

14    a Ford employee, but affiliated with Ford, such as a

15    vendor to Ford, would they be disqualified from

16    participating as an auditor?

17      A.    You'll have to restate what a vendor means.

18      Q.    Somebody who sells to Ford, sells or provides

19    services to Ford?

20      A.    Could you restate the entire question.

21      Q.    If an auditor was affiliated with Ford, such

22    as a vendor to Ford, would they be disqualified from

23    doing LPE audits?

24      A.    Depends, I think, on what area they might be

25    working with Ford Motor Company.  I want to make sure,

1    and so does J.D. Power -- their management wants to

2    make sure that there's absolutely no conflict of

3    interest, but I do know that these are all independent

4    contractors that they're working with.  There

5    potentially is room for where they may be working with

6    other divisions of the Ford Motor Company.

7        Q.    Would you, as the manager of the LPE program,

8    want that person to be removed from the auditor role to

9    ensure that there would be no bias?

10       A.    I would let J.D. Power make that call to

11   determine no bias or conflict of interest.

12       Q.    Do you know whether or not Eastside Lincoln

13   Mercury had an audit performed by someone who was a

14   Volvo trainer?

15       A.    I have no idea.

16       Q.    Had you found out that there was a Volvo

17   trainer that was performing Eastside's audit, would you

18   have further investigated to determine whether they

19   should be removed?

20       A.    No, I would not.

21       Q.    So you would trust J.D. Power?

22       A.    Absolutely.

23       Q.    Is the audit process, from an image

24   standpoint, arbitrary?

25       A.    No.

1    Q.    What steps does Ford go through to assure that

2    the image portion of the audit is not arbitrary?

3    A.    Well, there are -- obviously, you have them

4    right there in your hand.  The program rules of what we

5    determine is pass and fail for image.  We then give

6    that to J.D. Power, and they do their own training to

7    make sure they instill consistency in all their people

8    and that they have no issues on what constitutes pass

9    or fail when they're on site at the dealership.

10    Q.    So when I use the term "arbitrary," would you

11    agree that the opposite of that is consistent?

12    A.    Yes.

13    Q.    So you're looking for consistency in

14    evaluation of the image part; is that correct?

15    A.    That's correct.

16    Q.    So you want to take taste out of the equation,

17    correct?

18    A.    Yeah.

19    Q.    So you want everyone to be evaluated on the

20    same set of rules?

21    A.    That is correct, yes.

22    Q.    Are you aware that Eastside Lincoln Mercury

23    was originally failed on the image portion because of a

24    condition on the natural stone aggregate on the

25    exterior of the building?

1      A.    Yes.

2      Q.    And you were aware that they were subsequently

3    approved on the image portion?

4      A.    Yes, that's correct.

5      Q.    Do you know what changes to the building

6    Eastside Lincoln Mercury made in the interim?

7      A.    No, I do not.

8      Q.    Can you explain why the second auditor

9    approved Eastside Lincoln Mercury's facility from an

10   image standpoint and the first one denied the facility?

11     A.    I cannot explain that.

12     Q.    Have you seen photographs of Eastside Lincoln

13   Mercury's exterior, the same photos that were used to

14   deny the LPE certification?

15     A.    I've seen the photographs.

16     Q.    Were you involved in the appeal from denial of

17   Eastside's LPE audit?

18     A.    Yes, I was.

19     Q.    What happened in that appeal process?

20     A.    The original J.D. Power file was submitted for

21   review to the board, as well as the dealer's argument

22   and any supporting documentation that the dealer might

23   want to submit at that time.  It was reviewed by a

24   five-member panel, of which I am one of the board

25   members and have one of the votes.

1        And it was ruled that the J.D. Power

2    evaluator, first visit, did the consistent job and

3    followed the program rules that were expected, and,

4    therefore, the appeal was denied.

5        Q.   Can you recall what the basis of that denial

6    was?  And I'm talking about what you, as a board of

7    appeal, concluded.

8        A.   Based on the information that was supplied by

9    J.D. Power and looking at the stains or the demarcation

10   on the walls and based on the program rules, I

11   personally felt and voted to deny the dealer an

12   overturned ruling.

13       Q.   Can you remember what the vote was?

14       A.   Five to zero, unanimous against the dealer.

15       Q.   And the dealership was later approved,

16   correct?

17       A.   That's correct.

18       Q.   And if you assume that no work was done to the

19   exterior of the building between the first and the

20   second audit, can you tell me why the second auditor

21   approved the facility?

22       MS. MCNELLIE:  Object to the assumption, but you

23   can answer the question.

24       THE WITNESS:  I cannot assume what was done or what

25   was not done at the dealership in between.  However, I

1  did review both the before pictures and the after

2  pictures, and there is a marked difference in the way

3  that the facility looks.

4  BY MR. BERBERICH:

5      Q.   What was the difference?

6      A.   There are no stains on the walls on the second

7  set of pictures.

8      Q.   So did it appear to you that the dealer took

9  some action with regard to the natural stone aggregate

10  on the exterior of the building?

11     A.   I can't answer that.  I would assume that the

12  dealer did.  The marks were no longer there.

13     Q.   If the dealer testified that there was nothing

14  that was done to the building, you would disagree with

15  that; is that correct?

16     A.   Well, I can only agree with the fact that I

17  saw the before and after pictures and they look

18  remarkably different.

19     Q.   Well, the before and after pictures that

20  you're referring to are digital photos, correct?

21     A.   That's correct.

22     Q.   Did you actually inspect the facility at the

23  time of the first audit and at the time of the second

24  audit?

25     A.   No, I did not.

1    Q.    So you're relying on the accuracy of a digital

2    photograph?

3    A.    No, I'm relying on the accuracy of the

4    J.D. Power evaluator as an independent third party.

5    Q.    But based on that evaluation and your review

6    of the digital photographs, you rendered a 5-0 decision

7    against the dealer; is that correct?

8    A.    I was one vote as a board member of that

9    appeals board, correct.

10    Q.    And you'd stand by the determination that if

11    the building looked as presented in that original set

12    of photographs, you would deny that building LPE

13    certification for image?

14    A.    My individual vote on that appeals board would

15    be to deny.

16    Q.    If there were no change in the building,

17    meaning nothing was done --

18    A.    Uh-huh.

19    Q.    -- and the second evaluator passed the

20    facility, would you agree that the process was

21    arbitrary?

22    A.    I cannot agree that the process was arbitrary

23    because we have contracted with J.D. Power to send

24    independent third-party people out there as inspectors;

25    and, therefore, I rely on their judgment.

1     Q.    You claim that you saw some photos after the

2  second audit, correct?

3     A.    That's correct.

4     Q.    Did you watch this particular file or bird dog

5  this particular file?

6     A.    No.

7     Q.    How did you manage to look at the second set

8  of photos?

9     A.    I reviewed them this morning before this

10  deposition.

11     Q.    You reviewed the photos in connection with

12  this case; is that correct?

13     A.    That's correct.

14     Q.    Is it possible those photos are simply a

15  better photograph of the exterior of the building, that

16  showed it in a better light than the first set?

17     A.    I can't answer that because, again, we rely on

18  the J.D. Power evaluator to make the decision if

19  they're going to pass or fail a dealer.

20     Q.    If nothing was done to the building between

21  the first and the second audit and one auditor failed

22  the building and one passed the building, would you

23  agree that that process was arbitrary?

24     A.    Could you repeat the question, please.

25     Q.    If nothing was done by the owner of the

1    building between the first and the second audits, and

2    the first auditor failed the building and the second

3    auditor passed the building, would you agree that the

4    process is arbitrary?

5        A.    Well, with this scenario of two different sets

6    of pictures, before and after, with different pictures

7    of the walls showing no stains or streaks, I can say

8    that the J.D. Power evaluators did the right thing both

9    times; failed the first time and passed the second

10   time.  But again, it is not my decision.  It is the

11   decision of J.D. Power & Associates and their

12   evaluators.

13       Q.    But if nothing had been done to the building

14   in the interim, in the space between the first audit

15   and the second audit, and one auditor passed the

16   building and one auditor failed the building, wouldn't

17   you agree that that process is arbitrary?

18       A.    It would be arbitrary if that exact scenario

19   happened.

20       Q.    Do you have any evidence that Eastside Lincoln

21   Mercury did anything to the wall between the first

22   audit and the second audit?

23       A.    No, I have no evidence.  None that I'm aware

24   of.

25       Q.    Were you aware at the time of the appeal that

1    the contractor hired by Eastside Lincoln Mercury

2    indicated that nothing could be done to change the

3    condition of the wall?

4        A.    I recall a letter from a contractor that was

5    included in the dealer's appeal.

6        Q.    And do you recall what that letter said?

7        A.    Something to the effect that it was a natural

8    aging process to that type of wall.

9        Q.    Did the letter also indicate that nothing

10   could be done to change that condition?

11       A.    I don't recall that.

12       Q.    Do you know whether the letter said that

13   nothing should be done to change that condition?

14       A.    I don't recall that, either.

15       Q.    If the contractor advised that nothing should

16   be done to change that condition, did that -- strike

17   that.

18            Did the letter from the contractor matter at

19   all to you during the appeal process?

20       A.    We take all supporting evidence and review it

21   in detail at the appeal process.

22       Q.    Did that contractor's letter in any way impact

23   the board's decision?

24       A.    I can only speak as one member of the board.

25   It did not impact my vote.

1    Q.   Why didn't it impact your vote?

2    A.   Because I think after seeing a lot of

3  facilities around the country, that it can be power

4  washed, sandblasted, things of that nature to improve,

5  enhance and clean up our facilities.  And therefore, I

6  felt personally -- and my vote was against the

7  dealer -- as a board member, one of five board members

8  on that appeals board, to deny the dealer

9  certification.

10   Q.   So you based your decision on your own

11 experience versus the recommendation of Mr. Woeste's

12 contractor?

13   A.   I took the recommendation of his contractor

14 into advisement prior to making my decision; but to me,

15 the digital pictures that were presented and the detail

16 description that was presented by the J.D. Power

17 evaluator was more of a stain-type material than an

18 aging process, and therefore I denied the dealer his

19 appeal.

20   Q.   Did Mr. Woeste have the opportunity to find

21 out what experience you carried around inside your head

22 about stone walls at or about the time of the appeal?

23   A.   No, he would not have the experience in my

24 head.

25   Q.   Would any dealer have the opportunity to know

1    what extrinsic facts or opinions that any of the appeal

2    board members would bring to the table for this appeal

3    process?

4        A.    Irregardless of the appeal process, the

5    dealers were -- as you have in your hand, a Web site.

6    And they have printed materials that included pictures

7    of dealerships, representative samples from all around

8    the country, showing what was a pass-type facility and

9    what was a fail.  And stains on the side of the

10   building were noted in that Web site saying that

11   those would fail the dealership.

12       Q.    I guess my question was, would any of the

13   dealers that would submit their LPE noncertification to

14   the appeal board know what experiences and knowledge

15   the board members were going to bring into that

16   hearing?

17       A.    No, they would not.

18       Q.    Was there any set of rules that was prepared

19   for the appeal board to base its decisions on?

20       A.    There is a charter, yes.

21       Q.    What is the charter?

22       A.    The charter basically states that the appeals

23   board is there to determine if J.D. Power did the right

24   job and followed the rules -- program rules during the

25   on-site evaluation.

1      Q.    Is there any part of that rule process that

2  says the decision has to be based on evidence presented

3  to the panel?

4      A.    Well, obviously evidence has to be presented

5  by the dealer if they failed as to the reasons why they

6  deem they shouldn't have failed.  So yes, evidence

7  needs to be provided.

8      Q.    Well, have you ever sat on a jury before?

9      A.    No.

10     Q.    Have you ever participated in a trial?

11     A.    Yes.

12     Q.    Have you ever heard the instruction to the

13  judge that -- from the judge that the jury's only

14  supposed to consider the evidence that was presented at

15  trial and not to consider things that weren't

16  presented?

17     A.    Yes.

18     Q.    Does your charter have any similar protection

19  or provision?

20     A.    No, not specifically in the charter.

21     Q.    Do you believe that a decision upon an appeal

22  should be based on evidence that's presented by

23  J.D. Power and the dealer, versus evidence that the

24  board members themselves bring into the equation?

25     A.    Yes.  It should be three things.  J.D. Power,

1    the dealer, and the program rules that were published

2    in advance.

3        Q.   As part of the review process for preparing

4    for your deposition, did you look at the J.D. Power

5    photographs for Lincoln Mercury at Fairfield?

6        A.   No, I did not.

7        Q.   If the Lincoln Mercury of Fairfield

8    photographs showed --

9        A.   I'm sorry.  Can you strike that?  Yes, I did.

10   This morning we did look at Fairfield pictures.  My

11   apologies.

12       Q.   Did you notice any aspects of the

13   Lincoln Mercury of Fairfield facility that -- at the

14   time its J.D. Power evaluation was done, that would

15   disqualify it on the image portion?

16       A.   The one picture I saw this morning was one of

17   a front fascia with some type of damage or hole through

18   the fascia.

19       Q.   I call it like a racoon hole or a gopher hole.

20       MS. MCNELLIE:  I was going to say, your animal

21   changes every deposition.

22       MR. BERBERICH:  I like gopher hole, but I've never

23   seen a gopher, so it looks more like the damage a

24   racoon does to eaves.  I have seen that.

25   ///

1   BY MR. BERBERICH:

2       Q.    As far as the picture that you saw at the time

3   that Fairfield's J.D. Power's evaluation was done,

4   would you have disqualified them based on the condition

5   of the fascia?

6       A.    Based on the condition of the fascia, again, I

7   don't make the disqualification or the pass/fail.  That

8   would be J.D. Power.  But that would be pretty obvious

9   to the J.D. Power evaluator.

10      Q.    That would be an obvious disqualification?

11      A.    Again, I don't make that judgment of pass or

12  fail, but that would be pretty obvious to the

13  J.D. Power evaluator.

14      Q.    But would you agree with me that even though

15  you're not the evaluator, that the condition of the

16  fascia on Fairfield Lincoln Mercury would violate the

17  image requirement that's spelled out in the manual and

18  the examples that you provide?

19      A.    Yes.

20      Q.    Was it explained to the dealers that one way

21  to waive your image requirement was to propose a

22  relocation or propose some type of market rep action?

23      MS. MCNELLIE:  Object to the extent that -- well,

24  I'll just object to the form of the question.

25      THE WITNESS:  Could you restate that, please.

1    BY MR. BERBERICH:

2        Q.    Was it explained to the dealer body that one

3    way to get a facility waiver would be to propose a

4    relocation or some type of market rep action?

5        MS. MCNELLIE:    Same objection.

6        THE WITNESS:    Those are two elements in addition to

7    building a new facility or modernizing an existing

8    facility, correct, could get a waiver.

9    BY MR. BERBERICH:

10       Q.    Was that explained to the dealers?

11       A.    It was in our program materials and on our Web

12   site that the dealers could apply for a facility

13   waiver.  Yes.

14       Q.    To get a facility waiver, you don't actually

15   have to be remodeling; is that correct?  You only have

16   to promise to remodel?

17       A.    That's not correct.

18       Q.    Okay.  At the time that Lincoln Mercury got

19   its Fairfield -- excuse me.  Strike all that.

20            At the time Lincoln Mercury of Fairfield got

21   its facility waiver, there was no construction under

22   way; isn't that correct?

23       A.    I can't -- I cannot speak for a specific

24   dealer, but generally you would apply for a waiver

25   first, and then set out a time line to draw up plans

1    and begin a modernization or a construction action.

2        Q.    My point is, in order to get the facility

3    waiver, you don't actually have to be doing

4    construction.  You just simply have to promise to do

5    the construction and Lincoln Mercury agrees to that; is

6    that correct?

7        A.    A dealer can apply for a waiver without

8    beginning construction, and then over a certain course

9    of time, they need to construct or do whatever

10   modernization action they stated to us in their waiver.

11       Q.    And who's the point man at the region for

12   working this waiver through the system?

13       A.    I would say it would either be the regional

14   manager or the retail development manager position.

15       Q.    Aren't those the same two positions that

16   coordinate the market consolidations?

17       A.    In most regions, correct.

18       Q.    Did you have any interaction with the retail

19   market development person in the Cincinnati region

20   regarding Lincoln Mercury of Fairfield?

21       A.    No, none.

22       Q.    Did Lincoln Mercury of Fairfield get a

23   facilities waiver?

24       A.    To the best of my knowledge, yes.

25       Q.    Did they get any other type of waiver?

1       A.    None that I'm aware of as it associates with

2   the LPE program.

3       Q.    If a dealer doesn't have enough data to

4   qualify under the customer satisfaction end, are they

5   disallowed until they develop enough data?

6       A.    No, they are not.

7       Q.    How does that process work?

8       A.    If a dealer has less than 30 sales and service

9   customer surveys returned over a 24-month period, if

10  they're less than 30, they get an N/A for that

11  category, not applicable.

12      Q.    So they get a pass?

13      A.    They get a pass.

14      Q.    How long does that pass last?

15      A.    That lasts for the entire model year of the

16  program.

17      Q.    If a dealer purchases another facility, either

18  through a market consolidation action or just an

19  outright purchase, do they get any type of pass on the

20  customer satisfaction section for the new facility?

21      A.    You'll need to clarify your question because

22  you're talking about facilities and buy/sell

23  agreements.

24      Q.    Let's just say that I'm dealer A and I want to

25  buy dealer B's operation, which is 20 miles away, and

1    dealer B would never in a million years qualify under

2    the customer satisfaction provision.

3        A.    Uh-huh.

4        Q.    At the time that dealer A purchases dealer B's

5    store, does that new store qualify for LPE?

6        A.    That new store gets a 12-month grace period

7    from LPE requirements.

8        Q.    Does that -- strike that.

9              Does the market consolidation in any way

10   impact the qualification of the new facility under LPE?

11   And I'm talking from a CSI standpoint or a customer

12   satisfaction standpoint.

13       A.    Would you restate that, please.

14       Q.    If a dealer picks up a new store in a town as

15   part of a market consolidation, does that impact the

16   new store's qualification under LPE from a customer

17   satisfaction standpoint?

18       A.    No.  Again, it would be treated as a buy/sell,

19   and there's a 12-month grace period that is associated

20   with buying another store.

21       Q.    Is there anywhere in the LPE program

22   information that that explanation is given?

23       A.    I can't answer that without seeing the Web

24   site because I'm not sure what is published there.

25       Q.    I'm just asking you, is there any type of

1    published material that explains the rule that when you

2    buy a new dealership, that new dealership gets a pass

3    for a year on the customer satisfaction side?

4        A.    There is an internal operating guideline

5    document, yes, that all the regional managers have,

6    plus my entire department.

7        Q.    And that pass would show up as an N/A on

8    someone's J.D. Power form?

9        A.    No.  I would think it would show up as a yes,

10   but I can't be certain on that without seeing the

11   program rule guide.

12       Q.    At the time that LPE was rolled out, was that,

13   I'll call it -- I'll call it a waiver for customer

14   satisfaction, explained to the dealer body?

15       A.    Could you restate that.

16       Q.    At the time LPE was rolled out, was it

17   explained to the dealer body that upon purchase of a

18   new dealership, you would get a pass for the first year

19   on the customer satisfaction side?

20       A.    No, it was not stated because we don't do that

21   many retail dealership transactions each year.

22   However, I do need to clarify your question.  It is not

23   a pass for customer satisfaction as it is a grace

24   period for both customer satisfaction and image to

25   allow the incoming new dealer to get their operation up

1    to what they feel it can do from a performance

2    standpoint.

3        Q.    Well, correct me if I'm wrong, but if I bought

4    a dealership in February of 2001, would I automatically

5    qualify for LPE and Mercury Advantage for the next

6    year?

7        A.    You would get a grace period bonus for

8    12 months from the date you closed the transaction.

9    Technically, you're not LPE and Mercury Advantage

10   certified, you are just getting the bonus money as a

11   grace period bonus, and it's designated in our

12   documents as such.

13       Q.    So that's what you call it, a grace period

14   bonus?

15       A.    Yes.

16       Q.    Are there any other types of grace periods

17   that are made available?

18       A.    None that I'm aware of.

19       Q.    Was the grace period bonus explained or

20   described to the dealer body on rollout of the LPE?

21       A.    No.  It's only explained individually as the

22   buy/sell transaction comes together.

23       Q.    Did Lincoln Mercury project how many of its

24   dealers would become LPE certified before the program

25   was rolled out?

1    A.    Yes.  We looked at projections.

2    Q.    Did you have an idea -- strike that.

3          Did you have an idea at the time that you were

4    rolling out the program as to how many dealers would

5    become LPE certified?

6    A.    Somewhere between 75 and 85 percent.

7    Q.    Was that fact described to the dealer body?

8    A.    No, it was not.

9    Q.    Is there any reason why you didn't describe

10   that to the dealer body?

11   A.    Because I would expect that all dealers would

12   try and get certified.

13   Q.    So you didn't want to discourage anybody on

14   the front end?

15   A.    Absolutely correct, yes.

16         Can we take five?

17   MR. BERBERICH:  Sure.

18              (Lunch recess taken.)

19   BY MR. BERBERICH:

20   Q.    Was there an initiative as part of the LPE

21   program to upscale or upgrade the Lincoln Mercury

22   facilities across the country?

23   A.    No.

24   Q.    There was something on the Web page that talks

25   about clean, uncluttered and accessible dealership.  It

1    says, "We have an initiative in place to upgrade

2    facilities across the country."

3         What does that refer to?

4    A.    It's more clean and uncluttered.  And if you

5    look at the J.D. Power evaluation, it's really picking

6    up the garbage, making sure the paint's right, the

7    landscaping, the bushes are trimmed.  But we never

8    announced any type of program to upgrade our facilities

9    with significant cost.  It's all based on dealer's

10   voluntary actions.

11   Q.    Next sentence says, "We've already done

12   extensive renovations on close to 50 dealerships with

13   15 to 20 additional facility actions now in progress."

14        Who's the "we" in doing the extensive

15   renovations?

16   A.    "We," meaning Lincoln Mercury designed and

17   dealer funded.

18   Q.    And "15 to 20 additional facility actions now

19   in progress" means 15 to 20 renovations or new builds?

20   A.    Uh-huh, or new builds.  Yes, correct.

21   Q.    But all those were funded by the dealers

22   themselves, correct?

23   A.    That is correct.

24   Q.    Is one of the aims of the LPE program to

25   control dealership facility actions?

1    MS. MCNELLIE:  Objection to the form.

2    THE WITNESS:  It's not part of LPE to control.  We

3  would actually, with our criteria, try and improve our

4  facilities.

5        I may need you to explain further what you

6  mean by "facility action."

7  BY MR. BERBERICH:

8    Q.  Does the LPE program allow Lincoln Mercury to

9  dictate to the dealer body upgrades to the facility in

10 compliance with what Lincoln Mercury wants?

11   MS. MCNELLIE:  Objection to the form.

12   THE WITNESS:  The Lincoln Mercury -- excuse me.

13 The LPE program does not dictate to the dealers what

14 the facility upgrades need to be.

15 BY MR. BERBERICH:

16   Q.  In the 2003 program, though, there was the

17 demand that LPE compliant dealers add certain types of

18 waiting areas, for instance; is that correct?

19   A.  That's not correct.

20   Q.  Okay.  What were the new additions to the 2003

21 LPE program?

22   A.  Could you clarify; image or customer

23 satisfaction?

24   Q.  Image.

25   A.  The image requirements were increased to

1    include the showroom, the customer lounge, the service

2    write-up area and the customer rest rooms strictly from

3    a point of being clean and everything operable in those

4    locations.

5        Q.   Weren't those things supposed to be clean and

6    uncluttered before 2003?

7        A.   No, they were not.  Exterior only prior to

8    2003.

9        Q.   What if a dealership doesn't have a customer

10   lounge, does LPE 2003 require one be built?

11       A.   No, it doesn't require one to be built.

12       Q.   Well, if a dealership does not have a customer

13   lounge in 2003, can they be LPE certified?

14       A.   Yes, if they were to provide a chair in the

15   showroom and designate that area as a customer waiting

16   area.

17       Q.   So you're saying that there's no part of LPE

18   that is designed to control dealer facility changes or

19   improvements or upgrades?

20       A.   Changes or improvements or upgrades, no, there

21   are no parts of LPE.  Strictly clean, uncluttered and

22   all equipment working.

23       Q.   Is there any part of the LPE program that

24   tells Lincoln Mercury when it can stop in terms of what

25   areas it can add into the program?

1    A.    Image or customer satisfaction?

2    Q.    Image.

3    A.    Well, we work closely with our dealer council.

4    They designated a subset of the national dealer

5    council, five or six dealers, to be on a special LPE

6    subcommittee, and we review all the future program

7    requirements with them.

8          To answer your question strictly on image, we

9    have now, between the three years, covered all of the

10   requirements, exterior and interior, other than the

11   parking lot surfaces and the exterior lighting.  But

12   the building and the infrastructure we have now, over

13   the course of three years of programs, covered the

14   entire interior and the entire exterior of the

15   dealership so there's really no other elements to go.

16   Q.    Is there any part of the LPE program that says

17   that Lincoln Mercury won't require for certification,

18   for instance, a signature or gallery facility?

19   A.    We have not published that; however, I've told

20   the dealer council that numerous times, that there

21   would not be a requirement for a new facility to be LPE

22   certified.

23   Q.    Is that anywhere in writing?

24   A.    No, it is not.

25   Q.    Does the dealer that doesn't have a waiting

1  area know that it only has to add a chair to constitute

2  a customer lounge?

3      A.   I would have to think so.  We did not fail one

4  dealer for not having a waiting area.  That's pretty

5  uncommon in dealership facilities today.  They would at

6  least have a chair.

7      Q.   Was there any part of the rule book that talks

8  about what constitutes a customer lounge?

9      A.   Without looking at the Web site or the program

10  materials, I couldn't tell you.  I can tell you,

11  though, we did not fail a dealer for not having a

12  customer lounge.

13      Q.   On the Web site, there was a

14  question-and-answer section that talked about what if a

15  dealer is in the process of building a new facility.

16  It's talking about the waiver.  And the next sentence

17  says, "The dealer may request a waiver until the new

18  facility is completed."

19          I think we've gone over that in detail,

20  correct?

21      A.   Correct.

22      Q.   Then the next sentence says, "The waiver may

23  be granted so long as the current facility is clean and

24  reasonably comfortable."

25          Do you remember being involved in that,

1  developing that sentence or that phrase?

2      A.   I think I would need to see that in the

3  context that it's written or you'll need to clarify it

4  by reading more of that section.

5      Q.   That's all.

6      A.   Could you restate it, please.

7      Q.   The sentence after the waiver is discussed

8  says, "The waiver may be granted so long as the current

9  facility is clean and reasonably comfortable."

10          Is that an additional requirement for getting

11  the waiver?

12      A.   No, it is not.

13      Q.   So that sentence doesn't mean anything?

14      A.   I think -- again, in context, you have the Web

15  site or the program materials.  I do not.  And I did

16  ask you to clarify it, and I'm not sure if we have to

17  read the entire page or not, but it's always -- the

18  regional manager does need to concur in any waivers.

19  We would not grant them from a central program

20  headquarters general office location without the input

21  of the regional manager and the concurrence of our

22  local regional managers.

23      Q.   What if the local regional manager, for his

24  own reasons, wants that dealer to pass, and you, as the

25  LPE program director, upon seeing the facility, would

1    never pass in a million years, how do you resolve that

2    conflict?

3        A.    I need you to either restate or clarify that

4    question.

5        Q.    What if a regional manager, for his own

6    reasons such as market consolidation or other market

7    actions, wants a facility to pass and requests a

8    waiver, and you, as the LPE director, would never pass

9    that facility in a million years, how is that conflict

10   resolved?

11       A.    Well, first of all, your definition of pass

12   and your definition of waiver is -- you are bringing

13   together and they're not together.

14       Q.    Let's just say you would never waive that

15   facility in a million years.  How do you resolve that

16   conflict?

17       A.    First of all, I turn down zero waiver

18   requests.  I approve them all, a hundred percent of

19   them.

20       Q.    Okay.

21       A.    So that is really not an issue.  I am going on

22   the basis of the regional manager knowing their

23   marketplace closer than I do, so I would never decline

24   a request for a waiver.

25             But irregardless of what the facility looks

1    like today, the waiver gives the dealer two years to

2    improve or modernize or relocate, whatever that action

3    is, without an inspection by J.D. Power.

4        Q.   The Web site couched the waiver as a "may"

5    situation; you may request a waiver, you may receive a

6    waiver.  It doesn't talk about the waiver being

7    automatic.

8        A.   Uh-huh.

9        Q.   Do you recall stating in any of the program

10   materials that the waiver would be automatic?

11       A.   No.  It was never stated in any of the program

12   materials that it would be automatic, nor did I allude

13   to that.  I said I would just not decline any of them.

14       Q.   My question that I'll back up to, it's part of

15   the question and answer on the Web site about clean,

16   uncluttered and accessible.  And it's under number 5.

17   It says specifically, "The waiver may be granted so

18   long as the current facility is clean and reasonably

19   comfortable."

20           My question to you in following up that

21   statement is, can the waiver be granted if the facility

22   is not clean and not reasonably comfortable?

23       A.   Yes, based on the regional manager.

24       Q.   Do the people that sit on the appeal board for

25   LPE get paid to do that?

1       A.   No, they do not.

2       Q.   How do you encourage the dealer

3    representatives to sit on the panel?

4       A.   We, working with our dealer council,

5    established a pool of about ten dealers that are all

6    LPE and Mercury Advantage certified in the current

7    year.  And we just rotate them through so we don't take

8    too much of their time.

9       Q.   Does Bob Reichert sit on that appeal board?

10       A.   I can't answer that, to protect the

11    confidentiality of the dealer member on that board.

12       Q.   Well, that's a tough one for me because if he

13    does sit on that board --

14       MS. MCNELLIE:  Do you want to ask him if he sat on

15    the board and heard the Eastside appeal?

16    BY MR. BERBERICH:

17       Q.   Well, let me ask you this question.

18       A.   Can we go off the record for a second?

19       MR. BERBERICH:  Yeah, that's fine.

20            (Discussion held off the record.)

21    BY MR. BERBERICH:

22       Q.   How does this third party, that is the

23    tiebreaker, chosen?

24       A.   He was chosen by the dealer council.  And they

25    were looking for an independent person that had both

1    factory and retail knowledge.

2        Q.    Is it one person, or do you have a pool of

3    people?

4        A.    It's one person, and this individual has

5    attended a hundred percent of the meetings.

6        Q.    How is this person compensated?

7        A.    He is not.

8        Q.    Why does this person choose to participate?

9        A.    He's an educator right now, and he feels

10   staying close to the automotive industry will help him

11   teach his students.

12       Q.    And you mentioned that you're one of the board

13   members; is that correct?

14       A.    That's correct.

15       Q.    Is there -- do you have a permanent position

16   on the board?

17       A.    Virtually.  I've missed one meeting out of

18   probably about 15.

19       Q.    How are the other factory representatives

20   selected?

21       A.    They were selected by the dealer council, as

22   well.  The dealers felt that we should have equal

23   representation from the dealers and the company side

24   and an independent, so that's how we ended up with a

25   five-member board.

1              The other individuals, I can disclose who they

2      are.  Gary Lessuise, who's our dealer relations

3      manager, has sat in on probably 80 percent of the

4      cases.  And Jay Klahn, who is our Ford customer service

5      manager for Lincoln Mercury, has sat in on the balance.

6          Q.    Is there a waiver for brand signage?

7          A.    Yes, there is.

8          Q.    And is it the same application process for

9      both waivers?

10         A.    Yes.

11             There is a second subwaiver category that I

12      didn't speak to before.  I forgot about brand signs.

13      Virtually every dealer now has our new brand sign.

14      But, yes, the dealer has to order a sign, has to

15      install a sign.  And a lot of time municipalities have

16      governing law of square footage of signage and things;

17      we have to jump through hoops with city councils'

18      planning commissions.  Therefore, the dealer can file a

19      waiver while they're going through the appeals process

20      to get their sign.  It is no longer a requirement, by

21      the way.

22         Q.    In order to assure the fairness of LPE, should

23      a dealer identify all of his sales employees on the

24      STARS system within 60 days of their employment?

25         A.    Yes, he should, but there's probably other

1    reasons for it.

2        Q.    I'm asking, under the LPE program, if that

3    salesperson has been there for 60 days, should they be

4    enrolled in STARS?

5        A.    Yes.

6        Q.    As part of the LPE process, does the

7    dealership have to provide documentation that all of

8    its salespeople are on STARS?

9        A.    Yes, but not a STARS document.  We look for an

10   employment history, payroll history of when employees

11   started.

12       Q.    But the J.D. Power's auditor is supposed to

13   actually receive some documentation to show the list of

14   employees and something that they can use to see

15   whether or not that person's on STARS?

16       A.    That's correct.  There is a dealer printout of

17   STARS that they compare to employment records.

18       Q.    Right.  So in order to keep the dealers from

19   fudging the records, you ask for payroll records from

20   them, which are kept independently of Ford, and then

21   you look at the Ford STARS system; is that correct?

22       A.    That's correct, yes.

23       Q.    And to short-circuit a whole other line of

24   questions, is there any linkage whatsoever between LPE

25   and achievement of Lincoln Mercury's market

1    consolidation objectives?

2        A.    None.

3        Q.    Based on what you saw at the Lincoln Mercury

4    facility on the first set of J.D. Power's photographs,

5    what would you have recommended Eastside have done to

6    correct that problem?

7        A.    Going from memory -- again, this is three

8    years ago and just a brief review this morning --

9    sandblast, power wash, paint, would be the three

10   recommendations I would make to the dealer to clean up,

11   enhance the facility.

12       Q.    Are you saying they should have done all

13   three, or any one of the three?

14       A.    Any one of the three.  But again, the

15   requirements are pretty black and white in our Web site

16   and in our program materials sent to the dealers,

17   including pictures of facilities that would not pass.

18   And it's the dealer's responsibility to make their

19   facility to look the way we're asking them to.

20       Q.    Do you know if Lincoln Mercury of Fairfield or

21   any of Mr. Reichert's Cincinnati Lincoln Mercury stores

22   received any waivers other than the facility waiver for

23   Lincoln Mercury of Fairfield?

24       A.    None that I know of, but I don't have those

25   records handy.

133

1      Q.    What was the other term you used for when --

2    grace period.

3           Do you know whether any of Mr. Reichert's

4    dealerships, including Lincoln Mercury of Fairfield,

5    received an LPE grace period?

6      A.    They would -- I don't know Mr. Reichert's

7    dealerships in this area, but any dealership that he

8    bought would automatically get a 12-month grace period,

9    consistent with any other buy/sell we do across the

10   country.

11     Q.    What if the dealership was purchased before

12   the LPE program rollout?

13     A.    That would have no aspect of -- no grace

14   period if it's prior to the LPE rollout.  We wouldn't

15   treat it any differently.

16     Q.    When did LPE roll out?

17     A.    It was announced to the dealers May of 2000,

18   and it rolled out as a 2001 model year program on

19   October 1st of 2000.

20     Q.    So if the dealership was purchased before

21   October of 2000, he would not have received a grace

22   period?

23     A.    Correct.  Yeah.  No program, there would be no

24   grace period.

25     Q.    Under the LPE J.D. Power evaluation report,

1    the first section says, "Are all sales consultants,

2    service advisors, parts counter people and warranty

3    administrators with 60-plus days of service enrolled in

4    the STARS database?"

5         Do you recall if that's the first question --

6    I'll just represent to you that's the first question.

7         Is that a requirement?

8    A.    Yes.

9    Q.    And then under "Notes," it says, "Name of

10   employees not enrolled in STARS."

11        Is the J.D. Power's person supposed to input

12   the name of the people who are not enrolled in STARS?

13   A.    Correct.

14   Q.    Do you know if the same person that did

15   Eastside's first LPE audit did Lincoln Mercury of

16   Fairfield?

17   A.    I couldn't answer that.  I don't know.

18   Q.    If it was the same person, should he have

19   brought the condition of the Lincoln Mercury of

20   Fairfield's facility condition to the attention of the

21   LPE office?

22   A.    Not if there was a note in their file of a

23   waiver, there would -- no.  There would be no reason

24   to.

25   Q.    Then the second question says, "Will

1     75 percent of the dealership's sales consultants,

2     service advisors, parts counter people and warranty

3     administrators be certified by April 1 of 2001?"

4          What does certified mean?

5     A.    That is training certification.

6     Q.    Okay.  And they have to answer that question

7     yes, correct?

8     A.    That is more of a promise than it is an actual

9     pass/fail question.

10    Q.    What if, as of April 1, 2001, 75 percent of

11    the dealerships personnel aren't certified?  What

12    happens?

13    A.    They become decertified and discontinue their

14    bonus payments and their benefits.

15    Q.    Do they get back charged for the money that's

16    already been paid to them?

17    A.    No, they do not.

18    Q.    So when you lose that 75 percent ratio of

19    certified personnel, then you become decertified?

20    A.    That's correct.

21    Q.    How is that double-checked or ensured by

22    Lincoln Mercury, to make sure that that ratio is

23    maintained?

24    A.    Well, we have access, through our education

25    department, to the STARS database.  And if the

1     dealer -- you know, it's a pretty simple calculation.

2     I mean, we just pull out a printout of those job

3     functions within that database for that specific

4     dealer, and if 75 percent or more of them are training

5     certified in our database, the dealer qualifies,

6     continues.

7          Q.    Is anything automatically tripped if that

8     level of certification drops below 75 percent?

9          A.    Well, this was a one-time check on April 1st.

10         Q.    So there's no automatic procedure?

11         A.    No automatic procedure.

12         Q.    Okay.  That's fine.  Then under quality of

13    repair certification, it asks whether the dealership

14    monitors and trains technicians to meet STST

15    requirements.

16         A.    Uh-huh.

17         Q.    You're supposed to answer yes to that.

18         A.    That's correct.

19         Q.    What are STST requirements?

20         A.    I am not with STST, our customer service

21    division, so I'm going -- it's service technician

22    something standards.  It's an acronym for technician

23    training to make sure that they're qualified to work on

24    our vehicles.

25             And there is also a training schedule training

1    log of courses that those folks need to have if you're

2    a specialist in power train or transmission or

3    whatever.  And the J.D. Power evaluator did check those

4    logs when they were on site.

5       Q.  Well, in this particular one, this -- I'm

6    looking at Fairfield Lincoln Mercury in November 2000,

7    it's a list of all active technicians with appropriate

8    skill codes, and it says, "No."  So apparently there

9    was no listing of technicians with skill codes.

10          Is that a fail?

11    A.  No.

12    Q.  Okay.

13    A.  Skill codes, and I think -- I cannot answer

14    this because I'm not technical enough in our service

15    division or customer service department, but technical

16    codes are different than training courses.  I think

17    technical codes are more along the lines of this

18    technician can work on a transmission job.  This

19    technician can only do oil changes, cannot do

20    transmission jobs.

21       But you'll have to talk to someone from the

22    customer service division to get the specifics behind

23    that.

24    Q.  Well, the next one says -- it's in the same

25    numbered section.  The next letter says, "Obtain STARS

1    report," and it says, "No."

2            Is that a failure?

3    A.    Without seeing the report, I can't speak to

4    that.

5    Q.    If under "Quality of Repair Certification"

6    you've got a dealer who doesn't list all active

7    technicians with appropriate skill codes and doesn't

8    provide a STARS report on their technicians, are those

9    two elements considered to be a failure?

10    A.    Again, without looking at the actual audit

11    tool that you have in front of you, I'd have to -- I'm

12    not -- I do run the program, but I have people that do

13    the day-to-day operations.  So I'd have to see the

14    front page of that to see how all those questions are

15    tracked, monitored and determine the final pass/fail

16    grade for the dealership.

17    Q.    This document is called a dealership

18    evaluation -- in dealership evaluation report for

19    Fairfield Lincoln Mercury.  It's document ELM1 12979.

20    The page I'm referring to is 12982 under section 7.  I

21    just want the witness to look at that.  Go ahead and

22    let Beth look at it first.

23    A.    This, first of all, is a J.D. Power &

24    Associates document, just so we're clear on the record

25    that it is proprietary to J.D. Power, and they use this

1    to do their evaluations.

2        Q.    Okay.

3        A.    I'm sorry.  Can you restate the question now.

4        Q.    My question is, in looking at that document

5    under number 7, it looks like there's two "no's" out of

6    four or five, five or six questions, something like

7    that.

8              And my question to you is, do failures on

9    those two areas listed under that question constitute a

10   failure of the entire section for the dealership?

11       A.    No, they do not.

12       Q.    Is there any reason why those particular

13   provisions are waivable or do not constitute a fail?

14       A.    I would have to -- we would have to see all

15   the supporting documentation that goes with this.  But

16   I would have to assume that since they had a document

17   describing their process to monitor and train their

18   technicians to meet their requirements, and they have a

19   technician training planner which lays out all the

20   technicians and the amount of courses they need to take

21   to be certified, that would cover for the "no's" that

22   are categorized under 7(d) and 7(e).

23       Q.    Is it suspicious to you that the dealership

24   was not able to provide a STARS report to the

25   J.D. Power's examiner?

1    A.    No.

2    Q.    How hard is it to provide a STARS report?

3    A.    Very easy.

4    Q.    Does it bother you that they did not provide a

5    STARS report?

6    A.    No.  Because I think most of that is covered

7    in 7(b) in the training planner for the technicians.

8    Q.    What does QCM stand for?

9    A.    Quality care maintenance.

10    Q.    I'd like to refer you again to the same

11    report.  I'll look at the front page, 12979.  It

12    appears that that particular store failed under the top

13    section which is the customer satisfaction section,

14    correct?

15    A.    That is correct.

16    Q.    Is there any waiver for a failure under the

17    customer satisfaction section?

18    A.    No, there is not.

19    Q.    So --

20    A.    Let me rephrase that.  As of this date, there

21    was not.  There is now for the 2003 program.

22    Q.    Right.  But as of that date, they should not

23    have received full LPE payments?

24    A.    That is correct.

25    Q.    Okay.  Let me ask you to look at this next

1    report, which is ELM1 12991; looks like the

2    reevaluation of Lincoln Mercury of Fairfield.

3         Is that correct?

4    A.    I can't tell.  It's not stated.  It's the same

5    exact report, other than it's a later date for the

6    evaluation.

7    Q.    Okay.

8    A.    So one would assume that it is the

9    reevaluation.

10   Q.    I've got a question regarding -- it's under

11   "Customer Satisfaction," and it's number 2.  It says,

12   "Will the dealership have 75 percent of its personnel

13   certified on April 1, 2001?"  That's the question I

14   want you to look at.  It's number 2.

15   A.    Okay.

16   Q.    And under this section it says, "Previously

17   passed, N/A today," not applicable today.

18        Is that correct?

19   A.    Uh-huh, that is correct.

20   Q.    Is there any reason why, even though this

21   report's dated after April 23 of '01, that that issue

22   was not revisited to make sure -- excuse me.  This was

23   April 13, 2001.

24        Is there any reason why that issue was not

25   revisited on the report to make sure that the level of

142

1  certification had been met?

2      A.    Yes.  Because on a reevaluation, we only go

3  back and review the areas that were failed the first

4  evaluation.

5      Q.    Well, in the first evaluation, that particular

6  question was a promise for future conduct, correct?

7      A.    Uh-huh.

8      Q.    Is that correct?

9      A.    That's correct, yes.

10     Q.    Is there any reason why it wasn't reevaluated

11  to determine if that dealership complied with the

12  promise?

13     A.    Because we follow it by database at our office

14  for all dealers.

15     Q.    Okay.  Now, you're saying that on the

16  certification percentage, you follow it at your office

17  and don't need to look at a report?

18     A.    That is correct.

19     Q.    Do you follow it on an automatic basis, or do

20  you just follow it when you want to follow it?

21     A.    No.  We just follow it the one time a year

22  when the expiration date comes up.  We go in and look

23  at the database to make sure the dealers that are

24  certified all have 75 percent of their people training

25  certified.

1    Q.    So if this dealer happened to represent before

2    April 1 that they were going to have three-quarters of

3    their personnel certified and then, later, didn't, you

4    wouldn't find that error until the next year?

5    A.    Could you restate that, please.

6    Q.    If the dealer that's represented in this

7    report promised that all -- that 75 percent of its

8    personnel would be certified by April 1, and then they

9    didn't live up to that promise, you wouldn't find out

10   about that failure until the next year, correct?

11   A.    No, because on April 1 we would examine the

12   database for all of our dealers and all of their

13   personnel and determine if the dealer was compliant on

14   April 1st.  And if the dealer was not, we would

15   decertify them.

16   Q.    Do you remember whether or not Fairfield was

17   evaluated on April 1 as to its level of certification?

18   A.    Yes; a hundred percent of the dealers would

19   have been evaluated.  A hundred percent of the dealers

20   that were certified or in the process of getting

21   certified.

22   Q.    Let me hand you a document that's marked

23   ELM1 12971 and ask you to identify that.  Let Beth look

24   at it first.

25   MS. MCNELLIE:  I've seen it.

144

1    BY MR. BERBERICH:

2       Q.    I just want you to tell me what that document

3    is.

4       A.    Never seen it before.

5       Q.    Is this a form of Lincoln Mercury document

6    that you have any familiarity with?

7       A.    No, it is not.

8       Q.    Under North Gate Lincoln Mercury at the bottom

9    to the far right, there's something that says PHQ

10   registration -- or application, I'm sorry.  PHQ

11   application.

12         Can you tell me what that means?

13      A.    I assume that means program headquarters

14   application.  They called in their application and

15   faxed it in.

16      Q.    If a dealer does not meet the baseline

17   customer satisfaction requirements -- well, strike

18   that.

19         Is there a number in the Lincoln Mercury

20   system that a dealer has to meet in order to get

21   on-line to even start the LPE process?

22      A.    I think you're referring to our voice of

23   customer target from the viewpoint system that he has

24   to hit a minimum regional target before he can apply

25   for customer satisfaction elements of LPE.

1    Q.    Does it work in such a fashion that a dealer

2    can't even get on-line and make the application unless

3    they hit the minimum voice of customer number?

4    A.    That is correct.

5    Q.    Do you know whether or not any of the

6    Cincinnati area Lincoln Mercury stores were given a

7    waiver or an exception to that process where they were

8    allowed to apply before their voice of customer number

9    was acceptable?

10    A.    None were given an exception.  None in the

11    country.

12    Q.    Where would I find the minimum voice of

13    customer number?

14    A.    If you pulled a Web site screen print of your

15    client's information from 2001 and '02 and '03, it

16    would be there.  There's also a separate customer

17    viewpoint Web site that individualized per dealer that

18    you could pull for your client's dealership.

19    Q.    Is there any way around that process?  For

20    instance, if a dealer's customer viewpoint was too low,

21    could the region allow that dealer to begin the LPE

22    certification process anyway?

23    A.    No exceptions.  None.

24    Q.    So to your knowledge, none were made?

25    A.    To my knowledge, none were made on customer

1    satisfaction.

2        Q.    How low was the minimum number compared to the

3    group average for a particular region?

4        A.    We set the minimum target number at 96 percent

5    of group average.

6        Q.    Did each of the dealers' customer viewpoint

7    numbers have to be at that 96 percent, or was it based

8    on an average of all customer viewpoint scores?

9        A.    Could you restate that question, please.

10        Q.    Well, I'll restate it in a fashion that makes

11    more sense.

12            The 96 percent number that you refer to, what

13    does that mean?  Did all the viewpoint numbers have to

14    be at 96 percent or better, or did the average of all

15    the viewpoint numbers have to be at 96 percent or

16    better?

17        A.    First of all, I think, to answer your

18    question, I may just give you a little explanation of

19    how the numbers -- the target numbers -- how we reach

20    them.

21            First of all, we start with the region, then

22    we look at single point and multiple point dealers and

23    we look at high and large volume dealers.  So we

24    separate into those areas.  Thus, all dealers in a

25    given market that are in the same volume category and

1    the same metro area would be in the same viewpoint

2    group.  Then we take all of their surveys on an annual

3    basis, put them into a pot, take out the number at the

4    bottom what they average to and multiply it by

5    96 percent.

6        Q.    What if dealer had a recommended dealership

7    rating of -- for service, recommended dealership for

8    service rating of 52 and the group rating was 57, would

9    they meet that 96 percentile?

10       A.    Let's add on to my explanation.  It's four key

11   questions.  Sales, service experience, recommended

12   dealer for sales, recommended dealer for service.  And

13   it's the composite of those four questions.  That

14   comprises the target, and the dealer's composite of

15   those four questions has to be above the target.

16       Q.    And when you say "composite," does that mean

17   that each one of those numbers has to be above

18   96 percent, or is it an average of all those numbers

19   for the dealer compared to those numbers for the group?

20       A.    It is an average for the dealer and an average

21   for the group.

22       Q.    And to qualify for the LPE program in 2001,

23   you had to have qualifying numbers for year 2000; is

24   that correct?

25       A.    The previous 12 months, from whatever point

1    you elected to apply as a dealer.

2        Q.   Did the three-month average matter at all with

3    regard to the application process?

4        A.   No, it did not.

5        Q.   I'm going to hand Ford's counsel a document

6    marked ELM1 13188, and it goes through page 13226.  I

7    want you to look at that document and see if you can

8    identify it.

9        A.   I recognize the document.

10       Q.   What is that document?

11       A.   This is an internal working document that we

12   use to develop program rules.  In this case, it's

13   labeled "Key assumptions for the 2001 model year."

14       Q.   Is that the rule book for the LPE program?

15       A.   This is the rule book for the LPE program.

16       Q.   Was there any later version of that or revised

17   versions of that?

18       A.   Yes, there was.

19       Q.   When was it revised?

20       A.   I couldn't tell you.  I don't know.  It was

21   revised -- I would think it was revised a couple of

22   times for the balance of that 2001 model year.

23       Q.   Was this the edition that was in place at the

24   time of the LPE kickoff or --

25       A.   No, this would not be.

149

1     Q.    Is this a later version?

2     A.    This would be a later version.

3     Q.    Was the document that was -- strike that.

4           When was the first rule book published,

5     roughly?

6     A.    I would say third quarter of 2000.

7     Q.    When did LPE take effect?

8     A.    October of 2000.

9     Q.    Was everyone running -- strike that.

10          Was there a grace period for existing

11    Lincoln Mercury dealers in October of 2000?

12    A.    Yes, there was.  If the dealer -- but we had

13    many dealers apply and go through the certification

14    process and not worry about the grace period.

15    Q.    How long did the grace period extend?

16    A.    Until the end of -- I'll have to look.  We had

17    different types of grace periods.  If I'm not mistaken,

18    the one grace period was on customer viewpoint, VOC

19    scores, that went through December 31st of 2000.

20    Q.    Is there any reason that the dealers had until

21    April 1 to qualify for the certification that we talked

22    about earlier for employees?

23    A.    We felt that it was in the best interest to

24    give the employees time to do all of these courses.

25    And sales consultants, as an example, had to take

1    17 courses.  So we worked with the dealer council and

2    selected a date into the future.

3        Q.    Was the grace period provided through April 1

4    of 2001?

5        A.    Could you clarify?  For training

6    certification?

7        Q.    I'm just saying period.  Was there a blanket

8    grace period through April 1, 2001?

9        A.    We had three different initiatives happen in

10   the course of the first year.  One was a grace period

11   on customer viewpoint scores, one was an extension of

12   LPE image, and one was an extension of Mercury

13   Advantage.  All in concert, working with our dealer

14   council, who determined -- after we launched, we worked

15   together and determined we needed to give the dealers

16   more time in year one to hit and achieve the targets.

17       Q.    When did these grace periods expire?

18       A.    You'll have to allow me to look at that

19   document.

20       Q.    I don't even know if they're in here.  Can you

21   tell me based on your memory?

22       A.    Based on my memory, customer viewpoint would

23   have been 12/31 of 2000.  Lincoln Premier Experience

24   image -- I'm going off of memory -- I think April 30th

25   of 2001.  And Mercury Advantage, June 30 of 2001.

1    Q.    And what did you expect to happen in order for

2    someone to qualify for the grace period for the image

3    for LPE?

4    A.    Could you restate that or clarify it.

5    Q.    Explain to me how the grace period worked for

6    the image portion of LPE.

7    A.    It wasn't a grace period, as it was a program

8    extension period.

9    Q.    What do you mean by "program extension

10   period"?

11   A.    Give the dealers more time to get their

12   facilities up to speed before J.D. Power came out

13   without any loss of retroactive bonus.

14   Q.    What if a dealer got evaluated and

15   disqualified and then was subsequently qualified before

16   April 30 of 2001?  Were they given all of the LPE money

17   back retroactively?

18   A.    Going from memory, yes, they were.

19   Q.    As far as the waiver process -- I'm just

20   paraphrasing it -- the waiver process was supposed to

21   work through the retail development manager with a

22   carbon copy to the regional manager.

23       Is that your recollection of what was supposed

24   to happen?

25   A.    That's correct, yes.  Again, I would restate

 1    that I wouldn't do it without the concurrence of our

 2    regional manager.

 3         Q.   There's a reference to a waiver matrix.  What

 4    is a waiver matrix?

 5         A.   I would have to believe it's an attachment in

 6    there.

 7         Q.   I would like to believe it's an attachment in

 8    here, but can you remember developing a waiver matrix?

 9         A.   No, I cannot.

10         Q.   Ford likes matrices.

11         MS. MCNELLIE:  Uh-huh.

12         MR. BERBERICH:  You can't call them matrixes.  It's

13    a violation of everything you learned in Latin class.

14         MS. MCNELLIE:  This coming from a guy who referred

15    to assignees as assignees and completely confused the

16    witness.

17         MR. BERBERICH:  I really did.  He must have thought

18    I was talking about something really naughty.

19         MS. FULLER:  Love it.

20         MS. MCNELLIE:  Lawyer speak.

21    BY MR. BERBERICH:

22         Q.   Sir, I want you to look at page 13201 under

23    the section where it says, "Waivers for pending

24    ownership changes and/or consolidation."  Just go ahead

25    and read that section.  I want to ask you a few

1    questions.

2         A.    Okay.

3         Q.    Can you explain to me what this section refers

4    to?

5         A.    Well, many times when we do a buy/sell

6    agreement, the incoming dealer decides that they're

7    going to do some type of facility action.  And if it is

8    part of the buy/sell and it's part of our sales and

9    service agreement to do a facility modernization or

10   facility renovation or a new facility, then as part of

11   that we will grant the waiver.  But we don't grant it

12   until the ownership takes place -- ownership change

13   takes place.

14        Q.    Under "Facilities," it says, "Eight document

15   types."  Do you have any idea what that relates to?

16   Under that first bullet point, it says, "Facility,

17   eight document types."

18        A.    I think what it refers to, going again from

19   memory, is we had dealers who elected to do full

20   facility.  We had dealers to do a relocation of a

21   facility.  We had dealers that elected to do an

22   interior, dealers who elected to do an exterior only,

23   and so on.  And we had numerous different types of

24   documents prepared, ready for them to add to their

25   sales and service agreement file.

1       Q.    Would this be termed "Letter of

2  understanding"?

3       A.    I guess that's another word for waiver, yes,

4  letter of understanding.

5       Q.    There's a note in the margin that says, "While

6  franchising actions such as ownership changes and

7  market consolidation benefit Lincoln Mercury, they are

8  considered outside the scope of LPE and/or

9  Mercury Advantage."

10      A.    That's correct.

11      Q.    What does that note mean?

12      A.    That means that consolidations and market --

13  market consolidations and any ownership changes are the

14  responsibility of the franchising department and they

15  have no bearing on LPE.

16      Q.    Do you agree with the statement that market

17  consolidation benefits Lincoln Mercury?

18      A.    Yeah, I would agree with that, based on

19  individual market circumstances.  I think that's more

20  of an author's comments more so than program

21  requirements, but --

22      Q.    Who is the author of this document?

23      A.    I don't know; but I would have to think it was

24  my operations manager, because he deals in the real

25  technical aspects of this program.

1    Q.    Who is your ops manager?

2    A.    His name is Steve Had, H-a-d.

3    Q.    Is the waiver part of a consolidation?

4    A.    No.  It would be if a dealer was building --

5    was going to consolidate and build a new facility.  So

6    it depends specifically on what the franchising

7    department is doing.

8    Q.    What does it mean, that market consolidation

9    is considered outside the scope of LPE or

10   Mercury Advantage?

11   A.    It's a franchising action.  It's not an LPE

12   and Mercury Advantage action.

13   Q.    As you said earlier, they're completely

14   separate, correct?

15   A.    That's correct.  A lot of the reason these

16   notes are in that column is this document also went out

17   to our regional managers.  So it helped eliminate a lot

18   of questions when a variety of franchising actions are

19   going on around the country.

20   Q.    Did you have to review and approve this rule

21   book?

22   A.    A hundred percent of it.

23   Q.    Did anyone else have to approve this rule book

24   before it was issued?

25   A.    Approve, no.  Review, yes.

1    Q.    Who else reviewed it?

2    A.    I'd have -- I'd send it through probably

3    J.D. Power management and probably through Anne Belec

4    at the time, who was a network retail development

5    manager for input.  But the final approval would rest

6    in my shop.  It's so extensive that I wanted somebody

7    else to take a look at it so I didn't miss something.

8    Q.    That is the only people that you can recall

9    having reviewed it?

10    A.    Other than my own internal staff who was

11    working on it, Steve Had and his team.

12    Q.    Who else worked on it internally?

13    A.    I would say Scott Harkovich who worked for

14    Steve, and Adrianne Larouche, two analysts that would

15    work in the day-to-day operations area of LPE and

16    Mercury Advantage.

17    Q.    Were retail development managers given a

18    contest on signing up people for LPE?

19    A.    Yes.

20    Q.    And was it the Vegas Odyssey event?

21    A.    Yes.  I wouldn't call it signing up.  I would

22    encourage participation, would probably be a better

23    terminology.

24    Q.    What was the target number that the retail

25    development managers were expected to meet in order to

1  qualify for the trip?

2      A.   Well, you have it there, and I don't recall

3  that --

4      Q.   There's no percentage on here.  I was just

5  seeing if you could recall from memory.

6      A.   The whole point was getting dealers in their

7  first year to go in and apply and don't be scared of

8  the system and have J.D. Power come out and evaluate

9  your stores.

10     Q.   Do you know whether or not Mr. Warren Gardis

11 won the trip?

12     A.   I couldn't tell you.

13     Q.   I'm going to hand you a document which is

14 marked ELM1 13238.  It's an electronic field bullet.

15 See if you can identify that.

16     A.   Okay.

17     Q.   Don't say yes so quickly.  Look at the

18 document.

19     A.   Yes, I can identify this document.

20     Q.   What is that document?

21     A.   This document was an update to all of our

22 Lincoln Mercury regional personnel with a download file

23 by region to give them a heads-up to start working with

24 dealers who are less than 75 percent training certified

25 as of 1/18/2001.  Again, this had an April deadline to

1    meet this, and we wanted to make sure all of our

2    dealers who were below 75 percent were informed and had

3    an opportunity to improve and get above 75 percent.

4        Q.    There's a listing -- for instance, here's a

5    page for Lincoln Mercury of Fairfield.  What is the

6    column "Enrolled in certification" mean?

7        A.    That would be enrolled in STARS.

8        Q.    Okay.  And then this is "Number with primary

9    position," what does that mean?

10       A.    That's correct.  That would mean that there

11   are -- you could have a primary and a secondary

12   position on your Social Security number.  A good one

13   would be you're a primary sales consultant and you're a

14   secondary internet manager.

15       Q.    Is there any reason why the number enrolled in

16   certification is lower than the number with primary

17   position?

18       A.    I don't know.  I'm not familiar with how the

19   STARS system runs.

20       Q.    Then "Total achieved" is 11; is that correct?

21       A.    That's correct, for those positions.

22       Q.    I'd like for you to look at a document which

23   is marked ELM1 13275, and also ELM1 13281.  The first

24   says, "Lincoln Premier Experience Image Evaluation."

25   The second one says, "Lincoln Premier Experience

159

1    Customer Satisfaction Evaluation."

2          See if you can identify those documents and

3    tell me what they are.

4    A.    These are documents that we used to train our

5    regional managers and our retail development managers

6    at the launch of the program, walking them through --

7    Q.    Go ahead --

8    A.    We walked them through all the requirements,

9    the regional managers and the retail development

10   managers.

11   Q.    Do these documents explain those categories

12   that are in the J.D. Power survey form?

13   A.    Yes.

14   Q.    Is there any document or key which explains if

15   a dealer doesn't qualify for one of the sub parts of

16   the customer satisfaction evaluation, whether that

17   equals a failure for the entire section?

18   A.    Yes.  It should be in the Web site that you

19   are referencing or in the dealer communication package

20   that we sent out, printed materials.

21   Q.    Like under 7, under "Customer Satisfaction,"

22   it has A through F or A through E.

23          Is there any key that says if you pass A and

24   B, but fail C, then you fail the whole section?

25   A.    I would have to refer back to the materials to

1    see what they specifically say.  I couldn't answer that

2    question.

3        Q.   I'd like to hand you a document which is

4    marked ELM1 13250 and see if you can identify that

5    document.

6        A.   Okay.  Yes, I can identify it as a field

7    communication we sent out to all of our retail

8    development managers and regional managers.

9        Q.   Does that document spell out what you're going

10   to need to see, as the LPE manager, in order to approve

11   the waivers that are described in there?

12       A.   Yes, it does.

13       Q.   Did you ever relax your requirements on what

14   you needed to see in terms of a facility waiver for the

15   clean and uncluttered section?

16       A.   No, we did not.

17       Q.   I'll hand you a document marked ELM1 13270 and

18   see if you can identify that document.

19       A.   This is an announcement document that was sent

20   to all our management, both internally in Irvine, as

21   well as our regional managers, explaining what the

22   Lincoln Premier Experience is all about, the philosophy

23   behind the program, how we're going to launch it and

24   where we're going to launch it, and then a Q and A if

25   dealers had questions on how the program was being

1    structured, how the bonus money was being structured

2    and what the requirements were all about.

3        Q.   Is that the, I'll say, first official rollout

4    document internally for Ford for the LPE program?

5        A.   Yes, because our all-dealer meeting was the

6    week of May 5th.  So this went to all management right

7    before that.

8        Q.   I'm going to hand you two documents,

9    ELM1 13290 and 13291, and see if you can identify what

10   those documents are.

11       A.   These were early documents in the staging of

12   how we're going to roll out this program in future

13   years.  We were up front with the dealers and we told

14   them that we were going to increase the requirements

15   year by year.  And this was somewhat of a time line

16   rollout to get a feel of what we would put in place up

17   through 2005.  This document's dated May 3rd of 2000.

18   It kind of took a five-year glance at image and

19   customer satisfaction.

20       Q.   Are these deadlines or benchmarks still in

21   effect, or have they been replaced?

22       A.   They've been replaced.

23       Q.   Do you have a new listing of dealership

24   guidelines for LPE?

25       A.   The 2003 model year is current.  We have made

1  no changes and no -- we have formulated nothing as of

2  this time for 2004 and 2005.

3      Q.   Under approved LPE facility plan for

4  additional requirements 2003, it says, "Includes

5  critical points to LPC sales process -- LPE sales

6  process two."

7           Has that requirement been enforced or is that

8  requirement being enforced?

9      A.   That requirement has been taken off the chart.

10  No longer --

11      Q.   What was that requirement?  What did that mean

12  in human speak?

13      A.   At one time we did -- we were discussing --

14  and again, this was May of 2000, looking out into the

15  future.  We were discussing to have facilities as part

16  of our LPE requirements.  And as I stated before, that

17  we have taken that out.

18      Q.   So there is no facility requirement for LPE?

19      A.   There is no facility requirement for LPE.

20      Q.   But it was intended originally that there

21  would be a facility requirement, correct?

22      A.   At one time, yes.

23      Q.   Then the second point says, "Includes

24  exclusive customer touch points."

25           That's a facilities item, correct?

163

1     A.   That is correct.

2     Q.   And that requirement, if enforced, may have

3   required a dealer to change the layout or structure of

4   his operation -- facility operation; is that correct?

5     A.   Potentially, yes.   Depends on the current

6   state of the dealer facility.

7     Q.   And neither one of those requirements were

8   made a part of the LPE program?

9     A.   As I said before, we have verbally dropped the

10   facility requirement.   We have told our dealer council

11   on multiple times.

12     Q.   Is there any reason why the facility

13   requirement was dropped or not implemented?

14     A.   I think it's the fragile nature of the

15   financial statement of our Lincoln Mercury network.

16     Q.   What do you mean by that?

17     A.   Right now the Lincoln Mercury dealers are

18   struggling financially for a variety of reasons, and we

19   don't think it's the appropriate time to add in a major

20   investment in facility.

21     Q.   Was this last series of documents, 13290 and

22   -91 given to the dealers?

23     A.   No.   Those are internal.

24     Q.   Now, you mentioned, before I asked you that

25   last question, about the challenges facing

1   Lincoln Mercury dealers.  How would you list those or

2   rank order those?

3       A.   Would you be clearer on your question.

4       Q.   You were just mentioning, due to the fragile

5   nature or the condition of your Lincoln Mercury

6   dealers, you decided not to implement the facilities

7   changes.

8            What are those fragile conditions?

9       A.   Well, the return on sales is one percent, well

10  below any other luxury manufacturer.  And until our

11  dealers are financially healthy, it's very difficult

12  for us to put a requirement in to ask them to spend

13  more money on their facilities.

14      Q.   Are there any other conditions which lead you

15  to drop the facilities requirement?

16      A.   No, none.

17      Q.   Are there any reasons why the return right now

18  for the Lincoln dealers is one percent?

19      A.   It's a variety of a lot of things we talked

20  about earlier this morning.

21      Q.   Okay.

22      A.   Product, state of the economy, external

23  factors that we can't control.

24      Q.   Did you express to the dealers when you were

25  rolling out the LPE program, that the changes would be

1  more difficult over time?

2      A.   Yes, we did.  We said they would be

3  progressive requirements.

4      Q.   And what did you mean by that?

5      A.   Each year we would ask the dealers to do a

6  little bit more.

7      Q.   Would you agree that the most extensive thing

8  that you could demand out of a dealer would be a

9  facilities change, from a financial commitment

10 standpoint?

11     A.   Yes.

12     Q.   And that piece has been discontinued for the

13 present, correct?

14     A.   That is correct.

15     Q.   Is there any plan to put that back on the

16 table at some later date?

17     A.   At this point, no.

18     Q.   Are there any other items that were part of

19 that concept of things would get harder over time?

20     A.   Not so much harder, but maybe more additional

21 requirements, especially in the parts and service area

22 of your business.  All of these requirements are not

23 insurmountable, where a dealer that wanted to make the

24 effort can pass.

25     Q.   Were these requirements explained to the

1  dealers in advance?

2      A.   Extensively.

3      Q.   Is there any document that shows what these

4  future requirements or expectations are?

5      A.   Not the future ones, only the current ones.

6      Q.   How about the future ones, is there any

7  document that explains to the dealers the future

8  requirements?

9      A.   No, there is not.

10      Q.   How did you anticipate that you were going to

11  explain those requirements to the dealers, or did you

12  have a plan to do that?

13      A.   Clarify -- you mean communications plan?

14      Q.   Correct.

15      A.   Probably some type of printed collateral

16  materials and potentially a satellite broadcast or an

17  all-dealer meeting.

18      Q.   I guess my question's a little more broad --

19  let me ask it a different way.

20           If you had plans about future requirements you

21  were going to place on dealers, were those plans

22  written anywhere?

23      A.   No, because we don't have anything detailed

24  yet for 2004.  2003 is current, and it's been published

25  and it is printed and it is available to all dealers.

1    Q.    Who is Howard Revier?

2    A.    A former field operations manager, now

3  retired.

4    Q.    Do you know if he's in California or what part

5  of the world he settled in?

6    A.    I don't know.

7    Q.    How high up the chain of command was he at

8  Lincoln Mercury?

9    A.    Well --

10    Q.    At retirement?

11    A.    At retirement, he was the field operations

12  manager, which is president, vice president or general

13  sales manager or field operations manager.

14    Q.    What role did Howard Revier have with regard

15  to the LPE program?

16    A.    Strictly a support role to the department.

17    Q.    Was Mr. Revier involved in market

18  consolidation actions?

19    A.    I do not know.

20    Q.    I'm going to hand you a couple of documents --

21  one's marked as ELM1 13302, the other one is

22  ELM1 13330 -- and see if you can identify those

23  documents.

24    A.    Yes, I can.  These were handout materials to

25  dealers at regional meetings we held in June of 2000.

1    One is the meeting overview.  One is the document to

2    take notes on.

3        Q.   With regard to Eastside Lincoln Mercury's

4    second audit, was there any attempt by Lincoln Mercury

5    to guarantee or assure that Eastside was going to pass?

6        A.   No, no guarantees.

7        Q.   So no fix was in; is that correct?

8        A.   None whatsoever.  We treat all dealers

9    consistently.

10       Q.   I'd like to hand a document to you which is

11    marked as A 00487.  It's an Eastside Lincoln Mercury

12    document.  And see if you can identify that.

13       A.   That is correct.  This is a document from the

14    dealership's appeals case and all of the supporting

15    details that the dealer submitted for their appeal.

16       Q.   The letter on the top is your letter?

17       A.   That's correct.

18       Q.   And that letter advises that Eastside's been

19    denied, correct?

20       A.   That is correct.

21       Q.   And you said that was a 5-0 decision, correct?

22       A.   That is correct.

23       Q.   And can you tell me, based on your

24    recollection, what was the most critical factor with

25    regard to the denial of the appeal?

1     A.   Do you mind if I look at the subject document?

2     Q.   No, go ahead.  Take a look at it.

3     A.   Basically it's the digital photographs that

4  showed that the facility did not present a clean

5  appearance.  It was not free of discoloration, free of

6  stains, which are required elements in LPE and

7  Mercury Advantage.

8     Q.   So the biggest thing that you can remember,

9  and particularly after looking at the document, was

10  that the digital photographs were the reason the appeal

11  was denied?

12     A.   Again, I want to stress the charter of the

13  appeals board is to determine if the J.D. Power

14  evaluator did the right thing when they were on site,

15  followed the program rules.  Digital photography is one

16  thing, but it's the evaluator that's making the

17  pass/fail decision on site.  And the appeals board is

18  designed to review what the facts are of the case and

19  did the J.D. Power evaluator do the right thing on

20  site.

21     Q.   So you concluded as a group that the

22  photographs supported the J.D. Power's evaluator's

23  decision?

24     A.   That's correct.

25     Q.   Do you recall receiving a letter from

1    Mr. Beattie regarding the appeal on or about

2    December 27, 2000?

3         A.    Well, I don't recall it, but the board met on

4    January 25th, so obviously it was included in the

5    dealer's appeal package.

6         Q.    Do you believe you received some type of

7    letter from Eastside outlining the reasons they thought

8    they should win the appeal?

9         A.    Restate that, please.

10        Q.    Did you receive a letter from Eastside stating

11   its case on appeal?

12        A.    This would be it right here (indicating).

13        Q.    This is a document marked A 00488; is that

14   correct?

15        A.    That's correct.

16        Q.    And the second page is -489; is that also

17   correct?

18        A.    That is correct.

19        Q.    Here's a letter, the next page, A 00490, from

20   the Oswald Company.

21             Do you recall reviewing that at the time of

22   the LPE appeal?

23        A.    If it was in part of the appeals package, yes,

24   we would have reviewed it.

25        Q.    Do you recall receiving another letter from

1   Malachi Masonry?

2       A.   I don't recall that; but if it was part of the

3   package, we obviously would have reviewed it.

4       Q.   So you don't have any independent memory right

5   now what was included in the appeals packet for

6   Eastside, do you?

7       A.   No.  I'm sorry.  It was a couple of years ago.

8       Q.   That's perfectly fine.

9            Do you know anything at all off the top of

10  your head about Eastside's performance from a customer

11  satisfaction standpoint?

12      A.   No, I do not.

13      Q.   After Mr. Reichert moved the operation from

14  the old Lincoln Mercury of Fairfield location to the

15  new Lincoln Mercury of Fairfield location, did you ever

16  see any photographs of what that new operation looked

17  like?

18      A.   I have no idea what's going on in the

19  Cincinnati market from a franchising standpoint.

20      Q.   Would it be contrary to the LPE objectives to

21  have Lincoln Mercury products sitting on a car lot with

22  other brand signage and other brand vehicles mixed and

23  mingled around them?

24      A.   Well, that doesn't do anything for anybody's

25  brand if you co-mix inventory.

1     Q.   Like, for instance, if there was a row of

2   beautiful new Lincoln Navigators with a Suburu sign

3   over the top, would that -- and again, without a

4   waiver, would that typically violate the LPE

5   certification program?

6     A.   No.

7     Q.   Would that be the type of image that you would

8   want the Lincoln Mercury product to have?

9     A.   My opinion is no; but a lot of cases, you

10   don't have a whole lot of choice based on the business

11   at hand.

12     Q.   I'm going to let you look at a couple of

13   documents.  One's entitled A 00515, and another is

14   A 00519.  And they're simply black and white photos --

15   also, A 00516.  They're black and white photocopies of

16   photographs of the old Fairfield Lincoln Mercury store.

17          And see if you can tell me whether or not

18   you've ever seen photographs that show the condition

19   that's described in this photocopy.

20     A.   The only time I've ever seen this is this

21   morning when I pulled out the photographs to review

22   prior to this deposition.

23     Q.   And that's the problem noted in those photos,

24   is the problem with the eaves in the old Lincoln

25   Mercury Fairfield building?

1      A.    Obvious damage to the fascia.

2      Q.    And if that condition was displayed on the

3  facility without a waiver, then that facility would not

4  qualify for LPE image, correct?

5      A.    I am not the J.D. Power evaluator.  They make

6  the call when they're on site.  Personally, I would say

7  that dealership would fail.

8      Q.    Or that the dealership should fail, correct?

9      A.    Or that the dealership should fail.

10      Q.    But under the program that was administered by

11  you, once the waiver was in place, the J.D. Power

12  evaluator had no say-so as to whether it was passed or

13  failed; is that correct?

14      A.    That's correct.

15      MS. MCNELLIE:  Need a break?

16      THE WITNESS:  No.

17  BY MR. BERBERICH:

18      Q.    I'm going to hand you a document ELM1 4279 and

19  4280, and see if you can identify that document.

20           I have multiple copies of this one, Beth.

21      MS. MCNELLIE:  You're going to mark it?

22      MR. BERBERICH:  No.

23      THE WITNESS:  Well, I think we should start on

24  page 2 and work our way backwards.

25  ///

1  BY MR. BERBERICH:

2      Q.    That's fine.  Go ahead.

3      A.    Obvious E-mails between department members of

4  mine and regional management in Cincinnati.  I have

5  never seen this document before, so I can read through

6  it, but it's a very similar course of action on

7  facility waiver requests that we would get from any

8  other region to get regional concurrence.

9      Q.    At the very bottom of the second page under

10  the first bullet point it says, "Fairfield LM is a

11  participant in a larger market representation plan."

12          Do you have any idea what that means?

13      A.    No, I don't.

14      Q.    Would it matter to you, when evaluating a

15  waiver request, whether a dealership is a participant

16  in a larger market representation plan?

17      A.    No.  I just care about the facility.

18      Q.    The very last line on the second page says,

19  "Please process at your earliest convenience and

20  provide ET for dealer to complete the on-site

21  evaluation request via the LPE/MA Web site."

22          What is ET?

23      A.    I have no idea.

24      Q.    This E-mail was directed to Greg Allison and

25  Adrianne Larouche, correct?

175

1    A.    That's correct.

2    Q.    And those folks work for you?

3    A.    Yes.

4    Q.    You have no clue what ET means?

5    A.    Huh-uh.

6    Q.    Is that correct, you have no idea --

7    A.    That is correct.

8    Q.    Then the E-mail above that, what is that?  Is

9    that a recap of the points that are outlined in what's

10   got to be in the waiver request letter?

11   A.    Yes, that's correct.

12   Q.    Were these questions ever answered?

13   A.    I would assume so, because if they weren't, we

14   would decertify the dealer.

15   Q.    It says on the first page, on Thursday,

16   October 11, "The C and UC facility waiver for Fairfield

17   LM will expire."

18         What is "C and UC"?

19   A.    Clean and uncluttered.  I do know that

20   acronym.

21   Q.    All right.  That's fine.  I just want to make

22   sure.

23         I'm going to show you a couple of photographs.

24   And we'll mark them collectively as --

25         What's the next exhibit in line?  I have to

1    refer to Beth to help me with the exhibits.

2        MS. MCNELLIE:  I'm going to quit bringing my book.

3            Twenty.

4        MR. BERBERICH:  We'll collectively refer to this

5    set of photos as Exhibit 20.

6                (Plaintiffs' Exhibit 20 was marked for

7            identification by the Certified Shorthand Reporter,

8            and was retained by counsel.)

9    BY MR. BERBERICH:

10       Q.   And I want you to go ahead and take a look at

11   them and review them.  They're four photographs.

12           Let's go off the record.

13               (Recess taken.)

14       MR. BERBERICH:  Back on.

15   BY MR. BERBERICH:

16       Q.   Sir, can you identify what's in those

17   photographs?

18       A.   Looks like some new vehicle inventory and a

19   service directional sign.

20       Q.   Can you identify that building in the

21   photograph as the Eastside Lincoln Mercury building?

22       A.   No, I cannot.

23       Q.   I'd like you to look at the first page.  Can

24   you see any condition of that exterior wall which would

25   merit a fail on the image rating, image category?

1      A.    None that I know of, but -- however, again,

2    the J.D. Power's person is on site.

3      Q.    I understand.

4            How about on the second -- this second page.

5    Is there anything about the condition of that wall

6    which would merit a failure?

7      A.    Again, without being on site, you couldn't

8    tell what these are, if that's digital photography

9    issues or spotting.  And I can't tell what that

10   container is (indicating).

11     Q.    Why don't you go ahead and circle on the

12   photograph the areas that you thought looked like

13   staining.

14     A.    (Witness complies.)

15     Q.    If those areas on the building truly appear as

16   they do in this photograph, would those conditions

17   merit a fail on the image portion of the LPE

18   certification?

19     A.    I'm not the J.D. Power evaluator on site, so I

20   don't make that call.

21     Q.    Well, you're the godfather of this program, if

22   I may use that term.  Regardless of what the J.D. Power

23   evaluator may or may not think, do you think the

24   conditions as shown in the photograph, if that's what

25   the human eye observed at the site, would merit a

1   failure?

2       A.   Can't, because you're taking it out of context

3   of the full facility.

4       Q.   Are you telling me that just one wall does not

5   a failure make?

6       A.   Depends on how serious the one wall is.  And

7   without seeing the other four sides of this building, I

8   can't give you a pass or a fail grade on this.

9       Q.   Well, if the wall that's shown in the

10  photograph looks as advertised, would that in and of

11  itself qualify as a failure?

12      A.   This one wall, if I was there in person, I

13  could make that call.  I cannot from a digital

14  photograph.  That's why we have someone go on site.

15      Q.   I understand.  But if the photograph

16  represents what the actual naked eye saw, meaning if

17  the wall really looked like it does in this photograph,

18  would that qualify as a failure under the LPE image

19  program?

20      A.   Again, I can't answer that without

21  comparing -- you can't just look at one wall of a

22  dealership when there are three other walls.  That's

23  why you need to be able to walk around the entire wall.

24  I couldn't say pass or fail on this wall, based on the

25  one wall.

1    Q.    Well, let's just say I force you to evaluate

2    the dealership in isolation, and this is the only wall

3    that I'm going to show you.  Would this be enough to

4    fail somebody?

5    A.    If everything else was spotless, I would say

6    this would pass.

7    Q.    If any of the other walls -- and let's assume

8    there are two or three walls -- look like this, would

9    the facility fail?

10    A.    Yes.

11    Q.    I think this is a pull away of the same shot.

12    Does this digital photo appear to show the

13    same staining that was in the previous photograph?

14    A.    Yes, it does.

15    Q.    And, again, would your opinion hold true that

16    if this was the only staining on the facility, it would

17    not fail?

18    A.    Strictly opinion -- because I'm not the

19    J.D. Power evaluator.  They make the call on site; we

20    do not.  But yes, if this was the only wall, it would

21    pass.

22    Q.    But if there was another wall that exhibited a

23    staining pattern like this, you believe the facility

24    should fail?

25    A.    Correct.

1    Q.   This last photograph, does it show staining

2    which in any way offends your sensibilities?

3    A.   No, none.

4    MS. MCNELLIE:  Off the record.

5         (Discussion held off the record.)

6         (Recess taken.)

7    BY MR. BERBERICH:

8    Q.   Sir, I want to just jump back on the record a

9    second so we can identify some documents.

10        Exhibit Number 20 is four documents in a row.

11   And Ms. McNellie is going to be the keeper of the

12   original document, so I'll make a copy for the court

13   reporter to have in her files.

14        But what I want you to do is see if you can

15   identify the front page of Exhibit Number 20 as the

16   photograph marked A 00484.

17   A.   That is correct.

18   Q.   Okay.  And the second photograph --

19   MS. MCNELLIE:  I do want the record to reflect,

20   however, that the set you're showing him with the

21   numbers on it is significantly darker than the set that

22   is the original.

23   MR. BERBERICH:  I'll agree with that.  It's not as

24   good a copy.

25   ///

1   BY MR. BERBERICH:

2       Q.   And then the second photograph, the one you've

3   made some circles on, is reflected in A 00486; is that

4   correct?  I'll agree it's not as good a rendering as

5   the --

6       A.   It's much less noticeable, those stains.

7       Q.   The photograph that you looked at and marked

8   as an exhibit is a better or clearer rendering of the

9   shot; is that correct?

10      A.   Yes, that is correct.

11      Q.   And then the third photograph is a document

12  which has been marked as A 00485; is that correct?

13      A.   That is correct.  Again, it is much darker.

14      Q.   Okay.  And the last page of that exhibit is

15  marked as the document marked A 00483; is that correct?

16      A.   That is correct.  And much darker.

17      Q.   The numbered ones that I called off were

18  darker than the ones you actually looked at, correct?

19      A.   That's correct.

20      Q.   Have you ever reviewed the J.D. Power's

21  evaluation reports for Eastside Lincoln Mercury?

22      A.   This morning, for the first time.

23      Q.   When you took the appeal and evaluated the

24  appeal for Eastside Lincoln Mercury, did you review the

25  J.D. Power report?

1      A.   Yes.  Correction.  Yes, I did read it as part

2  of the appeals case.

3      Q.   So this morning would have been the second

4  go-around; is that correct?

5      A.   First go-around on the reevaluation because I

6  would have never seen that.  In the appeal, I would

7  have seen the original failed evaluation only.

8      Q.   As to the original evaluation, can you

9  remember anything about that report without referring

10 to the document?

11     A.   Nothing.

12     Q.   How about the reevaluation, as you sit here

13 right now, can you remember anything about the

14 reevaluation that's not clearly expressed in the

15 document?

16     A.   Other than the dealership passed the

17 reevaluation, and that's a document I reviewed for the

18 first time this morning.

19     MR. BERBERICH:  Let me take a break for just a

20 second and go over my notes and talk to you, and then I

21 think I'll be done.

22     MS. MCNELLIE:  Great.

23          (Recess taken.)

24 BY MR. BERBERICH:

25     Q.   Mr. Csernotta, was there any document that you

1  prepared that indicated to the dealers when LPE was

2  rolled out that there would be changes that they would

3  be required to make?

4      A.   Clarify, please.  What kind of changes?

5      Q.   Any changes.  Facilities changes, any type of

6  changes to how they operated their dealership.

7      A.   You're looking specifically for a document?

8      Q.   Correct.

9      A.   I would think one of those documents that you

10  referenced prior, a June handout, would explain what

11  the requirements were, if the dealer attended that

12  meeting.  And it would explain to them the processes

13  and the facility enhancements that would be required of

14  them to become certified.

15      Q.   Well, the two documents that look like

16  planning documents, dealership requirements, those were

17  not given to the dealers, correct?

18      A.   That's correct.  Those were internal.

19      Q.   And the regional launch meeting overview and

20  notes, were these Ford internal documents or were

21  these --

22      A.   No.  These were Ford dealers.  Dealers and

23  their managers received these.

24      Q.   Do you have any idea why these things are

25  marked confidential?

184

1      A.    I'm assuming the office of general counsel

2  marked them confidential.  There's no reason -- I mean,

3  any dealer who attended, received this.

4      Q.    And would these be the documents that would

5  specify to a dealer at launch what the requirements

6  were for LPE?

7      A.    Between this and supported by the Web site.

8  Correct.

9      Q.    But there was no map that would lay out in

10 year four or year five, these are the changes that we

11 will expect you to make?

12     A.    No.  We did not lay out any future

13 requirements.

14     Q.    Were any of the regional managers authorized

15 to give the non-LPE qualifying dealers money to get

16 recertified?

17     A.    I provided no funds to regional managers for

18 any type of incentives or any other things to get

19 dealers certified.

20     Q.    How about recertified, that $1500

21 recertification?

22     A.    Same answer.  I would provide no funds to

23 regional managers for recertification purposes.

24     Q.    Do you believe that it was appropriate for a

25 regional manager to provide recertification funds to a

1    dealer?

2        MS. MCNELLIE:  Objection.

3            Go ahead.

4        THE WITNESS:  Well, regional managers run their

5    regions.  That's why they're called regional managers

6    by title.  And they can do whatever they want with

7    their dealers.

8            I don't know of any regions that have done

9    anything along the lines of reinspection monies or

10   recertification monies.

11   BY MR. BERBERICH:

12       Q.   Would the provision of recertification money

13   to one dealer show favoritism or advantage over another

14   dealer who didn't receive those funds?

15       MS. MCNELLIE:  Objection.

16           Go ahead.

17       THE WITNESS:  If it was truly labeled as funds to

18   offset the cost of recertification, I would say yes.

19   BY MR. BERBERICH:

20       Q.   And you, as the LPE manager, would tell your

21   regional managers that you didn't -- you don't think

22   they should do that?

23       A.   I did not say that, because it was never

24   brought to my attention, so I never had a discussion

25   along those lines.

1      Q.   If you knew in advance that one of your

2    regional managers was going to do that, would you tell

3    him not to do it?

4      A.   I would recommend that they do not do it.

5      Q.   Now, there's one part of the LPE plan that

6    says that it was -- strike that.

7           There's one part of the LPE materials that say

8    that dealers help shape the plan; is that correct?

9      A.   That's correct.

10     Q.   What part of the plan did the dealers help

11   shape?

12     A.   The entire plan.

13     Q.   How was that accomplished?

14     A.   We started with our dealer council,

15   17 members, one from each region of the country that we

16   have a regional office.  And they all molded this

17   program to what it is today, from 2001 model year to

18   2002 to 2003.

19          I had mentioned before that we have split off

20   a subcommittee of about five or six of those dealers to

21   meet on a more regular basis, probably six times a

22   year, and discuss the future program; in this case, '04

23   model year.  And prior to launching this, after we met

24   with our dealer council, we took it out on a little

25   grass roots tour.  At the time, it was Mark Hutchins

1    and myself and Anne Belec, who were the management over

2    the program.  And we got the input of 120 influential

3    dealers from around the country to help mold the

4    program to what it is today.

5         Q.   Did the dealer council agree with paying the

6    bonus?

7         A.   Absolutely.

8         Q.   Is the subcommittee membership on the LPE

9    program secret?

10        A.   No.

11        Q.   Who's on the subcommittee?

12        A.   Dealer members?

13        Q.   Yes.

14        A.   Bob Maxey, Bob Maxey Lincoln Mercury, Detroit,

15   Michigan; Denny Zawalich, Burlington Lincoln Mercury,

16   Burlington, New Jersey; Tom Murphy, who's our dealer

17   council chairman, is Northeast Lincoln Mercury,

18   Philadelphia, Pennsylvania; Shelly LoCascio, she's our

19   dealer at Irwin Lincoln Mercury in Freehold,

20   New Jersey; Steve Downing who is our Lincoln Mercury

21   dealer in Yuba City, Lincoln Mercury in Yuba City,

22   California; and Billy Vaughn, who is our dealer at

23   North Park Lincoln Mercury in San Antonio, Texas.

24        Q.   Has Bob Reichert ever served on the

25   subcommittee?

1     A.    No, he has not.

2     Q.    Was he one of the 17 dealer representatives

3  for the LPE program?

4     A.    No, he was not.

5     Q.    Has Mr. Reichert ever served any function

6  related to the LPE process, that you're aware of?

7     A.    None that I'm aware of.

8     MR. BERBERICH:  That's all the questions I have.

9  Thank you very much.

10    MS. MCNELLIE:  For the record, I'd like to note

11  that there's a confidentiality agreement in this case;

12  and that under that agreement, we're allowed to

13  designate depositions as restricted confidential.  And

14  I would like to so designate this deposition because of

15  the references to other dealers and to documents that

16  have been marked restricted confidential in this case.

17    MR. BERBERICH:  Well, I would --

18    MS. MCNELLIE:  So that will require the front cover

19  of the deposition to be marked "Restricted

20  confidential."

21    MR. BERBERICH:  But I don't think all the items

22  discussed are restricted confidential.

23    MS. MCNELLIE:  Probably not.

24        Do you want me to do a line by line later?

25    MR. BERBERICH:  Or a page -- you know, a block, or

1    whatever.

2            Why don't we do this.  Why don't we agree that

3    before anybody at the client reviews this deposition,

4    that you and I will reach an agreement on what sections

5    are restricted confidential.

6      MS. MCNELLIE:  Okay.  There's a whole -- I mean, a

7    lot of the other depositions in this case have already

8    been sealed.

9      MR. BERBERICH:  Right.  Well, there's a lot of this

10   that is not restricted confidential.

11     MS. MCNELLIE:  True.

12     MR. BERBERICH:  But to the extent that there are

13   portions, then we'll agree between us.  And then,

14   otherwise, we'll use the procedure set forth in the

15   protective order.

16     MS. MCNELLIE:  Right.  That's fine.

17     MR. BERBERICH:  Thank you.

18            (Discussion held off the record.)

19     MS. MCNELLIE:  Send it to me when it's ready.

20     MR. BERBERICH:  I'd like to order the original and

21   a mini and a dirty ASCII if you have one, and you may

22   be relieved of your duties.

23            (Proceedings ended at 4:29 p.m.)

24            (Penalty of Perjury certificate on

25            the following page hereof.)

1                           - - - -

2

3            I declare under penalty of perjury under the

4    laws of the State of California that the foregoing is

5    true and correct.

6            Executed at _____,

7    California, this _____ day of _____,

8    20_____.

9

10

11            _____
                        JOHN E. CSERNOTTA
12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   State of California    )
                            )
 2   County of Orange       )

 3

 4          I, Kimberly Bonnell, Certified Shorthand

 5   Reporter No. 10668, do hereby certify:

 6          That prior to being examined, the witness in

 7   the foregoing deposition, to wit, JOHN E. CSERNOTTA,

 8   was by me duly sworn to testify to the truth, the whole

 9   truth and nothing but the truth;

10          That said deposition was taken down by me in

11   shorthand at the time and place therein named, and

12   thereafter reduced to print by means of computer-aided

13   transcription under my direction and the same is a

14   true, correct and complete transcript of said

15   proceedings.

16          I further certify that I am not interested in

17   the event of the action.

18          Witness my hand this 2nd day of April, 2003.

19

20

21

22                         _____

23                           Kimberly Bonnell, CSR No. 10668

24

25
```

192

1  State of California    )
                          )
2  County of Orange       )

3

4         I, Kimberly Bonnell, Certified Shorthand

5  Reporter No. 10668, hereby certify that the attached

6  deposition is a correct copy of the original transcript

7  of the deposition of JOHN E. CSERNOTTA, taken before me

8  on March 24, 2003, as thereon stated.

9         I declare under penalty of perjury that the

10 foregoing is true and correct.

11        Executed at Cerritos, California, this 2nd day

12 of April, 2003.

13

14

15

16

17        _____

                Kimberly Bonnell, CSR No. 10668
18

19

20

21

22

23

24

25