```
00001
  1                 UNITED STATES DISTRICT COURT
  2                FOR THE SOUTHERN DISTRICT OF OHIO
  3                        -  -  -
  4  EASTSIDE LINCOLN MERCURY, ET AL,   )
                                        )
  5                      PLAINTIFFS,    )
                                        )
  6  VS                                 )  CASE NO:  01CV00567
                                        )
  7  FORD MOTOR COMPANY, ET AL,         )
                                        )
  8                      DEFENDANTS.    )
     -----------------------------------
  9
 10
 11
 12              DEPOSITION OF:  ROBERT B. HUSER
 13                    CINCINNATI, OHIO
 14                    APRIL 2, 2003
 15
 16
 17
 18
 19
 20
 21
 22
 23  REPORTER:  JILL M. DRAGON SANDY
 24                  Dragon Reporting Service
                       5551 Seville Court
 25             Cincinnati, Ohio  45247
                     (513)574-8319
```

```
00002
  1            The deposition of ROBERT B. HUSER, taken on
  2    discovery, pursuant to agreement of counsel as to time and
  3    place, in the offices of Rendigs, Fry, Kiely & Dennis, Suite
  4    900, One West Fourth Street, Cincinnati, Ohio, on April 2,
  5    2003, at 2:00 PM, upon oral examination, and to be used in
  6    accordance with the Ohio Rules of Civil Procedure.
  7                                  -  -  -
  8
  9
 10                    S T I P U L A T I O N S
 11    It is stipulated by and between counsel for the
 12    representative parties that the deposition of ROBERT B.
 13    HUSER, the witness herein, may be taken at this time and
 14    place pursuant to the Ohio Rules of Civil Procedure,
 15    pursuant to agreement of counsel as to time and place; that
 16    the proof of the notary is waived; that the deposition may
 17    be recorded in stenotypy by the notary public, Jill M.
 18    Dragon Sandy, who is also the court reporter, and
 19    transcribed out of the presence of the witness, and that the
 20    deposition is required to be submitted to the witness for
 21    his examination and signature.
 22                                  -  -  -
 23
 24
 25
```

```
00003
    1                    A P P E A R A N C E S
    2
    3    FOR THE PLAINTIFFS:
    4    Mr. Gregory J. Berberich
         and
    5    Mr. Lawrence A. Flemer
         Statman, Harris, Siegel & Eyrich
    6    2900 Chemed Center
         255 East Fifth Street
    7    Cincinnati, Ohio  45202
         (513)621-2666
    8
    9
   10    FOR THE DEFENDANTS:
   11    Mr. Steven D. Hengehold
         Rendigs, Fry, Kiely & Dennis
   12    Suite 900
         One West Fourth Street
   13    Cincinnati, Ohio  45202-3688
         (513)381-9221
   14
   15    Mr. Gregory Smith
         Baker & Hostetler
   16    Capitol Square, Suite 2100
         65 East State Street
   17    Columbus, Ohio  43215-4260
         (614)462-2651
   18
   19    ALSO PRESENT:
   20    Mr. James Woodall
   21
   22
   23
   24
   25
```

Huser 4/2/03 page 4

```
00004
   1                        I N D E X
   2   CROSS-EXAMINATION BY:                    MR. FLEMER
   3                        PAGES  5 - 78
   4
   5
   6                  E X H I B I T   I N D E X
   7                        (None)
   8
   9
  10
  11
  12
  13
  14
  15
  16
  17
  18
  19
  20
  21
  22
  23
  24
  25
```

```
00005
   1                     ROBERT B. HUSER,
   2         called on behalf of the plaintiff, after having been
   3    first duly sworn, was examined and deposed as follows:
   4                C R O S S - E X A M I N A T I O N
   5    BY MR. FLEMER:
   6              Q.   Mr. Huser, my name is Larry Flemer, and
   7    I represent Eastside Lincoln Mercury and Bill Woeste in a
   8    lawsuit that's the reason that we're here today.
   9                   I'm going to be taking your deposition,
  10    which is a process whereby I'll ask you a series of
  11    questions to see if you have knowledge about some of the
  12    issues in the case.
  13              A.   Okay.
  14              Q.   And I don't know, have you ever had a
  15    deposition before?
  16              A.   No.
  17              Q.   Well, I'm sure Mr. Hengehold has given
  18    you kind of an outline of how it works.  But just to review
  19    with you, it's important, a couple of things, that you
  20    remember, No. 1, that you give a verbal answer to any of the
  21    questions that are asked and try to answer with words as
  22    opposed to "uh-huh" or "huh-uh."  Secondly, if you don't
  23    understand my question, or some portion of it, please tell
  24    me and I'll rephrase it to make it clear to you.
  25              A.   Okay.
```

```
00006
  1                    Q.    Everything that we're saying here is
  2   going to be taken down and transcribed and become part of
  3   the case record, so it's important that we be accurate.  And
  4   I'll assume that if you've answered one of my questions
  5   without asking for clarification, that you understood it.
  6   Okay?
  7                    A.    Okay.
  8                    Q.    All right.  If you need to take a break
  9   at some point, let me know.
 10                    A.    Okay.
 11                    Q.    And the only other thing that I ask is
 12   that you try to not begin your answer until I have finished
 13   my question, and I'll, likewise, not start the next question
 14   until you've finished your answer.  Okay?
 15                    A.    Very good.
 16                    Q.    All right.  Can you state your full name
 17   and give us your residence address?
 18                    A.    Robert B. Huser, 7242 Crinstead,
 19   C-R-I-N-S-T-E-A-D, Cincinnati, 45243.
 20                    Q.    How old are you?
 21                    A.    Forty.
 22                    Q.    Date of birth?
 23                    A.    6/20/62.
 24                    Q.    Are you married?
 25                    A.    Yes.
```

```
00007
     1                    Q.    Your wife's name?
     2                    A.    Gail.
     3                    Q.    Do you have any children?
     4                    A.    Two.
     5                    Q.    And their names and ages?
     6                    A.    Nicole, seven; Amanda, four.
     7                    Q.    What part of town do you live in?
     8                    A.    Madeira.
     9                    Q.    Can you give us an outline of your
    10   educational background?
    11                    A.    The University of Cincinnati.
    12                    Q.    Did you obtain a degree?
    13                    A.    Degree in business administration.
    14                    Q.    What year?
    15                    A.    1983.
    16                    Q.    And any school after your undergraduate
    17   degree?
    18                    A.    No.
    19                    Q.    Did you start to work after graduation?
    20                    A.    Yes.
    21                    Q.    Can you outline your work history for
    22   me, beginning with your first job out of college?
    23                    A.    Tom Sweeney Nissan, Grueninger
    24   Oldsmobile GMC.
    25                    Q.    Slow down a little.  I'm going to give
```

```
00008
    1    you a chance to tell me a little bit about each position
    2    before we go on to the next one.
    3              A.    Okay.
    4              Q.    What period of time did you work at Tom
    5    Sweeney?
    6              A.    1984, for a year.
    7              Q.    What did you do there?
    8              A.    Sales.
    9              Q.    New and used cars?
   10              A.    Yes.
   11              Q.    And where did you go after that?
   12              A.    Grueninger Oldsmobile GMC.
   13              Q.    What position?
   14              A.    First sales and then finance manager.
   15              Q.    How long were you there?
   16              A.    About three years.
   17              Q.    So that would be roughly until about
   18    1988?
   19              A.    Correct.
   20              Q.    Where did you go after that?
   21              A.    Flerlage Marine.
   22              Q.    F-L-E-R-L-A-G-E?
   23              A.    That's correct.
   24              Q.    What did you do there?
   25              A.    Finance manager.
```

```
00009
 1                  Q.   And what period of time did you work at
 2   Flerlage?
 3                  A.   About a year and a half, just short of
 4   '90.
 5                  Q.   Where did you work after that?
 6                  A.   Jupiter Dodge.
 7                  Q.   Where are they located?
 8                  A.   Jupiter, Florida.
 9                  Q.   What period of time did you work there?
10                  A.   I was only there for about a year.
11                  Q.   So roughly 1990, '91?
12                  A.   Yes.
13                  Q.   What position did you hold there?
14                  A.   Finance manager.
15                  Q.   And after that?
16                  A.   Cronin Lincoln Mercury Volkswagen, until
17   April of '92.
18                  Q.   I'm going to guess, finance manager?
19                  A.   Correct.
20                  Q.   And after that?
21                  A.   Mercedes Benz of Cincinnati.
22                  Q.   And what period of time were you at the
23   Mercedes dealership?
24                  A.   Until January of 2000.  Sales manager.
25                  Q.   Was that new and used cars?
```

```
00010
   1                   A.   Yes.
   2                   Q.   And what happened in January of 2000?
   3                   A.   I left there and started working for Bob
   4   Reichert in February of 2000.
   5                   Q.   What position did you take with
   6   Mr. Reichert's group?
   7                   A.   General manager.
   8                   Q.   That would be at the Fairfield Lincoln
   9   Mercury store?
  10                   A.   Correct.
  11                   Q.   And that's your current position; is it
  12   not?
  13                   A.   That's correct.
  14                   Q.   Have you had any training along the
  15   route of your career path, in connection with any of the
  16   positions you've held, formal training?
  17                   A.   Some F&I schools, Ryan Institute's F&I
  18   school, which is a two-week school in Chicago; the Oak
  19   Agency, also in Chicago.
  20                   Q.   The first word is "the," the second word
  21   is "oak?"
  22                   A.   Yes, correct.
  23                   Q.   They're both finance schools?
  24                   A.   Both finance schools, uh-huh.
  25                   Q.   And they're both in the Chicago area?
```

```
00011
  1                   A.   Correct.
  2                   Q.   When did you receive training there, at
  3  either one of those?
  4                   A.   That would been back in the late '80s.
  5  I can't remember the exact dates, but probably '86, '87,
  6  '88, somewhere in there.
  7                   Q.   And the training from the Oak Agency,
  8  was that also a two-week program?
  9                   A.   No, that was about four days.
 10                   Q.   Any other formal training?
 11                   A.   No.
 12                   Q.   So you've had no training as a -- from
 13  an operational standpoint, dealer operations or anything
 14  like that?
 15                   A.   Formal training, correct.
 16                   Q.   Okay.  Have you attended any program
 17  sponsored by Ford Motor/Lincoln Mercury Division?
 18                   A.   Yes, their new dealer orientation.
 19                   Q.   And when did that occur?
 20                   A.   I believe it was April or May of 2000.
 21                   Q.   And would that have coincided with the
 22  acquisition by Mr. Reichert of the Fairfield store?
 23                   A.   It was a little after that.
 24                   Q.   Was that about a one-week program up in
 25  Dearborn?
```

```
00012
    1                    A.   Yes.
    2                    Q.   Were you involved, in any respect, with
    3    Mr. Reichert's acquisition of Fairfield Lincoln Mercury?
    4                    A.   No.
    5                    Q.   Did you know anything about it, even
    6    though you weren't part of it?
    7                    A.   Limited.
    8                    Q.   Tell me what you know about how he came
    9    to own the dealership.
   10                    A.   I --
   11                    Q.   It was previously operated by another
   12    company; is that right?
   13                    A.   Correct.  Correct.
   14                    Q.   Tell me what you know.  I interrupted
   15    you, I'm sorry.
   16                    A.   I was hired in February 2000, to be the
   17    general manager of a store that I didn't even know the name
   18    of.
   19                    Q.   How did you come into contact with the
   20    opportunity?
   21                    A.   Rick Roselle, from Agency Services, he's
   22    an F&I trainer, and I had a -- I knew Rick, we did business
   23    with him at Mercedes Benz of Cincinnati, and he got me an
   24    interview with Mr. Reichert.
   25                    Q.   Did Mr. Reichert explain to you, at that
```

```
00013
 1   time, anything about how he acquired the dealership?
 2                   A.   No.
 3                   Q.   Do you know who operated it before he
 4   did?
 5                   A.   Yes.
 6                   Q.   Who was that?
 7                   A.   Jim Dixon.
 8                   Q.   Okay.  And at the time Mr. Reichert
 9   acquired it, was it strictly a Lincoln Mercury dealership --
10                   A.   Correct.
11                   Q.   -- or was there another brand involved?
12                   A.   Just Lincoln Mercury.
13                   Q.   Did Mr. Reichert subsequently get
14   approval from Ford to dual that dealership?
15                   A.   Yes.
16                   Q.   When I say Ford in this deposition, I
17   mean to refer to the Lincoln Mercury Division.
18                   A.   Right.
19                   Q.   Were you involved with his efforts to
20   get permission from Ford to dual?
21                   A.   Limited.
22                   Q.   Do you know how that took place?
23                   A.   No, I really don't.
24                   Q.   Is it your opinion that having a dual
25   dealership is beneficial to Mr. Reichert and the Kenwood
```

```
00014
 1  Dealer Group?
 2              A.   Yes, in some ways.
 3              Q.   Can you tell me how it's beneficial?
 4              A.   It's easier for me to run both locations
 5  being under one, well, one roof but two showrooms.  There's
 6  a few synergies, as far as employees, very few, but a few.
 7              Q.   Can you explain those to me, or just
 8  list them for me?
 9              A.   Office personnel, at the other store I
10  had four, this one I have six.
11              Q.   So you have a little more manpower, so
12  to speak?
13              A.   Yes.  A little less than you would have
14  if you had two, not by -- actually by about maybe four or
15  five employees.
16              Q.   So you have a few more employees but
17  they cover a wider area; is that right?
18              A.   Correct.
19              Q.   Okay.  What other synergies, as you
20  described them, would you identify there?
21              A.   Besides the fact that it's easier for me
22  to run a store that I'm in all the time, there's, there's
23  very little other --
24              Q.   Are there any economies that would be
25  associated with the physical facilities themselves?
```

```
00015
   1                    A.    Very little.
   2                    Q.    Would you be able to give me any
   3  examples on that?
   4                    A.    Rent factor.
   5                    Q.    Okay.  Spread the rent across both
   6  dealerships?
   7                    A.    Correct.
   8                    Q.    Okay.
   9                    A.    But the facility had to be redone, so
  10  the rent went up at the facility that we're at.
  11                    Q.    Okay.
  12                    A.    So you don't have the entire savings of
  13  the other store.
  14                    Q.    You would if you owned the property,
  15  right, and you weren't paying rent?
  16                    A.    Yes.
  17                    Q.    Okay.  Any other economies of scale or
  18  financial savings that you can identify as a consequence of
  19  dualing?
  20                    A.    My salary, what I make, you have one of
  21  me instead of two.
  22                    Q.    All right.  You mean they don't pay you
  23  double?
  24                    A.    I wish they did, but --
  25                    Q.    You have to ask.
```

```
00016
    1                         Are there any other personnel who also
    2    represent a savings to the dealer group, apart from
    3    yourself, where you can have one person doing two jobs, so
    4    to speak?
    5                A.    Yes.
    6                Q.    Who would those be?
    7                A.    The service manager and the parts
    8    manager.  But on the other hand, I then had to have an
    9    assistant parts manager and assistant service manager
   10    because it was too big for one person to handle.
   11                Q.    Okay.  But you have one service manager
   12    that supervises the servicing of both brands?
   13                A.    Correct.
   14                Q.    And the same for the parts?
   15                A.    Correct.
   16                Q.    But each of them needs an assistant?
   17                A.    Correct.
   18                Q.    Can't you get them to work any harder?
   19                A.    They're already working pretty hard.
   20                Q.    Are there any other individuals where
   21    that duality would result in some savings?
   22                A.    No.
   23                Q.    Or other positions, I guess I should
   24    say?
   25                A.    No.  We have separate sales managers,
```

```
00017
   1   two F&I.  Everything where we had one, we now have two.
   2                   Q.   Is it your belief, Mr. Huser, that
   3   having that dual status up there is beneficial to the dealer
   4   group, above and beyond the savings we've already talked
   5   about?
   6                   A.   No.
   7                   Q.   Do you think it helps them make any more
   8   money or sell any more cars?
   9                   A.   No.
  10                   Q.   Do you think it does the opposite?  Does
  11   it impact in a negative way?
  12                   A.   In the beginning, yes.
  13                   Q.   How so?
  14                   A.   Well, in the beginning, when we
  15   originally dualed, everybody was in the same showroom.  And
  16   since we separated the two, it has been a factor.
  17                   Q.   How long did that original phase exist
  18   or go on, where you were all in one facility?
  19                   A.   From June to January.
  20                   Q.   So there was six months of what, real
  21   problems?
  22                   A.   No.
  23                   Q.   Seven months, or whatever it would be?
  24                   A.   No.
  25                   Q.   How was it difficult to be in one
```

```
00018
 1   facility?
 2              A.   Well, if you have the same sales force
 3   selling two product lines out of the same showroom, you sell
 4   less cars.  Each person, you know, has two things to choose
 5   from.  Once we separated that, that doesn't occur anymore.
 6              Q.   The other dual is Volkswagen, correct?
 7              A.   Correct.
 8              Q.   Was it your belief that those were
 9   competitive brands?
10              A.   No.
11              Q.   I'm not sure I follow the earlier
12   statement you made about having two things to choose from.
13              A.   A salesperson doesn't care what they're
14   selling, as long as it's putting a commission in their
15   pocket.
16              Q.   I see.
17              A.   They don't care if it's a Lincoln
18   Mercury or a Volkswagen.  Now that we have dedicated Lincoln
19   Mercury salespeople and dedicated Volkswagen salespeople,
20   that's what they have to sell.
21              Q.   I see.
22                   Were there any other problem areas that
23   were evident during that break-in period, that first seven
24   months?
25              A.   Yes.
```

```
00019
 1                    Q.   Tell me what they were.
 2                    A.   Service, initially the same thing as
 3  sales, everybody went to the same service write-up.
 4                    Q.   And they just had to be redirected?
 5                    A.   No.  There was one service write-up for
 6  all products, and now those are both separate also.
 7                    Q.   I see.
 8                    Were you aware of whether the agreement
 9  that Ford entered into with Mr. Reichert to allow this dual
10  had some conditions attached to it?
11                    A.   Yes.
12                    Q.   Do you know what those conditions were?
13                    A.   Yes.
14                    Q.   What were they?
15                    A.   Separate customer contact points.  So we
16  have two cashier areas, two customer waiting areas, two
17  separate showrooms, two separate managers.
18                    Q.   How long were you given to get to that
19  point, because you didn't start out that way?
20                    A.   There was no time frame.  I mean, they
21  had already known our construction schedule, and that by the
22  first of the year we were going to have the new building
23  open.
24                    Q.   So they approved that as part of the
25  deal, and the assumption was that you would get the
```

```
00020
    1   construction done on time and things would split up at that
    2   point?
    3                   A.   Correct.  Correct.
    4                   Q.   Okay.  When you were hired, did
    5   Mr. Reichert indicate to you that permission to dual had
    6   been granted?  Did you know that was part of the package
    7   that you were going to be operating?
    8                   A.   No.
    9                   Q.   You did not?
   10                   A.   When I was hired?
   11                   Q.   Yes.
   12                   A.   No.
   13                   Q.   When did you first learn about it?
   14                   A.   December of 2000.
   15                        Can I -- I didn't answer that correctly.
   16                   Q.   Okay, sure.
   17                   A.   December of 2000 is when I found out we
   18   bought the other facility.
   19                   Q.   I'm sorry, sir.
   20                   A.   December of 2000 is when I found out
   21   that we were going to purchase the other facility.
   22                   Q.   Okay.  So that was ten months after you
   23   were hired?
   24                   A.   Correct.
   25                   Q.   Okay.  Am I correct that when Lincoln
```

Huser 4/2/03 page 21

```
00021
   1   Mercury moved into that facility, it was pretty well
   2   trashed?
   3                   A.   The facility itself was 15 years old, so
   4   yes, it was not in -- I wouldn't call it trashed.  It was
   5   much better than what we were coming out of, a 100 percent
   6   better than what we were coming out of.
   7                   Q.   Tell me about that.  Where was --
   8                   A.   The Dixon facility.
   9                   Q.   I see.
  10                        Where was the Dixon facility located
  11   before you moved in and started operations as Fairfield
  12   Lincoln Mercury?
  13                   A.   I don't understand what you're --
  14                   Q.   Was it in a different location before?
  15                   A.   The Dixon facility?
  16                   Q.   Yes, sir.
  17                   A.   No, it's at the same location, in that
  18   building it's --
  19                   Q.   What's the street address?
  20                   A.   6195 Dixie Highway.
  21                   Q.   And the new address is 6055 (sic)?
  22                   A.   6065.
  23                   Q.   Okay, 6065.
  24                        And at 6065 Dixie Highway, you have two
  25   separate showrooms?
```

```
00022
     1                    A.   Correct.
     2                    Q.   Two separate service areas?
     3                    A.   Two separate write-up areas.
     4                    Q.   Two separate service write-up areas.
     5                         What other aspects of the arrangement
     6 are physically separate?
     7                    A.   Everything from the physical service
     8 department forward (indicating).  The shop itself is the
     9 same.  The parts department is the same.
    10                    Q.   And when did you move in again, to 6065
    11 Dixie?
    12                    A.   With Lincoln Mercury or --
    13                    Q.   Yes.
    14                    A.   June of 2001.
    15                    Q.   Okay.  And how about Volkswagen?
    16                    A.   We purchased the end of February 2001.
    17                    Q.   So the Volkswagen piece moved in first?
    18                    A.   It was always there.
    19                    Q.   I see.
    20                         Do you know when Mr. Reichert received
    21 permission to relocate?
    22                    A.   I don't recall the exact date.
    23                    Q.   Do you know when he received permission
    24 to dual?
    25                    A.   I don't recall the exact date.
```

```
00023
   1                    Q.    Can you bracket it in terms of spring,
   2 summer, fall?
   3                    A.    Between March and June, 2001.
   4                    Q.    Are you aware of problems that arose
   5 between Mr. Reichert, in his request to dual, and Lincoln
   6 Mercury's regional manager's approval of it?
   7                    A.    No.
   8                    Q.    Did you ever become aware that
   9 Mr. Reichert perceived that Mr. Carter was going to withhold
  10 approval, after he said he would give it to him?
  11                    A.    No.
  12                    Q.    Or withdraw approval after he said he
  13 would give it to him?
  14                    A.    No.
  15                    Q.    Did you ever hear Mr. Reichert comment
  16 that he might have to sue Jerry Carter to get this deal
  17 done?
  18                    A.    Absolutely not.
  19                    Q.    What is your understanding of
  20 Mr. Reichert's relationship with Jerry Carter while he was
  21 here?
  22                    A.    Seemed great to me, never saw any
  23 animosity.
  24                    Q.    You never saw any adversity between the
  25 two of them?
```

```
00024
    1                    A.   No.
    2                    Q.   Do you know if Mr. Carter and
    3   Mr. Reichert had a social relationship?
    4                    A.   No.
    5                    Q.   You don't know or no, they did not?
    6                    A.   I don't believe they did.
    7                    Q.   Okay.  How about Mr. Reichert and
    8   Mr. Carnegie?
    9                    A.   No.
   10                    Q.   You don't believe they do?
   11                    A.   I don't believe they do.
   12                    Q.   Okay.  Were you present at a dinner at
   13   Wetherington Country Club, where Mr. Carter was there, and
   14   perhaps Pat LeTarte, to talk about some business issues?
   15                    A.   Yes.
   16                    Q.   Do you remember when that was?
   17                    A.   No, I don't.  I don't recall.
   18                    Q.   Were you and the other Lincoln Mercury
   19   general managers there?
   20                    A.   Yes.
   21                    Q.   Was it Mr. Carter and Mr. LeTarte?
   22                    A.   Yes.
   23                    Q.   Anyone else that you remember?
   24                    A.   I can't remember.
   25                    Q.   Do you remember what was discussed on a
```

```
00025
 1  business level?
 2                  A.    Just the state of affairs of Lincoln
 3  Mercury, how were things going, sales, you know, how
 4  everything was going, our individual scores.
 5                  Q.    Was there a request made at that meeting
 6  for financial assistance?
 7                  A.    No.
 8                  Q.    Was there an offer of financial
 9  assistance made at that meeting relative to turning some
10  inventory, some aged inventory?
11                  A.    Yes, yes, yes.
12                  Q.    There was an offer by Mr. Carter to do
13  that?
14                  A.    Uh-huh.
15                  Q.    What did he offer?
16                  A.    As I recall, it was $10,000, between the
17  three stores.
18                  Q.    And did that just come out of the blue?
19  He said, "hey, guys, it's nice to see you.  And by the way,
20  I've got $10,000 for you to help move some old inventory."
21                  A.    Not quite to that extreme, but yes.
22                  Q.    Well, it was all his initiative?
23                  A.    Absolutely.
24                  Q.    Okay.  And were you surprised when that
25  came out of the conversation?
```

```
00026
    1                    A.    A happy surprise.
    2                    Q.    But you didn't see that coming; is that
    3  right?
    4                    A.    No.
    5                    Q.    Do you know if any of your other
    6  counterparts from the other two dealerships were similarly
    7  surprised to hear that offer?
    8                    A.    I never discussed it with them, their
    9  surprise or their non-surprise.
   10                    Q.    Okay.  And was it Jerry that made the
   11  offer or Pat?
   12                    A.    Yes, Jerry.
   13                    Q.    Okay.  And was there any preamble to it
   14  or was it just, "hey, guys, I've been thinking and I know
   15  you all have some aged inventory and this is what I'd like
   16  to offer you?"  Tell me how it happened.  I'm kind of
   17  throwing thoughts out here, but I don't know if any them are
   18  right.
   19                    A.    In the conversation at that dinner,
   20  there was this much (indicating) -- I'm sorry -- very little
   21  business and more social, just having dinner and the state
   22  of how things were going, and Larry had brought up that.
   23                    Q.    Larry Feldhaus?
   24                    A.    Larry Feldhaus.
   25                          And Jerry is saying, you know, "what's
```

```
00027
   1    going on, what can I help you with, is there anything that
   2    we can help you with, anything the region can?"  Larry had
   3    brought up that we had a lot of aged prior inventory.
   4                    Q .   And what did Jerry say in response to
   5    that?
   6                    A.    I don't remember his exact words, but
   7    that's when he said what if I -- you know, don't quote me, I
   8    can't remember the exact words, but, basically, what if I
   9    put $10,000 out to somehow come up with a program to move
  10    the aged inventory?
  11                    Q.    And everybody said that would be good,
  12    right?
  13                    A.    Absolutely.
  14                    Q.    Did he tell you what kind of program he
  15    had in mind or how he was going to make it happen?
  16                    A.    No.
  17                    Q.    Did anybody inquire?
  18                    A.    No.  He told us, "you guys come up with
  19    how you want to do the program."  And, you know, it was
  20    basically, "I have this money and you come up with a program
  21    to move the inventory."
  22                    Q.    He didn't say from whence this money
  23    came?  I mean, was it discretionary money that he had?
  24                    A.    No.
  25                    Q.    At the regional level, was it LMDA
```

```
00028
    1   money, do you have any idea?
    2                    A.   I don't know.
    3                    Q.   And you never heard it characterized as
    4   to what the ultimate source of that money was?
    5                    A.   When someone is offering me, or myself
    6   and my two counterparts, I'm certainly not going to
    7   question, well, where are you getting it?
    8                    Q.   No.  I don't mean that you would
    9   challenge him or anything.  I'm just wondering if it ever
   10   became known to you how that money came to be available?
   11                    A.   No.
   12                    Q.   Okay.  So you were saying that he said
   13   what if I put up $10,000 and came up with a program, and
   14   then he asked you to come up with a program?
   15                    A.   No.  He didn't say, "I'll come up with a
   16   program."
   17                    Q.   Okay.
   18                    A.   He said, "you guys come up with a
   19   program that will help move the inventory."
   20                    Q.   Okay.  And so his piece was, he had the
   21   money, you would have to figure out how to move the
   22   inventory, figure out how to spend the money, correct?
   23                    A.   Correct.
   24                    Q.   And that wouldn't have been too
   25   difficult to do, right, for you guys?
```

```
00029
     1                    A.   (Shrugging shoulders).  Well --
     2                    Q.   What did you come up with?
     3                    A.   I don't recall the exact particulars.
     4  It was based on -- I believe we targeted -- and once again,
     5  I can't remember when this meeting took place, but I believe
     6  we targeted Mountaineers and we set a dollar amount, but I
     7  can't remember what it was.  And when each store sold a
     8  Mountaineer, we basically reported it to Larry and he
     9  tracked who sold how many.  At the end of the program, we
    10  divided the money accordingly.  Of course the money wasn't
    11  there yet, we had to let Mr. Carter know how the money
    12  divided up.
    13                    Q.   And the money that came in went to
    14  Kenwood Dealer Group, correct, it didn't get funneled down
    15  to your salespeople?
    16                    A.   No.  I believe we actually did pay the
    17  salespeople.  The bonus was to them, I recall.  I don't
    18  know.  I don't remember for sure.
    19                    Q.   Who would know?  How could I understand
    20  that, what exactly did happen there?
    21                    A.   I don't know.
    22                    Q.   Well, you said Larry tracked the number
    23  of sales?
    24                    A.   Correct.
    25                    Q.   And then ultimately did the math and
```

```
00030
 1   allocated the price per vehicle to where they were sold?
 2                 A.   Correct.
 3                 Q.   Okay.  Did you do any recordkeeping in
 4   connection with this program?
 5                 A.   No.
 6                 Q.   So the recordkeeping that was done was
 7   done by Mr. Feldhaus?
 8                 A.   Correct.
 9                 Q.   Do you remember if all the money went to
10   your sales staff?
11                 A.   I don't recall.
12                 Q.   Was it split, some portion went to the
13   sales staff and some portion stayed with the Kenwood Dealer
14   Group?
15                 A.   My recollection is all of it went to the
16   salespeople, at least in my store.  That's my memory of it.
17                 Q.   Do you know whether each of the three
18   stores handled the money the same way?
19                 A.   I don't know.
20                 Q.   Are you aware, Mr. Huser, of other
21   instances where Mr. Carter offered financial assistance to
22   dealerships operated by the Kenwood Dealer Group, outside
23   the channel of LMDA money?
24                 A.   No.
25                 Q.   Are you aware of where Mr. Carter
```

```
00031
    1  obtained money to make available for this type of program?
    2              A.   No.
    3              Q.   I know you've told me you didn't know
    4  specifically in this instance, but are you aware, generally,
    5  of how he would come by funds that, you know, he could say
    6  "what if I could get you $10,000?"
    7              A.   No.
    8              Q.   Have you ever had any discussions with
    9  anybody at Ford that would identify where those monies would
   10  be available on a regional level?
   11              A.   No.
   12              Q.   You told me that this was an instance
   13  where this offer came from Mr. Carter?
   14              A.   Correct.
   15              Q.   Rather than being initiated at the
   16  request from you all?
   17              A.   Correct.
   18              Q.   Were there instances where Kenwood
   19  Dealer Group made requests, not like this one, but where
   20  they initiated requests for extra money or extra financial
   21  assistance?
   22              A.   I'm not aware of any.
   23              Q.   How about Mr. LeTarte, ever know of any
   24  instances where somebody has gone to Pat LeTarte and said,
   25  "hey, we're stuck on this, we need some extra money?"
```

00032
```
 1                    A.   No.
 2                    Q.   Or anybody else at the regional office?
 3                    A.   No.
 4                    Q.   Do you know what the term "consolidator"
 5  means, "consolidator dealer?"
 6                    A.   I've read about consolidation.
 7                    Q.   Okay.  What do you know about
 8  consolidation, in the Lincoln Mercury parlance?
 9                    A.   Very little.
10                    Q.   Do you know that Mr. Reichert is the
11  consolidator for Lincoln Mercury in the Cincinnati market?
12                    A.   I did not know that.
13                    Q.   Until I said that, or you know it now,
14  huh?
15                    A.   No, until I found out that that was one
16  of the issues of this suit.
17                    Q.   Okay.  Do you know anything about how
18  Mr. Reichert came to be the consolidator?
19                    A.   No.
20                    Q.   And when I say Mr. Reichert, I'm talking
21  about the Kenwood Dealer Group, in which he owns controlling
22  ownership interest.
23                    A.   No.
24                    Q.   Have you ever discussed the topic of
25  consolidation of the marketplace with Mr. Reichert?
```

```
00033
 1                   A.   No.
 2                   Q.   Do you know if he has any plans to
 3  acquire any other Lincoln Mercury dealerships?
 4                   A.   No.
 5                   Q.   Have you read the lawsuit?
 6                   A.   No.
 7                   Q.   Am I correct in believing that the only
 8  knowledge you have about the issues in the lawsuit would
 9  have come out of communications where Mr. Hengehold was
10  present?
11                   A.   Correct.
12                   Q.   Have you discussed the lawsuit with
13  Mr. Reichert outside of Mr. Hengehold's presence?
14                   A.   No.
15                   Q.   Mr. Huser, I'm going to ask you some
16  specific questions about sums of money that were identified
17  on four documents as being paid to one of the Reichert
18  Lincoln Mercury dealerships.  I'm just asking you if these
19  sums and dates ring any bells with you, okay?
20                   A.   Okay.
21                   Q.   In April of 2000, are you aware that
22  Fairfield Lincoln Mercury received $47,250 in advertising
23  funds from the region?
24                   A.   Yes.
25                   Q.   And do you remember how that happened,
```

```
00034
   1   or what transpired to make that happen?
   2            A.   Part of the purchase of the dealership
   3   from Ford, there was an amount that basically was for
   4   differences in what the assets of the property appraised for
   5   between Mr. Dixon's, Ford's and our appraisal, and used car
   6   inventory, which had about $140,000 worth of wholesale loss
   7   in it.
   8            Q.   So this $47,250 related to making up a
   9   spread, so to speak, between somebody's appraisal of the
  10   existing inventory, vehicle inventory, and what --
  11            A.   No.
  12            Q.   I'm sorry.
  13            A.   The physical inventory of the
  14   dealership:  Service lifts, desks, garbage cans.
  15            Q.   Physical inventory, okay.
  16                 And how many appraisals were there?
  17            A.   Three, that I'm aware of.
  18            Q.   And whose number ruled the day when it
  19   was all over?
  20            A.   It was averaged.
  21            Q.   Okay.  And the 47,250 was paid over by
  22   Ford to compensate Mr. Reichert for what he paid?
  23            A.   Correct.
  24            Q.   Or to reimburse Mr. Reichert for what he
  25   paid, because he paid Ford, didn't he?
```

```
00035
    1                    A.    Correct.
    2                    Q.    To buy the dealership from dealer
    3   development?
    4                    A.    Yes.
    5                    Q.    Okay.  And it's your understanding that
    6   that figure was strictly for making up this variance in the
    7   physical inventory, it wasn't co-op money, it wasn't for
    8   advertising and it wasn't for grand opening; is that right?
    9                    A.    Correct.
   10                    Q.    Were there separate sums received about
   11   that time, for grand opening or new dealer opening or new
   12   advertising for a new dealer?
   13                    A.    I don't remember.
   14                    Q.    Okay.  Are you aware of whether such
   15   monies would ordinarily be available when a new dealership
   16   opens?
   17                    A.    Yes, with all manufacturers.
   18                    Q.    Okay.  And are you saying that you don't
   19   know if the Reichert dealership received any such funds?
   20                    A.    I don't believe we ever used grand
   21   opening funds.  I don't recall that.
   22                    Q.    I'm sorry.  Did you say whether you ever
   23   used grand opening funds or whether you ever received them?
   24                    A.    If they were available, I don't -- we
   25   never did have a grand opening.
```

```
00036
   1                    Q.    Do you recall whether there were monies
   2    made available to the Kings dealership for sell-down
   3    assistance --
   4                    A.    No.
   5                    Q.    -- in December of 2000?
   6                    A.    No.
   7                    Q.    Or whether there were monies made
   8    available to Kings for Cougar co-oping --
   9                    A.    No.
  10                    Q.    -- in October of 2000?
  11                    A.    No.
  12                    Q.    Is that because, if that happened, it
  13    just wouldn't come to your attention, that's not your store?
  14                    A.    That's not my store.
  15                    Q.    Do you know whether Kings received
  16    $17,000 in February of 2000, from the region, for any
  17    purpose?
  18                    A.    No.
  19                    Q.    Or 36,750 in April of 2000?
  20                    A.    No.
  21                    Q.    Or whether Northgate received $21,000 in
  22    April of 2000 for co-op?
  23                    A.    No.
  24                    Q.    Don't know?
  25                    A.    Don't know.
```

```
00037
  1                     Q.    Let me direct your attention to the end
  2  of '01, roughly the end of October of that year.  Do you
  3  remember receiving a $2,500 check for marketing
  4  assistance --
  5                     A.    No.
  6                     Q.    -- at the Fairfield store?
  7                     A.    I don't recall.
  8                     Q.    Okay.  Or a $420 check for an inventory
  9  sell-down issue at your store?
 10                     A.    I don't recall.
 11                     Q.    And is that because it's too long ago
 12  or, I mean, what --
 13                     A.    Because it's pretty long ago.
 14                     Q.    Okay.  Those are not particularly high
 15  sums of money, are they?
 16                     A.    No.
 17                     Q.    So if you received money back then for
 18  those reasons, it would have been kind of considered
 19  routine?
 20                     A.    No.
 21                     Q.    No?
 22                     A.    No.
 23                     Q.    Okay.  Was it not routine to receive
 24  separate checks from time to time, that were identified as
 25  marketing assistance or inventory sell-down?
```

00038

1              A.    There's LMDA funds that come from time
2    to time.  I mean, yes, there's funds.  With what consistency
3    there is and, you know, how often it is, there's no pattern
4    to it.
5              Q.    Okay.  When a LMDA check would come in,
6    would you identify it as such?
7              A.    Yes.
8              Q.    How?
9              A.    It says "LMDA" on it.
10             Q.    On the memo line?
11             A.    No, on the actual check.
12             Q.    On the check itself?
13             A.    Yes.
14             Q.    And is there a standard template, so to
15   speak, for how those checks are cut?
16             A.    They're all similar.
17             Q.    Okay.  And they're printed off -- those
18   checks that you've identified as LMDA-sourced monies all
19   come from Young & Rubicam?
20             A.    I don't recall if they all come from
21   them.
22             Q.    Do you know Young & Rubicam's
23   association with the LMDA?
24             A.    Yes.
25             Q.    And what is that?

00039
```
 1                      A.    That's their advertising agency, and
 2    Jeff Drew is -- he does the advertising.
 3                      Q.    But you're saying there could be LMDA
 4    funds that come without Young & Rubicam's connection or
 5    involvement?
 6                      A.    I don't recall there being any.
 7                      Q.    So if you saw an LMDA check, you would
 8    expect that it reflected involvement by Young & Rubicam to
 9    disperse those funds?
10                      A.    Correct.
11                      Q.    Whose company was the check written on,
12    who is the payor?
13                      A.    I don't know.
14                      Q.    So it would be unusual, then, in the
15    course of everyday operations, at least the ones that you're
16    aware of, to have a check come in that was representing
17    financial assistance from Ford that wasn't an LMDA fund
18    check; is that right?
19                      A.    No.
20                      Q.    That's not right?
21                      A.    That's correct.
22                      Q.    I'm not sure I understand your answer.
23    Maybe my questions are getting twisted a little bit.  I'm
24    trying to find out whether, when you receive checks that
25    were advertising support or marketing support, were they
```

```
00040
   1   all, in your experiences, reflecting LMDA money?
   2                   A.   No.
   3                   Q.   Where would the other checks come from
   4   and what would they reflect?
   5                   A.   I don't recall.
   6                   Q.   How would you receive checks that
   7   weren't LMDA funds?
   8                   A.   Through the mail.
   9                   Q.   Would there be any covering information
  10   with it, any memos, anything that would tie the check to a
  11   specific purpose?
  12                   A.   Check stub.
  13                   Q.   Okay.  And what -- if you were to
  14   describe to someone what types of check stubs you might
  15   receive in connection with these monies, what would they
  16   say?
  17                   A.   I don't recall any.
  18                   Q.   You don't recall ever having it happen
  19   or you don't recall?
  20                   A.   I don't recall any specifics on a check
  21   stub.
  22                   Q.   But you know these checks would come
  23   from time to time?
  24                   A.   No, I wouldn't categorize it as "time to
  25   time."
```

00041

1                    Q.    How would you categorize it?
2                    A.    There was some specific check and then
3    the check would go -- it's not an every day, very often
4    occurrence, but it's something that's in my normal business.
5                    Q.    In your capacity, Mr. Huser, as general
6    manager, was there bookkeeping done to identify where these
7    checks came from, or only the amounts that came in?
8                    A.    No, only the amount.
9                    Q.    Do you remember checks coming in
10   October of '01, $1500 for marketing assistance --
11                   A.    No.
12                   Q.    -- at the Fairfield store?
13                   A.    I don't recall.
14                   Q.    $18,785, April in of -- I'm sorry,
15   October of -- well, do you remember a check for $18,785 for
16   an April '01 statement that may have been paid in October?
17                   A.    No.
18                   Q.    That's a pretty big chunk of change,
19   isn't it?
20                   A.    Right.
21                   Q.    It's unusual to see a check of that
22   amount?
23                   A.    Correct.
24                   Q.    But that figure doesn't ring a bell or
25   jog your memory at all?

Huser 4/2/03 page 42

```
00042
   1                    A.   I receive several checks a day from
   2  several different sources, so, no, a check from 2001 does
   3  not ring a bell.
   4                    Q.   Well, I was just wondering if the figure
   5  itself made it stand out?
   6                    A.   No.
   7                    Q.   Okay.  Or a check for $2,600 that came,
   8  again, in October of '01, relative to a statement that was
   9  sent in May of that year?
  10                    A.   No.
  11                    Q.   Okay.  I think you testified earlier
  12  that you were aware that there were some conditions imposed
  13  on the dual?
  14                    A.   Correct.
  15                    Q.   And you mentioned a couple of them to
  16  me, about getting into a separate facility within the, you
  17  know, foreseeable period of time?
  18                    A.   Correct.
  19                    Q.   Although I guess you told me there
  20  wasn't a set deadline for doing it; is that right?
  21                    A.   There was nothing in writing about a set
  22  time, no.
  23                    Q.   Okay.  Do you recall any other
  24  conditions --
  25                    A.   No.
```

```
00043
 1                    Q.    -- associated with the dualing
 2   permission?
 3                    A.    The ones that I'm aware of are the
 4   separation of customer contact points in the facility
 5   itself.  We changed the plans of the facility to make the
 6   two showrooms look more separate than the original plans.
 7   But that's it.
 8                    Q.    Are you aware that Mr. Reichert's
 9   participation, or at least designation as a consolidator for
10   the Lincoln Mercury in this market, was also connected with
11   or hinged to the request to get dualing approval?
12                    A.    No, I'm not aware.
13                    Q.    Have you ever seen a consolidator
14   agreement that Mr. Reichert signed?
15                    A.    No.
16                    Q.    Did he ever make you aware that he
17   signed one?
18                    A.    No.
19                    Q.    Do you know if Mr. Reichert ever
20   provided a written long-term plan for the Cincinnati market?
21                    A.    No.
22                    Q.    Or a plan that would outline his service
23   capacity needs for the market?
24                    A.    No.
25                    Q.    Do you know if Mr. Reichert was required
```

```
00044
   1   to aggressively find and secure buildable property and
   2   pursue building a Lincoln Gallery facility in replacing the
   3   Northgate store?
   4              A.   I wasn't aware.
   5              Q.   Do you know that his approval for
   6   dualing had some time constraints, in terms of how long he
   7   was going to be able to permit that?
   8              A.   No.
   9              Q.   Do you know if he has any options to
  10   extend his permission to dual?
  11              A.   I'm not aware of any time conditions.
  12              Q.   Do you know of any program that Ford
  13   has, or any plan that Ford had, whose objective is to
  14   eliminate the number of different dealerships in the city;
  15   not the dealer points, but the ownership?
  16              A.   No.
  17              Q.   Are you involved from time to time with
  18   dealer trading?
  19              A.   Personally, no.
  20              Q.   Your dealership is though?
  21              A.   Yes.
  22              Q.   Car managers would be?
  23              A.   Correct.
  24              Q.   Do you agree that that's an important
  25   part of the car business, to be able to dealer trade?
```

00045
```
 1                      A.   Yes.
 2                      Q.   You try to get the customer the car that
 3  he or she is looking for, and hopefully the dealer you trade
 4  with will reciprocate when you need one, is that how that
 5  thing is at least supposed to work?
 6                      A.   Yes.  Not always.
 7                      Q.   I didn't say it always worked that way,
 8  but that's how it's supposed to, isn't it?
 9                      A.   Uh-huh, yes, that's the way it can work.
10  It doesn't work with everybody.  I would say about
11  50 percent of the dealers.
12                      Q.   And do you find out through individual
13  efforts whether it works or not?
14                      A.   Rarely.
15                      Q.   When you started at Fairfield Ford, did
16  you dealer trade with Eastside Lincoln Mercury?
17                      A.   Me personally?
18                      Q.   Your dealership.
19                      A.   I don't recall.
20                      Q.   Is there a policy right now not to
21  dealer trade with Eastside?
22                      A.   Yes.
23                      Q.   When did that get implemented?
24                      A.   About the time the lawsuit took place.
25                      Q.   And at whose direction was that policy
```

```
00046
 1  implemented?
 2                  A.   Mr. Reichert's.
 3                  Q.   Did he talk to you about it personally?
 4                  A.   Personally, me?  Yes, but I believe it
 5  was in a group, all three of us.
 6                  Q.   Okay.  And was that the reason given?
 7                  A.   Yes.
 8                  Q.   There's a lawsuit now and we're not
 9  going to dealer trade with Eastside?
10                  A.   That's correct.
11                  Q.   Was there anything else said about it?
12                  A.   No.
13                  Q.   Are there any other dealers that
14  Mr. Reichert has refused to trade with since you've been a
15  part of his organization?
16                  A.   No.
17                  Q.   Do you think that's hurting Eastside
18  Lincoln Mercury?
19                  A.   I have no idea.
20                  Q.   Well, would it hurt you if somebody who
21  you used to dealer trade with stopped doing it?
22                  A.   No, because there are several dealers
23  like that now.
24                  Q.   Who are they?
25                  A.   I don't know their names.  I know we
```

```
00047
 1  don't dealer trade with everyone.
 2              Q.  It wouldn't relate to lawsuits with the
 3  other ones, would it?
 4              A.  No.
 5              Q.  Well, what would the reason be?
 6              A.  Relationships.
 7              Q.  I don't understand.
 8              A.  If somebody reciprocates.  If I call X
 9  dealer and every time I need a car it's never available, and
10  when they call me, you know, it's always expected -- you
11  know, you develop a relationship in dealer trading.
12              Q.  So, if it's not reciprocated, then
13  there's no point in doing it; is that right?
14              A.  Over time, if it's a pattern.  Not just
15  one time, but a pattern.
16              Q.  Okay.  Right, right.
17                  Do you know if there was an initial
18  denial by Lincoln Mercury of Mr. Reichert's dual request?
19              A.  No.
20              Q.  I think you testified that the approval
21  had already been given by the time you were hired; is that
22  right?
23              A.  We hadn't bought the store when I was
24  hired.
25              Q.  Okay.
```

00048
```
 1                      A.   I mean, there was no store to dual with
 2  when I was hired.
 3                      Q.   All right.  Mr. Huser, did you attend a
 4  meeting with other members of the Kenwood Dealer Group to
 5  talk about wholesale planning?
 6                      A.   No.
 7                      Q.   Do you recall a meeting where there was
 8  discussion among members of the Kenwood Dealer Group along
 9  the lines of trying to aggregate sales to assist in the
10  allocation process?
11                      A.   No.
12                      Q.   Would that be possible, if you know?
13                      A.   Would it be possible to do that?
14                      Q.   Yes.
15                      A.   I have no idea.
16                      Q.   Do you remember a meeting where
17  Mr. LeTarte would have been present to discuss how to
18  enhance vehicle allocation to the Kenwood Dealer Group?
19                      A.   No.
20                      Q.   You've never taken part in such a
21  meeting?
22                      A.   No.
23                      Q.   Okay.  Are you involved with the
24  allocation process?
25                      A.   Yes.
```

```
00049
 1                    Q.    When you meet with Mr. LeTarte to
 2  discuss allocation issues, how does the process work?
 3                    A.    Now, presently, or in the past?
 4                    Q.    Well --
 5                    A.    Because it's different.
 6                    Q.    You're telling me it's different, so I
 7  guess let's start with now and then you can tell me how it's
 8  changed.
 9                    A.    It's on the Ford Motor Company Pipeline.
10  It's all web-based.  I can basically go in the system and,
11  for a particular allocation, like I did yesterday, it says
12  this is how many cars are going to be offered to you, and
13  you put in if you want all those cars.  Sometimes you want
14  them all, sometimes you don't.  Sometimes you read --
15  there's also a line for additional allocation if you want
16  it.  I can't recall a time in the last year that I've asked
17  for additional allocation.
18                    Q.    Cars are plentiful right now?
19                    A.    Yes, they are.
20                    Q.    Okay.  Let me back up just a second.
21  Did you all have a meeting with Pat to put your wholesale
22  order in?
23                    A.    One time.
24                    Q.    Tell me when that happened and why you
25  would have a meeting like that.
```

```
00050
  1                    A.   Why, I don't know.  Pat asked that we do
  2  one wholesale, and I have no idea why he asked.
  3                    Q.   When did you do it?
  4                    A.   I can't remember.  It has to be -- God,
  5  I would say, for me not to remember, at least a year and a
  6  half plus ago.
  7                    Q.   Well, was there some benefit to Kenwood
  8  Dealer Group to do it that way?
  9                    A.   No.
 10                    Q.   Was there some benefit to Pat?
 11                    A.   I would be speculating.  Time would be
 12  the only thing.  But for his time savings it was mine and
 13  Jerry Mullins' time wasted, because we had to drive to the
 14  Auto Mall.
 15                    Q.   That's right.
 16                    Did you have one such meeting and then
 17  not do it again?
 18                    A.   Correct.
 19                    Q.   Was there anything of value that you all
 20  got back for agreeing to do this?
 21                    A.   No.
 22                    Q.   Other than currying Mr. LeTarte's favor?
 23  I mean, I'm sure that's always an issue, isn't it?
 24                    A.   It actually became his detriment,
 25  because we ended up taking less cars than we would have
```

```
00051
    1  individually.
    2                  Q.    Why?
    3                  A.    Because instead of him beating up Larry
    4  to take 14 Grand Marquis, Jerry says, "well, wait a minute,
    5  I've got probably ten I don't need."  We ended up actually
    6  switching some cars between the dealerships instead of
    7  taking the cars on wholesale.
    8                  Q.    Do you think Mr. LeTarte recognized that
    9  and decided that this wasn't a good plan?
   10                  A.    That would be an assumption.  I never
   11  talked to him about it.
   12                  Q.    Did this meeting take place, Mr. Huser,
   13  before the lawsuit, which was what, June of '01, June or
   14  July of '01, if that's a --
   15                  A.    I don't remember the exact date.  I've
   16  already said it had to be at least a year and a half plus.
   17  If that puts it before the lawsuit, then yes.
   18                  Q.    It sounds like it puts it right in that
   19  time frame somewhere.
   20                  A.    I don't remember.
   21                  Q.    Okay.
   22                  A.    I don't remember.
   23                  (THEREUPON, AN OFF-THE-RECORD DISCUSSION
   24  WAS HELD).
   25  BY MR. FLEMER:
```

```
00052
   1                    Q.    With respect to allocation, have you
   2  encountered any specific allocation problems at the time of
   3  new vehicle rollouts?
   4                    A.    For initial allocation, yes.  But I
   5  believe -- I can't even remember the term they used but --
   6  system fill.
   7                    Q.    Excuse me?
   8                    A.    It's what they call "system fill."
   9                    Q.    What is that?  That's a new one.
  10                    A.    That's when they allot the initial
  11  allocation of first cars that are going to be built in the
  12  factory.
  13                    Q.    Were there instances that you know about
  14  where there was no car available to you, you got skunked or
  15  shut out at new vehicle rollout?
  16                    A.    I don't remember specifics, but yes,
  17  there have been times.
  18                    Q.    Could you find a car from one of the
  19  other dealers in the group?
  20                    A.    No.
  21                    Q.    So all three Lincoln Mercury dealerships
  22  got zero allocation at rollout?
  23                    A.    I typically don't ask them what they
  24  got.
  25                    Q.    So you don't --
```

00053

```
 1                    A.   If they would have gotten one that I
 2  didn't get, I wouldn't have been able to get it from them
 3  anyway.  We don't like each other that much.
 4                    Q.   Okay.  So you know it's happened but you
 5  don't remember when?
 6                    A.   Correct.
 7                    Q.   It's happened at Fairfield?
 8                    A.   At Fairfield, yes.
 9                    Q.   Okay.  Do you remember if you had
10  trouble getting initial allocation for the Lincoln Navigator
11  when it rolled out in late '97?
12                    A.   I wasn't there in '97.
13                    Q.   That's true.  So you wouldn't know?
14                    A.   I wouldn't know.
15                    Q.   How many times do you think it's
16  happened since you've been there?
17                    A.   Well, there's only been the Mountaineer,
18  the new restyled Navigator --
19                    Q.   Let's take them one at a time.  Let's
20  talk about the Navigator restyle.
21                    A.   Uh-huh.
22                    Q.   Did you get allocation then?
23                    A.   I don't believe I got one for system
24  fill.  My store sells less than one Navigator a month, so I
25  wouldn't have been someone that was allocated one at system
```

```
00054
   1   fill.
   2               Q.   I'm sorry.  Tell me again how this
   3   system fill process is supposed to work.
   4               A.   It's the initial cars that they build in
   5   the factory, you know, when they first ramp it up.  It's
   6   before the actual production is at full capacity.
   7                    Quite frankly, what I've seen is most of
   8   those cars end up getting to the dealers last because the
   9   initial cars off the line have different issues that need to
  10   be fixed.  They park it in the lot, it gets buried, and the
  11   first ones built end up being the last ones you get.
  12               Q.   Was this a situation, Mr. Huser, where
  13   you were shown to have allocation but you just didn't get
  14   delivery?
  15               A.   No, there was no allocation.
  16               Q.   Okay.  How about with the Cougar, any
  17   trouble there?
  18               A.   I wasn't around when the Cougar was
  19   introduced.  That was before March of 2000.
  20               Q.   Okay.  How about the Grand Marquis,
  21   before your time?
  22               A.   Before my time.
  23               Q.   And the LS?
  24               A.   Before my time.
  25               Q.   The Aviator?
```

```
00055
 1                        A.   I was there then.  I believe I got one
 2   for system fill.  I think I still have it.
 3                        Q.   Did your store get an allocation of
 4   popular vehicles on a special purchase basis when the store
 5   was purchased, if you know?
 6                        A.   No disrespect to Ford, but in the three
 7   years that I've been with Lincoln Mercury, I wouldn't say
 8   there has been any popular vehicles.
 9                        Q.   Okay.
10                        A.   That was also before my time.
11                        Q.   Okay.  And you don't know, historically,
12   whether that happened or not?
13                        A.   I have no idea.
14                        MR. FLEMER:  Let's go off the record for
15   a second.
16                        (THEREUPON, AN OFF-THE-RECORD DISCUSSION
17   WAS HELD).
18   BY MR. FLEMER:
19                        Q.   Are you aware of what type of dealer
20   agreement Mr. Reichert has at your store, whether it's a
21   continuing agreement or a term agreement that's got a --
22                        A.   I'm not aware of it.
23                        Q.   -- time frame limit on it?
24                        A.   I'm not aware of it.
25                        Q.   Are you aware of losses that were being
```

00056
 1  sustained by the dealer group when they took over Fairfield
 2  Lincoln Mercury?
 3              A.   Absolutely.
 4              Q.   How long a period did that take place?
 5              A.   The first -- all of 2000, 2001.  We
 6  broke even in 2002.
 7              Q.   So for the balance of 2000 and all of
 8  2001, you were in a loss posture?
 9              A.   Correct.
10              Q.   How much, on average, per month were you
11  losing?  I don't know if it fluctuated or not, but you're
12  familiar with those figures, that would have been Job 1 for
13  you, right?
14              A.   Absolutely.
15              Q.   Okay.  What was the average per month
16  loss for 2000 and 2001, as best you can remember?
17              A.   50,000.
18              Q.   And what action or what conversation, if
19  any, did you have with -- or did the dealer group have with
20  Ford on that subject?
21              A.   I'm not aware of any conversation that
22  was with Ford regarding the losses.
23              Q.   Had you projected that that was going to
24  get turned around at some point to Ford, didn't they request
25  some projections on that?

00057
```
 1                    A.   Well, if you realize that we bought the
 2   Dixon facility kind of when the wheels came off at Ford and
 3   Lincoln Mercury, yeah, I'm sure we projected a lot of
 4   things.  I would have probably not have taken that job had I
 5   known the store was going to lose that much money.  But when
 6   the wheels fell off, I'm sure it wasn't just us that made
 7   less or lost money with Ford or Lincoln Mercury dealerships.
 8                    Q.   With respect to the proposal and
 9   ultimate approval to move up the street and take over the
10   Volkswagen facility, --
11                    A.   Yes.
12                    Q.   -- was that part of the plan to turn
13   that around?
14                    A.   I would say we hoped that selling
15   Volkswagen would.  We already had experience on Colerain
16   Avenue selling Volkswagen and it seemed to be a profitable
17   line, yes.
18                    Q.   Did you know whether Mr. Reichert
19   presented that point to Ford as an effort to explain how
20   things were going to turn around?
21                    A.   I'm not aware of any conversation he had
22   with Ford with regards to that.
23                    Q.   Are you aware of any specifics that
24   Mr. Reichert had in terms of asking for approval to go up
25   the street and dual?
```

00058

1                    A.    Could you rephrase your question?
2                    Q.    Yeah.  Are you aware of any specifics
3    that Mr. Reichert included in his proposal to get Ford to
4    approve taking on Volkswagen as a dual, and then having two
5    facilities up the street?
6                    A.    I'm not aware of his proposal.  I'm
7    aware of what was the stipulations on us, as far as the
8    facility, that we've already talked about.
9                    Q.    And you said you started showing a
10   profit in 2002, or at least breaking even.  I don't know
11   what you said.
12                   A.    We made our first profit in May and we
13   were black in August and we were even for the year.  We
14   slipped into black for a short period of time.
15                   Q.    So the year, as a whole, was a
16   break-even year?
17                   A.    Pretty much.
18                   Q.    And what's your current posture?
19                   A.    I don't have my March financial.  We've
20   lost probably 26 a month the first two months.
21                   Q.    Is it your opinion that the relocation
22   was effective in turning this problem around?
23                   A.    It doesn't have to do with the
24   relocation.
25                   Q.    What does it have to do with?

```
00059
    1                    A.    Volkswagen and the body shop are the
    2  primary reasons.
    3                    Q.    Tell me, is that a two-part answer or a
    4  one-part answer?
    5                    A.    That's -- those are the two biggest
    6  contributing factors to the place now breaking even.
    7                    Q.    How does the Volkswagen piece contribute
    8  to breaking even?
    9                    A.    We purchased a point that was typically
   10  always fifth out of the five dealers in the city.  Last year
   11  the city was down 12 percent and we were up 47 percent, and
   12  we were only about nine units short of first place for the
   13  year, and we presently hold first place in Volkswagen.
   14                    Q.    And how did you do that?
   15                    A.    The facility and hiring the right
   16  manager.
   17                    Q.    And that experience is related to your
   18  VW operation only, right?
   19                    A.    No.  I have the facility on the Lincoln
   20  Mercury side that was also redone, which is what allowed
   21  me -- conversely, Lincoln Mercury was down almost 13 percent
   22  in the city last year and we were dead even, sold the exact
   23  same amount of cars.  And that's partly the facility and,
   24  once again, I have a great Lincoln Mercury sales manager.
   25                    Q.    What would your best estimate be as to
```

00060
```
 1   how much you would have lost on a monthly basis if there
 2   hadn't been approval to dual Volkswagen?
 3               A.   I couldn't even speculate.  I couldn't
 4   speculate.  There's more factors than just dualing involved.
 5   We took over a store that was for sale for two years, pretty
 6   poorly run, employees that were left were probably not the
 7   best employees in the world, and turning the store around
 8   was a process that was more than just dualing the two
 9   stores.
10               Q.   So dualing was a part of it, but you
11   don't know how to cut the pie or divide the pie to say how
12   much?
13               A.   It's a small, small part, very small.
14               Q.   And the other aspect you said was a body
15   shop?
16               A.   Yes.
17               Q.   Tell me about that.
18               A.   The facility has a 24-stall body shop as
19   opposed to the five that we had down the street; two paint
20   booths as opposed to one.  It's a pretty nice body shop
21   facility.
22               Q.   And were those features renovated
23   features or were they already there?
24               A.   The body shop was there.
25               Q.   But without the permission to dual, your
```

```
00061
    1  business wouldn't have gotten up there, it wouldn't have
    2  gone up the street, right?
    3               A.   I'm assuming not.  I mean, I -- there
    4  was no conversation either way.  I was never privy that we
    5  weren't going to move up there.
    6               MR. FLEMER:  Let's take a break, maybe
    7  we're done here.
    8               (THEREUPON, A SHORT RECESS WAS TAKEN).
    9  BY MR. FLEMER:
   10               Q.   Mr. Huser, were you involved in LPE
   11  certification for your store?
   12               A.   Yes.
   13               Q.   Before that process started -- when you
   14  first got into this building, it was a mess, wasn't it?
   15               A.   Correct.
   16               Q.   I mean, there were pieces hanging off
   17  the building?
   18               A.   Correct.
   19               Q.   Structural pieces of -- I don't know
   20  what it was, siding or what it was.  But literally the thing
   21  was falling apart, wasn't that right?
   22               A.   Yes.
   23               Q.   And the Reichert group, Kenwood Dealer
   24  Group, got a pass, initially, on the facilities piece of the
   25  thing, to get an LPE certification, just passed the whole
```

```
00062
    1    issue, which otherwise would have been a part of the LPE
    2    requirements; isn't that true?
    3                    A.   That's offered to every single Lincoln
    4    Mercury dealer, yes.
    5                    Q.   Okay.  Well, you guys got one and you
    6    needed it bad, isn't that true?  Looking at that building,
    7    there's no way that would have passed.
    8                    A.   That's correct.
    9                    Q.   All right.  And do you recall a meeting
   10    where there was discussions about having the requirements
   11    relating to the Star system waived for you guys?
   12                    A.   No.
   13                    Q.   Was there anybody that requested a
   14    written waiver of the Star system piece of that process?
   15                    A.   No.
   16                    Q.   Didn't you do that?
   17                    A.   No.
   18                    Q.   Was Mr. Woodall at that meeting?
   19                    A.   I never requested it.  I don't know what
   20    meeting you're talking about.  All my managers have always
   21    been above the certification level.  Why would I need a
   22    pass?
   23                    Q.   Okay.  What request, if any, did you
   24    make when there were discussions about LPE certification and
   25    how to get through that with this new building?  Did you
```

```
00063
  1   make any requests at all?
  2                   A.   Would you like me to explain the process
  3   on the building?
  4                   Q.   Yes.
  5                   A.   Because there was no meeting with
  6   Lincoln Mercury.  They were not involved.
  7                        The way you get a waiver on the facility
  8   is to go on to the LPE website, apply for a waiver, and the
  9   stipulation, which we met at that time, was that you had to
 10   be in the process of renovating the facility, which we were.
 11                   Q.   So there wasn't any independent meeting
 12   on this subject?
 13                   A.   No.
 14                   Q.   So you just went on the website and
 15   plugged in the information?
 16                   A.   Correct.
 17                   Q.   And then from there you went --
 18                   A.   You submit an application, and you had
 19   to actually submit plans and a time line and what you were
 20   doing with the facility.
 21                   Q.   And did you input data?
 22                   A.   Yes.
 23                   Q.   Was that your own personal task?
 24                   A.   Yes.
 25                   Q.   Okay.  Did you have discussions or
```

00064
```
 1  consultation with anybody as you put that information in the
 2  computer?
 3                  A.   No.  I mean, it's pretty, pretty
 4  self-explanatory.
 5                  Q.   Just fill in the blocks or fill in the
 6  boxes type of thing?
 7                  A.   Yes, yes.
 8                  Q.   Okay.  Was there a meeting at district
 9  council where you expressed concerns about this process to
10  Jerry Carter?
11                  A.   Not about the facility, no.
12                  Q.   Okay.  Did you express other concerns to
13  Jerry Carter at a district council meeting at some point?
14                  A.   Yes.
15                  Q.   Can you tell me when that was and what
16  concerns you expressed?
17                  A.   When it was, I can't remember the date
18  of the meeting.
19                  Q.   Did it happen more than once?
20                  A.   No.
21                  Q.   Okay.  So we know that there was one
22  meeting?
23                  A.   One council meeting, correct.
24                  Q.   District council?
25                  A.   Yes.
```

```
00065
   1                    Q.    And you had concerns to bring to Jerry's
   2  attention?
   3                    A.    No, I didn't bring it up.  I actually
   4  asked a question.
   5                    Q.    What was it?
   6                    A.    The question was:  In the certification
   7  process, not the facility but the actual other -- there's
   8  two parts, there's an image and there's the actual
   9  certification.
  10                    Q.    Okay.
  11                    A.    Was all the items that were going to be
  12  addressed for the evaluations going to be clearly posted on
  13  the website, because I had failed, for the customer
  14  satisfaction portion of it, for an item that there's no --
  15  it's not written anywhere, but it's something that's going
  16  to be tested.
  17                    Q.    And --
  18                    A.    And so my question was:  For next year's
  19  certification, are there going to be any other items that
  20  aren't listed that we have to do, or are they going to
  21  change it, which they actually still have never changed the
  22  website for that particular item.
  23                    Q.    And what was his answer?
  24                    A.    His -- I believe his answer was that he
  25  wasn't aware of any, any items that aren't addressed.
```

```
00066
  1                   Q.    Did you have any communications with
  2   Warren Gardis about the LPE problem?
  3                   A.    The LPE problem?
  4                   Q.    Well, the certification process, let's
  5   be general with this.
  6                   A.    I probably spoke to everybody.  I mean,
  7   when you fail for something that's -- you have to understand
  8   this website.  There's -- it's not the easiest to use
  9   website and there's 50 million different doors that you can
 10   (indicating), you know, go in.  And I was basically trying
 11   to find somebody at Lincoln Mercury that could show me on
 12   the website where that particular item was addressed.
 13                   Q.    Why did you go to Warren Gardis?
 14                   A.    I don't remember going to Warren Gardis.
 15   I said I probably spoke to everybody at the Lincoln Mercury
 16   Region Office.
 17                   Q.    So you might have gone to Mr. Gardis,
 18   but you're not sure?
 19                   A.    I probably did.  Because, like I said, I
 20   was trying to find someone at Lincoln Mercury that had
 21   knowledge of where that particular item would be.
 22                   Q.    And what was the item that you were
 23   looking for?
 24                   A.    You could miss -- and I don't even know
 25   the math now -- miss three.  They pull ten deal jackets and
```

```
00067
 1   they check to see if you scheduled oil appointments.  And
 2   you can miss three.  Well, and I don't even, to this day,
 3   know that it's a fact because, once again, it's not in
 4   writing anywhere.  You could miss three, and we missed four
 5   during our certification.
 6            Q.    So what was it that you were trying to
 7   identify on the website?  I mean, you know what happened.
 8            A.    I was trying to find somewhere where it
 9   said we're going to check oil appointments and you're only
10   allowed to miss three.  You have to have 70 percent of the
11   oil appointments scheduled.
12                  Q.    And did either Mr. Gardis or somebody at
13   the regional office help you find where that was?
14                  A.    It --
15                  Q.    Or nobody found it because it wasn't
16   there?
17                  A.    It doesn't exist.
18                  Q.    Okay.  Did you have any questions for
19   regional personnel about members of your sales personnel
20   that weren't certified?
21                  A.    No.
22                  Q.    That subject was never investigated by
23   you or questioned?
24                  A.    My sales personnel has (sic) always been
25   above the level being certified.  Since you keep harping on
```

```
00068
    1  this, somebody has me mistaken, possibly with one of my
    2  other two stores.  It wasn't me.
    3              Q.    And what is the level that you need to
    4  have your salespeople certified beyond?
    5              A.    Seventy-five percent.
    6              Q.    Of the head count; is that right?
    7              A.    Correct, adjusting for new hires.  If I
    8  hired someone today and the program ended tomorrow, they
    9  would get, you know, I believe a 180-day period that they
   10  don't count in the mix.
   11              Q.    Do you remember if either of your peers
   12  from the other stores had questions on that subject?
   13              A.    I don't know.  I'm not involved in the
   14  other stores.
   15              Q.    Well, I know you don't work at the other
   16  stores, but I'm just wondering how much information -- I
   17  mean, you know, this would be an issue that might come up in
   18  conversation, either with your boss or among your peers.  I
   19  mean, they've already testified, and I'll represent to you
   20  that they were aware that your store didn't pass the first
   21  time, so --
   22              A.    Were they aware why I didn't pass?
   23              Q.    Yes.  As a matter of fact, they were
   24  able to testify.
   25              A.    All right.
```

00069
1                          Q.    To some extent, I mean, you know, they
2      knew essentially what happened and that you had an issue
3      that, you know, wasn't sufficient to get you passed.
4                          A.    Uh-huh.
5                          Q.    But anyway, knowing that there was some
6      communication, I can only ask you, as I'm doing, to shed as
7      much light on the process that you know about as I can.
8                          A.    Which I've just done.
9                          Q.    Okay.  Do you recall, at the district
10     meeting, I'm going back to that for a second, whether you
11     asked Mr. Carter for some confirmation in writing?
12                         A.    I believe I said when will we see it in
13     writing, when is it going to be on the website?
14                         Q.    And what was his answer to that?
15                         A.    He still insisted that there was nothing
16     that wasn't clear on the website about the certification
17     process.
18                         Q.    Do you remember raising any other
19     concerns at that meeting about the LPE program and how it
20     would work in practice?
21                         A.    I don't recall anything else.
22                         Q.    Were there any discussions or references
23     made to, well, you know, could I be subjected to
24     charge-backs if something happens in this program and it
25     turns out that I wasn't certified and we got money through

00070
 1   the program and we'd have to give it back?
 2                   A.   No, there is -- I'm not aware of any
 3   charge-backs in the program.  You're either certified or --
 4   the only thing that decertifies you is not -- like
 5   April 30th is the cut-off date for the 2002 program.  If
 6   all -- if 75 percent of your sales staff or 75 percent of
 7   your managers are not certified by April 30th, you can be
 8   decertified.
 9                   Q.   And then you would potentially -- I
10   guess one could wonder whether you would be subjected to
11   paying back any funds that were received through the
12   program.
13                   A.   I don't believe you pay back.  You
14   become decertified and don't get funds from that point
15   forward.  You don't get charged back for what you've already
16   earned.  And I don't know, because 100 percent of my
17   managers and 100 percent of my salespeople are certified.
18   I'm not concerned about that portion of the program.  They
19   have been for quite a few months.
20                   Q.   Do you recall Mr. Carter offering to
21   talk with you about any specific issues at your store after
22   the meeting?
23                   A.   I don't recall that being the case.
24                   Q.   I'm not asking you if it happened, I'm
25   asking if he offered to do that?

00071
```
 1                    A.    I don't recall if he offered to do that.
 2                    Q.    Okay.  Do you recall if anybody else
 3   suggested that you talk to Jerry after the meeting?
 4                    A.    I definitely don't recall that.
 5                    Q.    Has your store ever been -- I think I
 6   might have asked this.  But again, you're No. 3 in the chair
 7   today, so I apologize if we've already hit this:  Has your
 8   dealership ever been involved in the warranty counseling
 9   process?
10                    A.    Yes.
11                    Q.    Okay.  And under what circumstances has
12   that occurred?
13                    A.    One time, probably, and I'm not sure how
14   long, possibly a year and a half, two years ago.  They have
15   a, basically a warranty grid in a lot of different areas.
16   And if you -- you know, you should have this many repairs
17   per thousand for glass, and ours are 0.5.  And once again,
18   without looking at the actual sheets, I wouldn't know the
19   exact numbers.  If you fall into a certain category in some
20   of these, you go into a warranty counseling process, that's
21   kind of a progressive counseling (indicating) on the
22   warranties.
23                    Q.    And was that the issue, glass repairs?
24                    A.    I don't recall what the particular issue
25   in our store was.
```

```
00072
 1                    Q.    How long were you in the process,
 2 counseling process?
 3                    A.    Maybe, between the whole process, a
 4 month to two months.
 5                    Q.    And what did it consist of?
 6                    A.    A self-review is the first step.
 7 There's working with the service manager, you know, for Ford
 8 Division, looking at some items and then actually having an
 9 auditor come in and do a warranty review, or a warranty RO
10 review, repair order review, for those particular areas, and
11 see why you might possibly be high in those areas.
12                    Q.    And what was learned from doing that?
13                    A.    I don't even -- well, the only thing I
14 recall is that, in his review, he actually said that our
15 warranty clerk probably was leaving warranty dollars on the
16 table, not applying for enough on certain areas.
17                    Q.    Did he suggest what to do, how to change
18 it?
19                    A.    Not specifically.  They probably weren't
20 going to give us a class on how to take more money from
21 them.
22                    Q.    Did you have any assistance from the
23 region when this process started?
24                    A.    The Ford Division, service division?
25                    Q.    Yes, sir.
```

00073
1              A.   Yes, from -- there might have been
2  assistance from the team leader service manager.
3              Q.   Who would that have been?
4              A.   To be honest, I don't recall.  It was
5  probably Tim Gilbert or George Castalli.  George, probably.
6  It was before Tim Gilbert.
7              Q.   And what kind of assistance did George
8  bring?
9              A.   He explained the process.
10             Q.   Were you advised when you had
11 successfully completed the counseling?  Did you get a letter
12 or something?
13             A.   No.
14             Q.   How did you know that you were finished
15 with it?
16             A.   The gentlemen that was there that day to
17 review, he discussed the results.
18             Q.   Do you remember who that was?
19             A.   No, I don't.
20             Q.   Were there any charge-backs issued?
21             A.   I believe there was.
22             Q.   How much?
23             A.   I don't recall.
24             Q.   1,000 bucks, 5,000 bucks?
25             A.   Less than five, more than a thousand.

00074
```
 1                    Q.   Okay.  Do you remember that figure
 2   expressed as a percentage of anything?
 3                    A.   No.
 4                    Q.   Are you aware of whether any other
 5   dealers in the Cincinnati market area have had warranty
 6   review issues or warranty audits?
 7                    A.   No.
 8                    Q.   Did you ever hear of anything in
 9   connection with the Eastside Lincoln Mercury dealership --
10                    A.   No.
11                    Q.   -- pertaining to warranty experience?
12                    A.   No.
13                    Q.   Okay.  And is this one instance that
14   you've described to me here in the last few minutes the only
15   time that you've been in the process?
16                    A.   No, we just went back into it again
17   about a month ago.
18                    Q.   Under what circumstances?
19                    A.   I'm not sure which categories.  It's
20   fairly easy for a Lincoln Mercury dealer to be in this
21   process.
22                    Q.   Is there more than one category?
23                    A.   Yes.
24                    Q.   Who's running herd on the problem?
25                    A.   Please?
```

00075
```
 1                     Q.    Who is taking care of this?  Whose
 2  responsibility is it to monitor the process this time
 3  around?
 4                     A.    Mine and my service manager's.
 5                     Q.    But you don't know what the issues are?
 6                     A.    Not as of right now, we just got the
 7  letter and just started the process.
 8                     Q.    Have you had a visit yet?
 9                     A.    Nope.
10                     Q.    Is there one scheduled?
11                     A.    No.
12                     Q.    You said it's fairly easy to get into
13  the process?
14                     A.    Uh-huh, for Lincoln Mercury dealers.
15                     Q.    Why do you say that, or what makes you
16  say that?
17                     A.    All the dealerships are, Ford and
18  Lincoln Mercury dealerships, are compared together.
19  Actually, two years ago, there was talk that they were going
20  to separate Ford and Lincoln Mercury dealers and make them
21  separate because the glass is a perfect example of why a
22  Lincoln Mercury dealership would be higher, because the
23  glass on some of the Lincoln products is extremely
24  expensive.  So if you compare us to a Ford store that's
25  replacing a bunch of Taurus windshields and we're replacing
```

00076
```
 1  a $2,000 Town Car windshield, it's going to appear that
 2  we're high, but we're really not (indicating).
 3                    Electrical is another area, probably
 4  because there's more wiring in a Town Car than there is in a
 5  Tracer or an Escort.  So I think it's -- I believe it's
 6  common at Lincoln Mercury, at least that's what I was told
 7  when we went into it the first time.
 8              Q.    Who told you that?
 9              A.    George.
10              Q.    Has anybody at customer service division
11  talked to you about other dealerships having similar issues?
12              A.    No.
13              Q.    Do you know what customer satisfaction
14  ratings your store is expected to hit?
15              A.    Yes.
16              Q.    What are they?
17              A.    What -- let me clarify.  What do you
18  mean, what the target is?
19              Q.    Yes.
20              A.    For the Lincoln -- I mean, clarify what
21  program.
22              Q.    For any program where you have a
23  customer service index, --
24              A.    Yes.
25              Q.    -- do you know what those numbers are?
```

```
00077
    1                 A.    Yes.
    2                 Q.    Can you tell me?
    3                 A.    Sixty-five for Lincoln Premier
    4   Experience and 60 for Mercury Advantage.
    5                 Q.    And do you know if those are the same
    6   targets that all other stores have to hit?
    7                 A.    I believe there's groups nationally, I
    8   think.  I mean, they call it a group average, so I would
    9   assume there's more than one group in the country.  I've
   10   never asked.
   11                 Q.    And do you know what group your store is
   12   in?
   13                 A.    No.  It says "group average," it doesn't
   14   say Group 1, Group 10.
   15                 Q.    And do you know what influences what
   16   group you're in?
   17                 A.    No, I don't.
   18                 Q.    Do you know if the requirements to meet
   19   these numbers, or to be at or above group average, are set
   20   forth in the consolidator agreement?
   21                 A.    No.
   22                 Q.    You don't know that?
   23                 A.    It's not part of the LPE program.
   24                 Q.    Okay.  But you don't know if that's a
   25   restriction or a provision in this consolidator agreement,
```

```
00078
  1   per se, do you?
  2                   A.   I'm not aware of the agreement.  As I've
  3   stated earlier, how would I know if this is a requirement?
  4                   Q.   By discussion, whether you've seen it or
  5   not --
  6                   A.   I've already said I haven't discussed
  7   the consolidator agreement, so I don't know.
  8                   MR. FLEMER:  Thanks, Mr. Huser.  I don't
  9   have anymore questions for you.
 10                   THE WITNESS:  Okay.
 11                   MR. FLEMER:  Thanks for coming down.
 12                   THE WITNESS:  You're welcome.
 13
 14                      (ROBERT B. HUSER)
 15                   (DEPOSITION CONCLUDED)
 16
 17
 18
 19
 20
 21
 22
 23
 24
 25
```

Huser 4/2/03 page 79

```
00079
   1                    C E R T I F I C A T E
   2  STATE OF OHIO            )
                               )    SS
   3  COUNTY OF HAMILTON       )
   4       I, Jill M. Dragon Sandy, the undersigned, a duly
   5  qualified and commissioned notary public within and for the
   6  State of Ohio, do hereby certify that before the giving of
   7  his aforesaid deposition the said ROBERT B. HUSER, was by me
   8  first duly sworn to depose the truth, the whole truth, and
   9  nothing but the truth; that the foregoing is the deposition
  10  given at said time and place by the said ROBERT B. HUSER;
  11  that said deposition was taken in all respects pursuant to
  12  agreement as to time and place, that said deposition was
  13  taken by me in stenotypy and I am neither a relative of, nor
  14  attorney for, any of the parties to this cause, nor relative
  15  of nor employee of any of their counsel, and have no
  16  interest whatever in the result of the action.
  17     IN WITNESS WHEREOF, I hereunto set my hand and official
  18  seal of office, Cincinnati, Ohio this_____day
  19  of_____, 2003.
  20
  21        _____
           Jill M. Dragon Sandy-Notary Public
  22      My commission expires:  January 31, 2005.
  23
  24
  25
```