00001
1                    UNITED STATES DISTRICT COURT
2                  FOR THE SOUTHERN DISTRICT OF OHIO
3                            - - -
4    EASTSIDE LINCOLN MERCURY, ET AL,    )
                                         )
5                       PLAINTIFFS,      )
                                         )
6    VS                                  )  CASE NO:  01CV00567
                                         )
7    FORD MOTOR COMPANY, ET AL,          )
                                         )
8                       DEFENDANTS.      )
     -----------------------------------
9
10
11
12                  DEPOSITION OF:  JERRY L. MULLINS
13                       CINCINNATI, OHIO
14                        APRIL 2, 2003
15
16
17
18
19
20
21
22
23   REPORTER:  JILL M. DRAGON SANDY
24                       Dragon Reporting Service
                              5551 Seville Court
25                       Cincinnati, Ohio  45247
                            (513)574-8319

```
00002
  1          The deposition of JERRY L. MULLINS, taken on
  2     discovery, pursuant to agreement of counsel as to time and
  3     place, in the offices of Rendigs, Fry, Kiely & Dennis, Suite
  4     900, One West Fourth Street, Cincinnati, Ohio, on April 2,
  5     2003, at 12:45 PM, upon oral examination, and to be used in
  6     accordance with the Ohio Rules of Civil Procedure.
  7                                  - - -
  8
  9
 10                    S T I P U L A T I O N S
 11     It is stipulated by and between counsel for the
 12     representative parties that the deposition of JERRY L.
 13     MULLINS, the witness herein, may be taken at this time and
 14     place pursuant to the Ohio Rules of Civil Procedure,
 15     pursuant to agreement of counsel as to time and place; that
 16     the proof of the notary is waived; that the deposition may
 17     be recorded in stenotypy by the notary public, Jill M.
 18     Dragon Sandy, who is also the court reporter, and
 19     transcribed out of the presence of the witness, and that the
 20     deposition is required to be submitted to the witness for
 21     his examination and signature.
 22                                  - - -
 23
 24
 25
```

```
00003
   1                    A P P E A R A N C E S
   2
   3   FOR THE PLAINTIFFS:
   4   Mr. Gregory J. Berberich
       and
   5   Mr. Lawrence A. Flemer
       Statman, Harris, Siegel & Eyrich
   6   2900 Chemed Center
       255 East Fifth Street
   7   Cincinnati, Ohio  45202
       (513)621-2666
   8
   9
  10   FOR THE DEFENDANTS:
  11   Mr. Steven D. Hengehold
       Rendigs, Fry, Kiely & Dennis
  12   Suite 900
       One West Fourth Street
  13   Cincinnati, Ohio  45202-3688
       (513)381-9221
  14
  15   Mr. Gregory Smith
       Baker & Hostetler
  16   Capitol Square, Suite 2100
       65 East State Street
  17   Columbus, Ohio  43215-4260
       (614)462-2651
  18
  19   ALSO PRESENT:
  20   Mr. James Woodall
  21
  22
  23
  24
  25
```

Mullins, Jerry 04/02/03 page 4

```
00004
   1                          I N D E X
   2   CROSS-EXAMINATION BY:                   MR. FLEMER
   3                       PAGES  5 - 44
   4
   5
   6                 E X H I B I T   I N D E X
   7                       (None)
   8
   9
  10
  11
  12
  13
  14
  15
  16
  17
  18
  19
  20
  21
  22
  23
  24
  25
```

```
00005
  1                     JERRY L. MULLINS,
  2       called on behalf of the plaintiff, after having been
  3  first duly sworn, was examined and deposed as follows:
  4                  C R O S S - E X A M I N A T I O N
  5  BY MR. FLEMER:
  6              Q.   Mr. Mullins, my name is Larry Flemer,
  7  and I represent the plaintiffs in the lawsuit that brings us
  8  here together.
  9              I'm going to be asking you a series of
 10  questions today that relate to what knowledge you have about
 11  some of the issues.
 12              Have you ever had your deposition taken
 13  before?
 14          A.   Yes.
 15          Q.   Okay.  Just as a brief review, the
 16  process works best when you remember to give a verbal answer
 17  to all the questions, as opposed to shaking your head.  Try
 18  to refrain from "huh-uhs" and "uh-huhs".  Those are kind of
 19  ambiguous and not always taken down clearly by our court
 20  reporter.
 21              If you don't understand one of my
 22  questions or any of the phrasing that I use, just let me
 23  know and I'll restate it.  It's important that you and I
 24  understand each other in this process.  But only you know if
 25  you understand my question, so hopefully you can let me know
```

```
00006
   1    if there is problem and I'll rephrase.  Okay?
   2                    A.   Yes.
   3                    Q.   Okay.  If you need to take a break at
   4    some time, just let us know and we'll accommodate you.
   5                         And I guess the other thing is try to
   6    remember to let me finish my question before you start your
   7    answer, and I'll do the same for you when you answer.
   8                    A.   Okay.
   9                    Q.   All right.  Would you state your full
  10    name and give me your current residence address?
  11                    A.   Jerry Lee Mullins, 6187 Dry Ridge Road,
  12    Cincinnati, Ohio.
  13                    Q.   And what's the zip?
  14                    A.   45252.
  15                    Q.   And how old are you?
  16                    A.   Forty-five.
  17                    Q.   Your date of birth?
  18                    A.   9/23/1957.
  19                    Q.   And can you give me your educational
  20    background, in just kind of a time line basis.  Did you
  21    graduate high school?
  22                    A.   No.
  23                    Q.   Okay.  Where did you go to high school?
  24                    A.   Connersville, Indiana.
  25                    Q.   And how far did you get through high
```

```
00007
 1   school before you left?
 2                A.   Mid-semester of my senior year.
 3                Q.   Okay.  Why did you leave at that time?
 4                A.   Due to a financial hardship on my
 5   family.
 6                Q.   Okay.  And you don't have a diploma or a
 7   GED certificate or anything like that?
 8                A.   No.
 9                Q.   Okay.  I assume you started working at
10   that time; is that correct?
11                A.   That's correct.
12                Q.   Okay.  Let's try to do kind of a
13   chronology of your employment history.  Again, I'd like to
14   go from the distant past into the more recent time frame.
15   So, once you left high school, just tell me where you
16   worked, and kind of do it with bracketing the years, if you
17   can, where you were at a particular job and who you worked
18   for.
19                A.   I worked for a factory in Connersville.
20                Q.   What year would that have been then,
21   when you left high school?
22                A.   That would have been approximately 1977,
23   I believe.
24                Q.   Okay.  All right.
25                A.   I worked there for approximately six
```

```
00008
 1  years.
 2                  Q.   What did you do?
 3                  A.   I worked in the shipping department,
 4  just a common laborer.
 5                  Q.   All right.  Where did you work after
 6  that?
 7                  A.   I worked for the utilities department.
 8                  Q.   The State of Indiana?
 9                  A.   It was the City of Connersville
10  utilities.
11                  Q.   Okay.  From when to when?
12                  A.   That would have been approximately, I
13  think, 1983, 1984, until 1986.
14                  Q.   Okay.  What type of work did you do
15  there?
16                  A.   Just labor.
17                  Q.   Okay.  What was your next job?
18                  A.   Used car salesperson at Tri-County AMC
19  Jeep.
20                  Q.   And for what period of time did you have
21  that position?
22                  A.   Approximately 19 -- just for few months.
23  I think it was right at 1987.
24                  Q.   And where did you work after that?
25                  A.   Glenway Chevrolet.
```

```
00009
    1                 Q.    Were you again in a sales position?
    2                 A.    That's correct.
    3                 Q.    How long did you have that job?
    4                 A.    Approximately one year.
    5                 Q.    So roughly 1988?
    6                 A.    That's correct.
    7                 Q.    And after that?
    8                 A.    Montgomery AMC Jeep.
    9                 Q.    At the Glenway Chev, were you selling
   10 new and used?
   11                 A.    Yes.
   12                 Q.    And how long did you work at Montgomery
   13 AMC Jeep?
   14                 A.    Approximately six months.
   15                       And then Kings Dodge.
   16                 Q.    Were you also in a sales position at
   17 Montgomery AMC?
   18                 A.    Used car manager.
   19                 Q.    And then you went to Kings Dodge.  And
   20 when did you start there?
   21                 A.    That was also in '88, approximately
   22 July.
   23                 Q.    Okay.  What position did you have at
   24 Kings?
   25                 A.    Used car manager.
```

```
00010
    1                    Q.    How long did you hold that position?
    2                    A.    Until approximately 1994.
    3                    Q.    What did you do then?
    4                    A.    I became new car manager at the same
    5    place.
    6                    Q.    And what did you do after that?
    7                    A.    Went to Northgate Lincoln Mercury,
    8    January of '96, as general manager.
    9                    Q.    And that's the position you currently
   10    hold?
   11                    A.    Yes.
   12                    Q.    Who owned Kings Dodge?
   13                    A.    Robert Reichert.
   14                    Q.    Was that the first dealership where you
   15    were working for Mr. Reichert?
   16                    A.    No, Montgomery Jeep.
   17                    Q.    Montgomery Jeep, okay.
   18                          What are your duties as General Manager
   19    of Northgate Lincoln Mercury?
   20                    A.    Manage the daily operations of the
   21    dealership.
   22                    Q.    Do you report to Mr. Reichert?
   23                    A.    Yes.
   24                    Q.    Who reports to you?
   25                    A.    The new car manager, used car manager,
```

```
00011
 1   parts manager, service manager, and office manager.
 2                   Q.    About how frequently do you have contact
 3   with Mr. Reichert, on a weekly basis?
 4                   A.    At least once a week.
 5                   Q.    Usually on the phone?
 6                   A.    We have a meeting on Mondays.
 7                   Q.    And what's covered in those meetings, as
 8   a rule?
 9                   A.    Just general business, week to week.
10                   Q.    And he comes to your dealership for that
11   purpose?
12                   A.    No, I go to his.
13                   Q.    Okay.  And where is that?
14                   A.    Kings Toyota.
15                   Q.    Do you have any training or -- well, any
16   training in the automobile industry?
17                   A.    I've had training.
18                   Q.    Tell me about that.
19                   A.    When I was with Dodge, I had a used car
20   management seminar.
21                   Q.    How long was that seminar?
22                   A.    Approximately three days, to the best of
23   my recollection.
24                   Q.    Any other training programs that you've
25   been through?
```

```
00012
     1                    A.    Not that I recall.
     2                    Q.    Anything ever sponsored by Ford Motor
     3   Company?
     4                    A.    In terms of training?
     5                    Q.    Yes, sir.
     6                    A.    They have a Ford Star System, which is
     7   essentially via satellite, that you can view training.
     8                    Q.    And from time to time do you tune in on
     9   some of those broadcasts?
    10                    A.    I have, I have.
    11                    Q.    Do you decide when and where to do that,
    12   or is there some formal process by which you know that you
    13   need to have so much time devoted to that during the year?
    14                    A.    No, I decide that.
    15                    Q.    What subjects have been covered in those
    16   programs that you can remember viewing?
    17                    A.    New model introduction, features,
    18   benefits.
    19                    Q.    Have you had any training with respect
    20   to dealer operations?
    21                    A.    No.
    22                    Q.    Would it be fair to state then, that
    23   your knowledge and expertise in that area has been
    24   on-the-job acquired?
    25                    A.    Yes.
```

00013

```
 1                    Q.    Prior to your deposition today,
 2   Mr. Mullins, did you do anything to prepare?
 3                    A.    I spoke with my attorney.
 4                    Q.    Okay.  Would that be Mr. Hengehold?
 5                    A.    That's correct.
 6                    Q.    He's Mr. Reichert's attorney?
 7                    A.    (Nodding affirmatively).
 8                    Q.    Right?
 9                    A.    Yes.
10                    Q.    Okay.  Did you review any papers, any
11   documents of any kind?
12                    A.    No.
13                    Q.    Did you speak with Mr. Reichert at any
14   time before you gave your deposition today, about any issues
15   in the case?
16                    A.    When I spoke with him, Mr. Hengehold was
17   there.
18                    Q.    Okay.  So you were all together at the
19   same time?
20                    A.    Yes.
21                    Q.    And that was one time only, earlier
22   today?
23                    A.    It was prior to today, yes, but it was
24   one time only.
25                    Q.    Was it Friday?
```

```
00014
     1                    A.    Yes.
     2                    Q.    Okay.  How long was that meeting?
     3                    A.    An hour, possibly.
     4                    Q.    Okay.  Was it down here?
     5                    A.    No.
     6                    MR. HENGEHOLD:  We deliver.
     7                    Q.    What do you know about the acquisition
     8  of Northgate Lincoln Mercury by Mr. Reichert?
     9                    A.    Nothing.
    10                    Q.    Okay.  Do you know how long Mr. Reichert
    11 had owned the dealership before you came on board as the
    12 general manager?
    13                    A.    Approximately three years.
    14                    Q.    Who held the position as general manager
    15 before you?
    16                    A.    Larry Feldhaus.
    17                    Q.    Do you know, generally, why he left the
    18 position?
    19                    A.    To my knowledge, there was an opening at
    20 one of our other stores that he transferred to.
    21                    Q.    Okay.  And that would be the Kings
    22 store?
    23                    A.    That's correct.
    24                    Q.    Do you have any ownership interest in
    25 any of the franchises operated by the Kenwood Dealer Group?
```

```
00015
    1                  A.   No.
    2                  Q.   Have you ever?
    3                  A.   No.
    4                  Q.   Are you familiar with any plans or
    5  discussions involving Mr. Reichert and the idea of him
    6  acquiring other Lincoln Mercury franchises?
    7                  A.   I can't answer that the way it's posed.
    8  I don't understand the question.
    9                  Q.   Have you ever been made aware of any
   10  interest on Mr. Reichert's behalf in purchasing other
   11  franchises?
   12                  A.   No.
   13                  Q.   Are you aware of any involvement
   14  Mr. Reichert has had to investigate the purchase of Eastside
   15  Lincoln Mercury?
   16                  A.   No.
   17                  Q.   Were you aware of Mr. Reichert's efforts
   18  to acquire Fairfield Lincoln Mercury?
   19                  A.   I became aware of it.
   20                  Q.   How did you become aware of it?
   21                  A.   Just in conversation with him.
   22                  Q.   Do you know of any of the particulars of
   23  how that deal came together?
   24                  A.   No.
   25                  Q.   Are you familiar with the term
```

```
00016
   1    "consolidator agreement?"
   2                 A.   No.
   3                 Q.   Are you familiar with whether
   4    Mr. Reichert and Ford Motor Company, Lincoln Mercury
   5    Division, has an agreement, or have an agreement, whereby
   6    Mr. Reichert and the Kenwood Dealer Group is considered a
   7    consolidator for the Lincoln Mercury Division in this
   8    market?
   9                 A.   I have no knowledge of that.
  10                 Q.   Do you know whether the Kenwood Dealer
  11    Group has a status with Ford Motor Company because of the
  12    fact that it owns three dealerships, special considerations
  13    that come from that fact?
  14                 A.   None that I'm aware of.
  15                 Q.   Do you know if there were ever any
  16    incentives made available to your dealership, be they sales
  17    incentives, advertising, marketing, anything like that, that
  18    were made available to your dealership because Mr. Reichert
  19    has three Lincoln Mercury dealerships?
  20                 A.   I wouldn't know that.
  21                 Q.   Do you have responsibilities in your job
  22    for advertising?
  23                 A.   Yes.
  24                 Q.   Do you have interaction with
  25    representatives of the Lincoln Mercury Division here in the
```

```
00017
    1   region in connection with advertising?
    2                   A.   Yes.
    3                   Q.   Who do you interact with?
    4                   A.   My zone manager.
    5                   Q.   Who is that?
    6                   A.   Pat LeTarte.
    7                   Q.   Anyone else?
    8                   A.   I've had brief discussions with my
    9   regional manager, Steve Carnegie.
   10                   Q.   Okay.  And before Mr. Carnegie was in
   11   his position, that would have been Jerry Carter?
   12                   A.   That's correct.
   13                   Q.   And do you have, or did you have, any
   14   discussions with Mr. Carter while he was here in the
   15   Cincinnati region?
   16                   A.   I have had, yes.
   17                   Q.   And what subjects would those have been
   18   on?
   19                   A.   I can't recall, specifically.  However,
   20   just in general, maybe a certain model or something that
   21   would be a slow mover, that maybe we should advertise that a
   22   little heavier, possibly.
   23                   Q.   And did you ever ask Mr. Carter to help
   24   you with vehicle allocation issues?
   25                   A.   I didn't discuss vehicle allocation with
```

```
00018
 1  Mr. Carter.
 2              Q.   Never?
 3              A.   I can't say never, but I don't recall.
 4              Q.   Okay.  Ordinarily, you would take those
 5  concerns to Mr. LeTarte; is that right?
 6              A.   That's correct.
 7              Q.   Would you have a monthly meeting with
 8  him where you would figure out your request and you would
 9  figure out your allocations, right?
10              A.   That's correct.
11              Q.   Do you know if Mr. Carter ever had
12  access to a supply of vehicles outside of the classic
13  allocation process, a pool of vehicles that he had control
14  over?
15              A.   Not to my knowledge.
16              Q.   Have you ever heard the term "regional
17  manager's pool?"
18              A.   No.
19              Q.   Did you ever hear of Mr. Carter helping
20  dealers get vehicles that couldn't be obtained through the
21  allocation process, or weren't obtained fast enough?
22              A.   No.
23              Q.   Did you ever have difficulty getting
24  allocation of vehicles or a shipment of vehicles at the time
25  of a new vehicle rollout?
```

```
00019
 1                  A.    Not out of the ordinary.
 2                  Q.    What would the ordinary be?
 3                  A.    Typically, with new vehicles, there's
 4  problems, quality problems and things that can slow down the
 5  allocation.
 6                  Q.    So that potential is there whenever a
 7  new vehicle is launched; is that right?
 8                  A.    From my experience.
 9                  Q.    Did you have difficulty getting Lincoln
10  Navigators when they were rolled out in '98?  It may have
11  been late '97, but they were model year '98 cars.
12                  A.    I don't recall having difficulty with
13  that particular model.
14                  Q.    Or any other particular model?
15                  A.    No, I don't.
16                  Q.    Okay.  Do you know if either of your
17  counterparts at the Kenwood Dealer Group's other two Lincoln
18  Mercury dealerships had any particular problems with vehicle
19  allocation issues at rollout?
20                  A.    I wouldn't know that.
21                  Q.    Well, you communicate from time to time
22  with Mr. Feldhaus, don't you?
23                  A.    We do, but we're still separate.  I
24  mean, what my market would be is certainly different than
25  his.
```

```
00020
  1                    Q.    Okay.  When there is a new model that's
  2  rolled out, during your tenure with any of the dealerships
  3  that Kenwood Lincoln Mercury owned, was there ever a time
  4  when you didn't get a single vehicle at rollout?
  5                    A.    I don't recall.
  6                    Q.    So that could have happened, but you
  7  just don't remember; is that right?
  8                    A.    That could have happened, but it's not
  9  uncommon for a dealership to get a car, the first car, and
 10  three days later another dealership gets their car.  Very
 11  seldom have I ever seen where they all come at once.
 12                    Q.    Okay.  But with respect to Northgate,
 13  you don't remember any new vehicle rollout situation where
 14  you didn't get any cars?
 15                    A.    I don't recall that.
 16                    Q.    Okay.  Where you ever at a meeting at
 17  the Wetherington Country Club with Jerry Carter and the
 18  other general managers for the Kenwood Dealer Group Lincoln
 19  Mercury dealers?
 20                    A.    Yes.
 21                    Q.    And when did that take place, if you can
 22  recall?
 23                    A.    I would say approximately spring of
 24  2000, maybe.
 25                    Q.    What type of business was discussed?  I
```

```
00021
    1   understand there was a dinner, but what type of business
    2   issues were discussed there?
    3                   A.   Market conditions.
    4                   Q.   What else?
    5                   A.   Aged inventory, prior year models.
    6                   Q.   And was it presented to Mr. Carter that
    7   your dealerships had some aged inventory that you needed to
    8   turn?
    9                   A.   As I recall, yes.
   10                   Q.   Did he offer some financial assistance
   11   to help you do that?
   12                   A.   He did.
   13                   Q.   How much?
   14                   A.   I think $10,000.
   15                   Q.   Do you know where that money came from?
   16                   A.   I do not know.
   17                   Q.   Do you know who the money was paid to?
   18                   A.   As I recall, it was paid for -- on
   19   models, Mountaineer models, and it was paid per dealership,
   20   to try to reduce the prior year models, as best of my
   21   recollection.
   22                   Q.   Do you remember how much of that $10,000
   23   came to Northgate?
   24                   A.   No, I don't.
   25                   Q.   Do you recall any other situations over
```

00022

```
 1  your tenure where you, or somebody on behalf of Kenwood
 2  Dealer Group, went to Mr. Carter and said we need some money
 3  to accomplish something at our dealerships?
 4                  A.   No, I do not.
 5                  Q.   On that $10,000, was there anything that
 6  Mr. Carter asked of your dealerships before you could
 7  receive it, any strings attached?
 8                  A.   Not that I recall.
 9                  Q.   Is it your recollection that the $10,000
10  was ultimately paid into the Kenwood Dealer Group?
11                  A.   It was.
12                  Q.   Have you been made aware of any
13  discussions between Mr. Reichert and Jerry Carter about
14  Mr. Reichert acquiring other dealerships?
15                  A.   No.
16                  Q.   If I asked you this already, I
17  apologize.  I just don't remember.
18                       Are you aware of whether Mr. Reichert
19  has ever had an interest or expressed an interest in
20  purchasing Eastside Lincoln Mercury?
21                  A.   No, I'm not aware.
22                  Q.   Or working out some series of
23  transactions which would result in him acquiring Eastside
24  Lincoln Mercury?
25                  A.   Nothing that I have knowledge to.
```

00023
```
 1                     (THEREUPON, A SHORT RECESS WAS TAKEN).
 2  BY MR. FLEMER:
 3                Q.   Given your experience in the car
 4  business here in the greater Cincinnati area, are you aware,
 5  generally, of what the reputation in the car community is
 6  with respect to Eastside Lincoln Mercury?  What kind of
 7  reputation do they have, as far as you know?
 8                A.   I wouldn't have any idea.
 9                Q.   Do you know whether they're
10  characterized as a dealer that has high consumer
11  satisfaction?
12                A.   I have no knowledge of that.  I don't
13  know.
14                Q.   Okay.  Well, sometimes -- I would assume
15  that you would at least see publications where consumer
16  service-type issues reflect awards or recognition.  Do you
17  know that Eastside has received anything like that?
18                A.   No, I do not.
19                Q.   Do you know if they have a reputation as
20  a high volume dealer or a moderate volume dealer or a low
21  volume dealer?
22                A.   I don't know.
23                Q.   If someone were to characterize them as
24  a low volume dealer, would you believe that to be true, or
25  would you not know?
```

```
00024
    1                 A.    They sell more than I do.
    2                 Q.    Excuse me?
    3                 A.    They sell more cars than I do.
    4                 Q.    So you wouldn't call them --
    5                 A.    That's the only way I'll characterize
    6    it, they outsell me.
    7                 Q.    Fair enough.
    8                       And they have for the last five years,
    9    as far as you can recall, or seven years maybe?
   10                 A.    Well, they did a good job last month,
   11    too.
   12                 Q.    All right.  You don't know of anything
   13    in particular that has been made known to you about Eastside
   14    Lincoln Mercury's reputation which would be negative; is
   15    that fair?
   16                 A.    I have no knowledge of anything like
   17    that.
   18                 Q.    Okay.  Were you aware, Mr. Mullins, that
   19    sometime in 1999, an internal Ford memorandum was circulated
   20    that presented a growth strategy from Ford's standpoint?
   21    Did you ever hear anything about that?
   22                 A.    I can't recall.
   23                 Q.    You've never seen a memo that presented
   24    a growth strategy by Ford, have you?
   25                 A.    I may have, but I don't recall.
```

```
00025
 1                  Q.   Okay.  Have you ever seen a Ford
 2 business plan?
 3                  A.   Can you be more specific?
 4                  Q.   Yeah.
 5                       Have you ever seen a document that
 6 presented issues that might be characterized as a business
 7 plan for this market that Ford would have produced?
 8                  A.   I reviewed my own business plan.
 9                  Q.   Right.
10                       You make up your own?
11                  A.   Yes.
12                  Q.   Prepare your own, I should say?
13                  A.   That's correct.
14                  Q.   Okay.  Have you ever seen one prepared
15 by Ford?
16                  A.   I don't recall.
17                  Q.   Other than the $10,000 that was made
18 available after your dinner with Mr. Carter at Wetherington,
19 for the purposes you've described, do you know of any other
20 programs like that which resulted in any of the Kenwood
21 Dealer Group dealerships, or the group as a whole, receiving
22 additional monies or advertising or financial support from
23 the region?
24                  A.   I do not.
25                  Q.   On an ask-and-see-if-we-can-get-it
```

```
00026
  1  basis?
  2                   A.   Every meeting that we always had, we
  3  asked.
  4                   Q.   Okay.
  5                   A.   And I'm speaking in terms of all Lincoln
  6  Mercury dealers.  We always asked, asked for everything, and
  7  take what we can get.
  8                   Q.   Okay.  But is that meeting that you had
  9  and received $10,000 for aged inventory the only time where
 10  you ever got something special?
 11                   A.   As I recall.
 12                   Q.   Okay.  Have you ever been involved in
 13  the Ford warranty audit process?
 14                   A.   No, I have not.
 15                   Q.   Or the warranty review process?
 16                   A.   No.
 17                   Q.   Has your dealership ever been involved
 18  in it?
 19                   A.   No.
 20                        (THEREUPON, AN OFF-THE-RECORD DISCUSSION
 21  WAS HELD).
 22  BY MR. FLEMER:
 23                   Q.   Were you involved with Northgate Lincoln
 24  Mercury's certification as an LPE dealership?
 25                   A.   Yes.
```

```
00027
    1                  Q.   When did that take place?
    2                  A.   Approximately two years ago.
    3                  Q.   Were you the point man for the project?
    4                  A.   Yes.
    5                  Q.   Did you pass on the first time?
    6                  A.   Yes.
    7                  Q.   Are you aware if any of Mr. Reichert's
    8   dealerships did not?
    9                  A.   Yes.
   10                  Q.   Tell me what you know about that.
   11                  A.   Fairfield Lincoln Mercury did not.
   12                  Q.   Why not?
   13                  A.   I'm not aware of that.  I just heard
   14   hearsay that they did not pass.
   15                  Q.   Would you have heard that from
   16   Mr. Huser, or Houser (sic)?  How does he say that?
   17                  A.   Huser.
   18                  Q.   Huser.
   19                       Is that where your information came
   20   from?
   21                  A.   Yes.
   22                  Q.   But you don't know anything about the
   23   details of why he didn't?
   24                  A.   No.
   25                  Q.   Do you know anything about what he did
```

```
00028
    1  to try to pass it the next time through?
    2                   A.   No, I don't.
    3                   Q.   Were you present at a meeting where
    4  Mr. Huser requested that there be a waiver of the
    5  requirement to have paperwork reflected in the Stars
    6  program?
    7                   A.   I don't recall that.
    8                   Q.   Do you know what the Stars program is?
    9                   A.   I know, yes, I know what Stars is.
   10                   Q.   What is that?
   11                   A.   Stars is an enrollment process for
   12  dealership employees, as I understand it.
   13                   Q.   And it reflects a certain level of
   14  training on their part, or competency, I guess?
   15                   A.   Well, I don't know about that.
   16                   Q.   Okay.
   17                   A.   I mean, it will measure training and
   18  collect the training.  You can see certification processes
   19  per salespeople and different employees.
   20                   Q.   Okay.  And was that a prerequisite to
   21  get into the LPE program, that a certain number of employees
   22  have that certification?
   23                   A.   Yes, as I recall.
   24                   Q.   Okay.  And do you know whether Mr. Huser
   25  had problems in that area when he was trying to get
```

```
00029
 1  certified?
 2                  A.   I had my own problems, I don't know
 3  about his.
 4                  Q.   You had your problems with the Stars
 5  program?
 6                  A.   No.  I had the same procedures that all
 7  other dealers had, so I'm concentrating on passing myself.
 8                  Q.   I see.
 9                  Are you familiar with Mr. Reichert's
10  efforts to receive Ford's approval to dual at your store
11  with Volkswagen?
12                  A.   No, sir.
13                  Q.   Are you familiar with anybody else's
14  efforts to obtain approval to dual one of Mr. Reichert's
15  dealerships with Volkswagen?
16                  A.   No.
17                  Q.   Do you understand that Mr. Reichert has
18  the privilege and, in fact, is operating a dual dealership
19  at Fairfield Lincoln Mercury and Volkswagen?
20                  A.   I assume that.
21                  Q.   But you don't know how that came to be?
22                  A.   No.
23                  Q.   Have you ever investigated doing that at
24  your dealership?
25                  A.   No.
```

Mullins, Jerry 04/02/03 page 30

00030
```
 1                 Q.   Has Mr. Reichert?
 2                 A.   I have no knowledge of that.
 3                 Q.   Do you have another brand of vehicles
 4   sold at Northgate Lincoln Mercury now?
 5                 A.   Volkswagen.
 6                 Q.   And was that arrangement in place when
 7   you got there?
 8                 A.   Yes.
 9                 Q.   And you don't know how it came to be in
10   place; is that right?
11                 A.   That's correct, I do not know.
12                 Q.   Is it your opinion, as the general
13   manager out there, that that relationship, the dualing
14   relationship, is beneficial?  Does it help you sell cars and
15   make money?
16                 A.   It doesn't help me sell Lincoln Mercury.
17                 Q.   Well, is it detrimental to selling
18   Lincoln Mercury?
19                 A.   I wouldn't say that.
20                 Q.   Well, I'm asking you to say whether it
21   is or it isn't.
22                 A.   Then, based on that, I don't know.
23                 MR. FLEMER:  Okay.  Let's go off the
24   record for a minute.
25                 (THEREUPON, A SHORT RECESS WAS TAKEN).
```

00031
1  BY MR. FLEMER:
2            Q.   You've worked at dealerships, prior to
3  coming on board at Northgate, where there has not been a
4  dual relationship, right?
5            A.   Correct.
6            Q.   And obviously you've had seven years of
7  experience, six-years-plus experience, where there has been
8  a dualing, right?
9            A.   That's correct.
10           Q.   Is it your experience that dualing helps
11 make your dealership more profitable than ones that didn't
12 have it?
13           A.   I can't answer that question like that.
14           Q.   Well, if I changed it -- I mean, what's
15 the part of the question that makes it impossible to answer
16 it?
17           A.   Well, the only really lengthy time I've
18 worked at a dealership to compare that to would be Dodge.
19           Q.   Okay.
20           A.   Otherwise, I couldn't -- I can't answer
21 your question, because I don't have knowledge of that.
22           Q.   Okay.
23           A.   The Dodge product was, at the time I
24 worked there, was a good selling product.  I can't imagine
25 having another dealership with it that could make it any

```
00032
 1  better.  I mean --
 2              Q.   Well, let's just talk about the dual
 3  that you have now, Lincoln Mercury and Volkswagen.  Okay?
 4              A.   Uh-huh.
 5              Q.   Do you see any benefits to that
 6  arrangement, for either brand, or for the entity that owns
 7  the franchise rights to sell each car?  I mean, you've got
 8  Kenwood Dealer Group, they went to get permission and
 9  received it, to dual, and is there any benefit to that?
10              A.   We sell more Volkswagens than we have in
11  the past.
12              Q.   To what do you attribute that increased
13  Volkswagen sales volume?
14              A.   Hard work.
15              Q.   Well what about the dualing arrangement?
16              A.   I don't see any benefit of the dualing
17  arrangement that sells more Volkswagens or more Lincoln
18  Mercurys.
19              Q.   Do you see any cost savings?
20              A.   I see no cost savings.  There's
21  actually -- it's not as cost effective.  I have to have more
22  managers, more service personnel, more equipment.
23              Q.   Well, aren't there some shared
24  resources?
25              A.   There can be, but not in equipment, not
```

```
00033
 1  in terms of equipment.  They're not compatible.
 2                  Q.   Okay.  Aren't there shared facility
 3  resources?
 4                  A.   There are.
 5                  Q.   And that could represent some cost
 6  savings to the dealer group, couldn't it?
 7                  A.   It could.
 8                  Q.   And how about sharing in terms of
 9  advertising?
10                  A.   We advertise separately.
11                  Q.   Okay.  So you don't know of any other
12  benefits that would be associated with the privilege of
13  dualing, apart from what you told me, that there might be
14  some facility savings that you had?
15                  A.   No.
16                  Q.   Do you know of any other benefits that
17  would relate to your fixed operations or your ability to
18  repair cars?
19                  A.   No.  I mean, there, Volkswagen's tools
20  and requirements, all that differs greatly from Lincoln
21  Mercury, therefore the expense is much greater.  We have two
22  of the same for each product, in most cases.
23                  Q.   Would it be your preference, then, not
24  to dual?  Do you think your dealership would be more
25  profitable without the dual?
```

00034
```
 1                    A.   I couldn't answer that.
 2                    Q.   Well, perhaps you've never studied it,
 3 but you're telling me that you really don't see any benefits
 4 to it, and you've listed a number of expenses or detriments
 5 that make it more costly and less cost-effective, I think
 6 that was your term.  Would you prefer that you not have a
 7 dual with Volkswagen?
 8                    A.   I wouldn't say that.
 9                    Q.   Well, you have no opinion on the
10 subject?
11                    A.   I guess I do not.
12                    Q.   What do you think if Volkswagen was no
13 longer a part of your dealership, just say that came to
14 pass, --
15                    A.   Uh-huh.
16                    Q.   -- what would change up at Northgate
17 Lincoln Mercury, in terms of their financial picture?  Do
18 you think it would be better without it, either in terms of
19 increased sales or lower expenses or some combination of
20 that?
21                    A.   Well, I would change my business
22 strategy.
23                    Q.   How would you do that?
24                    A.   I would try to increase my Lincoln
25 Mercury inventory some, probably 10 percent, and put
```

```
00035
  1  emphasis on used cars.
  2                    Q.   Would that be your strategy for trying
  3  to make up the lost Volkswagen sales?
  4                    A.   I don't know if I -- I wouldn't term it
  5  as lost.  I would just term it as what I would do with the
  6  additional space that would be there and how I would make up
  7  the inventory loss.
  8                    Q.   How would you increase used car sales?
  9                    A.   Larger inventory.
 10                    Q.   So you would have more physical space on
 11  the lot to park some cars, which is now taken up by
 12  Volkswagens?
 13                    A.   That's correct.
 14                    Q.   Are you aware of any situations where
 15  your dealership has sold a Lincoln Mercury product to a
 16  customer that was previously turned down at another Lincoln
 17  Mercury dealer?
 18                    A.   I'm not aware of that.
 19                    Q.   Do you believe that happens from time to
 20  time, that customers get turned down at one dealership and
 21  then go down the road to the next one?
 22                    A.   Yes.
 23                    Q.   I assume your new car manager would know
 24  about those circumstances from time to time?
 25                    A.   Yes, but not related just to Lincoln
```

00036
```
 1  Mercury.
 2                  Q.   Okay.  Have you ever had any discussions
 3  with Mr. Bill Woeste?
 4                  A.   Casual.
 5                  Q.   Here today, made his acquaintance, or --
 6                  A.   I think we were on a trip one time,
 7  maybe, if I recall.
 8                  Q.   Have you ever talked business issues
 9  with him?
10                  A.   Not that I recall.
11                  Q.   Or anybody from any of the dealerships
12  that he owns?
13                  A.   No.
14                  Q.   Are you aware of any circumstances where
15  Kenwood Dealer Group dealerships received any incentives or
16  benefits from Ford that weren't made available equally to
17  other dealerships?
18                  A.   Not to my knowledge.
19                  Q.   In connection with your sales of
20  Volkswagens, do you know if Volkswagen is permitted to do
21  that, to offer programs or benefits to specific dealers but
22  not make that same program or benefit available to other
23  dealers in their markets?
24                  A.   I don't know that.
25                  Q.   Have you ever heard of that happening?
```

```
00037
     1                    A.    I have not through Volkswagen.
     2                    Q.    Or any dealership, just from the
     3  knowledge that you may have acquired over the years?
     4                    A.    No.
     5                    MR. FLEMER:  Let's go off the record for
     6  a second.
     7                    (THEREUPON, A SHORT RECESS WAS TAKEN).
     8  BY MR. FLEMER:
     9                    Q.    Do you recall receiving some co-op money
    10  from Ford in the spring of 2000, approximately $21,000?
    11                    A.    No, I don't.
    12                    Q.    A co-op program of some type, you don't?
    13                    A.    No.
    14                    Q.    Would that sum of money, that figure, be
    15  considered a large check to receive on one co-op program?
    16                    A.    To my knowledge, Ford does not
    17  have co-op.  I don't understand your question in terms of
    18  co-op.  I don't recall receiving 21,000 in any fashion, but
    19  I don't understand co-op.
    20                    Q.    Well, just generally, when I use the
    21  term, I'm referring to a process whereby Ford will match a
    22  dealer with dollars for advertising, that they would match
    23  on a dollar-for-dollar basis, and they would call that
    24  co-op.
    25                    A.    Okay.  Ford does not have that program,
```

00038
```
 1   that I'm aware of.
 2                     MR. HENGEHOLD:  I hate to pipe up.  I
 3   try never to do this, but you started out the previous
 4   deposition by making Ford equal Lincoln Mercury.
 5                     MR. FLEMER:  Right.
 6                     MR. HENGEHOLD:  You didn't do that in
 7   this deposition.
 8                     MR. FLEMER:  Okay.
 9                     MR. HENGEHOLD:  This man sells Lincoln
10   Mercurys.  That may be the problem.
11                     MR. FLEMER:  Okay.
12   BY MR. FLEMER:
13           Q.  Well, let me do this:  Let me ask you to
14   understand, for the purposes of my questions, if I've used
15   the term Ford, I meant to include the Lincoln Mercury
16   Division within that.  I guess I didn't say that earlier, as
17   Mr. Hengehold has just pointed out.  But in this pending
18   question about co-op, I'd like you to understand that when I
19   said Ford, I meant the Lincoln Mercury Division of Ford
20   Motor Company.  Would that change your answer?
21           A.  No.
22           Q.  You don't understand that Lincoln
23   Mercury has a co-op program where they match funds for
24   advertising with what the dealer will put up?
25           A.  I'm not aware of that.
```

00039
1                    Q.   Well, are you aware that your dealership
2  puts up money for advertising?
3                    A.   Yes.
4                    Q.   Okay.  And are you aware that Ford
5  sometimes contributes to advertising programs?
6                    A.   The LMDA does.
7                    Q.   Okay, all right.  Do you know whether,
8  through the LMDA or elsewhere, that their money comes from
9  the Lincoln Mercury Division?
10                   MR. BERBERICH:  Let's take a break for a
11 second.
12                   MR. FLEMER:  We'll come back to this.
13                   (THEREUPON, A SHORT RECESS WAS TAKEN).
14 BY MR. FLEMER:
15                   Q.   Mr. Mullins, if I understand your
16 testimony, you're aware that there are co-op funds that are
17 made available to Kenwood Dealer Group dealerships, Lincoln
18 Mercury dealerships, through the LMDA process, right?
19                   A.   Yes.
20                   Q.   And is that the only process by which
21 you know that co-op advertising funds are available to your
22 dealerships?
23                   A.   Yes.
24                   Q.   Okay.  You don't know of some other
25 source where other advertising monies are made available,

```
00040
  1   outside the LMDA?
  2              A.   Not that I have knowledge of.
  3              Q.   Okay.  Now, are you aware of any
  4   instances where monies available through the LMDA have been
  5   made available to the Kenwood Dealer Group dealerships and
  6   not other dealerships in the Cincinnati market?
  7              A.   No.
  8              Q.   Or any other benefits that they might
  9   have, rebates or other incentives, any financial benefit?
 10              A.   No.
 11              Q.   Have you ever heard of the regional
 12   manager's discretionary fund, --
 13              A.   No.
 14              Q.   -- Lincoln Mercury Regional Managers?
 15   You've never heard of that term?
 16              A.   No.
 17              Q.   Are you aware of any other sources of
 18   funds for advertising, besides the LMDA funds, that
 19   Ford makes available?
 20              A.   Not that I'm aware of.
 21              Q.   And are you aware of any type of
 22   financial assistance available outside the LMDA umbrella, so
 23   to speak?
 24              A.   Not that I'm aware of.
 25              Q.   Were you part of a meeting or a
```

```
00041
    1  discussion where all three of the Reichert Lincoln Mercury
    2  dealerships met to discuss the possibility of aggregating
    3  your sales to get better allocation or more allocation?
    4            A.   I recall being in a meeting, but I don't
    5  recall the contents of that meeting.
    6            Q.   Well, did it have something to do with
    7  aggregating sales and vehicle allocation issues?  Something
    8  must have struck a nerve here, so that you can recall
    9  something.
   10            A.   Well, quite frankly, I wondered why I
   11  was at the meeting.  I had -- you know, I wasn't part of it.
   12  I was just there, and I don't recall any of the
   13  conversation.  I don't recall participating in any of the
   14  conversation.
   15            Q.   When was this meeting that you're
   16  referring to?
   17            A.   I would have to guess, maybe three years
   18  ago.  I don't -- I have no recollection of the date.
   19            Q.   Was allocation discussed there, vehicle
   20  allocation?
   21            A.   I can't recall.
   22            Q.   Who was present?
   23            A.   Bob Reichert, Jerry Carter --
   24            Q.   Was it unusual for you to be at a
   25  meeting with those folks there?
```

```
00042
    1                   A.    I felt so, yeah.  I don't --
    2                   Q.    And you don't know why you were there?
    3                   A.    Yes.
    4                   Q.    Who else was there?  I interrupted you.
    5                   A.    I don't -- there was maybe two or three
    6  others.  I don't recall who was there.
    7                   Q.    Were other GM's there?  Were your
    8  counterparts from the other dealerships there?
    9                   A.    I'm sorry, I can't recall.
   10                   Q.    Where was the meeting?
   11                   A.    At the Marriott.
   12                   Q.    Was this a grassroots meeting or was it
   13  a -- do you know what a grassroots meeting is?
   14                   A.    Yes.
   15                   Q.    Was it one of those?
   16                   A.    I don't recall.
   17                   Q.    Do you remember any of the topics
   18  discussed?
   19                   A.    None whatsoever.
   20                   Q.    I'm not trying to be argumentative with
   21  you, I'm just trying to probe your memory here.  But I
   22  started out by asking whether you were aware of any
   23  discussions where the subject of allocation and aggregating
   24  your sales was discussed, and I think that's what led you
   25  into this recollection, dim as it may be.  So does that help
```

```
00043
 1  you recall anything specific?
 2                A.   No, sir, I don't recall any of the
 3  conversation of that meeting.
 4                Q.   You were trying to remember who else was
 5  present.  Was Pat LeTarte there?
 6                A.   I can't recall.
 7                Q.   Or anybody at a zone level there?
 8                A.   I told you who I can remember was there.
 9                Q.   Okay.  Were there representatives of
10  other Lincoln Mercury dealerships there, or was it just the
11  Kenwood Group?
12                A.   I don't recall.
13                Q.   Allowing that you might not recall
14  specific names, I just wonder if you recall people with, you
15  know, other jerseys on, so to speak?
16                A.   Not that I can recall.
17                Q.   Okay.  Are you aware of Mr. Reichert
18  ever having concerns with regard to Mr. Carter's handling of
19  his request to dual at the Fairfield store?
20                A.   I have no -- I'm not privy of that.  I
21  have no knowledge of that.
22                Q.   Did you ever hear that Mr. Reichert was
23  contemplating suing Mr. Carter?
24                A.   No.
25                Q.   Or that he threatened to do so, or
```

```
00044
    1   thought he might have to?
    2                   A.   No.
    3                   MR. FLEMER:  Mr. Mullins, thank you.
    4   That's all we have.  Thanks for being down here and spending
    5   part of your day with us.
    6
    7                        (JERRY L. MULLINS)
    8                      (DEPOSITION CONCLUDED)
    9
   10
   11
   12
   13
   14
   15
   16
   17
   18
   19
   20
   21
   22
   23
   24
   25
```

```
00045
  1                    C E R T I F I C A T E
  2  STATE OF OHIO          )
                            )    SS
  3  COUNTY OF HAMILTON     )
  4       I, Jill M. Dragon Sandy, the undersigned, a duly
  5  qualified and commissioned notary public within and for the
  6  State of Ohio, do hereby certify that before the giving of
  7  his aforesaid deposition the said JERRY L. MULLINS, was by
  8  me first duly sworn to depose the truth, the whole truth,
  9  and nothing but the truth; that the foregoing is the
 10  deposition given at said time and place by the said JERRY L.
 11  MULLINS; that said deposition was taken in all respects
 12  pursuant to agreement as to time and place, that said
 13  deposition was taken by me in stenotypy and I am neither a
 14  relative of, nor attorney for, any of the parties to this
 15  cause, nor relative of nor employee of any of their counsel,
 16  and have no interest whatever in the result of the action.
 17    IN WITNESS WHEREOF, I hereunto set my hand and official
 18  seal of office, Cincinnati, Ohio this_____day
 19  of_____, 2003.
 20
 21       _____
          Jill M. Dragon Sandy-Notary Public
 22       My commission expires:  January 31, 2005.
 23
 24
 25
```