```
00001
   1                 UNITED STATES DISTRICT COURT
   2               FOR THE SOUTHERN DISTRICT OF OHIO
   3                          -  -  -
   4   EASTSIDE LINCOLN MERCURY, ET AL,    )
                                           )
   5                      PLAINTIFFS,      )
                                           )
   6   VS                                  )  CASE NO:  01CV00567
                                           )
   7   FORD MOTOR COMPANY, ET AL,          )
                                           )
   8                      DEFENDANTS.      )
       -----------------------------------
   9
  10
  11
  12               DEPOSITION OF:  ALLEN W. WALLS
  13                    CINCINNATI, OHIO
  14                    MARCH 13, 2003
  15
  16
  17
  18
  19
  20
  21
  22
  23   REPORTER:  JILL M. DRAGON SANDY
  24                    Dragon Reporting Service
                           5551 Seville Court
  25                    Cincinnati, Ohio  45247
                           (513)574-8319
```

```
00002
    1          The deposition of ALLEN W. WALLS, taken on discovery,
    2     pursuant to agreement of counsel as to time and place, in
    3     the offices of Baker & Hostetler, Suite 2650, 312 Walnut
    4     Street, Cincinnati, Ohio, on March 13, 2003, at 1:00 PM,
    5     upon oral examination, and to be used in accordance with the
    6     Ohio Rules of Civil Procedure.
    7                              -  -  -
    8
    9
   10                    S T I P U L A T I O N S
   11     It is stipulated by and between counsel for the
   12     representative parties that the deposition of ALLEN W.
   13     WALLS, the witness herein, may be taken at this time and
   14     place pursuant to the Ohio Rules of Civil Procedure,
   15     pursuant to agreement of counsel as to time and place; that
   16     the proof of the notary is waived; that the deposition may
   17     be recorded in stenotypy by the notary public, Jill M.
   18     Dragon Sandy, who is also the court reporter, and
   19     transcribed out of the presence of the witness, and that the
   20     deposition is required to be submitted to the witness for
   21     his examination and signature.
   22                              -  -  -
   23
   24
   25
```

```
00003
    1                    A P P E A R A N C E S
    2
    3   FOR THE PLAINTIFFS:
    4   Mr. Gregory J. Berberich
        and
    5   Mr. Lawrence A. Flemer
        Statman, Harris, Siegel & Eyrich
    6   2900 Chemed Center
        255 East Fifth Street
    7   Cincinnati, Ohio  45202
        (513)621-2666
    8
    9
   10   FOR THE DEFENDANTS:
   11   Ms. Elizabeth A. McNellie
        Baker & Hostetler
   12   Capitol Square, Suite 2100
        65 East State Street
   13   Columbus, Ohio  43215-4260
        (614)462-2651
   14
   15   Mr. Steven D. Hengehold
        Rendigs, Fry, Kiely & Dennis
   16   Suite 900
        One West Fourth Street
   17   Cincinnati, Ohio  45202-3688
        (513)381-9221
   18
   19
   20
   21
   22
   23
   24
   25
```

```
00004
   1                         I N D E X
   2   CROSS-EXAMINATION BY:                    MR. BERBERICH
   3                      PAGES  5 - 120
   4
   5
   6              E X H I B I T   I N D E X
                                          Marked on
   7   Plaintiff's                           Page
   8   10 - Letter to Mr. William Woeste, Jr., from
            A.W. Walls and Steve Carnegie dated
   9        September 13, 2002, with 4-page attachment    111
  10
  11
  12
  13
  14
  15
  16
  17
  18
  19
  20
  21
  22
  23
  24
  25
```

```
00005
  1                        ALLEN W. WALLS,
  2        called on behalf of the Plaintiff, after having been
  3   first duly sworn, was examined and deposed as follows:
  4               C R O S S - E X A M I N A T I O N
  5   BY MR. BERBERICH:
  6               Q.   Mr. Walls, my name is Greg Berberich,
  7   and I represent Bill Woeste and Eastside Lincoln Mercury in
  8   a lawsuit filed against Ford, against Mr. Carter, against
  9   yourself, and against Mr. Riechert's dealerships.
 10               I'm going to be asking you some
 11   questions this morning, or this afternoon, excuse me.  If
 12   you don't understand my questions, just let me know and I'll
 13   rephrase or explain.  Is that understood?
 14               A.   Yes.
 15               Q.   The most important rule is that you use
 16   words so that your testimony can be transcribed, instead of
 17   nodding or shaking your head.  Is that also understood?
 18               A.   Yes.
 19               Q.   If you need to take a break at any time
 20   or for any reason, let me know and we'll take a break.  No
 21   questions asked.
 22               Could you please state your full name?
 23               A.   Allen W. Walls, W-A-L-L-S.  Allen is
 24   A-L-L-E-N.
 25               Q.   A-O --
```

```
00006
    1                    A.   A-L-L-E-N, and my middle initial is W.
    2                    Q.   What is your business address?
    3                    A.   46080 Parkway Drive, Mason, Ohio.
    4                    Q.   Do you know what the zip is?
    5                    A.   No, I don't.
    6                    Q.   What's your age?
    7                    A.   Fifty-five.
    8                    Q.   Do you have any plans on transferring
    9  from the Cincinnati region in the next, let's just say a
   10  year?
   11                    A.   No.
   12                    Q.   For whom do you work, or by whom are you
   13  employed?
   14                    A.   Ford Motor Company.
   15                    Q.   And how long have you been with Ford
   16  Motor Company?
   17                    A.   Thirty years.
   18                    Q.   Do you have any retirement plans?
   19                    A.   No.
   20                    Q.   So you plan on working until they throw
   21  you out?
   22                    A.   No.
   23                    Q.   Okay.  What division of Ford or what
   24  part of the company do you work for?
   25                    A.   Ford Parts and Service Division.
```

```
00007
 1                   Q.    Is that division also called FCSD?
 2                   A.    Yes.
 3                   Q.    How long have you worked for FCSD?
 4                   A.    Thirty years.
 5                   Q.    So you've never worked on the new
 6  vehicle sales side?
 7                   A.    No.
 8                   Q.    Why don't give me a listing, from most
 9  recent to most distant, of the positions that you've held
10  with FCSD?
11                   A.    Okay.  The current position is regional
12  manager, Cincinnati; prior to that is regional manager,
13  Dallas region; prior to that was accessories business
14  manager, in Detroit; prior to that was district manager in
15  Buffalo, New York; prior to that was Indianapolis district
16  manager; prior to that was service operations manager, New
17  York; parts sales manager, New York; field service manager,
18  New York; operations manager, northeast region; owner
19  relations manager, Newark, N-E-W-A-R-K.
20                   MS. MCNELLIE:  And that would be New
21  Jersey and not Ohio?
22                   THE WITNESS:  Yeah.  They're both
23  colorful.
24                   A.    Priority supervisor, Detroit; training
25  publications manager, Detroit; parts and service zone
```

```
00008
   1   manager in Newark, New Jersey; and owner relations analyst,
   2   Newark, New Jersey.  That's It.
   3                Q.    And what is your highest completed grade
   4   of education?
   5                A.    College.
   6                Q.    And from where did you get your college
   7   degree?
   8                A.    Lincoln University, in Pennsylvania.
   9                Q.    What was your field of study?
  10                A.    English.
  11                Q.    Did you receive a Bachelor's?
  12                A.    Bachelor's.
  13                Q.    B.A.?
  14                A.    Yes.
  15                Q.    Have you had any training or education
  16   after your college English degree?
  17                A.    Yeah, Rutgers University, Master's in
  18   Business Administration, didn't complete it.
  19                Q.    How much of the course did you take?
  20                A.    Eighteen hours.
  21                Q.    Have you had any other training or
  22   education?
  23                A.    Yes, company-related training.
  24                Q.    And does Ford put on a variety of
  25   seminars for its employees?
```

```
00009
 1                    A.    Yes.
 2                    Q.    Do you have any experience performing
 3  automotive repair work?
 4                    A.    Yes.
 5                    Q.    What experience do you have?
 6                    A.    During summers, when I was in college, I
 7  worked for gas stations in Waldwick, New Jersey, doing
 8  maintenance and light repair.
 9                    Q.    And by maintenance, are you talking
10  about things like oil changes and wiper blades and those
11  types of things?
12                    A.    Yes.
13                    Q.    What does light repair refer to?
14                    A.    Light repair is water pumps, replacing
15  water pumps, and that type of thing.
16                    Q.    What would heavy repair be considered?
17                    A.    Engine, transmission, rear axle type
18  repairs.
19                    Q.    Like for instance today, if I were to
20  ask you to repair a Lincoln Mercury Town Car transmission,
21  that would be something that you would not be able to do
22  yourself?
23                    A.    That's correct.
24                    Q.    Do you have any other auto repair
25  experience, other than those summers?
```

00010
```
 1                    A.    The diagnostic training through Ford
 2 Motor Company.
 3                    Q.    What do you mean diagnostic training?
 4                    A.    Well, to identify a likely cause of a
 5 problem with a component based on how it's demonstrated in
 6 the terms of operation.
 7                    Q.    By diagnostic training, are you talking
 8 about the use of a machine to diagnose an error or a problem
 9 with a car?
10                    A.    No, that's just based on symptoms
11 demonstrated by the component.
12                    Q.    What type of diagnostic training have
13 you had, any particular courses or course names, or anything
14 like that?
15                    A.    No.  Transmission, but I don't know the
16 course name at the time the training was conducted.
17                    Q.    What other training?
18                    A.    Engine operation.
19                    Q.    What does engine operation training
20 consist of?
21                    A.    Identifying probable causes of an
22 inoperative engine, or symptoms demonstrated by an
23 inoperative engine.
24                    Q.    The training that you received from Ford
25 on diagnostics and engine operation, were those done with
```

```
00011
 1    live engines or live transmissions, or --
 2                    A.    Yes.
 3                    Q.    How long were those courses, in terms of
 4    time or duration?
 5                    A.    A day.
 6                    Q.    What was the purpose of you attending
 7    those training sessions?
 8                    A.    So that we could assist the service
 9    managers and dealerships to identify issues that may be
10    brought to their attention by customers with their vehicles.
11                    Q.    Okay.  Were these training sessions to
12    assist you in being conversant with service technicians
13    about the mechanical components of the engine and
14    transmission?
15                    A.    Yes.
16                    Q.    But even after the training that you've
17    had in engine diagnosis and whatnot, that still doesn't
18    qualify you to be a mechanic, for instance?
19                    A.    Correct.
20                    Q.    Do you have any other training or
21    education?
22                    A.    No.
23                    Q.    Does the FCSD division in Cincinnati
24    have any mechanics on staff?
25                    A.    No.
```

```
00012
 1                    Q.    Where would you have to look inside Ford
 2   Motor Company in order to find mechanics?
 3                    A.    Well, can you clarify what you mean by
 4   the term "mechanic?"
 5                    Q.    Sure.
 6                    I'm talking about somebody who knows how
 7   to fix a Lincoln Mercury product, who can actually get in
 8   there and get greasy and pull tools out and actually make
 9   repairs?
10                    A.    Okay.  We use the term "field service
11   engineers."
12                    Q.    All right.  Where would I have to go to
13   find a field service engineer?
14                    A.    I have field service engineers that work
15   in the Cincinnati office.
16                    Q.    How many do you have in Cincinnati who
17   are field service engineers?
18                    A.    Four.
19                    Q.    Who are they?
20                    A.    Chris Albrecht, Jeff Hazel, John
21   Centa, --
22                    Q.    How do you spell his last name?
23                    A.    C-E-N-T-A.
24                    -- and Dennis Wilson.
25                    Q.    Are each of these gentlemen certified
```

```
00013
   1   Lincoln Mercury technicians?
   2                 A.   No.
   3                 Q.   Have these gentlemen completed the
   4   master technician training program through Lincoln Mercury?
   5                 A.   No, not through Lincoln Mercury.
   6                 Q.   Through Ford?
   7                 A.   Yeah.
   8                 Q.   Are all these gentlemen certified Ford
   9   Master Technicians?
  10                 A.   No.
  11                 Q.   Okay.  Who is a master technician, of
  12   that group?
  13                 A.   They're not designated as master
  14   technicians.  That's a designation for dealership mechanics.
  15                 Q.   Okay.  Have each of these gentlemen had
  16   at least equivalent training and education to what would be
  17   considered a Lincoln Mercury Certified Master Technician?
  18                 A.   Yes, yes.
  19                 Q.   Do these four field service engineers
  20   perform warranty audits in the Cincinnati region?
  21                 A.   No.
  22                 Q.   Do they perform warranty audits
  23   anywhere?
  24                 A.   No.
  25                 Q.   What do they do for you?
```

```
00014
 1                    A.    They provide technical assistance to the
 2    Ford and Lincoln Mercury dealers in the region.
 3                    Q.    And what type of technical assistance do
 4    they provide?
 5                    A.    They will assist the technicians and
 6    service management in diagnosing and repairing a product
 7    problem.
 8                    Q.    How many days a week, on average, do
 9    these gentlemen spend in dealerships, actually assisting in
10    repairs?
11                    A.    Five days a week.
12                    Q.    So the field reps, you expect them to be
13    on the road most of the week?
14                    A.    Yes.
15                    Q.    How long have you been the Regional
16    Manager of FCSD in Cincinnati?
17                    A.    Since May of 1998.
18                    Q.    And before that time, you mentioned you
19    were regional manager in Dallas, is that correct?
20                    A.    That's correct.
21                    Q.    How long did you hold that position?
22                    A.    Three and a half years.
23                    Q.    And are your job duties as regional
24    manager in Dallas the same or similar to the ones that you
25    presently have in Cincinnati?
```

```
00015
   1                    A.    Yes.
   2                    Q.    What do you do as the Regional Manager
   3   of FCSD?
   4                    A.    I supervise 30 employees whose roles are
   5   to support the dealers, to grow their parts and service
   6   business and enhance customer satisfaction.
   7                    Q.    And your duties in Dallas were the same
   8   or similar?
   9                    A.    Yes.
  10                    Q.    What do you mean by growing the parts
  11   and service business?
  12                    A.    Increasing traffic in the parts and
  13   service departments to generate revenue for the dealer.
  14                    Q.    Did you recently discuss, during a
  15   dealer seminar, that the parts and service business of a
  16   dealership enhances the value, overall, of the dealership?
  17                    A.    I don't recall.
  18                    Q.    Do you think that's a correct statement?
  19                    A.    Yes.
  20                    Q.    From my understanding, a car needs parts
  21   and service when it's broken.  How you grow the business if
  22   there's a finite number of broken cars out there?
  23                    A.    Because you look for areas on a vehicle
  24   that will show wear and tear.  And based on what you
  25   discover, you present that to the customer to inform them
```

```
00016
    1   that they should replace this particular part.  And that's
    2   typically maintenance-type repairs.
    3             Q.   Okay.  So you assist the Lincoln Mercury
    4   dealers in identifying, from a proactive standpoint, where
    5   on the car, and then fixing it before it becomes a serious
    6   problem?
    7             A.   Yes.
    8             Q.   Okay.  Does Lincoln Mercury do its own
    9   research to determine what parts of its cars are wearing or
   10   more likely to wear or need service?
   11             A.   Yes.
   12             MS. MCNELLIE:  Can I just make one
   13   suggestion?
   14             MR. BERBERICH:  Sure.
   15             MS. MCNELLIE:  Lincoln Mercury is
   16   Lincoln Mercury.  FCSD is Ford and Lincoln Mercury.  And
   17   just so you guys are talking the same language, it may make
   18   sense to not define it as Lincoln Mercury.
   19             MR. BERBERICH:  Right, okay, that's
   20   fair.
   21             Q.   Mr. Walls, when I talk about a Lincoln
   22   Mercury product, can we agree that it's actually a Ford
   23   product that's branded Lincoln or Mercury?
   24             A.   Yes.
   25             Q.   Okay.
```

00017
1                    MS. MCNELLIE:  But that was not really
2     my issue.  The issue is that Ford Customer Service Division
3     is not just Lincoln Mercury.  It is Ford Division and
4     Lincoln Mercury Division interfaced.  So to just say Lincoln
5     Mercury is limiting what FCSD covers.
6                    MR. BERBERICH:  I understand that.
7              Q.    Mr. Walls, does Ford Customer Service
8     Division roll out programs to help its Lincoln Mercury
9     dealers use mechanical or electrical diagnostic equipment to
10    evaluate cars?
11             A.    Yes.
12             Q.    What types of mechanical or electronic
13    diagnostic equipment does Ford market to its Lincoln Mercury
14    dealers?
15             A.    Well, service bay diagnostic systems to
16    star testers, new generation system testers.
17             Q.    Can you think of any other types of
18    mechanical or electronic systems that are sold by Ford to
19    the Lincoln Mercury dealers?
20             A.    Front end alignment machines.
21             Q.    Does the service bay diagnostic machine
22    have a name, or a series of names?
23             A.    Well, they call it an SBDS, for service
24    bay diagnostic system, an acronym for that.
25             Q.    When was the SBDS program rolled out?

```
00018
   1                    A.   Oh, probably 1990.
   2                    Q.   Is the SBDS machine a very sophisticated
   3    machine or is it pretty rudimentary?
   4                    A.   It's sophisticated.  It's a computer.
   5                    Q.   And what is the star machine that you
   6    mentioned?
   7                    A.   It tests engine operation.
   8                    Q.   Does it perform a test on the computer
   9    that's in the car?
  10                    A.   Yes.
  11                    Q.   Okay.  And is the star machine different
  12    from the SBDS machine?
  13                    A.   Yes.
  14                    Q.   Can a Lincoln Mercury dealer buy the
  15    SBDS machine from someone other than Lincoln Mercury?
  16                    A.   No.
  17                    Q.   Can the star machine be purchased from
  18    anyone other than Lincoln Mercury?
  19                    A.   No.
  20                    Q.   What is new gen?
  21                    A.   That's new generation, and that's a star
  22    tester as well, just a new generation.
  23                    Q.   What does the new gen do that the old
  24    star doesn't?
  25                    A.   It's applicable to later engines.
```

00019
```
 1                    Q.    Is a Lincoln Mercury dealer supposed to
 2  use these systems, like SBDS or star or new gen, when a
 3  vehicle is brought in for service?
 4                    A.    Yes.
 5                    Q.    And by use them, does every car that
 6  comes in for service get hooked up to these machines to do a
 7  complete run of systems?
 8                    A.    It depends on what the reason is that
 9  the car is coming in, whether or not you're going to use a
10  particular tester on it.
11                    Q.    Does growing the parts and service
12  business involve you advising or training dealership
13  personnel in how to encourage the customer to have the car
14  looked at from a top to bottom standpoint by these machines?
15                    A.    Not by those machines in particular,
16  but, you know, bringing customers in to check their vehicles
17  out through different surveys or report cards, if you will,
18  to check the different components, to let the customers know
19  whether or not your components are in good shape, or if you
20  see an issue that you can, you know, show the customer where
21  it might be prudent to be replace the particular component.
22                    Q.    Can the SBDS machine spot a component
23  wearing before it actually fails?
24                    A.    No, it doesn't pertain to wearing.  It
25  pertains to, you know, an operation.  You can't tell whether
```

00020
1   it's wearing or not.  It should be doing certain things, and
2   if it's doing what it's supposed to do, then it's okay.  But
3   if it isn't, then it warrants maybe taking a look at.
4                Q.    So an SBDS machine basically does a
5   pass/fail on the systems that it measures?
6                A.    Basically.
7                Q.    Does the star on the new gen machine
8   spot wear, or spot any failure before it becomes a total
9   failure or a catastrophic failure?
10               A.    Possibly.
11               Q.    Can you think of any instances where the
12  star or the new gen machine would be able to spot wear or
13  spot a failure before it becomes total?
14               A.    No.  Typically what it will spot will be
15  the engine, in terms of its operation.  And for example, the
16  engine is running rough and you test it to determine what it
17  could be.  Maybe the EGR valve or something needs to be
18  replaced.
19               Q.    If I, for instance, had a 1998 Lincoln
20  Town Car, and I took it to Eastside Lincoln Mercury, would
21  you encourage Eastside Lincoln Mercury to advise me, as the
22  customer, to hook my car up to the new gen machine to make
23  sure that all my systems were running correctly?
24               A.    No, I wouldn't.
25               Q.    Okay.  How do you help your Lincoln

00021
```
 1   Mercury dealers sell more parts and service?
 2                   A.   Well, we design some marketing programs
 3   to help the dealer have a retail presence in the
 4   marketplace, as far as selling parts and providing service.
 5                   Q.   Would you describe for me what these
 6   programs are?
 7                   A.   Yeah.  The major program is quality care
 8   maintenance, which we refer to as QCM, and that provides
 9   report cards with which the technicians or service advisors
10   can look at the different components on the vehicle for
11   potential opportunities to sell a part or provide, you know,
12   measure, you know, brakes or tire tread depth to determine
13   whether there's a need for tires, that type of thing.
14                   Q.   How would my car get a report card under
15   the quality care maintenance program?
16                   A.   Well, under the program, we ask the
17   dealers to use a report card on every vehicle that comes in
18   for retail service.
19                   Q.   Now, you used the term "retail service,"
20   what does that mean?
21                   A.   Customer paid service.
22                   Q.   Okay.  And the other type of service is
23   warranty service, correct?
24                   A.   That's correct.
25                   Q.   Do you encourage the dealerships to use
```

```
00022
   1  a report card for warranty service?
   2              A.   No.
   3              Q.   Why would you not encourage the dealers
   4  to use a report card for warranty service?
   5              A.   Because the dealer, from a service, or
   6  from a warranty perspective, is to respond to the issue that
   7  the customer brought the vehicle in for for warranty
   8  coverage.
   9              Q.   Well, is the report card a good thing to
  10  provide the retail customer?
  11              A.   Yes.
  12              Q.   Okay.  And what does the report card
  13  talk about, or what does it show?
  14              A.   Well, the report card will lead the
  15  technician or service advisor to look at components for
  16  wear, to measure tread depth, to look at the dirt in an air
  17  filter, if you will, those types of things, so that you can
  18  show the customer needing to replace that particular
  19  component.
  20              Q.   Why wouldn't that same level of analysis
  21  be important to a customer who has a vehicle under warranty?
  22              A.   Because the warranty is to respond to
  23  any defects in material or workmanship in the, you know, the
  24  production of the vehicle, and that's what warranty is for.
  25              Q.   If a dealer spots a defect in material
```

00023
```
 1  or workmanship on a vehicle that's under warranty, but it's
 2  something that the customer did not complain of, is the
 3  dealer allowed to repair that under the warranty program?
 4              A.   The dealer is allowed to repair that if
 5  they follow a process that's required in order to repair
 6  that.
 7              Q.   And what is that process?
 8              A.   The process, essentially, is to contact
 9  the customer to let the customer know you've discovered
10  something that needs to be done, and also to have the
11  service management at the dealership, you know, sign off
12  that an additional repair is being done, versus what the
13  customer brought it in for.
14              Q.   Do you know if Eastside Lincoln Mercury
15  has ever been penalized, under a warranty audit or any other
16  type of warranty action, for making a repair to a part of
17  the car that was defective in material or workmanship under
18  the warranty program, though it was not the presenting
19  problem that the customer brought the car in for?
20              A.   Yeah, I'm aware that, as a result of
21  some audits that were conducted at Eastside, that there was
22  a category of add-on repairs, repairs that were added on
23  after the customer had brought the vehicle in, and did not
24  indicate that these were issues when the vehicle was written
25  up.  I understand that that was a category.
```

00024
```
 1                    Q.    And you describe add-on repairs almost
 2    as if it were a bad thing.  Is that a bad thing, under a
 3    warranty, to --
 4                    A.    No, I just described it for what it is.
 5    That's not, you know, good or bad.  I mean, it's something
 6    that wasn't brought in by the customer.
 7                    Q.    Why is it described as an add-on repair,
 8    versus a needed or necessary repair?
 9                    A.    Because it wasn't included in the
10    initial write-up of the vehicle when the customer brought it
11    in.
12                    Q.    Should the add-on repair be paid under
13    the warranty program if, in fact, the item was defective in
14    material or workmanship?
15                    A.    If the repair is duly noted, you know,
16    by contacting of the customer, also by service management in
17    the dealership, and if it's a safety-related issue, yeah,
18    you know, under those circumstances it should be.
19                    Q.    What if it's not a safety-related issue,
20    yet it's still defective?
21                    A.    Well, it has to be, it then has to be,
22    you know, authorized and documented, as far as service
23    management is concerned and the customer is concerned.
24                    Q.    And what kind of documentation would the
25    dealership have to do with Ford in order to get paid for
```

```
00025
 1   that warranty work, and I'm talking about add-on work?
 2                A.    Yeah.  The service, you know, manager
 3   needs to sign off on that particular repair and have that,
 4   you know, in writing, on the repair order, hard copy.
 5                Q.    Under a traditional warranty repair,
 6   does the service manager have to sign off?  And by
 7   traditional I mean where the customer complained of the
 8   problem.
 9                A.    No, not unless they, you know, are the
10   ones that are signing the repair order.
11                Q.    So you're saying, for an add-on repair,
12   that Ford is not necessarily taking the position that that's
13   a bad thing, you're just saying that it requires the service
14   manager to review and sign off on the repair before it's
15   submitted as a warranty claim; is that correct?
16                A.    Yes.  And I might add, with the
17   appropriate documentation that's required.
18                Q.    And what do you mean by appropriate
19   documentation?
20                A.    Well, the time to do it and, you know,
21   those types of things, you know, that's required to make
22   sure that that is included on the repair order, the time
23   punched on, punched off, and all those types of things, to
24   actually, you know, show that a technician did spend time
25   doing that repair.
```

```
00026
     1               Q.   Do you describe add-on warranty repairs
     2  as selling warranty work or selling warranty repairs?
     3               A.   No.
     4               Q.   Okay.  What is selling warranty repairs?
     5               A.   I don't know what it is.
     6               Q.   If, for instance, Eastside Lincoln
     7  Mercury were to take a Mercury or a Lincoln in in trade and
     8  perform a diagnostic check using one of the Lincoln Mercury
     9  approved machines, like new gen or the SB --
    10               A.   SBDS.
    11               Q.   -- SBDS, and there were, let's say, 15
    12  items noted to be defective, and that vehicle was under
    13  warranty, would Eastside Lincoln Mercury be allowed to claim
    14  those as warranty repairs?
    15               A.   Could you repeat that, just to clarify
    16  it?
    17               Q.   Sure.
    18               If Eastside Lincoln Mercury took a
    19  vehicle in trade, it was a Lincoln or Mercury vehicle, and
    20  that vehicle was still under warranty, and the dealership
    21  then placed that vehicle on the SB --
    22               A.   SBDS machine.
    23               Q.   -- SBDS machine or the new gen machine,
    24  and there were 15 items that were noted to be defective,
    25  would Eastside Lincoln Mercury be able to claim those
```

00027
```
 1  repairs as warranty repairs?
 2                 A.   I would say no, they would not be able
 3  to claim those as warranty repairs.
 4                 Q.   Why would Eastside not be able to claim
 5  those repairs as warranty repairs, if, in fact, it was
 6  something that was defective in material or workmanship
 7  while still under the warranty period?
 8                 A.   I would suggest that they have someone
 9  from, you know, Ford to verify that finding, if they were
10  doing that.
11                 Q.   If these warranty repairs were being
12  made on vehicles which were taken in trade and they were not
13  warranted, meaning they were not defective in material and
14  workmanship, would you consider that to be fraud?
15                 A.   Yes.
16                 Q.   In the case of Eastside Lincoln Mercury,
17  did you ever find an instance of fraud, in terms of the
18  warranty repair process, in any of the audits?
19                 A.   No.
20                 Q.   Is there a specific disallowance in the
21  Ford warranty program for a dealership repairing a turned in
22  used car which is still under warranty?
23                 A.   No, I do not believe so.
24                 Q.   Okay.  Do you know whether or not
25  Eastside Lincoln Mercury has ever been criticized by FCSD
```

```
00028
 1  for performing warranty repair work on vehicles which were
 2  used car trade-ins or used car purchases?
 3                  A.    Not to my knowledge.
 4                  Q.    And you're saying that the only thing
 5  that Eastside Lincoln Mercury would have to do to have those
 6  claims processed and paid is to have someone from Ford
 7  verify that they were, in fact, necessary, correct?
 8                  A.    Yes.
 9                  Q.    Has there been a big push recently by
10  Lincoln Mercury on the certified used car, certified
11  pre-owned used car?
12                  A.    Yes.
13                  Q.    Does the certified pre-owned used car
14  program refer to the fact that the vehicle has been checked
15  in numerous ways, from a performance standpoint and an
16  engine function standpoint, transmission standpoint, to make
17  sure that it is in good shape?
18                  A.    Yes.
19                  Q.    You want to represent, through that
20  program, that the certified pre-owned vehicle is "as good as
21  new," even though it's a used car?
22                  A.    Yes.
23                  Q.    Have you ever given a directive, through
24  FCSD, that a machine like the SBDS machine or the new gen
25  machine be turned off after one problem is found, so that
```

00029
```
 1   the machine doesn't record any other problems?
 2                   A.   No.
 3                   Q.   Would you consider that to be bad
 4   practice for a service technician to turn off a machine
 5   after one problem was found, versus letting it cycle through
 6   the entire diagnostic series?
 7                   A.   I really am not in a position to answer
 8   that from the technical standpoint, because that's not my
 9   expertise.
10                   Q.   But how about from a FCSD standpoint,
11   when a technician runs a diagnostic on a machine, you expect
12   them to run that diagnostic fully, correct?
13                   A.   I do not know that, because that is a,
14   you know, a technical process.  And we have a lot of
15   technical bulletins that we provide the dealer to tell them
16   how to conduct these tests, and it either says, you know,
17   keep going through an entire process or find your first code
18   and then you stop and fix it.  So it depends on what we
19   instruct the dealer to do with regard to that particular
20   test.
21                   Q.   Do you think it's fair to the consumer
22   for the service technician to stop a diagnostic procedure
23   before the full system check is done?
24                   A.   If that's what, if that's what we direct
25   the technician to do in order to run the test.
```

00030
```
 1                    Q.    I guess my question is:  Do you think
 2   it's fair to the consumer to stop a diagnostic machine
 3   before it's done its full cycle, or full battery of tests?
 4                    A.    And I would say yes, if that is the
 5   instruction that we have given the technician to identify a
 6   problem and then fix it.
 7                    Q.    Have you ever read a Ford technical
 8   service bulletin where the technicians were advised to stop
 9   a diagnostic machine from performing a full cycle when a
10   single problem is identified?
11                    A.    No.
12                    Q.    Did anyone under your supervision, or
13   yourself for that matter, ever tell any of the Cincinnati
14   region Lincoln Mercury dealers to stop a machine before it
15   performed its full diagnostic run?
16                    A.    Not to my knowledge.
17                    Q.    Mr. Walls, will you agree with me that
18   most of the repair work that's performed by the Lincoln
19   Mercury dealerships in Cincinnati fall under the warranty
20   repair category?  And by most I'm talking about greater than
21   50 percent.
22                    A.    I would say that it, to the best of my
23   knowledge, it's probably just over 50 percent.
24                    Q.    Is part of that reason the fact that car
25   warranties are getting longer, from the marketing or sales
```

```
00031
 1  standpoint?
 2                  A.    That's part of it.
 3                  Q.    When you started in the business, what
 4  was the typical Ford warranty; was it the old 12 months,
 5  12,000 miles?
 6                  A.    Yes.
 7                  Q.    And now, for Lincoln Mercury products
 8  for instance, it's four years, 50,000 miles; is that
 9  correct?
10                  A.    Right.
11                  Q.    Does Lincoln Mercury, and I'll say
12  through the FCSD division, ever perform testing on what the
13  expected useful life of a Lincoln Mercury product is?
14                  A.    Not at the local level.
15                  Q.    Have you ever read any research data
16  that Ford has done to determine what the expected useful
17  life of a Lincoln or Mercury product is?
18                  A.    No, I haven't.
19                  Q.    In the last three years, what has the
20  warranty repair trend been for Lincoln Mercury products?
21                  A.    The last three years we have seen, let's
22  put it this way:  In 2000 and 2001, we saw increases.  In
23  2002, it's been a marked decrease.
24                  Q.    How about from 1999 to the year 2000,
25  was there an increase or a decrease?
```

```
00032
 1                  A.    I'm not absolutely sure what the number
 2  is, but if I could venture an opinion, I would think that it
 3  was probably an increase.
 4                  Q.    And to be simple about it, from, let's
 5  say, 1999 through 2001, was Lincoln Mercury experiencing a
 6  quality problem, or a product quality issue, compared to
 7  previous years?
 8                  A.    Yes.  And can I qualify this answer --
 9                  Q.    Sure, sure.
10                  A.    -- by saying we had quite a few recalls,
11  for all Ford Motor Company products.  I can't be specific in
12  terms of Lincoln Mercury or Ford, but, overall, we had a lot
13  of recalls, and that, in fact, has had an impact on warranty
14  at the dealerships.
15                  Q.    And is it fair to say that, let's say
16  through the early '90s, that Lincoln Mercury had a very good
17  reputation for product quality?
18                  A.    Yes.
19                  Q.    In fact, it was, even among the Ford
20  brands, a leader in terms of initial product quality?
21                  A.    Yes.
22                  Q.    And then over the, I'll just say the '99
23  through 2001 time frame, that product quality decreased
24  because of some recalls and some other issues, correct?
25                  A.    Yes.
```

```
00033
 1                    Q.    And 2002, your expecting a decrease for
 2  that year of, I'll just say warranty traffic; is that
 3  correct?
 4                    A.    That's correct.
 5                    Q.    Is the data for 2002 in?
 6                    A.    Yes.
 7                    Q.    And what was the comparison of 2001 to
 8  2002, in terms of, I'll just say overall warranty
 9  experience?
10                    A.    Okay.   In the Cincinnati region, it's
11  off 20 percent in dollars and 24.4 percent in traffic.
12                    Q.    And by being off, you're talking about
13  comparing --
14                    A.    Year over year.
15                    Q.    Okay.   Comparing that to the previous
16  year?
17                    A.    Right.
18                    Q.    What was that experience like in 2000
19  and 2001?
20                    A.    I don't have the figures like I do for
21  2002, but I believe there was an increase.
22                    Q.    Was the increase in warranty traffic
23  greater than 50 percent?
24                    A.    I would say no.
25                    Q.    Was it greater than 40 percent?
```

```
00034
  1                    A.    I would say no.
  2                    Q.    Can you give me an estimate on what the
  3   increase in the warranty traffic was during that 2000-2001
  4   time frame?
  5                    A.    There was not an increase in the
  6   2001-2002 time frame.  Did I misunderstand your question?
  7                    Q.    No, 2000 and 2001.
  8                    A.    2000 and 2001?
  9                    Q.    Correct.
 10                    A.    I don't know.  I can't venture a guess.
 11                    Q.    What documents or reports would I look
 12   to in order to determine what the warranty claims experience
 13   was for Lincoln Mercury nationally in the 1999 through 2001
 14   time frame?
 15                    A.    You would want this for the Lincoln
 16   Mercury division, is that what you're referring to when you
 17   say for Lincoln Mercury, for the division?
 18                    Q.    Correct?
 19                    A.    We have a report that would have this
 20   information.  I mean, internally, we break it down.
 21                    Q.    What's the report called?
 22                    A.    MRS report.
 23                    Q.    And what does MRS stand for?
 24                    A.    Management reporting system.
 25                    Q.    In any of the last three years, can you
```

```
00035
    1   recall the traffic increasing for Lincoln Mercury repair
    2   work, and I'm talking about warranty work, greater than
    3   25 percent?
    4                  A.   No.
    5                  Q.   How about for warranty dollars, have
    6   you, during the last, I'll say three years or four years,
    7   seen an increase from one year to the next of warranty
    8   dollars of greater than 25 percent?
    9                  A.   I can't recall.
   10                  Q.   Have you ever undertaken any program to
   11   reduce the amount of warranty claims of the Cincinnati
   12   region Lincoln Mercury dealers?
   13                  A.   No.
   14                  Q.   How about the overall Ford dealerships?
   15   And that would include Lincoln Mercury, Ford, and everything
   16   else.
   17                  A.   No.
   18                  Q.   So, from your standpoint, you don't care
   19   how many warranty claims the dealerships are submitting, so
   20   long as they use the right paperwork; is that correct?
   21                  A.   I do care about what's being submitted
   22   by dealers in terms of warranty, but the warranty basically
   23   stands on its own.  If a customer has a problem, you bring
   24   it in and you repair it.  And whatever that number turns out
   25   to be, that is what the number is.
```

00036
```
 1                    Q.    So you don't place a value judgement on
 2 one dealer submitting a lot of warranty claims, as long as
 3 they do it correctly?
 4                    A.    Correct.
 5                    Q.    What did you do as accessories business
 6 manager in Detroit?
 7                    A.    In that position, I was responsible for
 8 the design and production of Ford authorized accessories for
 9 all of our vehicles.
10                    Q.    Are you talking about floor mats, or
11 what kind of things?
12                    A.    Floor mats were included in the product
13 line, you know, bumper guards, running boards, ski racks.
14 Those are what we talk about when we speak about
15 accessories.
16                    Q.    And that job had nothing to do with your
17 current tasks as FCSD regional manager; is that correct?
18                    A.    No, it didn't.
19                    Q.    And district manager in Buffalo, New
20 York and Indianapolis, Indiana, what did those positions
21 involve?
22                    A.    Essentially the same responsibilities
23 that I have now, we just, at that time, called the markets
24 districts, as opposed to regions.
25                    Q.    And how many years were you in those
```

00037
1   positions in Buffalo and Indianapolis?
2                   A.   I was in Indianapolis for three years,
3   and I was in Buffalo for two years.
4                   Q.   So in the position that you're in
5   presently, you've got roughly 13 years experience at that
6   level?
7                   A.   Yes.
8                   Q.   And what did you do as service ops
9   manager?
10                  A.   I was responsible for the field service
11  engineers, for the parts, or I'm sorry, for the service zone
12  managers, and owner relations operations for the New York
13  district at that time.
14                  Q.   How long were you in that position?
15                  A.   Let's see, from, let's say '85 to '87,
16  so two years.
17                  Q.   And parts sales manager, what did you do
18  in that job?
19                  A.   I was responsible for parts sales for
20  the New York district parts zone managers and dealer
21  channel, as well as independent channel, which is our
22  aftermarket product line, Motorcraft.
23                  Q.   And field services manager for New York,
24  what did you do in that position?
25                  A.   As field service manager, I had

```
00038
  1    responsibility for the zone managers, service zone managers.
  2                    Q.   And operations manager in the northeast
  3    region, what did you do in that position?
  4                    A.   I was responsible for coordinating the
  5    service responsibilities for seven districts that made up
  6    the northeast region.
  7                    Q.   Have you ever performed a warranty audit
  8    of a dealership?
  9                    A.   No.
 10                    Q.   Have you ever performed any warranty
 11    review of a dealership?
 12                    A.   Yes.
 13                    Q.   When did you perform a warranty review
 14    of a dealership?
 15                    A.   When I was a parts and service zone
 16    manager in the Newark district.
 17                    Q.   And how many times did you perform a
 18    review?
 19                    A.   On numerous occasions.
 20                    Q.   What's the difference between a review
 21    and an audit?
 22                    A.   A warranty review is a process of
 23    reviewing the practices of a dealership to administer the
 24    warranty claim process, and typically does not have a
 25    charge-back associated with it, but to provide the dealer
```

```
00039
  1  with your observations and recommendations.
  2              Q.   Okay.  And a warranty audit, how would
  3  you distinguish that from a review?
  4              A.   Warranty audits typically are conducted
  5  by auditors that are not part of the region or district at
  6  the time, if you will.  And their process is similar to the
  7  review in that they will look at claims and they will make
  8  observations and recommendations, but they will also charge
  9  the dealer back.
 10              Q.   Did you have any involvement in
 11  establishing the present system of warranty audits and
 12  warranty counseling that Ford uses?
 13              A.   Not audits, but the counseling process,
 14  yes.
 15              Q.   Okay.  Let me just step back for a
 16  second.
 17              Is the audit process and the review
 18  process part of Ford's overall warranty counseling process?
 19              A.   Yes.
 20              Q.   Okay.  And the first step, correct me if
 21  I'm wrong, is some form of self-review after a problem has
 22  been brought to a dealership's attention; is that correct?
 23              A.   Not totally.
 24              Q.   Okay.  What's the first step?  Why don't
 25  you give the steps to me?
```

```
00040
 1                    A.    The first step is a self-review.
 2                    Q.    Okay.
 3                    A.    The self-review is initiated when a
 4  dealer's warranty performance has been high for a period of
 5  six periods in a particular area.  There's three areas we
 6  look at:  Cost per vehicle, service repairs per 1000
 7  vehicles serviced, and cost per repair.  So if in any of
 8  those categories the dealership is tracking higher than the
 9  other dealers in their group, then they will be asked to do
10  a self-review.  And as a result of the self-review,
11  hopefully they will identify some areas that may require
12  some changes, from an administrative standpoint, put those
13  changes in place, and, as a result, improve their
14  performance so they come out of the warranty counseling
15  system.
16                    If they maintain that level of
17  performance and don't decrease, then they are scheduled for
18  a warranty review by a warranty specialist from our general
19  warranty operations.  That individual will come in and do a
20  review of claims and make observations and recommendations.
21                    Q.    Do these general warranty operations
22  specialists do nothing but that job?
23                    A.    Yes.
24                    Q.    Okay.  These guys are traveling
25  auditors, correct?
```

```
00041
    1                A.   Yes.
    2                Q.   Go ahead and continue.
    3                A.   There will not be a charge-back when a
    4   warranty review is conducted unless a fraud is uncovered.
    5   Then the recommendations are made to the dealer, and if they
    6   don't improve, a follow-up warranty review will be
    7   conducted, and the same parameters are in place.  And if
    8   they still don't improve, then an audit is scheduled.  And
    9   that's when an auditor comes in and they go through the
   10   process, and there are charge-backs identified with whatever
   11   is uncovered.
   12                Q.   Are there multiple levels of audits or
   13   is there just simply one type of audit?
   14                A.   Just one type.
   15                Q.   So from what you've just described,
   16   there are roughly four tiers:  The first being self-review,
   17   the second being warranty review, the third being follow-up
   18   warranty review, and then the fourth being an audit; is that
   19   correct?
   20                A.   Yes.  And then there's a follow-up
   21   audit, so that's actually a fifth step.
   22                Q.   Okay.  Did you have any role in creating
   23   or developing the warranty counseling process at Ford?
   24                A.   Yes.
   25                Q.   What was your role?
```

```
00042
    1                    A.   I was the champion of the team that
    2 worked to come up with this process of providing a
    3 dealership an opportunity to fix whatever might be wrong on
    4 their own, and then to move gradually through a process, in
    5 hopes of improving their performance.
    6                    Q.   What do you mean champion?
    7                    A.   Well, there was a team of approximately
    8 five individuals with warranty auditing experience, and I
    9 was the champion, in terms of being the lead manager to
   10 facilitate the process.
   11                    Q.   And what did you facilitate?
   12                    A.   You know, their need to go through some
   13 type of orderly road map to get to our desired results to
   14 come up with this process.
   15                    Q.   Did you actually have meetings or
   16 conferences with other similarly placed people in the
   17 organization to draw up a written plan?
   18                    A.   Yes.
   19                    Q.   Okay.  When did this happen?
   20                    A.   This was '95, '96, in that area, that
   21 time frame.
   22                    Q.   Before 1996, did Ford have a formalized
   23 warranty counseling program?
   24                    A.   No, it wasn't called a warranty
   25 counseling program, but there was a, you know, a process of
```

```
00043
   1  doing warranty reviews and audits, that type of thing, but
   2  not to the extent where we had, you know, had an opportunity
   3  for the dealer to do an in-dealership review and that type
   4  of thing, as we see it today.
   5              Q.   Now, the program that you've just
   6  described, the warranty counseling program, is that driven
   7  by the findings on the 126 report?
   8              A.   Yes.
   9              Q.   What is the 126 report called?
  10              A.   Warranty Trend Analysis Report.
  11              MS. MCNELLIE:  Can we take five minutes
  12  before we go into the 126, what that is?
  13              MR. BERBERICH:  Sure.
  14              (THEREUPON, A SHORT RECESS WAS TAKEN).
  15              Q.   The 126 warranty trend report, what is
  16  that report designed to reveal, what is the purpose of that
  17  report?
  18              A.   The purpose of it is to highlight any
  19  areas in the warranty expense process that shows where a
  20  dealer might be out of line with the group that he's a part
  21  of.  So it's like a red flag report, if you will.
  22              Q.   Are there certain codes that are shown
  23  on the 126 report?
  24              A.   Yes.
  25              Q.   And what do those codes do, or what is
```

```
00044
    1    the purpose of the codes?
    2                   A.   Well, the codes identify areas of repair
    3    that are out of line with the other dealers in the region.
    4                   Q.   Does a dealer throwing a code on a 126
    5    report show whether or not the dealer is committing fraud?
    6                   A.   No.
    7                   Q.   Does a code on an 126 report show
    8    whether or not a dealer is performing warranty repair work
    9    that's unwarranted or unnecessary?
   10                   A.   No.
   11                   Q.   Is it fair to say that the 126 report is
   12    simply an indicator, or a, I think you used the word a
   13    flag, --
   14                   A.   Uh-huh.
   15                   Q.   -- that further investigation is
   16    necessary?
   17                   A.   Yes.
   18                   Q.   And that investigation is to determine
   19    why this dealer is out of line compared to the other dealers
   20    in his region; is that correct?
   21                   A.   Yes.
   22                   Q.   What happens if, after a warranty review
   23    or audit is performed, it's concluded that the warranty work
   24    that was done by the dealership was necessary?
   25                   A.   Nothing.
```

00045
```
 1                    Q.   Well, for instance, if someone throws
 2   codes on the 126 report, and those codes are later
 3   investigated through an audit, --
 4                    A.   Uh-huh.
 5                    Q.   -- and it's determined that the
 6   dealership did not commit a fraud, would that be significant
 7   to you?
 8                    A.   No.
 9                    Q.   If after a warranty audit is performed
10   and it's concluded that there are minor administrative
11   deficiencies in terms of the warranty reporting, would that
12   be significant to you?
13                    A.   Yes.
14                    Q.   Okay.  And how is that significant to
15   you?
16                    A.   Because it's not in keeping with the
17   policy and procedure that's outlined in the warranty policy
18   manual, which is a supplement to the sales and service
19   agreement that the dealer has agreed to follow.
20                    Q.   Okay.  Where did you develop the
21   understanding that the warranty manual is part of the sales
22   and service agreement?
23                    A.   It's in the warranty policy manual.
24                    Q.   It says it right on the front, preamble;
25   is that correct?
```

```
00046
   1                    A.   Yeah.
   2                    Q.   And does the warranty policy and
   3  procedure manual specifically say that if a dealer is out of
   4  variance with his peers that he's doing something wrong?
   5                    A.   No.
   6                    Q.   Have you ever done warranty audits of
   7  dealerships who are not showing codes, in order to determine
   8  what a baseline error rate would be?
   9                    A.   No.
  10                    Q.   Do you understand what I'm saying by
  11  that question?
  12                    A.   I think I do.
  13                    Q.   Okay.  Like if you took 100 dealers who
  14  are not throwing codes on their 126 reports, and you did
  15  audits on those to determine what a typical error rate was
  16  for warranty repairs.
  17                    A.   Uh-huh.
  18                    Q.   Do you know if Ford has ever done
  19  anything like that?
  20                    A.   No.
  21                    Q.   Before you were sued by Eastside Lincoln
  22  Mercury, did you use their repair facility in order to
  23  repair your company car?
  24                    A.   No.
  25                    Q.   Had you ever used Eastside Lincoln
```

```
00047
 1  Mercury as a service facility to repair your company car?
 2                  A.   Yes.
 3                  Q.   When did that happen?
 4                  A.   Can't tell you specifically, but I can
 5  tell you when I've taken my wife's car in there for service
 6  it was to change the oil, and I took it in twice.  And it
 7  was -- we moved here in '98, so it had to be in '99, I would
 8  say that was when I brought it in, '99 or 2000.
 9                  Q.   What part of town do you live in?
10                  A.   Anderson Township.
11                  Q.   So this is, in fact, the nearest Lincoln
12  Mercury dealership to your home?
13                  A.   Yes.
14                  Q.   Based on your experience with Eastside
15  Lincoln Mercury, do you have an opinion as to the quality of
16  the technicians that they employ?
17                  A.   Yes.
18                  Q.   And what is your opinion?
19                  A.   That they're good.
20                  Q.   And do you believe that Eastside Lincoln
21  Mercury has the best service technicians in the city for
22  Lincoln Mercury service and repair work?
23                  A.   I don't know.  I can't make that
24  determination, whether they have the best technicians in the
25  city.  I just have, you know, no wheelbase to make that
```

00048
1  decision.
2              Q.    What type of parameters would you use to
3  determine whether or not a dealership has the best mechanics
4  of their particular brand?
5              A.    One thing that I would look at is what
6  certifications that they've achieved from Ford Motor
7  Company, in terms of their skill.
8              Q.    Do you keep track of the certification
9  level of the repair facilities in your region?
10             A.    Not within the region, but we do have
11 technical service operations located in the Cincinnati area,
12 they're out of Detroit, and they track the technician level
13 of accomplishment and achievement of the dealer's
14 technicians.
15             Q.    Can you state, off the top of your head,
16 whether or not Eastside Lincoln Mercury has the highest
17 number of certified master technicians?
18             A.    No, I can't.
19             Q.    Do you know whether or not Eastside
20 Lincoln Mercury has maintained the highest customer service
21 index on its repair service over the time you've been in the
22 Cincinnati region?
23             A.    I can't say that they have the highest,
24 but I know that they have been in the top dealerships in the
25 market since I've been here.

00049
```
 1                     Q.   Do you know whether or not they've been
 2   the highest in terms of customer satisfaction index for
 3   repair work of Lincoln Mercury dealers?
 4                     A.   I don't know whether they've been the
 5   highest, but again, they have been up there, ranked near the
 6   top, but I just can't say whether or not they were number
 7   one or not.
 8                     Q.   Have you ever heard the term "business
 9   plan" used?
10                     A.   Sure.
11                     Q.   Okay.   Does FCSD have its own business
12   plan that's unveiled at the beginning of each year?
13                     A.   Yes.
14                     Q.   And is that business plan shared with
15   the Lincoln Mercury Division?
16                     A.   Yes.
17                     Q.   What does that business plan look like?
18                     A.   Essentially, it defines what our
19   objectives are going to be for the year, it defines how we
20   plan to achieve those objectives, and we break it down by
21   market.
22                     Q.   During your time in Cincinnati, have you
23   ever attended a business plan meeting for the Lincoln
24   Mercury Division?
25                     A.   No.
```

```
00050
 1                    Q.    Does anyone from the Lincoln Mercury
 2 Division attend your business plan meetings?
 3                    A.    Yes.
 4                    Q.    Who, from the Lincoln Mercury Division,
 5 has attended your business plan meetings?
 6                    A.    Matt Wilson.
 7                    Q.    What's Matt's role?
 8                    A.    He's a GZM, general zone manager.
 9                    Q.    And has Jerry Carter ever attended any
10 of your business plan meetings?
11                    A.    Yes, yes.
12                    Q.    Can you recall on how many occasions?
13                    A.    Just once.
14                    Q.    Do you recall the specific reason why he
15 attended it?
16                    A.    This probably was back in, it would be
17 '99.  He gave an overview of his business plan to my people.
18                    Q.    In your business planning sessions, do
19 you discuss upcoming warranty counseling actions to be taken
20 against your dealers?
21                    A.    No.
22                    Q.    Have you ever heard the term "market
23 consolidation" used with regard to Ford or Lincoln Mercury
24 products?
25                    A.    Yes.
```

00051

```
 1                    Q.    What does the term "market
 2 consolidation" mean in your understanding?
 3                    A.    Market consolidation means to reduce the
 4 number of dealers in a given market area to provide
 5 distribution to the population in that area.
 6                    Q.    Was it explained to you by anyone at
 7 Ford, the purposes behind market consolidation, or why that
 8 would be a good thing?
 9                    A.    No.
10                    Q.    Okay.  Were you involved in any
11 discussions regarding market consolidation of the Cincinnati
12 market?
13                    A.    No.
14                    Q.    Did you ever have any discussions with
15 Jerry Carter regarding Cincinnati's market consolidation?
16                    A.    Yes.
17                    Q.    What discussions did you have with
18 Mr. Carter?
19                    A.    Just an informal discussion in terms of
20 what market consolidation meant from their perspective.
21                    Q.    Can you tell me when this discussion
22 happened?
23                    A.    No, not specifically.
24                    Q.    Did the discussion happen more than
25 once?
```

```
00052
   1                    A.   I'd say no.
   2                    Q.   So you can recall talking with Jerry
   3   Carter one time about market consolidation and what that
   4   meant from Lincoln Mercury's standpoint?
   5                    A.   Right.
   6                    Q.   Can you tell me anything else that you
   7   remember about that conversation?
   8                    A.   Not anything specifically.
   9                    Q.   Where did the conversation happen?
  10                    A.   In our offices.
  11                    Q.   In whose office?
  12                    A.   My office.  I'm not sure.  It could have
  13   been his office.  As I indicated, this was informal, this
  14   was not any planned meeting to discuss consolidation.
  15                    Q.   Did your discussion with Mr. Carter
  16   happen before any steps had been taken to consolidate the
  17   Cincinnati market?
  18                    A.   I would say yes.
  19                    Q.   Did you express any opinion to
  20   Mr. Carter about the merits of consolidating the Cincinnati
  21   market?
  22                    A.   No.
  23                    Q.   Did Mr. Carter explain to you how he
  24   believed that market consolidation would be accomplished?
  25                    A.   No.
```

00053
```
 1                    Q.    But you understood, generally, that the
 2   term meant that you would reduce the number of dealers in
 3   the area; is that correct?
 4                    A.    Yes, yes.
 5                    Q.    And was the topic of Eastside Lincoln
 6   Mercury raised during those discussions of consolidation?
 7                    A.    Not specifically.
 8                    Q.    How was Eastside Lincoln Mercury
 9   discussed, generally?
10                    A.    Just as one of the dealers in the
11   market.
12                    Q.    Did Mr. Carter explain to you that
13   Eastside Lincoln Mercury was one of the dealers that they
14   had intended to eliminate or reduce?
15                    A.    No.
16                    Q.    Did Mr. Carter explain to you that there
17   was a dealer that he had in mind to be the consolidator,
18   meaning the one that would remain?
19                    A.    No.
20                    MS. MCNELLIE:  Object to the form.
21                    Q.    Did Mr. Carter, in any way, describe to
22   you Mr. Riechert's role in the Cincinnati market
23   consolidation?
24                    A.    No.
25                    Q.    Now, you mentioned that Eastside Lincoln
```

```
00054
   1  Mercury was discussed generally.  How did the discussion
   2  impact Eastside, and what was stated about Eastside?
   3              A.    Nothing was stated about Eastside in
   4  particular.
   5              Q.    Okay.  What was stated about Eastside
   6  generally?
   7              A.    The fact, I mean, that Eastside is one
   8  of the Lincoln Mercury dealers on the south side of the
   9  city.
  10              Q.    How did Eastside Lincoln Mercury's name
  11  come up in the context of consolidation?
  12              A.    Only that it's one of the Lincoln
  13  Mercury dealers in the city.
  14              Q.    Did Mr. Carter ask your opinion, as the
  15  parts and service director of the area, as to which Lincoln
  16  Mercury dealer had the best parts and service organization?
  17              A.    No.
  18              Q.    Do you think that in determining what
  19  dealership to consolidate to, or what dealerships to get rid
  20  of, that a dealership's parts and service performance is
  21  relevant?
  22              A.    I believe that a dealer's parts and
  23  service performance is relative, but from the perspective of
  24  whether to get rid of them or not, I can't say.  That's not
  25  an area that I would make any kinds of decisions.  I mean,
```

00055
1   if somebody asks me what the parts and service performance
2   is, I can respond to that.  But as far as them, you know,
3   their operational or existence and that kind of thing, I
4   don't have any role to play there.
5                    Q.   Well, if Mr. Carter approached you when
6   discussing consolidating the Cincinnati market, who would
7   you have described to him had the best parts and service
8   operation of the Lincoln Mercury dealers?
9                    MS. MCNELLIE:  Are you assuming that
10  question got asked?
11                   MR. BERBERICH:  No, no, no.
12                   Q.   I'm saying had Mr. Carter approached you
13  and asked you who had the best parts and service operation
14  in the Cincinnati market, what would you have said, how
15  would you have responded?
16                   A.   I would have responded that I can't tell
17  you who has the best.  That we'd have to, you know, look at
18  a whole bunch of different parameters, in terms of saying
19  who's best or who isn't best.  Every, you know, every dealer
20  has, you know, positives and every dealer has negatives, but
21  I certainly haven't force ranked them in terms of the best
22  to worst.
23                   Q.   Now before the Cincinnati market
24  consolidation was attempted, do you know if anybody tried to
25  evaluate the Lincoln Mercury dealers from best to worst in

```
00056
    1   terms of parts and service?
    2                 A.    No.
    3                 Q.    Did Mr. Carter ever indicate to you that
    4   Bob Riechert was intended to be the market consolidator for
    5   Cincinnati?
    6                 A.    No.
    7                 Q.    Did you ever learn that Mr. Riechert was
    8   intended to be the market consolidator for the Cincinnati
    9   market?
   10                 A.    No.
   11                 Q.    Did you ever hear the use of the term
   12   "consolidator agreement?"
   13                 A.    No.
   14                 Q.    Other than as part of the warranty
   15   counseling process, have you ever had any conversations with
   16   Bill Woeste, George Beattie, Jim Woodall, or anyone that
   17   works for Mr. Woeste?
   18                 A.    Other than the warranty and counseling
   19   process, yes, I have.
   20                 Q.    What conversations or interactions did
   21   you have with Mr. Woeste or any of his employees?
   22                 A.    Probably with George Beattie, who is the
   23   general manager, talking about business in general, how
   24   they're doing, some marketing initiatives that they were
   25   doing on their own that I thought were very interesting, and
```

```
00057
 1  we would talk about those types of things.
 2              Q.    What marketing initiatives were you
 3  talking about?
 4              A.    Well, they had established a book
 5  (indicating), a coupon book of specials for their customers,
 6  that they mailed out.  Coupons that the customer could use
 7  for various different maintenance services and rental cars
 8  and things like that, that they sent to their customers.
 9  And I thought that was a pretty neat idea, and I remember
10  talking to George about that.  When I was there on a
11  Saturday morning with my wife's car, I'd chat with George
12  about the business and the dealership.
13              Q.    Did you have an occasion to be a
14  presenter in front of a group that was attended by
15  Mr. Woeste and Mr. Beattie, or any of the Eastside Lincoln
16  Mercury personnel?
17              A.    Yes.
18              Q.    You do that on a regular basis?
19              A.    Typically, twice a year I will make a
20  presentation to the dealers, as a group, in the market, and
21  whether it be all dealers, Ford and Lincoln Mercury, or, you
22  know, if it's a Lincoln Mercury meeting, I might have a role
23  in that.
24              Q.    So that would be a twice-a-year state of
25  the market address?
```

```
00058
 1                    A.    Yes, exactly.
 2                    Q.    At the time that you entered the
 3   Cincinnati market, what Lincoln Mercury dealers were
 4   present?
 5                    A.    Eastside Lincoln Mercury, Kings Auto
 6   Mall, Dixon, Northgate, and the point in northern Kentucky,
 7   the Riverside, I believe the name of it was at the time.
 8                    Q.    And Riverside is now Lincoln Mercury of
 9   Florence?
10                    A.    Florence, yes.
11                    Q.    And Northgate, what's that called now?
12                    A.    It's still called Northgate.
13                    Q.    Was there a Stillpass Lincoln Mercury?
14                    A.    Oh, yes, Stillpass.  I forgot, sorry.
15                    Q.    And the Stillpass point has been closed,
16   correct?
17                    A.    Yes.
18                    Q.    And Eastside is still Eastside, correct?
19                    A.    Correct.
20                    Q.    Kings is still Kings, correct?
21                    A.    Right.
22                    Q.    And Dixon is now Lincoln Mercury of
23   Fairfield, correct?
24                    A.    I believe It's Fairfield Lincoln
25   Mercury, but yeah.
```

```
00059
    1                 Q.    Something along those lines?
    2                 A.    Yeah.
    3                 Q.    And Northgate is still Northgate,
    4  correct?
    5                 A.    Yes.
    6                 Q.    Since you've been in the region, was the
    7  Stillpass dealership ever put on the self-review?
    8                 A.    Not to my knowledge.
    9                 Q.    Was the Stillpass dealership ever
   10  warranty counseled in any way?
   11                 A.    Not to my knowledge.
   12                 Q.    And by counseled, I'm talking about
   13  either a warranty review or an audit?
   14                 A.    Not to my knowledge.
   15                 Q.    Okay.  Since you've been in the region,
   16  has Eastside Lincoln Mercury been the subject of a
   17  self-review?
   18                 A.    Yes.
   19                 Q.    Has --
   20                 A.    No, I'm sorry.
   21                 Q.    Okay.
   22                 A.    Not since I've been here.
   23                 Q.    Do you believe, before you arrived, that
   24  Eastside was subject to self-review?
   25                 A.    I do believe they were.
```

```
00060
   1                    Q.    Let me ask you a general question about
   2  the warranty counseling process:  Is that process automatic
   3  or self-executing, based on the performance of the 126
   4  reports?
   5                    A.    Yes.
   6                    Q.    Is there a provision in the manual that
   7  governs that program, for warranty counseling to be
   8  initiated at the determination of regional management?
   9                    A.    No.
  10                    Q.    Is there any provision in the warranty
  11  counseling manual where any of the steps can be skipped?
  12                    A.    No.
  13                    Q.    Can a dealership be placed into the
  14  warranty counseling process, whether that's self-review,
  15  review or audit, at the discretion of FCSD management?
  16                    A.    No.
  17                    Q.    Can a Lincoln Mercury dealership be
  18  placed in the warranty consulting process, or warranty
  19  counseling process, at the request of the Lincoln Mercury
  20  retail division?
  21                    A.    No.
  22                    Q.    Can the Lincoln Mercury Division, I'll
  23  say countermand or eliminate the punishment, or the penalty,
  24  under the warranty counseling matrix that's levied by FCSD?
  25                    A.    Can you be more specific when you use
```

```
00061
   1   the term "punishment?"
   2                   Q.   Well, okay.  Let me just step back for a
   3   second.
   4                   As part of the warranty counseling
   5   process, if a dealer has been in that, I'll say process, for
   6   any period of time, is there a matrix which shows what will
   7   happen to that dealer based on the findings of an audit?
   8                   A.   Yes.
   9                   Q.   Are any of the items that are contained
  10   in the matrix good things for the dealer?
  11                   MS. MCNELLIE:  Object to the form of the
  12   question.
  13                   You can answer.
  14                   A.   Yes, in a sense, there are some good
  15   things.
  16                   Q.   How are the items that are contained in
  17   the matrix good for the dealer?
  18                   A.   Well, I think what those items suggest
  19   is that you're in, you know, because you're in the matrix,
  20   you haven't been able to improve your warranty, and these
  21   are some things that might help you get to the point where
  22   you've improved it, so you're no longer in the matrix.
  23                   Q.   Are there penalties that are contained
  24   in the matrix?
  25                   A.   Yes.
```

00062

1                    Q.    And the most severe penalty, if it's
2    contained in the matrix, is termination, correct?
3                    A.    It's a recommendation.  It's not -- it
4    doesn't say "termination."
5                    Q.    Okay.  So you're saying that FCSD can,
6    at most, recommend termination, based on the results of a
7    warranty audit; is that correct?
8                    A.    FCSD cannot recommend termination.  A
9    recommendation of termination can only be made by the
10   vehicle division.
11                   Q.    Okay.  Does the vehicle division
12   determine in which sector of the matrix that a dealer falls
13   after an audit?
14                   A.    No.
15                   Q.    Okay.  Does FCSD, as part of the matrix,
16   have the option of placing a Ford consultant, for six or
17   eight weeks, at the tune of $30,000, in a dealership?
18                   A.    Yes.
19                   Q.    And what if the dealership rejects that
20   placement?
21                   A.    Well, the matrix then indicates that a
22   recommended termination could result by the dealer not
23   accepting a consultant in their dealership.
24                   Q.    If the dealership rejects any of the
25   recommended fixes, or recommended, I call them penalties, in

00063
```
 1   the matrix, is termination an option?
 2                   A.   No.
 3                   Q.   What are some things that are
 4   recommended in the matrix that would not lead to a
 5   termination if the dealer just rejected them?
 6                   A.   There's a meeting with the regional
 7   manager from FCSD, or with the regional manager from the
 8   vehicle division.  You know, if the dealer refused to sit
 9   down to a meeting, the next step is not to recommend
10   termination, if the dealer refused to do that.
11                   The dealer is asked to sign warranty
12   claims as one of the areas of a matrix.  And, you know, if a
13   dealer refused to do that, we don't indicate that he then
14   can be subject to termination.  So there are other areas on
15   that list of eight items, seven or eight items, that could
16   pertain to that.
17                   The one area is that if you refuse to
18   have a consultant come in, and this is under the third
19   matrix, that, you know, a recommendation of termination
20   might be in order.  And that's spelled out on the matrix
21   that we, you know, have in the manual.
22                   Q.   So what does FCS do when the dealer
23   turns down the in-dealer consultant?
24                   A.   FCSD, you know, defers to the vehicle
25   division at that point, if the dealer turns it down, in
```

```
00064
   1    terms of whether to proceed forward or not, and the decision
   2    at that point might determine where we go next.
   3              Q.    But is it fair to say that the
   4    recommendation issues automatically from FCSD if a dealer
   5    refuses to take the in-dealer consultant?
   6              A.    No, it's not automatic.  It's not
   7    automatic.
   8              Q.    If the dealer refuses to sign the
   9    warranty, I guess repair claim forms, does that lead to an
  10    automatic recommendation of termination?
  11              A.    No.
  12              Q.    Have you verbally agreed to waive that
  13    requirement for Eastside Lincoln Mercury after past audits
  14    where that step was recommended?
  15              A.    No, I don't -- I can't remember.  I
  16    don't think so.
  17              Q.    Do you recall a previous audit, I
  18    believe in '99, where it was recommended that Mr. Woeste
  19    sign the warranty claim forms, and someone from the
  20    dealership spoke with you and you agreed to waive that
  21    requirement?
  22              A.    I don't remember.
  23              Q.    Now, if the dealership is found to have
  24    committed fraud, is the termination recommendation made?
  25              A.    I'm not sure how that's spelled out in
```

00065
1  that document.
2              Q.   Well, I'm just asking you based on your
3  experience as the FCSD regional manager.
4              A.   It's not automatic.
5              Q.   Is fraud the worst thing you can find on
6  an audit?
7              A.   Yeah, I think so.
8              Q.   Was fraud found on the audit of Jim
9  Dixon?
10             A.   I don't remember.
11             Q.   During your tenure here as FCSD regional
12  manager, can you tell me the number of dealers in which
13  fraud was found to have occurred in either a warranty review
14  or a warranty audit?
15             A.   No, I can't.
16             Q.   Okay.  Has fraud been found more than
17  once, to your recollection, in this region, during your
18  tenure?
19             A.   I can't remember.
20             Q.   Has fraud been found more than five
21  times in this region, in either a warranty review or a
22  warranty audit, during your tenure as regional manager?
23             A.   Don't know.
24             Q.   Has fraud ever been found on a warranty
25  audit or a warranty review during your term as regional

```
00066
  1    manager?  And I'm talking about here in Cincinnati.
  2                    MS. MCNELLIE:  In Cincinnati?
  3                    MR. BERBERICH:  In Cincinnati, yes.
  4              Q.    Now, I'm not talking about the
  5    Cincinnati market, I'm talking about the Cincinnati region.
  6              A.    Yes.
  7              Q.    Can you give me a rough estimate as to
  8    the number of times that fraud has been found?
  9              A.    No, I can't.
 10              Q.    Does it happen --
 11              A.    It's very minimal.
 12              Q.    Does it happen so frequently that you
 13    can't remember?
 14              A.    No.
 15              Q.    Is there any reason why you can't
 16    remember how many times fraud has been found on a review or
 17    an audit in this region, during your tenure?
 18              A.    No, I just can't recall any specific
 19    cases of fraud, you know, being uncovered.
 20              Q.    And you don't recall if fraud was found
 21    during one of the Jim Dixon reviews or audits; is that
 22    correct?
 23              A.    Yeah, I can't recall.
 24              Q.    Had fraud been uncovered, would you have
 25    recommended termination?
```

```
00067
 1                    A.    I don't know.  It depends on the
 2  circumstances.
 3                    Q.    Do you know what the manual says about
 4  how bad fraud is?
 5                    A.    No, I don't.
 6                    Q.    Do you know whether or not the warranty
 7  policy manual states whether a first time occurrence of
 8  fraud could form the basis of a termination?
 9                    A.    No, I'm not familiar with that.
10                    Q.    Did you have a disagreement with
11  Mr. Woeste during any of the warranty audit meetings related
12  to the 2001 audit?
13                    A.    No.
14                    Q.    Would you describe your communication
15  with Mr. Woeste during any of the 2001 warranty audit
16  meetings to be confrontational or, in any way, aggressive?
17                    A.    No.
18                    Q.    Would you consider your conversation
19  with Mr. Woeste during the 2001 audit meetings to be cordial
20  or polite?
21                    A.    No.
22                    Q.    How would you describe --
23                    A.    Businesslike.
24                    Q.    At how many meetings were you present
25  related to the 2001 audit of Eastside Lincoln Mercury?
```

```
00068
 1                    A.    Question:  Meetings with who?
 2                    Q.    With anybody, just related to the audit
 3 itself.
 4                    A.    Three.
 5                    Q.    What were those meetings?  Would you
 6 describe them for me?
 7                    A.    A meeting with the auditor.
 8                    Q.    Who was the auditor?
 9                    A.    Ernie Rouse.
10                          A meeting with Jorge Castillejo, my
11 office operations manager, and a meeting with Bill Woeste.
12                    Q.    Was the meeting with Mr. Woeste a
13 closing conference?
14                    A.    Yes.
15                    Q.    Did you attend the opening conference?
16                    A.    No.
17                    Q.    Did the meeting with auditor Rouse occur
18 before the audit was conducted?
19                    A.    No.
20                    Q.    At what point in the process did the
21 meeting with auditor Rouse occur?
22                    A.    Prior to the closing of the closing
23 meeting.
24                    Q.    And what was the purpose of that
25 meeting?
```

00069
```
 1                    A.    To review his findings.
 2                    Q.    And what did that review show?
 3                    A.    What's outlined in the report that he
 4  provided to, you know, everybody present at the meeting.
 5                    Q.    Can you tell me what, in general terms,
 6  those findings were?
 7                    A.    There were areas of disallowance, there
 8  were recommendations, there was the amount of the
 9  charge-back.
10                    Q.    Can you give me an idea as to what the
11  areas of disallowance were?
12                    A.    Not Ford responsibility, add-on repairs,
13  and I can't remember specifically what the others were.
14                    Q.    Anything specific stand out in your mind
15  about the not Ford responsibility?
16                    A.    No.
17                    Q.    How about the add-on repairs, anything
18  specific stand out in your mind?
19                    A.    No.
20                    Q.    Did Mr. Woeste show up on time for the
21  meeting?
22                    A.    Yeah, I believe he did.
23                    Q.    Did the meeting begin on time?
24                    A.    I believe it did.
25                    Q.    Was there a period where you sat in the
```

00070
1   meeting room with Mr. Woeste and just stared at him because
2   it wasn't the exact precise meeting time?
3              A.   No.
4              Q.   So if Mr. Woeste testifies that you sat
5   in the room and stared at him for a period longer than 15
6   minutes because they showed up early, you would say he's not
7   telling the truth?
8              A.   I would say that that's not what I
9   recall.
10             Q.   Okay.  And if he recalls a shouting
11  match between you and he, then you would also disagree with
12  him; is that correct?
13             A.   Yes.
14             Q.   Do you recall what the percentage of
15  disallowance was on the 2001 audit?
16             A.   I know that it was less than 2 percent,
17  because that's where it fit in the matrix, in that block
18  that says "less than 2 percent in total cost."
19             Q.   And would you consider that to be a
20  fairly modest amount, in terms of error?
21             A.   Yeah, I think we designate that block as
22  low cost.
23             Q.   And the amount of the charge-back, how
24  large was that?
25             A.   Approximately $5900.

```
00071
 1                    Q.    And can you recall how many invoices
 2  were reviewed in order to come up with the $5900 in
 3  disallowances?
 4                    A.    I don't remember the number.
 5                    Q.    Was it more than a hundred?
 6                    A.    I believe so.
 7                    Q.    Was it more than a thousand?
 8                    A.    I don't think so.
 9                    Q.    How many days did Mr. Rouse spend at
10  Eastside Lincoln Mercury, auditing the warranty invoices?
11                    A.    I don't know how many days he was in
12  there, but that's identified in his report that he filed.
13                    Q.    Do you think he spent more than 20 days
14  at Eastside?
15                    A.    I don't think so.
16                    Q.    Do you think he spent more than 14?
17                    A.    No, I don't think so.
18                    Q.    Do you think the cost associated with
19  performing the audit at Eastside Lincoln Mercury exceeded
20  the amount of disallowances that were found?
21                    A.    I don't know.  I don't have privy to the
22  cost associated with conducting an audit.
23                    Q.    Mr. Rouse is an out-of-towner; is that
24  correct?
25                    A.    Yes, he is.
```

```
00072
    1                   Q.    Was he put up at Ford's expense when he
    2   was in town?
    3                   A.    Yes.
    4                   Q.    Do you consider it a significant issue
    5   when one of your dealer franchisees is being warranty
    6   audited?
    7                   A.    Yes.
    8                   Q.    Does it happen all the time or does it
    9   happen fairly infrequently during the year?
   10                   A.    Clarification:  Are you speaking of in
   11   total, all the dealers?  I have 143 dealers.  How frequently
   12   they're audited?
   13                   Q.    Yes.  If you've got 144 dealers, or 143
   14   dealers, how often during the year do you have warranty
   15   audits conducted on those dealers?
   16                   A.    It's minimal.
   17                   Q.    Under five?
   18                   A.    Yeah.
   19                   Q.    So you would consider a warranty audit
   20   to be fairly important to you, as the regional manager of
   21   FCSD?
   22                   A.    Yes.
   23                   Q.    Does keeping your dealer franchisee body
   24   off the list, in terms of the warranty consulting process or
   25   the warranty counseling process, is that an issue for you,
```

00073
1    as the regional manager?
2                A.    It's not what I would define as an
3    issue.  It is important to me.  My preference would be that
4    I didn't have dealers on that audit program.
5                Q.    Are there any people that are under your
6    direct supervision that are tasked with assisting dealers
7    who are in the warranty counseling process to get out of
8    that process?
9                A.    Yes.
10               Q.    Who is tasked with that job?
11               A.    The market area team that's responsible
12   for calling on that dealer, and specifically the customer
13   service manager, as well as the dealer operations manager.
14               Q.    And who would those people have been
15   with regard to Eastside Lincoln Mercury?
16               A.    The dealer operations manager, this is
17   in 2000-2001, Monica Rivers, and Judy McLaughlin, who was
18   the customer service manager.
19               Q.    And so these two people would have had
20   the goal or the objective of helping Eastside Lincoln
21   Mercury get out of the warranty counseling process; is that
22   correct?
23               A.    They would have the goal to assist the
24   dealer to get out of the warranty counseling process.
25               Q.    So, during the five years, roughly, that

```
00074
   1  you've been in the Cincinnati region, --
   2                  A.   Uh-huh.
   3                  Q.   -- if you had a dealer that was showing
   4  up in the warranty counseling process each year, would you
   5  target that dealer for some type of remedial help, or some
   6  type of tutoring, in order get out of the warranty
   7  counseling process?
   8                  A.   That would be an area that the market
   9  area team would have on their radar screen, if you will, for
  10  the dealer.  But, you know, there's not a target identified,
  11  or an objective identified in that regard.  It's almost like
  12  a constant relationship of talking about warranty
  13  performance.  The 126 comes out every month, you talk about
  14  where you are (indicating), in terms of your performance,
  15  and talk about areas of improvement.
  16                  Q.   Do you know when the 126 report was
  17  first shared with Eastside Lincoln Mercury?
  18                  A.   It's sent to dealers on a monthly basis.
  19                  Q.   So the report itself is actually mailed
  20  or somehow --
  21                  A.   Yeah, it was mailed, and then
  22  electronically mailed when we got the upgraded technology,
  23  or technologically speaking.
  24                  Q.   And do you have evidence that Eastside
  25  Lincoln Mercury would have received the 126 report every
```

```
00075
 1  month for the last five years?
 2                  A.   Yes.
 3                  Q.   Okay.  Do you know when the first time
 4  anyone at Ford explained the 126 report to Eastside Lincoln
 5  Mercury personnel was?
 6                  A.   No, I don't.
 7                  Q.   Did you train either Monica Rivers or
 8  Judy McLaughlin on how to interpret the 126 report?
 9                  A.   No.
10                  Q.   Would each or both of these persons have
11  been able to explain to Eastside Lincoln Mercury how to
12  change their warranty service performance to get out of the
13  warranty counseling process?
14                  A.   Yes.
15                  Q.   Would that ability have been part of
16  their job description, or something that would have been
17  expected of that position?
18                  A.   Yes.
19                  Q.   Is there any reason why Ford has a
20  report called a 126 report to specifically track warranty
21  work versus, I'll call it retail repair work?
22                  A.   Yeah, we have a report called the
23  365/200 that tracks retail business, as well as total parts
24  and service operation.
25                  Q.   Is there any type of matrix or any type
```

00076
1   of counseling program related to the retail side, the retail
2   repair side?
3                   A.   That is -- the counseling associated
4   there is also one of the roles and responsibilities of the
5   marketing area team, to work with the dealer to improve the
6   retail business.
7                   Q.   Is there a policy manual for the retail
8   sales side, like --
9                   A.   No, there is not.
10                  Q.   Is there a matrix, an action matrix for
11  the retail sales side, like there is on the warranty side
12  (indicating)?
13                  A.   No.
14                  Q.   Is that because the warranty money is
15  Ford's money, versus the customer's money?
16                  A.   Yeah.
17                  Q.   And it's your job, as the FCSD manager,
18  to keep that money with Ford?
19                  MS. MCNELLIE:  Object to the form of the
20  question.
21                  Q.   Is your job as the retail -- or excuse
22  me, as the FCSD manager of the Cincinnati region, to keep
23  the warranty money in Ford as much as possible?
24                  MS. MCNELLIE:  Objection.
25                  Again, go ahead.

```
00077
 1                    THE WITNESS:  Do you want me to answer?
 2                    MS. MCNELLIE:  Yes.
 3                    THE WITNESS:  Oh, sorry.
 4          A.    No, that's not my job.
 5          Q.    Has any one of your dealer franchisees
 6   ever been terminated as a result of warranty repair
 7   problems?
 8          A.    Not in the Cincinnati region.
 9          Q.    How about in any other region?
10          A.    Yes.
11          Q.    And what other region?
12          A.    I don't know, but I know dealers have
13   been terminated because of warranty abuse.
14          Q.    How about anybody that's under your
15   direct supervision, meaning one of your dealer franchisees?
16          A.    No.
17          Q.    Would you take that very seriously?
18          A.    Yes.
19          Q.    Have you ever made, including in
20   Eastside Lincoln Mercury's case, a termination
21   recommendation related to a dealer's noncompliance with the
22   warranty and policy manual?
23          A.    No.
24          Q.    Do you know whether or not a termination
25   recommendation was made in Eastside's case?
```

```
00078
   1                    A.    No.
   2                    Q.    You don't know?
   3                    A.    No, I do know that it wasn't.
   4                    Q.    Okay.  Who is Amy Gabrion?
   5                    A.    She works in the global warranty
   6  operations department, in an administrative position.
   7                    Q.    Do you know whether or not Ms. Gabrion
   8  ever recommended that Eastside Lincoln Mercury be
   9  terminated?
  10                    A.    No.
  11                    Q.    You don't know or you --
  12                    A.    No, she has not.
  13                    Q.    Did anyone at Eastside Lincoln Mercury
  14  express to you, at any time, that they felt burdened by the
  15  warranty audit process or the warranty counseling process?
  16                    A.    No.
  17                    Q.    Did anybody at Eastside ever discuss
  18  with you, and I'm saying you, Al Walls, what it could do in
  19  order to remove itself from the warranty counseling process?
  20                    A.    No.
  21                    Q.    Was Eastside Lincoln Mercury, as a
  22  consequence of past audits, contrite, or did they express
  23  that they wanted to do what it took to get out of the
  24  warranty counseling process?
  25                    A.    Yes.
```

```
00079
 1                    Q.    Did you ever receive letters from
 2   Eastside Lincoln Mercury expressing its willingness and
 3   desire to do what was necessary to get out of the warranty
 4   counseling process?
 5                    A.    I am not aware of receiving a letter of
 6   that nature.
 7                    Q.    Do you remember speaking with anyone
 8   from Eastside Lincoln Mercury and having them express to
 9   you, before the 2001 audit, that they were interested in or
10   willing to do whatever it took to get out of the warranty
11   counseling process?
12                    A.    Yes.
13                    Q.    Who did you speak with?
14                    A.    Jim Hudson and George Beattie.
15                    Q.    And what was said during that
16   conversation?
17                    A.    Well, this is a conversation that took
18   place after the first audit in '98.  And, you know, they
19   indicated their willingness to do what was necessary to get
20   out of the process.
21                    Q.    Were they ever able to achieve that
22   goal?
23                    A.    No.
24                    Q.    And what was the problem?
25                    A.    The problem?  I'm not sure that there
```

00080
 1  was a problem that I can speak to here that prevented them
 2  from getting out of the process.  Observations made by
 3  auditors would suggest that the supervision in the shop
 4  wasn't as disciplined as it should be.
 5              Q.   And the supervision they're talking
 6  about is Al Schimweg; is that correct?
 7              A.   Yeah, who is the current service
 8  manager.
 9              Q.   Has Al Schimweg been the service manager
10  since you've been --
11              A.   No, Jim Hudson was the service manager
12  when I first got to the region, and then Jim moved to
13  another department within that organization, in the Woeste
14  organization, an then Al took over at that point.
15              Q.   Have any of the warranty audits from
16  Eastside Lincoln Mercury ever revealed greater than
17  2 percent disallowance, or 2 percent error?
18              A.   I do not think that they have.
19              Q.   All right.  Well, let me ask the
20  question this way:  As part of the 2001 audit, did you do
21  any review of Eastside Lincoln Mercury's prior performance
22  before you went to the closing meeting?
23              A.   No.
24              Q.   Would it have been relevant to you to
25  look at the historical performance of Eastside Lincoln

```
00081
 1  Mercury on the warranty audits before discussing the 2001
 2  audit?
 3                  A.   No.
 4                  Q.   What did you do or what was your role at
 5  the 2001 audit meeting, the closing conference?
 6                  A.   Yeah, okay.  My role was to give the
 7  dealership and the auditor a forum to review his
 8  observations and recommendations, and to, you know, indicate
 9  to Mr. Woeste what was going to take place as a result of
10  the findings of this audit.
11                  Q.   And did the auditor review the findings?
12                  A.   Yes.
13                  Q.   Did Mr. Rouse indicate, during that
14  review, that Eastside Lincoln Mercury could change its
15  performance on cost per vehicle by installing more wiper
16  blades?
17                  A.   No, I don't recall him making that
18  statement.
19                  Q.   Did Mr. Rouse indicate anything that
20  Eastside could do in order to improve its position in regard
21  to the warranty audit process?
22                  A.   Yeah, he made recommendations for each
23  area that he found some disallowances.
24                  Q.   Can you remember any of those specific
25  recommendations?
```

```
00082
 1                    A.   No, I can't.
 2                    Q.   Were there a great deal of
 3  recommendations, given the fact that it was $5900 in
 4  disallowances?
 5                    A.   There were recommendations for each area
 6  that he found charge-backs.
 7                    Q.   Were they fairly modest?
 8                    A.   The amounts?
 9                    Q.   The recommendations, the amounts --
10                    A.   The amounts were what they were, and the
11  recommendations are, you know, pretty standard
12  recommendations of things that needed to take place in order
13  to administer the warranty in those particular areas.
14                    Q.   As a consequence of the audit, were you
15  the person that was given the task of describing what
16  actions that Eastside would have to take as a consequence?
17                    A.   Yes.
18                    Q.   And what actions did you recommend that
19  Eastside take?
20                    A.   The actions that I recommended are
21  spelled out in a letter that I gave to Mr. Woeste at the
22  time of the meeting.
23                    Q.   Okay.  And those actions would have been
24  the business counseling meeting with FCSD and the vehicle
25  division regional manager?
```

```
00083
 1                    A.    Yes.
 2                    Q.    Had such a meeting ever happened in any
 3  of the preceding years?
 4                    A.    Yeah, essentially what that is is the
 5  meeting that, you know, the closing meeting itself.  And
 6  typically, Jerry Carter would have been there representing
 7  Lincoln Mercury Division and I would have been there
 8  representing Ford Customer Service Division.
 9                    Q.    So you're saying that under the action
10  plan, the fact that you were sitting in the closing meeting
11  with Mr. Carter qualified to satisfy Point 1, which is a
12  business counseling meeting with FCSD and vehicle division
13  regional managers?
14                    A.    Right.
15                    Q.    So you're saying that this action matrix
16  doesn't recommend a separate meeting?
17                    A.    No.
18                    Q.    And at that meeting, would you have
19  described to Eastside Lincoln Mercury what needed to be
20  done, from your standpoint, in order to get them out of this
21  process?
22                    A.    Yes.
23                    Q.    What would Mr. Carter's role have been,
24  or involvement?
25                    A.    His role or involvement would have been
```

00084
    1  as representing the Lincoln Mercury Division, to support the
    2  recommendations that we've made.  And as part of that
    3  process, I asked for Mr. Woeste to send me an action plan of
    4  what Eastside Lincoln Mercury is going to do to respond to
    5  the specific recommendations that were made, and to provide
    6  that to me within 30 days of the closing meeting
    7  (indicating).
    8              Q.   So Jerry just would have been there to
    9  hear what was said?
   10              A.   (Nodding affirmatively).
   11              Q.   Is that correct?
   12              A.   Well, no.  He would have been there to
   13  hear what was said, but also any input that he might have as
   14  a result of any of the discussion that takes place.  I mean,
   15  he's not just there as a figurehead.
   16              Q.   Did you have any discussions with Jerry
   17  Carter before the closing meeting that no penalties would be
   18  imposed on Eastside Lincoln Mercury?
   19              A.   No.
   20              Q.   Did you have any type of deal or
   21  agreement with Jerry Carter about what actions would be
   22  recommended with regard to Eastside Lincoln Mercury as a
   23  result of the audit?
   24              A.   No.
   25              Q.   Do you know if anyone that worked for

00085
```
 1   you had any discussion or agreement or deal with Jerry
 2   Carter as to what would happen to Eastside Lincoln Mercury
 3   as a consequence of the audit?
 4               A.   Jorge Castillejo, my office operations
 5   manager, I understand he had conversation with Jerry
 6   regarding the audit finding.
 7               Q.   And what was that conversation?
 8               A.   Well, Jerry indicated to him, from my
 9   understanding, that he wouldn't support a termination.
10               Q.   So are you telling me that termination
11   was mentioned at the meeting?
12               A.   Pardon me?
13               Q.   Was termination mentioned at that
14   closing conference?
15               A.   At the closing conference?
16               Q.   Yes.
17               A.   Yes.
18               Q.   And how was it mentioned?
19               A.   It was mentioned in the context that if,
20   you know, Mr. Woeste didn't accept the consultant, the
21   $30,000 consultant, to help him improve his warranty
22   performance, that termination could be recommended.
23               Q.   Had all of Mr. Woeste's warranty audits,
24   and I'll say Eastside's warranty audits, accumulated or
25   aggregated more than $30,000 in charge-backs?
```

```
00086
 1                    A.   No.
 2                    Q.   Do you think that the recommendation of
 3   the in-dealer consulting initiative was extreme, in light of
 4   the findings that were being made on the warranty audits?
 5                    MS. MCNELLIE:  Object to the form.
 6                    You can answer.
 7                    A.   Yeah, yes.
 8                    Q.   And I want to step back for just a
 9   second.  My earlier question was:  Did Jerry Carter have a
10   deal with anybody that worked for you that no actions or
11   that certain penalties would be changed or described as a
12   consequence of the audit?
13                    A.   No.
14                    Q.   So, to your understanding, there was no
15   deal with anybody from FCSD and Mr. Carter as to what was
16   going to happen at the closing conference, in regard to the
17   audit?
18                    A.   Yes.
19                    Q.   Is that correct?
20                    A.   Yes, that's correct.
21                    Q.   And to put that another way, was FCSD
22   going to execute the plan, based on the warranty manual, as
23   a consequence of the audit findings?
24                    A.   Could you repeat that, please?
25                    Q.   As a result of the audit findings, was
```

```
00087
   1  FCSD going to make the recommendations that were set forth
   2  in the audit matrix without any changes?
   3              A.  No.
   4              Q.  Okay.  Go ahead and explain that.
   5              A.  I'll expand on that.
   6              Q.  Yeah.
   7              A.  FCSD is not empowered to do Item No. 7
   8  on the plan.
   9              Q.  Okay.
  10              A.  So, therefore, I respond no, that we
  11  were not prepared to do that, because we're not empowered to
  12  do that.
  13              Q.  Well, under the plan, Item No. 7, which
  14  is termination, only arises if Item No. 6 isn't carried out,
  15  correct?
  16              A.  Correct.
  17              Q.  Okay.  My question was:  Based on the
  18  audit findings of the 2001 audit, were you at FCSD prepared
  19  to make the recommendations contained in the audit matrix
  20  without any changes?
  21              A.  Yes, yes.
  22              Q.  And you had no prior agreement or deal
  23  with Mr. Carter to change any part of the recommendation as
  24  to where Eastside Lincoln Mercury would fall in that action
  25  plan, correct?
```

```
00088
 1                  A.    No, did not.
 2                  Q.    After the 2001 audit, was any action
 3  taken against Eastside Lincoln Mercury as a consequence of
 4  the audit?
 5                  A.    No.
 6                  Q.    Has Eastside Lincoln Mercury been taken
 7  out of the warranty audit process?
 8                  A.    No.
 9                  Q.    Where does Eastside Lincoln Mercury now
10  exist in relation to the warranty audit process?
11                  A.    I do not know.
12                  Q.    Have you been following Eastside Lincoln
13  Mercury's warranty performance on the 126 reports since that
14  2001 closing conference?
15                  A.    No, I have not.
16                  Q.    Would Eastside Lincoln Mercury's
17  performance on its 126 reports be important to you?  And I'm
18  saying since that 2001 meeting.
19                  A.    Yes.
20                  Q.    Is there any reason why you haven't
21  reviewed those?
22                  A.    Yeah, because the market area team has
23  direct responsibility for tracking and following that, and I
24  defer to them if there's an issue that they think needs to
25  come to my attention.
```

```
00089
 1                    Q.    Can you tell me, as you sit here today,
 2    what Eastside Lincoln Mercury's status is regarding the
 3    warranty consulting process?
 4                    A.    I do not know what their status is.
 5                    Q.    Does anyone know what Eastside Lincoln
 6    Mercury's status is right now, related to the warranty
 7    consulting process, or the warranty counseling process?
 8                    A.    The market area team members would know,
 9    as well as global warranty operations I'm sure would know.
10                    Q.    Give me some names, please.
11                    A.    Randy Baughman is global warranty
12    operations for the market area team, the customer service
13    manager is Treva Reid, and the dealer operations manager is
14    Leisa Byars.
15                    Q.    During your tenure as the FCSD regional
16    manager, has Kings Lincoln Mercury been subjected to any
17    part of the warranty counseling process?
18                    A.    Yes.
19                    Q.    When did the first action against Kings
20    occur?
21                    A.    I can't recall the exact date.
22                    Q.    Do you know whether or not that action
23    occurred before or after April of 2001?
24                    A.    No, I don't.
25                    Q.    Do you know whether there is presently
```

```
00090
   1   any warranty counseling action pending or occurring with
   2   regard to Kings?
   3              A.   No, not to my knowledge.
   4              Q.   You don't think there's any or you just
   5   don't know?
   6              A.   I don't think there's any.
   7              Q.   During the last two years, can you
   8   recall if there's been any warranty audits or warranty
   9   reviews of Kings?
  10              A.   No.
  11              Q.   You can't recall any?
  12              A.   I can't recall.
  13              Q.   Can you recall whether or not there were
  14   any warranty audits of Mr. Dixon?
  15              A.   Yes.
  16              Q.   How many warranty audits of Mr. Dixon
  17   occurred?
  18              A.   I'm aware of two.
  19              Q.   Were these reviews or were they
  20   full-blown audits?
  21              A.   They were audits.
  22              Q.   And do you know what the conclusions of
  23   those audits or the results of those audits were?
  24              A.   There were charge-backs.
  25              Q.   And you don't recall if there were any
```

```
00091
 1   findings of fraud, correct?
 2                   A.   No, I don't.
 3                   Q.   You may have answered this before, but
 4   during your time here in the Cincinnati region, can you
 5   think of any specific dealers, by name, who were found to
 6   have committed fraud in the warranty process?
 7                   A.   No.
 8                   Q.   Since Mr. Riechert's group's purchase of
 9   the Jim Dixon dealership, have any warranty audits occurred?
10                   A.   No.
11                   Q.   Have any warranty reviews occurred?
12                   A.   Yes.
13                   Q.   Do you know what the result or the
14   consequence of that warranty review was?
15                   A.   No, I don't.
16                   Q.   Do you know when that warranty review
17   happened?
18                   A.   No, I don't.
19                   Q.   During your tenure here in Cincinnati,
20   has the Northgate Lincoln Mercury store been reviewed or
21   audited?
22                   A.   Not to my knowledge.
23                   Q.   Has any warranty counseling action been
24   taken with regard to Northgate?
25                   A.   Not to my knowledge.
```

```
00092
 1                      MS. MCNELLIE:  Can we take a break?
 2                      MR. BERBERICH:  Sure.  Let's go off the
 3    record.
 4                      (THEREUPON, A SHORT RECESS WAS TAKEN).
 5              Q.     Mr. Walls, was Riverside Lincoln Mercury
 6    ever part of the warranty counseling process during your
 7    time here?
 8              A.     Not to my knowledge.
 9              Q.     How about Lincoln Mercury of Florence or
10    Sym Fryson?
11              A.     Not to my knowledge.
12              Q.     What is the purpose of having the Dealer
13    Principle sign the warranty claims?
14              A.     The reason is that the Dealer Principle
15    has the ultimate responsibility for this activity that takes
16    place that submits claims to Ford Motor Company for payment.
17    And we would hope that by asking the dealer to do that, that
18    the dealer would pay close attention to what is going on in
19    terms of repairs in his shop, in concert with his service
20    management.
21              Q.     So you don't believe the charge-back
22    would cause a Dealer Principle to pay close attention to
23    what's happening in the service department?
24              A.     I would hope that that would get the
25    dealer's attention to do that.
```

00093
```
 1                    Q.    So you're saying the only purpose is to
 2   get the dealer to pay close attention, correct?
 3                    A.    Yeah.
 4                    Q.    Did you have any reason to believe that
 5   Mr. Woeste knew anything at all about auto repair?
 6                    A.    I don't know his background.
 7                    Q.    Okay.  Assuming that Mr. Woeste did not
 8   have a background in auto repair, what would the
 9   significance be of him signing each warranty repair claim?
10                    A.    Well, first of all, the thinking of
11   having the dealer signing claims is not to analyze how the
12   repair was done, whether or not it fixed the vehicle.  So
13   we're not looking at it from a technical standpoint.  We're
14   looking at it from an administrative standpoint.  And also,
15   that sends a message to the people in his organization that
16   he cares enough to be looking at this, and hopefully that
17   will keep them focused, more focused on doing the things
18   that we ask them to do, in terms of the policy and procedure
19   manual.
20                    Q.    Well, the policy and procedure manual
21   makes the Dealer Principle accountable for the repairs
22   regardless of whether he signs them, correct?
23                    A.    Uh-huh.
24                    Q.    Is that a yes?
25                    A.    Yes.
```

00094
1                      Q.   Okay.  So this is simply forcing the
2    dealer to sign each warranty claim to make everybody know
3    that it's serious?
4                      MS. MCNELLIE:  Objection.
5                      Q.   Is that what you're saying?
6                      A.   I'm saying that that's part of it,
7    (nodding affirmatively).
8                      Q.   Is it also a situation where you want to
9    have the dealer sign off on the warranty claims in case
10   there's a later finding of fraud?
11                     A.   No.
12                     Q.   Okay.  Is the sign-off procedure a
13   stepping stone, in any way, towards termination of the
14   dealer?
15                     A.   No.
16                     Q.   Now, the second item is dealer
17   disqualification from award programs.  Would that include
18   the LPE program?
19                     A.   No.
20                     Q.   I'm reading this document and it says
21   there are certain ones, and it says with the exception of
22   LPE and Mercury Advantage; is that correct?
23                     A.   That's correct.
24                     Q.   What is the significance of
25   disqualifying a dealer from the President's Award or Top 100

```
00095
  1   Club or Premier Club, or any of those types of clubs?
  2              A.   What is the significance?
  3              Q.   Correct.
  4              A.   These are assumptions that I can only
  5   make, but, obviously, that is something that dealers, you
  6   know, aspire to, and dealers that are held in high esteem.
  7   And we look at that as something that a dealer would
  8   probably be concerned about if he or she weren't able to
  9   realize those awards and recognition.
 10              Q.   Are those clubs FCSD clubs or are they
 11   Lincoln Mercury clubs?
 12              A.   Clubs, I'm not sure what you're
 13   referring to when you say "clubs."
 14              Q.   Like the President's Award, the Top 100
 15   Club --
 16              A.   They're company recognitions.
 17              Q.   All right.  But they're not FCSD
 18   programs?
 19              A.   No.
 20              Q.   So FCSD is making a recommendation that
 21   Eastside Lincoln Mercury be disqualified from Lincoln
 22   Mercury programs, other than LPE and Mercury Advantage; is
 23   that correct?
 24              A.   That's correct.
 25              Q.   Now, are you simply making a
```

```
00096
 1  recommendation?  It says dealer is disqualified, it doesn't
 2  say --
 3                  A.   No, that's a disqualification.
 4                  Q.   Okay.  It's not a recommendation?
 5                  A.   It's not a recommendation.
 6                  Q.   And then it also says that the dealer is
 7  suspended or removed from additional franchise
 8  opportunities; is that correct?
 9                  A.   Yes.
10                  Q.   And that's an FCSD determination, right
11  away?
12                  A.   No, that is a company determination,
13  that isn't an FCSD determination.
14                  Q.   Well, if someone falls within your
15  matrix and they run afoul of Step No. 2, then they're
16  disqualified, automatically, from other dealership
17  opportunities, correct?
18                  A.   Yeah, I believe so.
19                  Q.   Okay.  Is that a significant financial
20  burden on a dealer?
21                  A.   It could be.
22                  Q.   Do you know whether or not, at the time
23  that this April audit was being conducted, that Mr. Woeste
24  was discussing the purchase of another Ford or
25  Ford-affiliated dealership?
```

```
00097
 1                    A.    No.
 2                    Q.    Had he, in fact, been discussing the
 3  purchase of a Ford or Ford-affiliated dealership, do you
 4  think that the $5,900 in charge-backs that were levied
 5  against Eastside Lincoln Mercury was fairly modest, in
 6  comparison to losing a dealership opportunity?
 7                    MS. MCNELLIE:  I'll object to the form
 8  of the question.
 9                    You can answer it.
10                    A.    Yeah.
11                    Q.    What I'm saying is that sounds like a
12  very serious penalty for the amount of money that we're
13  talking about; do you agree?
14                    A.    Yes.
15                    Q.    Okay.  Dealership authorized AWA
16  privileges are removed.  What is AWA?
17                    A.    That stands for after warranty
18  adjustments.  That's money that a dealer can use to resolve
19  a customer complaint without contacting Ford Motor Company
20  to do it, and it's when a customer is beyond the stated
21  warranty for the vehicle.
22                    Q.    So your penalizing the dealer for
23  performing service that Ford would otherwise pay for?
24                    A.    Yes.
25                    Q.    Now, Penalty No. 5 is the dealership is
```

```
00098
    1  decertified from LPE or Mercury Advantage for one year.
    2  That's a disqualification that's fairly significant,
    3  correct?
    4               A.    Yes.
    5               Q.    Do you know how much money LPE
    6  certification or Mercury Advantage certification means to a
    7  dealer in a given year?
    8               A.    Not off the top of my head.
    9               Q.    Okay.  Are we talking about in the
   10  hundreds of thousands of dollars?
   11               A.    Depends on how many cars a dealer sells.
   12               Q.    Let's say a dealer sells 150 cars.  How
   13  much money, roughly, in your understanding, would be in
   14  jeopardy?
   15               A.    About 45 grand.  I think it's $300 a
   16  unit.
   17               Q.    And again, one of the recommendations
   18  that you made in your audit was decertification from LPE; is
   19  that correct?
   20               A.    No.
   21               Q.    Did that fall within the matrix?
   22               A.    No.
   23               Q.    Okay.  Now, the matrix that we're
   24  talking about for Eastside in the April audit was the
   25  additional follow-up Audit Matrix III, correct?
```

```
00099
 1                    A.   Yes.  And also it's under the category
 2  of administrative, if you look at the top there
 3  (indicating), not fraud or fraudulent, and I think that's
 4  what you were referring to when you asked me those previous.
 5                    Q.   Okay.  So we're in the low cost, low
 6  findings, and that would be one, two --
 7                    A.   And six.
 8                    Q.   -- and six.  Okay.  And I apologize if I
 9  was reading off the wrong column.
10                    But No. 6 is the warranty in-dealer
11  consulting initiative; is that correct?
12                    A.   That's correct.
13                    Q.   I think you already agreed that's a very
14  severe penalty for the $6000 or under that was at issue in
15  this case, correct?
16                    A.   Yes.
17                    Q.   Did you review Eastside Lincoln
18  Mercury's warranty traffic versus its warranty gross dollars
19  for the last couple of years?
20                    A.   Not specifically, but I look at that, in
21  terms of the dealers in the region.
22                    Q.   Okay.  And if we exclude last year,
23  where you say warranty experience got better, in the
24  previous couple of years, you would have anticipated that
25  Eastside Lincoln Mercury would have shown both an increase
```

```
00100
    1   in warranty traffic and an increase in warranty dollars?
    2                   A.   Yeah, because of the amount of recalls
    3   we were doing.
    4                   Q.   Do you recall Mr. George Beattie asking
    5   you, in one of these dealer meetings in fact, whether or not
    6   everyone else's warranty claims and warranty dollars were
    7   going up?
    8                   A.   I remember him asking me a question at a
    9   meeting that I held, and that could be the question that he
   10   asked me, but I can't remember specifically, verbatim, what
   11   he asked and that it was exactly what you just said.  But I
   12   know the meeting that you're referring to, and I remember
   13   George asking me a question, and I can't remember exactly
   14   what the question was.
   15                   Q.   But you recall commenting at that
   16   meeting that the warranty claims and warranty dollars for
   17   dealerships in your region were increasing?
   18                   A.   I don't recall making that statement at
   19   the meeting, and I don't recall what the response was to
   20   that specific question that he asked.
   21                   Q.   Well, let me ask you a broad question.
   22   If, at the time, and I'll just say 1999 through 2001, that,
   23   region-wide, dealers were showing an increase in traffic and
   24   an increase in dollars, and Eastside Lincoln Mercury was
   25   showing an increase in traffic and a decrease in dollars,
```

00101
1  and I'm talking about warranty work, can you give me an
2  explanation as to why that was occurring?
3           A.   I don't know specifically why it was
4  occurring, unless I was looking at the work that was coming
5  in to the dealership.  When you look at the volume of
6  traffic versus the dollar volume of traffic, in terms of
7  vehicles coming in versus the dollars, you know, it would
8  tend to say maybe the mix of repairs were lower cost
9  repairs, you know, that type of thing (indicating), that
10  would give you a reduced dollar amount year over year, even
11  though you got more traffic coming in to the dealership
12  (indicating).
13           Q.   Does the presence of more certified
14  master technicians at Eastside Lincoln Mercury increase the
15  likelihood that they will do the more difficult repairs?
16           A.   They are capable, because of their skill
17  set, to do just about anything, if they're masters.
18           Q.   Has the region, and I'll just say FCSD
19  in the region, ever referred specific problem cars to
20  Eastside Lincoln Mercury to work on?
21           A.   I'm not privy to that, but I -- it could
22  happen, because we've got engineers out there in the
23  marketplace that know the technicians, they know who's good
24  and who isn't, and they might do that from time to time.
25  So, it's a possibility.

00102
1                    Q.    But you can't recall any specific
2  referrals to Eastside Lincoln Mercury because of its service
3  department?
4                    A.    No.
5                    Q.    Did you ever receive an e-mail from
6  Jerry Carter, after the results of the warranty audit of
7  2001 were made public, that suggested that no penalty be
8  given to Eastside Lincoln Mercury?
9                    A.    No penalty?  I do not recall getting an
10 e-mail from Jerry saying that no penalty should be --
11                   Q.    Was it fair to say that since the
12 April 2001 audit, that no penalty has been taken against
13 Eastside Lincoln Mercury related to that audit?
14                   A.    Yes, that's correct.
15                   Q.    In fact, no action has been taken
16 against Eastside Lincoln Mercury, of any type, related to
17 that audit; is that correct?
18                   A.    That's correct.
19                   Q.    Do you know how that action was stopped,
20 or what led to the suspension of any of those
21 recommendations?
22                   A.    Because of the lawsuit that was filed.
23                   Q.    Was that recommendation memorialized in
24 any documents that you saw?  And the recommendation I'm
25 talking about is to take no action because of the lawsuit.

```
00103
 1                      A.   No.
 2                      Q.   Do you know whether or not Jerry Carter
 3    made a recommendation of no action be taken without regard
 4    to the lawsuit, as a result of the audit?
 5                      A.   I'm not sure what you mean when you say
 6    no action.  And if you can define that maybe a little bit
 7    more, I can respond to that.
 8                      Q.   Well, if the recommended actions were
 9    one, two and six, and you believe that one already occurred
10    as a result of the closing conference, --
11                      A.   Uh-huh.
12                      Q.   -- what happened to two and six?
13                      A.   Six -- two, I can't remember what two
14    is.  But six --
15                      Q.   Disqualification from programs.
16                      A.   From programs, okay.
17                      Two is what it is, disqualification from
18    programs.  Six is the consultant.  And I know that we,
19    Jerry, felt that that was harsh, to use that term.  And
20    also, it defaults to No. 7 if the dealer doesn't take it, so
21    that would be -- and he was against termination.
22                      Q.   Did you, as the FCSD Regional Manager,
23    have any authority to suspend any of the requirements of the
24    audit matrix?
25                      A.   No.
```

00104

1          Q.    What I meant by that is if you thought,
2    yourself, that Step No. 6 was not warranted, as a result of
3    the April 2001 audit, could you have said I don't want to
4    impose No. 6?
5          A.    I could have said that, but I don't make
6    the final decision on No. 6.  I can give my input to No. 6,
7    but I don't make that final decision.
8          Q.    Who makes the decision with regard to
9    whether No. 6 is --
10          A.    GWO essentially makes that call, and the
11    matrix, which represents all of this, was determined by the
12    management of marketing sales and services, which is the
13    leadership of customer service, the leadership of Ford
14    Division, and the leadership of Lincoln Mercury Division.
15          Q.    I guess my question, to make it a little
16    simpler, is:  If you believed, after reviewing the audit,
17    that any one of those steps, whether one, two or six, were
18    not merited or not warranted to fix the problem, could you
19    have suspended any one of those, or dropped any one of
20    those?
21          A.    No.
22          Q.    So you would have simply had to follow
23    the terms of the matrix to the letter and make that
24    recommendation to global warranty operations, is that
25    correct?

```
00105
 1                      A.    Yes.
 2                      Q.    And then would global warranty
 3   operations make that recommendation to the Lincoln Mercury
 4   Division?
 5                      A.    Yes, they would consult with Lincoln
 6   Mercury Division before a final determination was made.  You
 7   know, they want to know where we stand on it, they want to
 8   know where I stand on it, they want to know where Lincoln
 9   Mercury, or Jerry Carter in this case, stands on it, and
10   then the decision would be made from there.  But, you know,
11   we have input, but we are not the final say.
12                      Q.    Did you give any input to anybody that
13   the results of the 2001 audit, in light of the other audits,
14   revealed nothing that would merit the in-house consultant?
15                      A.    Yeah, I didn't agree with that, and I
16   didn't agree with termination.
17                      Q.    Did you agree with suspension from the
18   dealership franchise opportunities?
19                      A.    Yes.  I -- well, I won't say I agreed
20   with that.  I did not disagree with it.
21                      Q.    Did you send any e-mail or any
22   correspondence to anybody at Ford or Lincoln Mercury
23   Division, expressing your disagreement with the
24   recommendations made in the matrix?
25                      A.    Only with regard to the termination.
```

00106
```
 1                    Q.    And to whom did you express that feeling
 2  or that sympathy?
 3                    A.    That was expressed in a request by Amy
 4  Gabrion, who represented global warranty operations.
 5                    Q.    What did you tell Amy?
 6                    A.    Essentially that, you know, Jerry Carter
 7  didn't agree with termination and I concurred with his
 8  observation as well.
 9                    Q.    And to make it simple, what was the
10  basis of your disagreement?  Why didn't you recommend
11  termination?
12                    A.    Well, you know, because of the level of
13  charge-back and, you know, the relationship that, you know,
14  we have with the dealership.  And I didn't believe that this
15  was, you know, that there was anything here that was
16  contrived by, you know, the Dealer Principle or anything of
17  that nature.  There was no fraud.  There was nothing
18  fraudulent.  And that's the reason why.
19                    Q.    Can you explain to me what the term
20  "variance" means in regard to the 126 report?
21                    A.    Yes.  A variance from 0.5, when they
22  look at each particular component category, in terms of
23  standard deviation, 0.5 is the average for all of the
24  dealers in the group.  And your variation from 0.5, higher,
25  signals a code which puts you in the position where you're
```

00107
```
 1  higher than the group, and at the extent that it requires
 2  something to look at (indicating).  And of course if it's
 3  0.5 or lower, then you're below the group and there isn't
 4  any reason to actually take a look.
 5              Q.    So is the variance that's described on
 6  the 126 report based on a standard deviation analysis?
 7              A.    Yes.
 8              Q.    Do you know if Ms. Rivers knows what a
 9  standard deviation is?
10              A.    Yes.
11              Q.    Have you explained that to her?
12              A.    I haven't, but she's been in training
13  where it's been explained.
14              Q.    Do you know whether Ms. McLaughlin knows
15  what a standard deviation?
16              A.    Yes.  She's been in training where it's
17  been explained as well.
18              Q.    What does the general term standard
19  deviation refer to?
20              A.    I'm not -- you know, I don't have the
21  definition to really define that for you.  I just kind of
22  follow the number.
23              Q.    Sure.  I understand you're not a
24  statistician, but do you have any understanding of what a
25  standard deviation means?
```

00108
1                    A.    Yeah, I -- my interpretation of that is
2    when you do an analysis of the performance of a group, where
3    you get a level playing field is what becomes your standard,
4    in terms of what your measuring.  And then as you get
5    players within your group that are higher than that
6    standard, that becomes the variance from your standard
7    deviation.
8                    Q.    Okay.  Now, even if a person varies from
9    that, we'll just call it what the mean is, and that variance
10   is so big that it violates the standard deviation rule, does
11   that, in and of itself, mean that the dealer is doing
12   anything wrong?
13                   A.    No.
14                   Q.    And if somebody throws codes all over
15   the 126 report, is it still possible that the dealer is
16   doing nothing wrong?
17                   A.    Yes.
18                   Q.    And with regard to Eastside Lincoln
19   Mercury and the codes that were thrown in its reports, was
20   all that was determined to be wrong administrative
21   compliance with the warranty program?
22                   A.    Yes.
23                   Q.    Did Jerry Carter ever review the 126
24   reports from Eastside Lincoln Mercury?
25                   A.    Not to my knowledge.

```
00109
 1                    Q.   Would they have been available to him as
 2   regional manager of the Lincoln Mercury --
 3                    A.   Yes.
 4                    Q.   Would they have been available to him on
 5   the computer system?
 6                    A.   No, he probably would have had to
 7   request them from us.  I mean, we would have to e-mail it to
 8   him.
 9                    Q.   Do you recall whether Mr. Carter, or
10   anyone under his employ, ever requested a 126 report of
11   Eastside Lincoln Mercury?
12                    A.   No, I'm not.
13                    Q.   Did Mr. Carter ever talk to you or
14   anyone else at FCSD regarding Eastside Lincoln Mercury's
15   placement in the warranty counseling process, other than
16   after the April 2001 audit?
17                    A.   No.
18                    Q.   You don't remember Jerry ever talking to
19   you about Eastside's participation in the process, other
20   than the April audit?
21                    A.   No.
22                    Q.   Is that correct?
23                    A.   Yes, that's correct.
24                    Q.   Okay.  Have you ever heard of a tool
25   that's used at Lincoln Mercury, or at Ford, to help analyze
```

```
00110
 1    the dealership's performance and make some recommendations
 2    or changes on how to improve that performance?
 3                    MS. MCNELLIE:  Performance as to what?
 4                    MR. BERBERICH:  Retail performance, like
 5    a business plan that the Lincoln Mercury Division does with
 6    its dealers.
 7                    A.    Lincoln Mercury, I'm aware that they
 8    have a process to review a dealership's activity.  I don't
 9    know what the exact name of it is.
10                    Q.    Have you ever heard the term
11    "forecasting tool," or "business planning tool," or anything
12    like that?
13                    A.    Yeah, I've heard of those terms.
14                    Q.    Do you know whether or not one of
15    Eastside Lincoln Mercury's areas in which it could improve
16    would be more warranty sales?
17                    A.    No.
18                    Q.    Okay.  Would that surprise you if that
19    was one of Eastside Lincoln Mercury's areas in which it
20    needed to improve?
21                    A.    Yes, it would.
22                    Q.    Why would that surprise you?
23                    A.    Because that is not an area that you
24    basically grow your business.  You take care of what comes
25    in the door.  So, you know, you don't counsel a dealer to
```

```
00111
   1   increase a particular area of business that Ford Motor
   2   Company subsidizes to grow your business.
   3              Q.   Did anyone from the Lincoln Mercury
   4   Division ever talk with you about purchasing or selling
   5   Eastside Lincoln Mercury?
   6              A.   No.
   7              Q.   Were you even aware that there were any
   8   discussions about anyone purchasing Eastside Lincoln
   9   Mercury?
  10              A.   No.
  11              Q.   Is that correct?
  12              A.   Yes.
  13              MR. BERBERICH:   Okay.  Let's take a
  14   break for just a few minutes.
  15              (THEREUPON, A SHORT RECESS WAS TAKEN).
  16              (THEREUPON, PLAINTIFF'S EXHIBIT NO. 10
  17   WAS MARKED FOR IDENTIFICATION).
  18              Q.   Mr. Walls, have you had a chance to
  19   review the exhibit I just marked as Exhibit 10 there
  20   (indicating)?
  21              A.   Yes.
  22              Q.   Is that a letter that was sent out
  23   jointly by you and Mr. Carnegie, describing an October
  24   meeting for the retail service growth for the Mercury Elite
  25   Club?
```

00112
```
 1                    A.   Yes.
 2                    Q.   And what part of that handout, or
 3  whatever, did you prepare, or assist in preparing, under the
 4  FCSD division?
 5                    A.   Everything except the last page
 6  (indicating).
 7                    Q.   So, the first page, do you know if it
 8  was your office or Mr. Carnegie's that prepared that letter?
 9                    A.   It was my office.
10                    Q.   Okay.  And then the second page,
11  "getting things done, dealer feedback," is that something
12  that your office prepared?
13                    A.   Yes.
14                    Q.   Did you actually prepare that document?
15                    A.   No.
16                    Q.   Who in your office did?
17                    A.   I think this was a joint effort by Jorge
18  Castillejo and Monica Rivers.
19                    Q.   And then the third, fourth and fifth
20  pages look like a, like they're all the same document, or
21  part of the same handout; is that correct?
22                    A.   That's correct.
23                    Q.   Who prepared that section, which is
24  entitled or headed "Retail Repair Shop?"
25                    A.   Monica Rivers.
```

```
00113
 1                    Q.    And under the heading "Retail Repair
 2  Shop," when it describes success, as it looks like to a
 3  Dealer Principle, one of the sub headings, I think it's the
 4  fourth down, says "double-digit growth increases year over
 5  year."  What does that refer to?
 6                    A.    Double-digit growth in terms of repair
 7  traffic and dollars per repair order.  And this is retail.
 8                    Q.    I understand.
 9                    A.    Okay.
10                    Q.    How do you stimulate customer paid
11  repairs into double-digit growth?
12                    A.    Advertise, marketing programs, specials,
13  coupons, open full days on Saturdays, business on Saturday
14  like any other day of the week, convenience, price
15  competitively, all those things.
16                    Q.    Is there any comparative program that
17  FCSD does that outlines how warranty repair sales can be
18  increased?
19                    A.    No.
20                    Q.    Is there any reason for that?
21                    A.    Yes.
22                    Q.    And what's the reason?
23                    A.    Growing the warranty business isn't a
24  focus of Ford Motor Company, as opposed to growing the
25  retail business.
```

00114
 1                    Q.    The last page talks about car sales,
 2  basically; is that correct?
 3                    A.    Yes, that's correct.
 4                    Q.    Did Steve Carnegie and/or Jerry Carter
 5  contact you regarding how to change Eastside Lincoln
 6  Mercury's status from a loss dealer to a profitable dealer?
 7                    A.    Jerry Carter did not contact me, but I
 8  know that there was some dialogue with the zone manager from
 9  Lincoln Mercury and our market area team on those issues.
10                    Q.    Who was the zone manager and who was
11  your market area team?
12                    A.    The zone manager was Patrick LeTart for
13  Lincoln Mercury; and the market area team was, you know,
14  Monica Rivers, who led the team of Treva Reid and Jeff
15  Hazel; and Jim Meadors, at the time, was the RMM.
16                    Q.    Do you know what recommendations were
17  made as a result of that contact?
18                    A.    No, I don't.
19                    Q.    Do you know if FCSD did anything at all
20  to help Eastside Lincoln Mercury improve its loss dealer
21  status?
22                    A.    No, I do not.
23                    Q.    Do you recall that at the opening
24  meeting of Eastside Lincoln Mercury's 2001 audit, that 126
25  reports from other dealerships were inadvertently

```
00115
    1  distributed to Eastside personnel?
    2                  A.   No, I do not.
    3                  Q.   You didn't hear about that?
    4                  A.   No.
    5                  Q.   Okay.  Is there anyone that selects how
    6  a person, or a dealership, excuse me, gets placed into the
    7  warranty counseling process?
    8                  A.   GWO is where it initiates.
    9                  Q.   Who is GWO again?
   10                  A.   GWO is global warranty operations.
   11                  Q.   If I pulled the 126 reports from every
   12  Ford affiliated dealership in the Cincinnati region, am I
   13  going to find codes on every one of those reports, or nearly
   14  every one of those reports?
   15                  A.   No.
   16                  Q.   Okay.  How many of those reports,
   17  percentage-wise, am I going to see codes on?
   18                  A.   I cannot tell you that.
   19                  Q.   Is there a step where a dealer is
   20  identified as having thrown codes on their 126 report, and
   21  then that dealer gets placed into the warranty counseling
   22  process?
   23                  A.   Could you clarify what you mean by
   24  "thrown codes?"
   25                  Q.   Okay.  By "thrown codes" I mean showing
```

00116
 1  codes on their 126 report.
 2                  A.    Oh, okay.  And not be on the --
 3                  Q.    And being placed in the warranty
 4  consulting program.
 5                  A.    I'm -- I don't follow you.  I'm sorry.
 6                  Q.    How does somebody who throws codes, or
 7  shows codes on their 126 report, get into the warranty
 8  consulting program?
 9                  A.    If they show the codes over a six-month
10  period, that is what triggers them for the warranty
11  consulting process.
12                  Q.    How often do they have to show those
13  codes over a six-month period?
14                  A.    Well, six consecutive periods.
15                  Q.    Is there a number of codes that they
16  have to show over that period of time, or is there certain
17  codes that they have to show?
18                  A.    Yes.  There's three specific areas that
19  we look at.  And I'll mention them again, it's cost per
20  vehicle serviced, it's repairs per 1000 vehicles serviced,
21  and cost per repair.  So, in one of those three categories,
22  if they show a code for a period of six months, they then
23  will become eligible to be on the process.
24                  Q.    And you just mentioned that they would
25  be eligible.  Who then makes the decision whether these

```
00117
 1  repeat violaters become eligible for the warranty process?
 2                  A.    Global warranty operations.
 3                  Q.    Does global warranty operations consult
 4  with the region before that dealer is placed into the
 5  program?
 6                  A.    Yes, they do.
 7                  Q.    And how does that happen, or what goes
 8  on?
 9                  A.    They'll send us an e-mail, listing the
10  dealers and what requirement needs to take place with regard
11  to the warranty consulting process, and they ask us for any
12  feedback regarding those dealers and with regard to what the
13  plan to do is.  And we respond back to them if we have any
14  input that has any bearing on them being in that segment of
15  the process.  And then based on that response, then we move
16  forward with whatever needs to be done in the process.
17                  Q.    So, at that initial phase, you could
18  make a recommendation on behalf of FCSD that that Dealer
19  Principle not be placed in the consulting process, the
20  warranty counseling process?
21                  A.    We could make a recommendation with
22  whatever the facts that we have to bring to bear.
23                  Q.    Okay.  Do you contact the Dealer
24  Principle to let them know that a recommendation has been
25  made that they be placed in that system?
```

00118
```
 1                      A.   I do not do that.  This goes to the
 2  dealer operations manager for the particular dealer in
 3  question, and they make that call.
 4                      Q.   Okay.  They make the call as to --
 5                      A.   Right, they make the call whether it's
 6  necessary to consult with the dealer about being on the
 7  process, if there's something that's happening in the
 8  dealership that might prevent us from going in at that point
 9  and ask for a postponement.  Typically, we don't make that
10  goal.  We don't make whatever the request is go away.  We
11  might get it postponed because of something significant
12  happening at the dealership level, but, essentially, that's
13  how it happens.
14                      Q.   Okay.  But can you, at the regional
15  level, cancel or terminate the warranty consulting process?
16                      A.   No, no, I can't.
17                      Q.   Does the e-mail from global warranty
18  operations also go to Lincoln Mercury, to the retail side?
19                      A.   No, it just goes to FCSD.
20                      Q.   Okay.  Then at each, I'll just say
21  re-review or re-audit stage, does an e-mail come from global
22  warranty operations to FCSD to advise that this next step is
23  recommended?
24                      A.   Yes.
25                      Q.   And again, at that point, can you, as
```

```
00119
 1    the regional manager of FCSD, or the DOM, I guess DOM,
 2    recommend that that next step not be taken?
 3                    A.    No, we can't.
 4                    Q.    Is there any process or procedure that
 5    FCSD has that if a dealer participates in this program over
 6    several years and the findings are insignificant, that the
 7    dealer can be taken out of the warranty consulting program?
 8                    A.    That is not part of the process, as we
 9    know it today.
10                    Q.    Do you think that there should be some
11    mechanism for getting a dealer out of the warranty
12    counseling process if the findings over a span of years have
13    been significant?
14                    MS. MCNELLIE:  Objection.
15                    A.    I think it's something that is worth
16    looking at.
17                    Q.    Okay.  In your conversations with
18    Eastside Lincoln Mercury personnel, did they express to you
19    their frustration about remaining in the warranty counseling
20    process?
21                    A.    No.
22                    Q.    Did anyone at Eastside Lincoln Mercury
23    express to you that they felt like they were being
24    persecuted as a consequence of the warranty consulting
25    process?
```

```
00120
 1                      A.   No.
 2                      Q.   In terms of who gets audited and whether
 3  or not the next step in the audit process is taken, are you
 4  saying that Lincoln Mercury Division has no input in that
 5  process?
 6                      A.   No.
 7                      Q.   Is that what you're saying?
 8                      A.   Yes.
 9                      Q.   Okay.  But after the audit is performed,
10  and before the, I'll just say the matrix-driven
11  recommendations are made, then does Lincoln Mercury Division
12  have a say in what happens in response to the audit?
13                      A.   Yes.
14                      MR. BERBERICH:  Okay.  That's all the
15  questions I have.  Thank you.
16                      MS. MCNELLIE:  We would like to read it.
17
18                         (ALLEN W. WALLS)
19                         (DEPOSITION CONCLUDED)
20
21
22
23
24
25
```

```
00121
  1                    C E R T I F I C A T E
  2    STATE OF OHIO            )
                                )   SS
  3    COUNTY OF HAMILTON       )
  4        I, Jill M. Dragon Sandy, the undersigned, a duly
  5    qualified and commissioned notary public within and for the
  6    State of Ohio, do hereby certify that before the giving of
  7    his aforesaid deposition the said ALLEN W. WALLS, was by me
  8    first duly sworn to depose the truth, the whole truth, and
  9    nothing but the truth; that the foregoing is the deposition
 10    given at said time and place by the said ALLEN W. WALLS;
 11    that said deposition was taken in all respects pursuant to
 12    agreement as to time and place, that said deposition was
 13    taken by me in stenotypy and I am neither a relative of, nor
 14    attorney for, any of the parties to this cause, nor relative
 15    of nor employee of any of their counsel, and have no
 16    interest whatever in the result of the action.
 17      IN WITNESS WHEREOF, I hereunto set my hand and official
 18    seal of office, Cincinnati, Ohio this_____day
 19    of_____, 2003.
 20
 21            _____
               Jill M. Dragon Sandy-Notary Public
 22        My commission expires:  January 31, 2005.
 23
 24
 25
```