Eastside Lincoln Mercury, Inc. and William Woeste Jr.
    Plaintiffs

v.

Ford Motor Company, Inc., et al
    Defendants

U.S. District Court for Southern District of Ohio
Case No. c-1-01-567

Expert Report by:

    Roger M. Bean, CPA

A. **Overview**

1. At the request of counsel for Eastside Lincoln Mercury (Eastside or ELM) and William F. Woeste, Jr. I prepared the attached report setting forth the damages incurred by Eastside Lincoln Mercury and Mr. Woeste as a result of the actions of Ford Motor Company, Inc. and Robert Reichert/Kenwood Dealer Group (Reichert/KDG).
2. As a practicing CPA, I represented Eastside and Mr. Woeste during the period starting with the purchase of his original dealership in 1982 through 1999 when I left public practice. Since 1999 I have assisted the CPA firms that represent Eastside and Mr. Woeste in the performance of accounting, tax and special projects work.
3. While in public practice my emphasis was on providing audit, tax, merger and acquisition, divestiture and other consulting services to automobile dealerships in the Cincinnati area. Over the years my CPA firm and I represented over 30 dealerships and I was involved in the acquisition or sale of approximately 25 dealerships. Since leaving that firm I have maintained a job sharing arrangement with a CPA firm in Lexington Kentucky and have retained several client relationships, including Mr. Woeste's automotive group and three other car dealerships. My CV is attached as Attachment A.
4. As a practicing CPA I testified in court and by deposition concerning forensic accounting services or as an expert witness. Since I left public practice I have only testified in one case, which originated before leaving the CPA firm for which I worked. That case is listed on Attachment B.
5. In the past ten years I have been published a few times in not for profit newsletters and the local business paper, The Business Courier. This information is included on Attachment C.
6. The documents that I have reviewed in preparation of this report are listed on Attachment D.
7. Under my job sharing arrangement, my time is billed on an hourly basis to the CPA firm of Shaver & Coons, PSC, which in turn bills Eastside at an hourly rate of between $ 100 and $ 250.

2

B. **Summary Background Information**

1. Eastside has been a Lincoln Mercury dealership in the eastern part of Cincinnati for over 20 years. For approximately the last 17 years it has been under the management of Mr. Woeste.
2. During Mr. Woeste's ownership of Eastside, there have been several other Lincoln Mercury franchises in the Cincinnati multiple point market area (Cincinnati Market) area including (1) the Kings Lincoln Mercury franchise at the Auto Mall location owned by Reichert\KDG, (2) the former Lincoln Mercury franchise owned by the Stillpass family until its purchase by Mr. Wyler in 2000 and subsequent closing in 2000, (3) the former Jim Dixon Lincoln Mercury franchise purchased by Ford and subsequently sold at a loss in excess of $ 1,000,000 to Reichert/KDG, after which it was renamed Fairfield Lincoln Mercury, (4) the Ridgeview Lincoln Mercury franchise which was acquired by Mr. Fryson and then became Lincoln Mercury of Florence( and which may be in the process of being sold) and (5) Northgate Lincoln Mercury franchise also owned by Reichert/KDG.
3. Starting in 1998 Ford developed and executed a plan to consolidate the Cincinnati Market under one dealer. Ford entered into two agreements (Right of First Refusal and Consolidator Agreements) which allowed Reichert/KDG to consolidate the Cincinnati market. Ford orchestrated this consolidation process, financially and operationally through favorable market representation actions. For example, the two agreements (Right of First Refusal and Consolidator) gave Reichert/KDG the right to approve and disapprove all market representation and facilities actions for all Cincinnati market dealerships north of the Ohio River. In line with Ford's plans to consolidate the Cincinnati Market, Lincoln Mercury of Florence was made its own single point market. In the Cincinnati Market today, the only Lincoln Mercury dealership that is not controlled by Reichert/KDG is Eastside.
4. During this consolidation period, Mr. Woeste requested permission from Ford on multiple occasions but was denied the opportunity to operate his dealership as a "dual". Mr. Woeste intended to dual Eastside with another of his franchises ( Beechmont Chevrolet)in an effort to obtain substantial cost savings through a sharing of service, parts and administrative space with Beechmont Chevrolet. Ford allowed two of the KDG franchises to operate as duals. One dealership (Northgate) has been a dual for several years. Another dealership (Fairfield) was allowed to dual <u>after</u> Mr. Woeste's denials, in a more "liberal" fashion than Mr. Woeste had requested. Initially the Fairfield location was dualed with three other franchises but currently is only dualed with VW, a competitive make. The only separation between the franchises is in the showroom.

3

5. Several other actions by Ford were undertaken in an attempt to influence Mr. Woeste to sell or resign his franchise and to assist Reichert/KDG in controlling the Cincinnati Market. These actions involve the manipulation of warranty audits, manipulation of new vehicle allocation process, the arbitrary denial of LPE certification, and preferential distribution of marketing money.

### C.   Expert Conclusions

My conclusions are grouped into seven areas of damage based upon a common relationship. There can be more than one calculated damage in each of the seven sections below.

#### Warranty Issues

1. Beginning in 1996-1997 Ford began a process of "auditing" the claims submitted by Eastside under the new vehicle warranty programs of Ford. New Lincoln Mercury vehicles sold by a dealership are covered under a Ford warranty. The warranty allows a dealer to solve a customer complaint at no cost to the dealership or customer when the problem is due to poor design or manufacture of the vehicle. This benefits the dealer in that it is paid by the franchisor (Ford) to perform the warranty service work and is not forced to bill the customer.

   Because of the length and scope of the new car warranties, warranty repair work accounts for a significant portion of a dealership's service and parts business. The satisfaction of the customer is important to the dealer and Ford, as a happy customer comes back to the dealership, rather than an independent repair shop, for more service; will consider replacing his car with the same make and may refer others to the dealership or brand. Lincoln Mercury dealerships are graded upon their customer satisfaction in the warranty process

   Ford's stated rationale for the Eastside audits was the magnitude of claims submitted by Eastside and the assertion that the claims submitted were outside the "norm." The actual dollar volume of the errors determined by the Ford auditors through 5 audits from 1996 to 2001, involving almost 2 million dollars of warranty claims, is small. In my experience this indicates that Eastside was in substantial compliance with the manufacturer's procedures.

   Exhibit I summarizes the audit results. The audits reviewed $ 1,903,667 in warranty service work and found errors of $ 17,369, or less than 1 % error. Note on this Exhibit I that the initial repayment sought by Ford from the audits was $ 37,954.69 but under further review and analysis, Ford, apparently recognizing the imprecise and subjective nature of its audit process, reduced the original disallowance by greater that 50% and accepted repayment of $ 17,369.65.

4

Based upon my experience with automotive clients, warranty audits are designed to change the dealership's behavior by reducing the volume and size of warranty claims. The audits drive down the volume and size of warranty claims submitted. This damaged Eastside's reputation with its customers, reduced its profits, lowered the morale of dealership employees, and reduced the value of the dealership.

On April 9, 2001, Ford threatened severe penalties against Eastside and Mr. Woeste including the limitation on Mr. Woeste's ability to obtain another franchise, participate in Lincoln Mercury programs, and required Eastside to hire an "in dealer consultant". Mr. Walls and Mr. Carter both acknowledge that the magnitude of the penalties was too severe in light of the audit findings and the fact that no fraud occurred.

Exhibit II is a graph which indicates the impact that these audits had on the warranty sales volume of Eastside. The result was the decline in warranty service business due to the fear by individual mechanics and the shop manager that the next Ford audit would result in a "charge-back" or other penalties to the dealership.

Exhibit III details the volume of warranty service business by all of the Ford and Lincoln Mercury dealerships in the Cincinnati area as well as the direct competitors of Eastside. Note that the loss in sales volume by the other comparable dealerships is much less between 1998 and 1999 than was suffered by Eastside. There is a substantial increase in warranty sales volume in 2000 and 2001 while Eastside is in decline. The results of the direct competitors are comparable over time to the Ford-Lincoln Mercury group.

It is my opinion that the frequency and nature of the warranty audits at Eastside, including the progressive penalties, led to a decline in warranty sales volumes (and, consequently, gross profit) realized by Eastside. Without the impact of the warranty audits, the sales volume at Eastside would have been substantially the same as the results achieved by its competitors in the Cincinnati Market area.

Exhibit IV details what the sales volumes and gross profits of Eastside would have been, absent the warranty audits. The top section of this exhibit uses as the yardstick the actual results achieved by Eastside's direct competitors ( Kings Lincoln Mercury, Northgate Lincoln Mercury, Wyler/Stillpass Lincoln Mercury, Fryson/Ridgeview Lincoln Mercury and Dixon/Fairfiled Lincoln Mercury). As some of these direct competitors are dualed operations, I also compared their data against the warranty sales volumes of all Ford and Lincoln Mercury dealers in the Cincinnati Market. This comparative warranty sales data was obtained from Ford and is presented in the lower section of Exhibit IV. The far right hand column indicates the damage to Eastside for

each year. The net lost profit to Eastside is calculated to be $ 578,605, net of variable selling expenses.

It is reasonable to believe that there is a carryover impact from prior warranty audits. I estimated, on Exhibit V, that this loss will approximate the loss suffered in 2003. Discounting this figure to present value at an interest rate of 4% yields a loss of $ 63,018.

Exhibit VI lists the money that Eastside repaid to Ford as a result of the 1999 and 2001 warranty audits. The resulting damage to Eastside is $ 8,332.

### Denial of Dualing

2. In April, 1998 Mr. Woeste initially sought the permission of Ford to build a Lincoln Mercury showroom and service write up area on property adjacent to his Beechmont Chevrolet dealership. This proposal involved what is commonly referred to in the car business as a "dual" facility, which indicates that at a single location there are at least two, or perhaps more car franchises. This is common in the industry where one or more of the franchises does not sell enough vehicles to justify its own facility, or in instances where the franchise product line is in decline. In metropolitan areas, one rarely sees a dual facility involving a Honda or Toyota dealership due to their high volume. Similarly one rarely sees a dualed facility involving the more exclusive brands, such as Mercedes, Lexus and BMW.

Mr. Woeste's Chevrolet facility had the necessary space in the service, parts, administrative and used car areas to handle the extra volume a dualing with Eastside would require. Thus, Mr. Woeste proposed to Ford building a Lincoln "Signature" facility encompassing a new vehicle showroom, service write up and retail parts areas. Other facilities in this proposed arrangement were to be shared with Beechmont Chevrolet.

It is common in a dualed facility for the manufacturer to require separate areas for new cars and service write up ("customer touch points") in order to protect the franchise identity. This is exactly what Mr. Woeste proposed. The "non touch points" (parts storage, service and administrative areas) are normally allowed to be shared. The savings in such an arrangement are that space and personnel are more efficiently used, equipment can be shared, personnel are able to share jobs, and the land and location on a particular street are used for dual purposes, thereby spreading the cost of the lease of the facility, equipment, and personnel costs.

Mr. Woeste requested dualing options in 1998 and again in 1999, but his requests were denied. As a result, Mr. Woeste has been forced to maintain a separate facility, separate equipment and separate personnel to support Lincoln- Mercury and the Beechmont Chevrolet franchise, while Lincoln

Mercury has been suffering a decline in sales nationally, regionally and in the Cincinnati Market.

Eastside and Mr. Woeste would have saved a considerable sum of money on a monthly and yearly basis in the operation of the dualed facility. This conclusion is based upon my experience in the car business and my knowledge of Mr. Woeste's operations. The sharing of large fixed personnel and facilities expenses associated with auto dealerships is more efficient due to the economies of scale.

I looked at the staffing levels of the Chevrolet franchise and those of Eastside as well as the cost of operating separate facilities. A comparison of the number and job classification of the two dealerships is depicted on Exhibit VII. I determined where there was overlap or duplication, and summarized the cost of those inefficiencies that could be eliminated by operating a dualed facility. The individual savings by job classification and area of expenditure shown on Exhibit VIII.

I also considered the cost that would have been incurred by Mr. Woeste in the construction and ownership of a new car showroom and service write up area, a rental factor to reimburse Chevrolet for use of part of their facility, increased compensation for the employees that remained and the operating costs for the new facility. I offset these additional costs of operations against the calculated savings to arrive at the damage incurred by Eastside due to this denial of the opportunity to dual with the Chevrolet dealership. Exhibit VIII shows that these damages are $ 2,786,715.

Exhibit VIII includes only the extra costs incurred by Eastside for the years 1999, 2000, 2001, 2002 and the anticipated costs for 2003. Exhibit IX projects the next three years cost to Eastside of this based upon the assumption that the dealership would continue to be managed in the same manner. A present value factor of 4% was applied to this future cost to arrive at a damage of $ 1,507,689 as of December 31, 2003.

Exhibits VIII and IX indicate the actual and potential damages that are associated with operating costs of the facilities in a separate fashion. In addition, there are other costs not related to this issue, described below:

A. Eastside has spent $ 102,822, as detailed on Exhibit X, in updating its existing facility to continue to meet the Lincoln Premier program requirements. Had Mr. Woeste dualed Eastside in 1998 and constructed a new Lincoln Mercury facility, he would not have been required to spend this money.
B. Had Mr. Woeste been allowed to dual Eastside with Beechmont Chevrolet in 1998 or 1999 he would have moved his Honda franchise into the Eastside location. In 2000 Mr. Woeste undertook a major renovation of

his Honda facility at the request of Honda. After being denied the chance to dual the Eastside dealership with Chevrolet in 1998, Mr. Woeste again expressed to Ford in 1999 that he intended to dual Eastside with Beechmont Chevrolet and use the Eastside facility for Honda. He intended to sell the Honda dealership property.

Mr. Woeste still must dual the Eastside dealership with another franchise for it to be truly viable and when he does so he will still move Honda up to the current Eastside space and sell the Honda facility. The damage incurred by Mr. Woeste will be in the duplication of the double cost of renovations. Automobile dealership facilities are unique, so called "single purpose" facilities, which have very little value associated with the actual facilities as they are not useful for most other purposes. The improvements to the Honda facility will not improve the selling price of the dealership property when Mr. Woeste sells it. Consequently the money he spent on the Honda improvements were "wasted" because of Ford's denial of the dualing requests. Assuming that there is some value to a potential buyer from these new improvements, then the damage is the portion of the actual Honda improvements cost that is not recovered in a sale of that property. A fair estimate of this loss is 80% of the cost of the improvements or $ 704,240, as detailed on Exhibit XI.

## LPE Status

3. Mr. Woeste was denied approval to be certified as a Lincoln Premier Dealer on his initial try in 2000. Achievement of this status results in the ability of the dealership to earn a "bonus" for the sale of certain models vehicles. It is Mr. Woeste's contention that this denial was another attempt to deny him the economic benefits of selling Lincoln Mercury vehicles and to once again diminish the value he associated with his dealership so that he would resign or sell at a reduced price, to accomplish the planned consolidation of the market. On his second application for approval he was granted his status as a Lincoln Premier dealer. During the period from the date that he should have been approved through the date on which he was approved, the dealership was unable to ear a bonus in the amount of $ 8,618 as detailed by vehicle on Exhibit XII.

## Vehicle Distribution

4. The testimony of the General Manager of Eastside, Mr. George Beattie, is that there was preferential distribution of vehicles Reichert/KDG.

Ford's distribution of new vehicles to its dealer body has two components. The first is a mathematical or mechanical allocation methodology in which vehicles are allocated based on dealers' availability relative to their sales histories. This type of allocation methodology is known as "turn to earn". That is, the faster a dealer sells (turns) vehicles, the more vehicles it will earn for

future allocations. The second component of Ford's distribution system is a discretionary method to distribute vehicles, apart from and in addition to, those assigned by the mathematical allocation formula.

Ford has admitted that vehicle allocation records covering the consolidation period have been destroyed. Therefore, I am unable to precisely determine the number of vehicles denied to Eastside during the consolidation period.

Eastside was denied the opportunity to purchase "discretionary vehicles" and was therefore unable to sell vehicles that eventually were sold by Reichert/KDG. It is a vicious circle, in that the fewer cars a dealer gets in one period will also reduce future allocations.

The timing of delivery and in particular the availability of vehicles at the time of their introduction as new models is critical. Mr. Beattie will testify that, the mechanical allocation notwithstanding, the actual delivery dates of vehicles to Eastside were delayed by days or weeks compared to the Reichert/KDG dealerships. Eastside sales opportunities were diminished due to the unavailability and delivery of vehicles to the dealership.

Two examples of this are confirmed in units on Exhibits XIII and XIV, and presented on the two graphs, noted as Exhibits XV and XVI. These exhibits highlight the points in time when the 2000 model year Lincoln LS and Lincoln Navigator were being introduced to the public.

The graphs show the favorable delivery of vehicles to the Reichert/KDG dealerships.

Ford's destruction of the allocation data required that we rely on the vehicle 'release" data.

A dealer can only sell what he has in inventory including those cars that are ordered and on the way, indicated by their "release" date. This delay in deliveries to Eastside reduces its opportunity to sell these vehicles at the most crucial time of the product: its new model year introduction.

Exhibit XVII details by model and year the vehicles that Mr. Beattie believes Eastside would have sold had they been provided.

Failure to sell a new vehicle deprives a dealer of the gross profit on the sale, finance and insurance ( F & I ) income, and warranty and service work income.

Exhibit XVIII documents how frequently a new car sold by Eastside returns for service.

Exhibit XIX details the gross profit and variable selling expenses of the service department of Eastside during this same period of time.

Exhibit XX, details loss of gross profit per new car sold and F & I income that Eastside suffered due to the loss of the sales of these vehicles as well as the associated lost service gross profit, all net of the associated incremental variable selling expenses. The damage is $ 135,190.

### Borrowing Costs

5.  It is my experience that more profitable dealerships borrow less money to finance their inventory. Had Eastside been more profitable it, too, would have borrowed less money.

    Exhibit XXI indicates how much interest Eastside would have saved on the cost of borrowing had it not suffered these damages. This damage is $ 268,148

### Blue Sky Valuation

6.  Once Ford began consolidating the Cincinnati Market, and those related actions alleged in the Complaint, Eastside's profits suffered. The value of a dealership is determined by calculating the value of its operating assets and Blue Sky. Blue Sky is the term used in the automotive area to describe the value attributed to the goodwill of the dealership. The most common method to value the Blue Sky of a dealership, apart from its operating assets, such as inventory, receivables, equipment, tools, etc, is a multiple of earnings.

    Even Lincoln Mercury franchises which are losing money have a significant value. For example, in the Cincinnati Market Mr. Jeff Wyler purchased the Stillpass Lincoln Mercury dealership in March 2000 and paid $ 673,000 in Blue Sky to the Stillpass family for a dealership that was losing money. He sold this dealership to Ford in September 2000 for $ 775,000 plus an estimated loss to Ford on the parts inventory of $ 128,800 netting a true Blue Sky figure of $ 903,800, for a dealership in which he lost $ 377,386 in six months.

    Mr. Dixon negotiated a sale to Ford of his Lincoln Mercury dealership in December 1999 for significant Blue Sky. This dealership lost $ 307,015 in 1999. Ford paid a combined $ 1,600,000 in Blue Sky for this franchise.

    Exhibit XXII details the operating results of these franchises.

Ford did not disclose to Mr. Woeste or the other dealers whose franchises were purchased that it was going to consolidate the market. This consolidation dramatically diminished the value of Mr. Woeste's Eastside franchise to everyone except the Ford and the consolidator, Reichert\KDG. The franchise agreement and franchise laws provide a level playing field among competitors to create a partnership between the franchisor, Ford in this case, and its dealer. Once a consolidation begins, the level playing field tilts dramatically in favor of the consolidator as it has market position and advertising benefits, not to mention the two dualed facilities, which will make Eastside a much less attractive purchase by a dealer who is not in the position of being the consolidator. That is the position in which Mr. Woeste now finds himself. Had Ford disclosed to Mr. Woeste its intentions, he would have been able to look for a buyer like Mr. Wyler at an opportune time to sell, before the consolidation began. At present, it is unlikely that a potential buyer will offer fair market value for a dealership in a market that is consolidated. Further, had Eastside not suffered the damages that were the result of Ford and Reichert\KDG actions, the dealership would be more profitable and possess a greater Blue Sky value.

Experience dictates that with a willing buyer and a willing seller will establish the value of a franchise based upon the expectations of the buyer and seller as to the projected results of the dealership. Hence the determination of the Blue Sky. Mr. Woeste's dealership would certainly have been worth as much as was paid by Ford for the Wyler Franchise considering the operating results Eastside was achieving, which were better than the Stillpass /Wyler dealership. If Mr. Woeste's dealership had not suffered the above losses resulting from Ford's and Reichert\KDG actions it would have been worth much more than the price paid to Mr. Wyler.

The value of Eastside's projected Blue Sky is the lost profits of the Eastside franchise multiplied by the ordinary factor applied to dealership profits to calculate a Blue Sky figure. Exhibit XXIII documents that the operating profits of the Eastside dealership were understated by $ 734,657 in 1999 and $ 681,909 in 2000. In my opinion, from my experience representing buyers and sellers in the Cincinnati are, is that a factor of 3 should be associated with these lost profits to arrive at the figure that Mr. Woeste would have added to the base value of a losing franchise, to reflect the value of a profitable franchise. The diminished value is calculated on Exhibit XXIII to be
$ 2,124,849.

As a consequence of the consolidation, market representation actions, and other actions, the value of the Blue Sky of Eastside to anyone but Ford and Reichert\KDG is substantially reduced. The reduction in the Blue Sky value of Eastside to anyone other than Ford or the Consolidator is estimated to be in the range of $ 550,000 to $ 650,000.

**Financial Assistance to Reichert/KDG**

7. Ford employees testified that dealers within a multiple point market must be treated equitably in the distribution of marketing monies. Yet, Ford has provided direct financial assistance to the Reichert\KDG to assist in its take over and operations of its competing franchises. The purposes of these monies were to fund dealership purchases, assist Reichert\KDG in selling cars that were not selling, assist in motivating salesmen to sell cars, assist with advertising, and additional profit. All of this financial assistance has been denied to Eastside by Ford. Exhibit XXIV documents these sums. This damage is $ 341,250.

**Conclusion:**

The above report is accurate as of the date below and is based upon the information that I have reviewed to date. I reserve the right to alter the above should new information come to may attention either through testimony, additional documentation or other means.

I am prepared to testify at trial to the above issues

Respectfully submitted:

*Roger M Bean*
Roger M. Bean, CPA
10-15-03
Dated