## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

EASTSIDE LINCOLN MERCURY, INC.,                :
et al.,                                        :
                                               :
              Plaintiffs,                      :      Case No. C-1-01-567
                                               :
        v.                                     :      Judge Susan J. Dlott
                                               :
FORD MOTOR COMPANY, et al.,                    :
                                               :
              Defendants.                      :


## FORD DEFENDANTS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

**I.    INTRODUCTION**

On September 29, 2003, this Court ruled that plaintiffs could supplement the report of their alleged damage expert, Mr. Roger Bean. In an effort to alleviate the prejudice caused by this extraordinarily late disclosure of an expert, the Court allowed all Defendants to have an opportunity to depose Mr. Bean and to supplement their previously filed Motions for Summary Judgment.[1]

---

[1] As is set forth in Ford Defendants' Motion to Strike Report of Roger Bean, which was filed contemporaneously with this Memorandum, this attempt at avoiding prejudice has been unsuccessful.

## II.    OVERVIEW

### A.    If The Ford Defendants' Motion To Strike Is Granted, Plaintiffs Have No Means To Prove Damages And All Of Plaintiffs' Claims Fail As A Matter Of Law.

The Ford Defendants have filed a Motion to Strike the report of Mr. Bean.  If this Motion is well-taken, plaintiffs will have no basis upon which to prove any damages and all of their claims fail as a matter of law, as set forth in Ford's Motion for Summary Judgment.

### B.    The Structure Of Mr. Bean's Report Demonstrates The Fatal Flaw In Plaintiffs' Complaint.

Like plaintiffs, Mr. Bean did not choose to associate his conclusions as to "damages" with the counts of the Complaint, but rather with the loose categorization of allegations that have been used by plaintiffs to avoid describing particular causes of action.  In other words, Mr. Bean makes no attempt to explain the alleged damages associated with plaintiffs' claims of breach of contract, statutory violations or commission of any tort.  While one concedes that Mr. Bean is not an attorney and should not be charged with making those connections, the structure of Mr. Bean's report and the analysis that follows, based on the structure of that report, should not in any way be construed as an acknowledgement that plaintiffs have ever explained how the "facts" that they have alleged create the claims under the counts of their Complaint – specifically for breach of contract, violation of the Dealer Day in Court Act, violation of Chapter 4517 of the Ohio Revised Code, fraud or civil conspiracy.[2]  As is set forth in Ford Defendants' original Motion For Summary Judgment, each of those claims has specific elements upon which plaintiffs must provide evidence to overcome a motion for summary judgment.  Plaintiffs have never done so, and Mr. Bean's supplemental report has not changed this fact.

---

[2] Plaintiffs previously abandoned their claim of defamation and for injunctive relief.

C.   **Mr. Bean's Report Fails To Attribute Damages To Some Of The Categories of "Injury" That Plaintiffs Allege.**

In response to the Defendants' Motions for Summary Judgment, plaintiffs responded with a description of a number of acts that they believe are actionable under some theory.  No matter under what theory they are pursued, however, damages is an element of any claim they are attempting to state.  As Mr. Bean does not ascribe any damage to some of these allegations, they must fail as a matter of law.

The best example of this failure to assert any damage are plaintiffs' allegations with regard to the negotiations over the Florence Lincoln Mercury dealership.  Mr. Bean gave no opinion as to any damages to Eastside or to Mr. Woeste as a result of these actions.  As a result, plaintiffs have no evidence of any damage (as well as no evidence of any actionable conduct) and so this "claim" relating to the Florence negotiations must be dismissed as a matter of law.  In addition, Mr. Bean does not attribute any damage to any alleged false statement of any defendant, or to the alleged conspiracy between the defendants.  Finally, Mr. Bean has not given any opinion about alleged damages to Mr. Woeste, personally.  Therefore, plaintiffs' claims for fraud, civil conspiracy and those claims asserted by Mr. Woeste personally should all be dismissed for those reasons set forth in the Ford Defendants' earlier filings and for failure to show any damage.

D.   **Mr. Bean's Report Fails To Identify Any Category Of Damage Applicable To Any Allegations Against Defendants Carter and Walls.**

Mr. Bean's report makes no attempt to delineate any category of damages that are allegedly attributable to the acts of Mr. Carter or Mr. Walls.  Without any proof of damages based on the alleged conduct of these individuals, the claims against them must also be dismissed as a matter of law.

### III.    LAW AND ARGUMENT

#### A.    Mr. Bean's Attempt To Attribute Damages To Any Claim Attributable To Warranty Audit Issues Must Be Rejected As A Matter Of Law.

In addition to the fact that plaintiffs have never explained what contract, statute or tort is implicated by plaintiffs' protestations about warranty audits, they have no evidence that the audits were done to further some grand conspiracy to force Eastside out of business.    Moreover, plaintiffs have no means to show that the alleged decline in the amount of warranty work performed at Eastside bears any relation to the warranty audits that were done by Ford.    As was noted in Ford's initial briefing, Eastside's only "evidence" regarding this causal connection is the hearsay statement of Mr. Beattie that the mechanics were "chilled" into avoiding warranty work for fear of further audits.    Mr. Bean's report does nothing but parrot Mr. Beattie's statement. Deposition of Roger Bean ("Bean") at 61 (relevant pages attached as Exh. A)[3].    Mr. Bean did not speak with any mechanic at Eastside to confirm this unsubstantiated statement nor did he do any independent analysis of any of the repair orders submitted after the audits occurred.    *Id.* at 61, 174-75.    Therefore, plaintiffs still cannot show as a matter of law that they were damaged by the warranty audits, even if they could show, which have not and cannot, that these warranty audits were in some way improper.[4]

---

[3] All depositions cited in this Supplemental Memorandum have been filed with the Court.

[4] Mr. Bean's "opinion" that manufacturers conduct warranty audits to diminish the amount of warranty work that dealerships perform does not overcome this failing in plaintiffs' evidence.    This patent generalization, based solely on hearsay statements of other dealers, does not provide any evidence as to Ford's motives in conducting the specific audits at Eastside, or change the undisputed fact that Ford has the contractual right to conduct these audits.

**B.    Mr. Bean's Attempt To Attribute Damages To The Refusal To Allow Eastside To Relocate and Permanently Dual Its Facilities With Chevrolet Must Be Rejected As A Matter Of Law.**

Plaintiffs' claim with regard to dualing is that Ford breached some duty to Eastside by failing to approve Eastside's relocation and combination of its service and parts facilities with Chevrolet – a line make of General Motors Company. As was explained in the Ford Defendants' earlier papers, plaintiffs have yet to explain how Ford's business decision to refuse this permanent dual is a violation of contract or statute. For this reason, these alleged facts do not state a claim.

Moreover, in conjunction with his damage calculation, Mr. Bean claimed that the damages associated with this decision included not only the alleged cost saving that would have resulted from the dual with Chevrolet but also the costs that were associated with work that has been performed at a Honda dealership in which Mr. Woeste has an interest, because that dealership could have been moved to the current site of the Lincoln Mercury dealership. Significantly, Mr. Bean admitted that any damages that might be attributable to the decision to deny the request to relocate and dual is dependent upon the assumption that General Motors would have approved this same request, and that Honda Motor Company would have consented to the movement of its facility, either at the time that a "proposal" was made or sometime in the future when Eastside is permitted to relocate. Bean at 174.

Mr. Woeste has already testified that he did not have such approval from General Motors. Woeste II at 43 (relevant pages attached as Exh. B). Plaintiffs have never provided any evidence that Honda consented to the relocation of its store. Moreover, plaintiffs have not and cannot provide any proof that such approvals would have been or will be forthcoming. Without these approvals, plaintiffs could not have achieved any of the "efficiencies" or avoided the

"duplication" of costs of upgrades with Honda about which Mr. Bean opines. Consequently, any damages associated with this "claim" are simply too speculative to be valid. *See, e.g., Pietz v. Toledo Trust Co.*, 63 Ohio App. 3d 17, 22 (Lucas Cty. 1989) (uncertainty as to existence of damages precludes recovery). Therefore, any claim that plaintiffs may have that is associated with the denial of the request to relocate and dual cannot meet the element of damage and should be dismissed as a matter of law.

C.    **Mr. Bean's Attempt To Attribute Damages To Alleged Delay In Delivery Of Vehicles Must Be Rejected As A Matter Of Law.**

Plaintiffs' claim based on allocation and/or delivery time of vehicles must also fail as a matter of law. Plaintiffs have attempted to avoid this conclusion by providing this Court with a bait and switch argument. Despite all of the arguments posed in plaintiffs' opposition to summary judgment relating to the testimony of Mr. Mullins and the allocation of cars in the summer of 2000, the only damages plaintiffs have ascribed to this category relate to alleged lost sales supposedly attributable to delayed delivery of new model year cars at time of introduction. Therefore, despite the fact that plaintiffs rely on the testimony of Mr. Mullins as "evidence" of an allocation claim, they ascribe no damage to the supposed malallocation of Grand Marquis and Town Cars in the summer of 2000. As a result, plaintiffs cannot establish an allocation claim relative to the testimony of Mr. Mullins. *See, e.g., Jones v. Kimberly-Clark Corp.*, 2000 U.S. App. LEXIS 30249 at *11-*12 (6th Cir. November 28, 2000) (evidence of damage not caused by alleged acts are not recoverable) (Exh. C).

Instead, Mr. Bean relies solely on an unsubstantiated, hand written list from Mr. Beattie as to the sales that Mr. Beattie believes were lost because of a *delay* in delivery.[5] Bean at 146-47. This list, however, is insufficient to support a claim based upon allocation, under any theory. *See, e.g., Wootton Enters., Inc. v. Subaru of Am., Inc.,* 134 F. Supp. 2d 698, 705 (D. Md. 2001) (anecdotal evidence is insufficient to show same), *aff'd,* 2002 U.S. App. LEXIS 7180 (4th Cir. 2002). Mr. Bean also included charts in his report that had been prepared by Mr. Watkins, the alleged allocation expert that this Court has previously excluded from this case. These charts purport to provide some allegedly generalized proof of disparity in delivery dates of new vehicles at model year introduction. The improper inclusion of Mr. Watkins' charts, even if they are allowed to be presented through this witness, do not bridge plaintiffs' evidentiary gap. Because they are at best merely "examples" and bear no direct correlation to Mr. Beattie's admitted unsubstantiated estimate of lost sales (Bean at 144), they do not convert Mr. Beattie's anecdotal list into proof of improper allocation, or provide a legitimate basis to calculate damage. These charts fail to show, among other things, that there was an actual disparity in dates that the vehicles were received by the dealerships, fail to distinguish between the myriad of reasons that deliveries, if delayed, were delayed, fail to show any connection to a plot to undermine the Eastside dealership, fail to show how the deliveries if delayed, were delayed by or at the direction of anyone at Ford associated with the consolidation. *See, e.g., Colonial Dodge, Inc. v. Chrysler Corp.,* 11 F. Supp. 2d 737, 752, *aff'd mem.,* 121 F.3d 697 (4th Cir. 1997) (failure of

---

[5] Neither Mr. Beattie nor plaintiffs produced this list at the time of Mr. Beattie's deposition (or any time during the discovery period). In fact, Mr. Beattie testified that he had no way to identify the cars that were subject to allocation problems. Beattie at 135-37 (relevant pages attached as Exh. D). Moreover, Mr. Beattie testified that he "investigated" his claim of late delivery by calling the other dealerships to determine whether they had particular vehicles in stock, but had no evidence of whether or how Ford had manipulated this alleged disparity in delivery time. Beattie at 124-26.

expert to explain reason for seeming disparity between dealerships deprives analysis of ability to create rational basis for a fact finder to conclude improper activity has occurred). For this reason, any claim, whether it be contractual, statutory or tortious, based upon alleged improper allocation and/or delivery of vehicles fails as a matter of law.

**D.     The Remainder Of Mr. Bean's "Opinions" Do Not Form Any Basis To Overcome Summary Judgment.**

Despite the fact that Mr. Bean identifies himself only as an expert as to damages (Bean at 6), the narrative section of his report is replete with statements that appear to give opinions as to liability. Upon examination, however, Mr. Bean admitted that the bases for those statements were his conversations with Mr. Woeste, Mr. Woodall and Mr. Beattie, and/or plaintiffs' complaint or memorandum in opposition to the motions for summary judgment. *See, e.g.*, Bean at 33, 36, 79-80, 100, 128, 143, 167. Repetition of the unsusbstantiated beliefs of plaintiffs and their employees by an "expert" witness does not magically transfigure those statements into evidence, or an expert opinion.

Moreover, Mr. Bean is not qualified to render an opinion that the materials he has reviewed are sufficient to allow a fact finder to reach the conclusion he states in his report as either his opinions or as fact. *See, e.g.*, Bean at 126. Whether plaintiffs have produced any genuine issues of material fact is for the determination of this Court alone. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986). Therefore, none of the materials recently submitted by Mr. Bean provide any support for the claims of liability that have been asserted by plaintiffs.

## IV.    CONCLUSION

For the foregoing reasons, and those set forth in its earlier filings, Defendants Ford Motor

Company, Jerry Carter, and A.W. Walls are entitled to Summary Judgment on all of the claims

asserted against them in plaintiffs' Complaint.

Respectfully submitted,


  /s/ Elizabeth A. McNellie
Elizabeth A. McNellie (0046534)
Baker & Hostetler LLP
65 East State Street, Suite 2100
Columbus, Ohio 43215
(614) 228-1541

Trial Attorney for Defendants
Ford Motor Company, Jerry Carter, and A.W. Walls

OF COUNSEL:

George W. Hairston (0030507)
Brian T. Johnson (0065417)
John J. Frost (0077003)
Baker & Hostetler LLP
65 East State Street, Suite 2100
Columbus, Ohio 43215
(614) 228-1541
(614) 462-2616 (fax)

## CERTIFICATE OF SERVICE

A copy of the foregoing Ford Defendants' Supplemental Memorandum In Support Of Their Motion for Summary Judgment were mailed to Alan J. Statman, Esq., and Gregory J. Berberich, Esq., STATMAN, HARRIS, SIEGEL & EYRICH, LLC, 2900 Chemed Center, 255 East Fifth Street, Cincinnati, Ohio 45202, counsel for plaintiffs, and Steven D. Hengehold, Esq., and James J. Englert, Esq., RENDIGS, FRY, KIELY & DENNIS, LLP, 900 Fourth & Vine Tower, Five West Fourth Street, Cincinnati, Ohio 45202, counsel for defendants Robert C. Reichert and Kenwood Dealer Group, Inc., by regular U.S. mail, postage prepaid, this 21st day of November, 2003.


/s/ Brian T. Johnson
Brian T. Johnson

# Exhibit A

1              UNITED STATES DISTRICT COURT
2               SOUTHERN DISTRICT OF OHIO
                    WESTERN DIVISION

3                      -  -  -

4   EASTSIDE LINCOLN MERCURY,  :
    INC., et al.,              :
5                              :
                 Plaintiffs    :
6                              : CASE NO. C-1-02-567
              -vs-             :
7                              :
    FORD MOTOR COMPANY,        :
8   et al.,                    :
                               :
9                 Defendants   :
                     -  -  -
10

11          Deposition of ROGER M. BEAN, a witness

12   herein, taken by the defendants as upon

13   cross-examination pursuant to the Federal Rules of

14   Civil Procedure and pursuant to agreement among

15   counsel as to time and place and stipulations

16   hereinafter set forth, at the offices of Statman,

17   Harris, Siegel & Eyrich, 2900 Chemed Center, 255

18   East Fifth Street, Cincinnati, Ohio, at 9:30 a.m.,

19   on October 29, 2003, before Pamela S. Giglio, a

20   notary public within and for the State of Ohio.

21                      -  -  -

22

23             GIGLIO REPORTING SERVICES
                  3 Cypress Garden
24             Cincinnati, Ohio  45220
                  (512) 861-2200              ORIGINAL
25

```
 1              A.   No.

 2              Q.   Did you review the dealer agreement

 3      in this case?

 4              A.   Yes.

 5              Q.   Is there a reason that it's not on

 6      your list of documents you reviewed?

 7              A.   I listed the complaint, and it's

 8      attached to the complaint.

 9                   MR. FLEMER:  I think his list

10                   includes that he reviewed the memorandum

11                   relative to summary judgment and the

12                   exhibit.

13                   MS. MCNELLIE:  Your memorandum?

14                   MR. FLEMER:  Right, attached to the

15                   memorandum.

16                   THE WITNESS:  Correct.  I think it's

17                   attached to both those documents.

18      BY MS. MCNELLIE:

19              Q.   Did you review any of Mr. Woeste's

20      other dealer agreements with any of his other

21      manufacturers?

22              A.   In what time frame?

23              Q.   In the context of this litigation.

24              A.   No, ma'am.

25              Q.   Have you ever had the occasion to
```

```
 1              A.    Not that I recall, no.

 2              Q.    What is your understanding of how

 3    vehicle allocation works in the Ford system?

 4              A.    There is a mathematical calculation

 5    referred to as turn, to turn and/or earn which

 6    derives or drives the initial allocation.

 7                    There is a concept called coverage.

 8    There are discretionary allocations above and

 9    beyond the mathematical calculation.

10              Q.    Where did you -- upon what do you

11    base that understanding of the allocation system?

12              A.    My discussion with personnel at the

13    Eastside Lincoln Mercury, my reading of depositions

14    in this case, my discussions of that with Glen

15    Watkins.

16              Q.    Who at Eastside did you speak with

17    about allocation?

18              A.    Mr. Woeste, Mr. Beattie,

19    B-E-A-T-T-I-E, I believe, and Mr. Woodall.

20              Q.    When did you have this discussion

21    with them?

22              A.    Different points in time, '91

23    through 2000 or through today.  Not today, but

24    through 2003.

25              Q.    Have you had a discussion with them
```

1              A.    Experience and discussion with

2    George, Bill and Jim Woodall.

3              Q.    What did Mr. Beattie tell you about

4    this issue?

5              A.    He believes that the staff is

6    intimidated.

7              Q.    Do you know why he believes that?

8              A.    I'm sure there are a number of

9    reasons, I believe, that I can't recall today.

10             Q.    What did Mr. Woodall tell you?

11             A.    Similar.

12             Q.    Do you know why he feels that way?

13             A.    Similar reasons.

14             Q.    Anything different for Mr. Woeste?

15             A.    No.

16             Q.    Has there been any analysis done

17   comparing the RO's of Eastside before the audits

18   were done with those that were completed after the

19   audits were done to determine that the decline was

20   attributable to not looking for warranty issues not

21   related to customer complaints?

22             A.    I haven't done such an analysis.

23             Q.    Do you know of anyone that has?

24             A.    No, ma'am.

25             Q.    Do you know why manufacturers

```
 1                              marked for identification.)

 2    BY MS. MCNELLIE:

 3              Q.    Will you identify this document?

 4              A.    Affidavit I provided in connection

 5    with plaintiffs' filing relative to summary

 6    judgment.

 7              Q.    How long did it take you to prepare

 8    this document?

 9              A.    I don't recall.

10              Q.    Ballpark?

11              A.    In hours or days?

12              Q.    Yes, hours.

13              A.    Sixteen to 30.

14              Q.    Do you have time records for that?

15              A.    I have not billed for my services

16    for this, so I have not generated the time records

17    for that purpose.

18                    Can I clarify your original

19    question, was it the time incurred to write this

20    particular document?

21              Q.    Yes.

22              A.    Okay.  Thank you.

23              Q.    Who did you talk to about preparing

24    this particular document?

25              A.    Prior to the preparation of this
```

1    document, any number of phone calls, visits with

2    Mr. Woeste, George Beattie, Jim Woodall.

3            Counsel, I mean, this is a written

4    document.  It's the culmination of a lot of prior

5    work.

6            Q.   Did you tell them you needed

7    additional documents to complete your analysis when

8    you did this affidavit?

9            MR. FLEMER:  Object.

10            Can you read that back?

11                 (At which time, the court

12                 reporter read back the

13                 preceding question.)

14            THE WITNESS:  "Tell them" being?

15    BY MS. MCNELLIE:

16            Q.   Anyone.

17            A.   Yes.

18            Q.   Who did you tell?

19            A.   I discussed the documents that I

20    wanted to look at in this case with all of the

21    aforementioned people.  I can't tell you the

22    specific time or place that I did it in connection

23    with this.

24            Q.   Is this analysis complete?

25            A.   "Complete," a legal perspective?

1        A.    Yes.

2        Q.    What is the origin of those

3   documents?

4        A.    Those were provided to me by

5   Eastside personnel.

6        Q.    Do you know where they got those

7   documents?

8        A.    From their records, I don't know.

9        Q.    You don't know?

10       A.    I know with regard to No. 13 is

11  George Beattie and I and Jim Woodall sat down and

12  discussed the numbers of personnel from their

13  recollection that were employed by Chevrolet and

14  Eastside for that time period.

15       Q.    Okay.

16       A.    For instance, No. 14, that I sat

17  down with Mr. Beattie and asked him to provide me a

18  list of cars that would have qualified for LPE

19  money had they been approved for that process on

20  the first application.

21       Q.    Do you know where he got that

22  information from?

23       A.    My understanding from him is that he

24  went through the car deals which would have

25  qualified for LPE money and calculated the money

1    dealership was the only one with a charge back in

2    this group in this area.

3              That, to me, indicates that there

4    are facts which could lead someone to the

5    conclusion that those damages, he shouldn't have

6    incurred the cost of the charge backs.

7              That's my opinion.  I'm not Datsun

8    to render a legal opinion.  I wasn't asked to do

9    that.

10             Q.    Okay.  Have you done a facility

11   analysis of Mr. Woeste's Chevrolet facility as far

12   as its ability to absorb dualing with another

13   franchise?

14             A.    I'm familiar with that facility,

15   yes.

16             Q.    Have you done a facility analysis to

17   determine whether it's capable of absorbing a dual

18   franchise?

19             A.    By where?

20             Q.    Where the techs are Datsun to work,

21   where the parts are Datsun to go, all that kind of

22   stuff.

23             A.    Yes.

24             Q.    You have done that?

25             A.    I have inspected that.

```
 1    are required for a store of Mr. Woeste's size?

 2            A.   No, I do not.

 3            Q.   There is a statement at the bottom

 4    of Page 6, "Mr. Woeste requested dualing options in

 5    1998 and 1999.'

 6                 Is there any basis for that

 7    statement other than the testimony of Mr. Woeste in

 8    his deposition?

 9            A.   I mean, I have discussed it with

10    him.

11            Q.   Anything other than Mr. Woeste's

12    statements to you that he made proposals in '98 and

13    '99?

14            A.   Deposition testimony of Mr. Carter.

15            Q.   Look at Exhibit 7, which I think is

16    the personnel statistics.

17            A.   Yes.

18            Q.   Who prepared this document?

19            A.   I'm trying to think.  This is an

20    Excel spreadsheet that I prepared.  I know the

21    information came from George Beattie and Jim

22    Woodall to complete this.  So I think I disclosed --

23    this is information I got from them.  That's the

24    source.  I don't know who prepared it.

25            Q.   Do you know where they got the
```

1        A.    That's what my discussion with

2  Mr. Woeste and Beattie would lead me to believe,

3  that they proposed a facility which would have met

4  the LPE requirements.

5        Q.    Look at Exhibit No. 11.  What are

6  the land improvements done at the Honda facility?

7        A.    It's resurfacing the parking lot.

8  From recollection, it's items which the accountant

9  was able to characterize as land improvements so

10  that he could get a shorter depreciable life.

11        They are a component of a total

12  construction contract which amounted to 800-some

13  thousand dollars.

14        Q.    It's not the construction of two

15  different new showrooms.  It's just that one was

16  paid in 2000, rest was paid in '01?

17        A.    That's correct.

18        Q.    That comes from the Honda financial

19  statements?

20        A.    It's their fixed asset records,

21  property and depreciation.

22        Q.    Is there any relationship between

23  Exhibit 17 and Exhibits 13 through 16?

24        A.    Exhibit?

25        Q.    Thirteen through 16 and 17.  Is

1    there any connection between those?

2         A.    Yes.

3         Q.    What is the connection?

4         A.    In discussing with Mr. Beattie the

5    impact upon his estimate of the lost sales

6    associated with delayed deliveries, denial of cars

7    on a reallocation, he provided to me a list of the

8    vehicles which he thought he could have sold had he

9    had them.

10         Two of those particular models

11    are -- the release date is documented on Exhibits

12    13, 14, and on 15 and 16.

13         Q.    Thirteen through 16 all deal with

14    the time period between -- I'm sorry, this deals

15    with time periods in 1999; is that fair?

16         A.    Yes.

17         Q.    Seventeen actually deals with '99

18    through 2002, correct?

19         A.    Yes.

20         Q.    Is there a correlation between these

21    numbers that are on the '99 part of 17 to the

22    graph?

23         A.    Only that the graphs indicate the

24    cause which would have resulted in attainability of

25    Eastside to make these sales that resulted in the

1      1999 was chosen for Exhibit 13, for instance?

2             A.    It was the first year Mr. Beattie

3      associated lost opportunity to sell vehicles.

4             Q.    Why was the period of August through

5      October picked?

6             A.    It's the roll-out date for a new

7      model vehicle.

8             Q.    What about on Exhibit 14, you picked

9      May through July of '99?

10            A.    For similar reasons, just the

11     roll-out period for a new model vehicle.

12            Q.    New model year for the Navigator

13     with regard to 13?

14            A.    Yes.

15            Q.    Is this the introduction of the LS

16     on Exhibit 14?

17            A.    Introduction of the new model?  I

18     don't know what you mean by "introduction."  I use

19     the term roll out of the new model.

20            Q.    The numbers that are in Exhibit 17

21     came from Mr. Beattie?

22            A.    Yes.

23            Q.    Do you know where he got those

24     numbers?

25            A.    No.  I asked him to estimate for me,

1    supply to me a list of the vehicles which he

2    believed he lost the sales of given the delayed

3    billing -- I mean delayed deliveries of the

4    vehicles.  I don't know more than that.

5              Q.   You don't know if he relied on any

6    documents?

7              A.   Not that I have discussed.

8              Q.   Or the methodology he used to come

9    up with these estimates?

10             A.   I don't recall, no.

11             Q.   You made mention in response earlier

12   to a question about something about denial of

13   reallocation.  What does that mean?

14             I think we discussed the arbitrary

15   or the fact that there are cars available before

16   and beyond the mechanical, mathematical allocation

17   process.

18             A.   I probably -- I may have used that

19   term "reallocation," but it's the availability of

20   cars outside of the mechanical, mathematical term

21   for Ford.

22             Q.   Are any of the damage calculations

23   associated with an allegation that Eastside was

24   denied those discretionary vehicles?

25             A.   My understanding from Mr. Beattie is

```
 1              A.    They are an attachment.

 2              Q.    Got you.

 3              A.    One of the items on the list.

 4              Q.    Do you have any information that

 5    those moneys were not made available to Eastside?

 6              A.    Yes.

 7              Q.    What is the basis for that

 8    knowledge?

 9              A.    Discussion with personnel at Nissan.

10              Q.    Mr. Beattie, Woodall, and with

11    Woeste again?

12              A.    Correct.

13              Q.    Who prepared Exhibit 24?

14              A.    I did.

15              Q.    What is the source of that

16    information?

17              A.    The attachments to one of the legal

18    proceedings that are Ford Motor Company check

19    registers.

20                    I believe the top item comes from a

21    check and documentation associated with

22    Mr. Reichert's or Fairfield's acquisition of Dixon,

23    I believe.

24                         (At which time, Defendants'

25                         Exhibit No. 6, backup
```

# Exhibit
# B

1

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF OHIO

3               WESTERN DIVISION

4                  - - -

5    EASTSIDE LINCOLN MERCURY,   :

6    INC., et al.,               :

7          Plaintiffs,           :

8          vs.                   : CASE NO. C1-01-567

9    FORD MOTOR COMPANY, et al.,: Volume II

10         Defendants.           :

11                 - - -

12         Continued deposition of WILLIAM F. WOESTE,

13    JR., a witness herein, taken by the defendants

14    as upon cross-examination, pursuant to the

15    Federal Rules of Civil Procedure and pursuant

16    to agreement by counsel as to the time and

17    place and stipulations hereinafter set forth,

18    at the offices of Statman, Harris, Siegel &

19    Eyrich, 2900 Chemed Center, Cincinnati, Ohio,

20    at 8:50 a.m. on Tuesday, March 4, 2003, before

21    M. Sue Lopreato, a Registered Merit Reporter

22    and Notary Public within and for the State of

23    Ohio.

24                 - - -

25

43

1        A.    Correct.

2        Q.    Did you ever have any discussions

3   with Chevy about dualing their service

4   department with Lincoln Mercury?

5        A.    No, I did not.

6        Q.    Who was the person at Chevrolet

7   that you were dealing with at that point in

8   time?

9        A.    Specifically, do you mean the

10  person that called on the realtor?

11       Q.    Yes.

12       A.    I don't recall who that person

13  would have been.  We would have, similar to

14  Lincoln Mercury, a salesperson, a service

15  person, and I don't recall who they were.

16       Q.    You don't recall either one of

17  those people?

18       A.    No, I do not recall specifically.

19            MS. McNELLIE:  I still haven't

20  received a copy of his Chevy dealer.

21            MR. BERBERICH:  Let's go off the

22  record.

23            (Off the record.)

24       Q.    Other than this occasion we've

25  talked about, in late '97 or early '98, have

# Exhibit C

Source: Legal > / . . . / > **6th Circuit - US Court of Appeals Cases** ⓘ
Terms: **name(kimberly-clark)** (Edit Search)

➔Select for FOCUS™ or Delivery
☐

*2000 U.S. App. LEXIS 30249, \**

LOUISE JONES, et. al., Plaintiffs-Appellants, v. **KIMBERLY-CLARK** CORPORATION,
Defendant-Appellee.

No. 99-6280

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

2000 U.S. App. LEXIS 30249

November 28, 2000, Filed

**NOTICE: [\*1]** NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: 2000 U.S. App. LEXIS 36183.

**PRIOR HISTORY:** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE. 96-02533. Donald. 8-12-99.

**DISPOSITION:** AFFIRMED.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff former employees appealed the judgment of the United States District Court for the Western District of Tennessee granting summary judgment to defendant former employer in lawsuit alleging that defendant fraudulently represented that its Memphis mill would remain open and would not be sold.

**OVERVIEW:** Plaintiffs were formerly at-will employees of defendant who worked at its Memphis, Tennessee paper products mill. Defendant's management planned to reequip the Memphis plant to produce premium products and to make the plant more cost effective. The plant was sold and plaintiffs lost their jobs. Plaintiffs sued alleging fraud. Defendant moved for and was granted summary judgment. The court affirmed holding that plaintiffs waived the argument that there was a genuine issue of material fact regarding damages because their response to the motion for summary judgment failed to address the issue of damages. Furthermore, plaintiffs still had not shown any evidence of damages. Their claim of lost future wages and emotional distress was caused by the sale of the plant, not the alleged misrepresentation. There was no evidence they worked more hours without appropriate compensation in reliance on any of defendant's misrepresentations.

**OUTCOME:** Summary judgment affirmed; plaintiffs waived the argument that there was a genuine issue of material fact regarding damages because their response to the motion for summary judgment failed to address the issue of damages. Furthermore, plaintiffs

still had not shown any evidence of damages.

**CORE TERMS:** mill, summary judgment, misrepresentation, plant, genuine issue, punitive damages, designated, genuine issue of material fact, material fact, actual damages, terminated, non-movant, recitation, movant, high blood pressure, reasonable reliance, future income, remain open, fraudulently, deposition, distress, employment opportunities, profit sharing plan, order to recover, matter of law, hours worked, moving party, extra work, neutrality, non-moving

**LexisNexis (TM) HEADNOTES - Core Concepts -** ♦ Show Concepts

**COUNSEL:** For LOUISE JONES, Plaintiff - Appellant: Randall B. Tolley, Memphis, TN.

For KIMBERLY-CLARK CORPORATION, Defendant - Appellee: Gavin S. Appleby, Tricia A. Kinney, Powell, Goldstein, Frazer & Murphy, John F. Wymer, III, King & Spalding, Atlanta, GA.

For KIMBERLY-CLARK CORPORATION, Defendant - Appellee: Delaine A. Smith, Ford & Harrison, Memphis, TN.

**JUDGES:** BEFORE: SUHRHEINRICH and MOORE, Circuit Judges; EDMUNDS, District Judge. *

* The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation.

**OPINION: PER CURIAM.** Plaintiffs brought this suit against their former employer, Kimberly-Clark, alleging fraud. They allege that Kimberly-Clark fraudulently **[*2]** represented that its Memphis mill would remain open and would not be sold. Plaintiffs lost their jobs when the plant was in fact sold. Kimberly-Clark moved for summary judgment, alleging that Plaintiffs failed to present evidence in support of any of the elements of fraud. The district court granted summary judgment, finding that Plaintiffs brought forth no evidence of damages due to the alleged fraud. As explained below, this Court hereby AFFIRMS.

**I.**

Plaintiffs are one hundred forty-three former employees of Defendant, Kimberly-Clark Corporation, who were employed at its Memphis, Tennessee paper products mill. Plaintiffs were members of a union, United Paperworkers' International Union, and their employment was governed by a collective bargaining agreement. They were at-will employees.

Kimberly-Clark produced both name-brand and private label products. The Memphis plant produced primarily private label products for Wal-Mart. In the early 1990's, Kimberly-Clark's management believed that Wal-Mart would move to a less expensive supplier. The management, therefore, planned to reequip the Memphis plant to produce Kimberly-Clark's premium products and to make the plant more cost **[*3]** effective. In order to achieve this change, Tim Moe, Vice President of Kimberly-Clark's Household Products Sector, and Bill Douglas, manager of the Memphis mill, formed a plan called the "New Mill Vision."

In August of 1993, Kimberly-Clark began to discuss the possibility of selling the mill to Shepherd Tissue. Kimberly-Clark and Shepherd Tissue entered into a sales agreement on March 31, 1994, and on April 14, 1994, Moe and Douglas announced the sale to the employees. On September 24, 1994, the sale was completed and ownership of the mill was transferred to Shepherd. As a result, Plaintiffs lost their jobs at the mill.

Get a Document - by Party Name - kimberly-clark
Case 1:01-cv-00567-SJD    Document 74    Filed 11/21/2003    Page 32 of 41
Page 3 of 7

Subsequently, Plaintiffs brought this suit against Kimberly-Clark alleging fraud. Plaintiffs alleged in their complaint as follows:

> Kimberly-Clark Corporation management told its employees, the plaintiffs, that Kimberly-Clark Corporation would not sell it's (sic) Memphis plant, but rather, the plant would remain open. Further, Kimberly-Clark Corporation represented to the plaintiff employees, that Kimberly-Clark Corporation was seeking to implement a new program called the "New Mill Vision", which would further ensure continued success for Kimberly-Clark Corporation, **[*4]** and secure their future employment, and prevent the sale of the plant to a third party.

Complaint P 16, Appendix 48.

Defendant filed a motion for summary judgment, challenging Plaintiffs' ability to prove any of the elements of fraud. While Plaintiffs filed a response to the motion for summary judgment, the response failed to address Defendant's argument that Plaintiffs did not submit any evidence of damages. The district court granted Defendant's motion for summary judgment because Plaintiffs did not submit evidence of damages resulting from reasonable reliance on the alleged fraud. n1 Plaintiffs appealed.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 The district court did find evidence of some of the elements of fraud: 1) that there was a genuine issue regarding whether there was an intentional misrepresentation of a material fact; 2) that Defendant knew the misrepresentation was false; and 3) that the representation related to an existing or past fact.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

As explained below, the judgment of the district court is affirmed for two reasons. First, **[*5]** Plaintiffs waived the argument that there is a genuine issue of material fact regarding damages because they did not make this argument below. Second, Plaintiffs still have not shown any evidence of damages.

## II.

We review the district court's grant of summary judgment de novo. See Smith v. Ameritech, 129 F.3d 857, 863 (6th Cir. 1997). Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). The court must believe the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. See Liberty Lobby, 477 U.S. at 255. After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case **[*6]** and on which that party bears the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).

## III.

**A.**

Unless exceptional circumstances are present, issues that are not squarely presented to the trial court are considered waived and may not be raised for the first time on appeal. *See Preferred Rx, Inc. v. American Prescription Plan, Inc.*, 46 F.3d 535, 549 (6th Cir. 1995). On a motion for summary judgment, the movant has an initial burden of showing "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). If the movant points to a lack of evidence concerning an element of the case, the nonmoving party must bring forth significant evidence which demonstrates that there is a genuine issue for trial. *See Gaines v. Runyon*, 107 F.3d 1171, 1174-75 (6th Cir. 1997). **[*7]**

When a plaintiff fails to respond to a motion for summary judgment, the district court may examine the facts presented and designated by the defendant in seeking summary judgment. *See Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 404 (6th Cir. 1992). On appeal, the court of appeals examines the record "in the same fashion" as the district court. *See Estate of Mills v. Trizec Properties*, 965 F.2d 113, 115 (6th Cir. 1992). That is, the court of appeals is not required to look at facts newly presented and designated by the plaintiff. "This Court will not entertain on appeal factual recitations not presented to the district court any more readily than it will tolerate attempts to enlarge the record itself." *Guarino*, 980 F.2d at 404. *Accord Cacevic v. City of Hazel Park*, 226 F.3d 483 (6th Cir. 2000) (although plaintiffs presented facts on appeal which might show a genuine issue, court refused to consider such facts on review because plaintiffs failed to respond to summary judgment motion and thus failed to present such facts to district court). It is not the duty of the district court or the court of appeals to **[*8]** search the entire record to determine whether there is a genuine issue of material fact. *Guarino*, 980 F.2d at 404. To impose such a duty would be contrary to the interests of judicial economy and judicial neutrality.

Effectively searching the record for "genuine issues" requires time, of course, but it also requires an adroit knowledge of the core issues of proof in the case along with an ability to recognize how various threads of testimony, woven together, could possibly defeat a dispositive motion. It is the attorneys, not the judges, who have interviewed the witnesses and handled the physical exhibits; it is the attorneys, not the judges, who have been present at the depositions; and it is the attorneys, not the judges, who have a professional and financial stake in case outcome. Thus, the free-ranging search for supporting facts is a task for which attorneys in the case are equipped and for which courts generally are not. . . .

Additionally, it seems to us utterly inappropriate for the court to abandon its position of neutrality in favor of a role equivalent to champion for the non-moving party: seeking out facts, developing legal theories, and finding ways **[*9]** to defeat the motion. Such a role would carry the court far beyond simply reviewing evidence in "the light most favorable to the non-moving party," or giving effect to inferences reasonably arising from the designated evidence.

*Id.* at 406. Thus, in the absence of a response, the court must review carefully the evidence that was designated by the moving party. The court may rely on the moving party's unrebutted recitation of the evidence in reaching a conclusion that facts are uncontroverted and that there is no genuine issue of material fact. *Id.* at 410.

Although Plaintiffs in this case did file a response to Defendant's motion for summary judgment, their response failed to address the issue of damages. Thus, this Court should refuse to consider the facts that Plaintiffs now raise on appeal in support of their claim that they suffered damages caused by Defendant's alleged fraud. Defendant met its burden by showing the absence of damages due to fraud, and the district court's grant of summary judgment is affirmed.

**B.**

Even if the Court considers Plaintiffs' claim on appeal that they were injured due to Defendant's misrepresentations **[*10]** and examines the factual recitations now raised by Plaintiffs, the Court would find that Plaintiffs have failed to show evidence of damages. In order to prove fraud, a plaintiff must prove an injury caused by reasonable reliance on the representations. See *Shahrdar v. Global Housing, Inc.*, 983 S.W.2d 230, 237 (Tenn. Ct. App. 1998). n2 *See also Graham v. First American Nat'l Bank*, 594 S.W.2d 723, 725 (Tenn. Ct. App. 1979) (plaintiff can recover only for damages suffered as result of reliance). The plaintiff bears the burden of proving a loss or injury caused by the alleged misrepresentation. See *Harrogate Corp. v. Systems Sales Corp.*, 915 S.W.2d 812, 817 (Tenn. Ct. App. 1995). A victim of fraud can recover compensatory damages which place the victim in the same position he would have been in had the fraud not occurred. Further, fraud cannot be speculative but must be proven to a reasonable degree of certainty. *Id.*

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 The other elements of fraud are: 1) an intentional misrepresentation concerning a material fact; 2) knowledge of the representation's falsity; 3) that the misrepresentation relates to an existing or past fact, or if the claim is based on promissory fraud, that the misrepresentation embodies a promise of future action without the present intent to carry out the promise. See *Shahrdar v. Global Housing, Inc.*, 983 S.W.2d 230, 237 (Tenn. Ct. App. 1998).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*11]**

Under Tennessee law, an employee without an employment contract for a specific period of time is deemed to be an "at will" employee. See *Whittaker v. Care-More, Inc.*, 621 S.W.2d 395, 396 (Tenn. Ct. App. 1981). At will employment can be terminated at any time by any party, with or without cause. *See id.; accord Chism v. Mid-South Milling Company, Inc.*, 762 S.W.2d 552, 555 (Tenn. 1988).

One type of damages that Plaintiffs seek in this case is loss of future income and benefits that they would have earned if the Memphis mill had remained open. Such damages were not caused by the alleged misrepresentation. Defendant's statements that the mill would remain open and that employees would keep their jobs did not cause Plaintiffs to lose their jobs and their unearned income. Plaintiffs were terminated and lost their future income and benefits as a result of the sale of the mill. Further, because their employment at Kimberly-Clark was at will, Plaintiffs could be terminated at any time, with or without cause. To permit Plaintiffs to recover unearned compensation would do more than put them in the same position they would have been in if the fraud had not occurred. **[*12]** It would transform their at will employment into a contract that guaranteed their employment. In sum, Plaintiffs cannot recover unearned compensation and benefits as part of their claim for fraud because such damages were not caused by the alleged fraud.

Relying on *Killian v. McCulloch*, 850 F. Supp. 1239, 1253 (E.D. Pa. 1994), Plaintiffs argue

that they are entitled to damages for future income because they worked harder to institute the New Mill Vision in reliance on Defendant's statements that the mill would not be sold. In *Killian*, the defendant moved to dismiss the plaintiffs' claim for money due under a profit sharing plan because the plaintiffs were merely seeking the benefit of their bargain and no actual damages. The court denied the motion, finding that the plaintiffs had stated a claim for damages because they claimed that they were induced to work harder and to stay employed in reliance on the misrepresentation that they would obtain the benefit of the profit sharing plan. The court explained, "if Plaintiffs can show the amount of hours worked or profits generated prior to introduction of the Plan, and compare them to hours worked or profits generated **[*13]** after introduction of the Plan, then their extra efforts are capable of measurement. . . . Under this scenario, Defendants should not be entitled to the extra work effort without compensating Plaintiffs for the extra work generated." *Id.*

*Killian* is distinguishable from this case. Here, the issue comes before the Court on a motion for summary judgment, not a motion to dismiss. At this juncture, Plaintiffs were required to submit some evidence in support of their claims. Plaintiffs cite no evidence whatsoever that they worked more hours without appropriate compensation in reliance on any of Defendant's misrepresentations, and thus, there is no evidence that Defendant benefitted unfairly.

Plaintiffs also seek damages due to emotional distress. However, Plaintiffs did not submit evidence of any such distress as a result of Defendant's misrepresentations. The Plaintiffs who testified in their depositions that they suffered from emotional distress indicated that the distress was caused by the plant closing and their job loss, not by the alleged fraud. For example, Plaintiff Maurice Jones testified, "My mental stress is that I have always been one to provide for my family. . . . **[*14]** And since that was taken away from me when Kimberly-Clark closed, I suffered mentally because of it." Jones Dep., Appendix 391. Similarly, Plaintiff Benjamin Brown testified that he was not suffering emotionally or mentally prior to the sale of the mill in September of 1994. Brown Dep., Appendix 208-09. Other claims of distress are vague or wholly unsupported by the record. For example, Jones testified that his high blood pressure became worse after the sale of the mill. Yet he failed to seek treatment for three years after the sale. Jones Dep., Appendix 389. Plaintiff Leller Mae Mondie testified that the alleged fraud contributed to her high blood pressure. However, she had taken medication for high blood pressure for ten years prior to the sale of the mill, and she was able to control it without medication for two years after the sale. Mondie Dep., Appendix 482-85.

Plaintiffs also allege damages from lost employment opportunities. They claim that if they had known that the Kimberly-Clark mill would be sold, they would have taken other jobs. In order to recover for lost employment opportunities, a plaintiff must show that he was offered a specific opportunity and turned it down in **[*15]** reliance on the alleged fraud. Because the plaintiff must prove actual damages, a general allegation that he refrained from seeking other employment fails to state a claim. *See Killian v. McCulloch*, 850 F. Supp. 1239, 1253 (E.D. Pa. 1994).

Plaintiffs' allegation that they failed to look for other jobs does not state a claim for damages. The only Plaintiff who attempts to allege a specific missed opportunity is Clarence Hampton. He testified in his deposition that if he had known that the mill would be sold he "could have" contracted with the City to cut grass with his lawn care business. Hampton Dep., Appendix 319-20. Even this testimony reveals only that Hampton refrained from seeking other employment; it does not constitute evidence that Hampton actually was offered and refused other employment. Plaintiffs have not submitted evidence of actual damages due to lost opportunities related to the alleged fraud.

Plaintiffs also seek punitive damages. Under Tennessee law, punitive damages may be awarded if the plaintiff proves by clear and convincing evidence that the defendant acted intentionally, fraudulently, maliciously, or recklessly. *See Hodges v. S.C. Toof & Co.*, 833

S.W.2d 896, 901 (Tenn. 1992). **[\*16]**  "A person acts fraudulently when (1) the person intentionally misrepresents an existing, material fact or produces a false impression, in order to mislead another or to obtain an undue advantage, and (2) another is injured because of reasonable reliance upon that representation." *Id.* (emphasis added). In other words, in order to recover punitive damages due to fraud, a plaintiff must prove that he was injured. Because Plaintiffs have not submitted evidence of any injury or damage suffered as a result of the alleged fraud, they cannot recover punitive damages.

**IV.**

The district court's ruling granting summary judgment in favor of Kimberly-Clark and dismissing Plaintiffs' complaint for fraud is hereby AFFIRMED.

Source:  Legal > / . . . / > **6th Circuit - US Court of Appeals Cases** ⓘ
Terms:  **name(kimberly-clark)**  (Edit Search)
View:  Full
Date/Time:  Tuesday, November 18, 2003 - 5:51 PM EST

* Signal Legend:
⬤ -  Warning: Negative treatment is indicated
⚠ -  Caution: Possible negative treatment
◆ -  Positive treatment is indicated
Ⓐ -  Citing Refs. With Analysis Available
❶ -  Citation information available
* Click on any *Shepard's* signal to *Shepardize*® that case.

About LexisNexis | Terms and Conditions

Copyright © 2003 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# Exhibit D

1

1      UNITED STATES DISTRICT COURT

2      SOUTHERN DISTRICT OF OHIO

3         WESTERN DIVISION

4

5   EASTSIDE LINCOLN MERCURY, INC., :

6   et al.,                        :      COPY

7              Plaintiffs,         :

8                   CASE NO. C-1-01-567

9   FORD MOTOR COMPANY, et al.,    :

10             Defendants.         :

11            - - -

12         The Deposition of GEORGE

13  BEATTIE taken by the defendants as upon

14  cross-examination, pursuant to the Ohio

15  Rules of Civil Procedure and pursuant to

16  agreement by counsel as to the time and

17  place and stipulations hereinafter set

18  forth, at the offices of Statman, Harris,

19  2900 Chemed Center, 225 East Fifth Street,

20  Cincinnati, Ohio, at 9:00 a.m. on

21  Wednesday, the 12th day of March, 2003,

22  before Margaret M. Lynch, Registered

23  Professional Reporter, a Notary Public

24  within and for the State of Ohio.

25

124

1    vehicles they want in whatever

2    quantities.  What is the basis for that

3    statement?

4        A.  The basis for that statement is

5    specifically at model introduction time

6    when Lincoln-Mercury brings a new model to

7    the marketplace on every -- on every new

8    model roll-out, Eastside Lincoln-Mercury

9    did not have available inventory to sell

10   to the public.  And when we called the

11   Reichert stores, not only did they have

12   one of each model, they had several of

13   each model.  I can remember the Cougar,

14   when the '99 Cougar came out, all the

15   Reichert stores had Cougars.  We didn't

16   have any.  I called Jerry Carter and said,

17   "What's going on?  Why don't we have

18   Cougars?" And he said, "I can't tell you.

19   I don't know.  But what I'll do for you is

20   I'll get you a Cougar from other

21   dealerships and bring it over for you."

22   And it never happened.  And then a period

23   of time passed, and then our Cougars

24   finally came in.  You know, the real

25   problem with that is, you know, when our

125

1   people are approached by consumers that

2   have been to other stores in the

3   marketplace that have product and we

4   don't, it just plants the whole seed with

5   that consumer: Well, why don't you have

6   the product? I just came from Northgate.

7   I just came from Fairfield. I just came

8   from Kings. They all have inventory. Why

9   don't you have inventory? So, you know,

10  not only do we lose a sale in the

11  community and profitability from that

12  point forward, we lose credibility with

13  that customer and any other customer that

14  customer comes in contact with. So, not

15  having the right car at the right time has

16  been a real serious situation for

17  Eastside.

18      Q.  In any of those new vehicles

19  roll-outs, was it ever the case that you

20  hadn't earned any allocation of those

21  vehicles?

22      A.  No.

23      Q.  Do you have any understanding as to

24  how Lincoln-Mercury influenced the

25  allocation process to get Reichert cars

126

1  when he wanted them?

2      A.   Any time we would ask that question

3  of Jerry Carter or Pat Letarte or Mike

4  Roseingana or any of the people that were

5  involved in that process, they could never

6  answer that question.  They can't explain

7  to you.  It's like any program that we

8  have a question with Ford Motor Company,

9  there doesn't seem to be anyone in the

10 field that can sit us down and explain to

11 us, specifically, why we're being

12 penalized by not having inventory.  Did we

13 complain about it?  Absolutely, we

14 complained about it.  Did it do any good?

15 No.  I'll tell you when it finally did

16 some good is when we didn't get Navigators

17 and Aviator initial allocation and we

18 talked to Brian Kelley, who at that time

19 was the president of Lincoln-Mercury, and

20 he basically said that that was

21 unacceptable us being a Lincoln-Mercury

22 dealer not having product.  And then the

23 next day or maybe two days later, we got a

24 call from Pat Letarte and mysteriously we

25 were told there was absolutely no way we