## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

EASTSIDE LINCOLN MERCURY, INC.,
et al.,

                  Plaintiffs,

     v.

FORD MOTOR COMPANY, et al.,

                  Defendants.

:
:
:
:
:
:
:
:
:
:
:

Case No. C-1-01-567

Judge Susan J. Dlott

## FORD DEFENDANTS' MOTION TO STRIKE
## SUPPLEMENTAL DAMAGES REPORT OF ROGER M. BEAN

Pursuant to Federal Rules of Evidence 702 and 703, and Federal Rules of Civil Procedure 26 and 37, Defendants Ford Motor Company, Jerry Carter, and A.W. Walls (the "Ford Defendants") respectfully move this Court for an order striking the supplemental report of plaintiffs' purported damages expert Mr. Roger M. Bean ("Bean Damages Report"). A copy of the Bean Damages Report is attached to the Memorandum in Support of this Motion as Exhibit B. The Bean Damages Report should be stricken because it (1) is founded upon evidence expressly barred by this Court and is grossly beyond the scope allowed by this Court, (2) is founded upon otherwise insufficient bases (*i.e.*, opinions of others, speculation rather than any first-hand knowledge or investigation by Mr. Bean himself), and (3) is founded upon documents and materials never produced to the Ford Defendants during the lengthy course of discovery.

A memorandum in support of this Motion is attached and incorporated herein.

Dated:   November 21, 2003

Respectfully submitted,

 /s/  Elizabeth A. McNellie
Elizabeth A. McNellie (0046534)
BAKER & HOSTETLER LLP
65 East State Street, Suite 2100
Columbus, OH  43215-4260
Telephone: (614) 228-1541
Facsimile: (614) 462-2616

OF COUNSEL:

George W. Hairston (0030507)
Brian T.  Johnson (0065417)
John J. Frost (0077003)
Baker & Hostetler LLP
65 East State Street, Suite 2100
Columbus, Ohio  43215

Trial Attorney for Defendants
Ford Motor Company, Jerry Carter, and
A.W. Walls

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

EASTSIDE LINCOLN MERCURY, INC.,      :
et al.,                              :
                                     :
              plaintiffs,            :      Case No. C-1-01-567
                                     :
        v.                           :      Judge Susan J. Dlott
                                     :
FORD MOTOR COMPANY, et al.,          :
                                     :
              Defendants.            :

**MEMORANDUM IN SUPPORT OF FORD DEFENDANTS' MOTION TO STRIKE
SUPPLEMENTAL DAMAGES REPORT OF ROGER M. BEAN**

## I. INTRODUCTION

The tortured history of plaintiffs' failures to disclose expert witnesses adequately, and the

resulting prejudice to the Ford Defendants, is well-documented in earlier filings with this Court.[1]

In short, plaintiffs have consistently failed to satisfy their disclosure obligations under the

Federal Rules of Civil Procedure and prior Court orders. Plaintiffs' latest effort is no different:

the supplemental damages report submitted by plaintiffs' damages "expert" Mr. Roger M. Bean

("Bean Damages Report" or "Report") flaunts the Order of this Court and impermissibly

---

[1] *See, e.g.,* Ford Defendants' Memorandum in Opposition to plaintiffs' Motion for Leave to Identify Additional
Expert Witness (filed on June 30, 2003); Defendant Ford Motor Company's Motion to Exclude the Testimony of
plaintiffs' Expert Witnesses (filed on August 28, 2002); Ford Defendants' Memorandum in Support of Their Motion
for Summary Judgment (filed on July 1, 2003); and Ford Defendants' Reply in Support of Their Motion for
Summary Judgment (filed on September 10, 2003).

attempts to correct all the deficiencies in plaintiffs' case that were demonstrated in the pending

Motions for Summary Judgment. The Report should, therefore, be stricken.

## II. BACKGROUND

The dispute over the plaintiffs' repeated failures to adequately disclose their expert

evidence reached a climax on September 29, 2003 when this Court and counsel met to discuss

plaintiffs' request to disclose an "additional" expert witness, *i.e.*, Mr. Glen Watkins. At this

conference, because of plaintiffs' inexcusable delay in disclosing this " additional" expert, this

Court denied plaintiffs' request to introduce Mr. Watkins into this case. *See, e.g.,* September 29,

2003 Status Conference Transcript ("9/29/03 Trans.") at 38. (Attached as Exhibit A)  Further,

despite plaintiffs' repeated failures to adequately disclose their damages expert, this Court gave

plaintiffs one more opportunity to supplement Mr. Bean's damages evidence and to finally

satisfy the requirements of Federal Rule of Civil Procedure 26. *Id.* Mr. Bean's supplemental

materials were due on October 15, 2003. *See* September 29, 2003 Order ("9/29/03 Order").

(Attached as Exhibit B)

On October 16, 2003, Ford's counsel received the supplemental Bean Damages Report

(attached as Exhibit C) and, thereafter, confirmed Mr. Bean's deposition for October 29, 2003.

Far from curing the fatal defects in their earlier "disclosures," however, plaintiffs used the

opportunity given by this Court to circumvent the denial of their motion to designate Mr.

Watkins as an expert, to produce new documents unrelated to any allegedly newly discovered

evidence, and to have Mr. Bean opine as to liability issues outside of his area of alleged expertise

and beyond any independent investigation on his part.

Instead of honoring this Court's directive denying their request to use Mr. Watkins,

plaintiffs attempted to covertly introduce Mr. Watkins' opinions and analysis within the Bean

Damages Report, without any attribution to Mr. Watkins. Plaintiffs further determined to exploit

this Court's Order to inject opinion far beyond the damages supplementation allowed by this Court. Instead, plaintiffs now attempt to use Mr. Bean to address broad substantive questions of liability raised by the Ford Defendants in support of their Motion for Summary Judgment.

### III.  LAW AND ARGUMENT

**A.**    **The Bean Damages Report Rests Upon Information, Analysis, And Opinion *Expressly Barred By This Court A*nd Is Grossly Beyond The Scope Allowed By Law And By This Court.  Therefore, The Report Should Be Stricken.**

**1.**    **Plaintiffs ignored this Court's 9/29/03 ruling and Order, and included in the Bean Damages Report the analysis, opinions, and conclusions of Mr. Watkins.**

During the September 29, 2003 status conference, this Court pointedly denied plaintiffs' request to submit evidence and analysis by purported allocation expert, Glen Watkins.  *See, e.g.,* 9/29/03 Trans. at 38; 9/29/03 Order.  After considering plaintiffs' failure to disclose Mr. Watkins, this Court rightly concluded that plaintiffs' delay was too much: "Well, it just seems to me there has been too much delay here.  I'm not going to allow *any additional experts* on allocations or anything else." 9/29/03 Trans. At 38.  (Emphasis added.)  The Court memorialized its denial of plaintiffs' request to utilize Mr. Watkins in its 9/29/03 Order: "…the motion for leave to identify expert…is hereby DENIED . . . ."  (Emphasis in original.)

Contrary to this Court's express ruling and Order, plaintiffs flatly ignored the prohibition of Mr. Watkins' opinions and attempted to covertly and anonymously insert the Watkins allocation material into the record by incorporating it into the Bean Damages Report.  In fact, Mr. Bean testified that he repeatedly – *i.e., between 10 and 20 times* – consulted with Mr. Watkins, received assistance from Mr. Watkins, directed Mr. Watkins to conduct analysis and supervised that analysis, incorporated Mr. Watkins' analysis and opinions into his own report,

and even attached exhibits drafted by Mr. Watkins to the Bean Damages Report.[2] *See, e.g.,* Deposition of Roger Bean ("Bean") at 36-40, 152[3] (relevant pages attached as Exhibit D); Report Exh. 13-16.

Plaintiffs' clandestine effort to take advantage of the Court's Order, to inappropriately expand Mr. Bean's opinion to issues beyond damages, and to unfairly prejudice the Ford Defendants is obvious: not only have plaintiffs sought to avoid the indisputable intent of the Court's 9/29/03 ruling and Order, they have done so in a way and at a time that effectively prevents Ford from exploring the inappropriate information adequately. By surreptitiously injecting prohibited materials into the case record, plaintiffs seek the advantage of the information and opinion of Mr. Watkins without ever exposing him to any cross-examination.

This use of the prohibited Watkins materials is just another example of plaintiffs' failure to adhere to their obligations to both this Court and to the parties. For this reason alone, this Court should strike the Bean Damages Report.

### 2. The Bean Damages Report includes materials grossly beyond the scope allowed by this Court.

Plaintiffs' inclusion of inappropriate material in the Bean Damages Report does not end with the covert submission of the prohibited Watkins materials. Plaintiffs further took improper advantage of the Court's Order by including additional material grossly beyond the scope of opinion allowed by this Court when it agreed to allow plaintiffs to supplement their damages evidence.

There is no dispute that the plaintiffs have disclosed Mr. Bean as a *damages* calculation expert. *See, e.g.,* Bean Damages Report at 2 (¶ A.1); 9/29/03 Trans. at 4-5. At the September

---

[2] Mr. Bean identified himself as an expert as to damages only. Bean at 6; Report at ¶A(1). He does not purport to be an allocation expert who could have merely incorporated work done by others into his opinion.
[3] All of the cited depositions have been filed with the Court. The pages cited are attached as exhibits to this Motion.

29, 2003 conference, this Court allowed plaintiffs to supplement Mr. Bean's opinion regarding

the calculation of plaintiffs' alleged damages. Plaintiffs, instead, submitted the Bean Damages

Report that included opinions on issues of liability as well—issues far beyond the area of

damages quantification. Having been barred by this Court from any additional expert evidence,

plaintiffs submitted the vastly over-broad Report in an effort to counter all of the liability

arguments raised in the Ford Defendants' Motion for Summary Judgment.

It is axiomatic that an expert may not testify beyond the scope of the expertise he is

alleged to possess. *Bouchard v. American Home Prod.*, 213 F. Supp.2d 802, 809 (N.D. Ohio

2002); *Berry v. City of Detroit*, 25 F.3d 1342, 1352 (6th Cir. 1994), *cert denied*, 513 U. S. 1111

(1995); *Smelser v. Norfolk Southern Railway Co.*, 105 F.3d 299, 305 (6th Cir.), *cert denied*, 522

U.S. 817 (1997). Whether or not Bean is qualified even to speak to plaintiffs' damages, he

certainly cannot opine beyond the realm of damages quantification—the issue he has been

proffered to address.[4] *Bouchard*, 213 F.Supp. at 809. In fact, a court should exclude expert

evidence if it stretches beyond the witness's area of purported expertise. *Id.* An alleged expert

simply cannot testify generally and broadly, even if he is qualified to testify on some other

limited issue. *See, e.g., Marquardt v. Joseph*, 1999 U.S. App. LEXIS 5984, *4 (6th Cir. Mar.

30,1999) (attached as Exhibit E).

Yet, the Bean Damages Report is saturated with conclusions and opinions well beyond

the calculation of damages alone (and well beyond anything Mr. Bean would know about).

Plaintiffs endeavor to do exactly what the law and this Court's Order prohibit: leverage Bean's

alleged expertise in the area of damages calculation into a license to opine about anything even

tangentially relevant to plaintiffs' claims. Because this Court rightly barred plaintiffs from

---

[4] The Ford Defendants do not concede the issues of Mr. Bean's qualifications, methodology, helpfulness, or other requirements for the submission of expert evidence on any issue. Should the Bean Damages Report survive this Motion, the Ford Defendants will challenge these and other issues at an appropriate time.

disclosing any additional experts, plaintiffs have attempted to transform Mr. Bean from a limited

expert on the issue of damages calculations into an expert on anything and everything related to

any of their claims in this case—all in an effort to find some basis to counter the Ford

Defendants' Motion for Summary Judgment.

For example only, the Bean Damages Report offers opinions and conclusions regarding

the following items well beyond the topic of damages calculations (and, for that matter, well

beyond Bean's personal knowledge):

- Ford's intentions, internal motivations, and thought processes regarding warranty audits, procedures, market consolidation, etc. Obviously, Bean has no knowledge of Ford's internal motivations to do anything. Yet, the Report is fraught with speculative conclusions regarding Ford's motivations and intentions. *See, e.g.,* Report at 3-4.

- Procedures, purposes, and mechanisms of the warranty and warranty audit programs. Report at 4-5.

- "Compliance," or lack therefore, with warranty requirements. Report at 4.

- Conclusion that Ford allegedly recognized "the imprecise and subjective nature of its audit process . . . ." Report at 4.

- Terms, obligations, and breach of Eastside's contracts with Ford. Report at 11-12.

- Violation of alleged statutory obligations. Report at 11.

- Procedures regarding, and evaluation of, dualing requests and opportunities. Report at 6-8.

- Operation of dualed facilities. Report at 6-8; Bean at 34-36, 73-77.

- Opinions and conclusions regarding procedures and mechanisms involved in LPE certification, and whether Eastside should have been approved for the same. Report at 8.

- Ford's distribution and allocation procedures and mechanisms. Report at 8-10.

- Requirements of Eastside's franchise agreement and franchise-related statutes, and the purposes behind those agreements and statutes. Report at 11.

Because the Report is saturated with opinions and conclusions well beyond the area of

Mr. Bean's alleged expertise—*i.e.,* calculation of damages—the Report lacks the foundation required by law, is speculative, and should be stricken.

### B.    The Bean Damages Report is founded upon insufficient bases. Therefore, the Report should be stricken.

Even if Mr. Bean were allowed to present the extensive and over-broad evidence beyond his purported area of expertise contained in the Report, he has absolutely no basis for doing so. There is simply no foundation for his repeated efforts to opine regarding issues of liability, rather than simply the quantification of damages.[5]

An expert must be able to opine based upon a reasonable degree of certainty. *Kalamazoo River Study Group v. Rockwell Int'l Corp.,* 171 F.3d 1065, 1072 (6th Cir. 1999). A reasonable basis for expert testimony is not established by unfounded conclusions set forth without support. Unfounded conclusions do not somehow mutate into "reasonable certainty" just because they are uttered by an alleged expert. *See, e.g., Smelser,* 105 F.3d at 303; *May v. Dover Elevator Co.,* 1994 U.S. App. LEXIS 33049, *10-11 (4th Cir. Nov. 22,1994) (attached as Exhibit F) (an expert's endorsement of a wholly speculative theory does not create "reasonable certainty").

An expert must base his conclusions on his own observations, his own investigation, his own analysis. An expert must be more than just a mouthpiece or advocate for the plaintiffs' position. He cannot merely regurgitate what he has been fed by the party that retained him. Expert evidence without testing, without investigation, and founded upon hearsay alone should be excluded as speculative and uncertain. *Novak v. United States,* 865 F.2d 718, 721 (6th Cir. 1989); *Berry,* 25 F.3d at 1352; *Taylor v. Heller & Co.,* 364 F.2d 608, 613 (6th Cir. 1966). *See, also, Mid-State Fertilizer Co. v. Exchange Nat'l Bank of Chicago,* 877 F.2d 1333, 1340 (7th Cir. 1989)

---

[5] Of course, as plaintiffs have been unable to establish facts in support of their liability claims, from Mr. Bean or otherwise, Bean's "damages" quantification is irrelevant.

Here, Mr. Bean's conclusions as to liability are nothing more than a reframing of the plaintiffs' theories initially set forth in the Complaint and later in the plaintiffs' memorandum in opposition to the Ford Defendants' motion for summary judgment.[6] Mr. Bean conducted no independent investigation sufficient to support his conclusions. Instead, he relies almost exclusively on the "facts" and positions spoon fed by Mr. Woeste and other representatives of Eastside.

For example, Bean concludes that Ford's contractually allowed warranty audits scared Eastside's service technicians and service manager into performing less warranty work. Report at 5; Bean at 56-57. Setting aside the fact that Ford is contractually entitled to conduct warranty audits, Bean never spoke with any Eastside service technicians about whether the warranty audits altered their behavior or mindset in any way:

> Q:    Have you ever interviewed any techs about this?
>
> A:    Technicians, no, no.

Bean at 56.

Nor did Bean bother to speak with any Eastside  service manager either:

> Q:    At any time did you talk to the service manager at Eastside about how audits impacted the amount of warranty work they did?
>
> A:    No.

*Id.*

Further, though Bean admits that other issues or problems might cause a decline in warranty work, he *never* considered or investigated whether those "other issues" might be a factor at Eastside. Bean at 119-120. Nor did Bean bother to review or compare Eastside's repair orders before and after Ford's warranty audits to determine the cause for the decline in warranty

---

[6] Mr. Bean admits that he relied upon plaintiffs' complaint and plaintiffs' memoranda in opposition to the motions for summary judgment in formulating his opinions and reaching his conclusions.  Bean at 33; Report Exh. D.

repairs. *Id.* at 61. Finally, though he concludes that the warranty audits "damaged Eastside's reputation with its customers," he proffers no evidence whatsoever supporting his contention that customers thought less of Eastside because of the audits. Report at 5.

Instead of talking to the service technicians or service manager, or taking the time to review and compare repair orders, or consider other possible causes for the decline in warranty repairs, Mr. Bean simply took the word of the Eastside management team that "the staff is intimidated." Bean at 61. He readily admits, however, that he cannot even remember why the Eastside executives thought this was true. *Id.*

Mr. Bean's conclusions regarding plaintiffs' alleged dualing damages are equally flimsy and unsupported. For example, though he alleges that Ford's denial of the requested dual with Chevrolet cost Eastside additional profits, Mr. Bean never got around to determining whether a "dual" would be possible even if Ford had agreed. Report at 7; Bean at 77, 129-131. Though he admits that any damages are dependent upon approval of the proposed dual by Chevrolet, he never reviewed Eastside's contract with Chevrolet, never investigated whether Chevrolet would itself allow a dual with Ford, never determined whether Eastside ever asked Chevrolet to allow a dual with Ford, and never even researched whether Chevrolet had ever allowed such a dual at any time in the past.[7] Bean at 77, 129-131, 174. Mr. Bean also admitted that these alleged damages are further dependent upon Honda Motor Company's agreement to relocate. Bean at 174. Mr. Bean, however, provided no evidence whatsoever that Honda would agree to such a move.

Because of his mostly nonexistent investigation, Mr. Bean's conclusions are anything but "reasonably certain." The Bean Damages Report should, therefore, be stricken.

---

[7] In fact, Mr. Woeste testified that he never did ask Chevrolet to approve the desired dual. Woeste II at 43 (Exhibit G).

**C.    The Bean Damages Report is founded upon documents and materials never produced to the Ford Defendants during the lengthy course of discovery. Therefore, the Report should be stricken.**

Despite the fact that on March 1, 2002, approximately 20 months ago, Ford requested plaintiffs produce all documents relied upon by any expert witness, and although discovery closed on June 2, 2003, plaintiffs delayed until October 20, 2003, to produce multiple new categories of documents upon which they now allege Mr. Bean relied in reaching his conclusions.  Report at Attachment D.

Specifically, until October 20, plaintiffs withheld without the following categories of documents from production, all reviewed and relied upon by Mr. Bean in preparing his Report:

- Listing of lost LPE money from 2000.

- Property detail ledgers for Honda East and Beechmont Motors.  Prime interest rate detail.

- Actual detail of service records, Eastside Lincoln Mercury.

- Listing of lost vehicle sales.

- Listing of expenses re: updating Eastside's facility.

- Operating Report, Beechmont Chevrolet (1999 – Aug. 2003).

The prejudice to Ford as a result of plaintiffs' delay is obvious.  By failing to timely produce these documents, including unsupported, handwritten documents prepared by plaintiffs' fact witnesses after the close of discovery, plaintiffs denied the Ford Defendants any opportunity to explore these materials during the course of fact-witness depositions.  If Mr. Bean is permitted to rely upon these documents, plaintiffs will get the benefit of having their expert rely on them, without ever allowing the Ford Defendants to analyze the preparation, use, and foundation of the documents themselves.

For this reason alone, the Bean Damages Report should be stricken.

# IV. CONCLUSION

At every turn through the lengthy history of this case, plaintiffs have failed to abide by the orders of this Court relating to expert witness disclosures. Their submission of the Bean Damages Report is nothing new. Instead of *appropriately* supplementing Bean's *damages* conclusions, plaintiffs have:

- Ignored the Court's direction and founded the Report on information, materials, and analysis expressly prohibited and grossly beyond the scope allowed by this Court;

- Founded the Report on entirely insufficient bases; and

- Founded the Report on materials never before disclosed or produced to the Ford Defendants.

For these reasons, and for all of the reasons set forth above, this Court should strike the supplemental Bean Damages Report.

Dated:  November 21, 2003                    Respectfully submitted,

                                             /s/ Elizabeth A. McNellie
                                             Elizabeth A. McNellie (0046534)
OF COUNSEL:                                  BAKER & HOSTETLER LLP
                                             65 East State Street, Suite 2100
George W. Hairston (0030507)                 Columbus, OH 43215-4260
Brian T. Johnson (0065417)                   Telephone: (614) 228-1541
John J. Frost (0077003)                      Facsimile: (614) 462-2616
Baker & Hostetler LLP
65 East State Street, Suite 2100             Trial Attorney for Defendants
Columbus, Ohio 43215                         Ford Motor Company, Jerry Carter, and
                                             A.W. Walls

## CERTIFICATE OF SERVICE

A copy of the foregoing Motion and Memorandum In Support Of Ford Defendants' Motion To Strike Supplemental Damages Report Of Roger M. Bean were mailed to Alan J. Statman, Esq., and Gregory J. Berberich, Esq., STATMAN, HARRIS, SIEGEL & EYRICH, LLC, 2900 Chemed Center, 255 East Fifth Street, Cincinnati, Ohio 45202, counsel for plaintiffs, and Steven D. Hengehold, Esq., and James J. Englert, Esq., RENDIGS, FRY, KIELY & DENNIS, LLP, 900 Fourth & Vine Tower, Five West Fourth Street, Cincinnati, Ohio 45202, counsel for defendants Robert C. Reichert and Kenwood Dealer Group, Inc., by regular U.S. mail, postage prepaid, this 21st day of November, 2003.


　　　　　　　　　　　　　　　　　 /s/  Brian T. Johnson
　　　　　　　　　　　　　　　　　Brian T. Johnson

# Exhibit A

1                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF OHIO
2                     WESTERN DIVISION

3                        - - -

4    EASTSIDE LINCOLN MERCURY,    :  CIVIL ACTION C-1-01-567
     et al.,                      :
5                                 :  Cincinnati, Ohio
                    Plaintiffs,   :  Monday, September 29, 2003
6                                 :
         -vs-                     :
7                                 :
     FORD MOTOR COMPANY, et al.,  :  Conference in chambers
8                                 :
                                  :
9               Defendant.        :  3:05 p.m.

10                       - - -

11              TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE SUSAN J. DLOTT, JUDGE
12
                         - - -
13

     For the Plaintiffs:   Gregory J. Berberich, Esq.
14                         Alan J. Statman, Esq.
                           Statman, Harris, Siegel & Eyrich
15                         2900 Chemed Center
                           Cincinnati, Ohio  45202
16
     For the Defendants:   Steven D. Hengehold, Esq.
17                         Rendigs, Fry, Kiely & Dennis, LLP
                           900 Fourth and Vine Tower
18                         Cincinnati, Ohio  45202

19                         Robert C. Reichert, Esq.
                           9500 Kings Automall Road
20                         Cincinnati, Ohio  45249

21                         Elizabeth A. McNellie, Esq.
                           Brian Johnson, Esq.
22                         Baker & Hostetler LLP
                           65 East State Street, Suite 2100
23                         Columbus, Ohio  43215

24   Law Clerk:  Aly Stang
     Courtroom Deputy:  Steve Snyder
25   Court Reporter:  Betty Schwab

PROCEEDINGS IN CHAMBERS

THE COURT:  I think you folks have been in often enough that you know my clerk, Aly Stang, and my court reporter, Betty Schwab.

We have Mr. Berberich and Mr. Statman.  And Ms. McNellie and Mr. Johnson, and the two of you represent Ford?

MS. MCNELLIE:  And Mr. Carter and Mr. Walls.

THE COURT:  Walls.

MS. MCNELLIE:  W-a-l-l-s, Ford employees.

THE COURT:  And Mr. Hengehold and Mr. Reichert, you have got --

MR. HENGEHOLD:  Kenwood Dealer Group and Mr. Reichert.

THE COURT:  And, Mr. Reichert, let's see.  You're defendant and an attorney.  Are you a principal of the company or something?

MR. REICHERT:  Yes, I am.

THE COURT:  Okay.  All right.

So where are we?  Who called this conference?

MR. BERBERICH:  Your Honor, we filed on behalf of the plaintiffs a motion to name an additional expert.  At the very end of what was a fairly long discovery phase where we probably took 30 depositions in multiple different cities, one of Mr. Reichert's former employees came in and

1    testified that both -- he was -- actually observed Ford and

2    some of Reichert's other employees manipulating the

3    allocation system, saying that they were going to give --

4    not only were they going to give cars favorably to Mr.

5    Reichert's dealerships; they were actually going to take

6    cars away from Woeste's dealership.  And so at that point

7    we had proof there was a manipulation of the allocation

8    system from a defendant alleged conspirator.  And at that

9    point we went out and consulted with an allocation expert

10   who very quickly, when reviewing the documents, noted there

11   were some gaping holes in the allocation documents that had

12   been provided to us.  We always suspected there had been

13   some allocation manipulation by Ford, you know, not giving

14   us new cars as they were hot or as they were needed by our

15   dealership, and, as a consequence of that, he noticed

16   immediately there were some missing reports, a lot of

17   missing documents.  We made a request --

18          THE COURT:  When did all this occur?

19          MR. BERBERICH:  Probably it really heated up at

20   the end of May, beginning of June.

21          THE COURT:  What I'm trying to find here on the

22   docket sheets, what's the current scheduling order?

23          MR. BERBERICH:  I think we're set for a pretrial

24   conference on November 7th and set for a two-week jury

25   trial beginning December 1.  And I think that's the order

1    that's in place.

2            THE COURT:  When did discovery --

3            MR. BERBERICH:   June, I think it was June 2nd, or

4    it extended to June 2nd.  Because there was a witness that

5    kind of came out of the cold so to speak.  He came up to

6    us.  He was a former employee of Mr. Reichert.  So, anyway,

7    and he also testified that there was money that was given

8    preferentially to Mr. Reichert's dealerships that was not

9    also offered to Mr. Woeste's dealerships.  And, as a

10   consequence of that, our allocation expert has done a

11   significant amount of preliminary work but also needs some

12   responses or some documents from Ford in order to finish

13   his opinions on whether, in fact, there are allocation

14   manipulations that have affected our dealership.

15            And so we went ahead and filed a motion.

16   Mr. Hengehold and Ms. McNellie's offices both filed

17   opposing motions saying that, when we met with the Court

18   the last time, Your Honor said these dates are in stone.

19   If you don't comply, you're done, something.  I'm

20   paraphrasing.

21            THE COURT:  That sounds about right.

22            MR. BERBERICH:  Okay.  And so that's why we're

23   before the Court.  It's been briefed on summary judgment.

24   One of the big defenses that the defendants raised is you

25   don't have a damage expert.  Well, we have a CPA who

1    rendered preliminary opinions before discovery was

2    completed on the damages that we suffered.  Now he's

3    finalizing his opinions.  But a lot of that is also going

4    to hinge on what the allocation expert says.  Because they

5    can make a damage analysis that says, if you were denied

6    five cars this year, then this is the downstream impact

7    this is going to have on your dealership.

8            So we need to have a ruling from the Court on the

9    allocation expert so that our financial expert can conclude

10   his numbers and assumptions.  The defense has raised the

11   issue, you know, that we haven't properly identified a

12   damages expert.  We believe that we have.  The Court, there

13   was some --

14           THE COURT:  We're talking about two different

15   experts here now?

16           MR. BERBERICH:  Correct.

17           THE COURT:  So before -- I'm not sure what your

18   deadline was for expert identification.

19           MR. BERBERICH:  We identified a gentleman by the

20   name of Roger Bean last year in '02 and provided a

21   preliminary report of his findings.

22           THE COURT:  He's the accountant?

23           MR. BERBERICH:  CPA.  He's worked with our

24   dealership for a number of years, knows the financials

25   pretty well.  Ford has an opposing expert, Dr. Mark

1   Schmitz, and, because Ford gets our financial information

2   very promptly, knows how many units we're selling and how

3   many parts we're selling, they were able to provide a

4   rebuttal report to Mr. Bean's preliminary report.  But, in

5   order for Mr. Bean to do his final report and include the

6   allocation damage, we need to have a gentleman by the name

7   of Mr. Watkins, not only allowed to enter the case and

8   render expert opinions, but also to have some follow-up

9   documentation from Ford that we had requested and Ford says

10  is not available or was --

11          THE COURT:  What would your timetable be for

12  this?

13          MR. BERBERICH:  Probably -- well, there are two,

14  I guess two phases.  One is to find out from Ford if these

15  documents are really lost.  Like, for instance, there were

16  months of allocation reports that Ford says the manual

17  archive of these allocation reports was not captured for a

18  series of months due to a systems error.  I have no idea

19  what that means.  But our allocation expert says they

20  should have reports to find out how many cars Mr. Reichert

21  requested, how many he received, how many extra they gave

22  him, and for some significant periods of time when we think

23  that we were being targeted for consolidation.

24          THE COURT:  What --

25          MR. BERBERICH:  Probably 40 to 60 days.

1              MR. STATMAN:  Assuming we get the documents, we

2    can keep this trial date, but there are a couple other

3    things.  There have been settlement discussions begun at a

4    level higher than all of us that I understand Ford is

5    talking directly with -- Ford's counsel, general counsel,

6    is talking directly with one of our co-counsel in the case

7    that's admitted pro hoc vice from Florida.  They're talking

8    about a system of settlement that we had proposed a few

9    months ago and got shot down at the lawyer-to-lawyer level

10   but is now being talked about.

11             If that's going to move forward, there is an

12   opportunity for mediation to potentially settle it.  If we

13   had a magistrate mediator --

14             THE COURT:  We will be glad to provide you

15   anybody.

16             MR. STATMAN:  Right.  And the issue is, well,

17   certainly, because of the Court's previous order, and I

18   believe it involved, you know, going out and the proof is

19   in the quantity of papers you have seen.  I mean, there are

20   30, 40 depositions taken.  Summary judgment motions are the

21   size of telephone books.  But, if ordered to and if Ford

22   can prove to us that they actually somehow, of all of the

23   dealers, lost our allocation information or can provide it

24   so that the expert can look at it very quickly, he can be

25   deposed, and we can start trial in December.

```
 1            THE COURT:  What years are we talking about for
 2   this allocation information?
 3            MR. BERBERICH:  2000, 2001.
 4            THE COURT:  So you're talking about recent?
 5            MR. BERBERICH:  Yes, fairly recent.  It was right
 6   after the suit was filed.
 7            THE COURT:  It's hard to believe Ford doesn't
 8   have that information.
 9            MS. MCNELLIE:  It does not exist.  It doesn't
10   exist for any dealership in the country that they have
11   identified for the period.
12            THE COURT:  That's truly hard to believe.
13            MS. MCNELLIE:  It wasn't captured.  The person
14   who was supposed to input the data didn't input it, and the
15   manual records were all destroyed, as it would be in the
16   normal course.  So there just is no allocation records for
17   the time period they have identified for any dealership in
18   the United States.
19            Believe me, it would be in our best interests to
20   have those documents as well, because I think it would
21   shoot down Mr. Mullins' testimony in about five seconds,
22   but the documents just don't exist.
23            THE COURT:  Almost sounds like a spoliation
24   issue.  I don't know, but it's incredible that a company
25   the size of Ford doesn't have -- has a gap in their
```

1    records.

2        MR. STATMAN:  There's one other thing I would

3    like to say on behalf of the plaintiff in considering

4    whether to give us the time to do this.  This case is not

5    the kind of case that, if you said, "Hey you're done and

6    you can't have your expert," and then somehow either the

7    case, we lose on summary judgment or somehow we go through

8    trial without that expert.  These parties are intertwined

9    with each other where this case doesn't necessarily settle

10   issues between them.  We're going to be a Lincoln Mercury

11   dealer until they can figure out how to get rid of us

12   legally or illegally, and they're going to be our

13   franchiser until we sell our dealership to somebody else.

14   The one benefit that this litigation has if anything else

15   is to bring closure potentially from some factual finding

16   and not a legal technicality as to what was going on

17   between these parties and people.

18        So, if nothing else, having the expert come in

19   and finding out what happened with these documents, going

20   through a mediation and then, if it can't be resolved, a

21   trial, we'll at least have more closure for the parties

22   than having this case dismissed or changed on a

23   technicality.

24        THE COURT:  If the Court were to allow you to

25   identify this additional expert and produce a final report

1   from your CPA which would then cause additional discovery

2   and possibly a new expert on the other side, how does that

3   affect the summary judgment motions that have been filed?

4   Would they need to be supplemented?

5       MR. BERBERICH:  Your Honor, it would, because

6   allocation is one of those fundamental issues of the

7   franchiser/franchisee relationship.  If they weren't giving

8   us the product when we needed it when available in

9   preference to someone else, than that would implicate

10  several claims that we have.  So there are some issues.

11      THE COURT:  So there are implications for the

12  summary judgment?

13      MR. BERBERICH:  Your Honor, to follow up briefly

14  on that point, win, lose or draw on this trial, Ford

15  doesn't want us to be a Lincoln Mercury dealer.  At least

16  that's been the expressed sentiment.  Mr. Reichert has

17  almost completely consolidated the market.  We're the last

18  man standing.  So he would significantly benefit from

19  having our piece.  And our client has expressed a desire

20  that, if the right solution can be worked out, he would

21  exit the Lincoln Mercury business and give the dealership

22  back.

23      'So there are -- you know, if we win the trial or

24  if we lose the trial, they still have to unmarry, so to

25  speak.  And I think that's one area in which Beth and I

1   have talked a little bit about settlement.  We talked a

2   little bit with Steve, but it takes a lot of clout at the

3   Ford level to get anything done.  Mr. Reichert can sit in a

4   room; Mr. Woeste can sit in a room, but, unless somebody

5   from the Ford piece is there with a significant amount of

6   authority, nothing can happen.

7            MR. STATMAN:  I don't know that they haven't

8   created their own issue, in fact, by identifying that they

9   don't have any of the documents to prove how the allocation

10  worked.  So our client alleges from his own experience as a

11  dealer that allocation is being manipulated and he's being

12  damaged.  And their response is we don't have any

13  documents.  We just didn't do it.

14            MS. MCNELLIE:  That's not entirely accurate.  You

15  have gotten boxes of documents.  There is one discrete time

16  period in which there are no documents that are available.

17  It doesn't have anything to do with the way the system

18  works, and it doesn't have anything to do with all the

19  witnesses' testimony that substantiates that the allocation

20  system has worked perfectly well.

21            MR. BERBERICH:  The killer for us, Your Honor, is

22  they started consolidating our market in '99, 2000, and the

23  missing documents are in the 2000 frame, which, you know,

24  matters to us.  They went on paper as saying they wanted

25  Woeste out during that frame and they wanted Reichert in.

1   And so that, just whatever happened as to those documents,

2   it really comes at a bad time for us.

3           And then one of Mr. Reichert's men comes forward

4   and says, "Hey, I observed conversations where it was

5   stated that not only were they not going to give cars to

6   Woeste, they were going to take them away." So it's a

7   critical issue.

8           MR. STATMAN:  Well, it's the final of all final

9   issues in terms of case prep and --

10          THE COURT:  All right.  Then let me hear from the

11  defendants.

12          MS. MCNELLIE:  Well, first of all, we're sitting

13  here talking about an additional expert.  The first problem

14  here is that there was a January 2nd cutoff for the

15  disclosure of experts and the proper compliance with Rule

16  26, which they have never done for any of the experts.

17  There is no reason at all that Mr. Bean couldn't properly

18  have been disclosed, his opinions disclosed, his report

19  made available January 2nd.  We have gotten no

20  supplementation to this preliminary report that was done

21  two years ago until they did an affidavit in response to

22  our motion for summary judgment.  I still don't have any of

23  the other materials required under Rule 26 as far as

24  Mr. Bean goes.  As far as --

25          THE COURT:  Like what are you missing?

1    　　　　MS. MCNELLIE:  Well, I don't have his prior

2    testimony.  I don't have what he's gotten paid.  I don't

3    have the basis upon which he bases his opinions.  There are

4    parts of his opinions, even in the affidavit that's in

5    response to the motion for summary judgment, that just says

6    Eastside has been damaged.  Well, I don't know what that

7    means.  I don't know what that's based on.  I don't know

8    how much it is.

9    　　　　THE COURT:  Did you depose him?

10    　　　　MS. MCNELLIE:  I did not.

11    　　　　THE COURT:  Why not?

12    　　　　MS. MCNELLIE:  Because he had never been

13    disclosed as an expert witness.

14    　　　　MR. STATMAN:  They have known about him since

15    '02.  They never asked.  We have been fascinated by

16    their -- all the depositions that were taken and they never

17    wanted to take Mr. Bean.  That was their decision.

18    　　　　MS. MCNELLIE:  We moved to strike his testimony

19    after the first disclosure cutoff.  And we sat in this room

20    and we set January 2nd as a date to comply with Rule 26,

21    and that was never forthcoming.  I never had a report on

22    which to depose him.

23    　　　　MR. STATMAN:  But they even knew about him before

24    the new order, and they had the preliminary report.

25    　　　　THE COURT:  But you did provide a preliminary

1    report?

2         MR. BERBERICH:  Yes.  The preliminary report

3    breaks out seven different discrete areas of damage and

4    does the math on how he came up with his damage analysis.

5         THE COURT:  Did you get the preliminary report?

6         MS. MCNELLIE:  I did get the preliminary report,

7    but there was no supplementation.  There was no provision

8    of the materials under Rule 26 at all.  Supplementation

9    occurred well after the discovery was closed and we had

10   filed our motion for summary judgment.

11        MR. STATMAN:  Since '02, they have never asked

12   for a deposition.

13        THE COURT:  Was there any reason why you didn't

14   provide a final report?

15        MR. BERBERICH:  Yes, Your Honor.  After the --

16        THE COURT:  Were you still getting documents or

17   not getting documents?

18        MR. BERBERICH:  We were doing active discovery

19   heavily in February, March, April, May and June.

20        THE COURT:  Of this year?

21        MR. BERBERICH:  Of this year, right.

22        THE COURT:  What kind of discovery?

23        MR. BERBERICH:  Oh, not so much --

24        THE COURT:  Depositions or documents?

25        MR. BERBERICH:  Not so much documentary, but

1    mainly depositions to find out what the documents meant.

2            MR. STATMAN:  I was in Michigan, California, days

3    and days of depositions in Ohio.

4            MR. HENGEHOLD:  Your Honor, if I could.

5            THE COURT:  Yes?

6            MR. HENGEHOLD:  When we set the expert disclosure

7    date of January 2, I think it was actually Greg that said

8    that will give us three months to depose the experts.  When

9    January 2nd comes and goes, we had received -- from when we

10   were here in September through January 2nd, we didn't

11   receive anything in addition to what we had previously had,

12   which is the very bare bones preliminary report of Roger

13   Bean.  So our assumption was, and I think it was a pretty

14   fair one, that they didn't provide any additional

15   supplementation; there was nothing to be provided; and, as

16   the Court recognized then and everybody in the room did,

17   Bean's report at that point in time didn't meet the rule's

18   requirements.  It doesn't provide nearly what you would

19   need to prepare yourself to go in to take his deposition.

20           So our reason for not taking it is that we all

21   said, to get the extra four or five months to supplement

22   the opinion, you get the opinion with three or four months

23   to take depos.  Nothing was forthcoming from Bean at all on

24   anybody.

25           THE COURT:  Was there any communication as to why

1    it wasn't -- you know, since you had that deadline, was

2    there any communication with them about why it was

3    preliminary?

4         MR. BERBERICH:  We didn't agree that he had not

5    been correctly disclosed.  Now the defendants have raised

6    issues.  The judge didn't decide that.  Roger Bean still

7    can't complete his opinion, particularly on the allocation

8    issue and how that impacts his other line items, because he

9    needs to have Mr. Watkins fill that piece in.

10        He's done -- like, for instance, he gave an

11   opinion about the denial of dualing, how much that's

12   impacted our dealership.  If we could have consolidated two

13   operations into one, that would have yielded us X dollars

14   in savings.  That opinion hasn't changed.  Almost every

15   opinion Mr. Bean listed has not changed, with the exception

16   that the damages would grow if the allocation expert can

17   find an allocation issue.

18        THE COURT:  But when you had a January deadline,

19   this was before you realized, you know, you were missing

20   all these things, why didn't you -- you're saying you did

21   comply; you produced as good a report as you could at that

22   time?

23        MR. BERBERICH:  Right.  And perhaps a CV with an

24   hourly rate, that would be the only additional issues.  I

25   may have even provided a CV.  I'll have to check my file.

1        MS. MCNELLIE:  I don't have a CV.  I don't know

2   what he's getting paid per hour.  I don't have the

3   documents on which he relied.  I don't have the basis of

4   his calculations.  I still don't have the basis of his

5   calculations based on the affidavit.

6        They have had the documents for well over a year.

7   The documents were produced the summer of '02, all of the

8   documents in the case.

9        MR. STATMAN:  Our financials are what --

10        THE COURT:  Wait.  You can't all talk at one

11   time.

12        MS. MCNELLIE:  So we don't hear until a year

13   later that there are documents that are missing.  There

14   were documents that were missing, and part of what we did

15   at the time that we produced the documents back in '02 is

16   we took what records we did have regarding allocation and

17   created a spread sheet to try to fill in as much of that

18   information as we could, and that documentation was

19   provided to them voluntarily at the time of the original

20   production back in '02.

21        It's not like there is nothing for that time

22   period.  It's not all of the information they would like.

23   It's not all of the information we would like.  But we did

24   go and try to pull that information from other sources to

25   create a spread sheet just to fill in their request.  That

1    was provided a year ago.

2         I didn't hear there were documents missing until

3    the time that they filed their reply brief in support of

4    the motion to designate an additional expert.

5         THE COURT:  And I guess what you're saying is

6    that you didn't realize there were missing documents until

7    you took depositions and understood the significance of

8    some of the documents you had, and then you realized there

9    were other documents you needed.

10        MR. STATMAN:  There were two issues on that

11   point.  Issue one is they just said that they tried to

12   piece together what they could, but they never clearly

13   responded and said "We lost all these documents back then."

14   That's number one.  Number two --

15        THE COURT:  Do you agree with that?

16        MS. MCNELLIE:  That we didn't tell them at the

17   time that there --

18        THE COURT:  That month.

19        MS. MCNELLIE:  That's right.  We provided the

20   reports in lieu of the records that were missing.

21        MR. STATMAN:  So that's one.  And number two is

22   our expert opinion, as an accountant for the dealership, is

23   based on the accounting records of the dealership.  Unlike

24   a typical case between some businesses and financial

25   damages where people have to actually exchange these

1    documents through discovery, Ford, on a monthly basis, has

2    a very significant detailed form that we must disclose

3    everything, including the name of any child we are thinking

4    of having, on this form.  And it tells line item how many

5    cars, net profit, gross profit, you know, number of

6    employees, this, that and the other, overhead calculations,

7    parts calculations.  They get this every month.  Those are

8    the financials of the dealership.

9          They had -- the documents that he relied on are

10   obvious, any documents exchanged in discovery and the

11   financial statements provided to them monthly.

12         The hourly rate, I don't think that's a big deal.

13   You said what's your hourly rate.  $150 an hour.  Is that

14   really a big prediscovery question?  I just don't know see

15   how that prevents a deposition.

16         But the bigger issue is they chose all these

17   months to never ask to depose him and never sent us letters

18   complaining that the preliminary disclosure wasn't

19   adequate.

20         MS. MCNELLIE:  That's not true.  I have the

21   letter.

22         THE COURT:  That's what I wanted to know.

23         MR. BERBERICH:  And they filed --

24         THE COURT:  Wait.  Wait.  You cannot all talk at

25   the same time.

1       MR. STATMAN:  That came at the end, not at the

2   beginning.  Okay?  They're complaining about it now.  That

3   came at the end, not back --

4       THE COURT:  All right.  I want to hear from the

5   defendants.

6       MS. MCNELLIE:  I'm sorry.  I sent a letter when

7   you sent me Mr. Bean's preliminary report a year ago that

8   said it doesn't comply with Rule 26; will you please

9   immediately comply.  It's attached to my motion to strike

10  their expert report.  I told them a year and a half ago

11  that that report was not sufficient under Rule 26.

12      MR. STATMAN:  And that was prior to our previous

13  court hearing.

14      MS. MCNELLIE:  Yes.  And, at that point in time,

15  we set a new disclosure date so that you could comply with

16  Rule 26.  And Rule 26, to this very day as we still sit

17  here, has not been complied with.  They could have done it

18  when they attached their motion for leave.  They could have

19  done it when they responded to my notion for summary

20  judgment.  I still don't have all that material.  They've

21  had the documents for over a year.

22      MR. BERBERICH:  Your Honor, all that material is

23  what I'm having trouble with.  The CV and the hourly --

24      THE COURT:  Wait.  Wait.  Wait a minute.  I want

25  to hear from the defendants.

1          MS. MCNELLIE:  A preliminary calculation doesn't

2   tell me what he -- how he did it, how he put the numbers

3   together.

4          THE COURT:  I understand your problem.  I

5   understand your problems with the preliminary report of the

6   CPA.  What else?

7          MS. MCNELLIE:  Well, as far as this additional

8   expert goes, I think this whole additional information is a

9   red herring.  They have had an allegation in their

10  complaint for two years.  There was nothing that

11  Mr. Mullins said that was shocking or new.  It was all

12  stuff I had heard from their witnesses in their depositions

13  that they believed.

14          THE COURT:  Who is Mr. Mullins?

15          MS. MCNELLIE:  Mr. Mullins is --

16          MR. BERBERICH:  Mr. Reichert's employee.

17          MR. STATMAN:  Former employee.

18          MS. MCNELLIE:  That came forward this spring to

19  testify.

20          MR. BERBERICH:  Right.

21          MS. MCNELLIE:  There wasn't anything that he said

22  that was of any particular numerical value or time frame

23  that was different than the allegations that they had made

24  before.  I mean, there was no reason, based on the

25  documents they already had, their own witnesses' testimony

1    who ought to know whether they were being shorted cars or

2    not, that they couldn't have had an allocation expert many,

3    many months ago.  We sat in this room, and you said to

4    them, "If you have any problems getting your experts

5    identified by January 2nd, let me know so we don't have to

6    lose our dates."

7            I mean, we are going to lose all our dates.

8    There is no way that we could be ready for trial December

9    1st if they're going to get an extra expert now, because I

10   need to depose that person.  I need to --

11           THE COURT:  Wait.  I don't disagree with you in

12   this respect.  I was a trial lawyer for 25 years before I

13   got on the bench.

14           MS. MCNELLIE:  For over two years, and, frankly,

15   Mr. Walls and Mr. Carter and Mr. Reichert are not

16   businesses.  They have to live with this every day.  It's

17   burdensome on them personally.  And, you know, for them to

18   be able to just continually ignore dates and come back in

19   and say, well, gee, we really need more time, it's not a

20   matter of readjusting the calendar.  It doesn't matter to

21   me.  It doesn't matter to Ford.  But it matters to these

22   guys, and it matters to Ford employees.

23           It's -- Rule 37 is very clear that the sanctions

24   situation like this is exclusion of experts.  And they just

25   haven't given the Court any justification for not being

1  able to have their expert in a timely fashion or to not

2  come forward at some time when we could have corrected

3  this.

4         THE COURT:  Let me hear from Mr. Hengehold.

5         MR. HENGEHOLD:  Of course, all the disclosure and

6  so on are identical to us, or the failure to do so.  But,

7  in response to one of the items that Mr. Statman was

8  referring to, that this dispute will go on whether this

9  litigation goes on or not, this particular litigation, is

10  not true with respect to my client.  He's not Ford.  He's

11  not -- and this has -- we're at the two-and-a-half year

12  mark.  We are deep into this.  We've got through

13  everything.  We filed our motions for summary judgment on

14  the premise that the Court's finite unambiguous second

15  round of discovery cutoff would be enforced, the

16  requirements for disclosure would be enforced, and we're

17  ready to go on that basis.

18        We all attached to the memorandums in opposition

19  the discussions that we had in here last time, and you were

20  absolutely crystal clear, and nothing happened from that

21  date until today as far as any additional expert

22  identification.  We just got the name of the second expert

23  ten minutes ago and nothing on Mr. Bean until an affidavit

24  was filed, and that didn't provide the type of detail that

25  Rule 26 requires.

1          That report they keep referring to, the

2    preliminary report of Mr. Bean, is very skeletal.  And it

3    didn't meet the requirements then, and nobody argues that

4    it met Rule 26.  It became moot because he gave him so much

5    more time.  So here we are faced with having to re-rack it

6    and do it for another year or six months or eight months

7    and incur all the expenses associated with it when,

8    presumably, the reason it hasn't been done is that this

9    evidence doesn't exist, and we ought to just go forward as

10   it lays.

11         MR. BERBERICH:  Your Honor, my only response is,

12   if this was an issue on January 2nd like they're saying and

13   they couldn't go forward, we have a 16-page report from

14   Dr. Schmitz which fairly well addresses each item that was

15   raised in Roger Bean's report.  And why did they go through

16   six months of heavy discovery?  I mean, we have done almost

17   all the traveling and the depositions and everything else.

18   If this was going to be a nonstarter on January 2nd, then

19   why wait until we get done with six months of discovery?

20         Because it's the same issue in a different light

21   in their summary judgment motion is they're saying we don't

22   have an expert.  We're saying that we even have lay witness

23   testimony that clearly spells out what our damages are.

24         But, you know, the bottom line is that we have

25   disclosed Mr. Bean's preliminary report.  His opinions are

1   footnoted.  It shows how he does the math.  You know, it's

2   a couple of pages, and it shows how he does the math as to

3   most of those items.  The information he's basing it on is

4   something that Ford gets every month, and it's the same

5   information that Mr. Schmitz was -- Dr. Schmitz -- excuse

6   me -- was able to evaluate and piece together his own

7   opposition.

8           THE COURT:  Let me ask you this.  If the Court

9   set a new deadline of January 2nd, what was the old

10  deadline?

11          MR. BERBERICH:  September, I think, something.

12          MS. MCNELLIE:  I believe it was before that.  It

13  was earlier.  It was in the summer.

14          THE COURT:  Than you found that you couldn't

15  comply.  Then the appropriate thing to do at that point was

16  to move the Court for an extension of time of the expert

17  deadline.  You didn't do that.

18          MR. BERBERICH:  Your Honor, we provided -- again,

19  at that time, we provided an opinion that followed through

20  up to the date that it was made.  Because, like, for

21  instance, Mr. Bean's supplemental opinion would simply

22  update the numbers, because more time has passed from the

23  date he rendered his preliminary report until now.  So we

24  would simply update some numbers.  The math that he's going

25  through is the same math that he provided in his

1   preliminary report.  I mean there is no real change in

2   his -- in the substance of his opinions.  If the allocation

3   data is allowed to come in -- and, again, one point the

4   defense hasn't brought up is to hire an allocation expert

5   you're talking about spending, you know, $50,000, maybe

6   even more, because they have to go through detailed

7   records, hours and days of records, in order to put

8   together an allocation.  You know, they have to look at

9   everybody in your city and compare it to what you received.

10  It's very time consuming.

11          We didn't have anything but suspicions.  And Ford

12  sent us letters and their witnesses all testified, no, we

13  allocated fairly; we gave you exactly what we gave

14  everybody else this entire time.  Then one of Mr.

15  Reichert's former employees comes out of the woodwork, so

16  to speak, and tells us, "Hey, Guys, I sat in on meetings

17  where they said they were taking cars away from you and

18  that they were denying allocation to you."  So at that

19  point we felt, I guess, it was worthwhile to invest in the

20  allocation expert, because we had a live witness that

21  said -- from the other side that said we had been cheated.

22  So we had a lot more to go on at that point.

23          As far as Roger Bean's opinion testimony, it's

24  going to track his preliminary opinions very carefully.

25          MR. STATMAN:  Dr. Schmitz is their expert who

1    reviewed the report of Bean, and he responds to it line by

2    line saying this makes sense; this doesn't make sense; this

3    is idiotic; this is this; this is that.  And then, at the

4    end, he has a qualification section where he says that,

5    based on models for other data that may come to him, he may

6    have a few minor changes.

7         Nowhere in here does he say that the Bean data is

8    inadequate to be able to base a responsible opinion on, and

9    then he goes, quite frankly, through a 19, 20 page report

10   where he makes no complaint about the quality of the -- and

11   I would think that, for an expert to be able to respond to

12   the plaintiffs' expert, because that's what he's doing.  He

13   went line by line.  He tells who he is.

14        THE COURT:  All right.  I understand what you're

15   saying.  What you're saying, that you believed that in

16   January you had complied.

17        MR. BERBERICH:  With the exception of the CV,

18   and, again, that's my mistake, not my client's, the CV and

19   the hourly.  But, in terms of the basis of the opinions,

20   it's set out like an accountant's.  You know, he lists and

21   tabulates the data.  He footnotes some of the issues and

22   how he arrived at his numbers.  And the data that he's

23   basing it on is the same data that we provided to Ford on a

24   monthly basis.  And Dr. Schmitz is able to --

25        MR. STATMAN:  Respond.  He even starts it by

1    saying that he is responding.

2    THE COURT:  I understand the point that Schmitz

3    responded.  When were the last depositions taken that you

4    say --

5    MR. BERBERICH:  Beginning of June, I think was

6    when Mullins was produced.  He was the one that we wanted

7    to have give us an affidavit.  Then he said he wouldn't

8    testify.  We filed a motion to the Court alleging that

9    there had been some witness tampering, because he gave us a

10   voice mail saying, you know, I am concerned about what's

11   going to happen to me.  And so then we had to subpoena him.

12   He came in and testified that he had not been threatened

13   but that, in fact, everything he told us in his affidavit

14   was true.  And then he went through line by line and talked

15   about the allocation and the manipulation and preferential

16   marketing money and whatnot.  So he went through that in

17   detail.

18   Frankly, Your Honor, the fact witnesses and the

19   lay witnesses are all done.  The only thing that's left

20   would be some expert witness stuff.  We have deposed 30 or

21   thereabouts witnesses, and there -- you know, in terms of

22   how much extra time, I think that's a little bit blown out

23   of proportion, because all the data is there, other than

24   perhaps some additional data from Ford on allocation.  I

25   think all the people have testified, some of them for four

```
 1    hours and eight hours at a stretch.

 2              THE COURT:  Do you have a final report from -- is

 3    Mullins -- you're proposing Mullins as your allocation --

 4              MR. BERBERICH:  No, no.  A guy named Glen

 5    Watkins.

 6              THE COURT:  Okay.

 7              MR. BERBERICH:  What he said, where he's at, he

 8    has some preliminary opinions.  He can get close to his

 9    final opinions, but, until he receives Ford's data, he

10    can't plug in the -- he's only seen --

11              THE COURT:  What data is there that you don't

12    have from Ford?

13              MR. BERBERICH:  What there are is allocation

14    reports that show what somebody is allocated, how many they

15    asked for, how many they're given.

16              THE COURT:  Have those been provided to you?

17              MS. MCNELLIE:  Those are the ones that don't

18    exist.

19              THE COURT:  Oh.  Okay.

20              MR. BERBERICH:  And that really kills us,

21    because, like, for instance, our complaint, our complaint

22    is really simple.

23              THE COURT:  I understand.  But if Ms. McNellie is

24    representing that they don't exist, they're not going to

25    get produced.  I mean, if that's what your expert is going
```

```
 1    to rely on, then there is nothing to rely on.

 2              MR. BERBERICH:  I guess the only other thing,

 3    Your Honor --

 4              THE COURT:  You know, you can't conjure it up out

 5    of thin air.  You can argue spoliation or something, but

 6    she can't produce documents that --

 7              MR. BERBERICH:  He does have some opinions that,

 8    just looking at the numbers he does have, there are frames

 9    where, like the Navigator, which is a big issue because it

10    was a hot seller at the time, where we were

11    disproportionately treated on the Navigator allocation.  So

12    he does have some frames where he says, yes, clearly there

13    is an allocation, if cars were taken away from us or not

14    provided to us or preferentially within the same market

15    given to Mr. Reichert.

16              THE COURT:  So when could he provide a report?

17              MR. BERBERICH:  Again, assuming there is no more

18    evidence to come out of Ford -- and Mr. Reichert, we also

19    asked Steve Hengehold if he could talk to his client to see

20    if they had any, I'll say, handwritten order sheets, which

21    is something that, you know, when your salesman from Ford

22    comes to you, you write out these order forms, how many you

23    want, how many they're going to give you, how many extra

24    you would like to have, and apparently Reichert's operation

25    did not keep any extras.
```

1          MR. HENGEHOLD:  We saved last month's and this

2    month's.  It's not a historical document for us.

3          MR. BERBERICH:  If it's truly not available by

4    other means, let's say 30 days.

5          THE COURT:  I would say, based on the

6    representation I have heard from this side of the table,

7    there are no more documents.

8          MR. BERBERICH:  Thirty days.

9          MR. STATMAN:  No more than 30 days.  We'll do it

10    as fast as we can do it.  If we can do it in 21, we will do

11    it in 21.

12          THE COURT:  You want to respond at all?  Anything

13    you want to add?

14          MS. MCNELLIE:  I just don't understand why it's

15    taking so long and why we can just ignore the Court's

16    deadlines.  I really honestly don't understand.  They have

17    had the documents forever.  And, I mean, they have known

18    who the allocation person at Ford is since '01.  It was in

19    the initial 26 disclosures that were filed immediately

20    after the case was filed that Tim Fisher was the guy to

21    come and explain every document to you.  You could have sat

22    there for a week and gone through every document, and Tim

23    Fisher could have told them exactly what was in it.  And if

24    there were documents that Tim couldn't explain, there was

25    always a 30(b)(5) witness that could be asked for who could

1    explain a specific document if they had issues with it.

2          None of that ever happened.  We waited until

3    after January before they even asked me for a deposition.

4    Every time we have started this case, nothing has happened

5    on discovery until I call them and say, "I really need to

6    get my discovery started.  Can we set some depositions?"

7          And, you know, we provide documents on a timely

8    basis.  I follow the Court's rules and get Mr. Schmitz

9    disclosed at the appropriate time, completely following

10   Rule 26 on each letter of the rule.  I get a preliminary

11   report back from Mr. Bean that was done before the case was

12   filed.  And I don't hear anything more from him until after

13   I file for summary judgment?  I'm just a little at a loss.

14          THE COURT:  I understand.  Yes, I understand what

15   you're saying.

16          Aly, let's talk for a minute.

17          (Pause in proceedings.  Judge Dlott leaves the

18   conference room briefly.)

19          THE COURT:  I wanted to take a minute to go look

20   at the transcript of the previous hearing which occurred --

21   when was that, Aly?

22          MS. MCNELLIE:  September 12th, I believe.

23          THE COURT:  Okay.  Sometime in September.

24          MS. STANG:  September 12th, yes, ma'am.

25          THE COURT:  At that point, the language is pretty

1    clear that I guess you have already produced the

2    preliminary report, and I give you until January to

3    supplement that in any way you want.   And I advise you

4    that, if there is any problem with compliance with that, to

5    advise the Court.   And the Court was not advised.

6              Can you read the specific language there, Aly?

7              MS. STANG:   The Court says:   Let's talk about

8    experts.   What do you want for a cutoff for identification

9    of experts?   And by notification of experts, I mean

10   compliance with Rule 26.   If you want to do something less

11   than comply with Rule 26, you have to have agreement of the

12   other side.   If you do, that's fine.   If you can't agree on

13   that, then you have got to comply with Rule 26, which means

14   identification of experts and production of reports and

15   everything else that Rule 26 requires.

16             Mr. Berberich:   Your Honor, we have already run

17   into that problem, so I think that, now that we have the

18   documents, it probably would be --

19             And the Court says:   When can you identify your

20   expert or experts by?

21             And Mr. Berberich says:   We have already got the

22   people picked.

23             And the Court says:   No, no.   I mean compliance

24   with Rule 26.   When could you do that by?

25             And Mr. Berberich says:   I would say January 1,

1    which gives us three months to depose them.

2          The Court:  All right.  Yours will be January 2nd

3    for Plaintiffs' experts.  Yours will be February 2nd for

4    your experts.

5          Ms. McNellie:  That should be sufficient, Your

6    Honor.

7          And then you -- the Court continues:  These

8    dates, gentlemen and lady, are in stone.  They will not be

9    changed under any circumstances.  If you are having any

10   trouble with any discovery so that it appears you're not

11   going to be able to meet these deadlines, then it is

12   incumbent on you to notify the Court as soon as possible so

13   that I can deal with it so that you can still comply with

14   these deadlines.

15         And continuing on, Ms. McNellie says:  I'm sorry.

16   There is one other thing.  I did file a motion to exclude

17   his experts for not complying with Rule 26.  I'll withdraw

18   it.

19         The Court:  That will be denied as moot.  I will

20   just deny it.  You want to withdraw it?  Whatever.  It

21   doesn't make any difference.  I can deny it as moot.

22         THE COURT:  So, currently there is -- is there a

23   motion to strike Bean at this point pending or not?

24         MR. BERBERICH:  No.

25         MS. MCNELLIE:  We made reference in our reply

1  brief in support of our motion for summary judgment that

2  the Court should disregard Mr. Bean's testimony in its

3  entirety.  It's not formally moved, but I can so move if

4  the Court desires.

5      THE COURT:  Well, what I think I'm going to do at

6  this point, it seems to me that the plaintiffs have had

7  adequate time to get any additional experts, to get

8  documents, if witnesses were available who could have

9  explained the documents a long time ago and they have had

10  the documents since last September.

11      MS. MCNELLIE:  Yes, that would have been the last

12  of the documents to have been produced.  Most of them were

13  produced last July.

14      MR. BERBERICH:  Your Honor, the issue that we

15  raised is that we didn't have anyone -- all the Ford

16  witnesses testified they allocated things fairly.

17  Mr. Reichert testified and his general managers that they

18  didn't get special treatment.  Then in May or June --

19      THE COURT:  Of which year?

20      MR. BERBERICH:  Of this year -- Mr. Mullins came

21  forward, who was the former Reichert employee who said the

22  allocation, I was there when Ford's Mr. Letarte, who is our

23  general manager, was talking to another sales manager and

24  saying that he was withholding cars from Woeste and giving

25  additional cars to Mr. Reichert's dealership.

1          So, you know, as to what those allocation reports

2    could have told us before we -- you know, again, we

3    reviewed them, but there wasn't any detail that was

4    sufficient enough to really spell it out.  And there are

5    some other items that our expert says should be there.

6    Like there is something called a manager's pool where the

7    manager withholds ten percent of the cars and they don't go

8    through the traditional allocation.  That's one area.

9    There are no pool documents at all.  There is another set

10   of documents which would be reallocation, which means that

11   somebody in the region turns a car down and then it comes

12   back to the region, and then they divvy it up how they

13   want.  That's another way how to evade the allocation

14   system to provide cars to one guy in one city that you want

15   to help.  And --

16          THE COURT:  So you're saying and you were aware

17   of none of this until --

18          MR. BERBERICH:  We suspicioned it, but we had no

19   evidence.  We had no hard evidence.  We had no hard

20   evidence from any quarter, other than the cross-exam that

21   we did of Ford witnesses and Mr. Reichert's witnesses and

22   our suspicions.  And the documents, in terms of what the

23   numbers meant, were there, but we had no -- what I'll say,

24   there was no smoking gun.

25          MS. MCNELLIE:  So what he's telling us now is

1    that he violated Rule 11 when he signed the complaint

2    saying there was an allocation problem.  I mean, this was

3    two years ago.  I mean, if there are cars being withheld

4    from his client's dealership, they ought to be the first

5    ones to know they're not getting vehicles.  And then they

6    file a complaint saying that there are cars being withheld

7    from the allocation.  He's sitting here now saying he had

8    no evidence of that.

9              THE COURT:  No.

10             MR. BERBERICH:  That's not what I said.

11             THE COURT:  That's not what he's saying.  I think

12    what he's saying is that a witness came forward that was

13    unknown to him at the time that was like a smoking gun.

14             MS. MCNELLIE:  But they had all the documents.

15             THE COURT:  Right.

16             MS. MCNELLIE:  They should have known, if that

17    time period was critical to them, they could have figured

18    that out months before January 2nd, let alone months before

19    this summer when they come forward and, for the first time

20    on reply, tell me those documents are missing.

21             THE COURT:  You're not contending that

22    Mr. Mullins can't testify, are you?

23             MS. MCNELLIE:  Oh, no.  Mr. Mullins can testify.

24    He's a fact witness.

25             THE COURT:  All right.  So the only issue is this

1    additional expert, and I guess Bean's testimony and whether

2    or not he is an expert.

3         Well, it just seems to me there has been too much

4    delay here.  I'm not going to allow any additional experts

5    on allocations or anything else.  That's closed.  What I

6    will allow you to do is, if you have anything you want to

7    supplement Bean's testimony with, you can do that in the

8    next two weeks, I would say by October 15th.  And you can

9    take his deposition as soon after that as you wish.  And if

10   you don't, if you don't supply anything additional by that

11   date, you're still welcome to take his deposition if you

12   want, because he will be an expert at trial.  But he will

13   be precluded from adding any additional things if he

14   doesn't supplement by the 15th.  And all the other dates

15   will then stay.

16        MS. MCNELLIE:  We have a final pretrial statement

17   due two weeks after the 15th.  I'm not sure that we could

18   get a deposition in prior to that time.

19        THE COURT:  Will his depo change the final

20   pretrial that much?

21        MS. MCNELLIE:  It may change the summary

22   judgment.

23        MR. STATMAN:  We can supplement the final

24   pretrial order with any changes based on his deposition, or

25   I think the final pretrial is the 7th.  The trial isn't

1   until three-and-a-half weeks later.  Move that back a few

2   days.

3            THE COURT:  All I'm thinking is that you know

4   most of what this expert is going to say.  I mean, your

5   expert looked at his preliminary report.  I can't imagine

6   it's going to be that big a surprise what he's going to say

7   that it's going to make a whole lot of difference.

8            MS. MCNELLIE:  It may change our summary judgment

9   motion, though.

10           MR. JOHNSON:  It may, and our point, Your Honor,

11  so far has been that the preliminary report was very

12  skeletal, and it will take significant time to explore the

13  basis for his opinions that he simply stated in a

14  conclusiory fashion.  So that deposition could be

15  significant.

16           THE COURT:  All right.  Let's do this then.  They

17  have got two weeks if they're going to supplement.  They

18  may or may not.  If they do, fine.  Then you're welcome to

19  take his depo.  And I want him available within the

20  following two weeks to take his deposition.

21           MR. BERBERICH:  Two weeks from today, Your Honor?

22           THE COURT:  No.  Two weeks after the 15th, that

23  he'll be available during that time to take his deposition.

24           At that point in time, if you feel that you need

25  to supplement your summary judgment motion, if that changes

1    things, then what I will do is I'll permit you to do that.

2    We'll put off the -- just back up the final pretrial and

3    the trial a month or two.  And we won't change it very

4    significantly, but that will give everybody adequate time

5    so that you don't do any work for the final pretrial that

6    is unnecessary or whatever.

7          Because the other thing is, you know, we need

8    some time then to look at it if it is supplemented.  And I

9    don't want you all to do some unnecessary work.

10          MR. BERBERICH:  Judge, the only other area I

11    think we need to address is all I have right now is a

12    letter from Ford's counsel saying that these documents just

13    don't exist.  What I would like to do is have something --

14    either we could send a request to admit with a list of

15    documents saying admit or deny that they, you know, no

16    longer exist or that Ford's destroyed them or whatever,

17    because we would like to make the argument that these

18    allocation documents are no longer available, no longer

19    present.

20          THE COURT:  I imagine Ms. McNellie could

21    stipulate that.

22          MS. MCNELLIE:  Um-hum.

23          THE COURT:  You can just enter into a

24    stipulation.

25          MR. BERBERICH:  That's fine.  That's all I need.

1          THE COURT:  Okay.  All right.  So you will notify

2     the Court.  You will notify Steve Snyder, my courtroom

3     deputy, if you need a conference call to talk about new

4     dates after you have deposed Mr. Bean.  Okay?

5          MS. MCNELLIE:  Okay.

6          THE COURT:  Everybody on the same page?

7          MS. MCNELLIE:  That the trial date will be moved

8     back regardless?

9          THE COURT:  Probably, probably a little bit just

10    so we have got time, if there is -- well, it depends.  You

11    know, if there is no supplement to the summary judgment,

12    then the answer is no.  If it doesn't really change

13    anything or it changes it so little that it's not worth

14    supplementing it, then we can go ahead.

15          You know, what I need to know from you then is,

16    if there is such a significant -- whatever you find out is

17    so significant that it changes things for your side.

18    Because it's not going to change anything for them.

19    They're ready to go.  So it's only the defendant.  If you

20    need, then, additional time to supplement the summary

21    judgment or to prepare for the final pretrial in light of

22    Mr. Bean's testimony.

23          MR. JOHNSON:  Your Honor, at present, the joint

24    pretrial statement is due on October 30dth, I believe.

25          THE COURT:  I've got November the 7th.

1          MR. JOHNSON:  For the final pretrial, Your Honor.

2    And then the final pretrial statement is due October 30th,

3    which I think is the final date that we have been allocated

4    for taking the deposition.

5          THE COURT:  Right.  So we have got to back that

6    up.  Why don't we -- the trial is not set until December

7    1st.

8          Let's -- is Steve here, Aly?

9          Let's see if we can give you a new final pretrial

10   date.

11         MS. STANG:  Judge, I don't know if you want to

12   talk about this, but the plaintiffs did raise the issue

13   that, you know, a settlement conference might be useful if

14   the right people are involved.

15         THE COURT:  Good point.  Is there anything the

16   Court could do to facilitate that discussion?

17         MS. STANG:  I don't know if that's possible to do

18   that while the summary judgment motions are pending.

19         MR. BERBERICH:  We tried before the case to talk

20   about settlement.  I think we also -- I think we have

21   talked a little bit recently among the parties, but I think

22   it would be helpful to have, you know, a magistrate to

23   mediate the settlement.

24         THE COURT:  Do you want a settlement conference?

25         MS. MCNELLIE:  I'm not opposed to having one.

1    THE COURT:  How about you?

2    MS. MCNELLIE:  I do think having the summary

3  judgment motions ruled upon would facilitate that

4  discussion, because right now I'm very confident in my

5  motions for summary judgment.  It's very difficult for my

6  client to ascribe much value to this as a case when those

7  are still pending.

8    MR. BERBERICH:  Your Honor, I think our biggest

9  selling point on the settlement issue is that, if we win

10  the case or lose the case, we're still a dealer.

11  Mr. Reichert is still in an unconsolidated, one piece left

12  market.  Ford has expressed their desire on paper a couple

13  years ago that they didn't want us to be a dealer anymore.

14  So we are still left with the same unhappy family.

15    And I think we have talked about solutions that

16  don't involve Ford paying a lot of money for this

17  dealership.  You know, we're trying to propose a creative

18  solution versus just dollars and cents.  So when Ms.

19  McNellie says I can't tell my client that this case is

20  worth a lot of money, we're offering a solution that is not

21  going to cost them a lot of money.

22    MR. STATMAN:  There is a formula of swapping

23  dealerships and other things.

24    THE COURT:  Again, is your client amenable to

25  that kind of a conversation before the summary judgments

1  are decided?

2      MS. MCNELLIE:  They have not been to date with

3  me, although they related that there have been

4  conversations that have gone on that I really am not aware

5  of.  So I honestly cannot respond to that question.

6      MR. STATMAN:  Your Honor, if they're that

7  confident, I would rather just wait until after you rule.

8  I find oftentimes that parties misplace their confidence in

9  motions.

10      THE COURT:  I need to move back -- the final

11  pretrial is now set for November 7th, and I need to move it

12  back, move it out, like, about two weeks.

13      You know, that's still potential, because, if

14  they don't supplement or --

15      MS. MCNELLIE:  The problem again is that, because

16  we're then getting close to Thanksgiving, and there are so

17  many issues in this case that I think will at least be

18  significantly thinned by summary judgment, the amount of

19  work that has to be undertaken to prepare the final

20  pretrial order without a ruling is enormous.  I have heard

21  you speak about not trying to waste everybody's time.

22      THE COURT:  I understand.  So what are you

23  saying?  You want it in mid-December?

24      MS. MCNELLIE:  I think that makes a lot more

25  sense.

1          THE COURT:  Enough time to give us time to decide

2    the summary judgment.

3          MS. MCNELLIE:  Okay.

4          THE COURT:  That's fine.  I agree with what

5    you're saying.

6          Why don't you look at somewhere in mid-December

7    for the final pretrial?

8          MS. STANG:  So, Judge, we're going to change the

9    dates now regardless of -- the trial dates, not make it

10   contingent on --

11         THE COURT:  That's the only thing I'm starting to

12   say, that it could be contingent.  We will give you an

13   alternate set of dates, but, if they don't produce anything

14   more and you don't depose him, or you depose him and

15   nothing changes, do you want to try to keep the dates you

16   have got, if it's not going to change your summary judgment

17   at all?  Or do you want to just go to these other dates?

18         MS. MCNELLIE:  I think having the summary

19   judgments ruled upon would make the whole trial preparation

20   a whole lot easier for everybody.  But I'm happy to keep

21   the dates.  We can do it either way.

22         MR. STATMAN:  If we move it, then a mediation may

23   make sense if they lose their summary judgment and their

24   confidence suddenly evaporates.

25         THE COURT:  Let's move to it mid-December.

```
1              We do have one thing.  I usually do mediations in

2    my cases myself if it's a jury case.

3              Which -- is this a jury case?

4              MS. MCNELLIE:  Yes, it is.

5              THE COURT:  I'm not in any way saying you have to

6    have me, but our problem is we're going to be down to one

7    magistrate after this week.

8              MR. STATMAN:  We have no objection to that.  I

9    just didn't know you did it that way.

10             THE COURT:  Judge Sherman has retired, and he's

11   been kind enough to come back.

12             MR. BERBERICH:  Got drug back.

13             THE COURT:  But he said this Friday he's out of

14   here.  So he's gone, and we're down to just one magistrate,

15   Judge Hogan, and we have got four district judges.  So he's

16   just going to be swamped.

17             You know, there is a possibility we could bring

18   somebody in from another city, but, you know.

19             MS. MCNELLIE:  I think, given your familiarity

20   with the case, it would be the perfect solution.

21             THE COURT:  Yes.  I'm glad to do it.  I think

22   scheduling a magistrate is going to be tougher than getting

23   a Supreme Court justice at this point.

24             MR. HENGEHOLD:  We couldn't use Judge Hogan, Your

25   Honor.  He's a personal friend of mine.
```

```
 1              THE COURT:  Oh, okay.

 2              MR. STATMAN:  We have no objection.

 3              MR. REICHERT:  Maybe we should.

 4              MR. STATMAN:  This simplifies the process,

 5    because we don't have to go through the education that you

 6    already have, not only from the summary judgment but --

 7              THE COURT:  All right.  So usually what I do at

 8    the final pretrial conference is it's also a settlement

 9    conference.  Would you prefer it be a settlement conference

10    first and then a final pretrial --

11              MR. STATMAN:  I would.

12              THE COURT:  -- if that doesn't succeed?  Which

13    could be shortly thereafter.

14              MS. MCNELLIE:  Depending on when the motions are

15    ruled on, we could have the settlement conference prior to

16    the middle of December, too.

17              THE COURT:  Yes.

18              MS. STANG:  If they think it's going to be an

19    expensive final pretrial order to do, then that makes

20    sense.

21              THE COURT:  Right.  So what are we talking about?

22    You will have until October 30th to depose Mr. Bean.  Then

23    how long do you want to supplement, if you supplement your

24    summary judgment motions?  A couple weeks again?

25              MS. MCNELLIE:  I'm in trial the first week of
```

1    November, so probably three weeks.

2            THE COURT:  So mid-December is as soon as --

3            MR. STATMAN:  Then would we get some time to

4    respond?

5            THE COURT:  Yes, you get time to respond.

6            MR. STATMAN:  We would need two weeks after that.

7            THE COURT:  I think the best we could do then is

8    have the settlement conference sometime in December.

9            MR. STATMAN:  We could use the trial January 1st,

10   2nd as the settlement/pretrial and then have the trial in

11   the spring.

12           THE COURT:  I'm not sure the supplements to the

13   summary judgment would be in by then.

14           MS. MCNELLIE:  Probably not.

15           THE COURT:  I think we have got to go out

16   sometime mid to late December for the settlement

17   conference.  Just a supplement and a response, no reply.

18   We will do that.

19           (Discussion off the record.)

20           THE COURT:  We have blocked out some dates.

21   First, let me make clear that the supplement to the summary

22   judgment motion will not be, you know, whole new arguments

23   and everything.  It will just be anything additional as a

24   result of Mr. Bean's testimony.  And I can't imagine it's

25   going to be a whole lot, since he's already given a

1    preliminary opinion, you know, and then --

2          THE COURTROOM DEPUTY:  So you will supplement by

3    November 21st.

4          MS. MCNELLIE:  Oh, supplement the summary

5    judgment.  Right.

6          THE COURTROOM DEPUTY:  Then Plaintiffs will

7    respond by December 5th.  We will have a decision -- we

8    should have something out by December 12th.  On Monday,

9    December 15th, a synopsis from the parties of five pages or

10   less of where you stand in regard to settlement.  It goes

11   to the Court only, not to the opposing side.

12         MR. BERBERICH:  Monday what?

13         THE COURTROOM DEPUTY:  The 15th.

14         MR. BERBERICH:  Of December.

15         THE COURTROOM DEPUTY:  Yes.  Directly to us.

16   Settlement conference the 19th at 9:30.

17         THE COURT:  And I want, again, I want principals

18   or someone with full settlement authority.

19         So who will you have from Ford?

20         MS. MCNELLIE:  I don't know at this time who it

21   will be.

22         MR. STATMAN:  What time?

23         THE COURTROOM DEPUTY:  9:30.

24         THE COURT:  I want somebody with real authority.

25         MS. MCNELLIE:  No, no.  It will be someone.

1      THE COURT:  And you will have your principal --

2      MR. BERBERICH:  Yes, Your Honor.

3      THE COURT:  -- as well.

4      MS. STANG:  Are we going to vacate the other date

5  for trial and see where we go from there?

6      THE COURT:  Um-hum.  Yes, because we have got so

7  much stuff set for November and December.  We have two

8  other trials set for your date anyway.  So I think we would

9  be just as well off to do it in January is a lot better,

10  February.

11      THE COURTROOM DEPUTY:  Yes.  February is wide

12  open right now.

13      MR. STATMAN:  That really works better than

14  January.

15      MR. JOHNSON:  The beginning of February is

16  wonderful.

17      MS. MCNELLIE:  I have a trial the first week of

18  February in Toledo that I'm pretty sure is going to go.

19      MR. STATMAN:  We're going to pick a trial date at

20  the end of December?

21      THE COURT:  We can pick one today and block it

22  out if everybody has their calendars.  Let's pick one in

23  February.  Again, is this a ten-day trial?

24      MR. STATMAN:  How about February 16?

25      MS. MCNELLIE:  He's out of town with his family

1    that week.  I know that there is just no way.

2                MR. STATMAN:  Then you said you have a trial the

3    first week --

4                MS. MCNELLIE:  The first week in February.

5                THE COURT:  So we're looking at the 23rd.

6                MS. MCNELLIE:  That's the day, the first day of

7    his vacation.

8                THE COURT:  Oh.

9                MR. JOHNSON:  I leave town the 20th.

10                THE COURT:  When are you back?

11                MR. JOHNSON:  I'm back the 29th.

12                MR. HENGEHOLD:  I have one the week of the 16th.

13                MR. STATMAN:  March 1st?  March 1st is a Monday.

14                (Discussion off the record.)

15                THE COURT:  March 15th through the end of the

16    month, does that work for everyone?  December 19th.  We

17    will schedule a final pretrial if the settlement doesn't

18    work and everything, we will schedule a final pretrial,

19    which will be, like, a month before.

20                CONFERENCE CONCLUDED AT 4:30 P.M.

21                    C E R T I F I C A T E
          I, Betty J. Schwab, the undersigned, do
22    hereby certify that the foregoing is a correct
      transcript from the record of the proceedings in
23    the above-entitled matter.

24                    _Betty J. Schwab_
                  BETTY J. SCHWAB, RPR
25                  Official Reporter

# Exhibit
# B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

EASTSIDE LINCOLN MERCURY, et al,          :
                                          :
            Plaintiff(s)                   :
                                          :
                                          :   Case Number: 1:01cv567-SJD
      vs.                                  :
                                          :   District Judge Susan J. Dlott
FORD MOTOR COMPANY, et al,                :
                                          :
            Defendant(s)                   :

ORDER

This matter is before the Court upon plaintiff's motion for leave to identify expert (Doc.

37) and defendants' motion to file sur-reply to motion for leave to identify expert (Doc. 47). On

September 29, 2003, this Court met with the attorneys of record. Based upon such conference the

motion for leave to identify expert (Doc. 37) is hereby DENIED and the motion to file sur-reply

to motion for leave to identify expert (Doc. 47) is hereby DENIED as MOOT.

At the conference, the Court also amended the scheduling order in this case as follows:

1.      Plaintiff has until October 15, 2003 to supplement report of Roger Bean.

2.      Defendant has until October 30, 2003 to depose Roger Bean.

3.      Defendants shall supplement their pending motions for summary judgment by
        November 21, 2003.

4.      Plaintiff shall file their response to the defendants supplemental(s) on or before
        December 5, 2003.

5.      The parties shall submit ex parte letters not exceeding five pages to the Court as
        to their position on settlement no later than December 15, 2003.

6.      A settlement conference shall be held in Chambers on Friday, December 19, 2003
        at 9:30 a.m.

7.      The current Final Pretrial Conference is hereby VACATED.

8.    The jury trial in this case is hereby RESET to April 19, 2004.


    IS SO ORDERED.


                                    ___s/Susan J. Dlott_____
                                    Susan J. Dlott
                                    United States District Judge

# Exhibit
# C



DEFENDANT'S
EXHIBIT
3
10-29-03

Eastside Lincoln Mercury, Inc. and William Woeste Jr.
     Plaintiffs


v.


Ford Motor Company, Inc., et al
     Defendants

U.S. District Court for Southern District of Ohio
Case No. c-1-01-567


Expert Report by:


     Roger M. Bean, CPA

A.    Overview

1.    At the request of counsel for Eastside Lincoln Mercury (Eastside or ELM) and William F. Woeste, Jr. I prepared the attached report setting forth the damages incurred by Eastside Lincoln Mercury and Mr. Woeste as a result of the actions of Ford Motor Company, Inc. and Robert Reichert/Kenwood Dealer Group (Reichert/KDG).

2.    As a practicing CPA, I represented Eastside and Mr. Woeste during the period starting with the purchase of his original dealership in 1982 through 1999 when I left public practice. Since 1999 I have assisted the CPA firms that represent Eastside and Mr. Woeste in the performance of accounting, tax and special projects work.

3.    While in public practice my emphasis was on providing audit, tax, merger and acquisition, divestiture and other consulting services to automobile dealerships in the Cincinnati area. Over the years my CPA firm and I represented over 30 dealerships and I was involved in the acquisition or sale of approximately 25 dealerships. Since leaving that firm I have maintained a job sharing arrangement with a CPA firm in Lexington Kentucky and have retained several client relationships, including Mr. Woeste's automotive group and three other car dealerships. My CV is attached as Attachment A.

4.    As a practicing CPA I testified in court and by deposition concerning forensic accounting services or as an expert witness. Since I left public practice I have only testified in one case, which originated before leaving the CPA firm for which I worked. That case is listed on Attachment B.

5.    In the past ten years I have been published a few times in not for profit newsletters and the local business paper, The Business Courier. This information is included on Attachment C.

6.    The documents that I have reviewed in preparation of this report are listed on Attachment D.

7.    Under my job sharing arrangement, my time is billed on an hourly basis to the CPA firm of Shaver & Coons, PSC, which in turn bills Eastside at an hourly rate of between $ 100 and $ 250.

B. Summary Background Information

1. Eastside has been a Lincoln Mercury dealership in the eastern part of Cincinnati for over 20 years. For approximately the last 17 years it has been under the management of Mr. Woeste.

2. During Mr. Woeste's ownership of Eastside, there have been several other Lincoln Mercury franchises in the Cincinnati multiple point market area (Cincinnati Market) area including (1) the Kings Lincoln Mercury franchise at the Auto Mall location owned by Reichert\KDG, (2) the former Lincoln Mercury franchise owned by the Stillpass family until its purchase by Mr. Wyler in 2000 and subsequent closing in 2000, (3) the former Jim Dixon Lincoln Mercury franchise purchased by Ford and subsequently sold at a loss in excess of $ 1,000,000 to Reichert/KDG, after which it was renamed Fairfield Lincoln Mercury, (4) the Ridgeview Lincoln Mercury franchise which was acquired by Mr. Fryson and then became Lincoln Mercury of Florence( and which may be in the process of being sold) and (5) Northgate Lincoln Mercury franchise also owned by Reichert/KDG.

3. Starting in 1998 Ford developed and executed a plan to consolidate the Cincinnati Market under one dealer. Ford entered into two agreements (Right of First Refusal and Consolidator Agreements) which allowed Reichert/KDG to consolidate the Cincinnati market. Ford orchestrated this consolidation process, financially and operationally through favorable market representation actions. For example, the two agreements (Right of First Refusal and Consolidator) gave Reichert/KDG the right to approve and disapprove all market representation and facilities actions for all Cincinnati market dealerships north of the Ohio River. In line with Ford's plans to consolidate the Cincinnati Market, Lincoln Mercury of Florence was made its own single point market. In the Cincinnati Market today, the only Lincoln Mercury dealership that is not controlled by Reichert/KDG is Eastside.

4. During this consolidation period, Mr. Woeste requested permission from Ford on multiple occasions but was denied the opportunity to operate his dealership as a "dual". Mr. Woeste intended to dual Eastside with another of his franchises ( Beechmont Chevrolet)in an effort to obtain substantial cost savings through a sharing of service, parts and administrative space with Beechmont Chevrolet. Ford allowed two of the KDG franchises to operate as duals. One dealership (Northgate) has been a dual for several years. Another dealership (Fairfield) was allowed to dual after Mr. Woeste's denials, in a more "liberal" fashion than Mr. Woeste had requested. Initially the Fairfield location was dualed with three other franchises but currently is only dualed with VW, a competitive make. The only separation between the franchises is in the showroom.

3

5. Several other actions by Ford were undertaken in an attempt to influence Mr. Woeste to sell or resign his franchise and to assist Reichert/KDG in controlling the Cincinnati Market. These actions involve the manipulation of warranty audits, manipulation of new vehicle allocation process, the arbitrary denial of LPE certification, and preferential distribution of marketing money.

### C.    Expert Conclusions

My conclusions are grouped into seven areas of damage based upon a common relationship. There can be more than one calculated damage in each of the seven sections below.

### Warranty Issues

1. Beginning in 1996-1997 Ford began a process of "auditing" the claims submitted by Eastside under the new vehicle warranty programs of Ford. New Lincoln Mercury vehicles sold by a dealership are covered under a Ford warranty. The warranty allows a dealer to solve a customer complaint at no cost to the dealership or customer when the problem is due to poor design or manufacture of the vehicle. This benefits the dealer in that it is paid by the franchisor (Ford) to perform the warranty service work and is not forced to bill the customer.

   Because of the length and scope of the new car warranties, warranty repair work accounts for a significant portion of a dealership's service and parts business. The satisfaction of the customer is important to the dealer and Ford, as a happy customer comes back to the dealership, rather than an independent repair shop, for more service; will consider replacing his car with the same make and may refer others to the dealership or brand. Lincoln Mercury dealerships are graded upon their customer satisfaction in the warranty process

   Ford's stated rationale for the Eastside audits was the magnitude of claims submitted by Eastside and the assertion that the claims submitted were outside the "norm." The actual dollar volume of the errors determined by the Ford auditors through 5 audits from 1996 to 2001, involving almost 2 million dollars of warranty claims, is small. In my experience this indicates that Eastside was in substantial compliance with the manufacturer's procedures.

   Exhibit I summarizes the audit results. The audits reviewed $ 1,903,667 in warranty service work and found errors of $ 17,369, or less than 1 % error. Note on this Exhibit I that the initial repayment sought by Ford from the audits was $ 37,954.69 but under further review and analysis, Ford, apparently recognizing the imprecise and subjective nature of its audit process, reduced the original disallowance by greater that 50% and accepted repayment of $ 17,369.65.

4

Based upon my experience with automotive clients, warranty audits are designed to change the dealership's behavior by reducing the volume and size of warranty claims. The audits drive down the volume and size of warranty claims submitted. This damaged Eastside's reputation with its customers, reduced its profits, lowered the morale of dealership employees, and reduced the value of the dealership.

On April 9, 2001, Ford threatened severe penalties against Eastside and Mr. Woeste including the limitation on Mr. Woeste's ability to obtain another franchise, participate in Lincoln Mercury programs, and required Eastside to hire an "in dealer consultant". Mr. Walls and Mr. Carter both acknowledge that the magnitude of the penalties was too severe in light of the audit findings and the fact that no fraud occurred.

Exhibit II is a graph which indicates the impact that these audits had on the warranty sales volume of Eastside. The result was the decline in warranty service business due to the fear by individual mechanics and the shop manager that the next Ford audit would result in a "charge-back" or other penalties to the dealership.

Exhibit III details the volume of warranty service business by all of the Ford and Lincoln Mercury dealerships in the Cincinnati area as well as the direct competitors of Eastside. Note that the loss in sales volume by the other comparable dealerships is much less between 1998 and 1999 than was suffered by Eastside. There is a substantial increase in warranty sales volume in 2000 and 2001 while Eastside is in decline. The results of the direct competitors are comparable over time to the Ford-Lincoln Mercury group.

It is my opinion that the frequency and nature of the warranty audits at Eastside, including the progressive penalties, led to a decline in warranty sales volumes (and, consequently, gross profit) realized by Eastside. Without the impact of the warranty audits, the sales volume at Eastside would have been substantially the same as the results achieved by its competitors in the Cincinnati Market area.

Exhibit IV details what the sales volumes and gross profits of Eastside would have been, absent the warranty audits. The top section of this exhibit uses as the yardstick the actual results achieved by Eastside's direct competitors ( Kings Lincoln Mercury, Northgate Lincoln Mercury, Wyler/Stillpass Lincoln Mercury, Fryson/Ridgeview Lincoln Mercury and Dixon/Fairfiled Lincoln Mercury). As some of these direct competitors are dualed operations, I also compared their data against the warranty sales volumes of all Ford and Lincoln Mercury dealers in the Cincinnati Market. This comparative warranty sales data was obtained from Ford and is presented in the lower section of Exhibit IV. The far right hand column indicates the damage to Eastside for

each year. The net lost profit to Eastside is calculated to be $ 578,605, net of variable selling expenses.

It is reasonable to believe that there is a carryover impact from prior warranty audits. I estimated, on Exhibit V, that this loss will approximate the loss suffered in 2003. Discounting this figure to present value at an interest rate of 4% yields a loss of $ 63,018.

Exhibit VI lists the money that Eastside repaid to Ford as a result of the 1999 and 2001 warranty audits. The resulting damage to Eastside is $ 8,332.

## Denial of Dualing

2.    In April, 1998 Mr. Woeste initially sought the permission of Ford to build a Lincoln Mercury showroom and service write up area on property adjacent to his Beechmont Chevrolet dealership. This proposal involved what is commonly referred to in the car business as a "dual" facility, which indicates that at a single location there are at least two, or perhaps more car franchises. This is common in the industry where one or more of the franchises does not sell enough vehicles to justify its own facility, or in instances where the franchise product line is in decline. In metropolitan areas, one rarely sees a dual facility involving a Honda or Toyota dealership due to their high volume. Similarly one rarely sees a dualed facility involving the more exclusive brands, such as Mercedes, Lexus and BMW.

Mr. Woeste's Chevrolet facility had the necessary space in the service, parts, administrative and used car areas to handle the extra volume a dualing with Eastside would require. Thus, Mr. Woeste proposed to Ford building a Lincoln "Signature" facility encompassing a new vehicle showroom, service write up and retail parts areas. Other facilities in this proposed arrangement were to be shared with Beechmont Chevrolet.

It is common in a dualed facility for the manufacturer to require separate areas for new cars and service write up ("customer touch points") in order to protect the franchise identity. This is exactly what Mr. Woeste proposed. The "non touch points" (parts storage, service and administrative areas) are normally allowed to be shared. The savings in such an arrangement are that space and personnel are more efficiently used, equipment can be shared, personnel are able to share jobs, and the land and location on a particular street are used for dual purposes, thereby spreading the cost of the lease of the facility, equipment, and personnel costs.

Mr. Woeste requested dualing options in 1998 and again in 1999, but his requests were denied. As a result, Mr. Woeste has been forced to maintain a separate facility, separate equipment and separate personnel to support Lincoln- Mercury and the Beechmont Chevrolet franchise, while Lincoln

Mercury has been suffering a decline in sales nationally, regionally and in the Cincinnati Market.

Eastside and Mr. Woeste would have saved a considerable sum of money on a monthly and yearly basis in the operation of the dualed facility. This conclusion is based upon my experience in the car business and my knowledge of Mr. Woeste's operations. The sharing of large fixed personnel and facilities expenses associated with auto dealerships is more efficient due to the economies of scale.

I looked at the staffing levels of the Chevrolet franchise and those of Eastside as well as the cost of operating separate facilities. A comparison of the number and job classification of the two dealerships is depicted on Exhibit VII. I determined where there was overlap or duplication, and summarized the cost of those inefficiencies that could be eliminated by operating a dualed facility. The individual savings by job classification and area of expenditure shown on Exhibit VIII.

I also considered the cost that would have been incurred by Mr. Woeste in the construction and ownership of a new car showroom and service write up area, a rental factor to reimburse Chevrolet for use of part of their facility, increased compensation for the employees that remained and the operating costs for the new facility. I offset these additional costs of operations against the calculated savings to arrive at the damage incurred by Eastside due to this denial of the opportunity to dual with the Chevrolet dealership. Exhibit VIII shows that these damages are $ 2,786,715.

Exhibit VIII includes only the extra costs incurred by Eastside for the years 1999, 2000, 2001, 2002 and the anticipated costs for 2003. Exhibit IX projects the next three years cost to Eastside of this based upon the assumption that the dealership would continue to be managed in the same manner. A present value factor of 4% was applied to this future cost to arrive at a damage of $ 1,507,689 as of December 31, 2003.

Exhibits VIII and IX indicate the actual and potential damages that are associated with operating costs of the facilities in a separate fashion. In addition, there are other costs not related to this issue, described below:

A. Eastside has spent $ 102,822, as detailed on Exhibit X, in updating its existing facility to continue to meet the Lincoln Premier program requirements. Had Mr. Woeste dualed Eastside in 1998 and constructed a new Lincoln Mercury facility, he would not have been required to spend this money.

B. Had Mr. Woeste been allowed to dual Eastside with Beechmont Chevrolet in 1998 or 1999 he would have moved his Honda franchise into the Eastside location. In 2000 Mr. Woeste undertook a major renovation of

7

his Honda facility at the request of Honda. After being denied the chance to dual the Eastside dealership with Chevrolet in 1998, Mr. Woeste again expressed to Ford in 1999 that he intended to dual Eastside with Beechmont Chevrolet and use the Eastside facility for Honda. He intended to sell the Honda dealership property.

Mr. Woeste still must dual the Eastside dealership with another franchise for it to be truly viable and when he does so he will still move Honda up to the current Eastside space and sell the Honda facility. The damage incurred by Mr. Woeste will be in the duplication of the double cost of renovations. Automobile dealership facilities are unique, so called "single purpose" facilities, which have very little value associated with the actual facilities as they are not useful for most other purposes. The improvements to the Honda facility will not improve the selling price of the dealership property when Mr. Woeste sells it. Consequently the money he spent on the Honda improvements were "wasted" because of Ford's denial of the dualing requests. Assuming that there is some value to a potential buyer from these new improvements, then the damage is the portion of the actual Honda improvements cost that is not recovered in a sale of that property. A fair estimate of this loss is 80% of the cost of the improvements or $ 704,240, as detailed on Exhibit XI.

## LPE Status

3.  Mr. Woeste was denied approval to be certified as a Lincoln Premier Dealer on his initial try in 2000. Achievement of this status results in the ability of the dealership to earn a "bonus" for the sale of certain models vehicles. It is Mr. Woeste's contention that this denial was another attempt to deny him the economic benefits of selling Lincoln Mercury vehicles and to once again diminish the value he associated with his dealership so that he would resign or sell at a reduced price, to accomplish the planned consolidation of the market. On his second application for approval he was granted his status as a Lincoln Premier dealer. During the period from the date that he should have been approved through the date on which he was approved, the dealership was unable to ear a bonus in the amount of $ 8,618 as detailed by vehicle on Exhibit XII.

## Vehicle Distribution

4.  The testimony of the General Manager of Eastside, Mr. George Beattie, is that there was preferential distribution of vehicles Reichert/KDG.

Ford's distribution of new vehicles to its dealer body has two components. The first is a mathematical or mechanical allocation methodology in which vehicles are allocated based on dealers' availability relative to their sales histories. This type of allocation methodology is known as "turn to earn". That is, the faster a dealer sells (turns) vehicles, the more vehicles it will earn for

future allocations. The second component of Ford's distribution system is a discretionary method to distribute vehicles, apart from and in addition to, those assigned by the mathematical allocation formula.

Ford has admitted that vehicle allocation records covering the consolidation period have been destroyed. Therefore, I am unable to precisely determine the number of vehicles denied to Eastside during the consolidation period.

Eastside was denied the opportunity to purchase "discretionary vehicles" and was therefore unable to sell vehicles that eventually were sold by Reichert/KDG. It is a vicious circle, in that the fewer cars a dealer gets in one period will also reduce future allocations.

The timing of delivery and in particular the availability of vehicles at the time of their introduction as new models is critical. Mr. Beattie will testify that, the mechanical allocation notwithstanding, the actual delivery dates of vehicles to Eastside were delayed by days or weeks compared to the Reichert/KDG dealerships. Eastside sales opportunities were diminished due to the unavailability and delivery of vehicles to the dealership.

Two examples of this are confirmed in units on Exhibits XIII and XIV, and presented on the two graphs, noted as Exhibits XV and XVI. These exhibits highlight the points in time when the 2000 model year Lincoln LS and Lincoln Navigator were being introduced to the public.

The graphs show the favorable delivery of vehicles to the Reichert/KDG dealerships.

Ford's destruction of the allocation data required that we rely on the vehicle 'release" data.

A dealer can only sell what he has in inventory including those cars that are ordered and on the way, indicated by their "release" date. This delay in deliveries to Eastside reduces its opportunity to sell these vehicles at the most crucial time of the product: its new model year introduction.

Exhibit XVII details by model and year the vehicles that Mr. Beattie believes Eastside would have sold had they been provided.

Failure to sell a new vehicle deprives a dealer of the gross profit on the sale, finance and insurance ( F & I ) income, and warranty and service work income.

Exhibit XVIII documents how frequently a new car sold by Eastside returns for service.

9

Exhibit XIX details the gross profit and variable selling expenses of the service department of Eastside during this same period of time.

Exhibit XX, details loss of gross profit per new car sold and F & I income that Eastside suffered due to the loss of the sales of these vehicles as well as the associated lost service gross profit, all net of the associated incremental variable selling expenses. The damage is $ 135,190.

## Borrowing Costs

5.    It is my experience that more profitable dealerships borrow less money to finance their inventory.  Had Eastside been more profitable it, too, would have borrowed less money.

Exhibit XXI indicates how much interest Eastside would have saved on the cost of borrowing had it not suffered these damages. This damage is $ 268,148

## Blue Sky Valuation

6.    Once Ford began consolidating the Cincinnati Market, and those related actions alleged in the Complaint, Eastside's profits suffered. The value of a dealership is determined by calculating the value of its operating assets and Blue Sky. Blue Sky is the term used in the automotive area to describe the value attributed to the goodwill of the dealership. The most common method to value the Blue Sky of a dealership, apart from its operating assets, such as inventory, receivables, equipment, tools, etc, is a multiple of earnings.

Even Lincoln Mercury franchises which are losing money have a significant value. For example, in the Cincinnati Market Mr. Jeff Wyler purchased the Stillpass Lincoln Mercury dealership in March 2000 and paid $ 673,000 in Blue Sky to the Stillpass family for a dealership that was losing money. He sold this dealership to Ford in September 2000 for $ 775,000 plus an estimated loss to Ford on the parts inventory of $ 128,800 netting a true Blue Sky figure of $ 903,800, for a dealership in which he lost $ 377,386 in six months.

Mr. Dixon negotiated a sale to Ford of his Lincoln Mercury dealership in December 1999 for significant Blue Sky. This dealership lost $ 307,015 in 1999. Ford paid a combined $ 1,600,000 in Blue Sky for this franchise.

Exhibit XXII details the operating results of these franchises.

Ford did not disclose to Mr. Woeste or the other dealers whose franchises were purchased that it was going to consolidate the market. This consolidation dramatically diminished the value of Mr. Woeste's Eastside franchise to everyone except the Ford and the consolidator, Reichert\KDG. The franchise agreement and franchise laws provide a level playing field among competitors to create a partnership between the franchisor, Ford in this case, and its dealer. Once a consolidation begins, the level playing field tilts dramatically in favor of the consolidator as it has market position and advertising benefits, not to mention the two dualed facilities, which will make Eastside a much less attractive purchase by a dealer who is not in the position of being the consolidator. That is the position in which Mr. Woeste now finds himself. Had Ford disclosed to Mr. Woeste its intentions, he would have been able to look for a buyer like Mr. Wyler at an opportune time to sell, before the consolidation began. At present, it is unlikely that a potential buyer will offer fair market value for a dealership in a market that is consolidated. Further, had Eastside not suffered the damages that were the result of Ford and Reichert\KDG actions, the dealership would be more profitable and possess a greater Blue Sky value.

Experience dictates that with a willing buyer and a willing seller will establish the value of a franchise based upon the expectations of the buyer and seller as to the projected results of the dealership. Hence the determination of the Blue Sky. Mr. Woeste's dealership would certainly have been worth as much as was paid by Ford for the Wyler Franchise considering the operating results Eastside was achieving, which were better than the Stillpass /Wyler dealership. If Mr. Woeste's dealership had not suffered the above losses resulting from Ford's and Reichert\KDG actions it would have been worth much more than the price paid to Mr. Wyler.

The value of Eastside's projected Blue Sky is the lost profits of the Eastside franchise multiplied by the ordinary factor applied to dealership profits to calculate a Blue Sky figure. Exhibit XXIII documents that the operating profits of the Eastside dealership were understated by $ 734,657 in 1999 and $ 681,909 in 2000. In my opinion, from my experience representing buyers and sellers in the Cincinnati are, is that a factor of 3 should be associated with these lost profits to arrive at the figure that Mr. Woeste would have added to the base value of a losing franchise, to reflect the value of a profitable franchise. The diminished value is calculated on Exhibit XXIII to be $ 2,124,849.

As a consequence of the consolidation, market representation actions, and other actions, the value of the Blue Sky of Eastside to anyone but Ford and Reichert\KDG is substantially reduced. The reduction in the Blue Sky value of Eastside to anyone other than Ford or the Consolidator is estimated to be in the range of $ 550,000 to $ 650,000.

Financial Assistance to Reichert/KDG

7.  Ford employees testified that dealers within a multiple point market must be treated equitably in the distribution of marketing monies. Yet, Ford has provided direct financial assistance to the Reichert\KDG to assist in its take over and operations of its competing franchises. The purposes of these monies were to fund dealership purchases, assist Reichert\KDG in selling cars that were not selling, assist in motivating salesmen to sell cars, assist with advertising, and additional profit. All of this financial assistance has been denied to Eastside by Ford. Exhibit XXIV documents these sums. This damage is $ 341,250.

Conclusion:

The above report is accurate as of the date below and is based upon the information that I have reviewed to date. I reserve the right to alter the above should new information come to may attention either through testimony, additional documentation or other means.

I am prepared to testify at trial to the above issues

Respectfully submitted:

Roger M. Bean, CPA
10 -15- 03
Dated

12

ROGER M. BEAN, CPA

## QUALIFICATIONS

- Twenty-five years of experience in public accounting in areas such as; audits and reviews of financial statements, financial planning, budgeting, acquisitions, cost containment, financial reporting and cash management.

- Three years as Chief Financial Officer of not for profit entity involved with the certification of physicians in the field of family practice.

## EXPERIENCE PROFILE

- 1999-Present  Chief Financial Officer of the American Board of Family Practice, Inc

- 1978-1999    Rippe & Kingston Co. PSC,   Rippe & Kingston Systems, Inc., and affiliated entities.

  This group of companies is involved in the practice of public accounting, computer consulting, software development and licensing, investment advisory service, business valuations and mergers and acquisitions.

  Positions held:  1978 to 1980    Senior in Audit Department

  1980 to 1984    Manager in Audit Department

  1984 to 1999    Partner with firm

- 1974 – 1978  Arthur Young and Company, CPA's

## SCOPE OF POSITION 1984 TO PRESENT

- Responsible for all accounting, finance and treasury functions of the American Board of Family Practice

- Rippe & Kingston partner in charge of audit and accounting practice, quality control issues, AICPA peer review compliance, administrative responsibilities including recruiting, continuing professional education, insurance, scheduling and departmental mentoring

Attachment A, Page two

## ROGER M. BEAN, CPA

### JOB EXPERIENCES- 1978 TO PRESENT

- Audit, review and accounting services to business and not-for-profit concerns. These entities range in size from not-for-profits with annual budgets from $50,000 to $ 20,000,000 and business enterprises up to $250,000,000 in revenues with international operations.

- Litigation support and forensic accounting services to lawfirms and clients involved in litigation and fraud recovery.

- Consulting services involving:

  Franchising      Insurance       Internal Controls

  Banking          Budgeting       Succession Planning

  MIS Systems      Executive Recruiting

  Cost Control     Long Range Planning

- Industry Specialties Include

  Automobile Dealerships      Not-For-Profit Organizations

  Professional Service Organizations

### EDUCATION

- University of Kentucky, Lexington, Kentucky; B. S. Degree, Honors in Accounting, With Distinction; August, 1974

### PROFESSIONAL AFFILIATIONS

- Licensed CPA in Ohio and Kentucky

- Member American Institute of Certified Public Accountants

- Member Ohio Society and Kentucky Society of CPA's

- Three term member of Ohio Society of CPA's Professional Ethics Committee, 1996 through 2000, Two term member of the Kentucky Society of CPA's professional ethics committee

Attachments B and C

<u>Testimony of Roger M. Bean, CPA as Expert</u>

<u>1997-2003</u>

1.    Marc D. Hellman V. Castruci Auto Mall, State Court. Deposition given.


<u>Publications of Roger M. Bean</u>

<u>1993-2003</u>

1.    Several newsletter or newspaper articles for Business Courier or not for
profit publications

Attachment D
Page One

## Materials Reviewed in Preparation of this Report

1.  Ford Motor Company Dealer Financial Statements for Kings Lincoln Mercury, Stillpass Lincoln Mercury, Ridgeview Lincoln Mercury, Northgate Lincoln Mercury, Fryson Lincoln Mercury, Fairfield Lincoln Mercury, Wyler Lincoln Mercury for the period from 1996 to April 2002.

2.  Ford Motor Company Dealer Financial Statements for Eastside for the period from 1996 through August 31, 2003.

3.  Warranty Audit reports prepared by Ford and related correspondence on the Eastside franchise.

4.  Cross-Sell vehicle registrations for the period 1997 to 2003 for Ohio and Kentucky.

5.  Ford Dealer Fixed Operations Management Report for 2000 to 2003.

6.  Depositions and exhibits:
    A. Mr. Carter
    B. Mr. Reichert
    C. Mr. Mullins
    D. Mr. Huser
    E. Mr. Hall
    F. Mr. Crowley
    G. Mr. Gwaltney
    H. Mr. Walls
    I. Mr. Woeste
    J. Mr. Beattie
    K. Mr. Brown
    L. Mr. Woodall
    M. Mr. Letart
    N. Mr. Csernotta
    O. Mr. Fisher

7.  Automotive News Market Data reports, 1999-2002

8.  Acquisition documents pertaining to the Wyler\Stillpass franchise.

9.  Acquisition documents pertaining to the Dixon franchise

10. Cincinnati region business plan review – 2002

11. Cincinnati region 1999 Growth Strategy Plan

12. Cincinnati region business plan review – 2001

13. Summary of Eastside and Chevrolet personnel for 1999 through 2003

14. Listing of lost LPE money from 2000

15. Complaint

16. JD Power Initial Quality Survey reports

17. Eastside customer satisfaction reports

18. Plaintiffs Memorandum in Opposition to the Motions for Summary Judgment of Defendants and Exhibits

19. "Scheduled Orders- Select Time Periods" for Eastside, Kings and Northgate

20. August 7, 2002 expert report of Mark C. Schmidt, Ph.D.

Attachment D
Page two

21.   Lincoln Distribution Strategy ( 08-23-00)
22.   Lincoln Mercury Profit Plan for Fairfield
23.   12-07-01 Competitive Dualing Consent Letter
24.   KDG Agreement and Right of First Refusal
25.   Consolidator Agreement
26.   Property detail ledgers for Honda East and Beechmont Motors
27.   Prime interest rate detail
28.   Actual detail of service records at Eastside
29.   Listing of lost vehicle sales
30.   Listing of expenses incurred in updating Eastside facility
31.   Operating report for Beechmont Chevrolet for 1999 to August 2003

Eastside Lincoln Mercury
Damage Calculation

Warranty Audit Results                                                        Exhibit I

| Period Covered by Audit | Estimated Dollar Volume of Warranty Sales By Eastside | Ford's Original Claimed Disallowance | Ford's Final Disallowance | Final % of Disallowances To Total |
|---|---|---|---|---|
| 11-1-96 to 04-30-97 | 484,501 | 8,222.69 | 6,362.65 | 1.31% |
| 10-14-97 to 07-14-98 | 573,237 | 21,400.00 | 2,675.00 | 0.47% |
| 11-25-98 to 08-25-99 | 376,042 | 2,359.00 | 2,359.00 | 0.63% |
| 02-29-00 to 01-30-01 | 469,888 | 5,973.00 | 5,973.00 | 1.27% |
| | 1,903,667 | 37,954.69 | 17,369.65 | 0.91% |

Notes

Actual Warranty Sales Per Eastside Lincoln Mercury Dealer Financial statements

| Time Frame | Dollars | Prorated $ for audit period |
|---|---|---|
| Calendar 1996 | 1,099,192 | |
| Calendar 1997 | 903,908 | 484,501 |
| Calendar 1998 | 710,626 | 573,237 |
| Calendar 1999 | 475,234 | 376,042 |
| Calendar 2000 | 517,288 | 469,888 |
| Calendar 2001 | 465,774 | |



Eastside Lincoln Mercury Trend Lines on Service, Parts and Warranty Sales- Exhibit II

Eastside Lincoln Mercury
Damage Calculation

EXHIBIT III

Dollar Volume and Percentage Increase

Competitors Warranty Sales Volume

| Calendar Year | Other Lincoln Mercury Dealers Sales and % Change Note 1 | | Other Ford & Lincoln Mercury Dealers % Change Note 2 |
|---|---|---|---|
| 1998 | $ 2,374,586 | | |
| 1999 | $ 2,188,180 | -7.85% | |
| 2000 | $ 2,516,356 | 15.00% | 19.80% |
| 2001 | $ 3,953,296 | 57.10% | 46.20% |
| 2002 | $ 3,149,832 | -20.32% | -25.50% |
| 2003 | | | -26.70% |

Note 1- Warranty sales dollars from dealer financials for Kings, Dixon/Fairfield, Fryson/Ridgeview, Northgate, and Wyler/Stillpass. Data for 2002 is annualized using results through April 2002.

Note 2 - Per Ford Management Reporting System results for Region 47, Market A-1, representing 20 Ford and Lincoln Mercury dealers in the Cincinnati region. Data not available for 1999. 2003 data through April 30, 2003.

Eastside Lincoln Mercury
Damage Calculation

Lost Warranty Volume

Exhibit IV

| Calendar Year | Eastside Lincoln Mercury Data Per Dealership Financial Statements | | Note 1 Factor Applied to Sales Volume | Increase (Decline) In Sales Volume | Revised Annual Sales Volume | Impact on Gross Profit Net of Selling Expenses | Damage Using Lowest Annual Loss |
|---|---|---|---|---|---|---|---|
| | Sales | Gross Profit Percentage | Service Dept Variable Selling Expense as a % of Gross Profit | | | | |
| 1998 | 710,626 | 47.00% | | | | | |
| 1999 | 475,234 | 48.00% | 21.31% | -7.85% | 179,608 | 654,842 | 67,840 | 67,840 |
| 2000 | 517,288 | 45.00% | 22.38% | 15.00% | 235,780 | 753,068 | 82,356 | 82,356 |
| 2001 | 465,774 | 44.00% | 21.38% | 57.10% | 717,296 | 1,183,070 | 248,133 | |
| 2002 | 492,573 | 43.00% | 17.50% | -20.32% | 450,097 | 942,670 | 159,672 | |
| 2003 *Note 3* | 446,607 | 45.00% | 20.38% | -26.70% | 244,370 | 690,977 | 87,555 | |
| TOTAL | | | | | | | 645,556 | |

| Calendar Year | Eastside Lincoln Mercury Data Per Dealership Financial Statements | | Note 2 Factor Applied to Sales Volume | Increase (Decline) In Sales Volume | Revised Annual Sales Volume | Impact on Gross Profit Net of Selling Expenses | |
|---|---|---|---|---|---|---|---|
| | Sales | Gross Profit Percentage | Service Dept Variable Selling Expense as a % of Gross Profit | | | | |
| 1998 | 710,626 | 47.00% | | | | | |
| 1999 | 475,234 | 48.00% | 21.31% | -7.85% | 179,608 | 654,842 | 67,840 | |
| 2000 | 517,288 | 45.00% | 22.38% | 19.80% | 267,213 | 784,501 | 93,335 | |
| 2001 | 465,774 | 44.00% | 21.38% | 46.20% | 681,166 | 1,146,940 | 235,634 | 235,634 |
| 2002 | 492,573 | 43.00% | 17.50% | -25.50% | 361,897 | 854,470 | 128,383 | 128,383 |
| 2003 | 446,607 | 45.00% | 20.38% | -26.70% | 179,720 | 626,327 | 64,392 | 64,392 |
| TOTAL | | | | | | | 589,584 | 578,605 |

Note One  1999 to 2001 Factor derived from reported results from direct Lincoln Mercury competitors in the Cincinnati area.
2002 factor is annualized results from same competitors using their results through April 2002.
2003 factor is from Ford reports for Region 47, Market A-1, all Ford and Lincoln Mercury dealers
Note Two  1999 Factor from competitors reported results.
2000 to 2002 factor is from Lincoln Mercury Division reports for Region 47, Market A-1, all Ford and Lincoln Mercury dealers
2003 factor is annualized figure from Ford reports through April 2003.
Note Three 2003 data for ELM is annualized data derived from actual results through August 31, 2003

Eastside Lincoln Mercury
Damage Calculation

Exhibit V

Anticipated Loss From Carryover Impact of Warranty Audits on 2004

| | |
|---|---:|
| Loss incurred in 2003, per Exhibit IV | 64,392 |
| Anticipated 2004 loss from carryover impact of warranty audits | 64,392 |
| Discount factor at 4% to state future loss as of December 31, 2003 | (1,374) |
| Loss as of December 31, 2003 | 63,018 |

Eastside Lincoln Mercury
Damage Calculation

Cost of Warranty Audits                              Exhibit VI

| Warranty Period | Date of Audit | Amount |
|---|---|---|
| 11-12-98 to 08-25-99 | 10/20/1999 | 2,359 |
| 02-29-00 to 01-30-01 | 4/9/2001 | 5,973 |
| | | 8,332 |

Eastside Lincoln Mercury
Personnel Statistics 10-01-03                    Exhibit VII
Provided By Management

| | calendar year 1999 | | calendar year 2000 | | calendar year 2001 | | calendar year 2002 | |
|---|---|---|---|---|---|---|---|---|
| | Chevy | Eastside | Chevy | Eastside | Chevy | Eastside | Chevy | Eastside |
| Owner | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Gen Manager | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| New Manager | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Used Manager | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Service Manager | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Parts Manager | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| F & I Manager | 2 | 1 | 1 | 0 | 1 | 0 | 2 | 0 |
| Salespeople | 10 | 6 | 10 | 6 | 7 | 6 | 11 | 6 |
| Service Advisors | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| Parts Counter | 3 | 2 | 3 | 2 | 2 | 2 | 2 | 2 |
| Parts Driver | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Technicians | 9 | 11 | 9 | 11 | 9 | 11 | 9 | 11 |
| Lot Techs/Porters | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| Clerical | 7 | 4 | 4 | 4 | 4 | 3 | 4 | 5 |
| Detail Shop | 0 | 3 | 0 | 3 | 3 | 3 | 0 | 3 |

| | Estimated Calendar 2003 | |
|---|---|---|
| | Chevy | Eastside |
| Owner | 1 | 1 |
| Gen Manager | 1 | 1 |
| New Manager | 1 | 1 |
| Used Manager | 1 | 1 |
| Service Manager | 1 | 1 |
| Parts Manager | 1 | 1 |
| F & I Manager | 1 | 0 |
| Salespeople | 12 | 7 |
| Service Advisors | 3 | 3 |
| Parts Counter | 2 | 2 |
| Parts Driver | 0 | 1 |
| Technicians | 9 | 11 |
| Lot Techs/Porters | 2 | 4 |
| Clerical | 4 | 5 |
| Detail Shop | 0 | 3 |

Eastside Lincoln Mercury
Damage Calculation

Exhibit VIII

Expense Savings Associated With Dualed Facility

| | | For the Calendar year ended December 31 | | | | Estimated Annual | YTD |
|---|---|---|---|---|---|---|---|
| | | 1999 | 2000 | 2001 | 2002 | 2003 | 8/31/2003 |
| *Actual Expense per ELM Financial Statements* | | | | | | | |
| Dept Managers | | | | | | | |
| New | | 60,973 | 54,036 | 63,302 | 74,807 | 98,940 | 65,960 |
| Used | | 39,335 | 39,687 | 26,649 | 83,003 | 80,957 | 53,971 |
| Service | | 84,640 | 49,389 | 45,705 | 58,975 | 62,916 | 41,944 |
| Parts | | 40,071 | 38,374 | 38,649 | 45,590 | 44,630 | 29,753 |
| F & I | | 30,519 | 13,377 | 8,816 | 4,856 | 5,438 | 3,625 |
| Other Salaries | | | | | | | |
| New | | 79,096 | 86,354 | 107,056 | 55,623 | 42,866 | 28,577 |
| Used | | 51,840 | 56,041 | 63,083 | 38,066 | 21,024 | 14,016 |
| Service | | 232,515 | 241,139 | 253,675 | 220,785 | 264,924 | 176,616 |
| Parts | | 90,770 | 95,332 | 95,295 | 82,503 | 76,326 | 50,884 |
| Admin | | 16,306 | 27,763 | 51,299 | 55,753 | 59,912 | 39,941 |
| | | | | | | | |
| P/R taxes and Benefits | | 189,518 | 180,463 | 174,101 | 169,051 | 198,702 | 132,468 |
| General Manager | | 81,431 | 75,000 | 75,289 | 102,885 | 106,934 | 71,289 |
| Rent & equiv | | 219,410 | 218,317 | 216,191 | 220,087 | 209,645 | 139,763 |
| Utilities | | 27,333 | 26,521 | 29,451 | 28,594 | 28,322 | 18,881 |
| Data processing | | 92,594 | 100,292 | 97,107 | 106,767 | 99,999 | 66,666 |
| Telephone | | 23,276 | 33,496 | 33,545 | 29,366 | 28,671 | 19,114 |

| *Savings Calculation* | Factor | 1999 | 2000 | 2001 | 2002 | 2003 | |
|---|---|---|---|---|---|---|---|
| Department Managers | | | | | | | |
| General Manager | Eliminated | 81,431 | 75,000 | 75,289 | 102,885 | 106,934 | |
| New manager | Retained | 0 | 0 | 0 | 0 | 0 | |
| Used Manager | Retained | 0 | 0 | 0 | 0 | 0 | |
| Service Manager | Eliminated | 84,640 | 49,389 | 45,705 | 58,975 | 62,916 | |
| Parts Manager | Eliminated | 40,071 | 38,374 | 38,649 | 45,590 | 44,630 | |
| F & I Manager | Eliminated | 30,519 | 0 | 0 | 0 | 0 | |
| Other personnel | | | | | | | |
| New Department | 60% eliminated | 47,458 | 51,812 | 64,234 | 33,374 | 25,719 | |
| Used Department | 60% eliminated | 31,104 | 33,625 | 37,850 | 22,852 | 12,614 | |
| Parts Department | 25% eliminated | 22,693 | 23,833 | 23,824 | 20,626 | 19,082 | |
| Service Department | 20% eliminated | 46,503 | 48,228 | 50,735 | 44,157 | 52,985 | |
| Administrative | 50% eliminated | 8,153 | 13,882 | 25,650 | 27,877 | 29,956 | |
| P/R Taxes and Benefits at 20% | | 78,514 | 66,828 | 72,387 | 71,267 | 70,967 | |
| Utilities | 33% Eliminated | 9,020 | 8,752 | 9,719 | 9,436 | 9,346 | |
| Rent & Equivalent | Eliminated | 219,410 | 218,317 | 216,191 | 220,087 | 209,645 | |
| Data Processing & Phone | 10% Eliminated | 11,587 | 13,379 | 13,065 | 13,613 | 12,867 | |
| | | | | | | | |
| Pay raises for remaining personnel to recognize new responsibilities | | -20,000 | -25,000 | -30,000 | -35,000 | -40,000 | |
| Carrying cost of new facility at 8% of cost | | -52,000 | -52,000 | -52,000 | -52,000 | -52,000 | |
| Carrying costs for new furniture at 8% of cost | | -8,000 | -8,000 | -8,000 | -8,000 | -8,000 | |
| Rent paid to new landlord | | -3,500 | -3,500 | -3,500 | -3,500 | -3,500 | |
| Operating costs of new facility | | -20,000 | -20,000 | -20,000 | -20,000 | -20,000 | |
| | | | | | | | TOTAL |
| Net Savings From Dualing Facilities | | 607,602 | 532,918 | 559,797 | 552,238 | 534,159 | 2,786,715 |

Eastside Lincoln Mercury
Damage Calculation

Exhibit IX

Future Losses Associated With Inability to Dual Operations

| | |
|---|---|
| Calculated loss for 2003, per Exhibit VIII | 534,159 |
| Anticipated loss for 2004, same as calculated for 2003 | 534,159 |
| Anticipated loss for 2005, same as calculated for 2003 | 534,159 |
| Anticipated loss for 2006, same as calculated for 2003 | 534,159 |
| Subtotal | 1,602,478 |
| Less discount at 4% per annum to discount to December 31, 2003 | (94,789) |
| Loss as of December 31, 2003 | 1,507,689 |

Eastside Lincoln Mercury
Damage Calculation

Cost of Lincoln Premier Upgrades                                             Exhibit X

| Service Provided | Date of Service | Vendor Name | Cost | Subtotal By year |
|---|---|---|---|---|
| Painting of exterior of facility | November 3, 2000 | Baynum Painting | 8,210.00 | |
| Repair of doors on facility | November 2, 2000 | Overhead Door | 4,373.62 | 12,583.62 |
| Restoration/cleaning of block | May 2, 2001 | Shelton Construction | 1,600.00 | 1,600.00 |
| Showroom renovation | July 23, 2002 | JTF Construction | 21,350.00 | |
| Showroom renovation | September 26, 2002 | JTF Construction | 39,284.00 | |
| Showroom furniture | October 31, 2002 | Installation & Facilities Resources | 23,159.94 | |
| Showroom window tinting | September 12, 2002 | Solar Technology | 1,364.26 | |
| Clean up and repair for inspections | Various | Eastside Personnel (232 hrs @ $ 15) | 3,480.00 | 88,638.20 |
| TOTAL | | | 102,821.82 | |

Eastside Lincoln Mercury
Damage Calculation

Exhibit XI

Cost of Holding Honda Facility Due to Denial of Dualing Opportunity

| Cost Considered | Date Placed In Use | Cost |
|---|---|---|
| Land Improvements | 3/19/2001 | 120,275 |
| New Showroom | 12/1/2000 | 337,969 |
| New Showroom | 3/19/2001 | 422,057 |
| Subtotal | | 880,300 |

Calculated loss associated with inability to recover
costs incurred in the sale of the facility- at 80%          704,240

Eastside Lincoln Mercury
Damage Calculation

<u>Exhibit XII</u>

<u>Lost Lincoln Premier Bonus Money</u>

| <u>Customer Name</u> | <u>Deal #</u> | <u>Date</u> | <u>VIN #</u> | <u>Dollars</u> |
|---|---|---|---|---|
| Bergstrom | 202402 | 8/26/00 | 1L1Y602794 | 513.06 |
| Garascia | 202433 | 8/31/00 | 1L1Y604680 | 497.81 |
| Welch | 202530 | 9/28/00 | 1L1Y620150 | 497.81 |
| Jennings | 202549 | 9/30/00 | 1M1A608709 | 269.13 |
| Swisshelm | 202654 | 11/2/00 | 2M1X620937 | 285.06 |
| Clark | 202669 | 11/13/00 | 1L1Y616737 | 497.81 |
| Minning | 202678 | 11/16/00 | 1L1Y608802 | 552.00 |
| Ross | 202699 | 11/27/00 | 1L1Y620057 | 497.81 |
| Oaks | 202701 | 11/28/00 | 1L1Y603872 | 552.43 |
| Player | 202717 | 12/4/00 | 4M1UJ06724 | 376.50 |
| Althawadi | 202727 | 12/8/00 | 1M1A616611 | 269.13 |
| Ferguson | 202728 | 12/9/00 | 1L1Y643572 | 526.13 |
| Hartman | 202726 | 12/11/00 | 1L1Y623412 | 497.81 |
| Noggle | 202739 | 12/14/00 | 1L1Y635826 | 415.38 |
| 1st Natl Bank | 202745 | 12/19/00 | 1L1Y662604 | 552.44 |
| Hilltop research | 202752 | 12/21/00 | 1L1Y662709 | 552.44 |
| Frer | 202756 | 12/23/00 | 1M1A612650 | 269.81 |
| Haywood | 202764 | 12/27/00 | 1L1Y627955 | 497.81 |
| Briggs | 202767 | 12/28/00 | 1L1Y663251 | 497.81 |

8,618.18

Eastside Lincoln Mercury
Damage Calculation
Deliveries of Lincoln Navigator
August 24, 1999 to October 31, 1999

Exhibit XIII

### DAILY SCHEDULE RELEASES

| Date | KINGS | EASTSIDE | NORTHGATE |
|---|---|---|---|
| 08/24/1999 | | | |
| 08/25/1999 | | | |
| 08/26/1999 | 1 | | |
| 08/27/1999 | | | |
| 08/28/1999 | | | |
| 08/29/1999 | | | |
| 08/30/1999 | 1 | | |
| 08/31/1999 | | | |
| 09/01/1999 | | | |
| 09/02/1999 | | | |
| 09/03/1999 | 1 | | |
| 09/04/1999 | | | |
| 09/05/1999 | | | |
| 09/06/1999 | | | |
| 09/07/1999 | 1 | | |
| 09/08/1999 | 1 | | |
| 09/09/1999 | | | 1 |
| 09/10/1999 | | | |
| 09/11/1999 | | | |
| 09/12/1999 | | | |
| 09/13/1999 | 3 | | 1 |
| 09/14/1999 | | | |
| 09/15/1999 | | | |
| 09/16/1999 | | | |
| 09/17/1999 | | 1 | |
| 09/18/1999 | | | |
| 09/19/1999 | | | |
| 09/20/1999 | | | 1 |
| 09/21/1999 | | | |
| 09/22/1999 | | | |
| 09/23/1999 | | | |
| 09/24/1999 | 2 | | |
| 09/25/1999 | 2 | | |
| 09/26/1999 | | | |
| 09/27/1999 | | | |
| 09/28/1999 | | | |
| 09/29/1999 | | | |
| 09/30/1999 | | | |
| 10/01/1999 | | | |
| 10/02/1999 | | | |
| 10/03/1999 | | | |
| 10/04/1999 | | | |
| 10/05/1999 | | 1 | 2 |
| 10/06/1999 | | | |
| 10/07/1999 | | 1 | |
| 10/08/1999 | | 1 | 1 |
| 10/09/1999 | 2 | | |
| 10/10/1999 | 3 | | |
| 10/11/1999 | | | |
| 10/12/1999 | 1 | | |
| 10/13/1999 | | | |
| 10/14/1999 | | 1 | 1 |
| 10/15/1999 | | | |
| 10/16/1999 | 1 | | |
| 10/17/1999 | | | |
| 10/18/1999 | | | |
| 10/19/1999 | | | |
| 10/20/1999 | | | |
| 10/21/1999 | | 2 | |
| 10/22/1999 | 1 | | |
| 10/23/1999 | | | 1 |
| 10/24/1999 | | | |
| 10/25/1999 | | | |
| 10/26/1999 | | | 1 |
| 10/27/1999 | | 1 | |
| 10/28/1999 | | | |
| 10/29/1999 | 1 | | |
| 10/30/1999 | 2 | | |
| 10/31/1999 | 1 | | |

### ACCUMULATED SCHEDULE RELEASES

| | Date | Eastside | Northgate | Kings |
|---|---|---|---|---|
| 1.00 | 08/24/1999 | 0 | 0 | 0 |
| 2.00 | 08/25/1999 | 0 | 0 | 0 |
| 3.00 | 08/26/1999 | 0 | 0 | 1 |
| 4.00 | 08/27/1999 | 0 | 0 | 1 |
| 5.00 | 08/28/1999 | 0 | 0 | 1 |
| 6.00 | 08/29/1999 | 0 | 0 | 1 |
| 7.00 | 08/30/1999 | 0 | 0 | 2 |
| 8.00 | 08/31/1999 | 0 | 0 | 2 |
| 9.00 | 09/01/1999 | 0 | 0 | 2 |
| 10.00 | 09/02/1999 | 0 | 0 | 2 |
| 11.00 | 09/03/1999 | 0 | 0 | 3 |
| 12.00 | 09/04/1999 | 0 | 0 | 3 |
| 13.00 | 09/05/1999 | 0 | 0 | 3 |
| 14.00 | 09/06/1999 | 0 | 0 | 3 |
| 15.00 | 09/07/1999 | 0 | 0 | 4 |
| 16.00 | 09/08/1999 | 0 | 0 | 5 |
| 17.00 | 09/09/1999 | 0 | 1 | 5 |
| 18.00 | 09/10/1999 | 0 | 1 | 5 |
| 19.00 | 09/11/1999 | 0 | 1 | 5 |
| 20.00 | 09/12/1999 | 0 | 1 | 5 |
| 21.00 | 09/13/1999 | 0 | 2 | 8 |
| 22.00 | 09/14/1999 | 0 | 2 | 8 |
| 23.00 | 09/15/1999 | 0 | 2 | 8 |
| 24.00 | 09/16/1999 | 0 | 2 | 8 |
| 25.00 | 09/17/1999 | 1 | 2 | 8 |
| 26.00 | 09/18/1999 | 1 | 2 | 8 |
| 27.00 | 09/19/1999 | 1 | 2 | 8 |
| 28.00 | 09/20/1999 | 1 | 3 | 8 |
| 29.00 | 09/21/1999 | 1 | 3 | 8 |
| 30.00 | 09/22/1999 | 1 | 3 | 8 |
| 31.00 | 09/23/1999 | 1 | 3 | 8 |
| 32.00 | 09/24/1999 | 1 | 3 | 10 |
| 33.00 | 09/25/1999 | 1 | 3 | 12 |
| 34.00 | 09/26/1999 | 1 | 3 | 12 |
| 35.00 | 09/27/1999 | 1 | 3 | 12 |
| 36.00 | 09/28/1999 | 1 | 3 | 12 |
| 37.00 | 09/29/1999 | 1 | 3 | 12 |
| 38.00 | 09/30/1999 | 1 | 3 | 12 |
| 39.00 | 10/01/1999 | 1 | 3 | 12 |
| 40.00 | 10/02/1999 | 1 | 3 | 12 |
| 41.00 | 10/03/1999 | 1 | 3 | 12 |
| 42.00 | 10/04/1999 | 1 | 3 | 12 |
| 43.00 | 10/05/1999 | 2 | 5 | 12 |
| 44.00 | 10/06/1999 | 2 | 5 | 12 |
| 45.00 | 10/07/1999 | 3 | 5 | 12 |
| 46.00 | 10/08/1999 | 4 | 6 | 12 |
| 47.00 | 10/09/1999 | 4 | 6 | 14 |
| 48.00 | 10/10/1999 | 4 | 6 | 17 |
| 49.00 | 10/11/1999 | 4 | 6 | 17 |
| 50.00 | 10/12/1999 | 4 | 6 | 18 |
| 51.00 | 10/13/1999 | 4 | 6 | 18 |
| 52.00 | 10/14/1999 | 5 | 7 | 18 |
| 53.00 | 10/15/1999 | 5 | 7 | 18 |
| 54.00 | 10/16/1999 | 5 | 7 | 19 |
| 55.00 | 10/17/1999 | 5 | 7 | 19 |
| 56.00 | 10/18/1999 | 5 | 7 | 19 |
| 57.00 | 10/19/1999 | 5 | 7 | 19 |
| 58.00 | 10/20/1999 | 5 | 7 | 19 |
| 59.00 | 10/21/1999 | 7 | 7 | 19 |
| 60.00 | 10/22/1999 | 7 | 7 | 20 |
| 61.00 | 10/23/1999 | 7 | 8 | 20 |
| 62.00 | 10/24/1999 | 7 | 8 | 20 |
| 63.00 | 10/25/1999 | 7 | 8 | 20 |
| 64.00 | 10/26/1999 | 7 | 9 | 20 |
| 65.00 | 10/27/1999 | 8 | 9 | 20 |
| 66.00 | 10/28/1999 | 8 | 9 | 20 |
| 67.00 | 10/29/1999 | 8 | 9 | 21 |
| 68.00 | 10/30/1999 | 8 | 9 | 23 |
| 69.00 | 10/31/1999 | 8 | 9 | 24 |

Eastside Lincoln Mercury
Damage Calculation
Deliveries of Lincoln Model LS
May 1, 1999 to July 29, 1999

Exhibit XIV

### DAILY SCHEDULE RELEASES

| Date | KINGS | EASTSIDE | NORTHGATE |
|---|---|---|---|
| 05/01/1999 | | | |
| 05/02/1999 | | | |
| 05/03/1999 | 2 | | |
| 05/04/1999 | | 1 | 1 |
| 05/05/1999 | | | |
| 05/06/1999 | | 1 | |
| 05/07/1999 | 2 | | |
| 05/08/1999 | | | |
| 05/09/1999 | | | |
| 05/10/1999 | | | 1 |
| 05/11/1999 | | | |
| 05/12/1999 | | | |
| 05/13/1999 | | | |
| 05/14/1999 | | | |
| 05/15/1999 | | | |
| 05/16/1999 | | | |
| 05/17/1999 | 1 | | |
| 05/18/1999 | 2 | | |
| 05/19/1999 | 1 | | |
| 05/20/1999 | 1 | | |
| 05/21/1999 | 1 | | |
| 05/22/1999 | | | |
| 05/23/1999 | | | |
| 05/24/1999 | | | |
| 05/25/1999 | | 1 | |
| 05/26/1999 | 4 | | |
| 05/27/1999 | | | |
| 05/28/1999 | | | |
| 05/29/1999 | | | |
| 05/30/1999 | | | |
| 05/31/1999 | | | |
| 06/01/1999 | | | 1 |
| 06/02/1999 | | | 2 |
| 06/03/1999 | 1 | | |
| 06/04/1999 | | | 1 |
| 06/05/1999 | | | |
| 06/06/1999 | 2 | | |
| 06/07/1999 | 2 | 1 | |
| 06/08/1999 | | | |
| 06/09/1999 | | 1 | |
| 06/10/1999 | | 2 | |
| 06/11/1999 | | | |
| 06/12/1999 | | | |
| 06/13/1999 | | | |
| 06/14/1999 | | | |
| 06/15/1999 | 1 | | |
| 06/16/1999 | | 1 | |
| 06/17/1999 | 1 | | 1 |
| 06/18/1999 | 1 | 1 | |
| 06/19/1999 | | | |
| 06/20/1999 | | | |
| 06/21/1999 | | | |
| 06/22/1999 | | 1 | 1 |
| 06/23/1999 | | | |
| 06/24/1999 | 1 | 1 | 1 |
| 06/25/1999 | | | |
| 06/26/1999 | | | |
| 06/27/1999 | | | |
| 06/28/1999 | | | |
| 06/29/1999 | | | |
| 06/30/1999 | | | |
| 07/01/1999 | | | |
| 07/02/1999 | 1 | 1 | |
| 07/03/1999 | | | |
| 07/04/1999 | | | |
| 07/05/1999 | | | |
| 07/06/1999 | | | |
| 07/07/1999 | | | |
| 07/08/1999 | | | |
| 07/09/1999 | | | |
| 07/10/1999 | | | |
| 07/11/1999 | | | |
| 07/12/1999 | | | |
| 07/13/1999 | | | |
| 07/14/1999 | | | |
| 07/15/1999 | | | |
| 07/16/1999 | | | |
| 07/17/1999 | | | |
| 07/18/1999 | | | |
| 07/19/1999 | | | |
| 07/20/1999 | | 1 | |
| 07/21/1999 | | | |
| 07/22/1999 | 3 | | 2 |
| 07/23/1999 | | 2 | |
| 07/24/1999 | | | |
| 07/25/1999 | | | |
| 07/26/1999 | | 1 | |
| 07/27/1999 | | | |
| 07/28/1999 | | | |
| 07/29/1999 | | | |

### ACCUMULATED SCHEDULE RELEASES

| Date | Eastside | Northgate | Kings |
|---|---|---|---|
| 05/01/1999 | 0 | 0 | 0 |
| 05/02/1999 | 0 | 0 | 0 |
| 05/03/1999 | 0 | 0 | 2 |
| 05/04/1999 | 1 | 1 | 2 |
| 05/05/1999 | 1 | 1 | 2 |
| 05/06/1999 | 2 | 1 | 2 |
| 05/07/1999 | 2 | 1 | 4 |
| 05/08/1999 | 2 | 1 | 4 |
| 05/09/1999 | 2 | 1 | 4 |
| 05/10/1999 | 2 | 2 | 4 |
| 05/11/1999 | 2 | 2 | 4 |
| 05/12/1999 | 2 | 2 | 4 |
| 05/13/1999 | 2 | 2 | 4 |
| 05/14/1999 | 2 | 2 | 4 |
| 05/15/1999 | 2 | 2 | 4 |
| 05/16/1999 | 2 | 2 | 4 |
| 05/17/1999 | 2 | 2 | 5 |
| 05/18/1999 | 2 | 2 | 7 |
| 05/19/1999 | 2 | 2 | 8 |
| 05/20/1999 | 2 | 2 | 9 |
| 05/21/1999 | 2 | 2 | 10 |
| 05/22/1999 | 2 | 2 | 10 |
| 05/23/1999 | 2 | 2 | 10 |
| 05/24/1999 | 2 | 2 | 10 |
| 05/25/1999 | 3 | 2 | 10 |
| 05/26/1999 | 3 | 2 | 14 |
| 05/27/1999 | 3 | 2 | 14 |
| 05/28/1999 | 3 | 2 | 14 |
| 05/29/1999 | 3 | 2 | 14 |
| 05/30/1999 | 3 | 2 | 14 |
| 05/31/1999 | 3 | 2 | 14 |
| 06/01/1999 | 3 | 3 | 14 |
| 06/02/1999 | 3 | 5 | 14 |
| 06/03/1999 | 3 | 5 | 15 |
| 06/04/1999 | 3 | 6 | 15 |
| 06/05/1999 | 3 | 6 | 15 |
| 06/06/1999 | 3 | 6 | 17 |
| 06/07/1999 | 4 | 6 | 19 |
| 06/08/1999 | 4 | 6 | 19 |
| 06/09/1999 | 5 | 6 | 19 |
| 06/10/1999 | 7 | 6 | 19 |
| 06/11/1999 | 7 | 6 | 19 |
| 06/12/1999 | 7 | 6 | 19 |
| 06/13/1999 | 7 | 6 | 19 |
| 06/14/1999 | 7 | 6 | 19 |
| 06/15/1999 | 7 | 6 | 20 |
| 06/16/1999 | 8 | 6 | 20 |
| 06/17/1999 | 8 | 7 | 21 |
| 06/18/1999 | 9 | 7 | 22 |
| 06/19/1999 | 9 | 7 | 22 |
| 06/20/1999 | 9 | 7 | 22 |
| 06/21/1999 | 9 | 7 | 22 |
| 06/22/1999 | 10 | 8 | 22 |
| 06/23/1999 | 10 | 8 | 22 |
| 06/24/1999 | 11 | 9 | 23 |
| 06/25/1999 | 11 | 9 | 23 |
| 06/26/1999 | 11 | 9 | 23 |
| 06/27/1999 | 11 | 9 | 23 |
| 06/28/1999 | 11 | 9 | 23 |
| 06/29/1999 | 11 | 9 | 23 |
| 06/30/1999 | 11 | 9 | 23 |
| 07/01/1999 | 11 | 9 | 23 |
| 07/02/1999 | 12 | 9 | 24 |
| 07/03/1999 | 12 | 9 | 24 |
| 07/04/1999 | 12 | 9 | 24 |
| 07/05/1999 | 12 | 9 | 24 |
| 07/06/1999 | 12 | 9 | 24 |
| 07/07/1999 | 12 | 9 | 24 |
| 07/08/1999 | 12 | 9 | 24 |
| 07/09/1999 | 12 | 9 | 24 |
| 07/10/1999 | 12 | 9 | 24 |
| 07/11/1999 | 12 | 9 | 24 |
| 07/12/1999 | 12 | 9 | 24 |
| 07/13/1999 | 12 | 9 | 24 |
| 07/14/1999 | 12 | 9 | 24 |
| 07/15/1999 | 12 | 9 | 24 |
| 07/16/1999 | 12 | 9 | 24 |
| 07/17/1999 | 12 | 9 | 24 |
| 07/18/1999 | 12 | 9 | 24 |
| 07/19/1999 | 12 | 9 | 24 |
| 07/20/1999 | 13 | 9 | 24 |
| 07/21/1999 | 13 | 9 | 24 |
| 07/22/1999 | 13 | 11 | 27 |
| 07/23/1999 | 15 | 11 | 27 |
| 07/24/1999 | 15 | 11 | 27 |
| 07/25/1999 | 15 | 11 | 27 |
| 07/26/1999 | 16 | 11 | 27 |
| 07/27/1999 | 16 | 11 | 27 |
| 07/28/1999 | 16 | 11 | 27 |
| 07/29/1999 | 16 | 11 | 27 |



EXHIBIT 15

New Model Year Lincoln Navigator Releases to Select Cincinnati Area Lincoln Mercury Dealerships



EXHIBIT 16

New Model Year Lincoln LS Releases to Select Cincinnati Area Lincoln Mercury Dealerships

Eastside Lincoln Mercury
Damage Calculation

Exhibit XVII

**Lost Sales Volume Resulting From Preferential Delivery of Vehicles**

| Calendar Year | Lost unit sales by model of vehicle | | | | Total Lost Unit Sales |
|---|---|---|---|---|---|
| | Cougar | Navigator | Lincoln LS | Mountaineer | |
| 1999 | 20 | 8 | 6 | 9 | 43 |
| 2000 | 10 | 6 | 8 | 8 | 32 |
| 2001 | 8 | 5 | 5 | 6 | 24 |
| 2002 | 0 | 5 | 0 | 0 | 5 |
| Grand Total | | | | | 104 |

Eastside Lincoln Mercury
Damage Calculation

Analysis of Eastside Service Volume

Exhibit XVIII

| Model Years Included | Delivery period | Service Period | Type of Sale | Number Of Vehicles Serviced | Number of RO'S Written | # Of RO's Written Per Vehicle |
|---|---|---|---|---|---|---|
| 2001 to 2002 | 01-01-01 to 12-31-02 | 01-01-01 to 12-31-02 | All | 139 | 852 | 6 |

Eastside Lincoln Mercury
Damage Calculation

Exhibit XIX

Service and Parts Department Analysis and Variable Selling Expenses

| Calendar Year | Variable Selling Expense Stated in Dollars | | Gross Profit Dollars | | Variable Selling Expense as a % of Sales |
|---|---|---|---|---|---|
| | Service | Parts | Service | Parts | |
| 1999 | 178206 | 48095 | 724175 | 337896 | 21.31% |
| 2000 | 174858 | 41551 | 633655 | 333172 | 22.38% |
| 2001 | 160397 | 37674 | 606811 | 319742 | 21.38% |
| 2002 | 129479 | 31231 | 588763 | 329656 | 17.50% |

Calculation of Gross Profit per RO Written

| | RO'S Written Total All Categories | Gross profit Service & Parts | Average Gross Per RO |
|---|---|---|---|
| 2001 | 10677 | 926553 | 86.78 |
| 2002 | 9314 | 918419 | 98.61 |
| Average | | | 92.69 |

Note
Variable selling expense includes commissions, advertising, training, policy, service loaners, tools,
  supplies, freight, equipment and vehicle maintenance
Data taken from Eastside's dealership financial statements

Eastside Lincoln Mercury
Damage Calculation

Lost Profits Associated With Missed Sales                                    Exhibit XX

| Calendar Year | Lost new Unit Sales In Units | Lost # Of RO's Per Lost Sale | Gross Profit per ELM Financials | | | Variable Selling Expenses As a % of Gross Profit | | Net Missed Profit |
|---|---|---|---|---|---|---|---|---|
| | | | Per New Unit Sale | F & I per New Unit | Service & Parts Per RO | New Car Department | Service & Parts Dept | |
| 1999 | 43 | 6 | 1,147.73 | 127.00 | 92.69 | 26.30% | 21.31% | 59,215 |
| 2000 | 32 | 6 | 1,102.33 | 93.00 | 92.69 | 23.50% | 22.38% | 43,075 |
| 2001 | 24 | 6 | 957.21 | 145.00 | 92.69 | 32.30% | 21.38% | 28,402 |
| 2002 | 5 | 6 | 705.72 | 110.00 | 92.69 | 46.00% | 17.50% | 4,497 |
| | | | | | | | TOTAL | 135,190 |

Eastside Lincoln Mercury
Damage Calculation

Exhibit XXI

Borrowing Costs Incurred Due to Lost Gross Profit, Increased Expenses and Inability to Dual Facilities

Damage calculated through December 31, 2003

| Calendar Year | Savings Associated With | Amount of Savings | Interest Rate | Current Year Amount to Be Saved | Future Years Savings |
|---|---|---|---|---|---|
| 1999 | Denial of Permission to Dual Facilities | 607,602 | | | |
| 1999 | Lost Warranty Gross Profit | 67,840 | | | |
| 1999 | Lost Gross on Lost New Vehicle Sales | 59,215 | | | |
| | Subtotal | 734,657 | 8.00% | 29,386 | 128,565 |
| 2000 | Denial of Permission to Dual Facilities | 532,918 | | | |
| 2000 | Lost Warranty Gross Profit | 82,356 | | | |
| 2000 | Warranty Charge Backs | 2,359 | | | |
| 2000 | Lost LPE money | 8,618 | | | |
| 2000 | Cost of LPE Updates | 12,583 | | | |
| 2000 | Lost Gross on Lost New Vehicle Sales | 43,075 | | | |
| | Subtotal | 681,909 | 7.75% | 26,424 | 66,486 |
| 2001 | Denial of Permission to Dual Facilities | 559,797 | | | |
| 2001 | Lost Warranty Gross Profit | 235,634 | | | |
| 2001 | Warranty Charge Backs | 5,973 | | | |
| 2001 | Cost of LPE Updates | 1,600 | | | |
| 2001 | Lost Gross on Lost New Vehicle Sales | 28,402 | | | |
| | Subtotal | 831,406 | 3.75% | 15,589 | 49,884 |
| 2002 | Denial of Permission to Dual Facilities | 552,238 | | | |
| 2002 | Lost Warranty Gross Profit | 128,383 | | | |
| 2002 | Cost of LPE Updates | 88,638 | | | |
| 2002 | Lost Gross on Lost New Vehicle Sales | 4,497 | | | |
| | Subtotal | 773,756 | 3.00% | 11,606 | 23,213 |
| 2003 | Denial of Permission to Dual Facilities | 534,159 | | | |
| 2003 | Lost Warranty Gross Profit | 64,392 | | | |
| | Subtotal | 598,551 | 3.00% | 8,978 | 0 |
| | Grand Total | | | 91,984 | 268,148 |

Eastside Lincoln Mercury
Damage Calculation

Exhibit XXII

Comparison of Operating Results, Net Worth and Blue Sky Value

| Operating Loss | | Per Dealer Financial Statements | | | Blue Sky Paid by Ford |
|---|---|---|---|---|---|
| | | 1998 | 1999 | 2000 | |
| Dixon Lincoln Mercury | | 24,833 | (307,015) | Closed | 1,600,000 |
| Stillpass Lincoln Mercury | | (193,979) | (377,245) | Closed | |
| Wyler/Stillpass  Lincoln Mercury | Note 1 | | | (446,607) | 903,800 |
| Eastside Lincoln Mercury | | 50,246 | (209,215) | (290,339) | |

Note 1 - Combined results of Wyler\Stillpass through September 30, 2000

Eastside Lincoln Mercury
Damage Calculation

Exhibit XXIII

Pro Forma Eastside Financial Statements After Adjustment for Damages

|  | 1999 | 2000 | Combined |
|---|---|---|---|
| As originally reported on the dealer financials | (219,083) | (290,339) | (509,422) |
| Adjust for |  |  |  |
|    2000 Damaged Per Exhibit XXI | 734,657 | 0 | 734,657 |
|    2001 Damages per Exhibit XXI | 0 | 681,909 | 681,909 |
| Revised Operating Results- pretax | 515,574 | 391,570 | 907,144 |
| Lowest Goodwill amount paid by Ford in Consolidation of other Points |  |  | 903,800 |
| Increased Blue Sky Value that Mr. Woeste would attribute to Eastside had he not suffered the damages resulting from Fords actions Calculated at three times the average of the damages for 1999 and 2000 |  |  | 2,124,849 |

Eastside Lincoln Mercury
Damage Calculation

Exhibit XXIV

Ford Money Paid to Reichert/ Kenwood Dealer Group and Not Made Available to Eastside

| Stated Purpose | Amount |
|---|---|
| Fairfield Assistance with purchase of Dixon | 183,000 |
| Wyler Units - Kings | 8,000 |
| Wyler Units - Fairfield | 2,500 |
| Gentry sales trip | 10,000 |
| Fairfield Co-op Advertising | 25,000 |
| Fairfield Grand Opening | 20,000 |
| Fairfield LM Co-op Advertising | 2,250 |
| Kings Co-op - Cougar | 3,150 |
| Kings Co-op Selldown assistance | 12,600 |
| Kings LM | 17,000 |
| Kings Auto mall Co-op Advertising | 36,750 |
| Northgate Co-op Advertising | 21,000 |
| Grand total | 341,250 |

# Exhibit
# D

1    UNITED STATES DISTRICT COURT
2    SOUTHERN DISTRICT OF OHIO
     WESTERN DIVISION

3     - - -

4 EASTSIDE LINCOLN MERCURY, :
 INC., et al.,    :
5         :
    Plaintiffs :
6         : CASE NO. C-1-02-567
   -vs-     :
7         :
 FORD MOTOR COMPANY,  :
8 et al.,     :
         :
9    Defendants :
     - - -

10

11   Deposition of ROGER M. BEAN, a witness

12 herein, taken by the defendants as upon

13 cross-examination pursuant to the Federal Rules of

14 Civil Procedure and pursuant to agreement among

15 counsel as to time and place and stipulations

16 hereinafter set forth, at the offices of Statman,

17 Harris, Siegel & Eyrich, 2900 Chemed Center, 255

18 East Fifth Street, Cincinnati, Ohio, at 9:30 a.m.,

19 on October 29, 2003, before Pamela S. Giglio, a

20 notary public within and for the State of Ohio.

21     - - -

22

23   GIGLIO REPORTING SERVICES
    3 Cypress Garden
24   Cincinnati, Ohio  45220
    (512) 861-2200
25

ORIGINAL

1    public accountant, which is a broad spectrum of

2    expertise, if you will.  Accounting, auditing,

3    consulting, mergers and acquisitions, general

4    business advice.

5              Q.    Are there any fields of expertise

6    that you hold outside of the accounting area?

7              A.    Outside of the accounting area, no.

8              Q.    Which of these fields within

9    accounting have you been asked to give testimony in

10   this case?

11             A.    My purpose in this engagement was to

12   assist counsel in the damage calculations which

13   involved analysis of facts and figures, review of

14   financial statements of the dealerships involved in

15   this case, the majority of which is, in my opinion,

16   accounting related relative to the expert report

17   which I have provided to you.

18             Q.    Which aspects of your public

19   accounting background have you been using in

20   rendering your report?

21             A.    My expertise with automobile dealers

22   primarily, my expertise with the accounting and

23   financial aspects of automobile dealers.

24             The issues concerned with the

25   mergers, sales, acquisition, divestitures of

```
 1              A.   No.
 2              Q.   Did you review the dealer agreement
 3     in this case?
 4              A.   Yes.
 5              Q.   Is there a reason that it's not on
 6     your list of documents you reviewed?
 7              A.   I listed the complaint, and it's
 8     attached to the complaint.
 9                   MR. FLEMER:  I think his list
10                   includes that he reviewed the memorandum
11                   relative to summary judgment and the
12                   exhibit.
13                   MS. MCNELLIE:  Your memorandum?
14                   MR. FLEMER:  Right, attached to the
15                   memorandum.
16                   THE WITNESS:  Correct.  I think it's
17                   attached to both those documents.
18     BY MS. MCNELLIE:
19              Q.   Did you review any of Mr. Woeste's
20     other dealer agreements with any of his other
21     manufacturers?
22              A.   In what time frame?
23              Q.   In the context of this litigation.
24              A.   No, ma'am.
25              Q.   Have you ever had the occasion to
```

1    review his dealer agreement with Chevrolet?

2              A.    I don't recall.

3              Q.    How about his dealer agreement with

4    Honda?

5              A.    I don't recall.

6              Q.    Is there a standard ratio in the

7    industry for the number of managers that a

8    dealership needs compared to the number of sales

9    staff or the number of technicians that it has?

10             A.    No, I don't think there is a

11   standard for that.

12             Q.    How do you make that determination

13   as to how many managers you need compared to sales

14   staff, for instance?

15             A.    New or used?

16             Q.    New.

17             A.    Typical structure is there is a new

18   car sales manager.

19             Q.    What if the dealership represents

20   multiple lines, is that still a rule of thumb?

21             A.    Yes, ma'am.

22             Q.    What do you base that statement

23   upon?

24             A.    My experience with the car dealers I

25   have represented over the years.

1      Q.   Same true in the service department?

2      A.   Yes, ma'am.

3      Q.   Whether it's stand-alone or dual?

4      A.   Yes, ma'am.

5      Q.   Have you ever seen a dual facility

6  with more than one service manager?

7      A.   No, ma'am.

8      MR. FLEMER:  Off the record for a

9  second.

10                    (At which time, an off-the-

11                    record discussion was held.)

12      MR. FLEMER:  I'm sorry, go ahead.

13      MS. MCNELLIE:  Back on the record.

14      Q.   With the dealerships that you have

15  represented that have been dual, have any of the

16  manufacturers asked for separate parts or service

17  managers?

18      A.   I don't believe so.

19      Q.   Have you ever been involved with any

20  of the negotiations between the dealership and the

21  manufacturer with regard to staffing in a dual

22  facility?

23      A.   Yes, ma'am.

24      Q.   Any involving Ford or Lincoln

25  Mercury?

1          A.    Not that I recall, no.

2          Q.    What is your understanding of how

3    vehicle allocation works in the Ford system?

4          A.    There is a mathematical calculation

5    referred to as turn, to turn and/or earn which

6    derives or drives the initial allocation.

7                There is a concept called coverage.

8    There are discretionary allocations above and

9    beyond the mathematical calculation.

10         Q.    Where did you -- upon what do you

11   base that understanding of the allocation system?

12         A.    My discussion with personnel at the

13   Eastside Lincoln Mercury, my reading of depositions

14   in this case, my discussions of that with Glen

15   Watkins.

16         Q.    Who at Eastside did you speak with

17   about allocation?

18         A.    Mr. Woeste, Mr. Beattie,

19   B-E-A-T-T-I-E, I believe, and Mr. Woodall.

20         Q.    When did you have this discussion

21   with them?

22         A.    Different points in time, '91

23   through 2000 or through today.  Not today, but

24   through 2003.

25         Q.    Have you had a discussion with them

```
 1    as pertains to allocation in this litigation?

 2              A.   Yes.

 3              Q.   When did that occur?

 4              A.   Same time frame, '91 through 2003.

 5              Q.   Mr. Woeste was contemplating suing

 6    Ford in '91?

 7                   MR. FLEMER:  Objection.

 8                   THE WITNESS:  I'm sorry?

 9    BY MS. MCNELLIE:

10              Q.   With regard to this litigation?

11              A.   I'm sorry, I have the date wrong.

12    Excuse me, 2001.  Both those answers should have

13    been 2001 through 2003.  I apologize.

14              Q.   Who is Mr. Watkins?

15              A.   Mr. Glen Watkins.

16              Q.   Who is he?

17              A.   Individual knowledgeable in the

18    automobile business who assisted me in my work in

19    this engagement.

20              Q.   By whom is he employed, do you know?

21              A.   I don't know.

22              Q.   Do you know where he is?

23              A.   Richmond, Virginia.

24                   I should say I don't recall who he's

25    employed by.
```

1          Q.    Did you meet with him in person or

2    over the phone?

3          A.    On the phone.

4          Q.    On more than one occasion?

5          A.    Yes.

6          Q.    Do you know how many times?

7          A.    Is a range acceptable?

8          Q.    Yes.

9          A.    More than 10, less than 20.

10          Q.    Do you recall the first time you

11    spoke to him?

12          A.    I recall that I spoke to him the

13    first time.

14          Q.    Was it before you completed your

15    first report in this case?

16          A.    Which would be my first report in

17    this case.

18          Q.    That would be dated --

19                MR. FLEMER:  September of '01, I

20                believe.

21    BY MS. MCNELLIE:

22          Q.    Yes.

23          A.    It was not prior to September '01.

24          Q.    Was it prior to your affidavit that

25    was attached to the opposition for the motion for

1    summary judgment?

2          A.   Yes, ma'am.

3          Q.   Was it prior to January of '02?

4          A.   I don't remember.

5          Q.   What kinds of information did

6    Mr. Watkins give you specifically about allocation?

7          A.   We discussed Ford, Lincoln Mercury's

8    mathematical formula and the availability of

9    discretionary vehicles above and beyond the

10   mathematical calculation.

11              And we discussed the delivery times

12   where the release date for vehicles ordered by

13   several of the Lincoln Mercury dealers that are

14   part of this litigation.

15         Q.   Do you know the basis for

16   Mr. Watkins' understanding of these things?

17              MR. FLEMER:   Object.

18              You can answer if you can.

19              THE WITNESS:   I don't know.

20   BY MS. MCNELLIE:

21         Q.   Did you rely on any of the

22   information provided to you by Mr. Watkins in

23   reaching any of your conclusions in this report?

24         A.   What do you mean by rely upon?

25         Q.   Did you use any of the information

1    that you got from him in reaching any of your

2    conclusions?

3              A.    Yes.

4              Q.    Which information did you use?

5              A.    There are some exhibits to my report

6    which, that Glen collaborated with me on.  There

7    obviously is the telephone conversations.  I used

8    the knowledge that I gained from him to draft some

9    of the verbiage that's in the document, the report.

10             Q.    Did you speak with Mr. Watkins about

11   any other issues other than allocation and delivery

12   dates and things of that nature?

13             A.    I spoke to Mr. Watkins about a

14   number of issues in the case, but what I have

15   relied upon in there is in the exhibit and what I

16   told you.

17             Q.    That would be the information

18   related to whether you have titled vehicle

19   distribution?

20             MR. FLEMER:  Do you mind if he looks

21         at the report?

22             MS. MCNELLIE:  I'll get this, that's

23         fine.  I want to make sure we are talking

24         about the same topic.

25             Q.    Look at Page 8.

```
 1              A.   Experience and discussion with

 2    George, Bill and Jim Woodall.

 3              Q.   What did Mr. Beattie tell you about

 4    this issue?

 5              A.   He believes that the staff is

 6    intimidated.

 7              Q.   Do you know why he believes that?

 8              A.   I'm sure there are a number of

 9    reasons, I believe, that I can't recall today.

10              Q.   What did Mr. Woodall tell you?

11              A.   Similar.

12              Q.   Do you know why he feels that way?

13              A.   Similar reasons.

14              Q.   Anything different for Mr. Woeste?

15              A.   No.

16              Q.   Has there been any analysis done

17    comparing the RO's of Eastside before the audits

18    were done with those that were completed after the

19    audits were done to determine that the decline was

20    attributable to not looking for warranty issues not

21    related to customer complaints?

22              A.   I haven't done such an analysis.

23              Q.   Do you know of anyone that has?

24              A.   No, ma'am.

25              Q.   Do you know why manufacturers
```

```
 1              A.   No.

 2              Q.   Did you speak to anybody at Lincoln

 3   Mercury about the dualing request?

 4              A.   No, ma'am.

 5              Q.   Do you have any kind of a marketing

 6   background?

 7              A.   "Background" being?

 8              Q.   Study or work experience.

 9              A.   Clearly, in college, I took

10   marketing courses.  Clearly, over the years in

11   public accounting, we have had instances where we

12   have discussed with our clients their marketing

13   efforts.

14              Q.   Is it your understanding that auto

15   manufacturers have a preference as to whether their

16   dealerships are dualed or not?

17                   MR. FLEMER:  Objection.

18                   THE WITNESS:  Auto manufacturers in

19              general?

20   BY MS. MCNELLIE:

21              Q.   Yes.

22              A.   Or in specific?

23              Q.   In general.

24              A.   So is it my understanding that

25   automobile manufacturers franchisers --
```

1          Q.    Do you have an understanding as to

2    whether franchisers have a preference one way or

3    another whether their dealerships are dualed or

4    not?

5          A.    It depends on the franchiser.

6          Q.    What about Ford Motor Company?

7          A.    Statistics indicate that Ford does

8    have dual franchises.

9          Q.    Question is whether they have a

10   preference as to whether their dealerships are

11   dualed or not.

12         A.    I don't know whether Ford has a

13   preference or not.

14         Q.    What about Mercedes?

15         A.    I have a Mercedes franchise dualed

16   with somebody else, and it wasn't a problem.  So I

17   don't know what Mercedes' policy is.  I know from

18   experience that I represent a Mercedes dealership

19   that is dualed with somebody else.

20         Q.    When I asked you the question

21   originally, you said it depends on the

22   manufacturers.

23               Are there some manufacturers that

24   you know of that prefer not to have dualed or

25   prefer to have dualed dealerships?

1          A.    My understanding is as you succeed,

2    you want to have a stand-alone facility, for

3    instance, but I don't have any direct insight into

4    each individual manufacturer's policies or

5    procedure.

6          Q.    Are you aware of any studies that

7    have been done on the impact of new vehicle sales

8    after dualing has occurred?

9          A.    Studies by whom?

10          Q.    By anyone.

11          A.    I'm sure there are.  Couldn't tell

12    you who they were.

13          Q.    Have you ever reviewed any of them?

14          A.    Not that I recall.

15          Q.    Have you ever seen dualing of

16    domestic lines?

17          A.    Being?

18          Q.    Manufacturers, I'm sorry.

19          A.    I'm sure I have.  I'm trying to

20    think of the examples for you.  Lincoln Mercury are

21    dual.

22          Q.    Same manufacturer?

23          A.    Different franchise agreements.

24          Q.    Sure.

25                Other than Lincoln Mercury, any

```
 1    other domestic line makes that you know of that are
 2    dual?

 3            A.   I'm certain there are domestic
 4    manufacturers of a franchisee which is dual.

 5            Q.   Can you name me any one of them?

 6            A.   Multiple combinations of Pontiac,
 7    Buick, GMC, Olds, Cadillac.

 8            Q.   All owned by GM?

 9            A.   Different franchises.  Two
10    franchises in the same facility, similar facility,
11    is my understanding of dual.

12            Q.   Okay.

13            A.   Mike Higgins Pontiac was a dual.  He
14    happened to have a franchise to sell.  It was the
15    successor to Avante.

16                 Ferrari dealership I represented in
17    Michigan was dualed with a General Motors
18    franchise.

19            Q.   Is Ferrari a domestic line?

20            A.   Domestic line make with an import.

21            Q.   Have you ever seen two domestic line
22    makes dualed?

23            A.   Yes, yes.

24            Q.   Other than the Lincoln Mercury and
25    General Motors example that you have given me
```

1    already, are there any others?

2            A.    Yes.

3            Q.    Who?

4            A.    There is a huge auto mall between

5    here and Chicago that I stopped to look at that has

6    multiple franchises.  I can't remember the name.

7    Reading Automotive news, you can read where dealers

8    are consolidating multiple locations, I think

9    building a big auto mall in Arizona or someplace.

10   So I think the answer is yes.

11           Q.    Have you ever seen a Ford, General

12   Motors dual?

13           A.    I'm speculating if I say yes, I'm

14   speculating.  There is something Datsun through my

15   mind, but I can't be certain about it.

16                          (At which time, Defendants'

17                          Exhibit No. 1, preliminary

18                          damage analysis, was marked

19                          for identification.)

20   BY MS. MCNELLIE:

21           Q.    Can you identify that?

22           A.    Yes.

23           Q.    What is this?

24           A.    It was a preliminary damage analysis

25   which I performed back in 2001.

1    increased; is that correct?

2            A.    Correct.

3            Q.    Why is that a proper assumption?

4            A.    These are dealerships operating in

5    the same area, servicing the same products,

6    servicing the same customer.

7                  They are the best benchmark that I

8    have to determine the impact of the warranty audits

9    on Eastside's decline in business.

10           Q.    Did you investigate whether there

11   were any other reasons that Eastside's warranty

12   work would have declined at any point in time?

13           A.    That I considered the information on

14   this graph here, Exhibit 2, which indicates that

15   their service and parts business is relatively

16   flat, and there is a significant decline in their

17   warranty volume which doesn't compare with the

18   results achieved by other competitors in town.

19           Q.    Did you investigate whether there

20   were any other reasons that could have impacted

21   their warranty work aside from the warranty audits?

22           A.    I discussed -- I have discussed it

23   with my client, asked them if there are any other

24   reasons.  They did not indicate to me that there

25   were other reasons.. So I think -- I can't remember

1    the question now.

2              Q.    When did you do an investigation?

3              A.    I did other investigation and

4    discussion, and I think the answer is no.

5              Q.    Discussion with people at Eastside?

6              A.    Correct.

7              Q.    I'm looking again at Exhibit 4.

8              A.    Yes.

9              Q.    Am I correct in that your

10   calculation is cumulative in the sense that each

11   year's adjusted service numbers are then used to

12   calculate the next year's impact?

13             A.    I'm not sure I used the word

14   "cumulative."  The percentage used to apply to the

15   numbers are the annual percentage of change from

16   one year to the next.

17             So effectively you build upon the

18   first year with the annual change.

19             Q.    You will agree that from 2000,

20   Eastside's sales of service or warranty sales

21   actually increased?

22             A.    Correct.

23             Q.    Same for 2001 to '02, correct?

24             A.    Correct.

25             Q.    Do you have any explanation as to

1    information they gave to you?

2            A.    Their historical knowledge of

3    employment categories at those two dealerships

4    during that period of time.

5            Q.    Do you know if Chevrolet approved

6    the proposed dual with Lincoln Mercury?

7            A.    I do not.

8            Q.    You would agree with me that

9    Chevrolet would have had to approve that dual, are

10   you?

11           A.    I wouldn't agree.

12           Q.    Why?

13           A.    I can't recall what their franchise

14   agreement would say.  I don't know if they have

15   site -- I don't feel that property -- I can't

16   render a legal opinion as to whether they have the

17   ability to block it.

18           Q.    If Chevrolet had the ability to

19   block it, though, all of this would be moot if they

20   hadn't given an opinion or approval one way or the

21   other?

22                 MR. FLEMER:  Objection, objection.

23                 THE WITNESS:  It's a hypothetical.

24           My opinion is that these were the damages

25           incurred that Mr. Woeste would have been

```
 1              allowed to dual franchise.  He should

 2              have been allowed.  That's my

 3              calculation.

 4    BY MS. MCNELLIE:

 5              Q.   If Chevrolet had said no, would he

 6    have incurred these damages?

 7                   MR. FLEMER:  Objection.

 8                   THE WITNESS:  That's a hypothetical.

 9              I can't answer that.

10    BY MS. MCNELLIE:

11              Q.   You have no opinion one way or the

12    other about it?

13              A.   One way or the other about it?

14              Q.   If Chevrolet had said no?

15                   MR. FLEMER:  Objection, asked and

16              answered.

17                   THE WITNESS:  Yes.  It's a

18              hypothetical.  I don't think I have an

19              answer for you.

20    BY MS. MCNELLIE:

21              Q.   You have been offered as an expert

22    witness.

23                   Would it impact your damage

24    calculation if Chevrolet had said no?

25                   MR. FLEMER:  Objection.
```

```
1                    THE WITNESS:  I haven't been asked

2               to address that now.

3     BY MS. MCNELLIE:

4          Q.   I'm asking you now, would it impact

5     your analysis if Chevrolet had said no?

6                    MR. FLEMER:  Objection.

7                    THE WITNESS:  I can't -- I don't

8               think I can answer that.  I haven't

9               thought about it, don't know what they

10              would or wouldn't have done.

11    BY MS. MCNELLIE:

12         Q.   I'm not asking that.  Let's assume

13    for purposes of this question Chevrolet had said

14    no.

15                    Would it impact your damage

16    calculation?

17                    MR. FLEMER:  Objection about the

18              fifth time, he answered it four times.

19              The record will reflect he responded each

20              time.

21                    You don't like the answer, but

22              that's the answer he's given you.  He

23              said he can't say.

24                    MS. MCNELLIE:  Okay.

25                    MR. FLEMER:  Five times is enough.
```

```
 1              MS. MCNELLIE:  Could we take five

 2        minutes, please?

 3              MR. FLEMER:  Yes.

 4              THE WITNESS:  Thank you.

 5                    (At which time, a short recess

 6                    was taken.)

 7              MS. MCNELLIE:  Back on the record.

 8         Q.    Can you tell me who prepared

 9    Exhibit 13?

10         A.    It's another Excel spreadsheet.

11    Glen Watkins and I collaborated on this.  I think

12    he prepared this under my supervision or direction.

13         Q.    What did you ask Mr. Watkins to

14    prepare?

15         A.    To summarize the information on

16    Eastside release data from the Ford reports for new

17    model vehicles in this time frame, and we picked

18    Lincoln Navigator and Lincoln LS.  That's it.

19         Q.    Why did you pick Navigator and LS?

20         A.    They just happened to be new model

21    products during the time frame we were looking at.

22    That's all.

23         Q.    Did you look at any other vehicle

24    lines that you didn't include in your report?

25         A.    No.
```

1          Q.    Is there a letter of explanation or

2    a note or something that goes along with the

3    financial statements to Ford to tell them we don't

4    really have $2.6 million in this company?

5               The other dealerships are not Ford

6    dealerships that it consolidates with, correct?

7          A.    I don't know.

8          Q.    Yeah, you do.

9          A.    I'm sorry.  The other dealerships

10   are not Ford dealerships.

11              Do I know -- the first question was

12   do I know if there is an explanation that goes to

13   Ford?  The answer to that is no.

14         Q.    Your calculation of the savings that

15   would be enjoyed through dualing of the dealership

16   presumed that the mating dealership or their

17   franchiser allowed that to occur, it happened?

18         A.    Yes.  The dualing would happen,

19   correct.

20         Q.    You don't know whether or not that

21   franchiser either, A, has the right to disapprove,

22   or, B, had been consulted and approved the dualing?

23         A.    That's correct.

24         Q.    With respect to the warranty service

25   decline, did you discover in either your

# Exhibit
# E

Service: **Get by LEXSEE®**
Citation: **1999 U.S. App. LEXIS 5984**

*1999 U.S. App. LEXIS 5984, \**

JAMES MARQUARDT, Plaintiff-Appellant v. ROBERT Z. JOSEPH, D.M.D., M.D., Defendant-Appellee

No. 98-5163

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

1999 U.S. App. LEXIS 5984

March 30, 1999, Filed

**NOTICE: [\*1]** NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 206 LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 206 BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: 1999 U.S. App. LEXIS 12542.

**PRIOR HISTORY:** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY. 96-00447. J M Hood. 12-29-97.

**DISPOSITION:** Affirmed.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff appealed an order of the United States District Court for the Eastern District of Kentucky entering judgment for defendant physician in a medical malpractice suit filed by plaintiff against defendant for oral surgery. Plaintiff asserted that the trial court erred in excluding and limiting the scope of expert witness testimony, and granting judgment as a matter of law on plaintiff's negligence and informed consent claims.

**OVERVIEW:** Defendant performed oral surgery on plaintiff. Two years later some prosthetic teeth fell out, and plaintiff filed a negligence and informed consent suit against defendant. At trial, the court granted judgment as a matter of law on plaintiff's informed consent claim and a negligence claim involving splitting of plaintiff's jaw. The jury entered judgment for defendant on a remaining negligence claim involving implants. Plaintiff appealed. The court affirmed , holding that the trial court properly excluded and limited the scope of plaintiff's expert witness testimony, and properly granted judgment as a matter of law. The court held that plaintiff failed to disclose an expert witness prior to trial, pursuant to Fed. R. Civ. P. 26(a)(2) and 37(c)(1). Further, the court held that the trial court properly limited testimony of plaintiff's expert witness because the expert was not qualified to testify about an oral surgeon's standard of care, as required under Fed. R. Evid. 702. The court held that plaintiff failed to present the standard of care for oral surgeons, or provide proof of understanding of the risks involved in oral surgery to support an informed consent claim.

**OUTCOME:** The court affirmed judgment for defendant physician in a medical malpractice suit filed by plaintiff for oral surgery performed, because the trial court

properly excluded and limited the scope of plaintiff's expert witness testimony, and properly granted judgment as a matter of law on plaintiff's negligence and informed consent claims.

**CORE TERMS:** implant, standard of care, surgeon, expert testimony, surgery, informed consent, matter of law, numbness, jaw, laymen, continuance, disclosure, splitting, permanent, deadline, common knowledge, testifying, prosthesis, injurious, expertise, skill, angle, owed, medical malpractice, motion to continue, properly granted, oral surgery, doctor, negligently, prosthetic

### LexisNexis (TM) HEADNOTES - Core Concepts - ♦ Show Concepts

**COUNSEL:** For JAMES M. MARQUARDT, Plaintiff - Appellant: William J. Nold, Miller, Mosley, Clare & Townes, Eugene J. Mosley, Ackerson, Mosley & Yann, Louisville, KY.

For ROBERT Z. JOSEPH, D.M.D., M.D., Defendant - Appellee: David C. Trimble, Douglas J. Hallock, Frost & Jacobs, Lexington, KY.

**JUDGES:** BEFORE: MERRITT, DAUGHTREY and FARRIS, * Circuit Judges.

* The Honorable Jerome Farris, Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

**OPINIONBY:** MERRITT

**OPINION: MERRITT, Circuit Judge.** In this Kentucky diversity case, we have a medical malpractice action arising from oral surgery in 1993 performed by defendant Joseph on plaintiff Marquardt to correct an overbite by splitting the lower **[*2]** jaw and moving it forward and then inserting six prosthetic implants to replace extracted molars. Two years later some of the prosthetic teeth placed into the implants fell out. Plaintiff brought suit alleging negligence and the failure to inform him of the risks. At the close of the plaintiff's case in December 1997, the trial court granted judgment as a matter of law on plaintiff's claim that the splitting of his jaw was performed negligently and on the informed consent claim. On plaintiff's claim that the implant was negligently performed, the jury found that Dr. Joseph was not negligent in his placement of the implants.

On appeal, Marquardt raises the following issues: (1) whether the trial court erred in excluding some and limiting the scope of other proposed expert witness testimony; (2) whether the district court abused its discretion in denying Marquardt's motion to continue the trial; (3) whether the district court properly granted judgment as a matter of law to the defendant on the issue of the negligence of the jaw splitting surgery; and (4) whether the district court properly granted judgment as a matter of law to the defendant on Marquardt's informed consent claim. **[*3]**

1. Exclusion of Testimony -- Prior to the expiration of the court's July 1997 disclosure deadline for expert witnesses, plaintiff Marquardt identified Dr. Maureen O'Flanagan as his only expert witness. After the expiration of this deadline, he said that he would also rely on the expert testimony and opinions of Dr. Michael Logue and Dr. S. Anthony Wolfe. The defendant's motion to exclude the testimony of Drs. Logue and Wolfe was granted, and the court limited the testimony of Dr. O'Flanagan. Federal Rule of Civil Procedure 26(a)(2) requires the disclosure of experts to be used at trial at least 90 days prior to trial, and Rule 37(c)(1) provides that "a party that without substantial justification fails to disclose information required by Rule 26(a) . . . shall not, unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." The plaintiff violated Rule 26(a) and has not shown that his

failure to disclose was substantially justified or harmless, and it was not error for the trial court to exclude the two experts presented after the deadline.

Dr. O'Flanagan is a dentist but not an oral surgeon. **[*4]** The trial court ruled that she was not qualified to testify about the standard of care owed by an oral surgeon. She was allowed to testify that based upon the angle of the implants the prosthesis could not succeed. Dr. O'Flanagan was precluded from testifying to the cause of the angle because this would go to an oral surgeon's standard of care. Plaintiff fails to meaningfully challenge this ruling. A trial court's decision on whether a witness's "knowledge, skill, experience, training, or education," Fed. R. Evid. 702, qualify him or her to testify as an expert is reviewed for clear error. _United States v. Jones_, 107 F.3d 1147, 1151 (6th Cir. 1997). We have said that if a trial court allows an expert to testify in areas beyond her expertise it fails to perform its gatekeeping function under the _Daubert_ case. _Smelser v. Norfolk Southern Railway Co._, 105 F.3d 299, 301 (6th Cir. 1997), citing, _Daubert v. Merrell Dow Pharmaceuticals, Inc._, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993). Here, Dr. O'Flanagan did not hold herself out as a prosthodontist. Plaintiff makes no showing that Dr. O'Flanagan's expertise in dentistry provides her with the qualifications to **[*5]** comment on the standard of cared owed by an oral surgeon. Under these circumstances, it cannot be said that the trial court clearly erred in limiting Dr. O'Flanagan's testimony.

2. Motion for Continuance -- Plaintiff alleges that the trial court erred in denying his motion to continue the trial, ruling after the court's rulings on expert testimony. He says that since the court precluded Drs. Logue and Wolfe from testifying and limited Dr. O'Flanagan's testimony it should have granted him a continuance to find other experts, particularly because the ruling limiting Dr. O'Flanagan's testimony came one week before trial was to begin. The decision to grant or deny the continuance was well within the discretion of the trial court. Had the plaintiff fulfilled his disclosure duties under Rule 26, he would not have been left without expert witnesses.

3. Judgment As a Matter of Law on Jaw Splitting Surgery. -- In granting the defendant's motion for judgment as a matter of law, the trial court concluded that "there's been no testimony that this surgery was performed in such a manner that deviated from the standard of care an oral surgeon must use in this type of surgery" and that a reasonable **[*6]** jury should not be allowed to find negligence when they are unenlightened as to the relevant standard of care. Plaintiff concedes that he produced no expert testimony as to the standard of care for a surgeon performing jaw split surgery, but he contends that the defendant set the standard of care. Marquardt cites the following portion of Dr. Joseph's testimony:

> Q: Doctor, would you agree that the purpose of the osteotomy and the purpose of the placement of the implants was to allow Mr. Marquardt to have successfully placed the implants and prosthesis?
>
> A: Correct.
>
> Q. And that was the ultimate goal of what he wanted to accomplish, wasn't it?
>
> A: Yes, it was.
>
> Q: Do you believe it was your responsibility to achieve that goal as his oral surgeon?
>
> A: I believe it was my responsibility to achieve the goals that I had set for him which were done by the surgery.

Kentucky law imposes upon a physician the duty to "use that degree of care and skill which is expected of a reasonably competent practitioner in the same class to which [the physician] belongs acting in the same or similar circumstances." *Mitchell v. Hadl*, 816 S.W.2d 183, 185 (Ky. 1991), **[\*7]** *quoting, Blair v. Eblen, Ky.*, 461 S.W.2d 370, 373 (Ky. 1970). Under Kentucky law, the burden of proof in medical malpractice cases is on the party charging negligence, and negligence must be established by expert testimony unless the negligence and injurious results are so apparent that laymen with a general knowledge would have no difficulty in recognizing it. *Johnson v. Vaughan*, 370 S.W.2d 591, 596 (Ky. 1963) (citations omitted). Here, it is clear that the injurious results of the surgery are not so apparent that laymen could readily recognize them. Instead, plaintiff makes the erroneous argument that Dr. Joseph set the standard of care. Dr. Joseph merely articulated his aspirations for the surgery. He did not describe the standard of care for oral surgeons.

4. Judgment As a Matter of Law on Informed Consent Claim. -- Because plaintiff was unable to present expert testimony on his informed consent claim, the district court granted judgment as a matter of law for the defendant. In the court below, plaintiff's contention was that he is not required to present expert testimony to support his informed consent claim, relying on *Keel v. St. Elizabeth Medical Center*, 842 **[\*8]** S.W.2d 860 (Ky. 1992). The Court in *Keel* begins by saying that an informed consent action is a negligence action which necessarily raises the issue of a defendant's failure to conform to a proper professional standard, 842 S.W.2d at 861, and then concludes that "we must agree with St. Elizabeth that, in most cases, expert medical evidence will likely be a necessary element of the plaintiff's proof in negating informed consent," 842 S.W.2d at 862. The Court explains the rare circumstances where expert testimony is not essential to an informed consent claim:

> If we are to analogize consent actions to negligence actions, we must also acknowledge that a failure adequately to inform the patient need not be established by expert testimony where the failure is so apparent that laymen may easily recognize it or infer it from evidence within the realm of common knowledge.

842 S.W.2d at 862 (citations omitted and emphasis added). The Kentucky Supreme Court then pointed out that negligence could be presumed in the case before it because of the hospital's "utter silence" as to the risks of the procedure, while at trial the hospital admitted there was a substantial possibility **[\*9]** of complications. *Id.* In contrast to these facts, the facts here indicate that the defendant was not silent as to the risks of the procedure. Dr. Joseph testified that he informed plaintiff of the risk of permanent numbness. Plaintiff admits that the defendant informed him that "it was a kind of a -- would be a complicated case, that it would probably be a hard case to do...." He concedes that Dr. Joseph informed him that "there's a possibility that there would be some numbness for a time" and "a possibility that the implants would be rejected...." He also testified that he consulted with six doctors in Kentucky and Florida about implant surgery, but yet he contends that he was unaware of the risk of permanent numbness. A jury could not reasonably conclude from "common knowledge" that Dr. Joseph was negligent when, according to Marquardt, seven of Dr. Joseph's peers also failed to inform him of the risk of permanent numbness. We conclude that the proof was insufficient to allow the jury to find the defendant liable because the plaintiff did not understand the risks involved in the oral surgery performed.

Plaintiff's four assignments of error fail and, accordingly, the judgment **[\*10]** of the District Court is affirmed.

# Exhibit
# F

Service: **Get by LEXSEE®**
Citation: **1994 U.S. App. LEXIS 33049**

*1994 U.S. App. LEXIS 33049, \**

DIANA P. MAY, Plaintiff-Appellant, v. DOVER ELEVATOR COMPANY, Defendant-Appellee.

No. 94-1377

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

1994 U.S. App. LEXIS 33049

September 27, 1994, Submitted
November 22, 1994, Decided

**NOTICE: [\*1]**   RULES OF THE FOURTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: 40 F.3d 1244, 1994 U.S. App. LEXIS 38647.

**PRIOR HISTORY:** Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. Robert E. Payne, District Judge. (CA-93-684-R).

**DISPOSITION:** AFFIRMED

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff injured party appealed the summary judgment granted by the United States District Court for the Eastern District of Virginia to defendant corporation, and its decision denying her motion to remand the case to state court. The injured party's complaint alleged that an elevator accident, which caused her injuries, was due to the negligence of the corporation.

**OVERVIEW:** In challenging the summary judgment granted to the corporation in her negligence action, the injured party claimed that the district court erred in failing to remand the case to state court, arguing that its removal was untimely under 28 U.S.C.S. § 1446(b). She also alleged that it was improper to dismiss her claim that the doctrine of res ipsa loquitur applied to the case, and that the evidence she presented sufficiently set forth a material issue precluding summary judgment. Affirming the judgment, the court rejected the remand claim, noting that the injured party erroneously argued that the one-year period of removal set forth in § 1446(b) commenced with the filing of an earlier action, which had been nonsuited. The court also found that the notice of removal was filed within 30 days of the district court's order notifying the corporation that removal was possible; thus, it also met the strictures of § 1446(b). The court found that the facts did not give rise to the application of res ipsa loquitur. Moreover, the affidavit submitted by the injured party's expert witness was based on pure speculation, and thus was insufficient to raise a material issue of fact.

**OUTCOME:** The court affirmed the district court's grant of summary judgment to the corporation in the negligence action brought against it and the district court's order denying remand of the case to state court.

**CORE TERMS:** elevator, backup, control room, jumper, removal, notice, cable, removable, annual, exclusive control, first floor, circuitry, discover, lawsuit, one-year, granting summary judgment, properly dismissed, proposed order, malfunction, regulation, universal, arrived, floor, plain language, present action, speculative, untenable, ascertain, causation, happened

**LexisNexis (TM) HEADNOTES - Core Concepts -** ♦ Show Concepts

**COUNSEL:** Gary R. Hershner, MORRISSEY & HERSHNER, Richmond, Virginia, for Appellant.

Beverly Warner Snukals, MEZZULLO & MCCANDLISH, Richmond, Virginia, for Appellee.

**JUDGES:** Before WILKINS, MICHAEL, and MOTZ, Circuit Judges.

**OPINIONBY:** PER CURIAM

**OPINION:**

**OPINION**

PER CURIAM:

Diana P. May appeals from the district court's order granting summary judgment in favor of Dover Elevator Company ("Dover") in May's negligence action. May alleged that Dover was liable for injuries she sustained in 1987 when an elevator in which she was riding suddenly dropped three floors. Finding no error, we affirm.

I

May originally filed this action in a Virginia circuit court against Dover, a Delaware corporation with its principal place of business in Tennessee, and the Chippenham Hospital ("Chippenham"), a Virginia corporation. May alleged that she entered an elevator at the Chippenham Hospital intending to ride down **[*2]** to the first floor. The elevator rose to the fifth floor, descended to the third floor where it briefly stopped, but then rapidly descended to the first floor where it came to rest on the safety buffers eighteen inches below the first floor landing. May claimed she suffered physical and mental damages in the amount of $ 500,000 as a result of the accident.

At the time of the accident, Dover was under contract with Chippenham to maintain and repair the elevator. Various pieces of elevator equipment, however, were excluded from the contract, which expressly stated that Dover did not assume possession or control of any part of the elevator equipment. Accordingly, Chippenham's maintenance staff had complete access to the basement area where the elevator controls were housed.

One week prior to the accident, Dover performed a routine maintenance check on the elevator and, the day before the accident, Dover performed an annual "governor and safety test." The elevator operated normally both times. Immediately after the accident, Dover employees and the city inspector arrived at Chippenham. Dover arrived first, and adjusted the elevator so it would be level with the first floor. An examination **[*3]** of the elevator's normal slowdown/stopping device ("normal device") and the backup slowdown/stopping device ("backup device") failed to reveal a problem. Dover then bypassed the normal device and was able to duplicate the accident. This indicated that the backup device was not working, and that at the time of May's accident something caused the normal device to malfunction. A visual inspection of both devices failed to reveal a malfunction, but Dover adjusted the backup device to allow better electrical contact. The elevator operated properly thereafter.

May filed suit in state court in 1989, but voluntarily non-suited the action in 1992. Shortly thereafter, May instituted a second action, again naming Dover and Chippenham as defendants. On September 9, 1993, May sent Dover's counsel a proposed order to dismiss Chippenham from the lawsuit. Counsel for Dover endorsed the order and forwarded it to the state court. On September 17, 1993, the state court entered an order dismissing Chippenham from the suit. Because Chippenham's dismissal created federal diversity jurisdiction, Dover filed a notice of removal to the federal district court on October 14, 1993. May's motion to remand was **[*4]** denied.

In her response to Dover's motion for summary judgment, May relied primarily on the expert testimony of Michael Shiflett, an elevator inspector. Shiflett testified that, in his expert opinion, May's accident was caused because jumper cables were left on the circuitry which caused a bypass of the normal device. According to Shiflett, the out-of-condition state of the backup device allowed it to function properly until a point where it finally failed. Although there was never any evidence of jumpers left on the circuitry, Shiflett stated that this was the only plausible explanation. Shiflett's opinion was that Dover was negligent in placing the jumpers there or in allowing others access to the elevator control room. Shiflett also believed Dover was negligent for failing to discover the malfunctioning backup device when it performed the annual test the day before the accident.

The district court granted summary judgment to Dover. The court held that May had failed to show the existence of a disputed material fact supporting the theory that Dover negligently maintained either the normal or the backup devices. The court stated that the undisputed facts showed that Dover was not **[*5]** in exclusive control of the elevator control room, and that Shiflett's opinion that jumpers were left across the circuitry was pure speculation and conjecture. May timely appealed and argued district court error in denying her motion to remand, and alternatively in granting summary judgment to Dover.

II

May argues on appeal that the district court erred in denying her motion to remand this case to state court. May bases this argument on two alternative theories. May first argues that the case was not removable because it was pending for over one year before Dover filed its notice of removal. Alternatively, May argues that even if notice was filed within the required one-year period, Dover failed to file for removal within thirty days of receiving notice that the case had become removable as required by 28 U.S.C.A. § 1446(b) (West 1994).

A case filed in state court may not be removed to federal court based on diversity jurisdiction more than one year after commencement of the action. 28 U.S.C.A. § 1446(b). May argues that the present action was commenced when she filed the first lawsuit in 1989. This contention **[*6]** is meritless. May voluntarily non-suited the first case in 1992, the effect of which was to end that action. See Thomas Gemmell, Inc. v. Svea Fire & Life Ins. Co., 166 Va. 95, 184 S.E. 457 (Va. 1936); Clark v. Clark, 11 Va. App. 286, 398 S.E.2d 82, 88 (Va. App. 1990). The relevant one-year period began to run in December 1992, when May filed her second lawsuit which became the present action. Hence, Dover's notice of removal filed in October 1993, was within the one-year limitation.

Alternatively, May argues that the notice of removal was untimely because it was filed thirty-five days after Dover's receipt of the proposed order dismissing Chippenham from the lawsuit. When a case as originally filed is not removable, a notice of removal may be filed within thirty days after the defendant's receipt, "through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." 28 U.S.C.A. § 1446(b). May argues that the plain language of this rule required **[*7]** Dover to file its notice of removal within thirty days of September 9, 1993, the date Dover first saw a copy of May's proposed order.

May's contention is untenable. Application of the plain language of § 1446(b) demonstrates that the thirty days did not begin to run until Dover received the court's order dismissing Chippenham from the case. Only at that point could Dover definitely ascertain that the case had become removable. See Grubb v. Donegal Mut. Ins. Co., 935 F.2d 57, 59 (4th Cir. 1991). Prior to issuance of the order, May presumably could have changed her mind and decided not to voluntarily dismiss Chippenham. Accordingly, because Dover's notice of removal was filed within thirty days from the date the state court entered the dismissal order, May's subsequent motion to remand was properly denied.

III

May argued below that Dover was liable under the doctrine of res ipsa loquitur because she suffered an injury of a kind that does not ordinarily happen in the absence of negligence, and the elevator control room was under Dover's exclusive control. See Logan v. Montgomery Ward & Co., 216 Va. 425, 219 S.E.2d 685, 688 (Va. 1975); [*8] Easterling v. Walton, 208 Va. 214, 156 S.E.2d 787, 789 (Va. 1967). Although it appears May abandoned her res ipsa loquitur argument on appeal, to the extent her brief addresses it, the argument lacks merit.

The evidence clearly shows that Dover was not in exclusive control of the elevator control room. Dover's contract specifically stated that Dover did not assume possession or control over any part of the elevator equipment. Moreover, the control room doors remained unlocked and Chippenham employees had keys to the basement area where the control room was located. Hence, the district court properly dismissed this claim.

IV

May argues that if Dover did not have exclusive control over the elevator control room, then it was negligent in allowing universal access to the room. May argues that Dover had a duty, derived from the Virginia Building Code, to prevent universal access to the elevator equipment. This argument is untenable.

Under the Virginia Code, the Board of Housing and Community Development is empowered to promulgate a uniform state-wide building code. Va. Code Ann. § 36-99 (Michie 1990). At the summary judgment hearing, May submitted [*9] a copy of the 1987 Virginia Statewide Building Code. This code specifies that technical requirements of building maintenance are governed by the BOCA National Existing Structures Code ("BOCA Code"). Article 21 of the BOCA Code in turn provides that the owner of the building is responsible for the care and maintenance of elevator equipment located within that building and that elevator maintenance shall conform to the American National Standards Institute ("ANSI") regulations. ANSI appendix 17.1, rule 101.3a requires that a convenient means of access to the elevator control room shall be provided for authorized persons. The regulation goes on, however, to define an authorized person as "someone who has been instructed in the operation or maintenance of the equipment and designated by the owner to use or maintain the equipment." Id. (emphasis added).

Contrary to May's assertion, these regulations do not place any duty on Dover to prevent access to the elevator control room. To the extent such an obligation exists at all, it falls on Chippenham as the owner of the building. Accordingly, Dover did not have a statutory duty to prevent universal access to the control room in which [*10] the equipment was housed and the district court properly dismissed this claim.

V

May argues that the accident was caused by Dover's negligent maintenance of the elevator control room. To recover under this theory, May would need to establish that Dover

negligently left jumper cables across the normal device circuitry or negligently failed to discover a defect with the backup device. May cannot meet this burden.

Negligence cannot be presumed from the mere happening of an accident. Brill v. Safeway Stores, Inc., 227 Va. 246, 315 S.E.2d 214, 215 (Va. 1984). The plaintiff must come forward with direct or circumstantial evidence of how or why an accident happened. Id. While this evidence need not exclude every other possibility for the cause of the accident, the plaintiff must show with reasonable certainty that the defendant caused the injury. Boyle v. United Technologies Corp., 792 F.2d 413, 416 (4th Cir. 1986) (citing Logan v. Montgomery Ward & Co., 216 Va. 425, 219 S.E.2d 685 (Va. 1975)). An expert witness's endorsement of a wholly speculative theory of causation, **[*11]** however, is not sufficient to establish the defendant's responsibility to a reasonable certainty. See Stokes v. Geismar, 815 F. Supp. 904, 909 (E.D. Va. 1993).

May's negligence claim is based upon a purely speculative theory of causation that fails to establish Dover's responsibility with reasonable certainty. Shiflett, May's expert, stated that he was of the opinion that Dover was negligent for leaving a jumper cable across the normal device after performing an annual test on the elevator the day prior to the accident. Because there is no evidence to support this theory, May argues that Dover's employees must have removed the jumper cables immediately after the accident.

May's argument is not supported by the evidence. Dover's employees who arrived at the scene after the accident stated that they never saw jumper cables on the normal device. Moreover, the annual test performed the day prior to the accident did not involve the use of jumper cables. Shiflett testified at a deposition that the only evidence upon which he based his opinion was that he could not think of another way the accident could have happened. Shiflett stated, however, that he would **[*12]** need to do more research before he could know for sure whether a jumper cable could have caused the elevator to function in the manner it did on the day of the accident. Accordingly, May's jumper cable theory is based purely on speculation and conjecture, and was insufficient to establish a material factual dispute concerning Dover's negligence.

Neither did May establish that Dover was negligent in failing to discover a malfunction in the backup device. The undisputed evidence shows that the elevator worked properly the morning of the accident, but then the backup device failed at the time of May's accident. Dover was not able to ascertain exactly what was wrong with the backup device, but an adjustment of the electrical connection appeared to solve the problem.

May argues that Dover was negligent for failing to discover that the backup device was in need of adjustment the day prior to the accident. May does not offer any evidence, however, to support a belief that the backup device needed adjustment at that time. Her own expert admitted that he had no idea how or when the backup device got out of adjustment or what the specific problem was. Furthermore, the elevator worked properly **[*13]** immediately prior to the accident. Hence, because the record contains no evidence to even permit an inference that a defect preexisted the annual test, the district court properly dismissed this claim. See Grim v. Rahe, Inc., 246 Va. 239, 434 S.E.2d 888, 889-90 (Va. 1993).

We therefore affirm the orders of the district court denying May's motion to remand and granting summary judgment in favor of Dover. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

AFFIRMED

# Exhibit G

1

1    UNITED STATES DISTRICT COURT

2    SOUTHERN DISTRICT OF OHIO

3    WESTERN DIVISION

4    - - -

5    EASTSIDE LINCOLN MERCURY,    :    COPY

6    INC., et al.,    :

7        Plaintiffs,    :

8        vs.    : CASE NO. C1-01-567

9    FORD MOTOR COMPANY, et al.,: Volume II

10        Defendants.    :

11    - - -

12        Continued deposition of WILLIAM F. WOESTE,

13    JR., a witness herein, taken by the defendants

14    as upon cross-examination, pursuant to the

15    Federal Rules of Civil Procedure and pursuant

16    to agreement by counsel as to the time and

17    place and stipulations hereinafter set forth,

18    at the offices of Statman, Harris, Siegel &

19    Eyrich, 2900 Chemed Center, Cincinnati, Ohio,

20    at 8:50 a.m. on Tuesday, March 4, 2003, before

21    M. Sue Lopreato, a Registered Merit Reporter

22    and Notary Public within and for the State of

23    Ohio.

24    - - -

25

43

1          A.    Correct.

2          Q.    Did you ever have any discussions

3    with Chevy about dualing their service

4    department with Lincoln Mercury?

5          A.    No, I did not.

6          Q.    Who was the person at Chevrolet

7    that you were dealing with at that point in

8    time?

9          A.    Specifically, do you mean the

10   person that called on the realtor?

11         Q.    Yes.

12         A.    I don't recall who that person

13   would have been.  We would have, similar to

14   Lincoln Mercury, a salesperson, a service

15   person, and I don't recall who they were.

16         Q.    You don't recall either one of

17   those people?

18         A.    No, I do not recall specifically.

19         MS. McNELLIE:  I still haven't

20   received a copy of his Chevy dealer.

21         MR. BERBERICH:  Let's go off the

22   record.

23         (Off the record.)

24         Q.    Other than this occasion we've

25   talked about, in late '97 or early '98, have