UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| **EASTSIDE LINCOLN MERCURY, INC.,** et al., | : |
| | : Case No. C-1-01-567 |
| Plaintiffs, | : |
| | : Judge Susan J. Dlott |
| v. | : |
| | : **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE SUPPLEMENTAL MEMORANDUM OFFERED IN SUPPORT OF THE FORD DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| **FORD MOTOR COMPANY, et al.,** | : |
| Defendants. | : |
| | : |

_____

## MEMORANDUM

### PRELIMINARY STATEMENT

The Ford Defendants'[1] supplemental memorandum does not add anything substantive to the earlier memoranda and does not establish there are no genuine issues of material fact for determination at trial or that they are entitled to judgment in their favor as a matter of law. Most of the arguments contained in the memorandum address alleged weaknesses in the Plaintiffs' damage claims and the weight which this Court should give Roger Bean's opinion testimony and reports. As stated in Plaintiffs' memorandum in opposition to the Defendants motion to strike, Mr. Bean's reports themselves have no independent weight, though his testimony by affidavit and deposition have weight and create issues of material fact as to liability for and the amount of damages sustained by ELM as a consequence of Ford's wrongful conduct.

---

[1] Only the Ford Defendants supplemented their original summary judgment motion in light of the deposition testimony of Roger Bean, CPA and will hereafter be referred to simply as the "Defendants".

**MEMORANDUM**

**LAW AND ARGUMENT**

This Court recently restated the summary judgment standard in E.W. Scripps Co. v. United States, Case No. C-1-01-434, 2003 U.S. Dist LEXIS 12677 (decided June 16, 2003), 2003-2 U.S. Tax Cas. (CCH) P50, 578; 92 A.F.T.R.2d (RIA) 5382.

> Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). On a motion for summary judgment, **the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that permissibly can be drawn therefrom, must be read in the light most favorable to the party opposing the motion**. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).
>
> The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 324, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). On those issues for which it shoulders the burden of proof, **the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party**." Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986) (emphasis and citation omitted). ***
>
> In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings, but must go beyond the pleadings and "present affirmative evidence in order to defeat a **properly** supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e)
>
> Although "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient" to overcome a summary judgment motion, Anderson, 477 U.S. at 252, **a court should not grant summary judgment merely because the nonmovant's case appears weak. The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial**." Id. at 249. A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." Id. at 252.

The "overview" provided by the Defendants makes four incorrect "global" arguments or assertions which will be addressed in turn. The first involves the merits of the Defendants' motion to strike and the Defendants' mistaken belief that prevailing on that motion will render its summary judgment motion moot. For those reasons stated in greater detail in Plaintiffs' memorandum in opposition, that motion should be overruled because a motion to strike is an improper vehicle in the context of a motion for summary judgment.[2] However, even if the report is "stricken" as requested, the affidavit and deposition testimony of Mr. Bean by affidavit and deposition is still of record and creates issues of fact on both liability and damages.

The Defendants' second argument is that Mr. Bean's report, as well as Plaintiffs' Complaint, does not tie specific claims for relief, erroneously referred to by the Defendants as "counts" and "causes of action", to particular damage conclusions. The explanation for this perceived disconnect is quite simple, particularly in light of the notice pleading requirements imposed by the civil rules. As an example, if the Plaintiffs prove factually that Ford acted in bad faith and misused the warranty audit process to either destroy ELM's warranty repair business or force a termination, when the audit findings

---

2    This Court, the Federal District Court for the Northern District of Ohio, the Sixth Circuit, and reasoned commentators have made clear that a motion to strike affidavits (and exhibits) is not appropriate in a summary judgment context. See Bovee v. Coopers & Lybrand, 216 F.R.D. 596, 599-600 (S.D. Ohio 2003)(quoting Wright & Miller, Fed. Prac. & Proc. § 1380 (footnote omitted)) and Lombard v. MCI Telecomm., 13 F. Supp.2d 621, 625 (N.D. Ohio 1998)(quoting Dawson v. City of Kent, 682 F.Supp. 920 (N.D. Ohio 1988), affirmed, 865 F.2d 257 (6Th Cir. 1988)). Courts may exclude consideration of affidavits they deem improper, or disregard what they deem inadmissible evidence as would be customary in evaluating a summary judgment motion, but the evidence should not be stricken from the record. See Bovee, 216 F.R.D. 599-600 (citing Lombard, supra).

were insignificant, such conduct may constitute a 1) breach of the franchise agreement, 2) violation of the federal Automobile Dealer Day in Court Act ("ADDCA"), and 3) violation of the Ohio Motor Vehicle Dealer Act ("MVDA"), Ohio Revised Code § 4517.01, et seq. As a consequence of these violations, three or more types of damage may arise, such as 1) the loss of warranty repair revenue, 2) a diminution in the overall value of the dealership, termed "Blue Sky", which is often based on a multiple of earnings, and 3) an reduction in income because of the cost of borrowing money to fund dealership operations and purchases. Defendants' counsel apparently misunderstands both notice pleading and the fact that tortious conduct may yield multiple types of damages, e.g., pain and suffering, lost wages, medical expenses, etc., arising out of a single tort.

The third argument, similar to the second, claims that Mr. Bean's report fails to attribute damages to some categories of wrongful conduct alleged in the Complaint. The example used, and claimed to be the best example, is the failed negotiation over the Florence Lincoln Mercury Store. This is a particularly bad example for the Defendants if they claim this area of testimony is reserved exclusively for experts and does not involve a personal claim of Mr. Woeste. This particular claim involves genuine issues of material fact exist which require a jury's determination.

Mr. Woeste alleged that he was tricked or baited by Jerry Carter into negotiating for the purchase of the Florence store, presumably because Mr. Carter wanted Mr. Woeste to sell ELM to Reichert/KDG. Mr. Woeste testified he incurred thousands of dollars in expenses to evaluate the potential purchase of the Florence Lincoln Mercury store and develop a viable proposal. See W. Woeste depo., Vol. I at 124-125 and Vol. II at 46, 50-52. After expending those funds and effort, and while he believed

negotiations were ongoing, Mr. Woeste learned that Jerry Carter never intended to follow through on his proposal to assist Mr. Woeste with the purchase of the Florence store and that Mr. Carter was actually "shopping" or offering his proposal to other interested purchasers, including Reichert/KDG.  There is no need for Mr. Bean to testify as an expert in this matter - Mr. Woeste clearly testified he suffered damages in the thousands of dollars of a type that do not require an expert to explain them to a jury. There is clear damage to Mr. Woeste "personally" which is linked to wrongful conduct on the part of Ford and Mr. Carter, regardless whether that conduct is deemed fraud or part of a tortious civil conspiracy.

      The fourth argument is that no particular damage claims in Mr. Bean's report are attributed to the conduct of Mr. Carter, regional manager of Lincoln Mercury, and Mr. Walls, regional manager of Ford Customer Service Division ("FCSD").  Mr. Bean was not hired to determine whether Mr. Carter and Mr. Walls engaged in civil conspiracy and fraud as alleged in the complaint <u>nor would this Court allow him to render such an opinion</u>.  However, Mr. Bean did testify as to the damages suffered by ELM as a consequence of abuse of the warranty audit process (alleged to have been conducted by both Carter and Walls), denial of dualing (Carter), denial of LPE status (Carter), allocation (Carter), borrowing costs (Carter), dealership Blue Sky value (Carter and Walls) and discriminatory financial assistance to Reichert/KDG (Carter).  Mr. Bean also testified there were certain areas of damage for which Mr. Carter was clearly responsible, such as the denial of dualing and preferential distribution of marketing monies to Reichert/KDG.  <u>See</u> R. Bean depo. at 112.  As regional manager, Jerry Carter was the prime mover behind the consolidation and the efforts to force a

termination or "replacement" of ELM and its dealer principal as outlined in the 1999 "Growth Strategy Report". Genuine issues of material fact exist on these claims, regardless of whether Mr. Bean "delineates" any category of damages attributable to either defendant.

The Defendants made the following specific supplemental arguments in light of Roger Bean's supplemental report and deposition:

    A)    Mr. Bean cannot attribute damages to warranty audit abuses;

    B)    Mr. Bean cannot attribute damages to Ford's denial of permission for ELM to relocate;

    C)    Mr. Bean cannot attribute damages to Ford's delay in delivery and denial of allocation of "hot" vehicles to ELM; and

    D)    Mr. Bean's liability opinions do not create genuine issues of material fact.

These supplemental arguments, when viewed in conjunction with the Defendants original memoranda, do not establish that the Defendants have met their burden of proving they are entitled to judgment in their favor as a matter of law and that no reasonable trier of fact could find other than for the moving party. The Defendants primarily ask the Court to weigh the evidence presented and find in their favor. For these reasons, their summary judgment motion must be denied.

    **A)    MR. BEAN CAN AND DOES ATTRIBUTE DAMAGES TO THE DEFENDANTS' ABUSE OF THE WARRANTY AUDIT PROCESS**

The Plaintiffs have plead, and argued, that the abusive warranty audits factually support several of their claims, including breach of contract, violation of the MVDA, civil conspiracy, fraud, and violation the ADDCA. Mr. Bean testified that he relied upon Mr. Beattie's, Mr. Woeste's and Mr. Woodall's testimony and statements, as well as his own

experience with warranty audits with other clients, that the ELM service technicians and manager were frightened and intimidated by Ford into performing less warranty work and making fewer warranty claims by repeated audits and threats of chargebacks and other penalties. Mr. Bean testified it was his opinion that the service personnel were frightened or "chilled" into reducing the warranty work performed and claimed by ELM which reduced gross profits in excess of $500,000.00. See R. Bean depo at 52-56, 60-62, affidavit at ¶ 8.

Other than in instances such as Mr. Gwaltney's (Lincoln Mercury's "second in command") unfortunate slip during a meeting in which he admitted that Lincoln Mercury was no longer "torturing" dealers into leaving the network, see J. Gwaltney depo. at 47-49, it is unlikely a manufacturer like Ford will ever acknowledge the purposes for its conduct. For numerous public relations and other reasons, no manufacturer will openly admit that warranty audits are intended to force a reduction in the amount of warranty work performed and charged to it. The fact that the multiple audits of ELM revealed no fraud, only a one to two percent error rate, and led to penalties admitted by Mr. Carter and Mr. Walls to be excessive, including the termination recommendation of the ELM franchise at a time when Mr. Woeste was supposed to be "replaced" as dealer principal, is evidence of motive which should be decided by the finder of fact.

It is appropriate for the trier of fact to determine the Defendants' motives for conducting the audits in the number and manner they chose. If the jury concludes that the audits were "excessive" and designed to force Mr. Woeste to resign because of financial losses or be terminated because of non-compliance, it would then be required to determine the amount of financial damage, including the most recent chargeback

from the last audit, ELM suffered as a consequence of the "chill" and intimidation caused by the years of audits.

Mr. Bean's approach, which compared ELM's recent warranty sales trend against its competitors, is a fair method of evaluating such losses. See Bean depo. at 22, 117-126. The fact that Mr. Bean did not talk to each service technician, or the service manager, and only to the general manager, operations manager and owner, merely impacts the weight given to his opinion, not his ability to render the opinion. In addition, at trial, the service manager, Al Schimweg, a disclosed witness, will testify as to the effect of the abusive warranty audits on his technicians and his own unwillingness to perform and claim warranty work.

### B) MR. BEAN CAN AND DID ATTRIBUTE DAMAGES TO FORD'S DENIAL OF PERMISSION FOR ELM TO RELOCATE

The Plaintiffs have plead, and argued, that the denial of permission for ELM to relocate its facility, and dual its service bays with Beechmont Chevrolet, factually supports several of their claims, including breach of contract, violation of the MVDA, civil conspiracy, fraud, and violation the ADDCA. Mr. Woeste approached Jerry Carter in early 1998 with a request to relocate ELM next to a Chevrolet dealership he owned, also located on Beechmont Avenue, and dual or combine the service operations of the two stores. The only dualed part of the operation would be the service bays; showrooms and service write up areas would be completely separate from the neighboring dealership. Mr. Woeste expected to obtain the obvious cost savings available through combining these operations and sought to realign and better organize

his dealership campus, as well as sell an unnecessary piece of real estate.[3]  Had ELM been allowed to relocate and dual its service operation, it would have been able to better control overhead costs and save $300,000 to $600,000 per year.[4]  Mr. Bean calculates these damages to presently exceed $2,000,000.00.  See R. Bean depo. at 81-83.

Ford actually drew up plans for its version of the proposed dual, but Jerry Carter refused to consider the dual in any configuration and stated he "really wanted Mr. Woeste to sell" ELM to Ford.[5]  Despite the denial of the ELM relocation and dual of service bays, Mr. Carter approved Reichert/KDG's request to completely dual his recently acquired Fairfield Lincoln Mercury store for over a year with Volkswagen, a competitive make, KIA and Subaru.  Thereafter, he was allowed to dual not only service bays but also service counter/write up.  After Reichert/KDG was granted permission to dual it Fairfield store, its losses of $750,000 in less than a year, and further losses accruing at a rate of fifty thousand dollars a month,[6] were erased and turned into a positive cash flow.[7]

As a consequence of Mr. Carter's actions, motivated by his desire to complete his consolidation program under Reichert/KDG, Mr. Woeste was not able to ask General Motors for permission to dual service bays, even though the dual with

---

[3] See Woeste depo., Vol. II, at 40-42.

[4] See W. Woeste depo., Vol. II, at 40-42; see also G. Beattie depo. at 46-48.

[5] See Woeste depo., Vol. II at 38-39.

[6] See R. Reichert depo. at 200-202 and Exhibit 20.

[7] See R. Reichert depo. at 200-202, 206-207, 216, and 221-222.

Chevrolet was extremely benign and GM could not arbitrarily deny the request if made. The Defendants' should not be permitted to profit from their wrongful conduct. Mr. Bean testified that the relocation and dual, if permitted would have immediately led to significant savings for ELM (and also for Mr. Woeste's Honda franchise), a fact which was borne our almost "dollar for dollar" by Reichert/KDG's own experience when it stopped losses of $600,000.00 per year by dualing its Fairfield store. It was Mr. Bean's further opinion that such a dual is still required if ELM is to be a "viable" operation. See R. Bean depo. at 133.

A jury should be entitled to award damages for failure to allow the proposed relocation and dual because these damages are by no means speculative, even though some approval from GM may have been required to dual the service bays at the new facility. Any such issues merely impact the weight to be given to Mr. Bean's opinion and not whether the Plaintiffs are entitled to present this claim to the jury.

    **C)**     **MR. BEAN CAN AND DID ATTRIBUTE DAMAGES TO FORD'S DELAY IN DELIVERY AND DENIAL OF ALLOCATION OF "HOT" VEHICLES TO ELM**

The Defendants argue that the Plaintiffs cannot claim any losses for Ford's manipulation of the vehicle allocation system and/or the delayed delivery of vehicles. Mr. Gene Mullins, former employee of Reichert/KDG, testified that he observed Ford, through Patrick LeTart, its zone manager, and Reichert/KDG personnel manipulating the allocation system so as to provide vehicles to Reichert/KDG and deny them to ELM. Mr. Mullins' testimony alone confirms that the Defendants' manipulation of the allocation system occurred. However, as this Court is aware, the Plaintiffs cannot prove they were cheated out of a specific number of allocated vehicles because the Defendants

destroyed the allocation records.

As stated in the memorandum in opposition to the motion to strike, the Defendants should be circumspect in even arguing about vehicle allocation issues, considering that **Ford destroyed vital allocation documents,** a fact to which this Court indicated Ford may have to stipulate.[8]  Such a stipulation would support a finding that Ford manipulated the allocation process in an effort to destroy the Plaintiffs' franchise.  The Court further expressed its view that a spoliation of evidence issue may exist as a result of this document destruction.[9]

In addition, only two weeks ago Ford's counsel "further supplemented" its discovery responses with additional allocation documents, evidence that Ford has either concealed documents or simply didn't take the Plaintiff's discovery requests seriously enough to look for the relevant documents.  See correspondence from Elizabeth McNellie, Esq., dated November 19, 2003, and additional discovery documents attached hereto as Exhibit 1.  Such late production leads Plaintiff's counsel to question whether Ford's earlier document production was reliable and whether the destruction of allocation documents covering the critical time periods was intentional.

As a consequence of the Defendants' conduct, Mr. Beattie was left with the task of estimating those cars he would probably have sold had the allocations system not been manipulated and they been made available to ELM in the same fashion as they were made available to its competitor.  See Bean depo. at 145-149 and report, attached

---

8   See transcript at 40.

9   The Court expressed its concern that such destruction may have created a spoliation of evidence issue.  See transcript at 8, 30.

as Exhibit 3, at section 4.   Mr. Bean will testify that Mr. Beattie's estimated vehicle losses equate to a $135,190.00 loss.  As a consequence of the Defendants spoliation of the allocation records, the Plaintiffs are forced to speculate as to the number of vehicles of which they were deprived due to manipulation of the allocation system.  Though Ohio recognizes an independent claim for spoliation of the evidence, this Court may impose appropriate sanctions for such conduct while the case is still litigated.  See Smith v. Howard Johnson Co., Inc.,  67 Ohio St. 3d 28, 29, 615 N.E.2d 1037 (1993).

Any challenge to either Mr. Beattie's or Mr. Bean's opinions on allocation damages go to the weight of the opinion but not its admissibility.  The "delay in delivery" charts presented by Mr. Bean, though prepared through use of data compiled by Mr. Watkins from the allocation documents which weren't destroyed, are merely explanatory and confirm Mr. Mullins' testimony of Ford's manipulation of the allocation system with the specific goal of penalizing ELM, damaging ELM's sales, and advantaging Reichert/KDG.  Therefore, ELM's allocation and delivery related damages must be determined by the trier of fact.

**D) MR. BEAN'S OPINIONS ON LIABILITY CREATE GENUINE ISSUES OF MATERIAL FACT WHICH REQUIRE JURY DETERMINATION**

As stated in Plaintiffs' memorandum in opposition to the Defendants' motion to strike, Mr. Bean is, and has always been, both a liability and damages expert.  His testimony confirms his professional experience in the automobile industry and the fact he has a significant amount of experience evaluating dealership operations in the Greater Cincinnati market.  In his deposition, Mr. Bean stated some of his opinions, including his opinions that the allocation and delivery of vehicles to ELM were

manipulated, that warranty audits are designed to alter behavior and reduce the number of warranty claims, that ELM should have been allowed to relocate and dual, that consolidation of the market negatively impacted ELM, and that the Blue Sky value of the dealership has been permanently diminished in excess of $2,000,000.00.  See R. Bean depo. at 45-46, 55-58, 125-126, 129-130, 134, 158-163, 187.

      The Defendants' apparent contention that Mr. Bean is not entitled to form opinions based upon his review of depositions, conversations with his clients, and review of documents is absurd and conflicts with Rule 702 and 703 of the Rules of Evidence.  At trial, he will have to base his opinions, with some qualifications, on evidence admitted during the hearing.  However, for purposes of this motion, and considering that the non-moving party is entitled to have "all the evidence, together with all inferences that permissibly can be drawn therefrom ... read in the light most favorable to the party opposing the motion", he is entitled to rely upon testimony and evidence developed in this matter.  See E.W. Scripps Co. v. United States, supra,  Mr. Bean's reluctance to espouse "legal opinions", see Bean depo. at 126, does not mean he is not qualified to render the opinions set forth in either his affidavit, deposition and/or reports.

## CONCLUSION

      The burden is on the Defendants to establish there are no genuine issues of material fact as to each claim raised by the Plaintiffs and that they are entitled to judgment in their favor as a matter of law.  They have not come close to meeting that burden.  Further, as this Court stated in E.W. Scripps Co. v. United States, supra, a court should not grant summary judgment "even if the nonmovant's case appears

weak". This Court must determine whether a genuine issue exists which must be tried and it cannot "weigh the evidence and determine the truth of the matter...." Viewing the evidence in a light most favorable to the Plaintiffs, the Defendants motions for summary judgment must be denied.

Respectfully submitted,

/s/ Gregory J. Berberich

_____
Alan J. Statman (#0012045)
Gregory J. Berberich (#0043651)
Lawrence A. Flemer (#0018673)
STATMAN, HARRIS, SIEGEL & EYRICH, LLC
2900 Chemed Center
255 EAST FIFTH STREET
CINCINNATI, OHIO 45202
Ph. (513) 621-2666
Fax. (513) 621-4896
Counsel for Plaintiffs

OF COUNSEL:

Loula Fuller, Esq.
Myers & Fuller, P.A.
402 Office Plaza Drive
Tallahassee, Florida 32301

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served on the 5th day of December 2003, by electronic mail, upon:

| | |
|---|---|
| Elizabeth A. McNellie | Steven D. Hengehold |
| Baker & Hostetler, LLP | Rendigs, Fry, Keily & Dennis LLP |
| 65 East State Street, Suite 2100 | Fourth & Vine Tower, Suite 900 |
| Columbus, Ohio 43215-4260 | Cincinnati, Ohio 45202-3688 |

/s/ Gregory J. Berberich
_____
Lawrence A. Flemer