IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Eastside Lincoln Mercury, Inc. *et al.*     :
                                            :     Case No. C-1-01-567
                              Plaintiffs    :
                                            :     District Judge Susan J. Dlott
                          v.                :
                                            :     OPINION
Ford Motor Company *et al.*                 :
                                            :
                             Defendants     :


This matter came before the Court on the Motion for Summary Judgment by Defendants Kenwood Dealer Group, Inc. and Robert C. Reichert (doc. #42), the Motion for Summary Judgment of Defendants Ford Motor Company, Jerry Carter, and A.W. Walls (collectively, the "Ford Defendants") (doc. #44), and Ford Defendants' Motion to Strike Supplemental Damages Report of Roger M. Bean (doc. #75). On December 12, 2003, the Court **GRANTED IN PART AND DENIED IN PART** each of the motions for summary judgment and **DENIED** the motion to strike. (Doc. # 81.) This opinion sets forth the Court's reasoning in reaching those decisions.

I.      **FACTUAL BACKGROUND**

This case involves the relationships among Defendant Ford Motor Company ("Ford") and Cincinnati, Ohio area Ford dealers Plaintiff William Woeste, Jr. and Defendant Robert Reichert. Mr. Woeste is the majority owner, president and dealer principal of Plaintiff Eastside Lincoln Mercury, Inc. ("Eastside"). Mr. Reichert is the dealer principal of several Cincinnati area dealerships and is the principal of Defendant Kenwood Dealer Group, Inc. ("Kenwood").

On July 27, 2001, Eastside and Mr. Woeste filed suit against Ford, Mr. Reichert, Kenwood and two Ford personnel, Jerry Carter and Al Walls, in Ohio state court. (See doc. #1.) Plaintiffs set forth claims of fraud and civil conspiracy against all Defendants. (See id.) They also alleged claims for breach of contract, violation of Ohio Revised Code section 4517 and violation of the Automobile Dealers Day in Court Act (15 U.S.C. § 1221 et seq.) ("ADDCA") against Ford, a defamation claim against Messrs. Carter and Walls, and a claim of a "tort of business interference/unfair competition" against Kenwood and Mr. Reichert. (See id.) Defendants removed the case to this court. (See id.) Plaintiffs have since represented that they will voluntarily dismiss their defamation claims. (See doc. #55 at 3 n.9.)

## A.    Eastside's Contractual Relationship with Ford

In 1986 Eastside entered into two Sales and Service Agreements (the "SSAs") with Ford whereby Eastside obtained a nonexclusive right to buy Lincoln and Mercury products from Ford, resell those products to the public, and perform warranty services on those products. (Doc. #44 exs. B, C.[1]) The SSAs govern, inter alia, submission and filling of automobile orders, Ford's access to Eastside's records pertaining to warranty reimbursement requests, and the termination or nonrenewal of the agreements. Section 9(b) of the SSAs limits Ford's right to determine the number, location and size of authorized Lincoln Mercury dealers in a given sales area, providing that Ford (named in the text as "the Company"):

> will inform the Dealer of any proposed change in the Company's market representation plans for the DEALER'S LOCALITY, provided that if the Company's market representation plans do not provide for the continuation of representation of COMPANY'S

---

[1]Exhibit B is the Lincoln SSA between Eastside and Ford, and Exhibit C is the Mercury SSA between Eastside and Ford. They are substantially identical.

PRODUCTS from the Dealer's DEALERSHIP FACILITIES (except for a relocation thereof), the Company shall not be obligated to inform other dealers thereof, but shall give the Dealer written notice thereof.  If, in the Company's opinion, such changes should be disclosed to other dealers in connection with the Company's market representation plans for their respective DEALERSHIP OPERATIONS, the Company may inform such other dealers thereof, without liability to the Dealer, no earlier than thirty (30) days after such notice to the Dealer and shall inform such other dealers that the Dealer may maintain his DEALERSHIP OPERATIONS for so long as the Dealer desires and fulfills his responsibilities under this agreement.

**B.    Ford's Consolidation Plans**

There is no dispute that in the late 1990s Ford made plans to reduce the number of its dealer principals in the Cincinnati area, but there is some dispute as to if and how Ford planned to purchase or have someone else purchase Mr. Woeste's dealership, Eastside.  Generally speaking, any plans Lincoln Mercury might have to consolidate a given market are considered secret, and Defendants do not appear to seek summary judgment on any of Plaintiffs' claims on the ground that Plaintiffs knew about Lincoln Mercury's plans for consolidating the Cincinnati market from the outset. Apparently in furtherance of those plans, on June 16, 2000, Ford and Kenwood entered into a written agreement whereby Ford obtained a right of first refusal on transfers or sales of one third or more of the shares of any Kenwood dealership or any or all of the Kenwood dealerships to anyone other than Mr. Reichert or Kenwood's three vice presidents. (See doc. #55 ex. 8 at Bates ELM1 4906-11.)  On December 10, 2001, Ford also entered into a written "Consolidator Agreement" with Mr. Reichert, with Mr. Reichert acting on behalf of the three Kenwood dealerships in Cincinnati.  (See id. at Bates ELM1 4898-905.)  This agreement made reference to "certain rights and privileges with regard to future dealership acquisitions and facility actions" having been granted by Ford to Mr. Reichert's dealerships in the June 16, 2000

3

agreement and provided that Ford would grant Mr. Reichert and his dealerships "the right to seek retail dealership operational opportunities of scale subject to [Ford's] approval." (See id. at Bates ELM1 4898.)

Keith Ertel and Mr. Carter, Lincoln Mercury personnel responsible for the Cincinnati region, testified that there was not a plan by Ford to terminate Eastside's SSAs. However, Plaintiffs point to a Ford document that lists Eastside under "Dealer Replacement Opportunities." Additionally, Mr. Carter testified that he approached Mr. Woeste several times about selling Eastside. He also testified that Mr. Reichert was one of the leading contenders to take over the store if Mr. Woeste agreed to sell. Plaintiffs point to evidence of several adverse actions taken against them by Ford that they argue were designed to pressure Mr. Woeste to sell Eastside.

**C.    Adverse Actions by Ford Against Eastside**

**1.    Audits of warranty claims**[2]

According to Ford, Eastside has been in the "warranty counseling process," whereby a dealership's warranty performance is subject to a higher than normal level of scrutiny by Ford, since 1993. Mr. Woeste testified that during the most recent warranty audit by Ford, the auditor initially said to Mr. Woeste, "there is fraud here, and I'm going to find it," but within a few days the auditor conceded that there was no fraud in the dealership's warranty practices. (Woeste dep. II at 23.) Mr. Walls, regional manager of the Ford division responsible for service and parts sales, acknowledged in his deposition that this audit revealed a relatively modest level of error,

---

[2]Ford reimburses its dealers for parts and for service performed by the dealerships while customers' vehicles are still under a Ford warranty.

4

and Mr. Carter testified that there was no finding of fraud.  Notwithstanding, Ford informed

Eastside that Eastside faced several consequences as a result of its performance on this audit,

including that Mr. Woeste be required to sign all warranty claims, that Mr. Woeste not be

permitted to acquire additional Ford or Ford-affiliated franchises, and that Eastside be required

to retain an in-dealer consultant. Mr. Walls threatened to recommend termination of Eastside's

SSAs if Eastside failed to retain an in-dealer consultant.  The proposed consequences stemming

from the warranty audit results were never imposed.  Nonetheless, George Beattie, Eastside's

general manager, testified that the repeated audits cost Eastside money because they intimidated

Eastside employees into underreporting warranty claims to Ford, resulting in a drop in Eastside's

annual warranty sales.

## 2.    Allocation of vehicles

Plaintiffs also complain that Ford did not allocate vehicles among the Cincinnati

dealerships fairly.  Gene Mullins, former general sales manager of one of Kenwood's

dealerships, Northgate Lincoln Mercury ("Northgate"), testified that Kenwood dealerships

received more and Eastside received fewer Lincolns and Grand Marquis than "the number

normally allocated." (Mullins dep. ex. 1 ¶¶ 4-5.)  Both Mr. Woeste and Mr. Beattie testified that

Eastside frequently did not receive new vehicles at roll-out,[3] while its competitors did.  Ford

representatives testified that it was Ford's policy to ensure that each large dealer had at least one

new vehicle at roll-out.  However, counsel for Ford represented to the Court that the relevant

"manual" allocation records no longer exist and that those records were not "captured" in

electronic form.  (See doc. #76 at 8.)

_____

[3]It appears that a "roll-out" occurs when a new model is first released for sale to the public.

There is also some evidence that the Kenwood dealerships knew about misallocation of Lincoln Mercury vehicles in their favor and used this as a selling point. Mr. Mullins testified that his supervisor at Northgate told him to tell customers that "[Kenwood] dealerships were going to be the only Lincoln Mercury dealerships in the area before long." (Id. ¶ 7.) Mr. Mullins also testified that Northgate told its customers that it received vehicles that other area dealers, such as Eastside, did not.

### 3.    Other actions by Ford

Plaintiffs also cite other actions by Ford that they claim were coercive and/or violated the SSAs:

• Mr. Carter proposed that Mr. Woeste purchase a Lincoln Mercury dealership in Florence or "swap" his dealership for the Florence dealership. Mr. Woeste says that he spent money evaluating this proposal, while Mr. Carter presented the proposal to other dealers. Mr. Woeste never purchased the Florence dealership.

• Ford permitted Mr. Reichert to combine the service operations of two of his stores but denied a similar request by Mr. Woeste.

• Eastside claims that it was treated unfairly as compared to a Kenwood dealership with respect to the monetary incentives provided by the "Lincoln Premiere Experience" and "Mercury Advantage" programs (collectively, "LPE").

• Plaintiffs contend that other dealerships received financial assistance from Ford that Eastside did not.

### D.    Evidence on Damages

Mr. Beattie and James Woodall, the vice president of operation of Mr. Woeste's Beechmont Automotive Group, both testified that they could not calculate any damages suffered by Plaintiffs and that would have to be left to an expert. Mr. Woeste testified that, while he could not put a precise value on his dealership, the dealership becomes more valuable as the market becomes more consolidated. However, Plaintiffs' expert, Roger Bean, testified by way

6

of affidavit that, based on his experience in the automotive industry, the value of Eastside has

decreased as the Cincinnati Lincoln Mercury market has been consolidated.

## II.    STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if no genuine issue of material fact exists and the

moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c).  On a motion

for summary judgment, the movant has the burden of showing that there exists no genuine issue

of material fact, and the evidence, together with all inferences that permissibly can be drawn

therefrom, must be read in the light most favorable to the party opposing the motion.  See

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The

nonmoving party "must set forth specific facts showing there is a genuine issue for trial."  Fed.

R. Civ. P. 56(e).  The task of the Court is not "to weigh the evidence and determine the truth of

the matter but to determine whether there is a genuine issue for trial."   Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 249 (1986).  A genuine issue for trial exists when there is sufficient

"evidence on which the jury could reasonably find for the plaintiff."  Id. at 252.

## III.    ANALYSIS

### A.    Mr. Woeste's Individual Claims

Defendants move for summary judgment on any claims brought individually by Mr.

Woeste, claiming that he does not have standing to sue.  Mr. Woeste responds that he seeks relief

individually by way of: 1) federal and state statutory claims against Ford for penalizing him

individually as a result of the 2001 warranty audit, specifically by requiring that Mr. Woeste sign

all warranty claims and by forbidding him from acquiring additional Ford or Ford-affiliated

franchises, and 2) fraud claims for damages that he incurred in performing due diligence on a

potential purchase of the Florence Lincoln Mercury dealership.

Regarding the statutory claims, individual shareholders generally do not have standing to

bring suit under the ADDCA. See, e.g., Dienstberger v. Gen. Motors Corp., No. 94-4336, 1995

WL 559374, at **1 (6th Cir. Sept. 20, 1995); Salem Mall Lincoln Mercury, Inc. v. Hyundai

Motor Am., No. C-3-95-231, 1998 WL 1572766, at *3-5 (S.D. Ohio Aug. 18, 1998).  Further,

since it is undisputed that the penalties on which Mr. Woeste bases his statutory claims were

never imposed, Mr. Woeste could not have suffered any personal damage as a result of the

penalties. Therefore, Mr. Woeste cannot obtain relief under the dealer fairness statutes on the

ground that he was penalized individually as a result of the warranty audits.

Mr. Woeste's fraud claim stems from the ultimately fruitless negotiations over the

Florence dealership. Under Ohio law, recovery for fraud requires proof of a false representation

or, where there is a duty to disclose, concealment of a fact. See Williams v. Aetna Fin. Co., 700

N.E.2d 859, 868 (Ohio 1998).  Here, there is no evidence that Mr. Carter discussed with Mr.

Woeste the possibility of Mr. Woeste purchasing the Florence dealership while having no

intention of considering such a sale to Mr. Woeste.  Thus, there is no evidence of any false

representation by Mr. Carter on this front.  To the extent that Mr. Carter also discussed a

purchase of the Florence dealership with other prospective buyers, he had no duty to tell Mr.

Woeste.  The evidence shows that these were simply discussions about a possible deal that

ultimately fell through, which does not in and of itself create liability in fraud.  See, e.g.,

Properties Dev. Co. v. Bingham, No. 89-L-14-010, 1990 WL 120866, at *3 (Ohio Ct. App. Aug.

17, 1990).  Thus, no actions by Mr. Carter with respect to the negotiations over the Florence

8

dealership create fraud liability to Mr. Woeste.  Mr. Woeste having made no additional

arguments supporting a claim for individual relief, all Defendants are entitled to summary

judgment on Mr. Woeste's individual claims against them.

**B.     Eastside's ADDCA Claim Against Ford**

Next, Eastside brings an action against Ford for violation of the ADDCA.  That statute

provides in part that an automobile dealer may recover damages from an automobile

manufacturer by reason of the manufacturer's failure "to act in good faith in performing or

complying with any of the terms or provisions of the franchise, or in terminating, canceling, or

not renewing the franchise with said dealer."  15 U.S.C. § 1222.  As it is used in the statute, the

term "good faith" means:

> the duty of each party to any franchise, and all officers, employees,
> or agents thereof to act in a fair and equitable manner toward each
> other so as to guarantee the one party freedom from coercion,
> intimidation, or threats of coercion or intimidation from the other
> party: <u>Provided</u>, That recommendation, endorsement, exposition,
> persuasion, urging or argument shall not be deemed to constitute a
> lack of good faith.

15 U.S.C. § 1221(e).  Thus, "[i]n the absence of coercion, intimidation, or threats thereof, there

can be no recovery through the day-in-court statute, even if the manufacturer otherwise acted in

'bad faith' as that term is normally used." <u>Fray Chevrolet Sales, Inc. v. Gen. Motors Corp.</u>, 536

F.2d 683, 685 (6th Cir. 1976) (citations and internal quotation marks omitted).  "Coercion or

intimidation must include a wrongful demand which will result in sanctions if not complied

with." <u>Id.</u> (citations and internal quotation marks omitted).  <u>See also</u> <u>Am. Motors Sales Corp. v.</u>

<u>Runke</u>, 708 F.2d 202, 206-07 (6th Cir. 1983).  In order to make a claim under the ADDCA, a

dealer therefore must show that the manufacturer gave the dealer two choices: comply with the

manufacturer's wrongful demand or be sanctioned.  See Fray Chevrolet Sales, 536 F.2d at 685

(affirming grant of summary judgment to manufacturer because "there was no 'either-or' attempt

at coercion or intimidation").  See also Gen. Motors Corp. v. Villa Marin Chevrolet, Inc., No.

98-5206, 2000 WL 271965, at *19 (E.D.N.Y. Mar. 7, 2000)), cited in Transam. Servs. Technical

Supply, Inc. v. Gen. Motors Corp., No. C-2-00-1389, 2001 WL 175264, at *3 (S.D. Ohio Feb. 9,

2001).  A demand that is implicit, rather than explicit, can give rise to a cause of action under the

ADDCA.  See Sherman v. British Leyland Motors, Ltd., 601 F.2d 429, 446 (9th Cir. 1979).

However, the category of behavior that gives rise to liability under the ADDCA is "narrow" and

"restricted," limited to "quasi-extortion."  Transam. Servs. Technical Supply, 2001 WL 175264,

at *3 (citation and internal quotation marks omitted).

Eastside has presented evidence from which a jury reasonably might conclude that Ford

made at least an implicit additional demand – sell to Ford or Mr. Reichert, or Ford will continue

to make life difficult for Eastside.  Eastside has pointed to several instances of what it claims

were adverse actions by Ford designed to force Mr. Woeste to sell Eastside.  Some of these

instances – such as uneven allocation of financial assistance among the Cincinnati dealerships –

have not been supported by the record.[4]  However, Eastside has presented evidence from which a

reasonable jury could conclude that Ford used abusive warranty audit procedures and

misallocated vehicles with an eye to coercing Plaintiffs into selling Eastside.

---

[4]Mr. Woeste's testimony regarding "anonymous" phone calls regarding financial awards to Kenwood dealerships must, of course, be considered hearsay.  This testimony is not admissible as a party admission because there is no evidence that the calls were made by a party or a party's agent. While Plaintiffs have presented (arguably) admissible evidence that a Kenwood dealership won a minor sales contest in which Eastside was not invited to participate, this evidence is not probative of an attempt to coerce Plaintiffs to sell the dealership, as Eastside won a similar contest.

10

Ford subjected Eastside to repeated warranty audits, with one auditor telling Mr. Woeste that he intended to find fraud in Eastside's warranty practices. Despite finding minimal discrepancies and no evidence of fraud on Eastside's part – and even though Mr. Carter apparently concluded that the results did not warrant a requirement of an in-dealer consultant under Ford's warranty audit matrix guidelines – Ford representatives told Mr. Woeste that they would impose multiple penalties on Eastside as a result of the audits. Moreover, there is also evidence in the record from which a jury reasonably could conclude that Ford, in an attempt to coerce Mr. Woeste into selling Eastside, did not provide Eastside with the cars to which it was entitled under Ford's allocation system and the SSAs.[5]

The Ford Defendants claim that any evidence of damages suffered by Eastside as a result of Ford's arguably coercive measures is unacceptably speculative. A successful claim under the ADDCA requires proof of causation of damages. Eastside argues that coercive warranty audits by Ford caused Eastside to suffer damages in the form of a significant drop in warranty sales. A jury could logically conclude that frequent warranty audits and threats of penalties for even modest warranty reimbursement discrepancies could inhibit a dealership's service department from asking for reimbursement for the cost of parts and services. Defendants point out that the drop in warranty sales cannot necessarily be attributed to the actions of Ford without examining factors such as the overall service activity of the dealership. However, evidence that the sales

---

[5]Defendants can challenge whether these witnesses had sufficient personal knowledge to make these conclusions. However, Ford has represented that it is unable to provide documents that would show how cars were allocated. As the Court explained at a prior conference with counsel, a jury thus may be entitled to assume that any documentation of Ford's allocation of cars would be unfavorable to Ford. Consequently, the testimony of Messrs. Woeste, Beattie and Mullins is sufficient to create a material issue of fact as to whether Ford misallocated cars in an attempt to coerce Mr. Woeste into selling Eastside.

dropped significantly after the warranty audits is sufficient to create an issue of fact for trial as to whether the audits caused the drop in sales.

**C.     Eastside's Ohio Statutory Claim Against Ford**

Eastside also claims that Ford violated the Ohio Revised Code's dealer fairness law. Specifically, Eastside claims a violation of section 4517.59, which imposes on motor vehicle franchisors a good faith requirement.[6]  Section 4517's definition of "good faith" is similar to that found in the ADDCA.  See Ohio Rev. Code § 4517.01(BB).  However, unlike the federal statute, the Ohio statute additionally defines "coerce" as "to compel or attempt to compel by failing to act in good faith or by threat of economic harm, breach of contract, or other adverse consequences . . . [but] coerce does not mean to argue, urge, recommend, or persuade." Ohio Rev. Code. § 4517.01(CC).  Ohio courts have interpreted the Ohio statute's good faith requirement more broadly than the Sixth Circuit has interpreted the ADDCA.  See Earl Evans Chevrolet, Inc. v. Gen. Motors Corp., 598 N.E.2d 1187, 1192-93 (Ohio Ct. App. 1991).  As explained, supra, Eastside has pointed to sufficient evidence from which a jury reasonably could conclude that Ford failed to act in good faith under the Ohio statute by threatening economic harm should Eastside fail to sell.  Thus, Ford is not entitled to summary judgment on Eastside's Ohio statutory claim.

---

[6]Eastside also alleges in its Complaint that Ford violated section 4517.54, which governs termination or nonrenewal of automobile dealer franchise agreements, by "constructively" terminating Eastside's SSAs without following the requirements of the section.  The subsection is inapplicable, given the undisputed fact that Ford has not terminated the SSAs.  Indeed, Plaintiffs do not address this subsection in opposing Ford's motion for summary judgment.

**D.      Eastside's Breach of Contract Claim Against Ford**

Eastside also claims that Ford breached several terms of the SSAs.  Inter alia, Eastside

points to section 9(b), which imposes upon Ford a requirement that it notify the dealer in writing

of any changes in Ford's market representation plans that involve a discontinuation of the

dealer's representation of Ford's products.  Noting that there is no evidence that Ford intended to

close Eastside's physical plant altogether, Defendants argue that this provision applies only

where Ford plans to close a dealership's physical plant, not where it intends merely to change the

dealer principal of the dealership.

The construction of written contracts is a matter of law.  See Graham v. Drydock Coal

Co., 667 N.E.2d 949, 952 (Ohio 1996).  The purpose of contract construction is to determine the

intent of the parties, which is presumed to be found in the plain language of the agreement.  See

id.  The Court agrees with Eastside that Section 9(b) pertains even when a change in Ford's

market representation plans do not involve closing a physical plant.  The Court can think of no

intent behind this provision other than to protect Eastside.  Presumably, when an automobile

manufacturer takes a dealership away from a dealer, it is of no moment to the dealer whether the

manufacturer keeps the dealership open or not.  Additionally, Section 9(b) explicitly provides

that Ford need not inform a dealer if his dealership will be relocated, indicating that the

provision is not just about whether a particular physical plant will stay open.  Since there is

evidence that Ford had proposed a change in Ford's market representation plans that did not

provide for the continuation of the representation of its products by Mr. Woeste's Eastside, and

there being no dispute that Ford did not inform Mr. Woeste of any such change in writing,

Defendants may not obtain summary judgment on Eastside's breach of contract claim on the ground that there was no breach as a matter of law.

Defendants also argue that Eastside has shown no damage as the result of any breach. However, Plaintiffs' expert testified that the value of Eastside has decreased as the Cincinnati Lincoln Mercury market has been consolidated. If this testimony is credited, a jury might reasonably conclude that had Ford notified Eastside of its plans to terminate Eastside's SSAs at the outset, Eastside might have been sold then at a higher price than that at which it could be sold today. While Ford may challenge the credibility of Mr. Bean's assessment of Eastside's injury at trial, the testimony creates an issue of fact precluding summary judgment on Eastside's breach of contract claim.

**E.    Eastside's Defamation Claims Against Ford and Mr. Walls**

Plaintiffs also brought a defamation claim against Ford and Mr. Walls. In responding to these Defendants' motion for summary judgment, Plaintiffs indicated that they were withdrawing their defamation claims. Thus, the Court granted summary judgment to Ford and Mr. Walls on the defamation claims.

**F.    Eastside's Business Tort Claims against Mr. Reichert and Kenwood**

Next, Eastside brings a claim for "business interference/unfair competition" against Mr. Reichert and Kenwood. Eastside claims that Mr. Reichert and Kenwood tortiously interfered with Eastside's contractual rights under the SSAs by entering into the consolidation agreement with Ford, accepting cars that they knew had been withheld from Eastside by Ford, advising customers that Kenwood dealerships received preferential treatment from Ford and that Eastside would not be able to obtain certain vehicles necessary to complete sales, and forcing Ford to

allow Kenwood to combine the service operations of two of Kenwood's dealerships.  Under

Ohio law, the elements of tortious interference with contract are 1) the existence of a contract, 2)

the wrongdoer's knowledge of the contract, 3) the wrongdoer's intentional procurement of the

contract's breach, 4) lack of justification, and 4) resulting damages.  Fred Siegel Co., L.P.A. v.

Arter & Hadden, 707 N.E.2d 853, 855 (Ohio 1999) (syllabus ¶ 1).  In determining whether an

actor has acted improperly in intentionally interfering with a contract or prospective contract of

another, consideration should be given to the following factors: 1) the nature of the actor's

conduct, 2) the actor's motive, 3) the interests of the other with which the actor's conduct

interferes, 4) the interests sought to be advanced by the actor, 5) the social interests in protecting

the freedom of action of the actor and the contractual interests of the other, 6) the proximity or

remoteness of the actor's conduct to the interference, and 7) the relations between the parties.

See id. at 855-56 (syllabus ¶ 3).  The most important factor is the nature of the actor's conduct.

Sancap Abrasives Corp. v. Swiss Indus. Abrasives Group, 68 F. Supp. 2d 853, 861 (N.D. Ohio

1999) (citing Kand Med. v. Freund Med. Prods., 963 F.2d 125, 128 (6th Cir. 1992)).  Significant

to the question of the nature of the actor's conduct is whether the actor engaged in coercive or

intimidating conduct.  See id.

Here, regardless of whether Eastside has raised an issue of fact as to whether Ford did

anything to breach the SSAs other than fail to inform Eastside of its change in market

representation plans, Eastside has not pointed to evidence on which Mr. Reichert or Kenwood

could be liable to Eastside on a tortious interference theory.  Eastside has produced no evidence

that Mr. Reichert or Kenwood in any way encouraged, let alone intimidated or coerced, Ford into

taking those actions.  A jury reasonably might infer that Ford breached Eastside's SSAs in a

15

fashion that benefitted Mr. Reichert and Kenwood.  However, that does not give rise to an inference that Mr. Reichert and Kenwood encouraged any such breach.  Thus, Mr. Reichert and Kenwood are entitled to summary judgment on Eastside's tortious interference claims against them.

**G.    Eastside's Fraud Claim Against All Defendants**

Eastside has brought a fraud claim against all Defendants.  Under Ohio law, recovery for fraud requires proof of: 1) a representation or, where there is a duty to disclose, concealment of a fact, 2) that is material to the transaction at hand, 3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, 4) with the intent of misleading another into relying on it, 5) justifiable reliance upon the representation or concealment, and 6) a resulting injury proximately caused by the reliance. Williams, 700 N.E.2d at 868.

Mr. Reichert and Kenwood argue that there is no evidence that Mr. Reichert made any false statements to Eastside upon which Eastside relied.  In his deposition, Mr. Woeste testified that prior to a meeting among himself, Mr. Reichert and Mr. Carter, Mr. Reichert told him that he did not know the purpose of the meeting and that he did not know the location of Mr. Carter's office.  However, Mr. Woeste also testified that he did not believe these statements at the time they were made.  Thus, Eastside could not have relied on these statements, and they are not actionable.  Mr. Woeste also testified that Mr. Reichert made statements at a later meeting which he thought might be untrue, but Mr. Woeste could not be more specific and testified that he could not recall if he did or did not do anything in reliance on those statements.

16

Having produced no statements by Mr. Reichert or Kenwood that might give rise to recovery on a fraud theory, Eastside must show some concealment of a fact that Mr. Reichert or Kenwood had a duty to disclose. In responding to the motions for summary judgment, Plaintiffs cite no duty of disclosure that Mr. Reichert or Kenwood owed either plaintiff. While Ford may have had a contractual duty to make certain disclosures to Eastside, neither Mr. Reichert nor Kenwood had any such contractual relationship with either plaintiff. Thus, summary judgment for Mr. Reichert and Kenwood on Eastside's fraud claims against them is proper.

Defendants Ford and Messrs. Carter and Walls argue that they are entitled to summary judgment on Eastside's fraud claims against them because 1) no omission on their part could be actionable because they had no duty to speak, and 2) no statement or omission they may have made could be actionable because Plaintiffs never relied on any such statement. In arguing that they had no duty to speak, the Ford Defendants cite OKI Distributing, Inc. v. Amana Refrigeration, Inc., 850 F. Supp. 637, 646 (S.D. Ohio 1994), in which Judge Spiegel held that because a manufacturer had no duty to disclose to its distributors plans to make changes in operations, the distributor had no claim for fraud against the manufacturer on the basis of the manufacturer's failure to tell the distributor of its plans. However, here, Ford assumed a contractual duty to inform Eastside about certain changes in its market representation plans.[7] As discussed, supra, Eastside has raised a dispute of fact as to whether the Ford Defendants failed to tell it about those changes. Defendants have pointed to no evidence that Mr. Woeste or Eastside knew about the changes in the market representation plans at the outset. If Mr. Woeste had known about Ford's plans at the outset, he might have been able to sell Eastside before its value

_____

[7]Additionally, the court applied Iowa law in analyzing the fraud claims in OKI Distributing.

17

dropped.  This creates an issue of fact as to whether Eastside detrimentally relied on any omissions by the Ford Defendants and thus precludes summary judgment for the Ford Defendants on Eastside's fraud claims.

**H.    Eastside's Civil Conspiracy Claim Against All Defendants**

Finally, Eastside brings a civil conspiracy claim against all Defendants.  Under Ohio law, "[t]he tort of civil conspiracy is a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages."  Williams, 700 N.E.2d at 868 (citations and internal quotations omitted).  An underlying unlawful act is required before a party can prevail on a civil conspiracy claim.  See Avery v. Rossford, Ohio Transp. Improvement Dist., 762 N.E.2d 388, 395 (Ohio Ct. App. 2001).  The underlying unlawful act must be a tort.  See id.  See also Gosden v. Louis, 687 N.E.2d 481, 497 (Ohio Ct. App. 1996).  The Ford Defendants move for summary judgment on the civil conspiracy claim on the grounds that the only torts that Plaintiffs allege against them are for fraud and defamation, and these claims fail.  However, since the Court finds that there are material questions of fact as to whether the Ford Defendants are liable to Eastside in fraud, the Ford Defendants cannot obtain summary judgment on the ground that the fraud claims fail.

Kenwood and Mr. Reichert also move for summary judgment on the civil conspiracy claims against them, on the ground that there is no evidence of any underlying unlawful act by Mr. Reichert or Kenwood, joint action between Ford and Kenwood, or damages resulting from any conspiracy.  While Eastside may not be able to prevail on its fraud claim against Mr. Reichert or Kenwood because it was owed no duty by these Defendants, it may be able to establish an unlawful act of fraud by the Ford Defendants.  There is no requirement that each

18

party liable for conspiracy itself have committed an underlying unlawful act; otherwise any claim of civil conspiracy would be wholly superfluous.  Rather, a civil conspiracy claim serves only to enlarge the pool of potential defendants from whom a plaintiff may recover damages and increase the amount of damages that may be recovered.  Id. at 498.  Without the cooperative silence of Mr. Reichert and Kenwood, the Ford Defendants could not have succeeded in perpetuating any fraud against Eastside.

Further, the requirement of a malicious combination "does not require a showing of an express agreement between defendants, but only a common understanding or design, even if tacit, to commit an unlawful act."  Id. at 496.  There is evidence in the record from which a jury reasonably could conclude that all Defendants had at least a tacit understanding to conceal Ford's change of market representation plans from Plaintiffs.  Additionally, as explained, there is evidence from which a jury could conclude that Eastside suffered damage as a result this agreement.  Thus, Mr. Reichert and Kenwood's motion for summary judgment must fail as to the civil conspiracy claims against them.

## IV.    MOTION TO STRIKE

The Ford Defendants also moved to strike the supplemental report of Plaintiffs' expert Roger Bean on the grounds that it is founded upon 1) opinions of others, including a person whom Plaintiffs tried to name as an expert but whose expert opinions the Court has already disallowed on account of delay by Plaintiffs in properly naming him, 2) speculation, and 3) documents and materials never produced to the Ford Defendants during the course of discovery. The Court denied the motion to strike because 1) Plaintiffs did not rely on it in opposing

Defendants' motions for summary judgment,[8] and 2) in ruling on the summary judgment

motions, the Court considered Mr. Bean's *testimony* only as to damages, the one area in which

that the Ford Defendants do not appear to contend in their motion to strike that Mr. Bean cannot

testify fairly as an expert.  Additionally, to the extent that the Ford Defendants ask that the report

be stricken so that it may not be used at trial, none of their arguments renders the report

inadmissible in its entirety.  If the Ford Defendants wish to argue that certain portions of the

report are inadmissible or cannot be used fairly as evidence at trial, they may raise those

arguments at the appropriate time.

## V.    CONCLUSION

For the foregoing reasons, the Court **GRANTED IN PART AND DENIED IN PART**

the Motion for Summary Judgment by Defendants Kenwood Dealer Group, Inc. and Robert C.

Reichert (doc. #42) and **GRANTED IN PART AND DENIED IN PART** the Motion for

Summary Judgment of Defendants Ford Motor Company, Jerry Carter, and A.W. Walls (doc.

#44).  The Court granted the motion of Mr. Reichert and Kenwood Dealer Group, Inc. (doc. #42)

as to William Woeste's individual claims and Eastside Lincoln Mercury's claims of "tort of

business interference/unfair competition" and fraud and denied the motion as to Eastside's civil

conspiracy claims.  The Court granted the motion for summary judgment of Ford Motor

Company and Messrs. Carter and Walls (doc. #44) as to Mr. Woeste's individual claims and

Eastside's defamation claims and denied the motion as to Eastside's statutory, breach of

---

[8]The supplemental report was not yet complete when Plaintiffs filed their brief in opposition
to the summary judgment motions.

contract, fraud and civil conspiracy claims.  The Court also **DENIED** the Ford Defendants'

Motion to Strike Supplemental Damages Report of Roger M. Bean (doc. #75).

       IT IS SO ORDERED.


                                         ___s/Susan J. Dlott_____
                                         Susan J. Dlott
                                         United States District Judge