## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

EASTSIDE LINCOLN MERCURY, *et al.*,    :
    :
       Plaintiffs,    :
    :   Case No. 1:01cv00567
       v.    :
    :   Judge William O. Bertelsman
FORD MOTOR COMPANY, *et al.*,    :
    :
       Defendants.    :

### FORD DEFENDANTS' FINAL PRETRIAL MEMORANDUM

Defendants Ford Motor Company, Jerry Carter, and A.W. Walls ("Ford Defendants"), pursuant to this Court's Order of October 13, 2004 hereby submit their Final Pretrial Memorandum:

### I.    JURISDICTION OF THE COURT

This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action is founded on claims or rights arising under the laws of the United States, specifically 15 U.S.C. § 1221 *et seq.*    This Court has jurisdiction over the remainder of the claims set forth in plaintiff's Complaint pursuant to 28 U.S.C. § 1367.

## II.    KIND OF ACTION

This is an action by a automobile dealer, Eastside Lincoln Mercury ("Eastside"), against an automobile manufacturer, Ford Motor Company ("Ford"), two of Ford's employees, Jerry Carter and A.W. Walls, the Kenwood Dealer Group, Inc. ("Kenwood"), which has ownership interest in three other Lincoln Mercury dealerships and Robert Reichert, who has majority ownership interest in Kenwood.  Eastside claims that the Ford Defendants violated both state and federal automotive dealership statutes, breached the contracts between the parties and engaged in fraud with the ultimate goal of coercing Eastside into selling itself at less than fair market value or forcing it out of business.  Kenwood and Mr. Reichert are alleged to have conspired with one of more of the Ford Defendants to defraud Eastside.

## III.    STATEMENT OF FACTS

### A.    The Parties

Plaintiff Eastside Lincoln Mercury, Inc. ("Eastside")  has been a dealer of Lincoln Mercury products since 1983.  Eastside's dealer principal is William Woeste, Jr.  Eastside entered into Sales and Service Agreements with Ford that enable it to buy Lincoln and Mercury products from Ford for resale to the public and to perform warranty service on those products. Eastside is one of a number of Lincoln Mercury dealers in the vicinity of Cincinnati, Ohio that are responsible for the sale and service of Lincoln Mercury products for that entire area. Defendant Robert Reichert is the dealer principal of the remaining three Lincoln Mercury dealerships in this Cincinnati market, which are owned by Fairfield Lincoln Mercury, Inc., Kings Lincoln Mercury, Inc., and Northgate Lincoln Mercury, Inc.

Lincoln Mercury and Ford Customer Service Division are divisions of Ford.  Lincoln Mercury Division is the division of Ford that is primarily responsible for the sales of new

Lincoln and Mercury vehicles. In contrast, Ford Customer Service Division ("FCSD") is primarily responsible for the service and parts sales for all Ford products, including Lincoln and Mercury. In addition to this division of responsibility, Ford has also divided the country into geographic regions, each of which has a regional staff that assists with and monitors dealer performance. Defendant Jerry Carter, at all relevant times, was the Regional Manager for Lincoln Mercury for the Cincinnati Region. Defendant Al Walls was, during all relevant times, the Regional Manager of the Cincinnati Region of FCSD.

**B.      Undisputed Facts**

1.      In 1993, Eastside entered the Warranty Counseling Process and was directed to perform a self-review of its service operations with regard to claims made under a Ford warranty.

2.      In 1996, FCSD performed a Warranty Review, the second step in the Warranty Counseling Process, at Eastside.

3.      In 1997, FCSD performed a Follow Up Warranty Review, the third step in the Warranty Counseling Process, at Eastside. As a result of this review, charge backs were assessed to Eastside.

4.      1n 1998, FCSD performed a Warranty Audit, the fourth step in the Warranty Counseling Process, at Eastside. As a result of this audit, charge backs were again assessed.

5.      In 1998, Mr. Woeste orally proposed to Mr. Carter that Eastside be allowed to relocate to a new showroom that Eastside would build for Lincoln Mercury on the property adjacent to Beechmont Chevrolet (another dealership owned by Mr. Woeste) and that

parts and service operations for Lincoln Mercury would be combined or "dualed" with Chevrolet. Mr. Carter rejected that proposal.

6.    In the confidential 1999 Cincinnati Regional Business Plan, Eastside was listed as a "Dealer Replacement Opportunity." Portions of this Plan were mailed to selected dealerships by an unknown person in 1999.

7.    In October 1999, FCSD performed a Second Warranty Audit, the fifth step in the Warranty Counseling Process, at Eastside. As a result of that audit, charge backs were assessed to Eastside.

8.    In November and December of 1999, Mr. Carter sought and was given approval and a budget by his superiors to seek "consolidation" of the Cincinnati Multiple Point Market. Mr. Reichert, who already owned 2 of the 5 Lincoln Mercury dealerships in this market was chosen as the consolidator.

9.    In the first quarter of 2000, a corporation formed by Ford purchased the franchise and assets of Dixon Lincoln Mercury. Within hours, these same items were transferred to a corporation owned by Mr. Reichert for a sum less than what Ford had paid Mr. Dixon. This dealership changed its name to Fairfield Lincoln Mercury.

10.    Also in the first quarter of 2000, Mr. Jeff Wyler purchased the dealership then known as Stillpass Lincoln Mercury.

11.    In the summer of 2000, a new program, called Lincoln Premier Experience ("LPE"), was announced to Lincoln dealers nationwide by Ford.

12.    On June 16, 2000, Mr. Reichert and Ford entered into a Right of First Refusal agreement.

13.    On September 25, 2000, in exchange for monetary compensation, Mr. Wyler resigned his Lincoln and Mercury Sales and Service Agreements. Lincoln Mercury did not appoint a replacement dealer and the territory assigned to that dealership location was reassigned to the surrounding dealerships.

14.    On November 22, 2000, a representative of J.D. Powers conducted an on-site review of Eastside for purposes of LPE certification. Eastside did not pass this inspection. Eastside's appeal of that determination was denied on January 31, 2001.

15.    In February 2001, FCSD performed a Third Warranty Audit, the sixth step in the Warranty Counseling Process, at Eastside.

16.    On April 9, 2001, FCSD conducted a closing meeting with regard to the February audit in which Eastside was informed of the findings made and consequences associated with the audit. Other than the charge backs for improper warranty claims, none of these consequences were enforced by Ford.

17.    In May 2001, Mr. Reichert proposed to relocate Fairfield Lincoln Mercury and dual its operations with Volkswagon.

18.    On June 4, 2001, Lincoln Mercury approved the relocation of Fairfield Lincoln Mercury.

19.    On June 28, 2001, a different representative of J.D. Powers conducted an on-site review of Eastside for purposes of LPE certification. Eastside passed this inspection.

20.    On July 27, 2001, Eastside filed its Complaint.

21.    On December 7, 2001, Fairfield was given permission to dual with Volkswagon on the conditions, *inter alia*, that the dual not be permanent and that Northgate Lincoln Mercury provide stand alone representation of Lincoln Mercury at a later date.

22.    In December 2001, Mr. Reichert and Ford entered into a formal Consolidator Agreement.

23.    Eastside remains a Lincoln Mercury dealership to this day.

## C.    Disputed Facts

1.    Eastside claims that it was subject to the Ford Customer Service warranty actions and the sanctions associated with those actions for reasons unrelated to Ford's legitimate enforcement of its warranty claims procedures. Eastside also alleges that Ford is responsible for Eastside's alleged refusal to perform certain warranty repairs because of alleged fear instilled in its mechanics by these warranty actions.

2.    Eastside claims that it failed its initial LPE certification inspection because Ford directed the J.D. Powers' inspector to fail Eastside in order to harm Eastside economically, so that it would go out of business or be forced to sell at less than fair market value.

3.    Eastside claims that Ford denied Eastside's request to relocate and dual so that it would be economically harmed, so that it would go out of business or be forced to sell at less than fair market value. Moreover, Eastside claims that approval of the dual at Fairfield is discriminatory.

4.    Eastside claims that the Lincoln Mercury dealerships owned by Mr. Reichert were given marketing funds that were not made available to Eastside so that Eastside would be forced to compete unfairly with those dealerships, and thus, be economically harmed so that it would go out of business or be forced to sell at less than fair market value.

5.    Eastside claims that the Lincoln Mercury dealerships owned by Mr. Reichert were given preferential allocation and delivery of vehicles so that Eastside would be

forced to compete unfairly with those dealerships, and thus, be economically harmed so that it would go out of business or be forced to sell at less than fair market value.

6.    Eastside claims that the Ford Defendants made multiple false representations to it or omitted facts that Ford was allegedly required to divulge, upon which it relied to its detriment.

7.    Eastside claims that the Ford Defendants conspired with Mr. Reichert and/or Kenwood to commit fraud against it.

8.    Eastside claims that all of these actions, actual and alleged, were in furtherance of Ford's consolidation strategy.  The parties dispute exactly what "consolidation" means and how it was to be implemented.

9. Eastside claims to have been damaged as a result of these alleged acts by the Defendants.

## IV.    ISSUES OF LAW (SUBSTANTIVE)

### A.    Contested Elements of Substantive Claims.

#### 1.    Breach of Contract

Eastside's breach of contract claim is based on Ford's alleged violation of the disclosure requirement of paragraph 9(b) of the Lincoln and Mercury Sales and Service Agreements.  The contested elements of Eastside's breach of contract claim are whether: (1) Ford breached the Sales and Service Agreements; and (2) Eastside suffered damages as proximate result of Ford's breach. *Energy Mktg. Serv., Inc. v. Homer Laughlin China Co.*, 186 F.R.D. 369, 374 (S.D. Ohio 1999).

2.    **Dealer Day In Court Act, 15 U.S.C. Section 1221,** *et seq.*

The Dealer's Day in Court Act prohibits an automobile manufacturer from failing to act in good faith when performing or complying with the terms of a franchise agreement. 15 U.S.C. §§1221, 1222. The statute defines good faith as the duty of each party to act in a fair and equitable manner so as to guarantee that the other party is free from coercion, intimidation, or threats of coercion or intimidation. 15 U.S.C. §1221(e). Coercion and intimidation are a wrongful demand that will result in sanctions if not complied with. *Fray Chevrolet Sales, Inc. v. General Motors Corp.*, 536 F.2d 683, 685 (6th Cir. 1976). It is not coercion or intimidation for a manufacturer to enforce its contractual rights under a franchise agreement. *Clifford Jacobs Motors, Inc. v. Chrysler Corp.*, 357 F. Supp. 564, 574, n.2 (S.D. Ohio 1973). To prove that a manufacturer failed to act in good faith, a dealer must show that the manufacturer engaged in coercion or intimidation designed to obtain some benefit under the franchise agreement that the manufacturer did not have a right to. *Fray Chevrolet Sales, Inc.*, 536 F.2d at 685.

Eastside alleges that Ford violated the Dealer's Day in Court Act by attempting to coerce or intimidate Eastside into selling its dealership. The contested elements of Eastside's Dealer's Day in Court Act claim are whether: (1) Ford failed to act in good faith under the Sales and Service Agreements; (2) Ford's conduct amounted to coercion, intimidation, or threats of coercion or intimidation; and (3) Eastside suffered damages as a proximate result of Ford's conduct.

3.    **Ohio Revised Code Section 4517.59**

The Ohio Motor Vehicle Dealer Act controls certain aspects of the relationship between automobile manufacturers and dealers under Ohio law. Eastside alleges, in its proposed jury

instructions,[1] that Ford violated subsections (A), (B), (F), (G), (L) and (M) of Section 4517.59. The contested elements of Eastside's Ohio Motor Vehicle Dealer Act claim are whether: (1) Ford violated one of the subsections of Section 4517.59; and (2) Eastside suffered damages as a proximate result of Ford's conduct.

### a.    Section 4517.59(A)

Subsection (A) of Section 4517.59 makes it a violation of the statute for a manufacturer to fail to act in "good faith" "[i]n acting or purporting to act under the terms, provisions, or conditions of a franchise or in terminating, canceling, or failing to renew a franchise[.]"  Good faith means the duty of each party to act honestly and in a fair and equitable manner so as to guarantee that the other party is free from coercion, intimidation, or threats of coercion and intimidation from the other party. O.R.C. §4517.01(BB).  Coercion means to compel or attempt to compel another by failing to act in good faith or by threat of economic harm, breach of contract, or other adverse economic harm.  O.R.C. §4517.01(CC).  It is not coercion for a manufacturer to argue, urge, or recommend that a dealer take a certain action, or for a manufacturer to enforce its contractual rights against the dealer. *Id.*; *Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 207 (6th Cir. 1995).  To prove that a manufacturer failed to act in good faith under subsection (A), a dealer must show the manufacturer acted in a commercially unjustified manner. *Jim White Agency Co. v. Nissan Motor Corp.*, 126 F.3d 832, 834 (6th Cir. 1997).

---

[1] As is discussed below, some of these claims were not asserted or factually described in any pleading until proposed jury instructions were exchanged.

### b.    Section 4517.59(B)

Subsection (B) of Section 4517.59 makes it a violation for a manufacturer to terminate, cancel or fail to renew a franchise if the manufacturer fails to act in good faith.

Eastside, however, remains in business to this day.    Therefore, no termination, cancellation or failure to renew has occurred, and this claim has no application to this litigation.[2]

### c.    Section 4517.59(F)

#### i.    Allocation or Withholding of Delivery

Subsection (F) of Section 4517.59 makes it a violation for a manufacturer to "withhold or delay delivery of motor vehicles out of the ordinary course of business; nor discriminate against any franchisee in the allocation or through the withholding from delivery of certain models of motor vehicles ordered by a franchisee out of the ordinary course of business."

#### ii.    Allotment or Quota in a Sales Contest

Subsection (F) of Section 4517.59 makes it a violation for a manufacturer to "unfairly change or amend unilaterally a franchisee's allotment of motor vehicles or quota in a sales contest without reasonable cause."

#### iii.    Coercion For Dealership Participation in Sales Devices

Subsection (F) of Section 4517.59 also makes it a violation for a manufacturer to "employ any coercive techniques for any other purposes such as obtaining franchisee participation in contests, 'give-aways,' or other sales devices."

---

[2] In its Order on Defendants' Motion for Summary Judgment, the Court dismissed Eastside's "constructive termination" claims on all other counts of the complaint, including under Section 4517.54. No reason exists for a "constructive termination" claim to exist under Section 4517.59(B).

**d.    Section 4517.59(G)**

Subsection (G) of Section 4517.59 makes it a violation for a manufacturer to "coerce, or attempt to coerce, a franchisee by threatening to award an additional franchise or agreement to another person for the sale of its same product in the same area of influence for the purposes of compelling such franchisee to yield to demands of the franchisor for increased sales of the franchisor's products, parts, expansion of facilities and improvement of operations inconsistent with good business practices of the franchisee."

**e.    Section 4517.59(L)**

Subsection (L) of 4517.59 makes it a statutory violation for a manufacturer to "refuse to disclose to any dealer who sells its products the manner and mode of distribution of its products in the county in which that dealership is located."

**f.    Section 4517.59(M)**

Subsection (M) of 4517.59 makes it a statutory violation for a manufacturer to "engage in any predatory practice or discriminate against any new motor vehicle dealer." Discrimination occurs when an automobile manufacturer fails to apply consistent business criteria to decide the same issues under the same provision of the franchise agreement presented by two or more similarly situated automobile dealerships. *Halleen Chevrolet, Inc. v. General Motors Corp.*, 2001 Ohio App. LEXIS 2862, *26-28 (Franklin Cty. June 28, 2001) (Exh. A). Discrimination does not occur solely because a manufacturer grants one dealership's request, but not the same request of another. Moreover, the manufacturer is entitled to exercise business judgment when applying its business criteria.

11

### g. Damages under the Ohio Motor Vehicle Dealer Act

If the jury finds in favor of Eastside under any subsection of the Ohio Motor Vehicle Dealer Act, Section 4517.63(A) requires that the Court double the jury's award, and order Ford to pay the reasonable costs and attorneys' fees incurred by Eastside for its Ohio Motor Vehicle Dealer Act claim.

### 4. Fraud

Eastside alleges two types of fraud against the Ford Defendants. First, Eastside claims that the Ford Defendants made certain false statements to Eastside. Second, Eastside contends that the Ford Defendants concealed certain facts from Eastside that they had a duty to disclose. The contested elements of Eastside's fraud claims are whether: (1) the Ford Defendants made a false statement of fact with knowledge of its falsity or with utter disregard and recklessness about its falsity that knowledge may be concluded, **or** the Ford Defendants knowingly concealed a fact when they had a duty to disclose that fact; (2) the statement **or** concealment was material to the transaction; (3) the statement **or** concealment was made with the intent of misleading Eastside into relying upon it; (4) Eastside was justified in relying on the statement **or** concealment and did rely on the statement **or** concealment; and (5) Eastside was proximately injured by relying on the statement or concealment. *Cohen v. Lamko, Inc.*, 10 Ohio St. 3d 167, 169 (Ohio 1984).

The Ford Defendants contend that Eastside cannot pursue a fraud claim against them for concealment because they had no duty to speak and disclose facts to Eastside. *Blon v. Bank One, Akron, N.A.*, 35 Ohio St. 3d 98, 101 (Ohio 1988). A party has a duty to speak only when there is a relationship of special trust and confidence such that both parties understand and accept that one party is placing special trust and confidence in the other. *Id.* There is no relationship of

12

special trust and confidence, and therefore no duty to speak, when two parties enter into a business transaction. *Landskroner v. Landskroner*, 154 Ohio App. 3d 471, 486 (Cuyahoga Cty. 2003). Here, no relationship of special trust and confidence existed between the Ford Defendants and Eastside.

### 5.    Civil Conspiracy

Eastside alleges that the defendants engaged in a conspiracy to commit a fraud on Eastside. The contested elements of Eastside's conspiracy to commit fraud claim are whether: (1) there was a malicious combination; (2) between the defendants; (3) to injure Eastside; and (4) the Ford Defendants committed the underlying unlawful act of fraud. *Aetna Casualty & Sur. Co. v. Leahey Constr. Co.*, 219 F. 3d 519, 534 (6th Cir. 2000).

Because an employee or officer of a corporation acting in the course and scope of his employment cannot enter into a conspiracy with his corporation, it is undisputed by the parties that Ford cannot have conspired with Mr. Carter or Mr. Walls, and Mr. Reichert cannot have conspired with Kenwood. *Nilavar v. Mercy Health Sys.*, 142 F. Supp. 2d 859, 888 (S.D. Ohio 2000); *BSW Dev. Corp. v. City of Dayton*, 1995 U.S. Dist. LEXIS 22173 at *28 (S.D. Ohio March 18, 1995) (Exh. B).

If the jury finds that the defendants engaged in a conspiracy to commit a fraud on Eastside, then all of the members of the conspiracy are liable to Eastside for the damages arising from the fraud. *De Boer Structures (U.S.A.), Inc. v. Shaffer Tent and Awning Co.*, 233 F. Supp. 2d 934, 945 (S.D. Ohio 2002).

## V.    ISSUES OF LAW (PROCEDURAL)

### A.    Ability to Assert Claims Not Set Forth in Complaint Or Raised During the Course of Discovery

By virtue of its proposed jury instruction, Eastside, for the first time, is attempting to assert claims under Section 4517.59(F), relating to allotments and quotas of vehicles in sales contests and coercion relating to participation in sales programs, Section 4517.59(G), relating to threats of adding an additional dealership to seek improvements in a dealership's performance or facility,[3] and Section 4517.59(L), relating to refusals to disclose the manner and means of distribution of vehicles in the county.

None of these claims was plead in the complaint, either by reference to these subsections or, more importantly, by the facts that were alleged.  In addition, Eastside has never sought to amend its Complaint to add these claims, facts relating to these claims were not made apparent during discovery and Eastside did not mention any of these claims in its opposition to the Defendants' Motions for Summary Judgment.  Therefore, these claims are not properly before this Court. *Roskam Baking Co., Inc.,* 288 F.3d 895, 906 (6th Cir. 2002) (explaining that in order to bring a claim not previously stated in the complaint, Plaintiff must amend the complaint by presenting court with a motion for leave to amend and substance of the proposed amendment).

---

[3] Given that this statute requires a *threat* of the opening of an *additional* dealership, Eastside's eleventh hour attempt to assert a violation of this subsection comes as a particular surprise, as any such allegation would be contrary to the undisputed facts.  Specifically, no additional dealership was added to either Eastside's primary market area or the Cincinnati Multiple Point Market during the relevant time period.  Moreover, even if this subsection covered "threats" of awarding an existing dealership location to a particular person, which it does not, Eastside's allegations regarding changes in ownership center on its claim that it *should have been told* of those changes.  As such, this claimed "threat" is fundamentally inconsistent with Eastside's claim that Ford had a duty to disclose this information.  Finally, this statute requires that the threat of the appointment of an additional dealership be for the purpose of inducing increases in performance or upgrades in facilities.  At no time, has Eastside ever claimed that Ford made any such demands upon it.

Moreover, the Ford Defendants would be unfairly prejudiced if Eastside were allowed to amend at this time and present any evidence of these allegations at trial. Without having any idea to what these allegations relate, the Ford Defendants will have no opportunity to depose any witnesses that Eastside may present on these issues, or locate witnesses or documents that could refute these allegations. *Bridgeport Music, Inc. v. Dimension Films*, 383 F.3d 390, 402 *citing Wade v. Knoxville Utilities Bd.,* 259 F.3d 452, 459 (6th Cir. 2001) ("when amendment is sought at a late stage in the litigation, there is an increased burden to show justification for failing to move earlier."); *Leary v. Daeschner*, 349 F.3d 888, 907-909 (6th Cir. 2003) (affirming trial court's denial of motion for leave to amend where defendant would be prejudiced.)

**B.     Ability to Assert Claims Based on Events That Occurred After The Complaint Was Filed**

Based on Eastside's proffer of a jury interrogatory relating to events that occurred in 2004, the Ford Defendants are concerned that Eastside will attempt to present evidence relating to events that occurred after the filing of its Complaint for purposes of asserting additional claims based upon those events. The Complaint in this matter was filed in July 2001. Discovery has been closed for over a year. Eastside has made no effort to amend its Complaint. Any attempt to seek recovery on claims based on actions that occurred after the filing of the Complaint would be unfairly prejudicial to the Ford Defendants and should be barred.

**C.     The Court Should Not Allow Eastside's Damages Expert, Roger M. Bean, To Testify On The Subject Of Allocation, Nor Permit The Introduction Into Evidence of Exhibits 13, 14, 15, 16 or 17 to Mr. Bean's Report.**

Eastside repeatedly failed to comply with the Orders of this Court relating to expert witness disclosures. With no effort to comply with Fed. R. Civ. P. 26, Eastside identified Mr. Roger M. Bean, a CPA, as their expert on the subject of damages. Well after the discovery

cutoff, Eastside sought leave of this Court to identify Mr. Glen Watkins as an additional expert on the subject of "allocation." Eastside explained to the Court that Mr. Watkins testimony was necessary ". . . in order for Mr. Bean to do his final report and include the allocation damage, we need to have a gentleman by the name of Mr. Watkins, not only allowed to enter the case and render expert opinions, but also to have some follow-up documentation from Ford. . ." Tr. of Sept. 29, 2003 Hearing at 6 (Exh. C).

As a sanction for Eastside's repeated failures to comply with Fed. R. Civ. P. 26 and the Orders of this Court, Judge Dlott denied Plaintiff's Motion to Identify Mr. Watkins as an additional expert. Judge Dlott nonetheless allowed Eastside one last opportunity to finally satisfy the requirements of Fed. R. Civ. P. 26 as they concerned Mr. Bean, allowed Mr. Bean to supplement his damages report, and allowed Defendants to depose Mr. Bean after the discovery cut-off. Sept. 29, 2003 Order (Exh. D).

Mr. Bean's supplemental damages report ("Final Bean Report") revealed that Eastside intends to covertly introduce Mr. Watkins' opinions and analysis through Mr. Bean, and thereby circumvent the Court's Order refusing to allow them to designate Mr. Watkins as an expert. This intent was confirmed during Mr. Bean's deposition, when Mr. Bean was forced to admit that in order to prepare his report he spoke with Mr. Watkins between ten and twenty times. Mr. Bean also admitted that the subject of those discussions was Mr. Watkins' understanding of Ford Motor Company's allocation process, including the meaning and significance of the terms "release" and "delivery." Mr. Bean demonstrated that he, himself had almost no understanding of the significance of those terms (and what little knowledge he does have results solely from his discussions with Mr. Watkins and Eastside' sales manager, Mr. Beattie). Further, Mr. Bean admitted that he, himself, had no knowledge of the basis of Mr. Watkins knowledge. Finally, he

admitted that he had "collaborated" with Mr. Watkins to produce the exhibits to his damages report that relate to allocation.  Deposition of Roger Bean ("Bean Depo."), at 37-40, 43-46, (Exh.E).

Pursuant to Fed. R. Civ. P. 26 and 37, and in order to enforce the discovery and scheduling Orders of this Court and the sanction Order of this Court, Mr. Bean should not be permitted to testify on the topic of allocation.  Judge Dlott recognized the prejudice to Defendants when she excluded Mr. Watkins' testimony, and the prejudice to Defendants can only increase if Mr. Bean is permitted to testify regarding Mr. Watkins' opinions and Mr. Watkins is unavailable for cross-examination regarding those opinions.

**D.    Request for Site View**

One of the assertions of Eastside is that it was discriminatory for Lincoln Mercury to consent to the sharing of Fairfield Lincoln Mercury's facility with Volkswagon when an allegedly similar request from Eastside had been rejected three years earlier.  Although the Ford Defendants do not believe that it would be proper for the jury to substitute its business judgment regarding the propriety of these decisions for those that were made, the Ford Defendants also believe that the jury would be aided in its understanding of how the legitimate business judgment of Ford was applied to make these decisions if the jury had the opportunity to conduct an inspection of the relevant properties.

**VI.    ISSUE OF LAW (EVIDENTIARY)**

**A.    The Court Must Exercise It's Gate Keeper Role And Confine The Testimony of Mr. Roger Bean, Eastside's Damages Expert, To Financial Issues.**

After this Court precluded Eastside from identifying additional experts, Eastside's expert on damages, Mr. Bean, suddenly "morphed" into a generic "expert" on a large number of topics. For example, Eastside intends to offer opinion testimony by Mr. Bean on a number of causation

issues, each well beyond the scope of his expertise. Mr. Bean's opinions threaten to mislead the jury and confuse the issues because he is not qualified by education or experience to offer any opinion regarding Lincoln Mercury's motives, procedures, or legal obligations, his opinions are not based upon information reasonably relied upon by an expert in the fields in which he offers opinions, and Mr. Bean's opinions regarding these issues will not assist the jury in understanding Eastside's evidence of causation or to determine any fact in issue. Mr. Bean's opinions on issues of causation should be excluded pursuant to Fed. R. Evid., Rules 403, 702. *Cf. Berry v. City of Detroit*, 25 F.3d 1342, 1349-1353 (1994).

### 1.    Mr. Bean's Expert Qualifications Relate Solely To Financial Issues

Mr. Bean is currently employed as the chief financial officer of American Board of Family Practice, Inc., a certification board for family physicians and family medical practices. Mr. Bean is, however, a certified public accountant, familiar with "accounting, auditing, consulting, mergers and acquisitions, and general business advice." Bean Depo. at 6. Mr. Bean admits he has no field of expertise outside the area of accounting, but does claim familiarity with the accounting and financial aspects of automobile dealerships, having once represented a number of such dealerships while he was employed as an audit partner in an accounting firm. Bean Depo. at 6. He admits that he has absolutely no knowledge of the internal practices and policies of Ford Motor Company. Bean Depo. at 11-12.

### 2.    Mr. Bean Is Prepared To Offer Numerous Objectionable Opinions.

#### a.    Ford's Motives, Including The Purpose Behind Its Warranty Audits

In his final report on the subject of damages, Mr. Bean asserted any number of unsupported – and unsupportable – opinions regarding the motives of Ford Motor Company. For

example, Mr. Bean opines that Ford once reduced a warranty chargeback amount to Eastside ". . . apparently recognizing the imprecise and subjective nature of its audit process. . . ." Mr. Bean's Supplemental Damages Report ("Final Bean Report"), at 4 (Exh. F). Most egregious, perhaps, are the following opinions regarding warranty audits:

> Based upon my experience with automotive clients, warranty audits are designed to . . . drive down the volume and size of warranty claims submitted. This damaged Eastside's reputation with its customers, reduced its profits, lowered the morale of dealership employees, and reduced the value of the dealership.

Final Bean Report, at 5. As explained below, Mr. Bean has neither the qualifications nor any basis to opine regarding any of these subjects.

When asked to explain, generally, why a dealer's warranty work might decline during his deposition, Mr. Bean responded: "I think the primary reason would be as a result of audits from the manufacturer." Bean Depo. at 52. Mr. Bean intends to testify that service techs and their supervisors are intimidated by warranty audits and therefore will not repair, or even look for, warranty items recognized to need repair, as a result of such audits. Bean Depo. at 56.

Mr. Bean, however, has never conducted any studies to determine whether audits in fact reduce warranty work. Bean Depo. at 55. He didn't even attempt to analyze the repair orders at Eastside to confirm his opinion. Bean Depo. at 61. Even though he opines to the subjective thoughts and fears of service techs and their managers, he had never even spoken about the issue with a service tech. He also did not speak to the service manager at Eastside about the issue. Depo. at 55-56, 58-60. In truth, the *sole* basis Mr. Bean offers for his opinions is his "experience" and his discussions with Mr. Woeste, Eastside's principle, its general manager, Mr. Beattie, and with Mr. Woodall, a vice president of Beechmont Auto Group (the corporate owner of Eastside). Bean Depo. at 61. Worse still, the sum of the personal "experience" upon which

Mr. Bean relies apparently consists solely of discussing warranty audits with his other dealer clients. Depo. at 62.

The hearsay opinions of others are not the proper foundation for any opinion that Mr. Bean may properly offer. His opinions are not based upon information reasonably relied upon by an expert in the field. His opinions will not assist the jury because they can only mislead the jury and confuse the issues. His opinions regarding the purpose of warranty audits and the effects of warranty audits on others is properly excluded.

### b. The Alleged Manipulation of the Vehicle Allocation Process And Vehicle Delivery Processes

Defendants have separately addressed, within the section on Procedural Issues of Law, the necessity of limiting Mr. Bean's testimony regarding allocation in order to enforce the discovery and scheduling Orders of this Court, and the sanction Order of this Court. As demonstrated therein, Mr. Bean should also be precluded from testifying on the topics of allocation and vehicle delivery because he again is unqualified to offer any insight regarding the topic; and again, the hearsay opinions of others are not the proper foundation for any opinion of Mr. Bean's own regarding allocations or deliveries. His opinions can not assist the jury because they can only mislead the jury as they are not based upon information reasonably relied upon by an expert in the field. Any opinion he holds regarding allocations or the delivery of vehicles is properly excluded.

### c. Expenses Allegedly Incurred By a Separate Honda Dealership Operated By A Non-Party Corporation May Not Be Included As An Item Of Damage To Eastside Lincoln Mercury.

Honda East of Cincinnati, Inc., a separate corporate entity owned and controlled by Beechmont Auto Group and thus, ultimately, by Mr. Woeste, invested approximately $1,000,000