# EXHIBIT C

1  Schmitz, and, because Ford gets our financial information
2  very promptly, knows how many units we're selling and how
3  many parts we're selling, they were able to provide a
4  rebuttal report to Mr. Bean's preliminary report. But, in
5  order for Mr. Bean to do his final report and include the
6  allocation damage, we need to have a gentleman by the name
7  of Mr. Watkins, not only allowed to enter the case and
8  render expert opinions, but also to have some follow-up
9  documentation from Ford that we had requested and Ford says
10 is not available or was --
11         THE COURT: What would your timetable be for
12 this?
13         MR. BERBERICH: Probably -- well, there are two,
14 I guess two phases. One is to find out from Ford if these
15 documents are really lost. Like, for instance, there were
16 months of allocation reports that Ford says the manual
17 archive of these allocation reports was not captured for a
18 series of months due to a systems error. I have no idea
19 what that means. But our allocation expert says they
20 should have reports to find out how many cars Mr. Reichert
21 requested, how many he received, how many extra they gave
22 him, and for some significant periods of time when we think
23 that we were being targeted for consolidation.
24         THE COURT: What --
25         MR. BERBERICH: Probably 40 to 60 days.

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

EASTSIDE LINCOLN MERCURY, et al, :
:
Plaintiff(s) :
: Case Number: 1:01cv567-SJD
vs. :
: District Judge Susan J. Dlott
FORD MOTOR COMPANY, et al, :
:
Defendant(s) :

ORDER

This matter is before the Court upon plaintiff's motion for leave to identify expert (Doc. 37) and defendants' motion to file sur-reply to motion for leave to identify expert (Doc. 47). On September 29, 2003, this Court met with the attorneys of record. Based upon such conference the motion for leave to identify expert (Doc. 37) is hereby DENIED and the motion to file sur-reply to motion for leave to identify expert (Doc. 47) is hereby DENIED as MOOT.

At the conference, the Court also amended the scheduling order in this case as follows:

1. Plaintiff has until October 15, 2003 to supplement report of Roger Bean.

2. Defendant has until October 30, 2003 to depose Roger Bean.

3. Defendants shall supplement their pending motions for summary judgment by November 21, 2003.

4. Plaintiff shall file their response to the defendants supplemental(s) on or before December 5, 2003.

5. The parties shall submit ex parte letters not exceeding five pages to the Court as to their position on settlement no later than December 15, 2003.

6. A settlement conference shall be held in Chambers on Friday, December 19, 2003 at 9:30 a.m.

7. The current Final Pretrial Conference is hereby VACATED.

8. The jury trial in this case is hereby RESET to April 19, 2004.

IS SO ORDERED.

                                               ___s/Susan J. Dlott_____
                                               Susan J. Dlott
                                               United States District Judge

# EXHIBIT E

Page 5

1  ROGER M. BEAN
2  Of lawful age, a witness herein, being
3  first duly sworn as hereinafter certified, was
4  examined and deposed as follows:
5  CROSS-EXAMINATION
6  BY MS. MCNELLIE:
7  Q. Can you state your name for the
8  record, please.
9  A. Roger Menefee Bean.
10  Q. Where are you employed?
11  A. American Board of Family Practice,
12  Inc.
13  Q. Street address?
14  A. 2228 Young Drive, in Lexington,
15  Kentucky.
16  Q. How long?
17  A. Since November of 1999.
18  Q. What do you do for them?
19  A. Chief financial officer.
20  Q. What kind of a business do they do?
21  A. It's a certification board for
22  family physicians and family practice.
23  Q. In what field do you consider
24  yourself to be an expert?
25  A. Educated and training as a certified

Page 6

1  public accountant, which is a broad spectrum of
2  expertise, if you will. Accounting, auditing,
3  consulting, mergers and acquisitions, general
4  business advice.
5  Q. Are there any fields of expertise
6  that you hold outside of the accounting area?
7  A. Outside of the accounting area, no.
8  Q. Which of these fields within
9  accounting have you been asked to give testimony in
10  this case?
11  A. My purpose in this engagement was to
12  assist counsel in the damage calculations which
13  involved analysis of facts and figures, review of
14  financial statements of the dealerships involved in
15  this case, the majority of which is, in my opinion,
16  accounting related relative to the expert report
17  which I have provided to you.
18  Q. Which aspects of your public
19  accounting background have you been using in
20  rendering your report?
21  A. My expertise with automobile dealers
22  primarily, my expertise with the accounting and
23  financial aspects of automobile dealers.
24  The issues concerned with the
25  mergers, sales, acquisition, divestitures of

Page 7

1  accounting of automobile dealerships, their
2  investments in facilities and personnel, their
3  relationship with their manufacturer.
4  Q. What involvement have you had with
5  sales and mergers of dealerships?
6  A. Over my career with Rippe &
7  Kingston, I had been involved with over 25 sale or
8  merger acquisition transactions in the greater
9  Cincinnati area.
10  Q. Any of those sales or acquisitions
11  been between a dealership and a manufacturer?
12  A. Yes.
13  Q. Which ones?
14  A. New franchise arrangements with
15  Hummer, Hyundai, Mini. I suspect there are more.
16  I can't --
17  Q. Did the dealers in question on the
18  Hummer, Mini and Hyundai franchise pay for those
19  franchises for the manufacturer?
20  A. Not in terms of purchase price.
21  They were required to purchase specific assets in
22  connection with the assumption of the franchise.
23  That's the answer.
24  Q. So there was no payment of Blue Sky,
25  in other words?

Page 8

1  A. Correct.
2  Q. What experience have you had with
3  the investment in facilities, in personnel of
4  dealerships?
5  A. All dealerships have substantial
6  investments, they have added substantial
7  investments in those facilities.
8  Q. You have been involved in those
9  decisions?
10  A. Yes, ma'am.
11  Q. In what way?
12  A. Assisting with the financing,
13  evaluating the return, if you will, to make
14  investment facilities. Review of approvals of the
15  facilities, structuring of lease arrangements for
16  the facilities.
17  Q. Have you ever hired contractors?
18  A. During what period of time and for
19  whom?
20  Q. For a car dealership. All of this
21  is related to your car dealership experience.
22  A. Assisted in negotiating construction
23  contracts for the buildings and other improvements,
24  but I have never been directly obligated to pay for
25  anything.

Page 9

1  Q. I believe you also said that you
2  were involved with employee decisions with
3  dealerships.
4      A. Yes, ma'am.
5  Q. What involvement did you have with
6  that?
7      A. Some evaluation, compensation plans,
8  you know, the need for employees. To begin with,
9  the allocation of them between departments,
10 allocation between dealerships, reorganization of
11 operations from a personnel perspective.
12 Q. For which dealerships have you been
13 involved in those decisions, including allocation
14 between departments and the number of employees to
15 hire?
16     A. Almost all of them.
17 Q. Which dealerships have you done work
18 for in the past?
19     A. In the greater Cincinnati area?
20 Q. Yes.
21     A. BMW Store.
22 Q. You specifically, not the firm that
23 you work for.
24     A. Okay. It's about 30.
25 Q. Okay.

Page 10

1      A. BMW Store, three franchises.
2  Mr. Woeste's organization, which has a number of
3  franchises; Mercedes Benz in Lexington, Mercedes
4  Benz in Cincinnati.
5      MR. FLEMER: A little slower.
6      THE WITNESS: Jaguar in Cincinnati.
7  I'm sorry. George Walters Pontiac Buick
8  GMC in Lawrenceburg, Mike Higgins Pontiac
9  in Cincinnati, Camargo Cadillac, Tri-Town
10 Nissan, Tom Sweeney Nissan, West Side
11 Datsun, Datsun back a few years.
12 BY MS. MCNELLIE:
13 Q. I'd say.
14     A. Ferrari of Michigan.
15        I'm sure there is some that I have
16 missed in that list.
17 Q. For which of those dealerships have
18 you been involved in the decision on how to
19 allocate employees between departments?
20     A. I would say all of them.
21 Q. What kinds of experience do you have
22 in the dealerships with the manufacturers?
23     A. From a business prospective, I
24 understand the relationship between the franchisee
25 and the manufacturer. I understand that they have

Page 11

1  dealer meetings.
2  Q. Have you ever attended any of those
3  meetings?
4      A. Yes.
5  Q. What kinds of meetings?
6      A. New car introduction.
7  Q. What do you mean by "New car
8  introduction"?
9      A. Typically they roll out new
10 vehicles, invite their authorized dealers for a
11 presentation on those vehicles.
12 Q. Any other meetings that you have
13 attended between dealers and the manufacturers?
14     A. There may be. I can't recall them
15 offhand today.
16 Q. Have you ever done any work for an
17 automobile manufacturer?
18     A. I may have, but I can't think of the
19 experience right today.
20 Q. Do you have any specific knowledge
21 as to the internal procedures followed at Ford
22 Motor Company?
23     A. Internal procedure at Ford Motor
24 Company with regard to what?
25 Q. Anything.

Page 12

1      A. Other than what I have read in
2  depositions. There were some discussions that I
3  had relative to Dealer Development franchise in
4  Florence, Kentucky which I'm sure involves some
5  internal policies and procedures of Ford Motor
6  Company, but that's all I can think of right now.
7  I'm sorry, there are so many items.
8  Q. With whom did you have discussion
9  about the Florence plant?
10     A. Bill Woeste, obviously; Jerry
11 Carter; and Keith, a gentleman from Dealer
12 Development, Keith.
13 Q. Mr. Kenner?
14     A. Yes, yes. K-E-N-N-E-R.
15 Q. Were all these discussions about the
16 potential purchase of the Florence plant by
17 Mr. Woeste?
18     A. That and the dealership itself, yes.
19 Q. Other than Mr. Carter, have you ever
20 spoken with anybody else from Ford or Lincoln
21 Mercury about anything having to do with this case?
22     A. Relative to this case, no.
23 Q. Well, relative to anything else?
24     A. Yes.
25 Q. What would that be?

Page 37

1  as pertains to allocation in this litigation?
2      A. Yes.
3      Q. When did that occur?
4      A. Same time frame, '91 through 2003.
5      Q. Mr. Woeste was contemplating suing
6  Ford in '91?
7          MR. FLEMER: Objection.
8          THE WITNESS: I'm sorry?
9  BY MS. MCNELLIE:
10     Q. With regard to this litigation?
11     A. I'm sorry, I have the date wrong.
12 Excuse me, 2001. Both those answers should have
13 been 2001 through 2003. I apologize.
14     Q. Who is Mr. Watkins?
15     A. Mr. Glen Watkins.
16     Q. Who is he?
17     A. Individual knowledgeable in the
18 automobile business who assisted me in my work in
19 this engagement.
20     Q. By whom is he employed, do you know?
21     A. I don't know.
22     Q. Do you know where he is?
23     A. Richmond, Virginia.
24         I should say I don't recall who he's
25 employed by.

Page 38

1      Q. Did you meet with him in person or
2  over the phone?
3      A. On the phone.
4      Q. On more than one occasion?
5      A. Yes.
6      Q. Do you know how many times?
7      A. Is a range acceptable?
8      Q. Yes.
9      A. More than 10, less than 20.
10     Q. Do you recall the first time you
11 spoke to him?
12     A. I recall that I spoke to him the
13 first time.
14     Q. Was it before you completed your
15 first report in this case?
16     A. Which would be my first report in
17 this case.
18     Q. That would be dated --
19         MR. FLEMER: September of '01, I
20     believe.
21 BY MS. MCNELLIE:
22     Q. Yes.
23     A. It was not prior to September '01.
24     Q. Was it prior to your affidavit that
25 was attached to the opposition for the motion for

Page 39

1  summary judgment?
2      A. Yes, ma'am.
3      Q. Was it prior to January of '02?
4      A. I don't remember.
5      Q. What kinds of information did
6  Mr. Watkins give you specifically about allocation
7      A. We discussed Ford, Lincoln Mercury's
8  mathematical formula and the availability of
9  discretionary vehicles above and beyond the
10 mathematical calculation.
11         And we discussed the delivery times
12 where the release date for vehicles ordered by
13 several of the Lincoln Mercury dealers that are
14 part of this litigation.
15     Q. Do you know the basis for
16 Mr. Watkins' understanding of these things?
17         MR. FLEMER: Object.
18         You can answer if you can.
19         THE WITNESS: I don't know.
20 BY MS. MCNELLIE:
21     Q. Did you rely on any of the
22 information provided to you by Mr. Watkins in
23 reaching any of your conclusions in this report?
24     A. What do you mean by rely upon?
25     Q. Did you use any of the information

Page 40

1  that you got from him in reaching any of your
2  conclusions?
3      A. Yes.
4      Q. Which information did you use?
5      A. There are some exhibits to my report
6  which, that Glen collaborated with me on. There
7  obviously is the telephone conversations. I used
8  the knowledge that I gained from him to draft some
9  of the verbiage that's in the document, the report.
10     Q. Did you speak with Mr. Watkins about
11 any other issues other than allocation and delivery
12 dates and things of that nature?
13     A. I spoke to Mr. Watkins about a
14 number of issues in the case, but what I have
15 relied upon in there is in the exhibit and what I
16 told you.
17     Q. That would be the information
18 related to whether you have titled vehicle
19 distribution?
20         MR. FLEMER: Do you mind if he looks
21     at the report?
22         MS. MCNELLIE: I'll get this, that's
23     fine. I want to make sure we are talking
24     about the same topic.
25     Q. Look at Page 8.

**Page 41**

1  A. Thank you.
2  Q. All right.
3  A. Yes.
4  Q. Do you have any understanding of
5  when allocation issues between a manufacturer and a
6  dealer become actionable for legal purposes?
7      MR. FLEMER: Objection.
8      THE WITNESS: No, not Datsun to
9      render a legal opinion on that.
10 BY MS. MCNELLIE:
11 Q. Is there some relevancy for purposes
12 of allocation issues as to whether a product is
13 hot?
14 A. Oh, absolutely.
15 Q. What makes a product hot?
16 A. Popular, new product, new model
17 year, popular with the consumer, new market segment
18 product that meets new market segments. Products
19 in short supply.
20 Q. Is it your testimony that every time
21 a new model year product comes out, it's a hot
22 product?
23 A. Your definition of "hot product"?
24 Q. Yes.
25 A. Yes.

**Page 42**

1  Q. Did you do any analysis as to
2  whether the vehicles that are referenced in your
3  report were hot products?
4  A. I spoke with my client relative to
5  those.
6  Q. Who did you speak with?
7  A. Mr. Beattie, Mr. Woeste and
8  Mr. Woodall.
9  Q. Did you do any other analysis to
10 determine whether the products that are referenced
11 in this report were hot products?
12 A. Just my own knowledge of the
13 automobile business.
14 Q. Did you do any analysis as to
15 whether the vehicles in question were in short
16 supply?
17     MR. FLEMER: Objection.
18     THE WITNESS: Short supply with
19     regards to?
20 BY MS. MCNELLIE:
21 Q. I thought that was a term that you
22 used before to talk about whether a product was hot
23 or not.
24 A. Limited production. I thought I
25 said limited production can vary, for instance,

**Page 43**

1  where there are dramatic limitations on supply.
2  Q. What is a release date?
3  A. In this case, the release date
4  closely coincides with the build date.
5  Q. Is that coinciding of dates, is that
6  true for all Lincoln Mercury products or just the
7  ones that you have looked at and talked about in
8  this report?
9  A. I'm only rendering an opinion on the
10 one reference to this report.
11 Q. What is the release date?
12 Specifically refer to that.
13     You said it coincides with the build
14 date, but what does it reference?
15 A. A term provided on Ford Motor
16 Company documents.
17 Q. Do you have any idea what that
18 means?
19 A. Other than from the listed items
20 there, we determined that it was closely proximated
21 to the build date.
22 Q. You don't know if there is an
23 activity or action that's associated with that
24 date?
25 A. I'm sure there are a number of

**Page 44**

1  actions associated with that date on the part of
2  the manufacturer on the part of -- is your question
3  with regard to the manufacturer?
4  Q. Yes.
5  A. Obviously, there are cars which have
6  been ordered and Ford built for them to be on a
7  release date, meaning that are manufactured and
8  available.
9  Q. Release date makes reference to the
10 date in which they are available to be shipped?
11 A. Correct.
12 Q. From where did you get that
13 understanding?
14 A. We looked at the actual deliveries
15 that Eastside Lincoln Mercury achieved following
16 those release dates.
17 Q. The dates Eastside received the cars
18 that are referenced in the documents?
19 A. Yes, ma'am.
20 Q. What documents at Eastside did you
21 look at to make that comparison?
22 A. I discussed it with Mr. Beattie.
23 Q. He looked at the release dates from
24 the Ford documents, said yes, you received this
25 document four days later?

Page 45

1     A. We provided him with the VIN
2 numbers, and he called it up on the computer.
3     Q. Did you review those computer
4 records?
5     A. No, ma'am.
6     Q. Do you know what activity within the
7 manufacturer controls the release date on a
8 vehicle?
9     A. Specific knowledge, no.
10    Q. Do you have any understanding about
11 how that date might be manipulated by anyone within
12 the manufacturer?
13    A. Other than what I have read in
14 depositions, no.
15    Q. Will you be rendering an opinion
16 that those release dates were manipulated?
17    A. The documentation indicates via the
18 listing of vehicles for the two examples we have
19 there, that there is a significant disparity in the
20 release dates for those two model cars between
21 Eastside and its two competitors.
22        And my conclusion is that there is a
23 significant disparity which damaged Eastside in its
24 ability to make hot products available at
25 introduction for sale to customers. That's my

Page 46

1 conclusion and my opinion.
2     Q. Is it your opinion that that was
3 intentionally manipulated by someone at Ford Motor
4 Company?
5     A. It's my opinion that that was an
6 action on the part of Ford Motor Company and/or the
7 Reichert Kenwood Dealer Group.
8     Q. Do you have any idea how Reichert or
9 the Kenwood Dealer Group would have manipulated
10 release dates?
11    A. There is some testimony in
12 depositions relative to cars being made available
13 at different times to different people.
14        Mr. Beattie advises me that there
15 are instances where he has no vehicles to sell and
16 his competitors do have vehicles to sell. There
17 are examples of that in there.
18    Q. Your conclusion based on that is
19 that either someone at Ford or at Mr. Reichert's
20 dealership manipulated release dates from the
21 plant?
22    A. Release dates coincide with the
23 delivery dates, yes.
24    Q. But other than the -- other than the
25 exhibits that you have attached to your report, you

Page 47

1 don't have any other basis upon which to believe
2 that Ford or anyone at Kenwood Dealer Group
3 manipulated the release dates?
4     A. The documentation is not available
5 from Ford Motor Company to -- with specificity to
6 look at the allocation and the deliveries other
7 than what's been done there.
8     Q. Do you have any other basis beyond
9 what is attached to your report to come to the
10 conclusion that someone from Ford or from
11 Reichert's Dealer Group manipulated release dates?
12    A. Testimony and my discussions with
13 Bill Woeste, George Beattie, Jim Woodall and
14 reading of depositions, no.
15    Q. What documents do you think are
16 missing that you would need to complete your
17 analysis?
18        MR. FLEMER: Objection. I don't
19     think his analysis was incomplete.
20 BY MS. MCNELLIE:
21    Q. Go ahead.
22    A. Well --
23    Q. What documents do you believe are
24 missing?
25    A. I believe the history of the

Page 48

1 allocations of products by vehicle is missing for
2 certain months in time in this litigation.
3     Q. Do you know what months in time?
4     A. Not specifically.
5     Q. Were you ever advised of what months
6 in time were missing?
7     A. I'm not sure it was specific months
8 that were missing.
9     Q. If you had a client who came and
10 said that "I think my manufacturer is not treating
11 me fairly in my allocation," what document would
12 you expect to look at to determine whether they
13 were true?
14        MR. FLEMER: Talking about a Ford
15     case?
16        MS. MCNELLIE: Yes.
17        THE WITNESS: Well, I would expect
18     to look at the document which Ford
19     utilizes and provides the dealer to tell
20     them the actual allocation of vehicles.
21 BY MS. MCNELLIE:
22    Q. Any other documents that you would
23 like to see?
24        MR. FLEMER: Objection.
25 BY MS. MCNELLIE:

Page 49

1  Q. Or that you would tell your
2  dealership to make a request of Ford so that you
3  could make a determination whether allocation is
4  appropriate or not?
5  A. I can't think, I can't think offhand
6  anything else. There may be.
7  Q. What factors drive the amount of
8  warranty work that a dealership does?
9  A. In the broadest category, customer
10 demands, I guess. Quality of the product and the
11 technicians' mind-set, the service manager's
12 mind-set, the focus on solving customers' problems.
13 Q. Does the amount of new vehicle sales
14 have an impact on the amount of warranty work done?
15 A. New and used sales of vehicles can
16 have an impact.
17 Q. When you say "technicians'
18 mind-set," what impact does that have?
19 A. Technicians are the individuals who
20 provided the service, whether it's customer retail
21 or warranty service. Those technicians, their job
22 is to maintain the vehicles that are brought in for
23 their care.
24 They can -- I'm struggling with the
25 words. They can -- they can do a good job, an

Page 50

1  average job or a great job by doing this.
2  Q. So if they are doing -- I'm trying
3  to understand. If they are doing a poor job, the
4  amount of warranty work for the dealer goes down?
5  A. No. They have the ability to look
6  for additional customer pay or additional warranty
7  work. They have knowledge of the product,
8  knowledge of the agent, of the age of the product.
9  They have the ability to generate
10 more business for the dealership through doing a
11 great job of maintaining the car.
12 Q. What about the service manager's
13 mind-set, how does that impact the amount of
14 warranty work that a dealership does?
15 A. Service manager obviously supervises
16 the mechanics. He approves warranty work, service
17 manager approves additional customer pay work.
18 Q. Is there a relationship between the
19 amount of customer pay work and the amount of
20 warranty work a dealership does?
21 A. There can be.
22 Q. I asked you what the factors were
23 that impacted in the amount of warranty work that a
24 dealership does. You started talking about
25 customer pay.

Page 51

1  Why are those related?
2  A. A car can come in for a customer pay
3  issue and turn out to have a warranty claim issue.
4  That's the relationship that I see.
5  Q. Is it your opinion that if a car
6  comes in on a customer pay issue and there is a
7  warranty issue that also arises when the car is
8  there, that the dealership can refuse to do the
9  warranty work?
10 MR. FLEMER: Objection.
11 THE WITNESS: From a price
12 perspective, I see no reason why a
13 dealership would refuse to do requested
14 warranty work.
15 BY MS. MCNELLIE:
16 Q. From any other perspective?
17 MR. FLEMER: Objection.
18 THE WITNESS: The question again
19 was? I'm sorry.
20 (At which time, the court
21 reporter read back the pending
22 question.)
23 THE WITNESS: There may be. I can't
24 think offhand of anything.
25 BY MS. MCNELLIE:

Page 52

1  Q. What are the reasons that you would
2  expect that would explain why the amount of
3  warranty work in the dealership would be declined?
4  A. In this specific case?
5  Q. Generally.
6  MR. FLEMER: Objection.
7  THE WITNESS: The quality of the car
8  is dramatically improved.
9  BY MS. MCNELLIE:
10 Q. All right.
11 A. The manufacturer leaves the country,
12 quits selling vehicles in the United States, and I
13 have an instance of that.
14 Q. What if the dealership sells fewer
15 cars?
16 A. Given the length of the warranties,
17 it takes a while for that to have a direct impact.
18 The question again was?
19 Q. The reasons that the warranty work
20 in a dealership could decline.
21 A. I think the primary reason would be
22 as a result of audits from the manufacturer.
23 Q. Other than the Eastside situation,
24 have you personally viewed that happening to any
25 other dealership?

Page 53

1  A. Yes, ma'am.
2  Q. Which one?
3  A. BMW Store.
4     Would you like more?
5  Q. You got others?
6     MR. FLEMER: She wants to know all
7  of them.
8     THE WITNESS: Don't you?
9  BY MS. MCNELLIE:
10 Q. Yes.
11 A. Mercedes Benz. I have even seen it
12 at a Pontiac dealership. I'm sure there are
13 others. I can't think of them all today.
14 Q. Have any of these dealerships sued
15 their manufacturer over this issue?
16 A. No.
17    Thank you for clarifying that.
18 Q. Do you know the reasons the audits
19 were conducted at any of those other stores?
20 A. Yes.
21 Q. Let's start with the BMW Store. Why
22 was it audited?
23 A. It's a function of the number of
24 claims, the size of the claims, and the frequency
25 of the claims.

Page 54

1  Q. Is it any different for the Mercedes
2  or Pontiac store?
3  A. No.
4  Q. Warranty fraud involved in any of
5  those cases?
6  A. No.
7     MR. FLEMER: Allegations or
8  findings?
9  BY MS. MCNELLIE:
10 Q. Either one.
11 A. Neither.
12    MR. FLEMER: You know how it works.
13    THE WITNESS: There were no ultimate
14 findings of fraud in any of those cases.
15    MS. MCNELLIE: I have 11:15, if you
16 need to take a break.
17    MR. FLEMER: Thank you.
18    (At which time, a short recess
19    was taken.)
20    MS. MCNELLIE: Back on the record.
21 Q. Have you done any analysis for these
22 three stores that you listed similar to the
23 analysis that you did in the Eastside case with
24 regard to the impact on the warranty audits on
25 their warranty work?

Page 55

1  A. No formal reports, no.
2  Q. Did you do any analysis as to the
3  condition of the market for the warranty work for
4  the three manufacturers during the same time that
5  the audits took place?
6  A. I discussed with the dealer
7  principals what was Datsun on in their marketplace,
8  specific brands of vehicles they sold relative to
9  their competitors.
10    I forget the question, but that's
11 fine.
12 Q. Have you done a market analysis of
13 how the warranty work for other dealers of that
14 line had done during the same period as the
15 warranty items?
16 A. Other than it came up with
17 discussion with dealer principals, no.
18 Q. Did you have an opinion as to why
19 the amount of warranty work goes down after an
20 audit?
21 A. Yes.
22 Q. What is that?
23 A. My opinion is that the warranty
24 audit process, has the impact of altering the
25 mind-set, altering the behavior of the dealership

Page 56

1  personnel listed in my report.
2  Q. Have you ever interviewed any techs
3  about this?
4  A. Technicians, no, no.
5  Q. Have you ever interviewed service
6  managers about this phenomenon?
7  A. Yes, ma'am.
8  Q. Other than the service manager at
9  Eastside, have you interviewed any other service
10 manager about this?
11 A. I've talked to other service
12 managers about this, yes.
13 Q. Did you talk to the service manager
14 at Eastside?
15 A. Is there a time frame in mind?
16 Q. At any time did you talk to the
17 service manager at Eastside about how audits
18 impacted the amount of warranty work they did?
19 A. No.
20 Q. In what way do you believe that this
21 warranty process alters behavior so that the
22 warranty work goes down?
23 A. There was a fear on the part of the
24 mechanic and the service manager for -- there is a
25 fear that they perform warranty work which may

Page 57

1  result in charge back to the dealership.
2      So the behavior pattern of mechanics
3  looking for warranty work to solve a customer
4  problem diminishes, has a negative impact upon the
5  sales.
6      Q. Is it your testimony that it impacts
7  the number of problems that they seek to find when
8  the car comes in?
9      A. Question is, does it negatively
10 impact the number of problems that they seek to
11 find when it comes in, yes.
12     Q. Does it have any impact on the
13 warranty work that is performed with regards to
14 specific customer complaints when they first walk
15 in the door?
16     A. It can have an impact upon that if a
17 customer walks in the door with a specific
18 complaint which the customer believes is warranty.
19     Q. How does it -- how does it impact
20 that circumstance?
21     A. Mechanic and service manager need to
22 approve the fact that it's a warranty in there and,
23 therefore, not charge the customer. It can become
24 customer pay.
25     Q. If the car was just outside of the

Page 58

1  time or mileage limit?
2      A. Well, if it's inside of time and
3  mileage.
4      Q. It's your belief that the tech or
5  the customer service manager or the service manager
6  will determine that there has been some kind of
7  reason to void the warranty and make a customer
8  pay?
9      A. No. I believe there is some issues
10 there of whether it -- when the customer would come
11 in, the customer comes in with what they believe is
12 a warranty claim, it may not be a warranty claim.
13     The dealership at the levels we
14 talked about, tech and service manager, have the
15 ability to -- they make the determination if it's a
16 warranty claim or not within their knowledge of the
17 specific complaint.
18     They have the ability to decide that
19 it is or isn't. I think when there is a warranty
20 process, when the auditors come in, the mind-set
21 changes from dealership personnel, and they are
22 more likely than not, not to look for warranty work
23 and to call what might be warranty work something
24 else.
25     Q. On what basis do they have the

Page 59

1  discretion to figure out whether something is
2  warranty work or not?
3      A. It has to be a defect in the product
4  rather than a wear and tear item, I believe.
5      Q. So it's your testimony that if there
6  is an issue with a component part that has to do
7  with wear and tear, and it's brought in within the
8  three years, 30,000-mile warranty, that the tech
9  can determine that's not Datsun to be covered?
10     A. My experience is that the warranty
11 process ends up with less warranty claims at that
12 franchise because the tech and service manager, for
13 whatever reason, end up processing less warranty
14 claims than there were before.
15     Q. Why do they process -- how do they
16 do that, though, turn customers away?
17     A. They don't look for warranty work
18 for instance.
19     Q. If I come in to the dealership and I
20 say, "The car's idling funny," does the mechanic
21 not perform the work necessary to correct the
22 idling issue?
23     A. Well, I would hope they correct that
24 issue, but they also have knowledge that your make
25 and model has another problem, they have seen ten

Page 60

1  of them those weeks.
2      They have the choice at that time
3  when you come in for the idling issue to say, "I
4  have seen a car just like, but it had this problem,
5  it was a warranty claim."
6      They have the chance to do that, the
7  chance to contact, the customer service manager can
8  approve it.
9      Q. Is it your testimony that the
10 decline of warranty is all related to the tech not
11 looking for these additional things that the
12 customer may not have complained about when they
13 first came in?
14     A. Components of it.
15     Q. What are the other components of it?
16     A. In terms of the overall decline of
17 the warranty business at that franchise.
18     Q. Because of the audit?
19     A. That's the primary cause.
20     Q. You have not talked to the tech and
21 you have not talked to the service manager at
22 Eastside.
23     What do you base your conclusion
24 that there was that decline at Eastside because of
25 these audits?

Page 61

1  A. Experience and discussion with
2  George, Bill and Jim Woodall.
3  Q. What did Mr. Beattie tell you about
4  this issue?
5  A. He believes that the staff is
6  intimidated.
7  Q. Do you know why he believes that?
8  A. I'm sure there are a number of
9  reasons, I believe, that I can't recall today.
10  Q. What did Mr. Woodall tell you?
11  A. Similar.
12  Q. Do you know why he feels that way?
13  A. Similar reasons.
14  Q. Anything different for Mr. Woeste?
15  A. No.
16  Q. Has there been any analysis done
17  comparing the RO's of Eastside before the audits
18  were done with those that were completed after the
19  audits were done to determine that the decline was
20  attributable to not looking for warranty issues not
21  related to customer complaints?
22  A. I haven't done such an analysis.
23  Q. Do you know of anyone that has?
24  A. No, ma'am.
25  Q. Do you know why manufacturers

Page 62

1  conduct warranty audits?
2  A. Yes.
3  Q. Why?
4  A. It took place -- in my belief, one
5  of the objectives is to alter the behavior of the
6  dealership to reduce the claims submitted.
7  Q. What do you base that opinion on?
8  A. Discussion with my dealer clients.
9  Q. Anything else?
10  A. I'm sure there are other reasons
11  they do it. I can't think of any more.
12  Q. One was to alter the behavior of the
13  dealers. You said you had discussion with your
14  dealer clients to reach that conclusion.
15  A. Yes.
16  Q. Any other bases for that opinion
17  other than the discussions that you have had, other
18  than your discussions with dealer clients?
19  A. No.
20  Q. Do you know of any other reasons
21  that manufacturers conduct audits?
22  A. It's to review the process by which
23  dealerships submit claims and the validity of those
24  claims.
25  Q. Anything wrong with the auditing of

Page 63

1  dealerships by manufacturers?
2  A. Wrong in terms of?
3  Q. Illegal or improper?
4  MR. FLEMER: Objection.
5  THE WITNESS: I'm not Datsun to
6  render a legal opinion.
7  BY MS. MCNELLIE:
8  Q. Do you think there is any valid
9  purpose for a manufacturer to conduct a warranty
10  audit?
11  A. In instances of fraud. That's the
12  only thing I can think of.
13  Q. Have you ever been present when a
14  warranty audit was being conducted?
15  A. Yes.
16  Q. At Eastside?
17  A. No.
18  Q. Any Ford or Lincoln Mercury store?
19  A. I don't believe so.
20  Q. How many audits have you witnessed?
21  A. More than two, less than six.
22  Q. Do you know how a warranty audit is
23  done in the Ford system?
24  A. Done in terms of?
25  Q. How the audit is actually conducted.

Page 64

1  A. Having read the warranty reports
2  that were issued in the Eastside case, clearly they
3  have someone schedule a warranty.
4  They clearly arrive, select specific
5  warranty claims that they wish to review, they
6  review those, they look at the documentation
7  supporting those.
8  They have an exit conference with
9  the dealer, write up a written report. That's what
10  happens from the documentation in this case.
11  Q. Is it your understanding that the
12  auditor reviews all of the repair orders for a
13  specific period of time?
14  A. That's not my understanding.
15  MS. MCNELLIE: Lunch?
16  (At which time, a short lunch
17  recess was taken.
18  BY MS. MCNELLIE:
19  Q. Have you ever reviewed the audit
20  findings for any of the other dealerships?
21  A. Yes.
22  Q. How many others have you reviewed?
23  A. More than three, less than seven.
24  Q. Does that include the Eastside audit
25  reports?