# EXHIBIT F

5. Several other actions by Ford were undertaken in an attempt to influence Mr. Woeste to sell or resign his franchise and to assist Reichert/KDG in controlling the Cincinnati Market. These actions involve the manipulation of warranty audits, manipulation of new vehicle allocation process, the arbitrary denial of LPE certification, and preferential distribution of marketing money.

### C.    Expert Conclusions

My conclusions are grouped into seven areas of damage based upon a common relationship. There can be more than one calculated damage in each of the seven sections below.

#### Warranty Issues

1. Beginning in 1996-1997 Ford began a process of "auditing" the claims submitted by Eastside under the new vehicle warranty programs of Ford. New Lincoln Mercury vehicles sold by a dealership are covered under a Ford warranty. The warranty allows a dealer to solve a customer complaint at no cost to the dealership or customer when the problem is due to poor design or manufacture of the vehicle. This benefits the dealer in that it is paid by the franchisor (Ford) to perform the warranty service work and is not forced to bill the customer.

Because of the length and scope of the new car warranties, warranty repair work accounts for a significant portion of a dealership's service and parts business. The satisfaction of the customer is important to the dealer and Ford, as a happy customer comes back to the dealership, rather than an independent repair shop, for more service; will consider replacing his car with the same make and may refer others to the dealership or brand. Lincoln Mercury dealerships are graded upon their customer satisfaction in the warranty process

Ford's stated rationale for the Eastside audits was the magnitude of claims submitted by Eastside and the assertion that the claims submitted were outside the "norm." The actual dollar volume of the errors determined by the Ford auditors through 5 audits from 1996 to 2001, involving almost 2 million dollars of warranty claims, is small. In my experience this indicates that Eastside was in substantial compliance with the manufacturer's procedures.

Exhibit I summarizes the audit results. The audits reviewed $ 1,903,667 in warranty service work and found errors of $ 17,369, or less than 1 % error. Note on this Exhibit I that the initial repayment sought by Ford from the audits was $ 37,954.69 but under further review and analysis, Ford, apparently recognizing the imprecise and subjective nature of its audit process, reduced the original disallowance by greater that 50% and accepted repayment of $ 17,369.65.

Based upon my experience with automotive clients, warranty audits are designed to change the dealership's behavior by reducing the volume and size of warranty claims. The audits drive down the volume and size of warranty claims submitted. This damaged Eastside's reputation with its customers, reduced its profits, lowered the morale of dealership employees, and reduced the value of the dealership.

On April 9, 2001, Ford threatened severe penalties against Eastside and Mr. Woeste including the limitation on Mr. Woeste's ability to obtain another franchise, participate in Lincoln Mercury programs, and required Eastside to hire an "in dealer consultant". Mr. Walls and Mr. Carter both acknowledge that the magnitude of the penalties was too severe in light of the audit findings and the fact that no fraud occurred.

Exhibit II is a graph which indicates the impact that these audits had on the warranty sales volume of Eastside. The result was the decline in warranty service business due to the fear by individual mechanics and the shop manager that the next Ford audit would result in a "charge-back" or other penalties to the dealership.

Exhibit III details the volume of warranty service business by all of the Ford and Lincoln Mercury dealerships in the Cincinnati area as well as the direct competitors of Eastside. Note that the loss in sales volume by the other comparable dealerships is much less between 1998 and 1999 than was suffered by Eastside. There is a substantial increase in warranty sales volume in 2000 and 2001 while Eastside is in decline. The results of the direct competitors are comparable over time to the Ford-Lincoln Mercury group.

It is my opinion that the frequency and nature of the warranty audits at Eastside, including the progressive penalties, led to a decline in warranty sales volumes (and, consequently, gross profit) realized by Eastside. Without the impact of the warranty audits, the sales volume at Eastside would have been substantially the same as the results achieved by its competitors in the Cincinnati Market area.

Exhibit IV details what the sales volumes and gross profits of Eastside would have been, absent the warranty audits. The top section of this exhibit uses as the yardstick the actual results achieved by Eastside's direct competitors ( Kings Lincoln Mercury, Northgate Lincoln Mercury, Wyler/Stillpass Lincoln Mercury, Fryson/Ridgeview Lincoln Mercury and Dixon/Fairfiled Lincoln Mercury). As some of these direct competitors are dualed operations, I also compared their data against the warranty sales volumes of all Ford and Lincoln Mercury dealers in the Cincinnati Market. This comparative warranty sales data was obtained from Ford and is presented in the lower section of Exhibit IV. The far right hand column indicates the damage to Eastside for

Mercury has been suffering a decline in sales nationally, regionally and in the Cincinnati Market.

Eastside and Mr. Woeste would have saved a considerable sum of money on a monthly and yearly basis in the operation of the dualed facility. This conclusion is based upon my experience in the car business and my knowledge of Mr. Woeste's operations. The sharing of large fixed personnel and facilities expenses associated with auto dealerships is more efficient due to the economies of scale.

I looked at the staffing levels of the Chevrolet franchise and those of Eastside as well as the cost of operating separate facilities. A comparison of the number and job classification of the two dealerships is depicted on Exhibit VII. I determined where there was overlap or duplication, and summarized the cost of those inefficiencies that could be eliminated by operating a dualed facility. The individual savings by job classification and area of expenditure shown on Exhibit VIII.

I also considered the cost that would have been incurred by Mr. Woeste in the construction and ownership of a new car showroom and service write up area, a rental factor to reimburse Chevrolet for use of part of their facility, increased compensation for the employees that remained and the operating costs for the new facility. I offset these additional costs of operations against the calculated savings to arrive at the damage incurred by Eastside due to this denial of the opportunity to dual with the Chevrolet dealership. Exhibit VIII shows that these damages are $ 2,786,715.

Exhibit VIII includes only the extra costs incurred by Eastside for the years 1999, 2000, 2001, 2002 and the anticipated costs for 2003. Exhibit IX projects the next three years cost to Eastside of this based upon the assumption that the dealership would continue to be managed in the same manner. A present value factor of 4% was applied to this future cost to arrive at a damage of $ 1,507,689 as of December 31, 2003.

Exhibits VIII and IX indicate the actual and potential damages that are associated with operating costs of the facilities in a separate fashion. In addition, there are other costs not related to this issue, described below:

A. Eastside has spent $ 102,822, as detailed on Exhibit X, in updating its existing facility to continue to meet the Lincoln Premier program requirements. Had Mr. Woeste dualed Eastside in 1998 and constructed a new Lincoln Mercury facility, he would not have been required to spend this money.
B. Had Mr. Woeste been allowed to dual Eastside with Beechmont Chevrolet in 1998 or 1999 he would have moved his Honda franchise into the Eastside location. In 2000 Mr. Woeste undertook a major renovation of

7

his Honda facility at the request of Honda. After being denied the chance to dual the Eastside dealership with Chevrolet in 1998, Mr. Woeste again expressed to Ford in 1999 that he intended to dual Eastside with Beechmont Chevrolet and use the Eastside facility for Honda. He intended to sell the Honda dealership property.

Mr. Woeste still must dual the Eastside dealership with another franchise for it to be truly viable and when he does so he will still move Honda up to the current Eastside space and sell the Honda facility. The damage incurred by Mr. Woeste will be in the duplication of the double cost of renovations. Automobile dealership facilities are unique, so called "single purpose" facilities, which have very little value associated with the actual facilities as they are not useful for most other purposes. The improvements to the Honda facility will not improve the selling price of the dealership property when Mr. Woeste sells it. Consequently the money he spent on the Honda improvements were "wasted" because of Ford's denial of the dualing requests. Assuming that there is some value to a potential buyer from these new improvements, then the damage is the portion of the actual Honda improvements cost that is not recovered in a sale of that property. A fair estimate of this loss is 80% of the cost of the improvements or $ 704,240, as detailed on Exhibit XI.

### LPE Status

3. Mr. Woeste was denied approval to be certified as a Lincoln Premier Dealer on his initial try in 2000. Achievement of this status results in the ability of the dealership to earn a "bonus" for the sale of certain models vehicles. It is Mr. Woeste's contention that this denial was another attempt to deny him the economic benefits of selling Lincoln Mercury vehicles and to once again diminish the value he associated with his dealership so that he would resign or sell at a reduced price, to accomplish the planned consolidation of the market. On his second application for approval he was granted his status as a Lincoln Premier dealer. During the period from the date that he should have been approved through the date on which he was approved, the dealership was unable to ear a bonus in the amount of $ 8,618 as detailed by vehicle on Exhibit XII.

### Vehicle Distribution

4. The testimony of the General Manager of Eastside, Mr. George Beattie, is that there was preferential distribution of vehicles Reichert/KDG.

Ford's distribution of new vehicles to its dealer body has two components. The first is a mathematical or mechanical allocation methodology in which vehicles are allocated based on dealers' availability relative to their sales histories. This type of allocation methodology is known as "turn to earn". That is, the faster a dealer sells (turns) vehicles, the more vehicles it will earn for

8

Ford did not disclose to Mr. Woeste or the other dealers whose franchises were purchased that it was going to consolidate the market. This consolidation dramatically diminished the value of Mr. Woeste's Eastside franchise to everyone except the Ford and the consolidator, Reichert\KDG. The franchise agreement and franchise laws provide a level playing field among competitors to create a partnership between the franchisor, Ford in this case, and its dealer. Once a consolidation begins, the level playing field tilts dramatically in favor of the consolidator as it has market position and advertising benefits, not to mention the two dualed facilities, which will make Eastside a much less attractive purchase by a dealer who is not in the position of being the consolidator. That is the position in which Mr. Woeste now finds himself. Had Ford disclosed to Mr. Woeste its intentions, he would have been able to look for a buyer like Mr. Wyler at an opportune time to sell, before the consolidation began. At present, it is unlikely that a potential buyer will offer fair market value for a dealership in a market that is consolidated. Further, had Eastside not suffered the damages that were the result of Ford and Reichert\KDG actions, the dealership would be more profitable and possess a greater Blue Sky value.

Experience dictates that with a willing buyer and a willing seller will establish the value of a franchise based upon the expectations of the buyer and seller as to the projected results of the dealership. Hence the determination of the Blue Sky. Mr. Woeste's dealership would certainly have been worth as much as was paid by Ford for the Wyler Franchise considering the operating results Eastside was achieving, which were better than the Stillpass /Wyler dealership. If Mr. Woeste's dealership had not suffered the above losses resulting from Ford's and Reichert\KDG actions it would have been worth much more than the price paid to Mr. Wyler.

The value of Eastside's projected Blue Sky is the lost profits of the Eastside franchise multiplied by the ordinary factor applied to dealership profits to calculate a Blue Sky figure. Exhibit XXIII documents that the operating profits of the Eastside dealership were understated by $ 734,657 in 1999 and $ 681,909 in 2000. In my opinion, from my experience representing buyers and sellers in the Cincinnati are, is that a factor of 3 should be associated with these lost profits to arrive at the figure that Mr. Woeste would have added to the base value of a losing franchise, to reflect the value of a profitable franchise. The diminished value is calculated on Exhibit XXIII to be $ 2,124,849.

As a consequence of the consolidation, market representation actions, and other actions, the value of the Blue Sky of Eastside to anyone but Ford and Reichert\KDG is substantially reduced. The reduction in the Blue Sky value of Eastside to anyone other than Ford or the Consolidator is estimated to be in the range of $ 550,000 to $ 650,000.