**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **EASTSIDE LINCOLN MERCURY, INC. ET AL.,** | **:** | **CASE NO.  C-1-01-567** |
| | **:** | **Judge Susan J. Dlott** |
| **Plaintiffs,** | | **Special Judge William O. Bertelsman** |
| | **:** | |
| **v.** | **:** | |
| | **:** | **PLAINTIFF'S FINAL PRETRIAL** |
| **FORD MOTOR COMPANY, ET AL.,** | **:** | **MEMORANDUM** |
| **Defendants.** | **:** | |

_____

Pursuant to this Court's order, the Plaintiff, Eastside Lincoln Mercury, Inc. ("ELM"), hereby submits its Final Pretrial Memorandum as follows.

## I.    JURISDICTION

This action was originally filed by ELM in the Hamilton County Court of Common Pleas and removed by Ford Motor Company (hereafter referred to as "Ford") to this Court under 28 U.S.C. §1404 and federal question jurisdiction, 28 U.S.C. §1331. The jurisdiction of the Court is not disputed.

## II.    KIND OF ACTION

This is a franchise dispute arising out of Ford's[1] efforts to force ELM to sell its franchise to a competitor, Robert Reichert and the Kenwood Dealer Group (Reichert/KDG), or be terminated as part of an effort to "consolidate" or eliminate dealers from the Cincinnati Lincoln Mercury Market.  Ford's goal was to purchase, if

_____

1    Lincoln Mercury is a division of Ford.

possible, or terminate, if necessary, all Lincoln Mercury dealers in the Cincinnati market north of the Ohio River with the exception of Reichert/KDG who was intended to remain as the sole Lincoln Mercury franchisee, i.e., the market "consolidator".

ELM claims Ford breached its franchise agreement, violated the Ohio Motor Vehicle Dealer Act, R.C. § 4517.59, et seq., and the federal Automobile Dealer Day In Court Act, 15 U.S.C. §1222 ("ADDCA"). ELM also claims that Ford, and its employees, Messrs. Carter and Walls, committed several acts of fraud against it. ELM also claims that Reichert/KDG and the Ford Defendants engaged in a civil conspiracy designed to threaten, coerce or intimidate ELM into selling or terminating its franchise and/or to defraud it into doing the same.

### III.    <u>STATEMENT OF FACTS</u>

Bill Woeste and his Lincoln Mercury store, ELM, fell victim to Lincoln Mercury's national effort to reduce and reposition the number of franchises in its sales and service network. ELM, as a Lincoln Mercury franchisee, has spent nearly two decades, and millions of dollars, building the Lincoln and Mercury brands through selling and servicing their vehicles. At a time when both the Lincoln and Mercury brands have suffered from a huge drop in sales volume and market share - due to a lack of timely, popular and quality product from the manufacturer - Ford has made the challenge of surviving as a Lincoln Mercury dealer even more difficult and dependent on whether one is chosen as the market "consolidator".

It is undisputed that Lincoln Mercury embarked on a national consolidation

program at the end of 1998 to reduce the number of franchises.  The small and medium dealer programs were publicly announced, though the larger dealer program, the one applicable to ELM, was conducted in secret.

Jerry Carter, Lincoln Mercury Cincinnati Regional Manager, decided to consolidate the Cincinnati market under Reichert/KDG.  It is also undisputed that the Cincinnati market consolidation was <u>supposed to be</u> "purely voluntary" because Ford could not legally force dealers, like Bill Woeste, who did not wish to sell their stores to relinquish them to Ford or the chosen consolidator.

Mr. Carter, only the second Regional Manager in the nation to attempt to consolidate a large market, conducted the Cincinnati Market consolidation without rules or guidelines and without supervision from the Lincoln Mercury home office.[2]  ELM claims that Mr. Carter, whose performance was judged, in part, by his success in consolidation, and the other Defendants engaged in a series of actions designed to either terminate Mr. Woeste as the dealer principal or make operating the dealership so unprofitable and problematic that Mr. Woeste would be forced to sell the dealership to either Lincoln Mercury or to Reichert/KDG.

**1.    Bill Woeste has been an excellent Lincoln Mercury dealer and ELM is a successful franchise.**

Mr. Woeste operates a group of financially successful automobile franchises, collectively referred to as the Beechmont Automotive Group.  Mr. Woeste has been the

---

2    Counsel for the Lincoln Mercury/Ford Defendants has agreed to stipulate that the conduct of the Lincoln Mercury/Ford employees at issue in this action occurred within the course and scope of their duties and within the authority provided by Lincoln Mercury/Ford.

"dealer principal" at ELM since he purchased the dealership in 1986, a period of eighteen years.  ELM is not the largest Lincoln Mercury store in the Cincinnati market in terms of unit sales, though it is often a respectable second or third.  However, ELM has always been the Cincinnati market leader in customer satisfaction in sales and service, a crucial parameter of dealer performance.

Even Jerry Carter admitted ELM "represent[ed] the brand well" in years 2000 and 2001 and may have had the highest customer satisfaction scores for sales in the Cincinnati market.[3]  In 2003, ELM won the prestigious Lincoln Mercury "Presidents Award", an award that places ELM in the top ten percent (10%) of all Lincoln Mercury stores in the nation in sales and service satisfaction.

Al Walls, Cincinnati Regional Manager for Ford's Customer Service Division ("FCSD"), testified that ELM has good service technicians and has been at or near the top of the Cincinnati market in customer satisfaction for service ever since he has worked in the region.[4]  In fact, Mr. Walls has taken his wife's car to ELM for service.[5] George Beattie, ELM General Manager, testified that ELM has historically had great customer satisfaction numbers.[6]

**2.      Market Consolidation means buy-out or replacement of unwanted dealers so that the stores in a market are controlled by Lincoln Mercury's hand-picked "Consolidator".**

---

3      See J. Carter depo. at 92-94.

4      See A. Walls depo. at 48.

5      Id. at 46-47.

6      See G. Beattie depo. at 53.

At the end of 1998, Lincoln Mercury embarked on a business strategy of eliminating a significant portion of its dealer network.  Consolidation is described in Ford's "secret" internal documents as an "overall dealer count reduction strategy" or "dealer reduction objective".[7]  Forrest Brown, Lincoln Mercury Network Development and Contracts Manager, knew that if large dealer franchisees in an unconsolidated market learned they were the target of a consolidation, <u>the purchase price of the dealerships would go up and would exceed Ford's budget for the action</u>.[8]  Ford claims, however, that dealers are entitled to "fair market value" for their franchises at the time of sale.[9]

Lincoln Mercury's goals in consolidation were ambitious and wide ranging.  It intended to accomplish the following:

1.    **reduce dealer count**[10];

2.    **reduce "intra-brand" competition among Lincoln Mercury dealers**;[11]

3.    increase exclusivity of the Lincoln Mercury brands;[12]

---

7    <u>See</u> J. Gwaltney depo. at 64 and Plaintiff's Exhibit 1, "Private Capital Market Consolidations - Regional Proposal/Process Guidelines", hereafter referred to as "consolidation guidelines".  All exhibits referenced herein will be separately filed with the Court under seal.

8    <u>See</u> <u>id.</u> at 172-173.

9    <u>See</u> F. Brown depo. at 162-163.

10   <u>See</u> Exhibit 1, consolidation guidelines.

11   <u>See</u> J. Gwaltney depo. at 32; F. Brown depo. at 133-134; M. Crowley depo. at 56-57; and K. Ertel depo. at 25-26.

4.     increase profitability for dealers who survive consolidation;[13] and

5.     increase control over dealers in the consolidated markets in the areas of:

    a.     market representation actions and facility upgrades, and

    b.     resale opportunities, including Ford's right of first refusal or option to purchase all consolidated stores in a consolidated market if part of one is offered for sale.[14]

Lincoln Mercury also expected to benefit by having more profitable dealers and potentially reducing its own overhead costs to service those dealers.[15]  Consolidation of the Cincinnati market was so important to Ford that it provided Jerry Carter with $3,000,000 to fund the consolidation.[16]

Jerry Carter, Lincoln Mercury Regional Manager, intended to purchase the ELM franchise and award it to Reichert/KDG to complete the Cincinnati market consolidation.[17]  Before consolidation began in 1998/1999, the Cincinnati market consisted of six Lincoln Mercury stores and five dealer principals.  Four stores now

---

12    See K. Ertel depo. at 25-26.

13    See J. Gwaltney depo at 32-33 and M. Crowley depo. at 56-57.

14    See F. Brown depo. at 163-166, 168-169, 177-178, 238-240 and M. Crowley depo. at 107-108.  See also Exhibit 2, Consolidator Agreement, at Right of First Refusal ("ROFR") § 2.  Section 2 of the ROFR grants Ford the right to match any offer and purchase the entire consolidated operation if the consolidator attempts to sell a significant interest in any single consolidated dealership.

15    See J. Gwaltney depo. at 32-33.

16    See J. Carter depo. at 267.

17     See J. Carter depo. at 59-61 and 160 and M. Crowley depo. at  61.

remain, three of which are owned by Reichert/KDG, Ford's consolidator; the fourth is owned by ELM.[18]  Two stores, Jim Dixon and Wyler, were purchased by Ford for $1,500,000 and $750,000, respectively, while a third (Florence) was made its own "single point market".  The Dixon store was given to Reichert/KDG and Wyler was closed.

According to Lincoln Mercury's national franchising manager, Michael Crowley, the "formal" process of terminating a dealer takes years and rarely ever happens because of state franchise laws that protect dealers.[19]  In addition, a dealer that Lincoln Mercury intends to terminate may sell his dealership at any time during the termination process, thwarting the effort to regain the dealership.[20]  Mr. Crowley claims the "most effective way" to retake a dealership (and replace a dealer) is to buy the dealership.[21]

The secret consolidation guidelines require that Regional Managers assess the likelihood of "[a]chievement of dealer reduction objective" and confirm that the consolidation plan will accomplish an "[o]verall dealer count reduction strategy."[22]  Each Regional Manager must submit a color-coded map of the present market configuration

---

18   See Ford Defendants' Memorandum in Support of Their Motion for Summary Judgment at 6.

19   See M. Crowley depo. at 89-90.

20   Id.

21   Id.

22   See Exhibit 1.

and a color-coded map of the proposed market configuration.[23]  These program

documents make clear that market consolidation means dealer elimination, replacement

and reconfiguration of the market.

**3.     Involuntary consolidation methods are illegal and are against Lincoln Mercury policy.**

Whether the consolidation program was "voluntary" is hotly disputed and

assuredly not a "fact" as stated in Lincoln Mercury's memorandum in support of its

motion for summary judgment.  The architects of the program claim they <u>intended</u>

market consolidation to be strictly voluntary, without intimidating or penalizing dealers

who didn't want to leave the system.[24]  It is allegedly against Lincoln Mercury policy to

develop a strategy of disadvantaging dealers who don't want to sell their franchises.[25]

After the consolidation program had been underway for two years, Jim Gwaltney,

former General Sales Manager at Lincoln Mercury, its number two management

position, admitted in a Cincinnati Region dealer meeting that Ford was no longer

interested in "**torturing**" dealers out of the Lincoln Mercury business, inferring that

"torture" was at one time used to force dealers into relinquishing their stores.[26]  Bill

Woeste attended the meeting, and heard both Mr. Gwaltney's torture comment and his

_____

23  <u>See</u> <u>id.</u>

24  <u>See</u> J. Gwaltney depo. at 52-53 and M. Crowley depo. at 74.

25  <u>See</u> J. Gwaltney depo. at 53.

26  <u>See</u> <u>id.</u> at 47-49.

promise that, in the future, Ford would only "work with" dealers who wanted to quietly exit the business.[27]

Ford's senior management admit that state franchising laws and other laws are violated by intimidating or coercing a franchisee into giving up his franchise.[28] The prohibition of intimidation or coercion was covered at several meetings that Jerry Carter would have attended.[29] Regional managers were told that Ford was interested in consolidation only where it was voluntary and in the best interests of the selling and buying dealer, described as a "natural opportunity".[30]

**4. Jerry Carter consolidated the Cincinnati market without a "rulebook" and slated ELM to be replaced in year 2000.**

In late 1998, Jerry Carter and his staff developed the Cincinnati Region Growth Strategy Plan for 1999 ("1999 GSP"), a highly sensitive planning document for the Region that was described as the Region's business plan.[31] The GSP described the Cincinnati market as a CMA, which meant consolidated market opportunity.

Mr. Carter began consolidating his region before Lincoln Mercury rolled out Mr. Gwaltney's national consolidation program.[32] Though Mr. Carter denies he illegally

---

27  See W. Woeste depo., Vol. I, at 32-33; see also Gwaltney depo. at 117-118.

28  See M. Crowley depo. at 75.

29  Id. at 75.

30  Id. at 76; see also F. Brown depo. at 72.

31  See Carter depo. at 124-126 and 1999 GSP attached as Exhibit 3.

32  See M. Crowley depo. at 60; J. Gwaltney depo. at 65; and J. Carter depo. at 143.

forced the ELM "replacement opportunity" to happen, no one at Lincoln Mercury

supervised his efforts[33] and he and Keith Ertel were admittedly "just making it up as they

went along."[34]   Though some regions nominated multiple dealers for the consolidator

position and submitted proposals for Mr. Gwaltney's review (the consolidation

guidelines require that the Regional Manager discuss the consolidation with other

interested dealers), Mr. Carter simply selected Reichert/KDG, ELM's chief competitor,

for the role of consolidator and moved forward with his plan.[35]   Jerry Carter had a

"verbal agreement" that Mr. Reichert would be the consolidator even before the first

agreement was signed in June 2000.[36]

      Mr. Carter's 1999 GSP listed various market representation actions planned for

the Region, including which dealers would be "rehabilitated"[37], "rationalized"[38]; or

"replaced".[39]   ELM was included in this last ominous category – even though Mr. Carter

admitted Mr. Woeste did not express any interest in retiring or relinquishing his

---

33   See M. Crowley depo. at 151.

34   See K. Ertel depo. at 52.
35    See J. Gwaltney depo at 71-72; K. Ertel depo. at 42.

36    See J Carter depo. at 182.

37   "Dealer rehabilitation" involved improving weak performers.

38   "Dealer rationalization" referred to dealerships Ford would not replace if the point became open.

39   "Dealer replacement opportunity" meant that the market point would remain open but that the dealer franchisee would be replaced.  See J. Carter depo. at 128-129.

franchise, never offered to sell the franchise, and repeatedly stated he did not want to sell.[40]

Lincoln Mercury's reviewed the success of its consolidation strategy in a Power Point presentation of August 2000.[41]  Dealers Lincoln Mercury considered "low hanging fruit" – whatever that term meant – were to be consolidated first, though Ford realized that as it got past the initial group of dealers, consolidation would become more difficult and options other than "Plan A" would have to be utilized.[42]  Regional managers were given bonuses or positive performance reviews for the number of consolidations they achieved.[43]

In 2000, an unidentified person, presumed by all to be a Ford employee, provided Mr. Woeste with both telephone calls and highly sensitive documents, including the 1999 GSP[44] and Jerry Carter's personal performance evaluation.  The 1999 GSP indicated that Ford intended to replace Mr. Woeste as dealer principal in

---

40   See J. Carter depo. at 78, 149.

41   See Exhibit 4.

42   See id.

43   See M. Crowley depo. at 117.

44   See W. Woeste depo., Vol. I, at 57-63, 94-98.  Defendant Carter believes the Ford informant is Craig Hall, former General Zone Manager of the Cincinnati Region, though the informant has not revealed his identity.  See J. Carter depo. at 232-238.  Mr. Hall denies providing the Plaintiffs with any information, though during this same period he was transferred to a new position at Lincoln Mercury national headquarters in Irvine, CA, so that he could have a "fresh start".  See C. Hall depo. at 30-31, 158-159.

year 2000 so that Ford could award the franchise to Reichert/KDG.[45]  After Mr. Woeste

contacted Jerry Carter to ask why he was identified as a dealer to be replaced, an

attorney from Ford called and demanded the return of the GSP document.  Mr. Woeste

had no intention of being "replaced" and couldn't understand why he was on the list.[46]

Mr. Carter testified that putting dealers on the "dealer replacement list" was

totally subjective and determined by he and Keith Ertel.[47]  Mr. Carter further testified

that the persons on the replacement list had either 1) expressed an interest in exiting

the Lincoln Mercury business or 2) were elderly and/or had no acceptable succession

plan.[48]  In either event, the dealers on the list were not intended to remain dealers.

Though Mr. Woeste did not fall into either category, Mr. Carter placed him there

because he subjectively thought Mr. Woeste would be "willing to sell" if someone would

come up with the "right dollars" or a "pot of money" and because he subjectively felt **the

Lincoln Mercury franchise "was never near and dear to Bill's heart".**[49]

Keith Ertel placed ELM on the list of dealer replacement opportunities because

he considered it a "marginal" or "marginally performing" dealership in the area of market

share and, he guessed, profitability, though he agreed ELM had high customer

---

45  See W. Woeste depo., Volume I, at 30-31, 63-66.

46  See id. at 25-33, 63-66
47  See J. Carter depo. at 129-130.

48  See id. at 130-136.

49  See J. Carter depo. at 136-137.

satisfaction numbers.[50]  Significantly, Mr. Ertel divulged that a dealer could be identified as a dealer replacement opportunity <u>if Ford simply wanted to replace the dealer or close the point</u>.[51]  More significantly, Michael Crowley, former Lincoln Mercury National Franchising Manager, believes Mr. Carter placed ELM on the dealer replacement list <u>because keeping Mr. Woeste around was "not part of the plan"</u> and as of June 2000, when the first consolidator agreement was drafted, it was intended by Ford that Mr. Reichert would be successful in obtaining ELM from Mr. Woeste.[52]

Mr. Carter's 5-year plan showed ELM was targeted for replacement in 2000, though he conveniently claims the GSP was not an action plan but, rather, his way of "monitoring things".[53]  In contrast, other Ford representatives testified that the GSP contained strategic goals that needed to be accomplished and for which regional managers were rewarded.[54]

**5.    The Consolidator Agreement between Lincoln Mercury and Reichert/KDG allows ELM's competitor to control what happens to the ELM dealership.**

---

50  <u>See</u> K. Ertel depo. at 13-16.

51  <u>See</u> <u>id.</u> at 19.

52  <u>See</u> M. Crowley depo. at 59 and 160.

53  <u>See</u> J. Carter depo. at 144-146.

54  <u>See</u> K. Ertel depo. at 34-37, 113-115 and M. Crowley depo. at 117.

The Reichert/KDG consolidator agreement[55], in particular the Right of First Refusal provisions ("ROFR"), requires that Reichert/KDG and Ford <u>jointly</u> control all market representation actions, i.e., anything that involves or impacts the franchise[56], and facilities actions, including relocation/dualing requests, for the Cincinnati dealerships north of the Ohio River, <u>a geographic and market area that includes ELM</u>, in exchange for the right of Ford to purchase the entire consolidated dealer group if a significant component of one dealership is ever offered for sale.  Ford and Reichert/KDG were so certain they were going to succeed in fully consolidating the Cincinnati market, and that Mr. Woeste would sell ELM, that they entered into a verbal agreement (later memorialized in the ROFR of June 16, 2000, and the Consolidator Agreement of December 10, 2001) that specified how the "post-consolidation" Cincinnati market would be operated.[57]  The June 2000 ROFR agreement states:

> 3.  Future Facility Actions:  **All future facility actions for which of the Lincoln Mercury dealerships located in the Cincinnati metro market area north of the Ohio river must be agreed to <u>jointly</u> by the Company and Kenwood.**
>
> 4.  Future Market Representation Actions:  **All future market representation actions ... must be agreed to <u>jointly</u> by Kenwood and the Company.**  Should a market study indicate the

---

55  See attached Exhibit 2.

56   Defendant Carter described a "market representation action" as "**anything involving the franchise**, F-2 assignments (designation of the person who may act on behalf of the franchise), relocations, **anything that impacts the franchise**." <u>See</u> J. Carter depo. at 116.

57  <u>See</u> J. Carter depo. at 181-182 and Exhibit 2.

> need for additional Lincoln or Mercury representation in Cincinnati
> metro market area north of the Ohio river, Kenwood shall have the
> right to accept or reject the representation opportunity before it is
> offered to any other applicant. ****[58]

In short, Ford, through the ROFR and the later, full-blown consolidator agreement, empowered ELM's <u>chief rival and only competitor in the market</u> to determine what ELM could do with its franchise and what would happen in the Cincinnati market. When confronted with the literal terms of the ROFR, Mike Crowley and Forrest Brown of Lincoln Mercury's headquarters testified "the document doesn't mean what it says" and claimed state laws would protect Mr. Woeste's franchise from Reichert's ability to exert the control described in the ROFR.[59] This is an admission that the express terms of the ROFR violate the law. However, ELM has been denied the opportunity to relocate and/or dual, something that ELM believes, and the ROFR agreement confirms, has been blocked or vetoed by Reichert/KDG.

**6.    Mr. Carter attempted to coerce, threaten and intimidate Mr. Woeste into selling the ELM franchise and made it clear that Mr. Reichert would be the only potential purchaser.**

Mr. Carter raised the subject of acquiring ELM from Mr. Woeste and turning it over to Reichert/KDG on at least three occasions: once in 1998 and twice more in 2000. On the second occasion, Mr. Carter asked Mr. Woeste to sell ELM to Reichert/KDG under a proposal that envisioned Ford purchasing a dealership operation which

---

58  <u>See</u> Exhibit 8 at ROFR ¶¶ 3 and 4 (emphasis added).

59  <u>See</u> M. Crowley depo. at 167-168; <u>see also</u> F. Brown depo. at 252-253.

included both Lincoln Mercury and Volvo stores, so that Woeste could swap ELM in exchange for Ford supplying Woeste the Volvo piece.[60]  Such proposals from a Regional Manager are highly irregular, as Mr. Carter was expected by his superiors to remain neutral in negotiations between his dealers.[61]

Mr. Carter also orchestrated a meeting at Regional Headquarters between Messrs. Woeste, Reichert and himself where he announced at the meeting that they were there to discuss how he could put Mr. Woeste in another Volvo store and Mr. Reichert into ELM, and wanted the discussions put on a time line.[62]  At this point, Mr. Carter told Mr. Woeste ELM wasn't worth much — maybe $200,000 to $300,000 – even though Carter had recently purchased two other "consolidated" dealerships in the Cincinnati Region for many times that amount.[63]

Mr. Gene Mullins, former sales manager for Reichert/KDG's Northgate LM store, testified that Pat Letart, Lincoln Mercury Zone Manager for the Cincinnati market,

---

60  See J. Carter depo. at 148-152. Mr Woeste already owned a Volvo franchise and openly desired another.

61  See M. Crowley depo. at 185; J. Gwaltney depo. at 90; and K. Ertel depo. at 67.

62  See Woeste depo., Vol I, at 119-121.

63  Mr. Carter told Mr. Woeste that his dealership was only worth $200,000 to $300,000, even though two recent dealership sales which involved 1) historic sales numbers near or below ELM's numbers, 2) worse CSI numbers, and 3) an admitted worth of "zero" were purchased for many times that amount.  Mr. Carter paid $750,000 for Jeff Wyler Lincoln Mercury and more than $1,5000,000 for Jim Dixon Lincoln Mercury that was immediately sold to Reichert/KDG for $1,500,000 **less** than Ford's purchase price.  See J. Carter depo. at 62-63, 76 and 87.

admitted to him and others at Reichert/KDG that he was manipulating the vehicle allocation system in a manner designed to damage ELM's business and benefit Reichert/KDG.[64]  Mr. Letart also informed Reichert/KDG that Ford was providing preferential distributions of marketing money to Reichert/KDG.[65]  These efforts, which were designed to punish ELM for its low pricing of Lincoln Mercury vehicles and to assure that Reichert/KDG would be the only Lincoln Mercury dealer in the Cincinnati market, were done with the full understanding, cooperation and active participation of Reichert/KDG management.[66]  In reliance on Ford's assistance, Mr. Mullins trained his sales staff to advise its customers 1) that Reichert/KDG received preferential treatment from Lincoln Mercury regarding availability of vehicles and 2) regardless of ELM's advertising and promotions, ELM would not be able to obtain the vehicles necessary to complete the sale.[67]

### 7.    Ford Abused the Warranty Audit Process to Coerce, Intimidate and Threaten Plaintiff to Force the Termination or Sale of ELM

Plaintiffs agree that ELM spent several years in the warranty audit process, though they believe the testimony of Jerry Carter and Al Walls, coupled with the results of the audits, prove ELM's presence in the audit process was unjustified and that audits, particularly the last one, were used to force Mr. Woeste to sell ELM.  The repeated

---

64   See Manuel Eugene "Gene" Mullins depo. at 13, 32, 34-45, 81-85, 87-93.

65   See M. Mullins depo. at 13, 32, 46-51, 64-65, 87-93.

66   See M. Mullins depo. at 41-48, 82-88.

67   See id. at 52-54.

warranty audits terrorized ELM's staff and drove down the amount of warranty work performed, thereby reducing both the profitability and resale value of ELM.

Warranty audits critically impact the financial success of a dealership because warranty repairs account for greater than fifty percent (50%) of all repair work performed by a dealership.[68]   Ford's Customer Service Division ("FCSD"), locally managed by Al Walls, conducts the audits.   Ford considers its warranty repair manual, including the penalty matrices for violation thereof, a component of the SSA.   The penalties contained in the warranty manual go the heart of the continued ownership and control of the dealership.[69]   Despite the alleged "deficiencies" in ELM's warranty work cited in Ford's Memorandum, Mr. Carter admits that his investigation of ELM (after three years of audits by FCSD) revealed less than $20,000 in total chargebacks on well over $1,000,000 in warranty work.[70]

The April 2001 audit is a clear example of Ford's use of coercion, intimidation and threats used to force the sale of ELM.   The audit resulted in a finding of less than two percent error on $500,000 of work, for a total chargeback of approximately $5,973.[71]   Yet, as a consequence of this third audit, in which it received the "best" result it could obtain, ELM received an audit summary letter in which termination was

---

68   See A. Walls depo. at 30-31.

69   See J. Carter depo. at 244-245.

70   See J. Carter depo. at 248-250.

71   See A. Walls depo. at 70-71; see also audit report of May 8, 2001, attached as Plaintiffs Exhibit 14 to the J. Gwaltney depo. and attached hereto as Exhibit 15.

18

referenced four times, and terms such as "serious irregularities" and "improprieties" were used freely.[72] Mr. Walls conceded at deposition that the audit findings constituted a fairly modest amount of error by ELM, without any finding of fraud.[73] However, Mr. Walls testified that Ford's warranty audit matrix guarantees that penalties would be levied against ELM as a result of the audit, and potentially worse penalties if fraud or other misconduct was found.

Jerry Carter, himself a former FCSD Regional Manager, had advance notice of the audit [74] and testified he had an "agreement" with Cincinnati FCSD before the closing conference that ELM would not be penalized in any way as a consequence of the audit.[75] Relying on this "deal", Mr. Carter sent a stand-in to the closing conference, a conference he is required to attend.[76] Soon thereafter, Mr. Carter claims he learned ELM and Mr. Woeste had been penalized and that termination was recommended by FCSD for failure to agree to a list of sanctions including the hiring of a $30,000 in-dealer consultant to correct a $6,000 problem.[77]

---

72  See M. Lombardi depo. at 65-66 and Exhibit 5.

73  See A. Walls depo at 70, 105-106.

74  Keith Ertel testified that Jerry Carter was aware the warranty audit was going to occur before it happened.  See K. Ertel depo. at 113.

75  See J. Carter depo. at 9, 250-251 ("There would be no recommendations of termination or any of this stuff.").

76  Id. at 251.

77  Id. at 251-252.

In direct conflict with Mr. Carter's testimony, Al Walls (who conducted the closing conference) testified there was no "deal" of any kind or nature with Jerry Carter before the closing conference regarding the audit result or the suspension of penalties.[78]  In fact, Jerry Carter is the only Ford witness who claims there was a deal or agreement between FCSD and himself to prevent penalties from being assessed against ELM.

The closing conference was awful.  Mr. Walls told Mr. Woeste at the conference that he was "sick and tired" of ELM; that ELM must hire a $30,000 Ford "in-dealer" consultant to review its processes; and that if Mr. Woeste objected to the consultant, Mr. Walls would recommend termination of ELM's franchise.[79]  Mr. Walls presented Mr. Woeste with an agreement to hire the in-dealer consultant and expected him to sign it then and there.[80]  When Mr. Woeste wouldn't agree to hire the $30,000 in-dealer consultant without first speaking to his attorney, Mr. Walls read him the "Miranda rights for a dealership owner" and threatened him with termination of his dealership, termination of Ford affiliated dealerships, and denial of future dealership opportunities and programs, etc, if he didn't accept the penalty.[81]

Mr. Walls candidly testified that he was prepared to recommend termination, and that he had no choice but to recommend termination, though no action was taken

---

78  <u>See</u> A. Walls depo. at 86-87.

79  <u>See</u> A. Walls affidavit at ¶ 12-13 and depo. at 86-87.

80  <u>See</u> W. Woeste depo., Vol. II, at 27-28 attached as Exhibit 14.

81  <u>See</u> W. Woeste depo., Vol. II, at 27-28; <u>see</u> A. Walls depo. at 85-87.

against ELM because of the filing of this lawsuit and the intervention of Jerry Carter.[82]

Randy Baughman, Team Leader for Global Warranty operations, testified ELM should

have been terminated for not accepting the in-dealer consultant.[83]

       After letting ELM "twist in the wind" for three and a half weeks following the

closing conference, and with FCSD's recommendation of termination hanging over

ELM's head, Mr. Carter sent an email to Lincoln Mercury Headquarters asking that the

penalties be lifted and that ELM be removed from the warranty counseling process.[84]

This "request" occurred after Mr. Carter received a letter from Mr. Woeste's counsel

threatening legal action if the penalties were not lifted.  Mr. Carter now claims that had

he known what the FCSD recommendations were going to be, he would have pre-

empted the meeting and sent the same email with the same recommendation of "no

action" against ELM.[85]  In short, Mr. Carter had such clout that he removed ELM from

the audit process by simply sending an email to Lincoln Mercury headquarters advising

that the penalties were not warranted.[86]  If Mr. Carter truly had a deal with FCSD, and

--------

82  See A. Walls depo. at 86-88 and 102-106.

83  See R. Baughman depo. at 136-137 attached as Exhibit 17.

84  See J. Carter depo. at 246-250 and Exhibit 6 (email) and 7 (letter from ELM counsel).

85  Id. at 252-254.

86  See J. Carter depo. at 167, 246-253.  Mr. Walls testified he was aware that Dixon Lincoln Mercury, the predecessor to Reichert/KDG's Fairfield Lincoln Mercury, was audited twice and received chargebacks, though after Reichert/KDG purchased the store, there have been no audits.  See A. Walls depo at 90-91.

was not using the audit process to coerce, intimidate or threaten Mr. Woeste, there is no reason for him to have waited three and one-half weeks to "kill" the audit penalties and to have acted only after receiving a letter from ELM's counsel threatening legal action.

From a merits standpoint, both Al Walls and Jerry Carter testified the penalties which resulted from the audit were too extreme given the nature of the audit findings.[87] Mr. Carter conceded the penalties were not warranted and Mr. Walls now admits that Ford's demand that ELM hire the in-dealer consultant was extreme in light of the findings made in all three previous warranty audits.  Mr. Walls now says he "didn't agree" with the in-dealer consultant, the termination recommendation for refusal to hire the consultant, or the suspension of additional franchise opportunities, given the small amount of chargebacks and the non-existence of fraud.[88]  But his conduct at the closing conference, during Ford's campaign of intimidation, is utterly contradictory.

Mr. Woeste testified that he believes Mr. Carter put ELM into the audit process to intimidate and harass both his personnel and him and that he, in fact, felt harassed.[89] He notes that the warranty auditor came to the dealership stating he would "find fraud". Within a few days, the auditor had concluded there was no fraud, but rather only a few minor administrative matters which needed correction, and told ELM personnel it was nearly out of the audit process.  The auditor even slyly suggested that ELM "make a few

---

87  See J. Carter depo. at 167, 246-253 and A. Walls depo. at 85-86.
88  Id. at 105-106.

89  See Woeste depo., Vol. I, at 66-72, 76-81, and, Vol. II at 15-18..

extra wiper blade claims" to drive the "cost-per-repair" figure lower as a means of getting out of the audit process.[90]

Mike Crowley, former Lincoln Mercury franchising manager, testified that the worst thing that you can do to a dealer is terminate his franchise.[91]  Mr. Crowley testified that had he received the audit letter ELM received after the 2001 audit, <u>he would have felt threatened.</u>[92]

The actions of Ford related to warranty audits led to a decline in ELM warranty sales at a time when warranty sales in the Cincinnati market as a whole were <u>skyrocketing.</u>[93]  George Beattie testified that the repeated audits upset ELM workers, caused severe interference with operations, and cost ELM thousands of dollars in claims not written because mechanics didn't pursue them any longer for fear of triggering another audit.[94]  ELM's annual warranty sales, which were previously in the neighborhood of $1,000,000, dropped to $500,000 over the course of several years as a consequence of the warranty audits.[95]  ELM also suffered a chargeback penalty of $5,973 at the 2001 audit.

---

90  <u>See</u> W. Woeste depo., Vol. II, at 23-25.

91  <u>See</u> M. Crowley depo. at 93-94.

92  <u>Id.</u> at 94.
93  <u>See</u> W. Woeste depo., Vol. II, at 16.

94  <u>See</u> G. Beattie depo. at 81-83.

95  <u>See</u> G. Beattie depo. at 83-84.

8.  **Ford has permitted Reichert/KDG to "dual" two of his three Lincoln Mercury dealerships with competitor products but has denied this permission for ELM to relocate.**

When a brand is failing, the opportunity to dual, i.e., place two franchises or franchise operations in the same facility, is critically important to survival. The administrative costs of two dealerships may be cut in half through shared management and the facilities expenses may likewise be halved. In fact, one of Reichert/KDG's sales managers from a dualed store recently stated at a dealer meeting that the only Lincoln Mercury franchises in the Cincinnati Region that are profitable are duals and his store would not be profitable if it weren't a dual. If ELM were allowed to dual, and became profitable, it would be worth more money to Bill Woeste and be that much more expensive to a potential purchaser such as Ford or Reichert/KDG.

Despite what Ford and Reichert/KDG may say, the jury is entitled to determine whether Ford and Reichert have been carrying through with the terms of the ROFR, i.e., is Reichert/KDG "jointly" determining with Ford whether ELM may relocate and/or dual? The ROFR agreement specifically granted Reichert/KDG the right to control what happens to ELM from both a facilities and a market representation standpoint and ELM has every reason to believe Reichert/KDG is exercising a veto on ELM's relocation and/or dualing request.

Mr. Woeste approached Jerry Carter in early 1998 and from 2000 until he left (and his successor from the time he left until the present) with requests to relocate ELM to his Isuzu store which is located on Beechmont Avenue next to a Chevrolet dealership

24

he owns and "dual"[96] or combine only the service operations of the two stores. The only dualed part of the operation would be the service bays; showrooms and service write up areas would be completely separate from the neighboring dealership. Mr. Woeste hoped to obtain the obvious cost savings available through combining these operations. Had ELM been allowed to relocate and dual its service operation, it would have been able to better control overhead costs and save $300,000 to $600,000 per year.[97]

Instead of permitting the dual, Ford told Mr. Woeste the only acceptable arrangement would be for him to demolish the existing Chevrolet facility and build a huge, free-standing Lincoln Mercury store in its place.[98] Ford actually drew up plans for its version of the proposed dual, but Jerry Carter then refused to consider the dual in any configuration and stated he "really wanted Mr. Woeste to sell" ELM to Ford.[99]

Despite the denial of Mr. Woeste's dual, Mr. Carter approved Reichert/KDG's request to dual his recently acquired Fairfield Lincoln Mercury store.[100] Even after Ford gave Reichert/KDG over $1,500,000 to purchase the Fairfield store as part of the

---

96  Dualing allows cost savings (in areas of consolidated expenses such as facility overhead and personnel) and promotes increased revenues through creation a larger customer base that generates more overall vehicle sales and service and parts sales. See G. Beattie depo. at 46-51 and W. Woeste depo., Vol. II at 40-41.

97  See W. Woeste depo., Vol. II, at 40-42; see also G. Beattie depo. at 46-48.

98  See Woeste depo., Vol. II, at 35-39.

99  See Woeste depo., Vol. II at 38-39.

100  Carter arranged for Ford to first buy Dixon's dealership-at inflated prices for the physical assets, real estate and Blue Sky—after which it sold the business to Reichert/KDG for $1.5 million less than Ford had just paid for it. See Reichert depo. at 88-92.

market consolidation, it immediately lost money - lots of it - and Mr. Reichert asked Mr. Carter to allow Reichert/KDG's store to dual with its nearby Volkswagen/Kia/Subaru store.[101]  Reichert/KDG admitted Fairfield lost $750,000 in less than a year with losses accruing at a rate of fifty thousand dollars a month.[102]  Because it was given permission to dual by Ford, Reichert/KDG was able to erase these huge monthly losses, taking Fairfield LM out of the red and into the black.[103]

The Reichert/KDG Fairfield dual allowed by Ford was worse in all respects than the proposed Woeste dual.  Under the initial Reichert/KDG dual, all aspects of the combined Lincoln/Volkswagen/KIA/Subaru operation were shared and the salesmen "didn't care what cars they were selling" [104] Under the present configuration, the only portion **not** dualed is the showroom floor.  Both the customer service write-up areas and service bays are shared or contiguous.[105]  In addition, the Reichert/KDG Fairfield dual continues to this day to house Lincoln Mercury under one roof with Volkswagen, a competitive franchise.[106]

---

101    In the Spring of 2001, Reichert claims he had become frustrated over not receiving Carter's approval on his dualing proposal, and confided as much to Woeste.  Reichert knew of Carter's refusal to allow ELM to dual, and admits that he initiated this discussion with his competitor to find out if Woeste intended to sue him and Ford if Carter approved his request.  See R. Reichert depo. at 216.

102    See R. Reichert depo. at 200-202 and Exhibit 7.

103    See R. Reichert depo. at 200-202, 206-207, 216, and 221-222.

104    See R. Huser depo. at 18-19 attached as Exhibit 21.

105    See R. Huser depo. at18-19 and R. Reichert depo at 30-31, 212.

106    See J. Gwaltney depo. at 38.

Reichert/KDG's Northgate dual is also with Volkswagen and is a likewise a poor dual.  Volkswagen and Lincoln Mercury vehicles are "packed" into a very small showroom which denigrates both brands.

Dualing dealerships was not preferred by Lincoln Mercury during Jerry Carter's tenure as Cincinnati Regional Manager and was the opposite of what was expected from a consolidator.[107]  Nevertheless, Mr. Carter championed the Reichert/KDG dual of Fairfield Lincoln Mercury.[108]  Though the Reichert/KDG Fairfield and Northgate duals are supposed to unwind in a certain number of years, Ford's management admitted that it is very difficult to force a dealer to "de-dual" and the dual could last into the indefinite future.[109]

Even the outlying "single point localities" in the Cincinnati market, such as Middletown and Florence, are either dualed or have received permission to dual in the 2002 "market plan".  Cronin in Middletown is presently allowed to dual Lincoln Mercury with Jeep, a true competitor to Lincoln Mercury SUVs.

ELM has been given verbal, but not written, permission to dual a Maserati franchise at its present location.  The Maserati dealership does not generate a sufficient sales and service volume to support the Lincoln Mercury store.  ELM has again requested permission to relocate to the Isuzu building and offered to keep Lincoln Mercury service at its present location.  Even though the proposed relocation is next

---

107  See J. Carter depo. at 158 and M. Crowley depo. at 62.

108  See J. Carter depo at 157.

109  See M. Crowley depo. at 120.

door to one of the newest malls in the Cincinnati area, and ELM is losing money at a prodigious rate, the request was denied.

**9.    Ford illegally provided marketing and advertising funds to Reichert/KDG that were not made available to ELM.**

Senior Lincoln Mercury management testified that marketing monies cannot be awarded by Lincoln Mercury Regional management in a discriminatory fashion to a single franchisee or consolidated dealer group within a multiple point market, because to do so would have the effect of reducing the purchase price of a vehicle to the dealer who was advantaged.[110]    Mike Crowley and Forrest Brown both testified that marketing money must be made equally available to all dealers within a multiple point market, such as the Cincinnati market, on a per-unit, percentage of sales, or total amount basis because the discriminatory award of marketing monies within a market violates good business judgment, Ford's policies and the law.[111]

Bill Woeste received an anonymous phone call saying Reichert/KDG was given $50,000 in marketing money by Jerry Carter.  When confronted, Mr. Carter denied that $50,000 was given to Reichert, but he then quickly offered ELM $4,000 for an alleged program that ELM had not been told about.[112]

Discovery revealed Jerry Carter gave Reichert/KDG $105,000 from his regional marketing budget, allegedly as part of the Jim Dixon purchase, and disguised these

---

110    <u>See</u> J. Gwaltney depo. at 29-31 and F. Brown depo. at 145-146.

111    <u>See</u> M. Crowley depo. at 22-25, 35-37 and F. Brown depo. at 145-146.

112    <u>See</u> W. Woeste depo., Vol. I, at 94-98.

funds with false entries in Ford's checkbook. Ford's accounting records indicate Mr.

Carter provided all three of Reichert/KDG's stores with $80,000 in co-operative

advertising funds ("co-op") and the Fairfield store with another $25,000 in grand opening

assistance.[113] Though Mr. Carter claims these funds were advertising "co-op", i.e.,

matching advertising funds, Mr. Reichert testified these payments were not co-op. Mr.

Reichert considered these sums to be money Ford "owed" him as reimbursement for

the Dixon deal and that he needed to do nothing further to earn the money.[114] Bob

Huser, manager of Reichert/KDG's Fairfield store admitted that even though $45,000

(of the $105,000 total) was claimed by Mr. Carter to be co-op and "grand opening"

assistance, Ford paid the money without regard to any advertising and that no "grand

opening" event ever occurred.[115]

    In addition to the $105,000 taken out of the Region marketing budget to help

Reichert/KDG, Mr. Carter separately gave another $10,000 to KDG's managers and told

them to "make up a contest" so they could give the appearance of justifying receipt of

the funds.[116] Gene Mullins of Reichert/ KDG also testified that Pat Letart admitted Ford

preferentially distributed marketing money to Reichert/KDG.[117]

---

113  See J Carter depo. at 108-110.

114  See J. Carter depo. at 108-110, and compare R. Reichert depo. at 95-97.

115  See R. Huser depo. at 35.

116  See Jerry Mullins depo. at 21-22 and R. Huser depo. at 25-32.

117  See M. Mullins depo. at 13, 32, 46-51, 64-65, 87-93.

Mike Crowley, Lincoln Mercury's franchising manager, testified that he had never seen a situation where discretionary marketing funds were used by a region to fund a consolidation and that grand opening money should be used to fund a grand opening event.[118] Mr. Crowley had never heard of a situation in which Ford gave marketing money to a dealer group, or consolidated dealer in a multiple point market with other dealers, and told the dealer to make up its own contest to earn the money.[119]  He also testified that every dealer in a multiple point market must be offered the same amount of money either a per-unit basis or in total.[120]  Jerry Carter admitted that on at least one occasion he falsified the Region's check ledger, giving ELM a check for $1,500 which was falsely labeled "auto show reimbursement" when, in fact, it was reimbursement for the cost of LPE recertification.  There was no auto show.  Mr. Carter admitted he sent the falsely labeled check to ELM as a "morale builder".[121]

**10.    Ford manipulated the vehicle allocation system to damage ELM and held Reichert/KDG**

ELM was denied new vehicles at "roll-out" when the product was "hot" and when it attempted to sell vehicles as "loss leaders" to retain market share.  George Beattie testified that ELM frequently did not receive new vehicles at "roll-out" even though its

---

118   See M. Crowley depo. at 34-38.

119   See M. Crowley depo. at 36-37.

120   See id. at 35-37.

121   See J. Carter depo. at 112-114.

competitors had several in inventory.[122]  Mr. Woeste confirmed that ELM didn't receive new vehicles at roll-out, while its competitors did, and that Jerry Carter always had a ready excuse.[123]

Mr. Carter initially testified he had no ability to impact or influence the allocation system to provide hot-selling vehicles to franchisees.[124]  He later conceded that each region had the ability to create a discretionary "pool" of up to ten percent (10%) of the vehicles which were allocated it, though he supposedly discouraged its use.[125]   Mr. Carter claimed he didn't use the allocation system to ensure that allocation was provided to his dealers at new vehicle roll-out, he simply "[l]et it roll out and fall where it may."[126]  However, Carter's own zone manager, Pat Letart, admitted to ELM's general manager that Jerry Carter had access to other vehicles which he could divert to this market.[127]

In contrast to Mr. Carter's view of allocation, Ford executives, both superior and subordinate to him, testified that the company has a policy of ensuring that each large dealer has "coverage" by providing him with at least one example of the new vehicle at

---

122 See G. Beattie depo. at 123-128.

123 See W. Woeste depo., Volume I, at 72-75.

124 See J. Carter depo. at 205-209.

125 Id. at 205-2012.

126 Id. at 211-213.

127 Id. at 130-131.

roll-out so he has something to sell.[128]  Tim Fisher, Ford's allocation expert, testified that each region designs a plan to ensure coverage is achieved for its larger or "contact" dealers, such as ELM.[129]   Regional management knows in advance whether the large dealers are "covered" at roll-out[130] and management should pool or "memo bill" vehicles to ensure coverage exists.[131]

Forrest Brown testified that coverage must be provided in order for Lincoln Mercury to be in compliance with its sales and service agreement and state laws.[132] Mike Crowley added that it is Ford's "policy" to provide coverage for its contact dealers at new vehicle roll-out.[133]  It is difficult for a dealer to sell a car he doesn't have, while his competitor does.[134]

When the Lincoln Aviator was recently launched, Jerry Carter bluntly told Bill Woeste that ELM was not going to get one, only Reichert/KDG.[135]  When pressed, Mr. Carter admitted that Florence, Kentucky was also getting one, leaving ELM as the only

---

128  See F. Brown depo. at 41-42, T. Fisher depo. at 30-32, attached as Exhibit 24, Michael Crowley depo. at 26-28, C. Hall depo. at 11-12, 14-15, and Keith Ertel depo. at 71.

129  See T. Fisher depo. at 30-32, 45-46.

130  See T. Fisher at 45-46, 58-59.

131  See id. at 51-54.

132  See F. Brown depo. at 41-42.

133  See M. Crowley depo at 27-28.

134  See F. Brown at 42 and M. Crowley depo. at 28-29.

135  See W. Woeste depo., Vol. I, at 73-75.

Cincinnati dealer without the Aviator at roll-out.[136]  Luckily, Lincoln Mercury's interim president, Brian Kelly, happened to make a surprise visit to ELM and told Mr. Woeste it was unacceptable that ELM did not have product at roll-out and he immediately provided an allocation of the new Aviator to fill the void allowed to occur by Mr. Carter and his staff.[137]

Gene Mullins testified that Ford and Reichert/KDG engaged in a conspiracy to destroy ELM's business through manipulation of Ford's vehicle allocation practices for the benefit of Reichert/KDG.[138]  Mr. Mullins learned of Ford's efforts to deprive ELM of vehicle allocation and benefit Reichert/KDG with additional allocation from comments made by Pat Letart that he was "punishing" ELM by withholding vehicles and giving vehicles that should have gone to ELM to Reichert/KDG.[139]  Of course, Mr. Letart has denied he was involved in any preferential vehicle allocation practices.[140]

### 11.    Ford wrongfully denied ELM's initial LPE certification

Lincoln Premiere Experience ("LPE")[141] is a program by which Lincoln Mercury dealers "earn" money held back by the manufacturer on the purchase of new cars.

---

136  See id.

137  See G. Beattie depo. at 126.

138  See G. Mullins affidavit, infra, and depo. at 13, 32, 34-45, 81-85, 87-93.

139  See G. Mullins affidavit, infra, and depo. at 13, 32, 34-48, 81-93. .

140  See P. Letart depo. at 121.

141  LPE and the Mercury Advantage programs are, for purposes of this motion, identical and will be referred to only as LPE.

These "hold-backs" constitute a significant amount of money to a dealer.[142]  To participate in this program, a dealer must qualify in the areas of customer service and appearance or "image".

George Beattie testified that ELM failed its original LPE certification because of a small "stain" on the  natural stone aggregate wall of the ELM building.[143]  ELM's appeal was rejected, even though it presented evidence from an expert that the stain was the result of natural aging.[144]  The loss of LPE "image" certification cost ELM approximately $10,000.[145]

John Csernotta, National Director of the LPE program, after reviewing the ELM photos, testified that the stain on one wall should not have disqualified ELM from LPE image certification.[146]  Mr. Beattie testified ELM later passed its image "reinspection" without having done anything to the wall.[147]

In contrast to ELM's treatment, Ford gave Reichert/KDG a waiver for its LPE image certification at its newly acquired Fairfield Lincoln Mercury store, despite a gaping hole in the fascia and "stuff falling off the front" of the building, because it was

---

142  See John Csernotta depo. at 40-48 (LPE certification hold-back is 2.75% of the MSRP of the vehicle).

143  See G. Beattie depo. at 99, 101.

144  See id. at 99-101.

145  See id. at 107.

146  See J. Csernotta depo. at 178-180.

147  See G, Beattie depo. at 102-103.

34

supposedly "part of a larger market representation plan" and Mr. Reichert had promised to build a new facility.[148]  Not surprisingly, the "point men" requesting Ford approval for the Reichert/KDG waiver were the same persons coordinating the market consolidations: Regional Managers (Jerry Carter) or the Regional Retail Development Managers (Keith Ertel).[149]

As a further twist, Mr. Carter "reimbursed" ELM $1,500 for the LPE reinspection fee with a check that said "auto show reimbursement".[150]  Pat Letart said it was Jerry Carter's way of reimbursing ELM for its LPE recertification.[151]

## IV.    <u>SUBSTANTIVE ISSUES OF LAW</u>

The Plaintiff asserts the following claims:

A.    Breach of contract (Lincoln Mercury);

B.    Violation of the Ohio Motor Vehicle Dealer Act, R.C. § 4517.59, et seq. (Lincoln Mercury);

C.    Violation of the Federal Automobile Dealer Day in Court Act ("ADDCA), 15 U.S.C. § 1222, et seq. (Lincoln Mercury);

D.    Fraud (Lincoln Mercury, Mr. Carter and Mr. Walls;

E.    Civil Conspiracy (Mr. Reichert and the Kenwood Dealer Group); and

F.    Punitive Damages and Attorney Fees.

---

148  <u>See</u> J. Csernotta depo. at 112-115, 173-175 and K. Ertel depo. at 74.

149  <u>See</u> J. Csernotta depo. at 115.

150  <u>See</u> G. Beattie depo. at  103-105.

151  <u>Id.</u> at 106.

## A.    Breach of Contract

The "contract", generally speaking, is the Lincoln Mercury Sales and Service

Agreement (SSA) and any other incorporated documents and agreements that define the

franchise.  ELM contends that Lincoln Mercury breached the contract as set forth in the

Preamble of the SSAs, as well as sections 2(c)(1) (vehicle allocation/filling of orders), 9(b)

(market representation) and 17 (termination) of the standard provisions, have been

specifically breached.  Judge Dlott determined there was no section 17 claim because the

franchise has not been terminated.

The "Preamble" of the SSA states the purposes of the agreement, as well as the

representations and admissions by Ford and the franchisee.  The Preamble states:

> The purpose of this agreement is to (i) ***, (ii) *** and (iii) recognize
> the interdependence of both parties in achieving their mutual objectives of
> satisfactory sales, service and profits by continuing to develop and retain a broad
> base of satisfied owners of COMPANY PRODUCTS.
>
> ***
>
> It is the opinion of the Company that sales and service of
> COMPANY PRODUCTS usually can best be provided to the public through a
> system of independent franchised dealers....  The Dealer recognizes that, in such
> a franchise system, the company must plan for the establishment and the
> maintenance of the numbers, locations and sizes of dealers necessary for
> satisfactory and proper sales and service representation in each market area....
> At the same time, the Company endeavors to provide each of its dealers with a
> reasonable profit opportunity based on the potential for sales and service of
> COMPANY PRODUCTS within its locality.
>
> ***
>
> ***.  If dealers' specific orders for any product are greater than or
> different form their basic orders, the Company seeks to revise production
> schedules to the extent feasible, and to allocate fairly any product in short
> supply....  Thus, the automotive business is a high risk business in which the

> Company ... and its dealers can succeed only through cooperative and
> competitive effort in the respective areas of manufacturing, sales and service and
> customer satisfaction.
>
> ***
>
> The Dealer has elected to enter into this agreement with the Company with
> confidence in its integrity and ability, its intention to provide competitive products
> and assist the dealer to market them successfully, and its desire to maintain high
> quality dealers.
>
> ***
>
> It is the expectation of each of the parties that by entering into this
> agreement, and by the full and faithful observance and performance of its duties,
> a mutually satisfactory relationship will be established and maintained.

(Emphasis added).

The Ford Motor Company Lincoln (and Mercury) Sales and Service Agreement

Standard Provisions ("standard provisions")" are incorporated into the SSA.  Section

2(c)(1) of the standard provisions states that Ford "shall make reasonable efforts to fill

each order of the Dealer that is accepted by the Company."

Section 9 of the standard provisions, entitled Determination of Dealer

Representation, reserves to Ford, but not to Reichert/KDG as stated in the ROFR, the

right to determine the number, location and size of authorized Lincoln Mercury dealers

in a sales area.  The delegation of this "joint" authority to Reichert/KDG is a breach of

ELM's franchise agreement.  It also requires Ford to provide written notice to the dealer

if its market representation plan calls for discontinuation of the sale of Lincoln Mercury

vehicles from the dealership facility.  Section 9(b) states:

> The Company will inform the Dealer of any proposed change in the

> Company's market representation plans for the DEALER'S LOCALITY, provided that <u>if the Company's market representation plans do not provide for the continuation of representation of COMPANY PRODUCTS from the Dealer's DEALERSHIP FACILITIES</u> (except for a relocation thereof), <u>the Company ... shall give the Dealer written notice thereof</u>.

Paragraph 9(b) further states that, in the event other dealers are notified Ford intends to discontinue operations at the location, the dealer will still be entitled to maintain his operation at the location "for so long as [he] desires and fulfills his responsibilities under [the SSA]."

### B.    Violation of the Ohio Motor Vehicle Dealer Act, R.C. § 4517.59, et seq.

A motor vehicle manufacturer/franchisor such as Ford has a duty under Ohio law to act in good faith towards its dealer/franchisees such as Eastside Lincoln Mercury.   The terms "good faith and "coerce" are defined in R.C. §§ 4517.01(BB) and (CC) respectively.

"Good faith" is defined as honesty in the conduct or transaction concerned and the observance of reasonable commercial standards of fair dealing in the trade as is defined in division (S) of section 1301.01 of the Revised Code, including, but not limited to, the duty to act in a fair and equitable manner so as to guarantee freedom from coercion, intimidation, or threats of coercion or intimidation; provided however, that recommendation, endorsement, exposition, persuasion, urging, or argument shall not be considered to constitute a lack of good faith.  R.C. § 4517.01(BB).  "Coerce" is defined as "means to compel or attempt to compel by failing to act in good faith or by threat of economic harm, breach of contract, or other adverse consequences ... [but] coerce does not mean to argue, urge, recommend, or persuade."  R.C. § 4517.01(CC).

ELM contends that Ford failed to act in good faith under the following provisions of 4517.59:

1.   acting or purporting to act under the terms, provisions, or conditions of a franchise (A);

2.   terminating, canceling, or failing to renew a franchise (A);

3.   withholding or delaying delivery of motor vehicles out of the ordinary course of business or discriminating against any franchisee in the allocation or through the withholding from delivery of certain models of motor vehicles ordered by a franchisee out of the ordinary course of business (F);

4.   unfairly changing or amending unilaterally a franchisee's allotment of motor vehicles or quota in a sales contest without reasonable cause (F);

5.   employing any coercive techniques for any other purposes such as obtaining franchisee participation in contests, "giveaways," or other sales devices (F);

6.   coercing, or attempt to coerce, a franchisee by threatening to award an additional franchise or agreement to another person for the sale of its same product in the same area of influence for the purposes of compelling such franchisee to yield to demands of the franchisor for increased sales of the franchisor's products, parts, expansion of facilities and improvement of operations inconsistent with good business practices of the franchisee (G);

7.   refusing to disclose to any new motor vehicle dealer who handles the same line-make, the manner and mode of distribution of that line-make within the same county (L); or

8.   engaging in any predatory practice or discriminate against any new motor vehicle dealer (M).

R.C. 4517.59 must be interpreted liberally to achieve its intended remedial objectives.  See Earl Evans Chevrolet v. General Motors Corp., 74 Ohio App.3d 266,

275 (Lake Co. 1991).  Like the ADDCA, R.C. § 4517.59(A) may be triggered by conduct

that does not rise to the level of an actual termination, cancellation or non-renewal.

The court in <u>Earl Evans Chevrolet</u> made clear that the Ohio MVDA is far more

liberal than the ADDCA in its definition of "coercion" and that conduct which falls short of

termination, such as discriminatory allocation, constitutes bad faith.

> In the absence of any statutory definition, the federal courts have decided to attach the common, ordinary meaning to "coercion." However, the Ohio legislature chose to define coercion as "the failure to act in a fair and equitable manner in performing or complying with any terms or provisions of the franchise or agreement." This is clearly a different standard of conduct.
>
> R.C. 1.11 is perhaps the most elucidating concerning the construction of "good faith" and "coercion". R.C. 1.11 states:
>
>> "Remedial laws and all proceedings under them shall be liberally construed in order to promote their object and assist the parties in obtaining justice. The rule of the common law that statutes in derogation of the common law must be strictly construed has no application to remedial laws; but this section does not require a liberal construction of laws affecting personal liberty, relating to amercement, or of a penal nature." (Emphasis added.)
>
> ***
>
> We agree with this analysis regarding the remedial nature of R.C. Chapter 4517. Liberally construing, therefore, "good faith" and "coercion," we hold that <u>to establish a violation of R.C. 4517.59(A), it is sufficient to show that a manufacturer, outside the ordinary course of business, withheld or delayed delivery, or threatened to withhold or delay delivery of scarce vehicles from a dealer. Such a showing would also establish a violation of R.C. 4517.59(F)</u>.

74 Ohio App.3d at 275-276 (emphasis added).

R.C. 4517.65 (A) provides for franchisor liability under Chapter 4517 in double

the amount of actual damages, plus court costs and reasonable attorney fees.

C.    Violation of the Federal Automobile Dealer Day in Court Act ("ADDCA), 15 U.S.C. § 1222, et seq.

An automobile dealer/franchisee may make a claim for damages against an automobile manufacturer under the ADDCA if the manufacturer fails "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise...." See 15 U.S.C. 1222.  The statute defines "good faith" as "the duty of each party to any franchise ... to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party...." See 15 U.S.C. 1221(e)(emphasis added).  However, "recommendation, endorsement, exposition, persuasion, urging or argument  do not constitute a lack of good faith." See id.

"Good faith" has been interpreted to mean "acting in a fair and equitable manner, so that the other party to a franchise agreement is free from coercion." See Bob Tatone Ford, Inc. v. Ford Motor Co., 140 F. Supp. 2d 817, 826 (S.D. Ohio 2000)(quoting 15 U.S.C. § 1221(e)).  "Coercion" is defined as a "wrongful demand which will result in sanctions if not complied with." See id.  (quoting American Motors Sales Corp. v. Runke, 708 F.2d 202, 207 (6th Cir.  1983)); see also Fray Chevrolet Sales, Inc. v. General Motors Corp., 536 F.2d 683, 685 (6th Cir. 1976).

In Clifford Jacobs Motors, Inc. v. Chrysler Corp., 357 F. Supp. 564, 573 (S.D. Ohio 1973), the court stated that bad faith consists of some coercion or intimidation which is "designed to obtain something which the manufacturer does not have a

41

contractual right to." 357 F. Supp. at 573 (n. 5). It is bad faith to threaten a dealer with a contractual penalty "if the glove [doesn't] fit". Id.

### D.    Fraud

In Williams v. Aetna Finance Co. (1998), 83 Ohio St. 3d 464, 475 700 N.E.2d 859, the Ohio Supreme Court stated that a fraud claim requires the following elements:

> " '(a)   a representation or, where there is a duty to disclose, concealment of a fact,
>
> " '(b)   which is material to the transaction at hand,
>
> " '(c)   made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,
>
> " '(d)   with the intent of misleading another into relying upon it,
>
> " '(e)   justifiable reliance upon the representation or concealment, and
>
> " '(f)   a resulting injury proximately caused by the reliance.' "

(Quoting Cohen v. Lamko, Inc., 10 Ohio St. 3d 167, 169, 462 N.E.2d 407, 409 (1984). See also, Mussivand v. David, 45 Ohio St. 3d 314, 322; 544 N.E.2d 265 (1989) (quoting Burr v. Stark Cty. Bd. of Commrs., 23 Ohio St. 3d 69, 491 N.E. 2d 1101 (1986)(syllabus at 2)).

Ford claims, and has requested a jury instruction, that it had "no duty to speak" so as to create liability in fraud for any omissions to ELM because the parties "transacted business at arms length". This contention is absolutely absurd. The contract between the parties recognizes the special and interdependent relationship of the parties. However, and more importantly, Ohio and federal law recognize the inherently unequal bargaining power between automobile franchisors and franchisees

and have enacted special laws to protect franchisees from the abusive conduct of

automobile manufacturers.

In support of its argument, Ford cites two cases two cases that support the exact

opposite proposition of the one it attempts to support.  In Blon v. Bank One, Akron, NA,

35 Ohio St.3d 98, 101, the Ohio Supreme Court stated:

> Ordinarily in business transactions where parties deal at arm's length, each party
> is presumed to have the opportunity to ascertain relevant facts available to others
> similarly situated and, therefore, neither party has a duty to disclose material
> information to the other.
>
> However, this court has recognized that in certain circumstances there exists a
> duty to.  For example, a party to a business transaction in a fiduciary relationship
> with another is bound to make a full disclosure of material facts known to him but
> not to the other.  Such a duty may also arise out of an informal relationship where
> both parties to a transaction understand that a special trust or confidence has
> been reposed.  Full disclosure may also be required of a party to a business
> transaction "where such disclosure is necessary to dispel misleading impressions
> that are or might have been created by partial revelation of the facts."

Blon v. Bank One, Akron, NA, 35 Ohio St.3d 98, 101 (1988)(numerous citations

omitted).

The second case cited, Landskroner v. Landskroner, 154 Ohio App.3d 471, 486

(2003), relies upon the Blon holding.

> Nor does a fiduciary relationship exist between parties negotiating an arms-
> length commercial transaction.  Blon v. Bank One, Akron, N.A. (1988), 35 Ohio
> St.3d 98, 101, 519 N.E.2d 363 "In business transactions where parties deal at
> arm's length, each party is presumed to have the opportunity to ascertain
> relevant facts available to others similarly situated and, therefore, neither party
> has a duty to disclose material information to the other."  Id.

In this case, the parties had a contract which contains numerous disclosure

requirements and express cooperation requirements.  Further, state and federal law

recognize the unequal bargaining position of the parties that requires special protection for the franchise from abuse by the manufacturer/franchisor, particularly automobile manufacturers. The ADDCA, 15 U.S.C. § 1222, et seq., and the Ohio Motor Vehicle Dealer Act, R.C. § 4517.59, et seq., both mandate good faith conduct and further cite to numerous disclosures that are required.

Ohio courts have described R.C. § 4517.59 as a "remedial law" that should be interpreted liberally to achieve its intended remedial objectives. See Earl Evans Chevrolet v. General Motors Corp., 74 Ohio App.3d 266, 275 (Lake Co. 1991). In Kingsport Motors, Inc. v. Chrysler Motors Corp., 644 F2d 566, 572-573 (6th Cir. 1981), the Sixth Circuit Court of Appeals cited the congressional record of the ADDCA act as proof that automobile franchisees need special protection from franchisor/manufacturers because of the "overwhelming economic power" the manufacturer holds over the franchisee.

> Our view on this issue is strengthened by Congress' obvious intention to provide a remedy for the single dealer facing the possibility of bad faith coercion through employment of the overwhelming economic power of an automobile company like Chrysler. n1  In adopting the Dealer's Day In Court Act, Congress described its purpose thus:
>
>> AN ACT
>>
>> To supplement the antitrust laws of the United States, in order to balance the power now heavily weighted in favor of automobile manufacturers, by enabling franchise automobile dealers to bring suit in the district courts of the United States to recover damages sustained by reason of the failure of automobile manufacturers to act in good faith in complying with the terms of franchises or in terminating or not renewing franchises with their dealers.  70 Stat. 1125.

**E.**    **Civil conspiracy.**

44

Under Ohio law, the tort of civil conspiracy is " 'a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages.' " Kenty v. Transamerica Premium Ins. Co. (1995), 72 Ohio St. 3d 415, 419, 650 N.E.2d 863, 866. See also, Williams v. Aetna Finance Co. (1998), 83 Ohio St. 3d 464, 475, 700 N.E.2d 859. An underlying unlawful act is required before a civil conspiracy claim can succeed. Gosden v Louis, 116 Ohio App. 3d at 219, 687 N.E.2d at 496; Minarik v Nagy, 8 Ohio App. 2d at 195, 93 Ohio L. Abs. at 168, 193 N.E.2d at 281. The malice involved in the tort is "that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another." Pickle v. Swinehart (1960), 170 Ohio St. 441, 443, 166 N.E.2d 227, 229; Gosden, 116 Ohio App. 3d at 219, 687 N.E.2d at 496.

Ford seeks an instruction that improperly limits recovery on this claim to proof of a conspiracy to commit only common law torts, in this case fraud.  Under Ohio law, however, a conspiracy simply requires proof of an underlying tortious act, a much broader standard than that urged by the Defendants.   A conspiracy to violate either R.C. § 4517.59, the Ohio Motor Vehicle Act, or the ADDCA, 15 U.S.C. § 1222, is sufficient underlying tortious conduct to support a claim for conspiracy because both acts sound in tort and are designed to punish conduct that is threatening, coercive, intimidating, and in bad faith.

"Tortious conduct" has been broadly interpreted to include the violation of any legal duty, including a statutory duty.  See  Gor-Vue  Corp. v Hornell Elektrooptik AB, 634 F.

45

Supp. 535, 53 (N.D. Oh. 1986)(statutory and common law patent infringement claims held "tortious conduct" under Ohio's long arm statute) and Poindexter v Willis, 256 N.E.2d 254, 260 (Mont. Co. Com. Pl. 1970)(violation of child support statute constitutes tortious conduct under Ohio long arm statute). These cases clearly establish a legal duty can arise from common law (such as common law fraud) *or* from violation of a statute (such as the ADDCA or the Ohio Motor Vehicle Dealer Act) where such statutes prohibit coercion and intimidation, i.e., willful and malicious misconduct.

### F.    Punitive damages and attorney fees.

Punitive damages may be awarded in tort actions involving fraud, actual malice or insult. Preston v Murty, 32 Ohio St.3d 334, 512 N.E.2d 1174 (1987). Under Ohio law, actual malice is that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or a conscious disregard for the rights and safety of others that has a great probability of causing substantial harm. Id.

In cases where fraud is alleged as a basis for punitive damages, the elements of the tort itself must be proven, and the plaintiff must either show that the fraud is aggravated by the existence of malice or ill will, or that the wrongdoing is particularly gross or egregious. Charles R. Combs Trucking, Inc. v International Harvester Company, 12 Ohio St.3d 241, 466 N.E.2d 883 (1984)(syllabus para.3).

ELM contends that the evidence supports an instruction on punitive damages and attorney fees on the grounds that a jury could reasonably find that the Defendants' actions meet the definition of actual malice under Preston, and that the fraud committed by Ford was particularly gross and egregious under Combs.

46

### V.    Procedural Issues

By separate pleading, ELM will seek this Court's leave to amend its pleadings so that the pleadings conform to the evidence discovered and tried in this case. This motion shall be filed within the next three days.

### VI.    Evidentiary Issues

During discovery, Plaintiff learned that Ford destroyed evidence critical to Plaintiff's claims. Various records and reports regarding the allocation of new vehicles to ELM and other dealers are missing for periods during which ELM claims losses. Ford claims that these documents no longer exist, due to a "systems error" in its records retention procedure. In her Summary Judgment Opinion, Judge Dlott recognized that under the circumstances, the jury is entitled to assume that any documentation of Ford's allocations would be unfavorable to Ford. (Doc. 85, Opin. at 11, fn.5). This is not so much a spoliation issue as a discovery sanction for which ELM will file a motion within the next three days.

### VII.    Instructions and Special Verdict

Counsel for the Parties have met to discuss their proposed jury instructions and interrogatories. The Parties could agree on some, but not others, of the instructions and could not agree on a set of interrogatories. The parties agreed to submit to the Court their proposed separate instructions and interrogatories and allow the Court to choose which set is appropriate.

Filed herewith are ELM's proposed jury instructions and interrogatories. Attached to that document are ELM's objections to Ford's jury instructions and interrogatories based on

the drafts exchanged by the Parties.  These objections may change after ELM has had the

opportunity to review Ford's submission to the Court.

## VIII.   Special Damages

According to Roger Bean, ELM's Special Damages calculated thorough

December 31, 2004, are as follows:

| | | |
|---|---|---|
| 1. | Losses attributed to improper warranty audits | $ 763,547.00 |
| 2. | Losses attributed to improper warranty audit chargebacks (1999 and 2001) | $    8,332.00 |
| 3. | Losses attributed to improper denial of relocation | $3,332,135.00 |
| 4. | Losses attributed to improper denial of LPE bonus | $    8,168.18 |
| 5. | Losses attributed to improper vehicle allocation | $   89,770.00 |
| 6. | Losses attributed to increased borrowing costs | $ 450,169.00 |
| 7. | Losses attributed to reduced dealership value "blue sky" losses | $1,800,000.00 |
| 8. | Losses attributed to improper financial assistance to KDG | $   341,250.00 |
| | Total losses/damages | $6,793,371.18 |

Respectfully submitted,


____/s/_____
Alan J. Statman (0012045)
Gregory J. Berberich (0043651)

48

Lawrence A. Flemer (0018673)
STATMAN, HARRIS, SIEGEL & EYRICH, LLC
2900 Chemed Center
255 East Fifth Street
Cincinnati, Ohio  45202
Tel.    (513) 621-2666
Fax     (513) 621-4896
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Final Pretrial

Memorandum was served via ecf filing and ordinary U.S. mail on this 2nd day of

November, 2004 to the following:

Elizabeth A. McNellie
Baker & Hostetler
Capitol Square, Suite 2100
65 East State Street
Columbus, Ohio  43215-4260
Attorney for Ford Defendants


and

Steven D. Hengehold
Rendigs, Fry, Kiely & Dennis
One West Fourth Street, Suite 900
Cincinnati, Ohio 45202-3688
Attorney for Reichert/KDG


____/s/_____
Gregory J. Berberich (0043651)

50