Eastside Lincoln Mercury, Inc. and William Woeste Jr.
     Plaintiffs


v.


Ford Motor Company, Inc., et al
     Defendants

U.S. District Court for Southern District of Ohio
Case No. c-1-01-567


Expert Report Updated as of November 8, 2004 by:


     Roger M. Bean, CPA

## A.    Overview

1.    At the request of counsel for Eastside Lincoln Mercury (Eastside or ELM) and William F. Woeste, Jr. I prepared the attached report setting forth the damages incurred by Eastside Lincoln Mercury and Mr. Woeste as a result of the actions of Ford Motor Company, Inc. and Robert Reichert/Kenwood Dealer Group (Reichert/KDG).

2.    As a practicing CPA, I represented Eastside and Mr. Woeste during the period starting with the purchase of his original dealership in 1982 through 1999 when I left public practice. Since 1999 I have assisted the CPA firms that represent Eastside and Mr. Woeste in the performance of accounting, tax and special projects work.

3.    While in public practice my emphasis was on providing audit, tax, merger and acquisition, divestiture and other consulting services to automobile dealerships in the Cincinnati area. Over the years my CPA firm and I represented over 30 dealerships and I was involved in the acquisition or sale of approximately 25 dealerships. Since leaving that firm I have maintained a job sharing arrangement with a CPA firm in Lexington Kentucky and have retained several client relationships, including Mr. Woeste's automotive group and three other car dealerships. My CV is attached as Attachment A.

4.    As a practicing CPA I testified in court and by deposition concerning forensic accounting services or as an expert witness. Since I left public practice I have only testified in one case, which originated before leaving the CPA firm for which I worked. That case is listed on Attachment B.

5.    In the past ten years I have been published a few times in not for profit newsletters and the local business paper, The Business Courier. This information is included on Attachment C.

6.    The documents that I have reviewed in preparation of this report are listed on Attachment D.

7.    Under my job sharing arrangement, my time is billed on an hourly basis to the CPA firm of Shaver & Coons, PSC, which in turn bills Eastside at an hourly rate of between $ 100 and $ 250.

**B. Summary Background Information**

1. Eastside has been a Lincoln Mercury dealership in the eastern part of Cincinnati for over 20 years. For approximately the last 18 years it has been under the management of Mr. Woeste.

2. During Mr. Woeste's ownership of Eastside, there have been several other Lincoln Mercury franchises in the Cincinnati multiple point market area (Cincinnati Market) area including (1) the Kings Lincoln Mercury franchise at the Auto Mall location owned by Reichert\KDG, (2) the former Lincoln Mercury franchise owned by the Stillpass family until its purchase by Mr. Wyler in 2000 and subsequent closing in 2000, (3) the former Jim Dixon Lincoln Mercury franchise purchased by Ford and subsequently sold at a loss in excess of $ 1,000,000 to Reichert/KDG, after which it was renamed Fairfield Lincoln Mercury, (4) the Ridgeview Lincoln Mercury franchise which was acquired by Mr. Fryson and then became Lincoln Mercury of Florence and has since been re-sold and (5) Northgate Lincoln Mercury franchise also owned by Reichert/KDG.

3. Starting in 1998, the Lincoln Mercury Division of Ford developed and executed a plan to consolidate the Cincinnati Market under one dealer. Ford entered into two agreements (Right of First Refusal and Consolidator Agreements) which allowed Reichert/KDG to consolidate the Cincinnati market. Ford orchestrated this consolidation process, financially and operationally through favorable market representation actions. For example, the two agreements (Right of First Refusal and Consolidator) gave Reichert/KDG the right to approve and disapprove all market representation and facilities actions for all Cincinnati market dealerships north of the Ohio River. In line with Ford's plans to consolidate the Cincinnati Market, Lincoln Mercury of Florence was made its own single point market. In the Cincinnati Market today, the only Lincoln Mercury dealership that is not controlled by Reichert/KDG is Eastside.

4. During this consolidation period, Mr. Woeste requested permission from the Lincoln Mercury Division of Ford on multiple occasions but was denied the opportunity to relocate Eastside. Mr. Woeste intended to relocate Eastside with another of his franchises (Beechmont Chevrolet) in an effort to obtain substantial cost savings through a sharing of service, parts and administrative space with Beechmont Chevrolet. The Lincoln Mercury Division of Ford allowed two of the KDG franchises to share their facilities. One dealership (Northgate) has been sharing its location with VW for several years. Another dealership (Fairfield) was allowed to share its facilities _after_ Mr. Woeste's denials, in a more "liberal" fashion than Mr. Woeste had requested. Initially the Fairfield location was shared by three other franchises but currently is only dualed with VW, a competitive make. The only separation between the franchises is in the showroom.

5. Several other actions by Ford were undertaken in an attempt to influence Mr. Woeste to sell or resign his franchise and to assist Reichert/KDG in controlling the Cincinnati Market. These actions involve the manipulation of warranty audits, manipulation of new vehicle allocation process, the arbitrary denial of LPE certification, and preferential distribution of marketing money.

3

## C.    Expert Conclusions

My conclusions are grouped into seven areas of damage based upon a common relationship. There can be more than one calculated damage in each of the seven sections below.

### 1. <u>Warranty Issues</u>

*Eastside has suffered damages resulting from improper warranty audits in a range from $ 637,789 to $ 779,600, an estimated loss of $ 67,178 for 2005 plus the actual warranty charge backs in the amount of $ 8,332.*

Beginning in 1996-1997 Ford began a process of "auditing" the claims submitted by Eastside under the new vehicle warranty programs of Ford.  New Lincoln Mercury vehicles sold by a dealership are covered under a Ford warranty.  The warranty allows a dealer to solve a customer complaint at no cost to the dealership or customer when the problem is due to poor design or manufacture of the vehicle.  This benefits the dealer in that it is paid by the franchisor (Ford) to perform the warranty service work and is not forced to bill the customer.

Because of the length and scope of the new car warranties, warranty repair work accounts for a significant portion of a dealership's service and parts business. The satisfaction of the customer is important to the dealer and Ford, as a happy customer comes back to the dealership, rather than an independent repair shop, for more service; will consider replacing his car with the same make and may refer others to the dealership or brand. Lincoln Mercury dealerships are graded upon their customer satisfaction in the warranty process

Ford's stated rationale for the Eastside audits was the magnitude of claims submitted by Eastside and the assertion that the claims submitted were outside the "norm." The actual dollar volume of the errors determined by the Ford auditors through 5 warranty reviews and audits from 1996 to 2001, involving almost 2 million dollars of warranty claims, is small. In my experience this indicates that Eastside was in substantial compliance with the manufacturer's procedures.

Exhibit 1 summarizes the review and audit results. The reviews and audits examined $ 1,903,667 in warranty service work and found errors of $ 17,369, or less than 1 % error. Note on this Exhibit 1 that the initial repayment sought by Ford from the reviews and audits was $ 37,954.69 but under further review and analysis, Ford, reduced the original disallowance by greater that 50% and accepted repayment of $ 17,369.65.

Based upon my experience with automotive clients, warranty audits are designed to change the dealership's behavior by reducing the volume and size of warranty claims. The audits drive down the volume and size of warranty claims submitted. This reduced Eastside's  profits, lowered the morale of dealership employees, and reduced the value of the dealership.

On April 9, 2001, Ford threatened severe penalties against Eastside and Mr. Woeste including the limitation on Mr. Woeste's ability to obtain another franchise, participate in Lincoln Mercury programs, and required Eastside to hire an "in dealer consultant". Mr. Walls and Mr. Carter both acknowledge that the magnitude of the penalties was too severe in light of the audit findings and the fact that no fraud occurred.

Exhibit 2 is a graph which indicates the impact that these audits had on the warranty sales volume of Eastside. The result was the decline in warranty service business due to the fear by individual mechanics and the shop manager that the next Ford audit would result in a "charge-back" or other penalties to the dealership.

Exhibit 3 details the volume of warranty service business by all of the Ford and Lincoln Mercury dealerships in the Cincinnati area as well as the direct competitors of Eastside. Note that the loss in sales volume by the other comparable dealerships is much less between 1998 and 1999 than was suffered by Eastside. There is a substantial increase in warranty sales volume in 2000 and 2001 while Eastside is in decline. The results of the direct competitors are comparable over time to the Ford-Lincoln Mercury group.

It is my opinion that the frequency and nature of the warranty audits at Eastside, including the progressive penalties, led to a decline in warranty sales volumes (and, consequently, gross profit) realized by Eastside. Without the impact of the warranty audits, the sales volume at Eastside would have been substantially the same as the results achieved by its competitors in the Cincinnati Market area.

Exhibit 4 details what the sales volumes and gross profits of Eastside would have been, absent the warranty audits. The top section of this exhibit uses as the yardstick the actual results achieved by Eastside's direct competitors ( Kings Lincoln Mercury, Northgate Lincoln Mercury, Wyler/Stillpass Lincoln Mercury, Fryson/Ridgeview Lincoln Mercury and Dixon/Fairfiled Lincoln Mercury) where the data is known and the results from the other Ford/Lincoln/Mercury dealers where the direct competitor's results are not known. Using this combination of factors the lost net profit to Eastside is presented in the far right hand column and was $779,600. As some of these direct competitors are dualed operations, I also compared their data against the warranty sales volumes of all Ford and Lincoln Mercury dealers in the Cincinnati Market. This comparative warranty sales data was obtained from Ford and is presented in the lower section of Exhibit 4. The far right hand column indicates the damage to Eastside for each year. Utilizing this yardstick the lost profit to Eastside is $ 696,379, net of variable selling expenses.

Exhibit 5 is a calculation of what Eastside's damage is using the smallest factor possible where there is a choice. The far right hand column indicates that had these factors been realized by Eastside the damage that it suffered was $637,789.

It is my opinion that the damage suffered by Eastside in this area is not less than $637,789 and not more than $ 779,600.

5

I also believe that there is a carryover impact from prior warranty audits. I estimated, on Exhibit 6, that this loss will approximate the loss suffered in 2004. Discounting this figure to present value at an interest rate of 4% yields a loss of $ 67,178.

Exhibit 7 lists the money that Eastside repaid to Ford as a result of the 1999 and 2001 warranty audits. The resulting damage to Eastside is $ 8,332**.**

## 2.Denial of Relocation Requests

*Eastside has suffered damages up to December 31, 2004 in the amount of $ 3,332,135 resulting from the Lincoln Mercury Division of Ford denying his request to relocate the Eastside franchise. The ongoing damage beyond December 31, 2004 resulting from this denial is estimated to be $ 44,773 per month.*

In April, 1998 Mr. Woeste initially sought the permission of the Lincoln Mercury Division of Ford to build a Lincoln Mercury new vehicle showroom, retail parts area and service write up area on property adjacent to his Beechmont Chevrolet dealership. In the car business a "dual" facility indicates that at a single location there are at least two, or perhaps more car franchises. There are various forms of "dualing" including those where all of the facility is shared, where the new car showrooms are separate but all other departments are shared and then the format that Mr. Woeste proposed in which the service, wholesale parts, used car lot and administrative areas are shared. Operating in dualed facilities is common in the industry where one or more of the franchises does not sell enough vehicles to justify its own facility, or in instances where the franchise product line is in decline. In metropolitan areas, one rarely sees a dual facility involving a Honda or Toyota dealership due to their high volume. Similarly one rarely sees a dualed facility involving the more exclusive brands, such as Mercedes, Lexus and BMW.

Mr. Woeste's Chevrolet facility had the necessary space in the service, parts, administrative and used car areas to handle the extra volume associated with the business of Eastside. Thus, Mr. Woeste proposed to Ford building a Lincoln "Signature" facility encompassing a new vehicle showroom, service write up and retail parts areas. Other facilities in this proposed arrangement were to be shared with Beechmont Chevrolet.

It is common in a dualed facility for the manufacturer to require separate areas for new cars and service write up ("customer touch points") in order to protect the franchise identity. This is exactly what Mr. Woeste proposed. The "non touch points" (parts storage, service and administrative areas) are normally allowed to be shared. The savings in such an arrangement are that space and personnel are more efficiently used, equipment can be shared, personnel are able to share jobs, and the land and location on a particular street are used for dual purposes, thereby spreading the cost of the lease of the facility, equipment, and personnel costs.

Recently, the automotive industry has seen a renewed interest by the manufacturers in having their franchises represented by stand alone or "exclusive" franchises. In order to accomplish this manufacturers are offering cash incentives to subsidize dealers who agree to separate a franchise that is dualed with another and establish it as an exclusive dealership. This cash assistance by the manufacturer is a clear indication that they believe that it is necessary to financially subsidize or assist the dealer in offsetting the expense and inherent inefficiencies in running an exclusive dealership.

Mr. Woeste requested relocation in 1998 and again in 1999, but his requests were denied. As a result, Mr. Woeste has been forced to maintain a separate facility, separate equipment and separate personnel to support Lincoln- Mercury and the Beechmont Chevrolet franchise, while Lincoln Mercury has been suffering a decline in sales nationally, regionally and in the Cincinnati Market.

Eastside and Mr. Woeste would have saved a considerable sum of money on a monthly and yearly basis had they been allowed to relocate. This conclusion is based upon my experience in the car business and my knowledge of Mr. Woeste's operations. The sharing of large fixed personnel and facilities expenses associated with auto dealerships is more efficient due to the economies of scale.

I looked at the staffing levels of the Chevrolet franchise and those of Eastside as well as the cost of operating separate facilities. A comparison of the number and job classifications of the two dealerships is depicted on Exhibit 8. I determined where there was overlap or duplication, and summarized the cost of those inefficiencies that could be eliminated by sharing some of the facility. The individual savings by job classification and area of expenditure are shown on Exhibit 9.

I also considered the cost that would have been incurred by Mr. Woeste in the construction and ownership of a new car showroom and service write up area, a rental factor to reimburse Chevrolet for use of part of their facility, increased compensation for the employees that remained, and the operating costs for the new facility. I offset these additional costs of operations against the calculated savings to arrive at the damage incurred by Eastside due to this denial of the opportunity to relocate to the Chevrolet property. Exhibit 9 shows that these damages are $ 3,332,135**.**

Exhibit 9 includes only the extra costs incurred by Eastside for the years 1999, 2000, 2001, 2002, 2003 and the anticipated costs for 2004. Without knowing when Mr. Woeste would be given permission to relocate Eastside to the Chevrolet property, and a request was recently denied again, it is difficult to predict what the continuing damages will be from having to maintain separate facilities. The monthly cost of such damages is $44,773 per month for 2004 and I would expect that this level of damages would continue until such time as a request to relocate is approved. This same monthly cost to maintaining separate facilities is comparable to the $ 50,000 per month figure Mr. Reichert quoted when he asked for and was given permission by the Lincoln Mercury Division of Ford to dual his Fairfield dealership.

7

## 2.  LPE Status

*Eastside has suffered damages in the amount of $ 8,618 resulting from the denial of the first application by Eastside for Lincoln Premier Experience status.*

Mr. Woeste was denied approval to be certified as a Lincoln Premier Experience Dealer on his initial try in 2000. Achievement of this status results in the ability of the dealership to earn a "bonus" for the sale of certain vehicles. The "bonus" payment is really a misnomer. At the time LPE was instituted, Lincoln Mercury cut the incentive payments to dealers and reduced their margin on sales. In essence, the dealers had to qualify under LPE to recover the money they previously received on the sale of a vehicle. It is Mr. Woeste's contention that this denial was another attempt to deny him the economic benefits of selling Lincoln Mercury vehicles and to once again diminish the value he associated with his dealership so that he would resign or sell at a reduced price, to accomplish the planned consolidation of the market. On his second application for approval he was granted his status as a Lincoln Premier dealer. During the period from the date that he should have been approved through the date on which he was approved, the dealership was unable to ear a bonus in the amount of $ 8,618 as detailed by vehicle on Exhibit 10.

## 4.  Vehicle Distribution

*Eastside has suffered damages in the amount of $ 89,770 resulting from the preferential distribution of vehicles to Reichert/KDG.*

The testimony of the General Manager of Eastside, Mr. George Beattie, is that there was preferential distribution of vehicles to Reichert/KDG.

Ford's distribution of new vehicles to its dealer body has two components. The first is a mathematical or mechanical allocation methodology in which vehicles are allocated based on dealers' sales histories. This type of allocation methodology is known as "turn to earn". That is, the faster a dealer sells (turns) vehicles, the more vehicles it will earn for future allocations. The second component of Ford's distribution system is a discretionary method to distribute vehicles, apart from and in addition to, those assigned by the mathematical allocation formula.

Ford has admitted that vehicle allocation records covering the consolidation period have been destroyed. Therefore, I am unable to precisely determine the number of vehicles denied to Eastside during the consolidation period.

Eastside was denied the opportunity to purchase "discretionary vehicles" and was therefore unable to sell vehicles that eventually were sold by Reichert/KDG. It is a vicious circle, in that the fewer cars a dealer gets in one period will also reduce future allocations.

The timing of delivery and in particular the availability of vehicles at the time of their introduction as new models is critical. Mr. Beattie will testify that, the mechanical allocation notwithstanding, the actual delivery dates of vehicles to Eastside were delayed by days or weeks compared to the Reichert/KDG dealerships. Eastside sales opportunities were diminished due to the unavailability and delivery of vehicles to the dealership.

Two examples of this are confirmed in units on Exhibits 11 and 12, and presented on the two graphs, noted as Exhibits 13 and 14. These exhibits highlight the points in time when the 2000 model year Lincoln LS and Lincoln Navigator were being introduced to the public.

The graphs show the favorable delivery of vehicles to the Reichert/KDG dealerships.

Ford's destruction of the allocation data required that we rely on the vehicle 'release" data.

A dealer can only sell what he has in inventory including those cars that are ordered and on the way, indicated by their "release" date. This delay in deliveries to Eastside reduces its opportunity to sell these vehicles at the most crucial time of the product: its new model year introduction.

Exhibit 15 details by model and year the vehicles that Mr. Beattie believes Eastside would have sold had they been provided.

Failure to sell a new vehicle deprives a dealer of the gross profit on the sale and associated finance and insurance ( F & I ) income.

Exhibit 16, details loss of gross profit per new car sold and F & I income that Eastside suffered due to the loss of the sales of these vehicles, net of the associated incremental variable selling expenses. The damage is $ 89,770.

## 5. Borrowing Costs

*Eastside has suffered damages in the amount of $ 450,169 resulting from the inability to reduce its borrowing costs had it not suffered these damages.*

It is my experience that more profitable dealerships borrow less money to finance their inventory. Had Eastside been more profitable it, too, would have borrowed less money.

Exhibit 17 indicates how much interest Eastside would have saved on the cost of borrowing had it not suffered these damages. This damage is $ 450,169

## 6. Blue Sky Valuation

*Eastside has suffered damages in the amount of $ 1,800,000 resulting from the loss of the Blue Sky value of Eastside.*

Once Ford began consolidating the Cincinnati Market, and those related actions alleged in the Complaint, Eastside's profits suffered. The value of a dealership is determined by calculating the value of its operating assets and Blue Sky. Blue Sky is the term used in the automotive area to describe the value attributed to the goodwill of the dealership. The most common method to value the Blue Sky of a dealership, apart from its operating assets, such as inventory, receivables, equipment, tools, etc, is a multiple of earnings. This process is supported in the deposition of Mr. Carter. The Ford plan for consolidation specifically refers to the calculation of Blue Sky as a multiple of future earnings.

Even Lincoln Mercury franchises which are losing money have a significant value. For example, in the Cincinnati Market Mr. Jeff Wyler purchased the Stillpass Lincoln Mercury dealership in March 2000 and paid $ 673,000 in Blue Sky to the Stillpass family for a dealership that was losing money. He sold this dealership to Ford in September 2000 for $ 775,000 plus an estimated loss to Ford on the parts inventory of $ 128,800 netting a true Blue Sky figure of $ 903,800, for a dealership which lost $ 446,607 in the first nine months of 2000. These Blue Sky figures are not easily equated to prior earnings as both dealerships were losing money.

Mr. Dixon negotiated a sale to Ford of his Lincoln Mercury dealership in December 1999 for significant Blue Sky. This dealership lost $ 307,015 in 1999. Ford paid a combined $ 1,783,000 in Blue Sky for this franchise. This Blue Sky figure similarly cannot be equated to earnings as the Dixon franchise was losing money.

Exhibit 18 details the operating results of these two franchises in comparison to the operating results of Eastside, both before and after recalculation for the damages claimed. Eastside is a "stronger" franchise than either Dixon or Wyler based upon operating results. Given the Blue Sky values paid for Dixon and Wyler it is my opinion that the Blue Sky value of Eastside in 1999, when Ford started to consolidate the Cincinnati market, was $ 1,800,000.

Exhibit 19 details the pro-forma operating results of Eastside using actual results adjusted for the damages and associated interest savings on those damages. As is evident Eastside would have been reporting profits absent the damages associated with the actions of the defendants. Using the appropriate multiple of three times earnings, my calculation of the value of the Blue Sky of Eastside, in an arms length sale between a willing buyer and a willing seller, is $ 1,471,967.

As a consequence of the consolidation, market representation actions, and other actions of the defendants, the most viable buyer of the Eastside franchise would be Ford and Reichert\KDG. Having Eastside as a competitor has not allowed Reichert/KDG to achieve the desired goal of controlling the market place and achieving the maximum

benefits as the consolidator. In its position Eastside has taken certain market actions in response to the consolidation and is selling vehicles at reduced gross profits which further has an impact on the results of the Reichert/KDG group. On Exhibit 20 I have set out the probable increase in gross profit that Reichert/KDG would realize if they were to purchase Eastside or if it simply ceased to exist. This calculation results in a Blue Sky figure of $ 1,920,000 and is reflective of the Eastside Blue Sky value to Reichert/KDG. This calculation does not take into account other cost savings that might be achieved by the consolidated operations.

The Lincoln Mercury Division of Ford did not disclose to Mr. Woeste or the other dealers whose franchises were purchased that it was going to consolidate the Cincinnati market. This consolidation dramatically diminished the value of the Eastside franchise to everyone except Ford and the consolidator, Reichert\KDG. Franchise agreements should provide a level playing field among competitors to create a partnership with the franchisor. Once the Cincinnati consolidation began, the level playing field tilts dramatically in favor of Reichert/KDG which has market position and advertising benefits, not to mention the two dualed facilities, which will make Eastside a much less attractive purchase by a dealer who is not in the position of being the consolidator. That is the position in which Mr. Woeste now finds himself. Had Ford disclosed to Mr. Woeste its intentions, he would have been able to look for a buyer like Mr. Wyler at an opportune time to sell, i.e., before the consolidation began. At present, it is unlikely that a potential buyer will offer fair market value for a dealership in a market that is all but completely consolidated. Further, had Eastside not suffered the damages that were the result of Ford and Reichert\KDG actions, the dealership would be more profitable and possess a greater Blue Sky value.

Experience dictates that a willing buyer and a willing seller will establish the value of a franchise based upon the expectations of the buyer and seller as to the projected results of the dealership. Hence the determination of the Blue Sky. In my experience all franchises have some minimal value that a buyer is willing to risk on the purchase of Blue Sky and that is generally in the range of $250,000. Without a willing buyer, and it is unlikely that one will come forward knowing that the Reichert/KDG has consolidated most of the market, it is my opinion that the Blue Sky value of Mr. Woeste's dealership has all but disappeared and even this minimum value of $ 250,000 will not be achieved. Thus, the damage in this area is $ 1, 800,000.


## 7. Financial Assistance to Reichert/KDG

*Eastside has suffered a damage in the amount of $ 341,250 resulting from not receiving financial assistance from the Lincoln Mercury Division of Ford.*

Ford employees testified that dealers within a multiple point market must be treated equitably in the distribution of marketing monies. Yet, Ford has provided direct financial assistance to the Reichert\KDG to assist in its take over and operations of its competing franchises. The purposes of these monies were to fund dealership purchases,

assist Reichert\KDG in selling cars that were not selling, assist in motivating salesmen to sell cars, assist with advertising, and additional profit. All of this financial assistance has been denied to Eastside by Ford. Exhibit 21 documents these sums. This damage is $ 341,250.

**Conclusion:**

The sum of the above seven damage categories is $6,735,241 to $ 6,877,052 as of December 31, 2004.

The above report is accurate as of the date below and is based upon the information that I have reviewed to date. I reserve the right to alter the above should new information come to may attention either through testimony, additional documentation or other means.

I am prepared to testify at trial to the above issues

Respectfully submitted:

Roger M. Bean, CPA

11-8-04
Dated

12

## ROGER M. BEAN, CPA

### QUALIFICATIONS

- Twenty-five years of experience in public accounting in areas such as; audits and reviews of financial statements, financial planning, budgeting, acquisitions, cost containment, financial reporting and cash management.

- Three years as Chief Financial Officer of not for profit entity involved with the certification of physicians in the field of family practice.

### EXPERIENCE PROFILE

- 1999-Present  Chief Financial Officer of the American Board of Family Practice, Inc

- 1978-1999    Rippe & Kingston Co. PSC,   Rippe & Kingston Systems, Inc., and affiliated entities.

  This group of companies is involved in the practice of public accounting, computer consulting, software development and licensing, investment advisory service, business valuations and mergers and acquisitions.

  | Positions held: | 1978 to 1980 | Senior in Audit Department |
  |---|---|---|
  | | 1980 to 1984 | Manager in Audit Department |
  | | 1984 to 1999 | Partner with firm |

- 1974 – 1978  Arthur Young and Company, CPA's

### SCOPE OF POSITION 1984 TO PRESENT

- Responsible for all accounting, finance and treasury functions of the American Board of Family Practice

- Rippe & Kingston partner in charge of audit and accounting practice, quality control issues, AICPA peer review compliance, administrative responsibilities including recruiting, continuing professional education, insurance, scheduling and departmental mentoring

Attachment A, Page two

## ROGER M. BEAN, CPA

### JOB EXPERIENCES- 1978 TO PRESENT

- Audit, review and accounting services to business and not-for-profit concerns. These entities range in size from not-for-profits with annual budgets from $50,000 to $ 20,000,000 and business enterprises up to $250,000,000 in revenues with international operations.

- Litigation support and forensic accounting services to lawfirms and clients involved in litigation and fraud recovery.

- Consulting services involving:

  | | | |
  |---|---|---|
  | Franchising | Insurance | Internal Controls |
  | Banking | Budgeting | Succession Planning |
  | MIS Systems | Executive Recruiting | |
  | Cost Control | Long Range Planning | |

- Industry Specialties Include

  | | |
  |---|---|
  | Automobile Dealerships | Not-For-Profit Organizations |
  | Professional Service Organizations | |

### EDUCATION

- University of Kentucky, Lexington, Kentucky;  B. S. Degree, Honors in Accounting, With Distinction;  August, 1974

### PROFESSIONAL AFFILIATIONS

- Licensed CPA in Ohio and Kentucky

- Member American Institute of Certified Public Accountants

- Member Ohio Society and Kentucky Society of CPA's

- Three term member of Ohio Society of CPA's Professional Ethics Committee, 1996 through 2000, Two term member of the Kentucky Society of CPA's professional ethics committee

Attachments B and C

## **Testimony of Roger M. Bean, CPA as Expert**

### **1997-2003**

1.     Marc D. Hellman V. Castruci Auto Mall, State Court. Deposition given.

## **Publications of Roger M. Bean**

### **1993-2003**

1.     Several newsletter or newspaper articles for Business Courier or not for profit publications

Attachment D
Page One

## Materials Reviewed in Preparation of this Report

1.  Ford Motor Company Dealer Financial Statements for Kings Lincoln Mercury, Stillpass Lincoln Mercury, Ridgeview Lincoln Mercury, Northgate Lincoln Mercury, Fryson Lincoln Mercury, Fairfield Lincoln Mercury, Wyler Lincoln Mercury for the period from 1996 to April 2002.
2.  Ford Motor Company Dealer Financial Statements for Eastside for the period from 1996 through September 30, 2004.
3.  Warranty Audit reports prepared by Ford and related correspondence on the Eastside franchise.
4.  Cross-Sell vehicle registrations for the period 1997 to 2004 for Ohio and Kentucky.
5.  Ford Dealer Fixed Operations Management Report for 2000 to 2004.
6.  Depositions and exhibits:
    A.  Mr. Carter
    B.  Mr. Reichert
    C.  Mr. Mullins
    D.  Mr. Huser
    E.  Mr. Hall
    F.  Mr. Crowley
    G.  Mr. Gwaltney
    H.  Mr. Walls
    I.  Mr. Woeste
    J.  Mr. Beattie
    K.  Mr. Brown
    L.  Mr. Woodall
    M.  Mr. Letart
    N.  Mr. Csernotta
    O.  Mr. Fisher
7.  Automotive News Market Data reports, 1998-2004
8.  Acquisition documents pertaining to the Wyler\Stillpass franchise.
9.  Acquisition documents pertaining to the Dixon franchise
10. Cincinnati region business plan review – 2000
11. Cincinnati region 1999 Growth Strategy Plan
12. Cincinnati region business plan review – 2001
13. Summary of Eastside and Chevrolet personnel for 1999 through 2004
14. Listing of lost LPE money from 2000
15. Complaint
16. JD Power Initial Quality Survey reports
17. Eastside customer satisfaction reports
18. Plaintiffs Memorandum in Opposition to the Motions for Summary Judgment of Defendants and Exhibits
19. "Scheduled Orders- Select Time Periods" for Eastside, Kings and Northgate
20. August 7, 2002 expert report of Mark C. Schmidt, Ph.D.

Attachment D
Page two

21.   Lincoln Distribution Strategy ( 08-23-00)
22.   Lincoln Mercury Profit Plan for Fairfield
23.   12-07-01 Competitive Dualing Consent Letter
24.   KDG Agreement and Right of First Refusal
25.   Consolidator Agreement
26.   Property detail ledgers for Honda East and Beechmont Motors
27.   Prime interest rate detail
28.   Actual detail of service records at Eastside
29.   Listing of lost vehicle sales
30.   Listing of expenses incurred in updating Eastside facility
31.   Operating report for Beechmont Chevrolet for 1999 to September 2004
32.   Dealership financial and employment data for Beechmont Motors for the
      period from 1998 to 2004
33.   Facilities data for Beechmont Chevrolet
34.   Lincoln Mercury sales reports for 2003 and YTD 11-01-04
35.   Lincoln Mercury warranty policies and procedures manual
36.   Excerpts from Lincoln Mercury accounting manual and chart of accounts
37.   Chevrolet franchise agreement
38.   Dealer Performance Reports for 1997 through 2000
39.   Parts and Service Performance Analysis 1997 through 2000

**Eastside Lincoln Mercury**
**Damage Calculation**

**Warranty Review and Audit Results**                    **Exhibit 1**

| Period Covered by Review and Audit | Estimated Dollar Volume of Warranty Sales By Eastside | Ford's Original Claimed Disallowance | Ford's Final Disallowance | Final % of Disallowances To Total |
|---|---|---|---|---|
| 11-1-96 to 04-30-97 | 484,501 | 8,222.69 | 6,362.65 | 1.31% |
| 10-14-97 to 07-14-98 | 573,237 | 21,400.00 | 2,675.00 | 0.47% |
| 11-25-98 to 08-25-99 | 376,042 | 2,359.00 | 2,359.00 | 0.63% |
| 02-29-00 to 01-30-01 | 469,888 | 5,973.00 | 5,973.00 | 1.27% |
| | 1,903,667 | 37,954.69 | 17,369.65 | 0.91% |

Notes

Actual Warranty Sales Per Eastside Lincoln Mercury Dealer Financial statements

| Time Frame | Dollars | Prorated $ for audit period |
|---|---|---|
| Calendar 1996 | 1,099,192 | |
| Calendar 1997 | 903,908 | 484,501 |
| Calendar 1998 | 710,626 | 573,237 |
| Calendar 1999 | 475,234 | 376,042 |
| Calendar 2000 | 517,288 | 469,888 |
| Calendar 2001 | 465,774 | |



Eastside Lincoln Mercury Trend Lines on Service, Parts and Warranty Sales- Exhibit 2

**Eastside Lincoln Mercury**
**Damage Calculation**                    EXHIBIT 3

**Dollar Volume and Percentage Increase**

**Competitors Warranty Sales Volume**

| Calendar Year | Other Lincoln Mercury Dealers Sales and % Change Note 1 | | Other Ford & Lincoln Mercury Dealers % Change Note 2 | Eastside Sales | % change |
|---|---|---|---|---|---|
| 1998 | $ 2,374,586 | | | 710,626 | |
| 1999 | $ 2,188,180 | -7.85% | | 475,234 | -49.53% |
| 2000 | $ 2,516,356 | 15.00% | 19.80% | 517,288 | 8.85% |
| 2001 | $ 3,953,296 | 57.10% | 46.20% | 465,774 | -9.96% |
| 2002 | $ 3,149,832 | -20.32% | -25.50% | 492,573 | 5.75% |
| 2003 | | | -21.20% | 426,207 | -13.47% |
| 2004 | | | -6.50% | 420,128 | -1.43% |

Note 1- Warranty sales dollars from dealer financials for Kings, Dixon/Fairfield, Fryson/Ridgeview, Northgate, and Wyler/Stillpass. Data for 2002 is annualized using results through April 2002.

Note 2 - Per Ford Management Reporting System results for Region 47, Market A-1, representing 20 Ford and Lincoln Mercury dealers in the Cincinnati region. Data not available for 1999. 2004 data through July 31, 2004.

**Eastside Lincoln Mercury**
**Damage Calculation**                                    Exhibit 4

**Lost Warranty Volume**

Eastside Lincoln Mercury Data
Per Dealership Financial Statements

| Calendar Year | Sales | Gross Profit Percentage | Service Dept Variable Selling Expense as a % of Gross Profit | Note 1 Factor Applied to Sales Volume | Increase (Decline) In Sales Volume | Revised Annual Sales Volume | Impact on Gross Profit Net of Selling Expenses |
|---|---|---|---|---|---|---|---|
| 1998 | 710,626 | 47.00% | | | | | |
| 1999 | 475,234 | 48.00% | 21.31% | -7.85% | 179,608 | 654,842 | 67,840 |
| 2000 | 517,288 | 45.00% | 22.38% | 15.00% | 235,780 | 753,068 | 82,356 |
| 2001 | 465,774 | 44.00% | 21.38% | 57.10% | 717,296 | 1,183,070 | 248,133 |
| 2002 | 492,573 | 43.00% | 17.50% | -20.32% | 450,097 | 942,670 | 159,672 |
| 2003 | 426,207 | 46.00% | 18.06% | -21.20% | 316,617 | 742,824 | 119,341 |
| 2004 *Note 3* | 420,128 | 46.00% | 18.99% | -6.50% | 274,413 | 694,541 | 102,259 |
| TOTAL | | | | | | | 779,600 |

Eastside Lincoln Mercury Data
Per Dealership Financial Statements

| Calendar Year | Sales | Gross Profit Percentage | Service Dept Variable Selling Expense as a % of Gross Profit | Note 2 Factor Applied to Sales Volume | Increase (Decline) In Sales Volume | Revised Annual Sales Volume | Impact on Gross Profit Net of Selling Expenses |
|---|---|---|---|---|---|---|---|
| 1998 | 710,626 | 47.00% | | | | | |
| 1999 | 475,234 | 48.00% | 21.31% | -7.85% | 179,608 | 654,842 | 67,840 |
| 2000 | 517,288 | 45.00% | 22.38% | 19.80% | 267,213 | 784,501 | 93,335 |
| 2001 | 465,774 | 44.00% | 21.38% | 46.20% | 681,166 | 1,146,940 | 235,634 |
| 2002 | 492,573 | 43.00% | 17.50% | -25.50% | 361,897 | 854,470 | 128,383 |
| 2003 | 426,207 | 46.00% | 18.06% | -21.20% | 247,115 | 673,322 | 93,144 |
| 2004 **Note 3** | 420,128 | 46.00% | 18.99% | -6.50% | 209,429 | 629,557 | 78,043 |
| TOTAL | | | | | | | 696,379 |

Note One    1999 to 2001 factor derived from reported results from direct Lincoln Mercury competitors in the Cincinnati area.
             2002 factor is annualized results from same competitors using their results through April 2002.
             2003 factor is from Ford reports for Region 47, Market A-1, all Ford and Lincoln Mercury dealers
Note Two    1999 Factor from competitors reported results.
             2000 to 2002 factor is from Lincoln Mercury reports for Region 47, Market A-1, all Ford and Lincoln Mercury dealers
             2003 factor is annualized figure from Ford reports through April 2003.
Note Three  2004 data for ELM is annualized data derived from actual results through September 30, 2004

**Eastside Lincoln Mercury**
**Damage Calculation**                                    <u>Exhibit 5</u>

**Lost Warranty Volume**

<u>Eastside Lincoln Mercury Data</u>
<u>Per Dealership Financial Statements</u>

| Calendar<br>Year | <u>Sales</u> | Gross Profit<br><u>Percentage</u> | Service Dept<br>Variable Selling<br>Expense as a<br><u>% of Gross Profit</u> | <u>*Note 1*</u><br>Factor<br>Applied to<br>Sales<br><u>Volume</u> | Increase<br>(Decline)<br>In Sales<br><u>Volume</u> | Revised<br>Annual<br>Sales<br><u>Volume</u> | Impact on<br>Gross Profit<br>Net of Selling<br><u>Expenses</u> |
|---|---|---|---|---|---|---|---|
| 1998 | 710,626 | 47.00% | | | | | |
| 1999 | 475,234 | 48.00% | 21.31% | -7.85% | 179,608 | 654,842 | 67,840 |
| 2000 | 517,288 | 45.00% | 22.38% | 15.00% | 235,780 | 753,068 | 82,356 |
| 2001 | 465,774 | 44.00% | 21.38% | 46.20% | 635,212 | 1,100,986 | 219,737 |
| 2002 | 492,573 | 43.00% | 17.50% | -25.50% | 327,661 | 820,234 | 116,238 |
| 2003 | 426,207 | 46.00% | 18.06% | -21.20% | 220,138 | 646,345 | 82,975 |
| 2004 **Note 2** | 420,128 | 46.00% | 18.99% | -6.50% | 184,204 | 604,332 | 68,643 |
| TOTAL | | | | | | | <u>637,789</u> |

Note One    The annual factor used is the one with the smallest impact on Eastside's sales volume as follows:
　　　　　　1999 and 2000 factor derived from reported results from direct Lincoln Mercury competitors in the Cincinnati area.
　　　　　　2001 to 2003 factor is from Ford reports for Region 47, Market A-1, all Ford and Lincoln Mercury dealers
　　　　　　2004 factor is also from Ford and is annualized from the July 2004 factor
Note Two    2004 data for ELM is annualized data derived from actual results through September 30, 2004

**Eastside Lincoln Mercury**
**Damage Calculation**

Exhibit 6

**Anticipated Loss From Carryover Impact of Warranty Audits on 2005**

| | |
|---|---|
| Loss incurred in 2004, per Exhibit 5 | 68,643 |
| Anticipated 2005 loss from carryover impact of warranty audits | 68,643 |
| Discount factor at 4% to state future loss as of December 31, 2004 | (1,465) |
| Loss as of December 31, 2004 | 67,178 |

**Eastside Lincoln Mercury**
**Damage Calculation**

**Cost of Warranty Audits**                    **Exhibit 7**

| Warranty Period | Date of Audit | Amount |
|---|---|---|
| 11-12-98 to 08-25-99 | 10/20/1999 | 2,359 |
| 02-29-00 to 01-30-01 | 4/9/2001 | 5,973 |
| | | 8,332 |

**Eastside Lincoln Mercury**
**Personnel Statistics 10-01-03**          **Exhibit 8**
**Provided By Management**

| | calendar year 1999 | | calendar year 2000 | | calendar year 2001 | | calendar year 2002 | |
|---|---|---|---|---|---|---|---|---|
| | Chevy | Eastside | Chevy | Eastside | Chevy | Eastside | Chevy | Eastside |
| Owner | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Gen Manager | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| New Manager | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Used Manager | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Service Manager | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Parts Manager | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| F & I Manager | 2 | 1 | 1 | 0 | 1 | 0 | 2 | 0 |
| Salespeople | 10 | 6 | 10 | 6 | 7 | 6 | 11 | 6 |
| Service Advisors | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| Parts Counter | 3 | 2 | 3 | 2 | 2 | 2 | 2 | 2 |
| Parts Driver | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Technicians | 9 | 11 | 9 | 11 | 9 | 11 | 9 | 11 |
| Lot Techs/Porters | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| Clerical | 7 | 4 | 4 | 4 | 4 | 3 | 4 | 5 |
| Detail Shop | 0 | 3 | 0 | 3 | 3 | 3 | 0 | 3 |

| | Calendar 2003 | | Estimate Calendar 2004 | |
|---|---|---|---|---|
| | Chevy | Eastside | Chevy | Eastside |
| Owner | 1 | 1 | 1 | 1 |
| Gen Manager | 1 | 1 | 1 | 1 |
| New Manager | 1 | 1 | 1 | 1 |
| Used Manager | 1 | 1 | 1 | 1 |
| Service Manager | 1 | 1 | 1 | 2 |
| Parts Manager | 1 | 1 | 1 | 1 |
| F & I Manager | 1 | 0 | 1 | 1 |
| Salespeople | 12 | 7 | 11 | 7 |
| Service Advisors | 3 | 3 | 3 | 5 |
| Parts Counter | 2 | 2 | 4 | 2 |
| Parts Driver | 0 | 1 | 1 | 1 |
| Technicians | 9 | 11 | 12 | 12 |
| Lot Techs/Porters | 2 | 4 | 4 | 6 |
| Clerical | 4 | 5 | 3 | 3 |
| Detail Shop | 0 | 3 | 0 | 5 |

Eastside Lincoln Mercury
Damage Calculation

Exhibit 9

Expense Savings Associated With Dualed Facility

| | | For the Calendar years ended December 31 | | | | | Estimated Annual | YTD |
|---|---|---|---|---|---|---|---|---|
| | | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 9/30/2004 |
| **Actual Expense per ELM Financial Statements** | | | | | | | | |
| Dept Managers | | | | | | | | |
| New | | 60,973 | 54,036 | 63,302 | 74,807 | 95,147 | 79,315 | 59,486 |
| Used | | 39,335 | 39,687 | 26,649 | 83,003 | 76,715 | 108,677 | 81,508 |
| Service | | 84,640 | 49,389 | 45,705 | 58,975 | 70,288 | 84,360 | 63,270 |
| Parts | | 40,071 | 38,374 | 38,649 | 45,590 | 44,523 | 46,911 | 35,183 |
| F & I | | 30,519 | 13,377 | 8,816 | 4,856 | 574 | 10,320 | 7,740 |
| Other Salaries | | | | | | | | |
| New | | 79,096 | 86,354 | 107,056 | 55,623 | 40,438 | 40,608 | 30,456 |
| Used | | 51,840 | 56,041 | 63,083 | 38,086 | 22,490 | 28,795 | 21,596 |
| Service | | 232,515 | 241,139 | 253,675 | 220,785 | 253,575 | 238,389 | 178,792 |
| Parts | | 90,770 | 95,332 | 95,295 | 82,503 | 76,773 | 77,791 | 58,343 |
| Admin | | 16,306 | 27,763 | 51,299 | 55,753 | 60,486 | 65,676 | 49,257 |
| | | | | | | | | |
| P/R taxes and Benefits | | 189,518 | 180,463 | 174,101 | 169,051 | 202,745 | 214,992 | 161,244 |
| General Manager | | 81,431 | 75,000 | 75,289 | 102,885 | 105,774 | 74,748 | 56,061 |
| Rent & equiv | | 219,410 | 218,317 | 216,191 | 220,087 | 213,016 | 210,255 | 157,691 |
| Utilities | | 27,333 | 26,521 | 29,451 | 28,594 | 28,336 | 34,488 | 25,866 |
| Data processing | | 92,594 | 100,292 | 97,107 | 106,767 | 99,188 | 104,915 | 78,686 |
| Telephone | | 23,276 | 33,496 | 33,545 | 29,366 | 33,283 | 41,141 | 30,856 |
| | | | | | | | | |
| **Savings Calculation** | Factor | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | |
| | | | | | | | | |
| Department Managers | | | | | | | | |
| General Manager | Eliminated | 81,431 | 75,000 | 75,289 | 102,885 | 105,774 | 74,748 | |
| New manager | Retained | 0 | 0 | 0 | 0 | 0 | 0 | |
| Used Manager | Retained | 0 | 0 | 0 | 0 | 0 | 0 | |
| Service Manager | Eliminated | 84,640 | 49,389 | 45,705 | 58,975 | 70,288 | 84,360 | |
| Parts Manager | Eliminated | 40,071 | 38,374 | 38,649 | 45,590 | 44,523 | 46,911 | |
| F & I Manager | Eliminated | 30,519 | 0 | 0 | 0 | 0 | 10,320 | |
| Other personnel | | | | | | | | |
| New Department | 60% eliminated | 47,458 | 51,812 | 64,234 | 33,374 | 24,263 | 24,365 | |
| Used Department | 60% eliminated | 31,104 | 33,625 | 37,850 | 22,852 | 13,494 | 17,277 | |
| Parts Department | 25% eliminated | 22,693 | 23,833 | 23,824 | 20,626 | 19,193 | 19,448 | |
| Service Department | 20% eliminated | 46,503 | 48,228 | 50,735 | 44,157 | 50,715 | 47,678 | |
| Administrative | 50% eliminated | 8,153 | 13,882 | 25,650 | 27,877 | 30,243 | 32,838 | |
| P/R Taxes and Benefits at 20% | | 78,514 | 66,828 | 72,387 | 71,267 | 71,699 | 71,589 | |
| Utilities | 33% Eliminated | 9,020 | 8,752 | 9,719 | 9,436 | 9,351 | 11,381 | |
| Rent & Equivalent | Eliminated | 219,410 | 218,317 | 216,191 | 220,087 | 213,016 | 210,255 | |
| Data Processing & Phone | 10% Eliminated | 11,587 | 13,379 | 13,065 | 13,613 | 13,247 | 14,606 | |
| | | | | | | | | |
| Pay raises for remaining personnel | | | | | | | | |
| to recognize new responsibilities | | -20,000 | -25,000 | -30,000 | -35,000 | -40,000 | -45,000 | |
| Carrying cost of new facility | | | | | | | | |
| at 8% of cost | | -52,000 | -52,000 | -52,000 | -52,000 | -52,000 | -52,000 | |
| Carrying costs for new furniture | | | | | | | | |
| at 8% of cost | | -8,000 | -8,000 | -8,000 | -8,000 | -8,000 | -8,000 | |
| Rent paid to new landlord | | -3,500 | -3,500 | -3,500 | -3,500 | -3,500 | -3,500 | |
| Operating costs of new facility | | -20,000 | -20,000 | -20,000 | -20,000 | -20,000 | -20,000 | |
| | | | | | | | | **TOTAL** |
| Net Savings From Dualing Facilities | | 607,602 | 532,918 | 559,797 | 552,238 | 542,306 | 537,274 | 3,332,135 |

**Eastside Lincoln Mercury**
**Damage Calculation**

<u>**Exhibit 10**</u>

### <u>Lost Lincoln Premier Bonus Money</u>

| <u>Customer Name</u> | <u>Deal #</u> | <u>Date</u> | <u>VIN #</u> | <u>Dollars</u> |
|---|---|---|---|---|
| Bergstrom | 202402 | 8/26/00 | 1L1Y602794 | 513.06 |
| Garascia | 202433 | 8/31/00 | 1L1Y604680 | 497.81 |
| Welch | 202530 | 9/28/00 | 1L1Y620150 | 497.81 |
| Jennings | 202549 | 9/30/00 | 1M1A608709 | 269.13 |
| Swisshelm | 202654 | 11/2/00 | 2M1X620937 | 285.06 |
| Clark | 202669 | 11/13/00 | 1L1Y616737 | 497.81 |
| Minning | 202678 | 11/16/00 | 1L1Y608802 | 552.00 |
| Ross | 202699 | 11/27/00 | 1L1Y620057 | 497.81 |
| Oaks | 202701 | 11/28/00 | 1L1Y603872 | 552.43 |
| Player | 202717 | 12/4/00 | 4M1UJ06724 | 376.50 |
| Althawadi | 202727 | 12/8/00 | 1M1A616611 | 269.13 |
| Ferguson | 202728 | 12/9/00 | 1L1Y643572 | 526.13 |
| Hartman | 202726 | 12/11/00 | 1L1Y623412 | 497.81 |
| Noggle | 202739 | 12/14/00 | 1L1Y635826 | 415.38 |
| 1st Natl Bank | 202745 | 12/19/00 | 1L1Y662604 | 552.44 |
| Hilltop research | 202752 | 12/21/00 | 1L1Y662709 | 552.44 |
| Frer | 202756 | 12/23/00 | 1M1A612650 | 269.81 |
| Haywood | 202764 | 12/27/00 | 1L1Y627955 | 497.81 |
| Briggs | 202767 | 12/28/00 | 1L1Y663251 | <u>497.81</u> |

8,618.18

Eastside Lincoln Mercury
Damage Calculation
Deliveries of Lincoln Navigator
August 24, 1999 to October 31, 1999

Exhibit 11

| DAILY SCHEDULE RELEASES | | | | ACCUMULATED SCHEDULE RELEASES | | | | |
|---|---|---|---|---|---|---|---|---|
| Date | KINGS | EASTSIDE | NORTHGATE | | Date | Eastside | Northgate | Kings |
| 08/24/1999 | | | | 1.00 | 08/24/1999 | 0 | 0 | 0 |
| 08/25/1999 | | | | 2.00 | 08/25/1999 | 0 | 0 | 0 |
| 08/26/1999 | 1 | | | 3.00 | 08/26/1999 | 0 | 0 | 1 |
| 08/27/1999 | | | | 4.00 | 08/27/1999 | 0 | 0 | 1 |
| 08/28/1999 | | | | 5.00 | 08/28/1999 | 0 | 0 | 1 |
| 08/29/1999 | | | | 6.00 | 08/29/1999 | 0 | 0 | 1 |
| 08/30/1999 | 1 | | | 7.00 | 08/30/1999 | 0 | 0 | 2 |
| 08/31/1999 | | | | 8.00 | 08/31/1999 | 0 | 0 | 2 |
| 09/01/1999 | | | | 9.00 | 09/01/1999 | 0 | 0 | 2 |
| 09/02/1999 | | | | 10.00 | 09/02/1999 | 0 | 0 | 2 |
| 09/03/1999 | 1 | | | 11.00 | 09/03/1999 | 0 | 0 | 3 |
| 09/04/1999 | | | | 12.00 | 09/04/1999 | 0 | 0 | 3 |
| 09/05/1999 | | | | 13.00 | 09/05/1999 | 0 | 0 | 3 |
| 09/06/1999 | | | | 14.00 | 09/06/1999 | 0 | 0 | 3 |
| 09/07/1999 | 1 | | | 15.00 | 09/07/1999 | 0 | 0 | 4 |
| 09/08/1999 | 1 | | | 16.00 | 09/08/1999 | 0 | 0 | 5 |
| 09/09/1999 | | | 1 | 17.00 | 09/09/1999 | 0 | 1 | 5 |
| 09/10/1999 | | | | 18.00 | 09/10/1999 | 0 | 1 | 5 |
| 09/11/1999 | | | | 19.00 | 09/11/1999 | 0 | 1 | 5 |
| 09/12/1999 | | | | 20.00 | 09/12/1999 | 0 | 1 | 5 |
| 09/13/1999 | 3 | | 1 | 21.00 | 09/13/1999 | 0 | 2 | 8 |
| 09/14/1999 | | | | 22.00 | 09/14/1999 | 0 | 2 | 8 |
| 09/15/1999 | | | | 23.00 | 09/15/1999 | 0 | 2 | 8 |
| 09/16/1999 | | | | 24.00 | 09/16/1999 | 0 | 2 | 8 |
| 09/17/1999 | | 1 | | 25.00 | 09/17/1999 | 1 | 2 | 8 |
| 09/18/1999 | | | | 26.00 | 09/18/1999 | 1 | 2 | 8 |
| 09/19/1999 | | | | 27.00 | 09/19/1999 | 1 | 2 | 8 |
| 09/20/1999 | | | 1 | 28.00 | 09/20/1999 | 1 | 3 | 8 |
| 09/21/1999 | | | | 29.00 | 09/21/1999 | 1 | 3 | 8 |
| 09/22/1999 | | | | 30.00 | 09/22/1999 | 1 | 3 | 8 |
| 09/23/1999 | | | | 31.00 | 09/23/1999 | 1 | 3 | 8 |
| 09/24/1999 | 2 | | | 32.00 | 09/24/1999 | 1 | 3 | 10 |
| 09/25/1999 | 2 | | | 33.00 | 09/25/1999 | 1 | 3 | 12 |
| 09/26/1999 | | | | 34.00 | 09/26/1999 | 1 | 3 | 12 |
| 09/27/1999 | | | | 35.00 | 09/27/1999 | 1 | 3 | 12 |
| 09/28/1999 | | | | 36.00 | 09/28/1999 | 1 | 3 | 12 |
| 09/29/1999 | | | | 37.00 | 09/29/1999 | 1 | 3 | 12 |
| 09/30/1999 | | | | 38.00 | 09/30/1999 | 1 | 3 | 12 |
| 10/01/1999 | | | | 39.00 | 10/01/1999 | 1 | 3 | 12 |
| 10/02/1999 | | | | 40.00 | 10/02/1999 | 1 | 3 | 12 |
| 10/03/1999 | | | | 41.00 | 10/03/1999 | 1 | 3 | 12 |
| 10/04/1999 | | | | 42.00 | 10/04/1999 | 1 | 3 | 12 |
| 10/05/1999 | | 1 | 2 | 43.00 | 10/05/1999 | 2 | 5 | 12 |
| 10/06/1999 | | | | 44.00 | 10/06/1999 | 2 | 5 | 12 |
| 10/07/1999 | | 1 | | 45.00 | 10/07/1999 | 3 | 5 | 12 |
| 10/08/1999 | | 1 | 1 | 46.00 | 10/08/1999 | 4 | 6 | 12 |
| 10/09/1999 | 2 | | | 47.00 | 10/09/1999 | 4 | 6 | 14 |
| 10/10/1999 | 3 | | | 48.00 | 10/10/1999 | 4 | 6 | 17 |
| 10/11/1999 | | | | 49.00 | 10/11/1999 | 4 | 6 | 17 |
| 10/12/1999 | 1 | | | 50.00 | 10/12/1999 | 4 | 6 | 18 |
| 10/13/1999 | | | | 51.00 | 10/13/1999 | 4 | 6 | 18 |
| 10/14/1999 | | 1 | 1 | 52.00 | 10/14/1999 | 5 | 7 | 18 |
| 10/15/1999 | | | | 53.00 | 10/15/1999 | 5 | 7 | 18 |
| 10/16/1999 | 1 | | | 54.00 | 10/16/1999 | 5 | 7 | 19 |
| 10/17/1999 | | | | 55.00 | 10/17/1999 | 5 | 7 | 19 |
| 10/18/1999 | | | | 56.00 | 10/18/1999 | 5 | 7 | 19 |
| 10/19/1999 | | | | 57.00 | 10/19/1999 | 5 | 7 | 19 |
| 10/20/1999 | | | | 58.00 | 10/20/1999 | 5 | 7 | 19 |
| 10/21/1999 | | 2 | | 59.00 | 10/21/1999 | 7 | 7 | 19 |
| 10/22/1999 | 1 | | | 60.00 | 10/22/1999 | 7 | 7 | 20 |
| 10/23/1999 | | | 1 | 61.00 | 10/23/1999 | 7 | 8 | 20 |
| 10/24/1999 | | | | 62.00 | 10/24/1999 | 7 | 8 | 20 |
| 10/25/1999 | | | | 63.00 | 10/25/1999 | 7 | 8 | 20 |
| 10/26/1999 | | | 1 | 64.00 | 10/26/1999 | 7 | 9 | 20 |
| 10/27/1999 | | 1 | | 65.00 | 10/27/1999 | 8 | 9 | 20 |
| 10/28/1999 | | | | 66.00 | 10/28/1999 | 8 | 9 | 20 |
| 10/29/1999 | 1 | | | 67.00 | 10/29/1999 | 8 | 9 | 21 |
| 10/30/1999 | 2 | | | 68.00 | 10/30/1999 | 8 | 9 | 23 |
| 10/31/1999 | 1 | | | 69.00 | 10/31/1999 | 8 | 9 | 24 |

Eastside Lincoln Mercury
Damage Calculation
Deliveries of Lincoln Model LS
May 1, 1999 to July 29, 1999

Exhibit 12

### DAILY SCHEDULE RELEASES

| Date | KINGS | EASTSIDE | NORTHGATE |
|---|---|---|---|
| 05/01/1999 | | | |
| 05/02/1999 | | | |
| 05/03/1999 | 2 | | |
| 05/04/1999 | | 1 | 1 |
| 05/05/1999 | | | |
| 05/06/1999 | | 1 | |
| 05/07/1999 | 2 | | |
| 05/08/1999 | | | |
| 05/09/1999 | | | |
| 05/10/1999 | | | 1 |
| 05/11/1999 | | | |
| 05/12/1999 | | | |
| 05/13/1999 | | | |
| 05/14/1999 | | | |
| 05/15/1999 | | | |
| 05/16/1999 | | | |
| 05/17/1999 | 1 | | |
| 05/18/1999 | 2 | | |
| 05/19/1999 | 1 | | |
| 05/20/1999 | 1 | | |
| 05/21/1999 | 1 | | |
| 05/22/1999 | | | |
| 05/23/1999 | | | |
| 05/24/1999 | | | |
| 05/25/1999 | | 1 | |
| 05/26/1999 | 4 | | |
| 05/27/1999 | | | |
| 05/28/1999 | | | |
| 05/29/1999 | | | |
| 05/30/1999 | | | |
| 05/31/1999 | | | |
| 06/01/1999 | | | 1 |
| 06/02/1999 | | | 2 |
| 06/03/1999 | 1 | | |
| 06/04/1999 | | | 1 |
| 06/05/1999 | | | |
| 06/06/1999 | 2 | | |
| 06/07/1999 | 2 | 1 | |
| 06/08/1999 | | | |
| 06/09/1999 | | 1 | |
| 06/10/1999 | | 2 | |
| 06/11/1999 | | | |
| 06/12/1999 | | | |
| 06/13/1999 | | | |
| 06/14/1999 | | | |
| 06/15/1999 | 1 | | |
| 06/16/1999 | | 1 | |
| 06/17/1999 | 1 | | 1 |
| 06/18/1999 | 1 | 1 | |
| 06/19/1999 | | | |
| 06/20/1999 | | | |
| 06/21/1999 | | | |
| 06/22/1999 | | 1 | 1 |
| 06/23/1999 | | | |
| 06/24/1999 | 1 | 1 | 1 |
| 06/25/1999 | | | |
| 06/26/1999 | | | |
| 06/27/1999 | | | |
| 06/28/1999 | | | |
| 06/29/1999 | | | |
| 06/30/1999 | | | |
| 07/01/1999 | | | |
| 07/02/1999 | 1 | 1 | |
| 07/03/1999 | | | |
| 07/04/1999 | | | |
| 07/05/1999 | | | |
| 07/06/1999 | | | |
| 07/07/1999 | | | |
| 07/08/1999 | | | |
| 07/09/1999 | | | |
| 07/10/1999 | | | |
| 07/11/1999 | | | |
| 07/12/1999 | | | |
| 07/13/1999 | | | |
| 07/14/1999 | | | |
| 07/15/1999 | | | |
| 07/16/1999 | | | |
| 07/17/1999 | | | |
| 07/18/1999 | | | |
| 07/19/1999 | | | |
| 07/20/1999 | | 1 | |
| 07/21/1999 | | | |
| 07/22/1999 | 3 | | 2 |
| 07/23/1999 | | 2 | |
| 07/24/1999 | | | |
| 07/25/1999 | | | |
| 07/26/1999 | | 1 | |
| 07/27/1999 | | | |
| 07/28/1999 | | | |
| 07/29/1999 | | | |

### ACCUMULATED SCHEDULE RELEASES

| Date | Eastside | Northgate | Kings |
|---|---|---|---|
| 05/01/1999 | 0 | 0 | 0 |
| 05/02/1999 | 0 | 0 | 0 |
| 05/03/1999 | 0 | 0 | 2 |
| 05/04/1999 | 1 | 1 | 2 |
| 05/05/1999 | 1 | 1 | 2 |
| 05/06/1999 | 2 | 1 | 2 |
| 05/07/1999 | 2 | 1 | 4 |
| 05/08/1999 | 2 | 1 | 4 |
| 05/09/1999 | 2 | 1 | 4 |
| 05/10/1999 | 2 | 2 | 4 |
| 05/11/1999 | 2 | 2 | 4 |
| 05/12/1999 | 2 | 2 | 4 |
| 05/13/1999 | 2 | 2 | 4 |
| 05/14/1999 | 2 | 2 | 4 |
| 05/15/1999 | 2 | 2 | 4 |
| 05/16/1999 | 2 | 2 | 4 |
| 05/17/1999 | 2 | 2 | 5 |
| 05/18/1999 | 2 | 2 | 7 |
| 05/19/1999 | 2 | 2 | 8 |
| 05/20/1999 | 2 | 2 | 9 |
| 05/21/1999 | 2 | 2 | 10 |
| 05/22/1999 | 2 | 2 | 10 |
| 05/23/1999 | 2 | 2 | 10 |
| 05/24/1999 | 2 | 2 | 10 |
| 05/25/1999 | 3 | 2 | 10 |
| 05/26/1999 | 3 | 2 | 14 |
| 05/27/1999 | 3 | 2 | 14 |
| 05/28/1999 | 3 | 2 | 14 |
| 05/29/1999 | 3 | 2 | 14 |
| 05/30/1999 | 3 | 2 | 14 |
| 05/31/1999 | 3 | 2 | 14 |
| 06/01/1999 | 3 | 3 | 14 |
| 06/02/1999 | 3 | 5 | 14 |
| 06/03/1999 | 3 | 5 | 15 |
| 06/04/1999 | 3 | 6 | 15 |
| 06/05/1999 | 3 | 6 | 15 |
| 06/06/1999 | 3 | 6 | 17 |
| 06/07/1999 | 4 | 6 | 19 |
| 06/08/1999 | 4 | 6 | 19 |
| 06/09/1999 | 5 | 6 | 19 |
| 06/10/1999 | 7 | 6 | 19 |
| 06/11/1999 | 7 | 6 | 19 |
| 06/12/1999 | 7 | 6 | 19 |
| 06/13/1999 | 7 | 6 | 19 |
| 06/14/1999 | 7 | 6 | 19 |
| 06/15/1999 | 7 | 6 | 20 |
| 06/16/1999 | 8 | 6 | 20 |
| 06/17/1999 | 8 | 7 | 21 |
| 06/18/1999 | 9 | 7 | 22 |
| 06/19/1999 | 9 | 7 | 22 |
| 06/20/1999 | 9 | 7 | 22 |
| 06/21/1999 | 9 | 7 | 22 |
| 06/22/1999 | 10 | 8 | 22 |
| 06/23/1999 | 10 | 8 | 22 |
| 06/24/1999 | 11 | 9 | 23 |
| 06/25/1999 | 11 | 9 | 23 |
| 06/26/1999 | 11 | 9 | 23 |
| 06/27/1999 | 11 | 9 | 23 |
| 06/28/1999 | 11 | 9 | 23 |
| 06/29/1999 | 11 | 9 | 23 |
| 06/30/1999 | 11 | 9 | 23 |
| 07/01/1999 | 11 | 9 | 23 |
| 07/02/1999 | 12 | 9 | 24 |
| 07/03/1999 | 12 | 9 | 24 |
| 07/04/1999 | 12 | 9 | 24 |
| 07/05/1999 | 12 | 9 | 24 |
| 07/06/1999 | 12 | 9 | 24 |
| 07/07/1999 | 12 | 9 | 24 |
| 07/08/1999 | 12 | 9 | 24 |
| 07/09/1999 | 12 | 9 | 24 |
| 07/10/1999 | 12 | 9 | 24 |
| 07/11/1999 | 12 | 9 | 24 |
| 07/12/1999 | 12 | 9 | 24 |
| 07/13/1999 | 12 | 9 | 24 |
| 07/14/1999 | 12 | 9 | 24 |
| 07/15/1999 | 12 | 9 | 24 |
| 07/16/1999 | 12 | 9 | 24 |
| 07/17/1999 | 12 | 9 | 24 |
| 07/18/1999 | 12 | 9 | 24 |
| 07/19/1999 | 12 | 9 | 24 |
| 07/20/1999 | 13 | 9 | 24 |
| 07/21/1999 | 13 | 9 | 24 |
| 07/22/1999 | 13 | 11 | 27 |
| 07/23/1999 | 15 | 11 | 27 |
| 07/24/1999 | 15 | 11 | 27 |
| 07/25/1999 | 15 | 11 | 27 |
| 07/26/1999 | 16 | 11 | 27 |
| 07/27/1999 | 16 | 11 | 27 |
| 07/28/1999 | 16 | 11 | 27 |
| 07/29/1999 | 16 | 11 | 27 |



New Model Year Lincoln Navigator Releases to Select Cincinnati Area Linco
Exhibit 13



rea Lincoln Mercury Dealerships,

Kings/Northgate

Eastside

8          36445          36452          36459



New Model Year Lincoln LS Releases to Select Cincinnati Area Lincoln Mercury Dealerships, Exhibit 14

**Eastside Lincoln Mercury**
**Damage Calculation**

**Exhibit 15**

**Lost Sales Volume Resulting From Preferential Delivery of Vehicles**

| Calendar Year | Lost unit sales by model of vehicle | | | | Total Lost Unit Sales |
|---|---|---|---|---|---|
| | Cougar | Navigator | Lincoln LS | Mountaineer | |
| 1999 | 20 | 8 | 6 | 9 | 43 |
| 2000 | 10 | 6 | 8 | 8 | 32 |
| 2001 | 8 | 5 | 5 | 6 | 24 |
| 2002 | 0 | 5 | 0 | 0 | 5 |
| Grand Total | | | | | 104 |

**Eastside Lincoln Mercury**
**Damage Calculation**

**Lost Profits Associated With Missed Sales**          **Exhibit 16**

| Calendar Year | Lost new Unit Sales In Units | Gross Profit Per ELM Financials Per New Unit Sale | F & I per New Unit | Variable Selling Expenses as a % of Gross Profit New Car Department | Net Missed Profit |
|---|---|---|---|---|---|
| 1999 | 43 | 1,147.73 | 127.00 | 26.30% | 40,397 |
| 2000 | 32 | 1,102.33 | 93.00 | 23.50% | 29,262 |
| 2001 | 24 | 957.21 | 145.00 | 32.30% | 17,909 |
| 2002 | 5 | 705.72 | 110.00 | 46.00% | 2,202 |
| | | | | TOTAL | 89,770 |

Eastside Lincoln Mercury
Damage Calculation

Exhibit 17

**Borrowing Costs Incurred Due to Lost Gross Profit, Increased Expenses and Inability to Dual Facilities**

Damage calculated through December 31, 2003

| Calendar Year | Savings Associated With | Amount of Savings | Interest Rate | Current Year Amount to Be Saved | Future Years Savings |
|---|---|---|---|---|---|
| 1999 | Denial of Permission to Relocate Dealership | 607,602 | | | |
| 1999 | Lost Warranty Gross Profit | 67,840 | | | |
| 1999 | Lost Gross on Lost New Vehicle Sales | 40,397 | | | |
| | Subtotal | 715,839 | 8.00% | 28,634 | 146,747 |
| | | | | | |
| 2000 | Denial of Permission to Relocate Dealership | 532,918 | | | |
| 2000 | Lost Warranty Gross Profit | 82,356 | | | |
| 2000 | Warranty Charge Backs | 2,359 | | | |
| 2000 | Lost LPE money | 8,618 | | | |
| 2000 | Lost Gross on Lost New Vehicle Sales | 29,262 | | | |
| | Subtotal | 655,513 | 7.75% | 25,401 | 83,578 |
| | | | | | |
| 2001 | Denial of Permission to Relocate Dealership | 559,797 | | | |
| 2001 | Lost Warranty Gross Profit | 219,737 | | | |
| 2001 | Warranty Charge Backs | 5,973 | | | |
| 2001 | Lost Gross on Lost New Vehicle Sales | 17,909 | | | |
| | Subtotal | 803,416 | 3.75% | 15,064 | 72,307 |
| | | | | | |
| 2002 | Denial of Permission to Relocate Dealership | 552,238 | | | |
| 2002 | Lost Warranty Gross Profit | 116,238 | | | |
| 2002 | Lost Gross on Lost New Vehicle Sales | 2,202 | | | |
| | Subtotal | 670,678 | 3.00% | 10,060 | 40,241 |
| | | | | | |
| 2003 | Denial of Permission to Relocate Dealership | 542,306 | | | |
| 2003 | Lost Warranty Gross Profit | 82,975 | | | |
| | Subtotal | 625,281 | 3.00% | 9,379 | 18,758 |
| | | | | | |
| 2004 | Denial of Permission to Relocate Dealership | 537,274 | | | |
| 2004 | Lost Warranty Gross Profit | 68,643 | | | |
| | Subtotal | 605,917 | 3.00% | 9,089 | |
| | | | | | |
| | Grand Total | | | 88,538 | 361,631 |

**Eastside Lincoln Mercury**
**Damage Calculation**

**Exhibit 18**

**Comparison of Operating Results and Blue Sky Value**

| Operating Loss | Per Dealer Financial Statements | | | Date Purchased | Blue Sky Paid by |
| --- | --- | --- | --- | --- | --- |
| | 1998 | 1999 | 2000 | By Ford | Ford |
| Dixon Lincoln Mercury | 24,833 | (307,015) | Closed | Dec-99 | 1,600,000 |
| Wyler/Stillpass Lincoln Mercury  **Note 1** | (193,979) | (377,245) | (446,607) | Sep-00 | 903,800 |

| Eastside Lincoln Mercury | | | |
| --- | --- | --- | --- |
| As Originally reported | 50,246 | (209,215) | (290,339) |
| Damages incurred | 0 | 715,839 | 655,513 |
| Interest savings on damages | | 28,634 | 80,879 |
| Restated profits before damages | 50,246 | 506,624 | 365,174 |

**Note 1** - Combined results of Wyler\Stillpass January 1, 2000 through September 30, 2000

**Eastside Lincoln Mercury**
**Damage Calculation**

**Exhibit 19**

**Pro Forma Eastside Financial Statements After Adjustment for Damages**

|  | 1999 | 2000 | Combined | Two Year Average |
|---|---|---|---|---|
| As originally reported on the dealer financials | (209,215) | (290,339) | (499,554) |  |
| Adjust for |  |  |  |  |
| 1999 Damages and interest savings | 744,473 | 0 | 744,473 |  |
| 2000 Damages and interest savings | 0 | 736,393 | 736,393 |  |
| Revised Operating Results- pretax | 535,258 | 446,054 | 981,311 | 490,656 |
| Typical multiple of eanings paid for blue sky |  |  |  | 3 |
| Typical value of Blue Sky when willing buyer and seller exist |  |  |  | 1,471,967 |

**Eastside Lincoln Mercury**
**Damage Calculation**

**Exhibit 20**

**Eastside Blue Sky Value to Kenwood Dealer Group**

| | |
|---|---|
| Probable Increase in gross profit per vehicle for KDG if Eastside was not in business or was owned by KDG | 400 |
| Expected new vehicles sold per year by KDG and Eastside | 1,600 |
| Probable increase in gross profit to KDG | 640,000 |
| Estimated variable selling expenses at 25% of gross | (160,000) |
| Retained gross profit | 480,000 |
| Multiple to apply to incremental gross profit | 4 |
| Blue sky value to KDG of Eastisde going out of business | 1,920,000 |

| Gross Profit per new Car sold | Eastside | Kings | Northgate | Fairfield | |
|---|---|---|---|---|---|
| 1999 | 1150 | 1432 | 1330 | 1323 | |
| 2000 | 1102 | 1474 | 1296 | 1333 | |
| 2001 | 957 | 1395 | 1282 | 1216 | |
| 2002 | 706 | 1542 | 1383 | 1370 | |
| 2003 | 989 | | | | |
| 2004 | 442 | | | | |

| New Cars Sold | Eastside | Kings | Northgate | Fairfield | KDG Totals |
|---|---|---|---|---|---|
| 1999 | 451 | 1,140 | 583 | 549 | 2,272 |
| 2000 | 376 | 920 | 527 | 467 | 1,914 |
| 2001 | 325 | 848 | 476 | 358 | 1,682 |
| 2002 | 286 | 749 | 331 | 364 | 1,444 |
| 2003 | 319 | 592 | 298 | 322 | 1,212 |
| 2004 Estimated | 236 | 538 | 290 | 313 | 1,141 |

**Eastside Lincoln Mercury**
**Damage Calculation**

**Exhibit 21**

**Ford Money Paid to Reichert/ Kenwood Dealer Group and Not Made Available to Eastside**

| Stated Purpose | Amount |
|---|---|
| Fairfield Assistance with purchase of Dixon | 183,000 |
| Wyler Units - Kings | 8,000 |
| Wyler Units - Fairfield | 2,500 |
| Gentry sales trip | 10,000 |
| Fairfield Co-op Advertising | 25,000 |
| Fairfield Grand Opening | 20,000 |
| Fairfield LM Co-op Advertising | 2,250 |
| Kings Co-op - Cougar | 3,150 |
| Kings Co-op Selldown assistance | 12,600 |
| Kings LM | 17,000 |
| Kings Auto mall Co-op Advertising | 36,750 |
| Northgate Co-op Advertising | 21,000 |
| Grand total | 341,250 |